**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Case No. 18-_____ (__) |
|  | ) |
| AVANTI COMMUNICATIONS GROUP PLC, [1] | ) Chapter 15 |
|  | ) |
| Debtor in a Foreign Proceeding. | ) |
|  | ) |

### DECLARATION OF PATRICK WILLCOCKS IN SUPPORT OF VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF

I, PATRICK WILLCOCKS, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States as follows:

1.     I am the General Counsel and Secretary of Avanti Communications Group plc (the "Debtor").  I joined the Debtor in 2009 and am responsible for all legal, company secretarial and compliance matters.  Prior to joining the Debtor, I was a senior attorney at Electronic Data Systems Limited.  After graduating with degrees in law and business studies, I began my early career as an investment banker, and have significant experience as a lawyer and in management working in the satellite industry.

2.     I have been actively involved in the Debtor's proposed restructuring (the "Restructuring") that will be effectuated pursuant to, among other things, a scheme of arrangement (the "Scheme") if such Scheme is duly approved by the Scheme Creditors (as defined below) and sanctioned by the English Court in the English Proceeding (as described in

---

[1]     Avanti Communications Group plc is the Debtor in this chapter 15 case (the "Chapter 15 Case") and the identifying four digits of the tax identification number of such Debtor are: Avanti Communications Group plc (0137). The location of the Debtor's corporate headquarters and registered office is Cobham House, 20 Black Friars Lane, London, EC4V 6EB, United Kingdom.  The Debtor's company registration number is 06133927.

paragraphs 16-18 below), all in accordance with applicable English law. Accordingly, I have knowledge of the matters described herein.

3.      On February 14, 2018, I was duly appointed foreign representative pursuant to a resolution (the "Resolution of Appointment") of the Debtor's board of directors. The Resolution of Appointment is attached hereto as Exhibit A. On February 19, 2018, the English Court entered an order (the "Convening Order"), a copy of which is attached hereto as Exhibit B, authorizing the Debtor to, among other things: (i) convene a meeting of the Scheme Creditors for the purpose of voting on the Scheme (the "Scheme Meeting") to be held at 10:00 a.m. (London time) on March 20, 2018, at the London offices of Milbank, Tweed, Hadley & McCloy LLP ("Milbank"); and (ii) distribute an explanatory statement (the "Explanatory Statement"), a copy of which is attached hereto as Exhibit C, to all Scheme Creditors. The Convening Order also authorized me to act as the foreign representative of the Debtor in respect of this Chapter 15 Case.

4.      I am authorized by the Debtor to submit this declaration (the "Declaration") on its behalf in support of the: (i) *Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* (the "Verified Petition" [Dkt. No. 2], and together with the Voluntary Chapter 15 Petition [Dkt. No. 1], filed contemporaneously herewith, the "Petition"), and (ii) *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002(m), 2002(q), 9006(c)(1) and 9007 for an Order Scheduling a Hearing on Recognition of Foreign Main Proceeding and Specifying Form and Manner of Service of Notice* [Dkt. No. 3] (the "Application").[2]

---

[2]      Except as otherwise indicated, capitalized terms used herein shall have the meaning ascribed to them in the Verified Petition.

5.      I am an individual over the age of 18 and have knowledge of the matters described herein.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other professionals and members of the Debtor's management, or learned from my review of the relevant documents or upon my opinion based upon my experience and knowledge of the Debtor's industry, operations and financial condition.  If called upon, I could testify to all matters set forth in this Declaration.

6.      In this Declaration, I provide a description of the following: (a) the Debtor's business; (b) its current capital structure; (c) its restructuring negotiations and the Restructuring Agreement (as defined below) that it has entered into with certain of its creditors; and (d) a description of the Restructuring and Scheme (as both are defined below) and their implementation.  Thereafter, I also summarize the English Proceeding relating to the Scheme underway in the English Court with respect to the Debtor.

A.      **Overview of the Debtor's Business**

7.      The Debtor is a public limited company incorporated under the laws of England and Wales, with subsidiaries incorporated in England, Isle of Man, Germany, Sweden, Turkey, Cyprus, Kenya, Nigeria, Tanzania and South Africa.  The Debtor's shares are admitted to trading on the Alternative Investment Market (AIM) of the London Stock Exchange.  The Debtor's headquarters and primary place of business are in London, England.

8.      The Debtor is a satellite operator providing fixed satellite services in Europe, the Middle East and Africa through its fleet of Ka-band satellites.[3]  The Debtor's satellite fleet is positioned in orbital slots that are recorded in the International Telecoms Union Master

---

[3]      Ka-band systems have higher frequency ranges and significantly higher spectral efficiency than satellite systems operating in other bands, such as Ku-band and C-band, allowing larger data carrying capacity at comparatively lower cost.

International Frequency Register.  The Debtor sells satellite data communications services on a wholesale basis to a range of service providers who supply four key end markets:  broadband, government, enterprise and backhaul.  The Debtor's current fleet consists of two Ka-band satellites, HYLAS 1 and HYLAS 2, which have been commercially operational since April 2011 and November 2012.  A further satellite, Artemis, a multiband satellite acquired from the European Space Agency (ESA) on December 31, 2013, was successfully re-orbited in November 2017.  The Debtor also has leased a steerable Ka-band beam, HYLAS 2-B, under an indefeasible right of use agreement entered into in June 2015 with another satellite operator, and also has a payload, HYLAS 3, under construction which will be deployed on the ESA's EDRS-C satellite. HYLAS 3 is currently under construction and continues to experience delays.  It is now expected to launch in the first three months of 2019 (although this date is subject to further change).[4]  As of June 30, 2017, the Debtor had incurred approximately $49.5 million in connection with the construction and launch of HYLAS 3 and expects to incur an additional $37.5 million.

9.       The Debtor's HYLAS 4 satellite, which will complete its coverage of Europe, the Middle East and Africa, has now been constructed after experiencing some delays in the factory and, in February 2017, was successfully delivered to its launch site in Kourou in French Guyana. Construction on HYLAS 4 commenced in August 2014 and is scheduled to launch in mid-March 2018, with the target of being in orbital position ready for service in July 2018 with sufficient fuel to support the satellite for up to 19 years in orbit.  HYLAS 4 is expected to generate revenue from July 2018, largely within the existing fixed cost base, and to have a strong positive effect on the Debtor's business as it completes EMEA coverage and greatly increases the amount of

---

[4]       The Debtor anticipates that its HYLAS 3 and HYLAS 4 satellites, which are currently under construction, will primarily address high-growth markets in Africa and the Middle East, where terrestrial-based communications infrastructure is generally less developed and often not economically viable to develop, as well as providing back-up and growth capacity over Europe.

capacity available in mature markets in Western Europe and new markets in Africa. The efficient procurement of HYLAS 4 will bring the overall fleet cost per MHz down significantly, mitigating some of the effects of falling global prices for satellite bandwidth. The Debtor is in discussions with a number of current and new distributors to sign up master partnership distribution agreements to market this new capacity, which is largely over sub-Saharan Africa countries. As of June 30, 2017, the Debtor had incurred approximately $237.4 million in connection with the construction, launch and insurance of HYLAS 4 and expected to incur an additional $121.8 million in costs through launch and in-orbit testing.

**B.** **The Debtor's Current Capital Structure**

10. As of December 31, 2017, the Debtor's capital structure was composed of the following material agreements:

   a. Super Senior Facility Agreement. The Debtor is the borrower under a super senior term loan facility agreement (the "Super Senior Facility Agreement"), maturing in 2020 (the "Super Senior Facility") with approximately $118 million currently outstanding.[5]

   b. 2021 Notes. The Debtor issued its 10%/15% Senior Secured Notes due 2021 (the "2021 Notes") pursuant to an Indenture, dated as of January 26, 2017, as amended from time to time among, inter alios, the Debtor, certain subsidiaries of the Debtor, as guarantors, The Bank of New York Mellon, London Branch, as trustee (the "2021 Trustee") and primary security agent and Wilmington Trust (London) Limited, as secondary security agent (as amended, the "2021 Indenture"). Approximately $323.3 million in aggregate principal amount of the 2021 Notes are outstanding.

   c. 2023 Notes. The Debtor issued its 12%/17.5% Senior Secured Notes due 2023 (the "2023 Notes" and together with the 2021 Notes, the "Notes") pursuant to an Indenture, dated as of October 3, 2013, as amended from time to time, among, inter alios, the Debtor, certain subsidiaries of the Debtor, as guarantors, The Bank of New York Mellon, London Branch, as trustee (the "2023 Trustee") and primary security agent and Wilmington Trust (London) Limited, as secondary security agent (as so amended, the "2023 Indenture" and together with the 2021 Indenture,

---

[5]   The Super Senior Facility Agreement is subject to English law and subject to the exclusive jurisdiction of the English Courts.

the "Indentures").   Approximately $557 million in aggregate principal amount of the 2023 Notes are outstanding.

     d.    **Intercreditor Agreement.** The Notes and the Super Senior Facility Agreement are subject to an intercreditor agreement, dated January 26, 2017, as amended from time to time, and entered into by, amongst others, the Debtor, The Bank of New York Mellon, London Branch as trustee and primary security agent and Wilmington Trust (London) Limited as secondary security agent under the Indentures and the subsidiaries of the Debtor as original debtors named therein (the "Intercreditor Agreement"). Pursuant to the Intercreditor Agreement, lenders to the Super Senior Facility Agreement rank pari passu amongst themselves and above both the holders of the 2021 Notes (the "2021 Notes Creditors") and the holders of the 2023 Notes (the "Scheme Creditors").   The 2021 Notes Creditors rank pari passu amongst themselves and above the Scheme Creditors, and the Scheme Creditors rank pari passu amongst themselves.

    11.    As of December 31, 2017, the Debtor had approximately $68.0 million of cash and cash equivalents.

## C.   **Restructuring Negotiations and the Restructuring Agreement**

    12.    Due to delays associated with the manufacture, procurement and launch of two of its satellites, Avanti has experienced financial difficulties and finds itself with a materially over-leveraged capital structure.   As a result, the Debtor entered into preliminary discussions with the Ad Hoc Group regarding a proposed comprehensive restructuring of its indebtedness that would create a sustainable long-term capital structure from which to further develop its business.   On December 13, 2017 and thereafter, the Debtor and certain members of the Ad Hoc Group and other holders of the Notes (together, the "Consenting Creditors") have become party to a restructuring agreement (the "Restructuring Agreement"),[6] pursuant to which the parties agreed to implement the Restructuring comprised primarily of the 2023 Notes Equitization and the 2021 Notes Amendments.

---

[6]    A copy of the Restructuring Agreement is attached to the Willcocks Declaration as Exhibit D.

D.    **Description of the Scheme**

13.    <u>2023 Notes Equitization</u>.  Pursuant to the terms of the Scheme, all of the Debtor's

outstanding 2023 Notes will be exchanged (the "<u>Exchange</u>") for 92.5% of the Debtor's then

enlarged issued share capital (the "<u>Exchange Shares</u>"). The Exchange Shares will be allocated

and issued to the Scheme Creditors on a pro rata basis based on the principal amount of 2023

Notes held by each Scheme Creditor as at the Record Time.[7]  Following the Exchange, the 2023

Notes will be cancelled in their entirety and cease to exist, together with all accrued unpaid

interest relating to the 2023 Notes.  Consummation of the 2023 Notes Equitization pursuant to

the Scheme will result in Avanti achieving a deleveraging of approximately $557 million in

aggregate principal amount of the 2023 Notes and savings of approximately $81 million in

interest expense savings per year.

14.    <u>Releases</u>.  Pursuant to the Scheme, the Scheme Creditors will grant the Releases,

including the Guarantor Releases.  The Releases themselves include releases of any claim or

liability, whether present or future, known or unknown, prospective or contingent, against the

Debtor arising directly or indirectly out of, from or in connection with, the 2023 Notes and the

2023 Indenture, including in respect of any accrued but unpaid interest, other than any claim or

liability arising after the date upon which all of the conditions precedent to the Restructuring

become effective (the "<u>Restructuring Effective Date</u>") and held by a person that is a shareholder

of the Debtor as a result of receiving share allocations pursuant to the Scheme.  The Guarantor

Releases will preclude Scheme Creditors from seeking to recover under guarantees of the 2023

Notes provided by each of the Debtor's subsidiaries.  The Releases and the Guarantor Releases

that the Scheme Creditors will grant under the Scheme are typical of the sort of relief routinely

---

[7]    The Record Time has been designated as 5:00 p.m. New York time on March 12, 2018.

granted in connection with creditor schemes of arrangement similar to the proposed Scheme. See Angel Declaration ¶ 26.

## E.    **Implementation of the Restructuring**

15.    The Debtor previously sought to implement certain aspects of the Restructuring pursuant to the Consent Solicitations.   Among other things, the Consent Solicitations sought consents from the holders of the 2021 Notes and the 2023 Notes (i.e., the Scheme Creditors), as applicable, for the following amendments:

a.    The 2021 Notes Restructuring Amendments. Amend the 2021 Indenture to:

  i.    extend the final maturity date of the 2021 Notes from October 1, 2021 to October 1, 2022;

  ii.    change the interest rate payable on the 2021 Notes from 10% Cash Interest or 15% PIK interest to 9% cash interest or 9% PIK interest for all remaining interest periods commencing October 1, 2017;

  iii.    eliminate the Maintenance of Minimum Consolidated LTM EBITDA covenant contained in Section 4.30 of the 2021 Indenture, which would require testing on the last day of each fiscal quarter commencing March 31, 2018 and ending on March 31, 2020;

  iv.    permit the issuance of up to $30 million of additional Indebtedness which will rank junior to or *pari passu* with the 2021 Notes;

  v.    eliminate the Margin Increase payable on the 2021 Notes if the relevant Minimum Consolidated LTM EBITDA threshold was not met; and

  vi.    permit interest payments on the 2021 Notes for all remaining interest periods commencing October 1, 2017 (but excluding the final interest payment) to be paid as PIK interest if the Debtor does not have sufficient cash to satisfy the applicable interest coupon (collectively, the "2021 Notes Restructuring Amendments");[8]

---

[8]    The 2021 Notes Restructuring Amendments will result in interest expense savings of approximately $11 million per year as a result of the elimination of the Margin Increase and assuming the Debtor pays interest at 9% per annum on the 2021 Notes for all remaining periods up to maturity.

      b.      <u>The Jurisdiction Amendment</u>. Amend the submission to jurisdiction provision of the 2023 Indenture so that each party thereto will submit to the exclusive jurisdiction of English Courts (the "<u>Jurisdiction Amendment</u>") until the Restructuring Agreement is either terminated or no longer in effect; and

      c.      <u>The Consent Solicitation Amendments</u>. Amend and waive certain bankruptcy-related events of default within the Indentures (the "<u>Majority Amendments and Waiver</u>", together with the 2021 Notes Restructuring Amendments and the Jurisdiction Amendment, the "<u>Consent Solicitation Amendments</u>"), to prevent the occurrence of an event of default under the Notes and related automatic acceleration of the Notes from being triggered by the filing of a petition for recognition of the Scheme pursuant to chapter 15 of the U.S. Bankruptcy Code or by any other part of the Restructuring.

16.     The requisite consents for each of the Consent Solicitation Amendments were received on or prior to February 7, 2018, demonstrating significant support for the Restructuring, as holders of the 2021 Notes holding 98.09% of the aggregate principal amount thereof provided their consents, and Scheme Creditors holding 87.73% of the aggregate principal amount of the 2023 Notes provided their consents.

17.     The Debtor executed the various supplemental indentures required to implement the Consent Solicitation Amendments on February 8, 2018 so that consents provided under the Consent Solicitations could not be revoked. The Majority Amendments and Waiver became effective immediately upon execution whereas the Jurisdiction Amendment became effective on February 16, 2018 and the 2021 Notes Restructuring Amendments will become effective conditional on the Restructuring Effective Date, reflecting the interconditional nature of the principal elements of the Restructuring.

18.     The Debtor is seeking to implement the 2023 Notes Equitization pursuant to the Scheme because under the 2023 Indenture such transaction would require unanimous consent, which the Debtor did not consider to be feasible. The Debtor is also asking the Court to recognize and enforce the Releases to ensure it or the guarantors do not become liable for taking

the actions set forth in the Restructuring Agreement and/or the Scheme. To facilitate the effectiveness of the Scheme, the Debtor is hereby seeking recognition of the Scheme and the Releases, including the Guarantor Releases, which are conditions to the effectiveness of the Restructuring.

## F.    The English Proceeding

19.    To effectuate the Scheme, on February 15, 2018, the Debtor applied to the English Court for permission to convene a meeting of its creditors for the purpose of considering and approving the Scheme. The English Court considered that application at the Convening Hearing on February 19, 2018 and issued the Convening Order which, among other things: (i) ordered the convening of the Scheme Meeting of the Scheme Creditors (i.e., holders of the 2023 Notes) on March 20, 2018; (ii) ordered that notice of the Scheme, together with an explanatory statement and proxy forms for voting at the Scheme Meeting, be made available to the Scheme Creditors; and (iii) authorized the appointment of the Foreign Representative to act as a foreign representative in this Chapter 15 Case. See Willcocks Declaration, ¶ 3. As only the Scheme Creditors, comprised of the holders of the 2023 Notes, are affected by the Scheme, the Scheme contains only one voting class.

20.    Shortly following the Convening Hearing, and in accordance with the Convening Order, copies of the following documents were made available to all Scheme Creditors: ( i )  notice convening the Scheme Meeting; (ii) terms of the Scheme; (iii) an account holder letter, including a voting form for the Scheme Creditors (including guidance notes for the completing the voting form); and (iv) the Explanatory Statement (collectively, the "Notes Restructuring Documents"), at https://sites.dfkingltd.com/avanti (the "Scheme Website") maintained by D.F. King (the "Information and Tabulation Agent"). The Notes Restructuring Documents were posted on the Scheme Website and the Information and

10

Tabulation Agent also sent a notice via email directing the Scheme Creditors to the Scheme Website to each DTC Participant of which the Information and Tabulation Agent is aware.

21.    Following the Scheme Meeting, and upon receiving the necessary votes in favor of the Scheme from the Scheme Creditors, the English Court will conduct the Sanction Hearing.

## REQUESTS FOR RECOGNITION AND RELATED RELIEF

22.    In connection with the filing of this Chapter 15 Case, the Debtor submitted the Petition.  In addition to the facts set forth above, I believe, after consultation with counsel, that the relief requested in the Petition is necessary to maximize value for all of the Debtor's creditors as the Scheme is integral element of the Debtor's Restructuring, and necessary to protect the Debtor, its creditors and other stakeholders.

23.    As explained in the Petition, the relief requested therein is necessary to: (a) ensure that all of the Scheme Creditors affected by the Scheme are treated consistently, regardless of whether they are located in the United Kingdom or the United States, (b) protect the Debtor from any lawsuits in the United States from those who are bound by, and benefit from, the terms of the Scheme, and (c) minimize the risk of other claims that might be alleged under the 2023 Indenture.

24.    The Debtor has property in the United States and, specifically, in this jurisdiction. Milbank, as counsel to the Foreign Representative and counsel for the Debtor, holds $100,000 in a non-interest bearing client trust account located with JPMorgan Chase in New York (the "Retainer Account").  The funds remain in the Retainer Account as of the date hereof and are the Debtor's property (subject to Milbank's rights under its engagement letter).

25.    In addition, the 2023 Indenture is governed by New York law.  I am advised by counsel that, under relevant law, the Debtor's rights under these instruments constitute interests in property located within the United States.

26.    To the best of my knowledge and belief, the English Proceeding: (a) constitutes a "foreign main proceeding" within the meaning of 11 U.S.C. § 1502(4), as the Debtor is headquartered in London, United Kingdom, which is its center of main interests, and (b) is a judicial proceeding in the United Kingdom under English law relating to insolvency or the adjustment of debt in which the assets and affairs of the Debtor is subject to control and supervision of the English Court for the purpose of recapitalization or liquidation.  Accordingly, I believe the English Proceeding constitutes a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

27.    Finally, as described in the Petition and as discussed with counsel, I understand and believe that recognizing the English Proceeding as a foreign main proceeding and granting the relief requested therein on a final basis is consistent with the purposes of chapter 15 of the Bankruptcy Code and public policy of the United States.  Therefore, I believe that the relief requested in the Petition is necessary and appropriate and in the best interests of the Debtor, its creditors and other parties in interest.

## SECTION 1515(c) STATEMENT

28.    I am informed by counsel that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

29.    In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that, to my knowledge, the only foreign proceedings (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to the Debtor is the English Proceeding.

## LIST PURSUANT TO BANKRUPTCY RULE 1007(A)(4)

30.    I am informed that Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that a foreign representative filing a petition for recognition under chapter 15 of the Bankruptcy Code shall file with the petition:

> (A) a corporate ownership statement containing the information described in [Bankruptcy] Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the [Bankruptcy] Code.

In accordance with Bankruptcy Rule 1007(a)(4), I hereby provide the following information:

a)    Corporate Ownership Statement: In accordance with Bankruptcy Rule 7007.1, I confirm that no individuals, corporations or other entities directly or indirectly own 10% or more of the Debtor's equity interests as of December 31, 2017, other than M&G Investment Management, Solus Alternative Asset Management L.P. and MAST Capital Management LLC.  Since December 31, 2017, the Debtor has not received any notification otherwise that would lead me to believe that the same is not true as of the date of this Declaration.

b)    Persons or Bodies Authorized to Administer the Foreign Proceeding: On February 14, 2018, I was duly appointed foreign representative pursuant to the Resolution of Appointment of the Debtor's board of directors, and the English Court declared on February 19, 2018, that I am authorized and empowered to act as the foreign representative of the Debtor in respect of any chapter 15 case that may be commenced in the United States.  My contact address is Cobham House, 20 Blackfriars Lane, London EC4V 6EB, United Kingdom.

c)      <u>Pending Litigation</u>: I am currently unaware of any litigation pending in the United States in which the Debtor is a party.  Nor am I aware of any preferences or fraudulent transfers that be subject to avoidance under the relevant provisions of the Bankruptcy Code.

d)      <u>Provisional Relief</u>: I am not seeking provisional relief at this time because I am not aware of any imminent threat to the Debtor's assets located in the United States or to the English Proceeding by virtue of actions in the United States.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information and belief.

Executed on February 21, 2018 in London, England

Patrick Willcocks

**<u>EXHIBIT A</u>**
(Resolution)

**AVANTI COMMUNICATIONS GROUP PLC**

Registered in England and Wales with number 06133927

Minutes of a meeting of the board of directors held by telephone on 14 February 2018 at 3:00 p.m. (UK time).

| PRESENT: | NAME | POSITION |
|---|---|---|
| | Mr David Bestwick | Executive Director |
| | Mr Nigel Fox | Group Financial Director |
| | Mr Patrick Willcocks | General Counsel and Group Company Secretary |

1. **CHAIRMAN**

   Mr Fox chaired the meeting.

2. **NOTICE AND QUORUM**

   It was noted that due notice of the meeting had been given to those persons entitled to receive notice and that a quorum was present.

3. **DIRECTORS' INTERESTS**

3.1   Each director present declared the nature and extent of his or her interest in the business to be transacted at the meeting in accordance with the requirements of section 177 of the Companies Act 2006 (the "**Act**") and Article 121.2 of the company's articles of association, as follows:

| Name | Nature and Extent of Interest |
|------|-------------------------------|
| David Bestwick | Director of each of the following companies each of which is a wholly owned subsidiary of the Company: Avanti Broadband Limited, Avanti Communications Limited, Avanti Space Limited, Avanti Communications Marketing Services Limited, Avanti HYLAS 2 Limited, Avanti Communications Infrastructure Limited, Avanti Space Limited, Avanti Broadband (Ire) Limited, Avanti Communications Africa Infrastructure Limited, Avanti Communications Africa Infrastructure 1 Limited, Avanti Communications Africa Infrastructure 2 Limited, Avanti Local TV Services Limited, Avanti Space 3 Limited, Avanti Communications Kenya Limited, Avanti Communications Sweden AB, Avanti Communications Tanzania Limited, Avanti HYLAS 2 Cyprus Limited, Avanti Communications South Africa (Pty) Ltd, Avanti Satellite Communications Services |
| Nigel Fox | Director of each of the following companies each of which is a wholly owned subsidiary of the Company: Avanti Broadband Limited, Avanti Communications Limited, Avanti Space Limited, Avanti Communications Marketing Services Limited, Avanti HYLAS 2 Limited, Avanti Communications Infrastructure Limited, Avanti Space Limited, Avanti Broadband (Ire) Limited, Avanti Communications Africa Infrastructure Limited, Avanti Communications Africa Infrastructure 1 Limited, Avanti Communications Africa Infrastructure 2 Limited, Avanti Local TV Services Limited, Avanti Space 3 Limited, Avanti Communications Kenya Limited, Avanti Communications Sweden AB, Avanti Communications Tanzania Limited, Avanti HYLAS 2 Cyprus Limited, Avanti Communications South Africa (Pty) Ltd, Avanti HYLAS 2 Launch Services Limited, Avanti Hylas Services Limited, Avanti Launch Services Limited, Avanti Satellite Communications Services Limited. |

## 4. BACKGROUND AND PURPOSE OF THE MEETING

### IT WAS NOTED THAT:

4.1 Unless otherwise indicated, capitalised terms used herein shall have the meaning given to them in the draft explanatory statement in relation to the proposed scheme of arrangement under Part 26 of the Act between the Company and the Scheme Creditors (the "**Explanatory Statement**").

4.2 The meeting had been convened in order to consider and, if thought fit, approve the transactions and actions contemplated by or in connection with the Scheme and, if thought fit, authorise one or more persons to take actions necessary to the implementation of the Scheme, as set out in further detail below.

4.3    Further to the board meeting held on 1 February 2018 approving the terms of and entry into various indentures in respect of the 2021 Notes Restructuring Amendments, the Jurisdiction Amendments and the Majority Amendments and Waiver:

  (i)    having received the necessary consents from the 2021 Notes Creditors, the elements of the Scheme regarding the 2021 Notes Restructuring Amendments were no longer required and could be withdrawn;

  (ii)   the Jurisdiction Amendments in respect of the 2023 Notes and the Majority Amendments and Waiver in respect of both the 2021 Notes and the 2023 Notes would be operative prior to the Convening Hearing (defined below) in respect of the Scheme in order to facilitate this aspect of the Restructuring.

4.4    The Company intends to apply to the High Court at a hearing scheduled for 19 February 2018 (the "**Convening Hearing**") seeking an order, among other things, permitting the Company to:

  (i)    convene the Scheme Meeting so that the Scheme Creditors can consider and vote on the Scheme; and

  (ii)   make the Explanatory Statement available to all Scheme Creditors with at least 28 clear days' notice prior to the day appointed for the Scheme Meeting so that the Scheme Creditors can read and fully consider the proposed terms of the Scheme and its implications ahead of the Scheme Meeting (the "**Application**").

4.5    In addition to the Convening Hearing, the proposed dates for the remaining key events for the Scheme process were as follows (subject to court availability and/or such order as the Court thinks fit):

| 1. | Scheme Meeting | 20 March 2018 |
|----|----------------|---------------|
| 2. | Scheme Sanction Hearing | 26 March 2018 |
| 3. | Chapter 15 Recognition Hearing | 27 March 2018 |
| 4. | Scheme Settlement Date | 5 April 2018 |

4.6    The meeting had been convened in order to decide whether the Company should:

  (i)    authorise Nigel Fox to make a witness statement on behalf of the Company in support of the Application; and

  (ii)   appoint Patrick Willcocks, or any other person, to serve as its foreign representative in any proceedings under Chapter 15 of the United States Bankruptcy Code in relation to the Scheme.

5.    **DOCUMENTS CONSIDERED AT OR BEFORE THE MEETING**

5.1    The following documents had been sent to the Directors before the meeting and/or were considered by them at the meeting:

    (i)    witness statement of Nigel Fox on behalf of the Company in support of the Application (the "**Witness Statement**"); and

    (ii)    the Explanatory Statement and all documents appended thereto, which is in substantially final form to be presented to the Court and made available to the Scheme Creditors.

6.    **RESOLUTIONS**

Following due consideration, including consideration of the matters referred to in section 172(1) of the Companies Act 2006 and the Directors' obligations under section 214 of the Insolvency Act 1986 **IT WAS RESOLVED** that:

6.1    the Witness Statement and Explanatory Statement (or with any amendments or modifications approved by, in the case of the Witness Statement, Nigel Fox and, in the case of the Explanatory Statement, a director, authorised signatory or attorney in his/her sole discretion, such approval to be conclusively evidenced by such person's execution of such document or written confirmation of such amendment or modification) are hereby approved and Nigel Fox is hereby authorised to execute the Witness Statement;

6.2    Patrick Willcocks be and is hereby appointed to serve as foreign representative in any proceedings under Chapter 15 of the United States Bankruptcy Code,

6.3    unless otherwise provided, any director or any other person authorised by the Board or an attorney appointed by the Company for the purpose of or in connection with the Scheme and its implementation be and are hereby severally authorised on behalf of the Company to execute any and all other documents, agreements, instruments, certificates, notices, requests, powers of attorney and confirmations that may be required or desirable in connection with or under the terms of the Scheme (the "**Documents**", which term shall include the Witness Statement)to be signed and/or despatched by it under or in connection with the Scheme to which it is a party and which is approved, in the sole discretion, of the person so authorised and executing each such other agreement or document, the approval of each such person in any such case to be conclusively evidenced by their signing such document in connection with the Scheme;

6.4    the signature of any director may, but need not, be a facsimile or electronic signature imprinted or otherwise reproduced on the Documents, and for that purpose the Company hereby adopts as binding upon it the facsimile signature of any present or future Director, notwithstanding the fact that at the time the Documents shall be executed, authenticated or delivered or disposed of such person shall have ceased to be a Director of the Company and that, in case any Director of the Company whose facsimile signature shall appear on the Documents shall cease to hold such office before the Documents have been executed, authenticated and delivered or disposed of by the Company, such Documents nevertheless may be executed, authenticated and delivered or disposed of and such Documents shall be valid as though such person had not ceased

to hold such position with the Company; and that any such Documents as shall have been so executed authenticated, delivered or disposed of are hereby adopted by the Company as its binding obligations; and

6.5    any one director, either singly or with another director, or any other person authorised by the Board or an attorney appointed by the Company for such purpose be and is hereby authorised on behalf of the Company to execute and do all such deeds, documents and things as he/she may consider to be expedient, necessary or desirable in connection with the Scheme.

## 7.   FILINGS

**IT WAS RESOLVED** that the company secretary of the company be instructed to make the appropriate entries in the statutory books of the company, to file or assist in filing any documents required to be registered with the Registrar of Companies or the Financial Conduct Authority.

## 8.   OTHER BUSINESS

There being no other business, the chairman declared the meeting closed.

…………………………………………

**Chairman**

**<u>EXHIBIT B</u>**
(Convening Order)

**IN THE HIGH COURT OF JUSTICE**            **Claim No. CR-2018-001278**

**CHANCERY DIVISION**

**COMPANIES COURT**

**THE HONOURABLE MR JUSTICE BIRSS**

**19 February 2018**

**IN THE MATTER OF**

**AVANTI COMMUNICATIONS GROUP PLC**

**AND**

**THE COMPANIES ACT 2006**



---

**CONVENING ORDER**

---

**UPON THE APPLICATION OF** Avanti Communications Group Plc (the "**Company**") by a Part 8 Claim Form dated 14 February 2018 (the "**Application**")

**AND UPON HEARING** William Trower QC and Adam Al-Attar for the Company

**AND UPON READING** the Part 8 Claim Form and the Witness Statement of Nigel Fox and the exhibits thereto

**AND UPON READING** the proposed scheme of arrangement (the "**Scheme**") and the proposed explanatory statement in relation thereto pursuant to section 897 of the Companies Act 2006 (the "**Explanatory Statement**")

**AND UPON** the Court adopting in this Order, save where terms are otherwise expressly defined, the abbreviations, words and phrases contained in the Explanatory Statement and the Scheme

**IT IS ORDERED** that:

1.  The Company be at liberty to convene a meeting of the Scheme Creditors (the "**Scheme Meeting**") for the purpose of considering and, if thought fit, approving (with or without modification) the scheme of arrangement (the "**Scheme**") pursuant to Part 26 of the Act proposed to be made between the Company and the Scheme Creditors.

2.  The Scheme Meeting shall be held at 10.00 a.m. London time on 20 March 2018 (or such other time or date as the Company may decide) at the offices of Milbank, Tweed, Hadley & McCloy LLP, 10 Gresham Street, London, EC2V 7JD (or if such venue is not available, such other suitable venue in central London as the directors of the Company may select).

3.  Nigel Fox or, if for any reason he is unable to act, Nick Angel, be appointed to act as chairman of the Scheme Meeting (and any adjournment thereof) (the "**Chairman**") and be directed to report the result of the Scheme Meeting to the Court.

4.  The Chairman shall first give an introductory address outlining the main terms of the Scheme proposed in respect of the Company, the method of voting at the Scheme Meeting and any other appropriate matters, following which the Chairman shall open the Scheme Meeting for the purpose of allowing Scheme Creditors to vote on the Scheme. Following the taking of the vote in the Scheme Meeting, the Chairman shall conclude the Scheme Meeting, give a closing address and close the Scheme Meeting.

5.  At least 28 clear days before the day appointed for the Scheme Meeting, copies of the following documents will be made available to all Scheme Creditors:

    (a)   the Explanatory Statement in accordance with section 897 of the Act;

    (b)   the terms of the Scheme;

    (c)   a notice convening the Scheme Meeting (the "**Notice**"); and

    (d)   an account holder letter, including guidance notes for the completion thereof,

    (together, the "**Scheme Documents**"), in each case, in substantially the form as initialled by Mr Justice Birss on the date of this order subject to completion of blanks, correction of typographical errors and such minor or immaterial modifications as Milbank may advise. The Scheme Documents shall be made available to Scheme Creditors by sending such documents and a notice directing Scheme Creditors to the Scheme Website (https://sites.dfkingltd.com/avanti) maintained by D.F. King (the "**Information and Tabulation Agent**"). The documents will also be posted on the Scheme Website and the Information and Tabulation Agent will email the notice directing Scheme Creditors to the Scheme Website to each DTC Participant the Information and Tabulation Agent is aware of.

6.  Until the date of the Scheme Meeting, hard copies of the Scheme Documents shall also be made available free of charge to any of the Scheme Creditors upon request to Milbank (reference Avanti, +44 207 615 3000, avanti@milbank.com).

7.  Unless the Court orders otherwise, the accidental omission to serve any Scheme Creditor with notice of the Scheme Meeting or the non-receipt of notice of the Scheme Meeting by any Scheme Creditor shall not invalidate the proceedings at the Scheme Meeting.

8.  In order to vote on the Scheme by proxy, Scheme Creditors are requested to liaise with their Account Holder to ensure that a validly completed Account Holder Letter is delivered to the Information and Tabulation Agent in accordance with the terms set out therein as soon as possible after the Record Time (being 5.00 p.m. New York time on 12

March 2018) and in any event to be received no later than the Voting Submission Deadline (being 5.00 p.m. New York time on 16 March 2018).

9.   If the Scheme Creditor or its representative is attending the Scheme Meeting to vote in person, it must either hand in a validly completed Account Holder Letter at the registration desk prior to the commencement of the Scheme Meeting, or otherwise provide satisfactory evidence to the Chairman and Information and Tabulation Agent at or in advance of the Scheme Meeting of (a) the principal amount of 2023 Notes held by that Scheme Creditor at the Record Time; (b) the Scheme Creditor's entitlement to vote; and (c) the Scheme Creditor's representative's identity and authority to represent the Scheme Creditor at the Scheme Meeting.

10.  The Chairman be at liberty for any reason and without the consent of the Scheme Creditors to adjourn the Scheme Meeting from time to time to the same or another place in London, and to such date and time, by notice to the Scheme Creditors in the same manner as notice was given to them of the information referred to in paragraph 5.

11.  The Chairman be entitled to rely on the signatures on the Account Holder Letters as a warranty that the signatory has been duly authorised by the relevant Scheme Creditor to sign the Account Holder Letter on behalf of that Scheme Creditor.

12.  The Chairman be at liberty to accept an otherwise incomplete or late Account Holder Letter at his discretion after the Voting Submission Deadline, provided that any such Account Holder Letter is received before he closes the relevant Scheme Meeting.

13.  Any person appointed as proxy for a Scheme Creditor may attend and speak at the Scheme Meeting.

14.  If a Scheme Creditor attends the Scheme Meeting to vote in person after having nominated a proxy in its Account Holder Letter to vote on its behalf, the appointment of that Scheme Creditor's proxy will be automatically revoked.

15.  The Voting Value of a Scheme Creditor for voting purposes at the Scheme Meeting shall be based on the principal amount of 2023 Notes held by that Scheme Creditor as at the Record Time (being 5.00 p.m. New York time on 12 March 2018).

16.  The Chairman be at liberty to permit the attendance of persons who are not otherwise entitled to attend and vote at the Scheme Meeting as observers, unless an objection is taken by a Scheme Creditor entitled to attend and vote at the Scheme Meeting, provided that such a person shall not be entitled to speak at the Scheme Meeting without the permission of the Chairman.

17.  The Chairman may, for voting purposes, reject the Voting Value of a Scheme Creditor if he considers that it does not constitute a fair and reasonable assessment of the relevant sums owed to the relevant Scheme Creditor, or if the relevant Scheme Creditor has not complied with the applicable Account Holder Letter procedures or instructions or any undertaking given, including by reference to information confidentially provided to the Company by the relevant Scheme Creditor.

18. The Chairman shall have the discretion to accept the Voting Value in respect of which a Scheme Creditor seeks to vote, in whole or in part, notwithstanding failure by such Scheme Creditor to comply with the requirements contained in the Account Holder Letter, if sufficient information has been provided in the Account Holder Letter or by some other means to enable the Chairman to determine that the Voting Value asserted by the Scheme Creditor is a reasonable assessment of the amounts outstanding to such Scheme Creditor.

19. If a Scheme Creditor's Voting Value is disputed (in part) but the Chairman of the relevant Scheme Meeting is able to establish a minimum Voting Value for that Scheme Creditor, the Chairman will admit that minimum Voting Value.

20. If a scheme claim is disputed in its entirety, that claim will be marked "objected to" and, at the Chairman's discretion, will be permitted to vote.

21. The Chairman be directed to file a report on the Scheme Meeting voting results at least two Business Days prior to the hearing of any application for sanction of the Scheme (assuming the requisite majority is obtained at the Scheme Meeting).

22. Patrick Willcocks, who was appointed by the Board of the Company on 14 February 2018 to serve as foreign representative in any proceedings under chapter 15 of the United States Bankruptcy Code, or if for any reason he is unable to act, such other appropriate person selected by the Board of the Company, is authorised to act as foreign representative in any proceedings under chapter 15 of the United States Bankruptcy Code in relation to the Scheme.

23. The Chairman shall have permission to apply for such further direction in this matter as he may consider necessary or appropriate.

24. The Part 8 Claim Form be adjourned generally with liberty to the Company to restore it.

25. If the Scheme is approved at the Scheme Meeting by the required statutory majority, the Part 8 Claim Form shall be restored and a further Court hearing at which the Claimants shall seek the sanction of the Court for the Scheme shall be listed on or around 26 March 2018.

26. That this Order be served by the Company.

**AND IT IS FURTHER ORDERED** that:

27. There be liberty to apply for such further directions in this matter as may be necessary or appropriate.

Dated:      19 February 2018

**Service of this Order**

The Court has provided a sealed copy of this Order to the serving party:

Milbank, Tweed, Hadley & McCloy LLP, 10 Gresham Street, London, EC2V 7JD
Ref: SS / NA
Tel:  + 44 (0) 20 7615 3000

#4829-9110-2039v10

<u>**IN THE HIGH COURT OF JUSTICE**</u>
<u>**CHANCERY DIVISION**</u>
<u>**COMPANIES COURT**</u>

**Claim No. CR-2018-001278**

**Before the Honourable Mr Justice Birss**

**19 February 2018**

**IN THE MATTER OF AVANTI
COMMUNICATIONS GROUP PLC
AND
THE COMPANIES ACT 2006**

---

**CONVENING ORDER**

---

**Milbank, Tweed, Hadley & McCloy LLP**

10 Gresham Street
London EC2V 7JD

Tel: + 44 (0) 20 7615 3000

Ref:  SS / NJA

**Solicitors for the Company**

#4829-9110-2039v10

**<u>EXHIBIT C</u>**
(Explanatory Statement)

## EXPLANATORY STATEMENT IN RELATION TO A SCHEME OF ARRANGEMENT

### under part 26 of the Companies Act 2006

### between

### AVANTI COMMUNICATIONS GROUP PLC

### and the

### Scheme Creditors

### (as defined in this Explanatory Statement)

### in respect of the
### 12%/17.5% Senior Secured Notes due 2023
(Reg S CUSIP/ISIN: G0713N AH3/USG0713NAH38 and 144A CUSIP/ISIN: 05351L AJ6/US05351LAJ61)
### issued by Avanti Communications Group Plc

### DATE: 19 February 2018

### THIS DOCUMENT IS AN EXPLANATORY STATEMENT IN COMPLIANCE WITH SECTION 897 OF THE COMPANIES ACT 2006 AND IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION

This Explanatory Statement is being sent to persons who are believed to be Scheme Creditors (as defined in this Explanatory Statement) as at the date of this document. If you have assigned, sold or otherwise transferred your holdings of 2023 Notes or any other 2023 Notes Scheme Claims (as defined in this Explanatory Statement) or do so before the Record Time you should forward a copy of this document to the person or persons to whom you have assigned, sold or otherwise transferred those interests.

### THE RECORD TIME FOR THE SCHEME WILL BE 5.00 P.M. NEW YORK TIME ON 12 MARCH 2018.

### ONLY PERSONS THAT HOLD 2023 NOTES ON THE RECORD TIME WILL BE ENTITLED TO VOTE ON, OR RECEIVE CONSIDERATION UNDER, THE SCHEME.

### ANY PERSONS WHO ACQUIRE 2023 NOTES AFTER THE RECORD TIME WILL NOT BE ENTITLED TO VOTE ON THE SCHEME IN RESPECT OF THOSE 2023 NOTES NOR WILL THEY BE ENTITLED TO RECEIVE ANY CONSIDERATION UNDER THE SCHEME (ALTHOUGH THEY MAY BE ENTITLED TO RECEIVE CONSIDERATION FROM THE PERSON THAT HELD THOSE 2023 NOTES AS OF THE RECORD DATE SUBJECT TO THE TERMS OF THEIR TRADE).

If you are in any doubt as to the contents of this document or what action you should take, you are recommended to seek immediately your own independent financial, legal and/or tax advice.

This Explanatory Statement is accompanied by a form of Account Holder Letter at Annex III. It is important that Scheme Creditors read the Account Holder Letter carefully as it contains important information about what Scheme Creditors need to do to participate in the Scheme. Scheme Creditors should ensure that an Account Holder Letter is completed and returned by them or on their behalf in accordance with the instructions contained within it.

Copies of this Explanatory Statement are available from the Information and Tabulation Agent, which can be contacted at avanti@dfkingltd.com and +44 20 7920 9700 and via the Scheme Website (https://sites.dfkingltd.com/avanti).

Unless the context otherwise requires, all capitalised terms used in this Explanatory Statement shall have the meanings set out in PART O of this Explanatory Statement. The annexes to this Explanatory Statement form an integral part of it and, unless expressly stated otherwise, references to this Explanatory Statement shall be construed as references to the Explanatory Statement including the annexes to it.

### THE INFORMATION IN THE EXPLANATORY STATEMENT

This Explanatory Statement has been prepared in connection with a scheme of arrangement under Part 26 of the Companies Act 2006 between the Company and the Scheme Creditors, and has been prepared solely for the purpose of providing information to Scheme Creditors in relation to the Scheme.

This Explanatory Statement, including any other document issued with or appended to it should only be used by Scheme Creditors to make a decision on the Scheme, and should not be used or relied upon by any other person or for any other purpose. Scheme Creditors may not reproduce or distribute this Explanatory Statement, in whole or in part, and may not disclose any of the contents of this Explanatory Statement or use any information herein for any purpose other than considering and/or making a decision in respect of the Scheme except as required by applicable law or regulation. In particular and without limitation, nothing in this Explanatory Statement should be relied on in connection with the purchase or acquisition of any Notes or any other financial instruments or assets of the Company or any other member of the Group.

Nothing contained in this Explanatory Statement shall constitute a warranty, undertaking or guarantee of any kind, express or implied, and nothing contained in this Explanatory Statement shall constitute any admission of any fact or Liability on the part of the Company, or any other member of the Group with respect to any asset to which it or they may be entitled or any Claim against it or them. Without prejudice to the generality of the foregoing, the distribution of this Explanatory Statement and the information contained within it does not evidence to any person, or constitute any admission by the Company or any other member of the Group, that a Liability is owed by it to any person in respect of any Claim (including without limitation any 2023 Notes Scheme Claim) or that any person is or may be a Scheme Creditor. The failure to distribute this Explanatory Statement to any Scheme Creditor shall not constitute an admission by the Company or any other member of the Group that such person is not a Scheme Creditor.

No person has been authorised by the Company or the Information and Tabulation Agent to give any information or make any representations concerning the Scheme (including concerning the Company or any other member of the Group or the Exchange Shares) which is inconsistent with this Explanatory Statement and, if made, such representations may not be relied upon as having been so authorised.

The information contained in this Explanatory Statement has been prepared based upon information available to the Company as at the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that, unless expressly stated otherwise, the information herein is correct as at any time subsequent to the date hereof. Save as otherwise agreed, or as required by applicable law or regulation, the Company has no obligation to update or revise any of the information, forward-looking statements or the conclusions contained herein or to reflect new events or circumstances or to correct any inaccuracies which may become apparent subsequent to the date hereof. To the best of the Company's knowledge, information and belief, the information relating to the Company contained in this Explanatory Statement is in accordance with the facts known to the Company as at the date of this Explanatory Statement and does not omit anything likely to affect the import of such information. The Company has taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary to enable Scheme Creditors and any other person with an interest in the 2023 Notes to make an informed decision about the effect of the Scheme on them.

The Company's financial and legal advisers have not verified that the information contained in this Explanatory Statement is accurate and complete and that it does not omit anything likely to affect the import of such information. None of the Company's financial or legal advisers shall have any responsibility or liability for the information contained in this Explanatory Statement.

In making a decision in respect of the Scheme, each Scheme Creditor must rely on its own examination, analysis and enquiry of the Company and the terms and, if approved, the consequences of the Scheme, including the merits and risks involved.

This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority. Without prejudice to the representations and warranties given by the Company or any other member of the Group or any directors or officers of the Company or any member of the Group elsewhere, to the fullest extent permitted by law, neither the Company nor any other member of the Group nor any directors or officers of the Company or any other member of the Group will have any tortious, contractual or any other liability to any person in connection with the use of this Explanatory Statement and the Company and all other members of the Group do not accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in connection with it, even if the Company or other member of the Group (as applicable) has been advised of the possibility of such damages.

## ELECTRONIC FORM

This Explanatory Statement has been sent to you in electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of transmission and although the Company and the Information and Tabulation Agent have taken

reasonable steps to prevent alteration or corruption of the Explanatory Statement, none of the Company, the other members of the Group, the Information and Tabulation Agent or any person who controls, or is a director, officer, employee or agent of any of the Company, the other members of the Group or the Information and Tabulation Agent, or any affiliate of any such person, accepts any liability or responsibility whatsoever in respect of any differences between the attached Explanatory Statement distributed to you in electronic format, the Explanatory Statement as it may appear on the Scheme Website and any hard-copy version provided to you on request by Milbank, Tweed, Hadley & McCloy, legal advisers to the Company.

## RESTRICTIONS

The distribution of this Explanatory Statement may be restricted by law in certain jurisdictions. The Company does not represent that this Explanatory Statement has been lawfully distributed to any person in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assume any responsibility for such distribution to any recipient.

This Explanatory Statement does not constitute an invitation to participate in the transactions in or from any jurisdiction in or from which, or to or from any person to or from whom, it is unlawful to make such invitation under applicable securities laws.

The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation in certain jurisdictions and persons into whose possession this Explanatory Statement comes are required by the Company and the Information and Tabulation Agent to inform themselves about, and to observe, any such restrictions.

Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

## SUMMARY ONLY

The description of the Scheme contained in this Explanatory Statement is qualified in its entirety by reference to the Scheme itself, the full text of which is set out in Annex I to this Explanatory Statement. Each Scheme Creditor is advised to read and consider carefully the text of the Scheme.

IN THE EVENT OF A CONFLICT BETWEEN THIS EXPLANATORY STATEMENT AND THE SCHEME, THE TERMS OF THE SCHEME SHALL PREVAIL.

## NO PROSPECTUS

This Explanatory Statement is not, and is not required to be, a prospectus within the meaning of Article 5.4 of the Prospectus Directive, or a prospectus equivalent document.

Accordingly, no prospectus will be prepared or published in connection with the distribution of the Exchange Shares pursuant to the Scheme.

## FORWARD-LOOKING STATEMENTS

Nothing in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of the Company and/or any member of the Group except where otherwise specifically stated.

This Explanatory Statement includes forward-looking statements. All statements, other than statements of historical fact, included in this Explanatory Statement regarding the Company's financial condition or future events or prospects are forward-looking statements. The words "aim," "anticipate," "believe," "continue," "estimate," "expect," "future," "help," "intend," "may," "plan," "shall," "should," "will" or the negative or other variations of them, as well as other statements regarding matters that are not historical fact, are or may constitute forward-looking statements. The Company has based these forward-looking statements on management's current view with respect to future events and financial performance. These views reflect the best judgment of the Company's management but involve a number of risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialise, or should underlying assumptions prove incorrect, actual results may differ materially from those predicted in the Company's forward-looking statements and from past results, performance or achievements. All forward-looking statements contained in this Explanatory Statement are qualified in their entirety by this cautionary statement.

All subsequent written or oral forward-looking statements attributable to the Company, or persons acting on its behalf, are expressly qualified in their entirety by the cautionary statements contained throughout this Explanatory Statement. As a result of these risks, uncertainties and assumptions, you should not place undue reliance on these forward-looking statements.

## RISK FACTORS

SCHEME CREDITORS' ATTENTION IS DRAWN TO CERTAIN RISKS ASSOCIATED WITH THE RESTRUCTURING REFERRED TO IN PART K: "RISK FACTORS" OF THIS EXPLANATORY STATEMENT.

## LEGAL, TAX AND FINANCIAL ADVICE

Scheme Creditors and any other person with an interest in the 2023 Notes should not construe the contents of this Explanatory Statement as legal, tax or financial advice.

This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it, and, consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to their own objectives, financial situations and needs. Scheme Creditors are recommended to consult their own professional advisers as to legal, tax, financial or other matters relevant to the action Scheme Creditors should take in relation to the Scheme, or the implications/consequences of those actions.

This Explanatory Statement is issued by the Company to Scheme Creditors in the United Kingdom in reliance on Article 43 of the Financial Promotion Order. This Explanatory Statement is only addressed to Scheme Creditors and no other person should rely on it.

## OTHER JURISDICTIONS

The implications of the Scheme for Scheme Creditors who are residents or citizens of jurisdictions other than the United Kingdom may be affected by the laws of the relevant jurisdictions. Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements. Any person outside the United Kingdom who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

In connection with the implementation of the 2023 Notes Restructuring, the Company intends to seek the Chapter 15 Order. If the U.S. Bankruptcy Court recognises the Scheme, the provisions of the Scheme will be given full force and effect in the United States and Scheme Creditors will be enjoined from commencing or continuing any action or proceeding which is inconsistent with the Scheme.

In connection with the implementation of the 2023 Notes Restructuring, the Company will also seek to comply with the exemption from registration provided by Section 3(a)(10) of the Securities Act.

SCHEME CREDITORS SHOULD CONSULT THEIR OWN PROFESSIONAL ADVISERS WITH RESPECT TO THE MATTERS DESCRIBED IN THIS DOCUMENT, INCLUDING THE LEGAL, FINANCIAL AND TAX CONSEQUENCES OF THE SCHEME IN THEIR PARTICULAR CIRCUMSTANCES.

## STATEMENT REGARDING INFORMATION CONTAINED IN THIS EXPLANATORY STATEMENT

Each Scheme Creditor is responsible for assessing the merits of the Restructuring. In accordance with normal practice, the Notes Trustees, the Custodian, the Security Agents and the Information and Tabulation Agent do not express any opinion as to the merits of the Restructuring to Scheme Creditors in this Explanatory Statement. Accordingly, the Notes Trustees, the Custodian, the Security Agents and the Information and Tabulation Agent urge Scheme Creditors who are in doubt as to the impact of the implementation of the Restructuring (including any tax consequences) to seek their own independent advice. The Notes Trustees, the Custodian, the Security Agents and the Information and Tabulation Agent have not made and will not make any assessment of the merits of the Restructuring or of the impact of the Restructuring on the interests of the relevant Scheme Creditors, either as a class or as individuals. Neither the Notes Trustees nor the Security Agents have been involved in the Restructuring or in formulating the Restructuring and they do not make any representation that all relevant information has been disclosed to Scheme Creditors in this Explanatory Statement.

## ADDITIONAL INFORMATION

The Company has furnished, pursuant to Section 4.03 of the 2023 Notes Indenture, quarterly, semi-annual and annual earnings releases and reports, as well as certain other types of reports specified in Section 4.03(a)(4) of the 2023 Notes Indenture, to The Bank of New York Mellon, London Branch, One Canada Square, London E14 5AL, United Kingdom, as 2023 Notes Trustee under the 2023 Notes Indenture, and (where required pursuant to Section 4.03 of the 2023 Notes Indenture) the Company has posted copies of such releases and reports on its website. The Company's shares are admitted to trading on the AIM Market of the London Stock Exchange and, as a result, the Company has filed copies of the foregoing releases and reports with the London Stock Exchange, which are available for review free of charge at www.londonstockexchange.com.

In addition, if and so long as the 2023 Notes are listed on the Official List of the Irish Stock Exchange and admitted for trading on the Global Exchange Market and the rules of the Irish Stock Exchange so require, copies of the Company's semi-annual and annual reports may be obtained during normal business hours at the offices of the principal paying agent in London, The Bank of New York Mellon, London Branch, One Canada Square, London E14 5AL, United Kingdom.

No information or documents that are included on the Company's website or filed with the London Stock Exchange or the Irish Stock Exchange are or will be incorporated by reference into this Explanatory Statement. To the extent of any inconsistency between this Explanatory Statement and any document, the information in this Explanatory Statement prevails.

Milbank will provide without charge to each person to whom this Explanatory Statement is delivered, upon written or oral request, copies of any or all of the documents described above. Written or telephone requests for such copies should be directed to Milbank at the email address and telephone number set out at the end of this Explanatory Statement. Please be sure to include your complete name and address in your request. If you request any documents, Milbank will mail them to you by email, or, if requested, first class mail, or another equally prompt means, as soon as reasonably practicable after Milbank receives the request. The Information and Tabulation Agent has made copies of the documents described above available on the Scheme Website (https://sites.dfkingltd.com/avanti).

**TABLE OF CONTENTS**

**PART A INTERIM CHIEF EXECUTIVE'S LETTER** ...................................................1

   1.   INTRODUCTION.................................................................................................... 1

   2.   WHAT IS A SCHEME OF ARRANGEMENT?......................................................... 1

   3.   OVERVIEW AND KEY ASPECTS OF THE RESTRUCTURING.............................. 2

   4.   IMPACT OF SCHEME ON SCHEME CREDITORS' INTERESTS............................ 3

   5.   CLASSES OF SCHEME CREDITORS ..................................................................... 3

   6.   CONSENTING CREDITORS AND THE RESTRUCTURING AGREEMENT .............. 4

   7.   JURISDICTION ..................................................................................................... 4

   8.   ALTERNATIVES TO THE RESTRUCTURING........................................................ 5

   9.   RECOMMENDATION............................................................................................. 5

  10.   ACTION TO BE TAKEN ........................................................................................ 5

  11.   DISTRIBUTION OF DOCUMENTS TO SCHEME CREDITORS .............................. 6

  12.   IMPORTANT INFORMATION................................................................................. 6

**PART B KEY SCHEME DATES** ..........................................................................................8

**PART C COMPANY AND THE BACKGROUND TO THE RESTRUCTURING** ....... 10

   1.   OVERVIEW OF AVANTI COMMUNICATIONS GROUP PLC ............................. 10

   2.   2016 SALES PROCESS AND PRIOR RESTRUCTURING ..................................... 11

   3.   THE COMPANY'S CURRENT CAPITAL STRUCTURE......................................... 12

   4.   FINANCIAL CONDITION OF THE GROUP AND RATIONALE FOR THE RESTRUCTURING 12

   5.   RESTRUCTURING NEGOTIATIONS AND THE RESTRUCTURING AGREEMENT.............. 13

   6.   RESTRUCTURING TERMS ................................................................................. 13

   7.   ADDITIONAL CAPITAL RAISE FOLLOWING THE RESTRUCTURING .................................. 17

   8.   ALTERNATIVE TO THE RESTRUCTURING ....................................................... 18

   9.   INSOLVENCY ANALYSIS .................................................................................. 21

**PART D OVERVIEW OF THE SCHEME** ....................................................................... 24

   1.   WHO WILL BE BOUND BY THE SCHEME?........................................................ 24

   2.   WHAT ARE THE TERMS OF THE SCHEME? ..................................................... 24

   3.   THE RECORD TIME ........................................................................................... 25

   4.   VOTING VALUE ................................................................................................. 25

   5.   ISSUANCE AND CALCULATION OF SCHEME CREDITOR ENTITLEMENTS AND SCHEME SHARE ALLOCATIONS.................................................................................... 26

   6.   WHEN WILL THE SCHEME MEETING TAKE PLACE? ........................................ 27

7.    WHAT IS THE VOTING PROCESS FOR THE SCHEME? .................................................. 27

8.    WHAT HAPPENS AFTER THE SCHEME MEETING? ..................................................... 27

9.    WHEN WILL THE SCHEME AND THE RESTRUCTURING BECOME EFFECTIVE? ............ 27

**PART E ACTIONS TO BE TAKEN BY SCHEME CREDITORS ............................... 29**

1.    COMPLETION OF ACCOUNT HOLDER LETTERS ..................................................... 29

2.    VOTING AT THE SCHEME MEETING BY PROXY ..................................................... 29

3.    VOTING IN PERSON AT THE SCHEME MEETING ..................................................... 30

4.    VOTING PROCEDURES AT THE SCHEME MEETING ................................................. 30

5.    APPOINTMENT OF NOMINATED RECIPIENTS BY SCHEME CREDITORS .................... 31

6.    COMPLETION OF ACCOUNT HOLDER LETTERS AFTER THE SCHEME MEETING ........ 31

7.    COMPLETION AND DELIVERY OF CONFIRMATION FORMS ...................................... 31

8.    RELATIONSHIP BETWEEN SCHEME CREDITORS, THE 2023 NOTES AND CLEARING SYSTEMS ........................................................................................................... 33

**PART F CUSTODY OF EXCHANGE SHARES DURING THE HOLDING PERIOD . 35**

**PART G 2021 NOTES RESTRUCTURING AMENDMENTS ...................................... 37**

**PART H CAPITALISATION .................................................................................. 43**

**PART I DESCRIPTION OF THE ORDINARY SHARE CAPITAL OF THE COMPANY ......................................................................................................... 45**

1.    RIGHTS ATTACHING TO ORDINARY SHARES ....................................................... 45

2.    TRANSFER OF SHARES ..................................................................................... 46

3.    DISCLOSURE OF INTERESTS IN SHARES ............................................................. 47

4.    PURCHASE OF OWN SHARES ............................................................................ 48

5.    VARIATION OF RIGHTS ..................................................................................... 48

6.    GENERAL MEETINGS ....................................................................................... 48

7.    BOARD AUTHORISATION OF CONFLICTS ............................................................ 49

8.    DIRECTORS' INTERESTS ................................................................................... 49

9.    DIRECTORS' ABILITY TO VOTE AND COUNT FOR QUORUM .................................. 50

10.   DIRECTORS ..................................................................................................... 51

11.   PENSIONS AND BENEFITS ................................................................................. 51

12.   INDEMNIFICATION OF DIRECTORS .................................................................... 52

**PART J DIRECTORS' INTERESTS ..................................................................... 53**

**PART K RISK FACTORS ................................................................................... 54**

1.    RISKS RELATING TO THE RESTRUCTURING ......................................................... 54

2.    RISKS RELATING TO THE SCHEME ...................................................................... 55

3.    RISKS RELATING TO A FAILURE TO IMPLEMENT OR A DELAY IN IMPLEMENTING THE SCHEME .................................................................................................................. 56

4.    RISKS RELATING TO AN UNSUCCESSFUL COMPLETION OF THE RESTRUCTURING ... 57

5.    RISKS RELATING TO THE COMPANY'S BUSINESS AND INDEBTEDNESS ...................... 59

**PART L CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ..................... 73**

1.    CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES ................................ 73

2.    TAX STATUS OF THE 2023 NOTES .................................................................................. 75

3.    CONSEQUENCES OF THE SCHEME ................................................................................. 75

4.    CONSEQUENCES TO U.S. HOLDERS OF THE OWNERSHIP AND DISPOSITION OF EXCHANGE SHARES ........................................................................................................ 76

5.    TAX CONSEQUENCES TO NON-U.S. HOLDERS OF EXCHANGE SHARES .......................... 79

6.    U.S. BACKUP WITHHOLDING TAX AND INFORMATION REPORTING................................. 80

**PART M CERTAIN UNITED KINGDOM TAXATION CONSEQUENCES ............... 81**

1.    UK TAX TREATMENT OF THE RESTRUCTURING OF 2023 NOTES ....................................... 81

2.    UK TAX TREATMENT OF THE 2021 NOTES RESTRUCTURING AMENDMENTS ................. 82

3.    UK TAX TREATMENT OF EXCHANGE SHARES ................................................................ 83

**PART N EXPENSES .................................................................................................... 85**

**PART O CERTAIN DEFINITIONS AND INTERPRETATION .................................. 86**

**ANNEX I THE SCHEME ............................................................................................. 98**

**ANNEX II NOTICE OF SCHEME MEETING ........................................................... 99**

**ANNEX III FORM OF ACCOUNT HOLDER LETTER ........................................... 100**

**ANNEX IV FORM OF CONFIRMATION FORM ..................................................... 101**

**ANNEX V SUMMARY FINANCIAL INFORMATION AND OTHER DATA .......... 102**

1.    CONSOLIDATED INCOME STATEMENT DATA .................................................................. 102

2.    CONSOLIDATED STATEMENT OF CASH FLOWS................................................................ 103

**ANNEX VI MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS ..................................................... 104**

1.    EMPHASIS OF MATTER .................................................................................................. 104

2.    RECENT DEVELOPMENTS ............................................................................................. 104

3.    PRINCIPAL FACTORS AFFECTING THE COMPANY'S RESULTS OF OPERATIONS ........ 106

4.    RESULTS OF OPERATIONS ............................................................................................ 107

5.    RESULTS OF OPERATIONS FOR THE FISCAL YEAR ENDED 30 JUNE 2017 COMPARED TO THE FISCAL YEAR ENDED 30 JUNE 2016 ..................................................................................... 108

6.    RESULTS OF OPERATIONS FOR THE FISCAL YEAR ENDED 30 JUNE 2016 COMPARED TO THE FISCAL YEAR ENDED 30 JUNE 2016 ..................................................................................... 109

7.    LIQUIDITY AND CAPITAL RESOURCES ...................................................................... 110

8.    OFF BALANCE SHEET ARRANGEMENTS...................................................................... 113

9.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK................. 113

**ANNEX VII COMPANY ACCOUNTS ...................................................................... 119**

**PART A**
**INTERIM CHIEF EXECUTIVE'S LETTER**

Avanti Communications Group plc
Cobham House
20 Black Friars Lane
London
EC4V 6EB

19 February 2018

Dear Scheme Creditors,

1. **INTRODUCTION**

   I am writing to you in your capacity as a Scheme Creditor to summarise the terms of the Restructuring which the Company is pursuing, of which the Scheme forms an integral part.

   This letter forms part of the Explanatory Statement for the Scheme, and capitalised terms used in this letter have the meanings given to them in PART O of this Explanatory Statement. The purpose of the Explanatory Statement is to provide Scheme Creditors with sufficient information to make an informed decision as to whether to vote for or against the Scheme.

2. **WHAT IS A SCHEME OF ARRANGEMENT?**

   A scheme of arrangement is a statutory procedure under the Companies Act 2006 which allows a company and its creditors (or a class of creditors) to agree a compromise or arrangement that will bind the entire class, including any non-consenting members of the class.

   If the Court is satisfied at the convening hearing that a proposed scheme of arrangement has a prospect of being approved, and that the proposed classes of creditors for voting purposes have been correctly constituted, the Court will order a meeting or meetings of the relevant classes of creditors to be convened.

   In order to become effective, a scheme of arrangement must be:

   (a) approved by a majority in number (above 50%) representing at least 75% in value of creditors present and voting at each scheme meeting;

   (b) sanctioned by the Court; and

   (c) delivered to the Registrar of Companies of England and Wales with a copy of the Sanction Order.

- 1 -

If a scheme of arrangement becomes effective, it will be binding upon the company and all the members of that class of creditors according to its terms as a matter of English law, including those creditors who did not vote on the scheme or who voted against it, irrespective of where in the world those creditors reside or have their seat.

The convening hearing for the Scheme was held on 19 February 2018, at which the Court granted the Company's application to convene the Scheme Meeting.

3.   **OVERVIEW AND KEY ASPECTS OF THE RESTRUCTURING**

As you may be aware from its prior announcements on 13 December 2017 and 25 January 2018, the consent solicitation statements issued on 25 January 2018, the practice statement letter relating to the Scheme dated 1 February 2018 and the announcement on 8 February 2018, the Company is seeking to implement a restructuring of its financing arrangements through certain transactions related to the 2023 Notes and the 2021 Notes.

The principal elements of the proposed Restructuring are as follows:

(a)   the release of all accrued but unpaid interest on the 2023 Notes immediately prior to the Exchange;

(b)   an exchange of all of the 2023 Notes for the Exchange, Shares; and

(c)   the 2021 Notes Restructuring Amendments, which, among other things, will extend the maturity of the 2021 Notes by one year to 2022,

each as described in PART C (*Company and the Background to the Restructuring*) of this Explanatory Statement in addition to a number of ancillary steps including the Majority Amendments, the Waiver and the Jurisdiction Amendments.

The principal elements of the Restructuring outlined above, and the steps required to implement them, will be inter-conditional with each other and will be conditional upon the successful completion of the other parts of the Restructuring.

The Company launched the 2021 Notes Consent Solicitation on 25 January 2018 which sought, among other things, consent of the holders of the 2021 Notes to approve the 2021 Notes Restructuring Amendments. Holders of 2021 Notes representing 98.09% in principal amount of the 2021 Notes provided consents to the 2021 Notes Restructuring Amendments on 7 February 2018. The 2021 Notes Restructuring Amendments are set out in the 2021 Notes Fifth Supplemental Indenture which was executed on 8 February 2018. Pursuant to the terms of the 2021 Notes Fifth Supplemental Indenture, the 2021 Notes Restructuring Amendments will come into effect upon the completion of the 2023 Notes Restructuring on the Restructuring Effective Date.

To facilitate the effectiveness of the Scheme outside the U.K., the Company intends to apply for recognition and assistance pursuant to Chapter 15 of the U.S. Bankruptcy Code, which is anticipated to follow the sanction of the Scheme and is a condition to the effectiveness of the Restructuring. In connection with the implementation of the 2023 Notes Restructuring, the Company will also seek to comply with the exemption from registration provided by Section 3(a)(10) of the Securities Act.

4.   **IMPACT OF SCHEME ON SCHEME CREDITORS' INTERESTS**

Upon the Restructuring Effective Date:

(a)   each Scheme Creditor will completely and forever waive, cancel and release unconditionally any and all 2023 Notes Scheme Claims in respect of accrued but unpaid interest on the 2023 Notes as at the Restructuring Effective Date;

(b)   each Scheme Creditor will, to the fullest extent permitted by law, completely and forever waive, cancel and release unconditionally, any and all 2023 Notes Scheme Claims (other than those waived, cancelled and released pursuant to (a) above) in consideration for its Scheme Creditor Entitlements, which Scheme Creditor Entitlements will then in turn be exchanged for its Scheme Share Allocations; and

(c)   the 2021 Notes Fifth Supplemental Indenture will become operative and amend the rights of the parties under the 2021 Notes Indenture.

Upon the Restructuring Effective Date, the Scheme Creditors will not have any interest in or entitlement to any 2023 Notes Scheme Claim and the Company will instruct DTC to cancel the 2023 Notes, and each Scheme Creditor will have irrevocably authorised the Company and the 2023 Notes Trustee (as applicable) to take any other steps necessary to cancel the 2023 Notes.

5.   **CLASSES OF SCHEME CREDITORS**

As part of the Scheme process, the Scheme Meeting must be convened for the Scheme Creditors (being the holders of the 2023 Notes) to consider, and if thought fit, approve the proposed Scheme. A separate meeting must be held for each class of creditors whose rights are so dissimilar as to make it impossible for them to consult together with a view to their common interest.

Under the Practice Statement, it is the Company's responsibility to formulate the class or classes of creditors affected by the Scheme and notify those Scheme Creditors.

The Company has considered the present rights of each of the Scheme Creditors and the way in which those rights will be compromised under the Scheme. Having taken into account previous decisions of the Court, and consulted its legal advisers, the Company has concluded that there will be one class of creditors consisting of the Scheme Creditors voting at a single creditor meeting.

The Company's conclusion that the Scheme Creditors constitute one single class for the purpose of voting on the Scheme is largely based on the following:

(a)   all Scheme Creditors have materially the same rights against the Company as holders of 2023 Notes and benefit equally from the guarantees and security provided under the 2023 Notes; and

(b)   all Scheme Creditors are treated in the same way under the Scheme.

4822-0238-1911v18

6. **CONSENTING CREDITORS AND THE RESTRUCTURING AGREEMENT**

The Consenting Creditors, being a substantial majority of the Scheme Creditors, have signed the Restructuring Agreement, and are obliged to support the Restructuring, including by voting in favour of the Scheme at the Scheme Meeting. In the Company's view, this does not mean that the Consenting Creditors should form a separate class from the other Scheme Creditors because:

(a)    the Restructuring Agreement does not itself vary or affect the relevant rights of the Consenting Creditors under the 2023 Notes;

(b)    any Scheme Creditor is able to accede to the Restructuring Agreement;

(c)    there is no fee payable to any person for entry into the Restructuring Agreement (save that, in respect of the Ad Hoc Group, the Company has agreed to pay the fees and expenses of the Ad Hoc Group's professional advisers in connection with the negotiation and implementation of the Restructuring; however, the Company's view is that this is not a material difference or one that would mean that the members of the Ad Hoc Group should form a different class from other Scheme Creditors); and

(d)    the Consenting Creditors' obligations under the Restructuring Agreement to support the Restructuring are not irrevocable as the Restructuring Agreement is terminable upon the occurrence of certain events, including a material adverse effect to the business, operations or conditions of the Group.

The Company has therefore concluded, based on the advice of its legal advisers, that the Scheme Creditors can consult together with a view to their common interest irrespective of whether or not they are Consenting Creditors and/or members of the Ad Hoc Group.

7. **JURISDICTION**

The Company is incorporated under the laws of England and Wales. For this reason, the Company considers that the Court has jurisdiction under the Companies Act 2006 to convene the Scheme Meeting.

Moreover, pursuant to the Jurisdiction Amendments, holders of the 2023 Notes have agreed to submit to the exclusive jurisdiction of the Courts of England and Wales with respect to any suit, proceeding or action arising out of or in connection with the 2023 Notes Indenture and the 2023 Notes. The Jurisdiction Amendments were implemented for the purpose of the Scheme and explained to Scheme Creditors on that basis. The Jurisdiction Amendments became effective on 8 February 2018 and became operative upon payment of the 2023 Consent Payment on 16 February 2018.

In addition, the Company believes that certain of the Scheme Creditors are domiciled in the UK and therefore, to the extent the Judgments Regulation would apply to the Scheme or an order sanctioning it, the Court has jurisdiction for the matters underlying the Scheme to be heard and determined.

4822-0238-1911v18

8. **ALTERNATIVES TO THE RESTRUCTURING**

If the Scheme and the Restructuring are not implemented, the Company would have only a limited number of alternative courses of action to choose from. Based on the historic and current projected cash flows of the Group, and in the absence of a successful restructuring (on the same or similar terms to the Restructuring) or without obtaining additional capital and/or generating additional cash flows from operations in the near term, none of which are considered to be realistic prospects by the Company, it will, at some point within the next twelve months or less, become unlikely to be able to meet its debt obligations as and when they fall due. In particular, the Company may not be able to make ongoing scheduled interest payments on its indebtedness, including those that would become payable on 1 April 2018, as well as maintaining adequate cash reserves to fund the continuing operating costs of the business. The Directors consider this possibility to be realistic, not remote and therefore, the Company would be forced to act.

If the Restructuring were to fail, some or all of the entities within the Group would most likely seek to enter formal insolvency proceedings in a relatively short period of time. As there is no way of predicting the effects of the failure of the Restructuring upon the Company's relationships with its commercial counterparties, it is difficult to forecast with any certainty at what point the Company may be required to file for insolvency. However, if the Company were to file for insolvency, it is likely to be highly destructive of the value of the Group and, in the Company's view, will certainly result in a significantly lower recovery for the Scheme Creditors than that represented by the Scheme.

Alternatives to the Restructuring are considered more fully at Part C, Section 8 (*Alternatives to the Restructuring*) and Part C, Section 9 (*Insolvency Analysis*).

9. **RECOMMENDATION**

For the reasons explained in PART C of this Explanatory Statement, the Directors consider the Scheme to be in the best interests of the Scheme Creditors. Accordingly, the independent Directors recommend that the Scheme Creditors vote in favour of the Scheme.

10. **ACTION TO BE TAKEN**

The Company urges all Scheme Creditors to ensure that a Confirmation Form and an Account Holder Letter are validly completed and submitted by them or on their behalf to the Information and Tabulation Agent as soon as possible and before the deadlines set out in this Explanatory Statement. The form of Account Holder Letter attached at Annex III to this Explanatory Statement contains detailed instructions to assist Scheme Creditors in its completion and submission. An editable PDF version of each of the Account Holder Letter and the Confirmation Form is available on the Scheme Website (https://sites.dfkingltd.com/avanti).

**If the Scheme is not approved by a majority in number (above 50%) of Scheme Creditors representing at least 75% in value of Scheme Creditors** present and voting at the Scheme Meeting, the Company will be unable to implement the 2023 Notes Restructuring and the 2021 Notes Restructuring Amendments will not take effect.

4822-0238-1911v18

11. **DISTRIBUTION OF DOCUMENTS TO SCHEME CREDITORS**

Any notices or documents in connection with the Scheme will be given to Scheme Creditors by the Information and Tabulation Agent posting them to the Scheme Website, with a follow up email being sent to DTC participants whose email contact details are known to the Information and Tabulation Agent, notifying them that there has been a new notice published to the Scheme Website. Notices and documents will also be given directly to DTC, Euroclear S.A./N.V. Clearstream Banking, *société anonyme* for posting to their respective portals or electronic systems for access by their participants.

12. **IMPORTANT INFORMATION**

If you are in any doubt as to what action you should take in connection with the Restructuring, this Explanatory Statement, the proposals contained within it or the documents that accompany it, we recommend you seek immediately your own financial and legal advice from your stockbroker, bank manager, accountant, tax adviser, legal adviser or independent financial adviser.

The information contained in this letter is not intended to be exhaustive or complete. Scheme Creditors should read this Explanatory Statement, together with the documents that accompany it, in their entirety. All relevant documentation is available on the Scheme Website set up by the Information and Tabulation Agent at https://sites.dfkingltd.com/avanti.

13. **CONTACTS FOR SCHEME CREDITOR QUERIES**

If you have any questions in relation to this letter, the Scheme or the Restructuring, please contact:

Milbank, Tweed, Hadley & McCloy LLP
Legal advisers to the Company

Contact: Nick Angel / Stuart Swift
Tel: +44 207 615 3000
Email: avanti@milbank.com
Post: 10 Gresham St., London, EC2V 7JD

or

D.F. King
Information and Tabulation Agent
Email: avanti@dfkingltd.com

London
125 Wood Street
London EC2V 7AN
United Kingdom
Telephone: +44 20 7920 9700

New York
48 Wall Street, 22nd Floor
New York, New York 10005
United States
Telephone: +1 212 269 5550
Toll-free: # (800) 714-3311

Hong Kong
Suite 1601, 16/F, Central Tower
28 Queen's Road Central
Hong Kong
Telephone: +852 3953 7230

Yours faithfully,

Alan Harper, Interim Chief Executive Officer

**AVANTI COMMUNICATIONS GROUP PLC**

4822-0238-1911v18

## PART B
## KEY SCHEME DATES

Scheme Creditors should take note of the following dates in connection with the Restructuring. The dates below are indicative only and may be modified in accordance with this Explanatory Statement.

| Date | Calendar Date | Event |
|---|---|---|
| Record Time | 5.00 p.m., New York time on 12 March 2018 | The time at which a Scheme Creditor's Voting Value will be determined for the purposes of the Scheme Meeting, and, in addition, holdings of 2023 Notes will be determined for the purpose of calculating Scheme Creditor Entitlements and Scheme Share Allocations. |
| Voting Submission Deadline | 5.00 p.m., New York time on 16 March 2018 | The deadline for Scheme Creditors to submit their validly completed Account Holder Letter in order to vote by proxy at the Scheme Meeting. |
| Registration for the Scheme Meeting | 9.45 a.m. London time on 20 March 2018 | When registration opens for any Scheme Creditors or Scheme Creditor proxies or representatives who are attending the Scheme Meeting in person. |
| Scheme Meeting | 10.00 a.m. London time on 20 March 2018 | The meeting at which Scheme Creditors will vote (either in person or by proxy) in respect of the Scheme. |
| Sanction Hearing | 26 March 2018 | The Court hearing at which the Court will consider whether to sanction the Scheme. |
| Entitlement Submission Deadline | 5.00 p.m. New York time on 27 March 2018 or such later time as the Information and Tabulation Agent may decide in its sole discretion (acting reasonably) | The deadline for Scheme Creditors to submit their validly completed Account Holder Letter and validly completed Confirmation Form to the Information and Tabulation Agent if they have not already done so in order to receive their Scheme Share Allocation on the Restructuring Effective Date. |

4822-0238-191 1vl8

| Date | Calendar Date | Event |
|------|---------------|-------|
| Chapter 15 Hearing | As soon as practicable after the Sanction Hearing. | The Court hearing at which the U.S. Bankruptcy Court will consider whether to grant relief to the Company in respect of the Scheme under Chapter 15 of the U.S. Bankruptcy Code. |
| Scheme Lodgement Date | As soon as possible after the Sanction Hearing. | The date the Sanction Order is delivered to the Registrar of Companies of England and Wales and will become binding on all Scheme Creditors, whether or not they voted in favour of or against the Scheme or did not vote at all. |
| Restructuring Implementation Date | As soon as possible after the Scheme Lodgement Date once all Restructuring Conditions Precedent have been satisfied. | The date for implementing the Restructuring notified to Scheme Creditors through the Scheme Website once the Company has determined that all of the Restructuring Conditions Precedent have been satisfied. |
| Restructuring Effective Date | As soon as all of the Scheme Implementation Steps have been completed. | The date on which, after completing all of the Scheme Implementation Steps, the 2023 Notes Restructuring will be implemented and the 2021 Notes Restructuring Amendments will become effective. |
| Longstop Date | 30 April 2018 or as may be amended in accordance with the terms of the Scheme. | The date on which the terms of the Scheme will lapse if the Restructuring Effective Date has not already occurred. |
| Expiration of the Holding Period | 5.00 p.m. New York time on the date falling 150 days after the Restructuring Effective Date. | The deadline for any Custody Scheme Creditors to take the necessary steps to ensure that their Scheme Share Allocations are distributed to them. |

The date for the Sanction Hearing is based on current expectations and may be subject to change if so directed by the Court, if the Scheme Meeting is adjourned, or if any person opposes the Scheme.

4822-0238-1911v18

## PART C
## COMPANY AND THE BACKGROUND TO THE RESTRUCTURING

1.  **OVERVIEW OF AVANTI COMMUNICATIONS GROUP PLC**

The Company is a satellite operator providing fixed satellite services in Europe, the Middle East and Africa through its fleet of Ka-band satellites, which operate with high spectral efficiency allowing the Company to deliver to its customers large data carrying capacity at relatively low cost.

The Company sells satellite data communications services on a wholesale basis to a range of service providers who supply four key end markets: Broadband, Government, Enterprise and Backhaul. The Company's current fleet consists of two Ka-band satellites, HYLAS 1 and HYLAS 2, which have been commercially operational since April 2011 and November 2012, respectively, and Artemis, a multiband satellite acquired from the ESA on December 31, 2013, which was successfully re-orbited in November 2017. The Company operates a steerable Ka-band beam, HYLAS 2-B, under an indefeasible right of use agreement entered into in June 2015 with another satellite operator. The Company's satellite fleet is positioned in orbital slots that are recorded in the International Telecoms Union Master International Frequency Register, providing coverage in Europe, the Middle East and Africa.

The Company anticipates that its HYLAS 3 and HYLAS 4 satellites, which are currently under construction, will primarily address high-growth markets in Africa and the Middle East, where terrestrial-based communications infrastructure is generally less developed and often not economically viable to develop, as well as providing back-up and growth capacity over Europe. HYLAS 3 will be deployed on the ESA's EDRS-C satellite. HYLAS 3 is currently under construction and continues to experience delays. It is now expected to launch in the first three months of 2019 (although this date is subject to further change). As of 30 June 2017, the Company had incurred approximately $49.5 million in connection with the construction and launch of HYLAS 3 and it expects to incur an additional $37.5 million.

The Company's HYLAS 4 satellite, which will complete its coverage of Europe, the Middle East and Africa, is at an advanced stage of construction after experiencing delays in the factory. Construction on HYLAS 4 commenced in August 2014. HYLAS 4 is currently expected to be delivered in mid-February 2018 and is scheduled to launch in mid-March 2018, with the target of being in its orbital position ready for service in July 2018 with sufficient fuel to support the satellite for up to 19 years in orbit. HYLAS 4 is expected to generate revenue from July 2018, largely within the existing fixed cost base, and to have a strong positive effect on the Company's business as it completes EMEA coverage and greatly increases the amount of capacity available in mature markets in Western Europe and new markets in Africa. The efficient procurement of HYLAS 4 will bring the overall fleet cost per MHz down significantly, mitigating some of the effects of falling global prices for satellite bandwidth. The Company is in discussions with a number of current and new distributors to sign up master partnership distribution agreements to market this new capacity, which is largely over sub-Saharan Africa countries. As of 30

June 2017, the Company had spent approximately $237.4 million in connection with the construction, launch and insurance of HYLAS 4 and expects to incur an additional $121.8 million in costs through launch and in-orbit testing.

The Company is a public limited company incorporated under the laws of England and Wales, with subsidiaries incorporated in England, Isle of Man, Germany, Sweden, Turkey, Cyprus, Kenya, Nigeria, Tanzania and South Africa. The Company's shares are admitted to trading on the AIM Market of the London Stock Exchange.

2.    **2016 SALES PROCESS AND PRIOR RESTRUCTURING**

As part of a broad-ranging strategic review, Avanti engaged Jefferies to conduct the 2016 Sales Process. As part of the 2016 Sales Process, Jefferies identified around 20 parties that, at that time, would have been seen as credible bidders with a potential interest in acquiring the Group. However, following approaches to those identified parties, only one formal indicative offer was received, which was significantly less than the senior secured debt the Company owed at that time and at a level that would no offer no return to the Scheme Creditors and shareholders today. The board believed that this offer did not reflect the Company's true value and could not be recommended to its shareholders. Accordingly, it was rejected and the 2016 Sales Process was terminated.

Since that time, the Company's debt burden has increased significantly to almost $1 billion and it has continued to experience financial difficulties, largely attributable to the delayed launch of HYLAS 4, pushing out the increased revenues it is anticipated to generate once launched and operational. Accordingly, the Board's view is that, had it conducted a further sales process in the intervening period since the termination of the 2016 Sales Process, there is no reason to believe that a better outcome would have been achieved and, in all likelihood, any offers received in a subsequent sales process, given the Company's continued worsening financial position, would have been less than the single offer made under the 2016 Sales Process.

Separately, in December 2016, the Company and its key bondholders agreed on the terms of the Prior Restructuring. The Prior Restructuring, which was consummated in January 2017, was implemented through a consent solicitation and involved, among other things, the contemplation of new super senior debt funding to provide additional working capital for general purposes and to cover expenses relating to the construction and launch of HYLAS 4 and a re-scheduling of Avanti's c. $708 million senior secured notes due 2019 into:

(a)    the 2021 Notes issued under the 2021 Notes Indenture; and

(b)    the 2023 Notes issued under the 2023 Notes Indenture.

Several months after completion of the Prior Restructuring, Avanti entered into the Super Senior Facility Agreement.

3.    **THE COMPANY'S CURRENT CAPITAL STRUCTURE**

The Company's capital structure as of 31 December 2017 is described in the below table:

| Capital structure as of 31 December 2017 ($m) | |
| --- | --- |
| Super Senior Debt | 118 |
| 2021 Notes ....................................... | 323.3 |
| 2023 Notes ....................................... | 557 |
| Other debt facilities and finance leases ................................................. | 6 |
| **Total debt** ......................................... | 1,004.3 |

This capital structure arose from the Prior Restructuring implemented by the Company to preserve its short-term liquidity and provide the capital required to fund its business through the launch of HYLAS 4 and beyond. Pursuant to the Prior Restructuring, among other things c. $708 million of the Company's senior secured notes due 2019 were exchanged for $481 million of 2023 Notes and c. $293 million of 2021 Notes. The Company also later entered into a new up to $132.5 million Super Senior Facility Agreement on 15 June 2017, of which $118 million was drawn as of 31 December 2017. The Super Senior Facility ranks senior to the 2021 Notes, which in turn rank senior to the 2023 Notes.

4.    **FINANCIAL CONDITION OF THE GROUP AND RATIONALE FOR THE RESTRUCTURING**

Although the Prior Restructuring stabilised the Company's business in the short term, once it became clear that HYLAS 4 would not be delivered on schedule in 2017, the Company determined that greater debt service relief would be needed with respect to the Company's existing financial obligations to achieve a feasible capital structure with long term sustainability.

The Company's Directors are of this view because, based on the current cash flows of the Group, and in the absence of a successful restructuring (on the same or similar terms to the Restructuring) or without generating additional cash flows from operations in the near term, the Company will likely at some point within the next twelve months become unable to pay its debt obligations as and when they fall due. The Directors are also concerned that the Company may not be able to make ongoing scheduled interest payments on its indebtedness. These possibilities are considered to be realistic, not remote.

The ability to generate additional cash flows from operations is linked to a successful restructuring because until the uncertainty regarding the Group's financial position and its ability to meet its future obligations is addressed:

(a)    it will be more difficult for the Group to attract and retain customers, staff and suppliers, which will put it at a competitive disadvantage;

4822-0238-1911v18

(b) the Group's high debt service obligations will reduce its liquidity and limit an investment in the business which could ultimately culminate in the Group filing for insolvency; and

(c) commercial counterparties may seek to terminate or limit their business relationships with the Group.

5. **RESTRUCTURING NEGOTIATIONS AND THE RESTRUCTURING AGREEMENT**

The Company commenced negotiations with the Ad Hoc Group regarding a comprehensive restructuring of its indebtedness that would create a sustainable long-term capital structure from which to further develop the Group's business. As described in more detail in section 6 below, the Restructuring entails the amendment to the terms and extension of the maturity date of the 2021 Notes and the exchange of 2023 Notes for 92.5% of the Company's enlarged share capital.

On 13 December 2017, the Company entered into the Restructuring Agreement with the Initial Consenting Creditors and the Initial Consenting Shareholders, who have agreed to support the Restructuring. As of the date of this Explanatory Statement, approximately 71% by value of the 2023 Notes and 80% by value of the 2021 Notes have agreed to support the Restructuring by becoming party to the Restructuring Agreement.

A copy of the Restructuring Agreement is available to all Scheme Creditors on request to the Company's legal advisers, Milbank. Contact details for Milbank are provided at the end of this Explanatory Statement.

6. **RESTRUCTURING TERMS**

6.1 **The Exchange**

If the Scheme is approved and the Sanction Order is granted, on the Restructuring Implementation Date, the Scheme Creditors will:

(a) release their 2023 Notes Scheme Claims in respect of accrued but unpaid interest on the 2023 Notes outstanding as at the Restructuring Effective Date; and

(b) release any and all 2023 Notes Scheme Claims (other than those waived, cancelled and released in accordance with (a) above) in consideration for their Scheme Creditor Entitlements and in turn their Scheme Share Allocations.

Each Scheme Creditor's pro rata share of the Exchange Shares shall be calculated by Company and the Information and Tabulation Agent pursuant to the terms of the Scheme, based on the principal amount of 2023 Notes held by each Scheme Creditor as at the Record Time as a proportion of the total aggregate outstanding principal amount of the 2023 Notes as at the Record Time. Upon completion of the 2023 Notes Restructuring, the Company will deliver an order to DTC instructing DTC to cancel the 2023 Notes.

In order to obtain the necessary shareholder approvals for the issuance of the Exchange Shares pursuant to the Exchange, the Company will distribute all required materials to its shareholders for a general meeting of shareholders expected to be held in April 2018. The

- 13 -

issuance of the Exchange Shares pursuant to the Exchange will require the following shareholder approvals:

(a)     the approval of a simple majority of independent shareholders (being those shareholders not participating in the Exchange) voting in person or by proxy on a poll of a waiver of the obligation to make a general offer pursuant to Rule 9 of the Code that would otherwise apply to Solus Alternative Asset Management LP and certain funds and accounts advised and managed by it, as a result of the issue and allotment of the Exchange Shares pursuant to the Exchange;

(b)     the approval of shareholders voting in person or by proxy and holding a simple majority of the votes cast to the allotment of the Exchange Shares pursuant to the Exchange; and

(c)     the approval of shareholders voting in person or by proxy and holding at least 75% of the votes cast to the disapplication of statutory pre-emption rights in relation to the issue of the Exchange Shares pursuant to the Exchange.

The actions which Scheme Creditors are required to take to receive their Scheme Creditor Entitlements and Scheme Share Allocations on the Restructuring Effective Date are set out in PART E.

Consummation of the 2023 Notes Restructuring pursuant to the Scheme would result in the capitalisation of $557 million in aggregate principal amount of 2023 Notes and approximately $81 million in interest expense savings per year.

6.2     **2021 Notes Restructuring Amendments**

Pursuant to the 2021 Notes Consent Solicitation, the Company obtained the 2021 Notes Restructuring Amendments Requisite Consents on 7 February 2018 to amend certain terms of the 2021 Notes Indenture to:

(a)     eliminate the Maintenance of Minimum Consolidated LTM EBITDA covenant contained in Section 4.30 of the 2021 Notes Indenture, which would require testing on the last day of each fiscal quarter commencing 31 March 31 2018 and ending on 31 March 2020;

(b)     permit the issuance of additional Indebtedness which shall be capped at $30.0 million and rank junior to or *pari passu* with the 2021 Notes;

(c)     extend the final maturity date of the 2021 Notes from 1 October 2021 to 1 October 2022;

(d)     change the interest rate payable on the 2021 Notes from (i) 10% Cash Interest or 15% PIK Interest to (ii) 9% Cash Interest or 9% PIK Interest for all remaining interest periods commencing 1 October 2017;

(e)     eliminate the Margin Increase payable on the 2021 Notes if the relevant Minimum Consolidated LTM EBITDA threshold was not met; and

(f)    permit interest payments on the 2021 Notes for all remaining interest periods commencing 1 October 2017 (but excluding the final interest payment) to be paid as PIK Interest if the Company does not have sufficient cash to satisfy the applicable interest coupon.

The full text of the 2021 Notes Restructuring Amendments is set out at PART G.

The Company entered into the 2021 Notes Fifth Supplemental Indenture on 8 February 2018, though the 2021 Notes Restructuring Amendments will only become operative if and when the Restructuring Effective Date occurs and the wider Restructuring is implemented.

The adoption of the 2021 Notes Restructuring Amendments will result in interest expense savings of approximately $11 million per year as a result of the elimination of the Margin Increase and assuming the Company pays interest at 9% per annum on the 2021 Notes for all remaining periods up to maturity.

6.3    **Majority Amendments and Waiver**

In order to prevent an event of default under the Notes and related automatic acceleration of the Notes from being triggered by the commencement of a case under Chapter 15 of the U.S. Bankruptcy Code or any other part of the Restructuring, the Company commenced the Majority Consent Solicitations on 25 January 2018 to seek consents from holders of the Notes to implement:

(a)    the Majority Amendments; and

(b)    the Waiver.

The Company received the consents required to implement the Majority Amendments and the Waiver on 7 February 2018 in respect of the 2023 Notes and 8 February 2018 in respect of the 2021 Notes. Accordingly, these amendments and waivers became effective on 8 February 2018 when the Company executed the 2023 Third Supplemental Indenture to amend the 2023 Notes Indenture and the 2021 Fourth Supplemental Indenture to amend the 2021 Notes Indenture.

6.4    **Jurisdiction Amendments**

The Company proposed the Jurisdiction Amendments in order to facilitate the implementation of the 2023 Notes Restructuring pursuant to the Scheme by amending the submission to jurisdiction provision of the 2023 Notes Indenture to provide that each party to the 2023 Notes Indenture irrevocably submits to the jurisdiction of the Court of England and Wales until the Restructuring Agreement is either terminated or is no longer in effect.

The Company received the consents required to implement the Jurisdiction Amendments pursuant to the 2023 Consent Solicitation on 7 February 2018 and the amendments were effected by the Company and the 2023 Notes Trustee executing the 2023 Fourth Supplemental Indenture on 8 February 2018, however, the 2023 Fourth Supplemental Indenture only became operative upon payment of the 2023 Consent Payment on 16 February 2018.

6.5   **2021 Consent Payment**

In order to incentivise holders of the 2021 Notes to timely approve the 2021 Notes Restructuring Amendments in the 2021 Notes Consent Solicitation, under the 2021 Notes Consent Solicitation, the 2021 Consent Payment of $2.50 per $1,000 principal amount of the 2021 Notes was available to any holders of 2021 Notes who provided, and did not revoke, the relevant consents by 7 February 2018.

Holders of 2021 Notes holding 98.09% by value did so, and accordingly an aggregate consent fee of $792,783.20 is payable on the Restructuring Effective Date provided the other conditions to payment of the consent fee described within the 2021 Notes Consent Solicitation are satisfied.

6.6   **2023 Consent Payment**

In order to incentivise Scheme Creditors to timely approve the Jurisdiction Amendments, under the 2023 Notes Consent Solicitation, the 2023 Consent Payment of $0.05 per $1,000 principal amount of the 2023 Notes was available to any Scheme Creditor who provided, and did not revoke, the relevant consents by 7 February 2018.

Scheme Creditors holding 87.73% by value of 2023 Notes provided the relevant consents by 7 February 2018, and accordingly an aggregate consent fee of $24,433.67 was paid on 16 February 2018.

6.7   **Chapter 15 recognition**

The Company intends to apply to the U.S. Bankruptcy Court of the Southern District of New York for recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code on or around the date of this Explanatory Statement.

The Company will seek an order from the U.S. Bankruptcy Court granting the following relief, among other things, pursuant to Chapter 15 of the U.S. Bankruptcy Code:

(a)   an automatic stay of proceedings against the Company in respect of Scheme Claims or to enforce judgments against the Company and its property within the territorial jurisdiction of the United States;

(b)   a declaration that the Scheme will have full force and effect in the U.S. against all entities (as that term is defined in section 101(15) of the U.S. Bankruptcy Code); and

(c)   an order providing that all entities subject to the U.S. Bankruptcy Court's jurisdiction are permanently enjoined from taking any action inconsistent with the Scheme, including, without limitation, against the Company or any of its property, in each case at least to the extent of the territorial jurisdiction of the United States.

The Chapter 15 Order will help ensure that the Scheme, including the 2023 Notes Restructuring, is enforceable and effective in the United States. Obtaining the Chapter 15 Order is a Restructuring Condition Precedent, which means the Restructuring Effective Date cannot occur and the Restructuring cannot be implemented unless and until the Chapter 15 Order has been granted.

6.8   **3(a)(10) exemption**

The Company intends to rely on the exemption from the requirement to register the offer and issuance of the Exchange Shares to Scheme Creditors available under Section 3(a)(10) of the Securities Act. This exemption is available if:

(a)   the Exchange Shares are issued in exchange for the Scheme Creditor Entitlements, which are in turn issued for the 2023 Notes Scheme Claims; and

(b)   the Court approves the fairness of the terms and conditions of the Scheme and the Exchange to those Scheme Creditors to whom securities will be issued, after holding an open hearing and having been previously advised of the Company's reliance on the 3(a)(10) Exemption based on the Court's approval of the Scheme and the Exchange.

For the avoidance of doubt, Scheme Creditor Entitlements are simply a mechanic used in the Scheme to implement the exchange of the 2023 Notes Scheme Claims for the Exchange Shares; they are not a separate security being issued to Scheme Creditors. The Company is relying on the following to avail itself of the 3(a)(10) Exemption for the Exchange:

(a)   under the laws of England and Wales, the Court will not approve the Scheme, including the Exchange, unless it considers that the terms and conditions of the transaction are fair to the Scheme Creditors;

(b)   the Scheme Creditors have received notice of, and have the right to appear and be heard at, the hearings before the Court with respect to the Scheme; and

(c)   the Company notified the Court in its submissions for the Convening Hearing that the Company is seeking to rely on the 3(a)(10) Exemption based on the Court's approval of the Scheme and the Exchange and will not register the Exchange Shares under the Securities Act.

7.   **ADDITIONAL CAPITAL RAISE FOLLOWING THE RESTRUCTURING**

In order to raise new liquidity to grow its business, contingent upon the implementation of the Restructuring, the Company is considering raising between $30 million and $60 million of additional capital. This could be through the issuance of additional ordinary shares in the Company shortly after the completion of the Restructuring, or alternatively through raising additional indebtedness. Pursuant to the 2021 Notes Restructuring Amendments, under the terms of the amended 2021 Notes Indenture, the Company will be able to raise additional indebtedness of up to $30 million ranking junior to or pari passu with the 2021 Notes.

Discussions in relation to how the additional capital will be raised, and on what terms, are ongoing. As at the date of this Explanatory Statement, there is no certainty as to whether or not these discussions will lead to a successful capital raise. If not, the Company will explore other options as to how it may raise the additional capital, which could include the issue of additional 2021 Notes, subject to the Company obtaining any necessary consents required.

If the Exchange is implemented and additional capital is raised through the issuance of additional ordinary shares in the Company, this would dilute the existing shareholding of any shareholders who do not participate in the additional capital raise, including any Scheme Creditors holding Exchange Shares following the 2023 Notes Restructuring. If additional capital is raised through the incurrence of debt, the additional debt claim will be structurally senior to each Scheme Creditor's position as a shareholder of the Company.

8.  **ALTERNATIVE TO THE RESTRUCTURING**

If the Scheme and the Restructuring are not implemented, the Company would have only a limited number of alternative courses of action to choose from. Based on the historic and current projected cash flows of the Group, and in the absence of a successful restructuring (on the same or similar terms to the Restructuring) or without obtaining additional capital and/or generating additional cash flows from operations in the near term, none of which are considered to be realistic prospects by the Company, it will, at some point within the next twelve months or less, become unlikely to be able to meet its debt obligations as and when they fall due. In particular, the Company may not be able to make ongoing scheduled interest payments on its indebtedness, including those that would become payable on 1 April 2018, as well as maintaining adequate cash reserves to fund the continuing operating costs of the business. The Directors consider this possibility to be realistic, not remote and therefore, the Company would be forced to act.

If the Restructuring were to fail, some or all of the entities within the Group would most likely seek to enter formal insolvency proceedings in a relatively short period of time. As there is no way of predicting the effects of the failure of the Restructuring upon the Company's relationships with its commercial counterparties, it is difficult to forecast with any certainty at what point the Company may be required to file for insolvency. However, if the Company were to file for insolvency, it is likely to be highly destructive of the value of the Group and, in the Company's view, will certainly result in a significantly lower recovery for the Scheme Creditors than that represented by the Scheme.

In reaching their conclusions as to the potential consequences for the Scheme Creditors and other stakeholders of the Restructuring failing, the Directors have:

(a)  considered the relevant information available to them regarding the Company and its business and how this would be affected by the relevant insolvency processes; and

(b)  obtained advice from its legal advisers and AlixPartners, who have prepared the AP Report for the Company, which, based on financial information provided by the Company, outlines potential recoveries in certain illustrative insolvency scenarios, and the key considerations applicable to those insolvency scenarios. The information set out in this section is primarily based upon the content of the AP Report. The assumptions, considerations, methodology and asset realisation calculations supporting the conclusions reached in the AP Report are set out in full in the AP Report.

In preparing the AP Report, AlixPartners calculated estimated outcomes for the following two scenarios, both of which are dealt with in further detail in the Insolvency Analysis section below:

(a)    The 'high' case: which assumes an administrator is appointed over the Company and its significant subsidiaries under English law to realise assets through an orderly but accelerated sales process (of around four to six weeks) that achieves the least possible value destruction in the circumstances; and

(b)    The 'low' case: which assumes a liquidator is appointed over all Group companies, including the Company, under English law and assets are realised through an accelerated "fire sale" process resulting in significant value destruction.

In addition, AlixPartners also considered two other potential alternatives, where the intention would be for the business to continue to trade while a restructuring of the Company's financial indebtedness is pursued:

(a)    English law administration of the Company only; or

(b)    Chapter 11 filing under the U.S, Bankruptcy Code of the Company and its main trading subsidiaries only ("**Chapter 11**").

Having considered the options in paragraph 1.5 in detail, the Company believes that both have significant inherent drawbacks, increased uncertainty as to potential outcomes and therefore do not represent a viable or better alternative for Scheme Creditors to the Scheme and the Restructuring. Furthermore, on the basis that neither of these alternatives described in 1.5 has any certainty of providing a materially better recovery to Scheme Creditors, particularly after taking into account increased uncertainty, than the 'high' case scenario used in connection with the insolvency analysis, neither the Company nor AlixPartners undertook a granular analysis of the likely available recoveries in the alternative scenarios described in 1.5. The Company considered in particular the following factors which apply to the various scenarios described above:

(a)    Placing the Company only into administration

    (i)    Triggering Makewhole Premiums. The commencement of an administration would trigger the ability for the Super Senior Facility Agreement to be accelerated and subject to payment of a makewhole premium that would add an additional $5.6 million of liabilities for satisfaction in priority to the 2023 Notes. The commencement of the administration would also automatically trigger the acceleration of the 2021 Notes, including a makewhole premium of $114.6 million that would have to be satisfied in priority to the claims of the holders of 2023 Notes.

    (ii)    Potential Damage to the Business. Generally, administration may enable several counterparties to terminate key contracts that would have seriously detrimental effects on the Company's business and its ability to continue operations. Administration of the Company only (i.e., not its subsidiaries) is unlikely to resolve the potential damage to the business because the

- 19 -

administration itself could also trigger cross-default provisions on the key contracts material to a subsidiary's business. In addition, there is a risk that regulatory authorities may suspend or revoke licences for orbital slots and spectrum rights.

(iii) Prospects of a Successful Sales Process. While the administrator would be permitted to engage in asset sales, the potential damage to the business during the process and the makewhole triggers in respect of the Super Senior Facility Agreement and 2021 Notes would have a negative impact on economic recoveries available for the 2023 Notes.

(iv) Prospects of a Successful Debt Restructuring. Administration does not include mechanics for effecting a debt restructuring and although the Administrator could make use of a parallel process to effect such a restructuring, absent the opportunity to plan in advance of its appointment, the Administrator would be unlikely to pursue such a strategy.

(v) Costs of Process. The costs could be reduced from the 'high' case scenario on the basis that it would be limited to the Company only, but the costs could still be considerable.

(b) Placing the Company and major trading subsidiaries into Chapter 11

(i) Triggering Makewhole Premiums. The debt under the Super Senior Facility Agreement does not automatically accelerate upon the commencement of a Chapter 11 case and the automatic stay imposed upon the commencement of a Chapter 11 case would prohibit the lenders from accelerating the debt under the Super Senior Facility Agreement. The makewhole premium under the Super Senior Facility Agreement will not be payable in a Chapter 11. The makewhole premium with respect to the 2021 Notes, however, will be payable in a Chapter 11 as the 2021 Notes Indenture provides for the automatic acceleration of the 2021 Notes upon the commencement of a Chapter 11. The 2021 Notes makewhole premium will have an effect on the economic recovery available to the holders of the 2023 Notes.

(ii) Potential Damage to the Business. Unlike in the administration alternative above, counterparties will generally be restricted from exercising termination rights against the debtor entities on account of the Chapter 11 proceeding (although customers or counterparties could argue that they ought not to be subject to U.S. bankruptcy proceedings). Moreover, Chapter 11 allows key contracts to be sold or transferred generally without giving effect to counterparty consent rights. As with the Administration alternative above, regulators may be able to suspend or revoke licences for orbital slots and spectrum rights, as well as the space licences and ground station licences.

(iii) Prospects of a Successful Sales Process. Chapter 11 provides the ability to sell the assets of a debtor free and clear of all liens, such sale would be subject to court approval and would usually following a public auction process. In

any event, the reputational damage and the triggering of the makewhole premiums are likely to have an adverse impact on recoveries for holders of the 2023 Notes as against the 'high' case.

(iv)   Prospects of a successful Debt Restructuring. Chapter 11 provides for the restructuring of a debtor's financial indebtedness, but the reputational damage to the business and the triggering of the makewhole premiums are likely to have an adverse impact on recoveries for holders of the 2023 Notes as against the 'high' case.

(v)   Costs of Process. Chapter 11 can be a costly process given it provides for the appointment of a statutory committee of unsecured creditors whose costs and expenses, including legal and financial advisors, are generally paid by the debtor in addition to any contractual obligation it might have to pay the costs and expenses, including legal and financial advisors' fees. Moreover Chapter 11 would open the Company to the risk of protracted and costly litigation and discovery that would not otherwise generally be the case under English law.

Accordingly, given the substantial uncertainty regarding the outcome of each alternative transaction, including whether a particular alternative restructuring might provide a higher or lower recovery to creditors than the 'high' case described below, the Company believes that the Restructuring offers the only realistic option for the Company to continue operating as a going concern and, in the Company's view, provides a materially better outcome for Scheme Creditors than the alternatives.

9.   **INSOLVENCY ANALYSIS**

On or about 25 January 2018, the Company engaged AlixPartners to prepare the AP Report, which, among other things, assesses and presents the illustrative financial outcomes for creditors in the event of an insolvency of the Group. The AP Report contains a comparison between the outcome anticipated under the Scheme against that which might occur if the Restructuring failed and the Group were to be placed in certain insolvency processes. In carrying out this analysis, AlixPartners owed its duty of care to the Company only and does not owe or assume any duty to the Scheme Creditors.

The analysis involved modelling the likely realisations of the Group's assets under certain insolvency scenarios on a Group and entity-by-entity basis. The analysis considered a 'high' case (which assumes an administrator is appointed over the Company and its significant subsidiaries to realise assets through an orderly but accelerated sales process (of around four to six weeks) that achieves the least possible value destruction in the circumstances) and a 'low' case (which assumes a liquidator is appointed over all Group companies, including the Company, and assets are realised through an accelerated "fire sale" process resulting in significant value destruction). While these two cases form the likely upper and lower limits of likely recoveries for Scheme Creditors in the event of an insolvency of the Group, other outcomes are possible. In particular, the relevant regulatory authorities could revoke substantially all of the Company's licences, orbital slot rights, spectral frequency rights as well as space licences and ground station licences

- 21 -

in the event of a liquidation, which would result in a catastrophic outcome for Scheme Creditors, significantly below even the 'low' case.

The realisations of the Group assets under the 'high' case and 'low' case scenarios took into account the following principal factors:

(a)    At the point of insolvency, HYLAS 4 would have been successfully launched and ready to enter operations in July 2018. HYLAS 4 is the most important asset for the Group's future. The launch phase is a critical and high risk phase in the life of a satellite and, once that risk is retired, the risk of operational failure is much lower;

(b)    An officeholder would have a short period of forbearance from the regulatory authorities to dispose of the businesses and assets of the Group and access to sufficient funding to undertake this;

(c)    A sales process would be a 'distressed sale', conducted in a very short timeframe which would impact upon the levels of realisations for creditors as buyers would reduce their offers considerably compared to a sale with no visible signs of distress. Buyers would not have the opportunity to perform due diligence and would act opportunistically, particularly given the significant inherent downside risks. While buyer behaviour in any given scenario is difficult to predict, a discount of 50% or more on a going concern perspective could reasonably be expected;

(d)    Costs of realisation have not been accounted for, which would only further reduce realisations for creditors;

(e)    All Group entities are assumed to have their centre of main interests in the UK and be subject to the insolvency laws of England and Wales. It is possible that some Group entities may have their centre of main interests in other jurisdictions in which case, an insolvency process other than an English law administration or liquidation would be applicable. In that case, the prescribed insolvency waterfall may differ, resulting in a different outcome for creditors;

(f)    The assumed formal insolvency process in the 'low' case is liquidation. The powers of a liquidator are more limited than the powers of an administrator (e.g. a liquidator may lack the power to trade the businesses of the Group between appointment and sale);

(g)    The assumed formal insolvency process in the 'high' case is an English law administration, where the business continues to trade for a short period of time while an accelerated sales process is conducted; and

(h)    To the extent an administrator is appointed, some of the realisations otherwise available to secured creditors could be set aside in a fund for the unsecured creditors known as the "Prescribed Part", further reducing possible returns to the secured creditors by up to £600,000 per relevant entity (approximately U.S.$828,000).

The key conclusion from the AP Report insofar as it affects the Scheme Creditors is that the Scheme Creditors would not receive any returns on an insolvency of the Group

following the failure of the Restructuring in both the 'high' case scenario and the 'low' case scenario.

AlixPartners notes the following regarding the approach it took to its analysis:

(a)     It performed its analysis on a desktop basis using the Group's audited financial statements for the period up to 30 June 2017, unaudited management accounts in the period to 31 December 2017 management forecasts for the period from 1 January 2018 onwards and did not carry out formal valuations of the Group's assets; and

(b)     The analysis assumes a theoretical insolvency of the Group.

The Company will provide a copy of the AP Report to any Scheme Creditor who requests it, subject to that Scheme Creditor providing the Company with satisfactory evidence that it holds 2023 Notes. Any requests for the AP Report should be made in writing or by email to Milbank.

## PART D
## OVERVIEW OF THE SCHEME

**This section contains a brief description of the principal terms of the Scheme. The summary information contained in this section does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by references to the Scheme and the information contained elsewhere in this Explanatory Statement.**

1.  **WHO WILL BE BOUND BY THE SCHEME?**

    The Scheme Creditors under the Scheme will be the persons with the ultimate economic interest as principal in the 2023 Notes held in global form through DTC including by the right to have definitive notes issued under the 2023 Notes Indenture and/or the benefit of such right.

    If the Scheme becomes effective, it will bind each and every present and future Scheme Creditor whether or not such Scheme Creditor approved, objected to, took no action in respect of, or was not aware of the Scheme.

2.  **WHAT ARE THE TERMS OF THE SCHEME?**

    The Scheme provides for, among other things:

    (a)  the release of any and all 2023 Notes Scheme Claims in respect of accrued but unpaid interest on the 2023 Notes as at the Restructuring Effective Date;

    (b)  the release immediately thereafter of each Scheme Creditor's 2023 Notes Scheme Claims (excluding all accrued but unpaid interest released under (a) above), other than any Claim or Liability arising after the Restructuring Effective Date and held by a person that is a shareholder of the Company as a result of receiving Scheme Share Allocations, in consideration for;

    (c)  each Scheme Creditor's Scheme Creditor Entitlement, being an entitlement to receive its *pro rata* allocation of the Exchange Shares calculated in accordance with the Scheme, which is then exchanged for;

    (d)  each Scheme Creditor's Scheme Share Allocation, being each Scheme Creditor's *pro rata* allocation of the Exchange Shares calculated in accordance with the Scheme, which will be issued on the Restructuring Effective Date to Scheme Creditors who have met conditions under the Scheme to receive those Exchange Shares, or to the Custodian for those Scheme Creditors who have not met the conditions under the Scheme to receive those Exchange Shares;

    The Exchange Shares will be listed on the AIM of the London Stock Exchange and freely tradeable on the Restructuring Effective Date.

    In order to give practical effect to the Scheme's release of the 2023 Notes Scheme Claims, with effect from the Restructuring Effective Date, each Scheme Creditor will completely and forever waive, cancel and release unconditionally any and all remaining 2023 Notes

Scheme Claims and undertake not to bring any action in relation to any 2023 Notes Scheme Claim against (among others) the Company and any other member of the Group.

The Scheme also contains customary releases from the Scheme Creditors of any Claims or Liabilities of the Released Parties arising from their involvement in the 2023 Notes Restructuring, excluding any claims or liabilities arising out of fraud, gross negligence, wilful default or a Released Party's breach of its express obligations under the Scheme or any Restructuring Document.

3.    **THE RECORD TIME**

Each Scheme Creditor's Voting Value and Scheme Creditor Entitlements (and therefore each Scheme Creditor's Scheme Share Allocation) will be determined by the Information and Tabulation Agent based on the principal amount of 2023 Notes held by such Scheme Creditor as at the Record Time, being 5.00 p.m. New York time on 12 March 2018. The Information and Tabulation Agent will make these determinations based on each Scheme Creditor's Holdings Certification and the SPR and the Omnibus Proxy.

Any persons who acquire 2023 Notes after the Record Time will not be entitled to receive Scheme Creditor Entitlements or Scheme Share Allocations under the Scheme, nor will they be entitled to vote on the Scheme, unless the Information and Tabulation Agent exercises its discretion to recognise the transfer of such 2023 Notes.

A single Record Time is being used for the purpose of the Scheme because it is currently anticipated that there will be a relatively short period between the Record Time and the Restructuring Effective Date, and the Company and its advisers therefore believe there is no need to have one record time for determining Voting Values and another record time for determining Scheme Creditor Entitlements and Scheme Share Allocations, particularly as the Information and Tabulation Agent has a general discretion to recognise transfers of 2023 Notes after the Record Time if it deems appropriate.

4.    **VOTING VALUE**

The Voting Value attributable to each individual Scheme Creditor will be the principal amount of 2023 Notes held by such Scheme Creditor as at the Record Time.

The Voting Value for each Scheme Creditor will be calculated by the Company and the Information and Tabulation Agent based on the Holdings Certifications the Information and Tabulation Agent has received and the SPR and the Omnibus Proxy. The Voting Value attributed to a Scheme Creditor does not constitute an admission of the existence or quantum of any Liability of any Group member to that Scheme Creditor.

The Chairman may, for voting purposes only, reject the Voting Value attributed to a Scheme Creditor if the relevant Scheme Creditor has not complied with the applicable voting procedures and/ or the instructions set out in the Account Holder Letter or any undertaking given.

5. **ISSUANCE AND CALCULATION OF SCHEME CREDITOR ENTITLEMENTS AND SCHEME SHARE ALLOCATIONS**

Upon the Restructuring Implementation Date, subject to and in accordance with the Scheme Implementation Steps each Scheme Creditor will release its 2023 Notes Scheme Claims in consideration for its Scheme Creditor Entitlements.

Each Scheme Creditor's Scheme Creditor Entitlements shall be exchanged on the Restructuring Effective Date for that Scheme Creditor's Scheme Share Allocations by the Company instructing the Share Registrar to issue the Exchange Shares to:

(a) the Scheme Creditors and/ or Nominated Recipients who have satisfied the conditions in the Scheme in order to receive Scheme Share Allocations on the Restructuring Effective Date; and

(b) the Custodian in respect of the Scheme Creditors who have not satisfied the conditions in the Scheme to receive Scheme Share Allocations on the Restructuring Effective Date.

The Company and the Information and Tabulation Agent shall calculate Scheme Creditor Entitlements and Scheme Share Allocations by:

(a) dividing the principal amount of 2023 Notes held by that Scheme Creditor as at the Record Time by the aggregate outstanding principal amount of the 2023 Notes as at the Record Time, as confirmed to the Information and Tabulation Agent by the 2023 Notes Trustee; then

(b) multiplying the resulting number and the total number of Exchange Shares.

Fractions of Scheme Share Allocations will not be issued and will be rounded down to the nearest whole share. The Information and Tabulation Agent will calculate Scheme Creditor Entitlements and Scheme Share Allocations based on the Holdings Certifications provided by Scheme Creditors and the SPR and the Omnibus Proxy. The Information and Tabulation Agent's determination of any Scheme Creditor Entitlements will be final absent manifest error.

The Information and Tabulation Agent has discretion, but no obligation, to recognise transfers of 2023 Notes Scheme Claims after the Record Time for the purposes of calculating Scheme Creditor Entitlements and Scheme Share Allocations, subject to the production of such evidence or information as it may reasonably require and to any other terms and conditions which the Information and Tabulation Agent or Company may consider necessary or desirable.

To receive its Scheme Share Allocation on the Restructuring Effective Date:

(a) the Information and Tabulation Agent must have received, in respect of that Scheme Creditor, a validly completed Account Holder Letter including a Holdings Certification and a validly completed Confirmation Form on or prior to the Entitlement Submission Deadline; and

(b)    a Scheme Creditor must not be a Disqualified Recipient, or if it is a Disqualified Recipient, must have nominated one of more Nominated Recipient(s) to receive its entire Scheme Share Allocation.

If these conditions are not satisfied, that Scheme Creditor's Scheme Share Allocation will be issued to the Custodian on the Restructuring Effective Date, rather than that Scheme Creditor or its Nominated Recipient(s). The procedure to be followed by Custody Scheme Creditors to obtain their Scheme Creditor Entitlements from the Custodian are summarised below at PART F.

6.    **WHEN WILL THE SCHEME MEETING TAKE PLACE?**

Pursuant to the order from the Court convening the Scheme Meeting, the Scheme Meeting will take place on 20 March 2018 at 10.00 a.m. London time at Milbank's offices in London and will be chaired by Nigel Fox, or Nick Angel. The form of Notice for the Scheme Meeting is set out at Annex II.

7.    **WHAT IS THE VOTING PROCESS FOR THE SCHEME?**

In order for the Scheme to be approved by the Scheme Creditors, the Scheme must be approved by a majority in number (above 50%) representing at least 75% in value of the Scheme Creditors present and voting (either in person or by proxy) at the Scheme Meeting.

The procedure for Scheme Creditors to vote on the Scheme is set out at PART E.

8.    **WHAT HAPPENS AFTER THE SCHEME MEETING?**

The Court will consider whether to sanction the Scheme at the Sanction Hearing, which will only take place if the Scheme has been approved by the requisite majority of Scheme Creditors at the Scheme Meeting. The Sanction Hearing is currently scheduled for 26 March 2018.

At the Sanction Hearing, the Company may agree and implement on behalf of all Scheme Creditors any modification of, or addition to, the Scheme and/or the Restructuring Documents or any terms or conditions that the Court may think fit to approve or impose and which would not directly or indirectly have an adverse effect on the rights or interests of Scheme Creditors, or any individual Scheme Creditor under the Scheme.

9.    **WHEN WILL THE SCHEME AND THE RESTRUCTURING BECOME EFFECTIVE?**

The Scheme will become effective when the Sanction Order is delivered to the Registrar of Companies of England and Wales, which the Company will do as soon as possible once the Sanction Order has been granted. Once this has been done, pursuant to clause 4 of the Scheme, the Company will be authorised to give instructions and sign any Restructuring Documents on behalf of the Scheme Creditors. The Company will notify the Scheme Creditors once the Scheme Lodgement Date has occurred.

4822-0238-1911v18

The Restructuring will be implemented on the Restructuring Implementation Date, which will be the date notified to Scheme Creditors through the Scheme Website once the Company has determined that the following Restructuring Conditions Precedent have been satisfied:

(a)   that the Company's shareholders have provided the necessary consents to:

  (i)   approve the issue of, and disapply statutory pre-emption rights relating to the issue of, the Exchange Shares to the Scheme Creditors pursuant to the terms of the Scheme; and

  (ii)   waive Rule 9 of the Takeover Code in so far as it would require Solus Alternative Asset Management LP and certain of its funds to make a mandatory offer to the Company's shareholders as a result of the Exchange;

(b)   that the Company's board has approved the issue of the Exchange Shares to the Scheme Creditors pursuant to the terms of the Scheme;

(c)   the Custody Agreement has been executed by the Company and the Custodian;

(d)   the Share Registrar has received proof that the application has been made for Exchange Shares to be admitted to trading on the AIM market of the London Stock Exchange; and

(e)   the Chapter 15 Order has been granted by the U.S. Bankruptcy Court.

When all the Scheme Implementation Steps have been implemented, the Restructuring Effective Date will occur, and the Company will promptly inform Scheme Creditors through the Scheme Website that the Restructuring Effective Date has occurred.

If the Restructuring Effective Date has not occurred by the Longstop Date, the terms of the Scheme will lapse, unless such date has been extended by the Company and the Majority Scheme Creditors.

4822-0238-1911v18

## PART E
## ACTIONS TO BE TAKEN BY SCHEME CREDITORS

1.  **COMPLETION OF ACCOUNT HOLDER LETTERS**

    Each Scheme Creditor wishing to vote at the Scheme Meeting is requested to liaise with its Account Holder to ensure that a validly completed Account Holder Letter is delivered to the Information and Tabulation Agent in respect of that Scheme Creditor as soon as possible after the Record Time, and by no later than Voting Submission Deadline. The form of Account Holder Letter is attached as Annex III to this Explanatory Statement, and should be completed in accordance with the instructions set out therein. An editable PDF version of the Account Holder Letter is available on the Scheme Website: http://sites.dfkingltd.com/avanti.

    In particular, to be validly completed, the Account Holder Letter must set out details of the interests in the 2023 Notes held by the relevant Scheme Creditor as at the Record Time (being 5.00 p.m. New York time on 12 March 2018). To constitute a Holdings Certification for the purposes of the Scheme, the Account Holder Letter must contain the Account Holder's Signature Medallion Guarantee Stamp.

    The Holdings Certification will, along with the SPR and the Omnibus Proxy, be used by the Information and Tabulation Agent to tabulate the votes for and against the Scheme at the Scheme Meeting. The Information and Tabulation Agent will also use the Holdings Certification to calculate each Scheme Creditor's Scheme Creditor Entitlement and Scheme Share Allocation, which will be determined based on the principal amount of 2023 Notes held by each Scheme Creditor as a proportion of the total outstanding 2023 Notes, in each case as at the Record Time.

    Account Holder Letters cannot be submitted before the Record Time, as the Account Holders will need to confirm each Scheme Creditor's interests in the 2023 Notes as of the Record Time.

    **Scheme Creditors or Account Holders should notify the Information and Tabulation Agent as soon as possible if an Account Holder will not be able to provide a Signature Medallion Guarantee Stamp to certify the principal amount of 2023 Notes held by that Scheme Creditor as of the Record Time.**

2.  **VOTING AT THE SCHEME MEETING BY PROXY**

    If a Scheme Creditor does not want, or is not able to attend the Scheme Meeting to vote in person, that Scheme Creditor should use an Account Holder Letter to appoint a proxy to vote on that Scheme Creditor's behalf. The proxy can be either the Chairman or another nominated individual. In either case, the proxy will have no discretion as to how to vote on the Scheme and must vote for or against the Scheme in accordance with the relevant Scheme Creditor's instructions set out in the Account Holder Letter.

    Appointments of proxies will only be effective if they are appointed in a validly completed Account Holder Letter including a Holdings Certification delivered to the Information and Tabulation Agent before the Voting Submission Deadline.

Appointing a proxy will not preclude a Scheme Creditor from attending the relevant Scheme Meeting to vote in person if they so wish, but doing so will automatically revoke the appointment of any proxy. Proxies other than the Chairman should bring a copy of the relevant Scheme Creditor's Account Holder Letter and a passport so their identity can be confirmed.

3.    **VOTING IN PERSON AT THE SCHEME MEETING**

To vote at the Scheme Meeting in person, a Scheme Creditor or its representative must either produce a copy of that Scheme Creditor's validly completed Account Holder Letter (including a Holdings Certification) which has been delivered to the Information and Tabulation Agent by the Voting Submission Deadline, or otherwise be able to provide satisfactory evidence to the Information and Tabulation Agent and Chairman at or in advance of the Scheme Meeting of (a) the principal amount of 2023 Notes held by that Scheme Creditor as of the Record Time; (b) the Scheme Creditor's entitlement to vote; and (c) the Scheme Creditor's representative's identity and authority to represent the Scheme Creditor at the Scheme Meeting.

The Scheme Meeting will take place at 10.00am London time on 20 March 2018 at Milbank's offices at 10 Gresham Street, London EC2V 7JD. Each person attending will be required to register its attendance at the Scheme Meeting prior to its commencement. Registration for the Scheme Meeting will commence at 9.45 a.m. London time.

4.    **VOTING PROCEDURES AT THE SCHEME MEETING**

The Chairman and the Information and Tabulation Agent will determine whether the Scheme has been approved by the requisite majorities of Scheme Creditors at the Scheme Meeting. Each Scheme Creditor's Voting Value at the relevant Scheme Meeting will be determined based on that Scheme Creditor's holding of 2023 Notes as at the Record Time, as set out in its Holdings Certification or otherwise evidenced to the satisfaction of the Chairman.

The Chairman shall be authorised to reject or modify the value attributed to a Scheme Creditor's holding of Notes for voting purposes only if that Scheme Creditor has not complied with the applicable voting procedures.

Scheme Creditors will be given the opportunity to raise any questions or issues they may have in relation to the Scheme. Scheme Creditors are however encouraged to raise any such questions or issues with the Information and Tabulation Agent as soon as possible, rather than waiting until the Scheme Meeting.

The 2023 Notes Trustee is not considered to be a Scheme Creditor. However, to avoid the possibility of any double-counting at the Scheme Meeting, the 2023 Notes Trustee has confirmed to the Company in a letter dated 13 February 2018 that it will not seek to vote at the Scheme Meeting and has not sought instructions from the Scheme Creditors in this regard.

4822-0238-1911v18

5.  **APPOINTMENT OF NOMINATED RECIPIENTS BY SCHEME CREDITORS**

Scheme Creditors have the option of nominating another person to receive some or all of their Scheme Share Allocation by completing Section 1, Part C of the Account Holder Letter.

If a Scheme Creditor validly nominates one or more Nominated Recipient(s) to receive 100% of its Scheme Share Allocation, that Scheme Creditor does not need to provide CREST Account details in Part A of Section 1 of its Account Holder Letter.

If a Scheme Creditor purports to appoint a Nominated Recipient in its Account Holder Letter, but does not provide all the information required to complete the Nominated Recipient Nomination Form in the Account Holder Letter, provides invalid CREST account details for the Nominated Recipient, or nominated a Nominated Recipient who is a Disqualified Recipient, the nomination of the Nominated Recipient will be invalid and not Scheme Share Allocation will be issued to the Nominated Recipient.

6.  **COMPLETION OF ACCOUNT HOLDER LETTERS AFTER THE SCHEME MEETING**

Any voting instructions in Account Holder Letters submitted after the Scheme Meeting will be disregarded.

Scheme Creditors who did not submit a validly completed Account Holder Letter (including a Holdings Certification) by the Voting Submission Deadline are nonetheless strongly encouraged to do so before the Entitlement Submission Deadline to ensure that their Scheme Share Allocations are distributed to them or their Nominated Recipient(s) on the Restructuring Effective Date, rather than to the Custodian.

If an Account Holder Letter is being delivered after the Entitlement Submission Deadline, the Scheme Creditor should ensure that Section 4 (*Custody Distribution Instructions*) is completed.

7.  **COMPLETION AND DELIVERY OF CONFIRMATION FORMS**

The form of Confirmation Form is attached to this Explanatory Statement as Annex IV. A Scheme Creditor must validly complete a Confirmation Form in accordance with the instructions set out therein as a condition to having its Scheme Share Allocation issued to it or its Nominated Recipient(s). If a Scheme Creditor wishes to have its Scheme Share Allocation issued to it on the Restructuring Effective Date, it must ensure that it delivers a validly completed Confirmation Form to the Information and Tabulation Agent on or before the Entitlement Submission Deadline. If a Scheme Creditor does not do so, its Scheme Share Allocation will be issued to the Custodian on the Restructuring Effective Date.

An editable PDF version of the Confirmation Form is available on the Scheme Website (https://sites.dfkingltd.com/avanti).

A Scheme Creditor does not need to deliver a Confirmation Form to vote on the Scheme.

- 31 -

4822-0238-1911v18

8. **RELATIONSHIP BETWEEN SCHEME CREDITORS, THE 2023 NOTES AND CLEARING SYSTEMS**

The following diagram illustrates the relationship between certain persons with interests in the 2023 Notes held in global form through DTC:



**Clearing Systems**
(DTC)

**Account Holder**
(typically a bank or brokerage house holding directly via DTC)

Each Account Holder holds 2023 Notes either for its own account or for its client who may be a Scheme Creditor

**Intermediary(ies)**

(typically a bank or brokerage house which does not have an account with DTC and which holds 2023 Notes either for its own account or for its client (being a Scheme Creditor)). There may be one or more Intermediaries between an Account Holder and a Scheme Creditor for its client.

**Scheme Creditor**

**Voting**

Each Scheme Creditor with the ultimate economic interest as principal in the 2023 Notes will be entitled to appoint a proxy (either the chairman of the Scheme Meeting or any other person) or to attend in person and vote at the Scheme Meeting.

4822-0238-1911v18

The following persons have interests in the 2023 Notes:

(a) **Account Holders**: An Account Holder is recorded directly in the records of DTC as holding an interest in the 2023 Notes in an account with DTC. An Account Holder may hold an interest in the 2023 Notes on its own behalf as a Scheme Creditor and/or (directly or indirectly) for one or more other Scheme Creditors.

(b) **Intermediaries**: An Intermediary holds an interest in the 2023 Notes on behalf of another person or other persons and does not hold that interest as an Account Holder.

(c) **Scheme Creditors**: A Scheme Creditor has the ultimate economic interest as principal in the 2023 Notes held in global form through DTC including by the right to have issued definitive notes under the 2023 Notes Indenture, and/or the benefit of such right, as applicable. For the avoidance of doubt, a person who is an Account Holder may also be a Scheme Creditor where they hold the ultimate economic interest under the 2023 Notes for their own account.

(d) **The DTC Custodian and the 2023 Notes Trustee**.

4822-0238-1911v18

## PART F
## CUSTODY OF EXCHANGE SHARES DURING THE HOLDING PERIOD

If a Scheme Creditor has not satisfied the conditions under the Scheme to have its Scheme Share Allocation issued to it or its Nominated Recipient(s) on the Restructuring Effective Date, that Scheme Creditor's Scheme Share Allocation will instead be issued to the Custodian on the Restructuring Effective Date, rather than to that Scheme Creditor or its Nominated Recipient(s).

The Custodian will hold the Exchange Shares issued to it pursuant to the terms of the Custody Agreement, which will provide (among other things) that the Custodian will distribute any Custody Share Allocations and related Accruals in accordance with the Company's instructions.

Any Scheme Creditor whose Scheme Share Allocation is issued to the Custodian may at any time before the expiration of the Holding Period deliver a validly completed Account Holder Letter including a completed Section 4 (*Custody Distribution Instructions*) to instruct the Information and Tabulation Agent to deliver a Custody Distribution Instruction to the Company.

The Information and Tabulation Agent will send Custody Distribution Instructions to the Company on a monthly basis, which will set out the details of the Custody Scheme Creditors who have instructed the distribution of their Scheme Share Allocations and have satisfied the conditions in the Scheme to receive them. Any Accruals relating to the Scheme Share Allocations held by the Custodian will be distributed as and when the related Scheme Share Allocations are distributed.

Upon receipt of a Custody Distribution Instruction, the Company shall promptly instruct the Custodian to make the distributions set out in that Custody Distribution Instruction, or otherwise procure that the Scheme Share Allocations specified in the Custody Distribution Instruction are distributed to the relevant recipient(s). The Company's obligations to take these steps shall be directly enforceable against the Company by the relevant Distribution Scheme Creditor(s).

If upon the expiration of the Holding Period, the Information and Tabulation Agent has:

(a)    not received a validly completed Account Holder Letter (including a completed Section 4 (*Custody Distribution Instructions*) in respect of a Custody Scheme Creditor; or

(b)    received a validly completed Account Holder Letter (including a completed Section 4 (*Custody Distribution Instructions*)) in respect of a Custody Scheme Creditor, but such Custody Scheme Creditor has not yet delivered a Confirmation Form to the Information and Tabulation Agent and/ or such Custody Scheme Creditor is a Disqualified Recipient and has not nominated one or more Nominated Recipient(s) to receive its entire Scheme Share Allocation,

the Company shall be irrevocably authorised and instructed by such remaining Custody Scheme Creditors to instruct the Custodian to transfer any remaining Scheme Share

Allocations held by the Custodian (together with any Accruals thereon) to the Company or as the Company directs free of any claim or interest of the Custody Scheme Creditors and without notice to the Custody Scheme Creditors.

## PART G
## 2021 NOTES RESTRUCTURING AMENDMENTS

*The following description includes the text of certain relevant provisions of the 2021 Notes Indenture as they will be amended by the 2021 Notes Fifth Supplemental Indenture once it becomes operative on the Restructuring Effective Date, with an indication of differences between such provisions as amended to incorporate the 2021 Notes Restructuring Amendments and those provisions as of the date hereof. New text is indicated by a double underline, whereas deleted text is indicated by a strikethrough (<u>new text</u> / ~~deletion~~). The following text does not restate in its entirety all parts of the 2021 Notes Fifth Supplemental Indenture as it will appear following adoption of the 2021 Notes Restructuring Amendments.*

**2021 Notes Restructuring Amendments**

Section 1.01  *Definitions*

"*Applicable Premium*" means, with respect to any Note on any redemption date, the excess (if any) of:

(a)    the present value at such redemption date of (i) the scheduled principal amount of the Note at the Maturity Date, plus (ii) all required interest payments due on the Note through the Maturity Date (excluding accrued but unpaid interest to the redemption date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(b)    the principal amount of such Note.

For purposes of calculating the Applicable Premium, (i) interest for any ~~PIK Election~~ Interest Period that begins after the redemption date will be calculated as PIK Interest at the Applicable Rate of ~~15~~<u>9</u>.000% per annum ~~(plus, to the extent that one or more Margin Increases has occurred with respect to any Interest Period prior to the redemption date, the aggregate rate of all such Margin Increases)~~, which PIK Interest will be deemed capitalized and added to the principal amount of the Notes, and interest for all other Interest Periods that begin after the redemption date will be calculated as Cash Interest at the Applicable Rate of ~~10~~<u>9</u>.000% per annum ~~(plus, to the extent that one or more Margin Increases has occurred with respect to any Interest Period prior to the redemption date, the aggregate rate of all such Margin Increases)~~, and (ii) the Maturity Date shall refer to the Maturity Date as in effect on the date of the notice of redemption provided pursuant to Section 3.03.

The calculation of the Applicable Premium shall be performed by the Issuer or on behalf of the Issuer by such Person as the Issuer may engage.

"*Maturity Date*" means October 1, ~~2021~~<u>2022</u>; ~~provided that the Maturity Date shall be extended by one year to and shall mean October 1, 2022, if Holders representing at least 60% in aggregate principal amount of then-outstanding Notes consent prior to April 1, 2021 to extend the maturity of the Notes by one year to October 1, 2022~~.

"*Permitted Collateral Liens*" means:

(10)    Liens on the Collateral to secure Indebtedness permitted by Section 4.09(b)(23), which Indebtedness may have super seniority priority status in accordance with the terms of the Security Documents; ~~and~~

(11)   Liens on the Collateral to secure Indebtedness permitted by Section 4.09(b)(24), which Indebtedness may have super seniority priority status in accordance with the terms of the Security Documents~~.~~; and

(12)   Liens on the Collateral to secure Indebtedness permitted by Section 4.09(b)(25); *provided* that (A) such Indebtedness is secured on a junior or *pari passu* basis with the Notes, (B) the creditors in respect of such Indebtedness are or will become a party to the Intercreditor Agreement prior to or substantially simultaneously with providing the relevant Indebtedness and (C) the final maturity date and/or scheduled repayments in respect of such Indebtedness each fall after the applicable Super Senior Termination Date.

Section 1.02   *Other Definitions*

"*Cash Available for Debt Service*" ............................................................... Exhibit A
"~~Margin Increase~~" ........................................................................................ ~~Exhibit A~~
"~~Minimum Cash Balance~~" ............................................................................. ~~Exhibit A~~
"~~PIK Election Interest Period~~" ...................................................................... ~~Exhibit A~~

Section 4.09   *Incurrence of Indebtedness and Issuance of Preferred Stock*

(b)   Section 4.09(a) will not prohibit any of the following (collectively, "*Permitted Debt*"):

(23)   the incurrence of Indebtedness represented by Super Senior Debt and Permitted Refinancing Indebtedness in respect thereof (and guarantees thereof) in an aggregate principal amount not to exceed at any one time outstanding the sum of (a) $82.5 million *plus* (b) an amount equal to the applicable redemption premium payable upon the optional redemption of the aggregate principal amount of Notes required to be redeemed with the proceeds of Super Senior Debt pursuant to this Indenture *plus* (c) an amount equal to the aggregate amount of fees, expenses or charges related to the incurrence or issuance of any Super Senior Debt; the net proceeds of which Super Senior Debt will be deposited into the HYLAS 4 Reserve Account for the purposes of HYLAS 4 Funding or for the redemption of Notes as required pursuant to Section 3.07; *provided* that if any Indebtedness is to be incurred under this clause (23) other than Indebtedness under the Super Senior Facility or if any Indebtedness outstanding under this clause (23) is renewed, refunded, refinanced, replaced or exchanged, or the terms thereof are amended, supplemented or otherwise modified, then such resulting Indebtedness shall only be included in the definition of Permitted Debt under this clause (23) if such incurrence, renewal, refunding, refinancing, replacement, exchange, amendment, supplement or modification is consented to prior to its effectiveness by Holders representing at least 60% in aggregate principal amount of then-outstanding Notes; ~~and~~

(24)   the incurrence of (i) Indebtedness (if the net proceeds of such Indebtedness are deposited into the Segregated Account) and Permitted Refinancing Indebtedness in respect thereof in an aggregate principal amount at any one time outstanding under this subclause (i) not to exceed $50.0 million and (ii) any Indebtedness issued as payment-in-kind interest in respect of Indebtedness under this clause (24) and Permitted Refinancing Indebtedness in respect thereof, and in each case, the guarantees thereof; *provided* that if any Indebtedness is to be incurred under this clause (24) other than Indebtedness under the Super Senior Facility or if any Indebtedness outstanding under this clause (24) is renewed, refunded, refinanced, replaced or exchanged, or the terms thereof are amended, supplemented or otherwise modified, then such resulting Indebtedness shall only be included in the definition of Permitted Debt under this clause (24) if such incurrence, renewal, refunding, refinancing, replacement, exchange, amendment, supplement or modification is consented to prior to its effectiveness by Holders representing at least 60% in aggregate principal amount of then-outstanding Notes;

*provided* that, prior to the incurrence of super senior Indebtedness pursuant to Sections 4.09(b)(23) and 4.09(b)(24) which would result in greater than $100.0 million in aggregate principal amount of super senior Indebtedness being outstanding at any one time (excluding any payment-in-kind interest

in respect of such super senior Indebtedness), such incurrence must be consented to by Holders representing at least 60% in aggregate principal amount of then-outstanding Notes if the terms of such super senior Indebtedness are different than those provided in the Super Senior Facility (excluding minor or administrative differences); and

(25)   the incurrence by the Issuer or any Guarantor of Indebtedness, including Additional Notes, in an aggregate principal amount not to exceed at any one time outstanding the sum of (a) $30.0 million, (b) an amount equal to the aggregate amount of fees, expenses or charges related to the incurrence or issuance of such Indebtedness, and (c) any payment-in-kind interest in respect thereof and the related Guarantees thereof; *provided,* that the Issuer and the Guarantors shall have complied with the procedures set forth in Section 4.09(h) of this Indenture.

(h)   The Issuer or the Guarantor(s) who propose to incur Indebtedness under Section 4.09(b)(25) of this Indenture shall, prior to incurring any such Indebtedness, offer the Holders the opportunity to fund such Indebtedness on the same terms and conditions as the Indebtedness is proposed to be incurred, which may include additional Notes. The Issuer shall send a notice to the Holders containing a description of the terms and conditions of the Indebtedness, and the Holders shall have thirty (30) days to elect whether to participate in funding the Indebtedness. Such offer shall be made to all Holders on a pro rata basis based on the aggregate principal amount of Notes held by such Holder at the time of such notice. If any Holder declines to participate, participating Holders shall have the right to subscribe for the unsubscribed amount (and if more than one Holder subscribes for the unsubscribed amount, such Holders shall subscribe for their pro rata portion of the unsubscribed amount, where the numerator is such Holder's aggregate principal amount of Notes and the denominator is the aggregate principal amount of Notes held by all Holders who are subscribing for the unsubscribed amount). Any portion of the Indebtedness for which the Holders do not subscribe may be funded on the terms and conditions of the offer by any other Person.

~~Section 4.30~~   ~~*Maintenance of Minimum Consolidated LTM EBITDA.*~~

~~The Issuer shall maintain a minimum Consolidated LTM EBITDA as of the last day of any fiscal quarter, beginning on March 31, 2018 and ending on March 31, 2020, based on the following:~~

| ~~EBITDA Testing Date~~ | ~~Minimum Consolidated LTM EBITDA ($'000)~~ |
|---|---|
| ~~March 31, 2018~~ | ~~$1~~ |
| ~~June 30, 2018~~ | ~~$2,000~~ |
| ~~September 30, 2018~~ | ~~$5,000~~ |
| ~~December 31, 2018~~ | ~~$7,500~~ |
| ~~March 31, 2019~~ | ~~$11,000~~ |
| ~~June 30, 2019~~ | ~~$15,000~~ |
| ~~September 30, 2019~~ | ~~$20,000~~ |
| ~~December 31, 2019~~ | ~~$25,000~~ |
| ~~March 31, 2020~~ | ~~$31,000~~ |

Section 9.01 *Without Consent of Holders of Notes*

(g)      to provide for the issuance of (i) Additional Notes in accordance with the limitations set forth in this Indenture as of the Exchange Offer Settlement Date and (ii) additional notes that are substantially identical to the Notes in existence immediately prior to such issuance, other than issue date, issue price (including original issue discount), and "CUSIP" number, if any, which additional notes and the Notes shall be treated as a single class for all purposes under this Indenture except as necessary to reflect such differences;

Section 9.02  *With Consent of Holders of Notes*

(b)    reduce the principal of or change the fixed maturity of any Note or alter the provisions with respect to the redemption of the Notes (except as provided above with respect to Section 3.07, Section 3.10, Section 4.11 and Section 4.15 hereof); ~~provided that the Maturity Date shall be extended by one year to October 1, 2022 hereunder if consented to prior to April 1, 2021 by Holders representing at least 60% of the aggregate principal amount of then-outstanding Notes;~~

Form of Note

AVANTI COMMUNICATIONS GROUP PLC, a public limited company organized under the laws of England and Wales, promises to pay to _____, or registered assigns, upon surrender hereof, the principal sum of _____ dollars, subject to any adjustments listed in the Schedule of Exchanges of Interests in the Global Note attached hereto, on October 1, 202~~1~~2 (the "*Maturity Date*")~~; provided that the Maturity Date shall be extended by one year to October 1, 2022 hereunder if consented to prior to April 1, 2021 by Holders representing at least 60% of the aggregate principal amount of then-outstanding Notes.~~

~~1.~~  *INTEREST*. Avanti Communications Group plc, a public limited company incorporated under the laws of England and Wales (including any and all successors thereto, the "*Issuer*"), promises to pay or cause to be paid interest on the principal amount of this Note at the rate *per annum* (the "*Applicable Rate*") of 1~~0~~2.000% *per annum*, with respect to <u>interest payments paid in cash</u> any <u>("*Cash Interest*")</u> ~~(as defined herein)~~ and 1~~5~~2.000% *per annum*, with respect to any <u>interest paid in kind by increasing the principal amount of the outstanding Notes in a principal amount equal to such interest or by issuing Additional Notes in a principal amount equal to such interest ("*PIK Interest*")</u> ~~(as defined herein)  from and after the Exchange Offer Settlement Date for all Interest Periods commencing October 1, 2017. ; provided that (i) if on a Determination Date (as defined herein) the Issuer's Consolidated LTM EBITDA on either (but not both) of the two EBITDA Testing Dates immediately preceding such Determination Date is less than the minimum Consolidated LTM EBITDA specified in respect of such EBITDA Testing Date in the table immediately following this paragraph, the Applicable Rate with respect to (x) Cash Interest shall be 11.250% per annum and (y) PIK Interest shall be 16.250% per annum, in each case, for the Interest Period following such Determination Date and (ii) if on such Determination Date the Issuer's Consolidated LTM EBITDA on both of the two EBITDA Testing Dates immediately preceding such Determination Date is less than the minimum Consolidated LTM EBITDA specified in respect of such EBITDA Testing Dates in the table immediately following this paragraph, the Applicable Rate with respect to (x) Cash Interest shall be 12.500% per annum and (y) PIK Interest shall be 17.500% per annum, in each case, for the Interest Period following such Determination Date (any such increase in the Applicable Rate with respect to Cash Interest or PIK Interest, a "Margin Increase"). A Margin Increase with respect to any Interest Period shall not carry forward into subsequent Interest Periods.~~

| ~~EBITDA Testing Date~~ | ~~Minimum Consolidated LTM EBITDA~~ |
|---|---|
| ~~June 30, 2017~~ | ~~$12.0 million~~ |
| ~~September 30, 2017~~ | ~~$23.0 million~~ |
| ~~December 31, 2017~~ | ~~$32.0 million~~ |
| ~~March 31, 2018~~ | ~~$42.0 million~~ |
| ~~June 30, 2018~~ | ~~$47.0 million~~ |

The Issuer will pay interest semi-annually in arrears on April 1 and October 1 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "*Interest Payment Date*"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; *provided* that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date~~; provided further that the first Interest Payment Date after the Exchange Offer Settlement Date shall be April 1, 2017.~~  The Issuer will, to the extent lawful, pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at a rate that is 2.000% *per annum* higher than the then applicable interest rate on

the Notes, and will, to the extent lawful, pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Amounts (without regard to any applicable grace periods) at the same rate. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

~~Except as provided in the immediately succeeding sentence, interest on the Notes shall be payable entirely in cash ("*Cash Interest*"). For the Interest Periods ending on April 1, 2017 and October 1, 2017 (each such Interest Period, a "*PIK Election Interest Period*"), if (x) no Default or Event of Default exists, and (y) the Minimum Cash Balance (as defined herein) on the Determination Date in respect of such Interest Period is below the Minimum Cash Balance Threshold specified in respect of such Determination Date in the table immediately following this paragraph, then the Issuer shall pay interest on 100% of the then outstanding principal amount of the Notes by increasing the principal amount of the outstanding Notes or by issuing Additional Notes in a principal amount equal to such interest ("*PIK Interest*").~~

| ~~Determination Date~~ | ~~Minimum Cash Balance Threshold~~ |
|---|---|
| ~~March 16, 2017~~ | ~~$40.0 million~~ |
| ~~September 15, 2017~~ | ~~$42.0 million~~ |

Commencing October 1, 2017, for any Interest Period (other than the final Interest Period ending on the Stated Maturity of the Notes), if the Cash Available for Debt Service as determined on the Determination Date (each, as defined herein) for such Interest Period is less than the aggregate amount of Cash Interest that would otherwise be due on the relevant Interest Payment Date, then the Issuer may, at its option, elect to pay all or part of the interest on the then outstanding principal amount of the Notes as PIK Interest in an amount equal to all or a portion of the excess of the aggregate amount of Cash Interest due on the relevant Interest Payment Date over the Cash Available for Debt Service.

~~In the event that the Issuer shall be entitled to pay PIK Interest for any Interest Period~~ If interest on the Notes with respect to an Interest Period will not be paid entirely as Cash Interest, ~~then~~ the Issuer shall deliver a notice to the Trustee (copied to the Paying Agent) following the Determination Date but not less than five Business Days prior to the Interest Payment Date in respect of the relevant Interest Period, which notice shall state the total amount of interest to be paid on such Interest Payment Date and the amount of such interest to be paid as PIK Interest. The Issuer shall cause such notice to be delivered to DTC for communication to Participants in any Global Note. Such notice shall be binding on the Issuer, shall include a calculation of the ~~Minimum Cash Balance~~ Cash Available for Debt Service certified by the chief financial officer of the Issuer and shall set forth in reasonable detail the Issuer's good faith determination of ~~each component of Minimum Cash Balance~~ Cash Available for Debt Service, ~~identifying the applicable restriction(s) and the Issuer's good faith determination of the maximum amount of funds that may be paid after giving effect to such restriction~~. If the Issuer is required pursuant to this paragraph and the preceding paragraph to pay Cash Interest on the Interest Payment Date, to the extent that on such Interest Payment Date the Issuer would not otherwise have sufficient cash or Cash Equivalents on hand to pay such amount of Cash Interest on such Interest Payment Date in full, the Issuer shall, and shall cause each of its Restricted Subsidiaries to, take all such shareholder, member, corporate, limited liability company and other corporate or similar entity actions required to permit the making of any such dividends or distributions as are within the control of the Issuer and its Subsidiaries and that would not violate any applicable law. If the Issuer pays a portion of interest on the Notes as Cash Interest and a portion as PIK Interest, such Cash Interest and PIK Interest shall each be paid to the Holders pro rata in accordance with their holdings.

~~The insufficiency or lack of funds available to the Issuer to pay Cash Interest as required by the preceding two paragraphs shall not permit the Issuer to pay PIK Interest in respect of any Interest Period. The sole right of the Issuer to elect to pay PIK Interest shall be as (and to the extent) provided in the preceding two paragraphs.~~

As used herein:

"*Determination Date*", with respect to each Interest Period, shall be the 15th calendar day immediately prior to the Interest Payment Date in respect of such Interest Period.

"~~*Minimum Cash Balance*~~ *Cash Available for Debt Service*," as of any Determination Date, shall be the amount equal to the balance of cash and Cash Equivalents on hand at the Issuer and its Restricted Subsidiaries as of such Determination Date, excluding:

~~(a)     excluding any cash and Cash Equivalents on hand at the Issuer that have been distributed to the Issuer and the distribution of which was conditioned in good faith upon such cash and Cash Equivalents being utilized for a purpose which is not that of paying Cash Interest (including amounts permitted to be distributed to the Issuer solely for the purpose of paying taxes attributable to the Issuer's consolidated Subsidiaries) as the result of restrictions on the ability to make such dividends or distributions provided such restrictions are otherwise permitted by Section 4.08 of the Indenture (including, without limitation, any restrictions and limitations in Indebtedness of any Restricted Subsidiaries in existence on the Exchange Offer Settlement Date; *provided* the incurrence and terms of such Indebtedness do not violate the Indenture, or any agreement that amends, modifies, renews, increases, supplements, refunds, replaces or refinances such Indebtedness);~~

~~(b)     including undrawn amounts under any revolving credit facilities or local working capital facilities (other than capital lease facilities) of the Issuer and its Restricted Subsidiaries; and~~

(a)     $30.0 million;

(b)     any cash on hand constituting proceeds from the Super Senior Debt, ~~or~~ Other Indebtedness or the issuance of equity of the Issuer;

(c)     any cash held by the Issuer or any Restricted Subsidiary classified as restricted cash under IFRS; and

(d)     any cash or Cash Equivalents necessary for purposes of HYLAS 4 Funding or working capital purposes as determined in good faith by the Board of Directors of the Issuer to be prudent to be retained for the purposes of satisfying actual, contingent and prospective liabilities of the Issuer as at that date,

determined on a *pro forma* basis to give effect to (i) the payment of any Cash Interest payable under the Notes on such Interest Payment Date, and (ii) the payment of cash interest on the Super Senior Debt on the next succeeding interest payment date thereunder.

## PART H
## CAPITALISATION

The following table sets forth the Company's consolidated cash and cash equivalents and its total capitalisation as of 30 June 2017 on (i) an actual basis, (ii) an as-adjusted basis to give pro forma effect to the incurrence of the Super Senior Debt post-fiscal year end and (iii) an as-adjusted basis to give pro forma effect to the Restructuring.

| | As of 30 June 2017 | | | |
| --- | --- | --- | --- | --- |
| | Actual | Adjustment 1[(1)] | Adjustment 2[(2)] | As Adjusted |
| | (audited) | (unaudited) | | |
| | ($ millions) | | | |
| Cash and cash equivalents............................ | 32.7 | 118.0 | (0.8)[(3)] | 149.9 |
| **Debt** | | | | |
| 2021 Notes (4)............................................. | 287.6 | — | — | 287.6 |
| 2023 Notes[(5)] ............................................... | 293.6 | — | (293.6) | — |
| Super Senior Debt....................................... | — | 118.0 | — | 118.0 |
| Finance leases(6)......................................... | 13.5 | — | — | 13.5 |
| **Total debt** ................................................. | 594.7 | 118.0 | (293.6) | 419.1 |
| **Shareholders' equity**................................ | 136.8 | — | 292.8[(7)] | 429.6 |
| **Total capitalisation**.................................... | 731.5 | 118.0 | (0.8) | 848.7 |

(1)   Reflects adjustments relating to the incurrence of Super Senior Debt post-fiscal year end. Includes $100 million in proceeds from the incurrence of Super Senior Debt in July 2017 and $18 million in proceeds from the incurrence of Super Senior Debt in October 2017.

(2)   Reflects adjustments relating to the Restructuring.

(3)   Includes $792,783.20 paid as the 2021 Consent Payment (assuming 100% participation in the 2021 Notes Consent Solicitation and delivery by each Scheme Creditor of its consent at or prior to the Early Consent Time in the 2021 Notes Consent Solicitation) and $24,433.67 paid as the 2023 Consent Payment in the 2023 Notes Consent Solicitation (assuming 100% participation in the 2023 Notes Consent Solicitation and delivery by each Scheme Creditor of its consent at or prior to the Early Consent Time in the 2023 Notes Consent Solicitation).

(4)   The 2021 Notes have been reflected at their aggregate principal amount. In accordance with IFRS, the issuance costs associated with the 2021 Notes have been capitalised and amortised over the life of the 2021 Notes.

(5)   As a result of the financial restructuring in January 2017, there was a substantial modification to the 2023 Notes. As a result, the original 2023 Notes are required to be de-

recognised and the new 2023 Notes recorded at market value at that date. The liability on the balance sheet was recorded at the market value immediately after the restructuring had been completed in January 2017. The carrying value of the 2023 Notes was reduced from $481.6 million to $245.6 million with the resulting credit of $219.2 million being credited to the income statement. The carrying value of the debt will accrete up to the face value over the maturity of the 2023 Notes.

(6)   Amount presented reflects carrying amount. As of 30 June 2017, the aggregate contractual amount of the Company's finance leases was $21.8 million.

(7)   The increase in shareholders' equity is an estimate representing the fair value of the Exchange Shares issued in the Exchange for the 2023 Notes and the impact of the gain or loss on shareholders' equity. The gain or loss will be calculated immediately following completion and will be the difference between the carrying value of the 2023 Notes, including accrued interest at that point in time, and the market value of the Exchange Shares issued in consideration for the 2023 Notes in the Exchange.

## PART I
### DESCRIPTION OF THE ORDINARY SHARE CAPITAL OF THE COMPANY

The following description contains a summary of the Articles, which were adopted by a special resolution of the Company passed on January 6, 2010, and certain relevant information about the ordinary share capital of the Company. The summary is not meant to be complete and is qualified by reference to the Company's Articles, a copy of which is incorporated herein by reference and is available to you as provided under the heading "Additional Information."

1. **RIGHTS ATTACHING TO ORDINARY SHARES**

1.1 **Voting Rights**

Subject to the provisions of the Act and the Articles and to any rights or restrictions as to voting attached to any class of shares, at any general meeting on a show of hands, every member who (being an individual) is present in person has one vote. On a vote on a show of hands, a proxy appointed by one member has one vote and a proxy appointed by more than one member has one vote, if instructed to vote in the same way by all those members, and is entitled to one vote for and one vote against, if instructed to vote in different ways by those members. On a poll, every member present in person or by proxy or (being a corporation) by a duly authorised representative has one vote for each share of which he is the holder. A member of the Company shall not be entitled, in respect of any share held by him, to vote (either personally or by proxy) at any general meeting of the Company unless all amounts payable by him in respect of that share in the Company have been paid or credited as having been paid.

1.2 **Dividends**

Subject to the provisions of the Act and of the Articles and to any special rights attaching to any shares, the Company may, by ordinary resolution, declare that out of profits available for distribution dividends be paid to members of the Company according to their respective rights and interests in the profits of the Company. However, no such dividend shall exceed the amount recommended by the Board. Interim dividends may be paid to members of the Company; provided that they appear to the Board to be justified by the profits available for distribution and the position of the Company.

Except as otherwise provided by the Articles or by the rights attached to shares, all dividends shall be apportioned and paid pro rata according to the amounts paid up or credited as paid up (otherwise than in advance of calls) on the ordinary shares during any portion or portions of the period in respect of which the dividend is paid.

Unless otherwise provided by the rights attached to any share, no dividends payable by the Company shall bear interest as against the Company.

The Company in general meeting may, on the recommendation of the Board, by ordinary resolution direct that payment of any dividend declared may be satisfied wholly or partly by the distribution of assets, and in particular, of fully paid shares or debentures of any other company.

The Board may, with the prior authority of an ordinary resolution of the Company and provided the Company has sufficient undistributed profits or reserves to give effect to it, offer the holders of ordinary shares the right to elect to receive ordinary shares credited as fully paid in whole or in part instead of cash in respect of the whole or some part of any dividend specified in the resolution.

Any dividend unclaimed for a period of 12 years after having become due for payment shall (if the Board so resolves) be forfeited and shall revert to the Company.

1.3   **Return of Capital**

On a winding-up of the Company, the surplus assets remaining after payment of all creditors shall be divided among the members in proportion to the capital which, at the commencement of the winding up, is paid up on their respective shares or the liquidator may, with the sanction of a special resolution of the Company (and any other sanction required by law), divide amongst the members in specie the whole or any part of the assets of the Company in such manner as shall be determined by the liquidator.

2.   **TRANSFER OF SHARES**

Save in the case of shares which have become participating securities for the purposes of the CREST Regulations, title to which may be transferred by means of a relevant system such as CREST without a written instrument, all transfers of shares must be effected by an instrument of transfer in writing in any usual form or in any other form approved by the Board.   The instrument of transfer shall be executed by or on behalf of the transferor and (in the case of a transfer of a share which is not fully paid up) by or on behalf of the transferee.   The Board may, in its absolute discretion, refuse to register any transfer of certificated shares unless it is:

(a)   in respect of a share which is fully paid up;

(b)   in respect of a share on which the Company has no lien;

(c)   in respect of only one class of shares;

(d)   in favour of a single transferee or not more than four joint transferees;

(e)   duly stamped (if so required); and

(f)   delivered for registration to the registered office of the Company (or such other place as the Board may from time to time determine) accompanied by the relevant share certificate(s) and such other evidence as the Board may reasonably require to prove the title of the transferor and the due execution by him of the transfer or, if the transfer is executed by some other person on his behalf, the authority of that person to do so,

provided that the Board may not exercise such discretion in such a way as to prevent dealings in such shares from taking place on an open and proper basis.

The Board shall register a transfer of title to any uncertificated share, except the Board may refuse (subject to any relevant requirements of the London Stock Exchange plc) to

register the transfer of an uncertificated share which is in favour of more than four persons jointly or in any other circumstances permitted by the CREST Regulations.

If the Board refuses to register a transfer of a share it must, within two months after the date on which the transfer was lodged with the Company, send notice of the refusal to the transferee together with its reasons for refusal.

3.  **DISCLOSURE OF INTERESTS IN SHARES**

The provisions of rule 5 of the Disclosure Guidance and Transparency Rules of the UK Financial Conduct Authority govern the circumstances in which a person may be required to disclose his interests in the share capital of the Company. Inter alia, this requires a person who is interested in 3% or more of the voting rights in respect of the Company's issued ordinary share capital to notify his interest to the Company (and above that level, any change in such interest equal to 1% or more). In addition, the Code contains further provisions pursuant to which a person may be required to disclose his interests in the share capital of the Company.

Pursuant to the Articles, if a member is holding Default Shares, then the Board may, at least 14 days after service of the notice, serve on the holder of such Default Shares a Disenfranchisement Notice pursuant to which the following sanctions shall apply:

(a)  the member shall not, with effect from the service of the Disenfranchisement Notice, be entitled in respect of the Default Shares to be present or to vote (either in person or by proxy) at any general meeting or at any separate meeting of the holders of any class of shares of the Company or on any poll or to exercise any other right conferred by membership in relation to any such meeting or poll; and

(b)  where the Default Shares represent at least 0.25% in nominal value of their class:

(i)  any dividend or other money payable in respect of the ordinary shares shall be withheld by the Company which shall not have any obligation to pay interest on it and the member shall not be entitled to elect in the case of a scrip dividend to receive shares instead of that dividend; and

(ii)  subject, in the case of uncertificated shares to the CREST Regulations, no transfer, other than an approved transfer, of any shares held by the member shall be registered unless:

(A)  the member is not himself in default as regards supplying the information required; and

(B)  the member proves to the satisfaction of the Board that no person in default as regards supplying such information is interested in any of the ordinary shares which are the subject of the transfer.

The above sanctions shall also apply to any shares in the Company issued in respect of the Default Shares (whether on capitalisation, a rights issue or otherwise) unless a separate notice is issued in respect of such further shares.

4.   **PURCHASE OF OWN SHARES**

Subject to the provisions of the Act and to any rights for the time being attached to any shares, the Company may with the sanction of a special resolution enter into any contract for the purchase of its own shares.

5.   **VARIATION OF RIGHTS**

Subject to the provisions of the Act and of the Articles, if at any time the share capital of the Company is divided into shares of different classes, any of the rights attached to any share or class of share in the Company may (unless otherwise provided by the terms of issue of the ordinary shares of that class) be varied or abrogated in such manner (if any) as may be provided by such rights or, in the absence of any such provision, either with the consent in writing of the holders of not less than three quarters in nominal value of the issued shares of the class or with the sanction of a special resolution passed at a separate general meeting of the holders of the ordinary shares of the class duly convened and held as provided in the Articles (but not otherwise) and may be so varied or abrogated whilst the Company is a going concern or while the Company is or is about to be in liquidation.

The quorum for such separate general meeting of the holders of the ordinary shares of the class shall be not less than two persons present holding or representing by proxy at least one-third in nominal value of the issued shares of the class in question.

6.   **GENERAL MEETINGS**

Subject to the provisions of the Act, annual general meetings shall be held at such time and place as the Board may determine.  The Board may convene any other general meeting whenever it thinks fit.  A general meeting shall also be convened by the Board on the requisition of members in accordance with the Act.

A general meeting of the Company (other than an adjourned meeting) shall be called by notice of:

(a)   in the case of an annual general meeting, at least 21 clear days; and

(b)   in any other case, at least 14 clear days.

The accidental omission to give notice of general meeting or, in cases where it is intended that it be sent out with the notice, an instrument of proxy, or to give notice of a resolution intended to be moved at a general meeting to, or the non-receipt of any of them by, any person(s) entitled to receive the same shall not invalidate the proceeding at that meeting and shall be disregarded for the purpose of determining whether the notice of the meeting, instrument of proxy or resolution were duly given.

No business shall be transacted at any general meeting unless the requisite quorum is present but the absence of a quorum shall not preclude the choice or appointment of a chairman which shall not be treated as part of the business of the meeting.  Subject to the provisions of the Articles, two persons entitled to attend and vote on the business to be

transacted, each being a member present in person or a proxy for a member, shall be a quorum.

With the consent of any general meeting at which a quorum is present the chairman may, and shall if so directed by the meeting, adjourn the meeting from time to time (or indefinitely) and from place to place as he shall determine. The chairman may, without consent of the meeting, interrupt or adjourn any general meeting if he is of the opinion that it has become necessary to do so in order to secure the proper and orderly conduct of the meeting or to give all persons entitled to do so a reasonable opportunity of speaking and voting at the meeting or to ensure that the business of the meeting is otherwise properly disposed of.

Notice of adjournment or of the business to be transacted at the adjourned meeting is not required unless the meeting is adjourned for 14 days or more, in which case at least 7 clear days' notice is required. No business shall be dealt with at any adjourned meeting, the general nature of which was not stated in the notice of the original meeting.

7.  **BOARD AUTHORISATION OF CONFLICTS**

Subject to and in accordance with the Act and the provisions of the Articles, the Board may authorise any matter or situation in which a Director has, or can have, a direct or indirect interest that conflicts, or may possibly conflict, with the interests of the Company. Any such authorisation shall be effective only if:

(a)  any requirement as to the quorum at any meeting of the Directors at which the matter is considered is met without counting either the conflicted Director or any other interested Director;

(b)  the matter or situation was agreed to and any relevant resolution was passed without counting the votes of the conflicted Director and without counting the votes of any other interested Director; and

(c)  the conflicted Director has disclosed in writing all material particulars of the matter, office, employment or position which relates to the matter or situation which is the subject of the conflict or possible conflict.

8.  **DIRECTORS' INTERESTS**

Provided permitted by any relevant legislation and provided that he has disclosed to the Board the nature and extent of his interest in accordance with the Articles, a Director, notwithstanding his office:

(a)  may be party to or otherwise interested in any contract, arrangement, transaction or proposal with the Company or in which the Company is otherwise interested;

(b)  may hold any other office or position of profit under the Company (except that of auditor of the Company or of any subsidiary of the Company) and may act by himself or through his firm in a professional capacity for the Company;

(c)   may be a member of or a director or other officer of, or employed by, or a party to any transaction or arrangement with, or otherwise interested in, anybody corporate promoted by or promoting the Company or in which the Company is otherwise interested or as regards which the Company has any powers of appointment; and

(d)   shall not, by reason of his office, be liable to account to the Company for any dividend, profit, remuneration, superannuation payment or other benefit which he derives from any such office, employment, contract, arrangement, transaction or proposal or from any interest in any such body corporate and no such contract, arrangement, transaction or proposal shall be avoided on the grounds of any Director having any such interest or receiving any such dividend, profit, remuneration, payment or benefit.

9.   **DIRECTORS' ABILITY TO VOTE AND COUNT FOR QUORUM**

A Director shall not vote on or be counted in the quorum in relation to, any resolution of the Board or any committee of the Board concerning any transaction or arrangement with the Company in which he has an interest which may reasonably be regarded as likely to give rise to a conflict of interest, save that a Director shall be entitled to vote and be counted in the quorum in respect of any resolution at such meeting if the resolution relates to one of the following matters:

(a)   the giving to him of any guarantee, security or indemnity in respect of money lent or obligations incurred by him at the request of or for the benefit of the Company or any of its subsidiary undertakings;

(b)   the giving to a third party of any guarantee, security or indemnity in respect of a debt or obligation of the Company or any of its subsidiary undertakings for which he himself has assumed responsibility in whole or in part, either alone or jointly with others, under a guarantee or indemnity or by the giving of security;

(c)   where the Company or any of its subsidiary undertakings is offering securities in which offer the Director is or may be entitled to participate as a holder of securities or in the underwriting or sub-underwriting of which the Director is to participate;

(d)   relating to another company in which he and any persons connected with him do not to his knowledge hold an interest in shares representing 1% or more of either any class of the equity share capital, or the voting rights, in such company;

(e)   relating to an arrangement for the benefit of the employees of the Company or any of its subsidiary undertakings which does not award him any privilege or benefit not generally awarded to the employees to whom such arrangement relates;

(f)   concerning insurance which the Company proposes to maintain or purchase for the benefit of Directors or for the benefit of persons including Directors;

(g)   the funding of expenditure by one or more Directors in defending proceedings against him or them or doing anything to enable such Directors to avoid incurring such expenditure provided that such funding is consistent with, or no more

beneficial to him or them than the provisions of the Articles and is permitted pursuant to the provisions of the relevant legislation; or

(h)   the giving of an indemnity or indemnities in favour of one or more Directors which is/are consistent with, or no more beneficial to him or them than any such indemnities provided pursuant to the Articles (and provided such indemnities are permitted pursuant to the relevant legislation).

A Director may not vote or be counted in the quorum on any resolution of the Board or committee of the Board concerning his own appointment as the holder of any office or position of profit with the Company or any company in which the Company is interested (including fixing or varying the terms of such appointment or its termination).

Where proposals are under consideration concerning the appointments (including fixing or varying the terms of the appointment) of two or more Directors to offices or position of profit with the Company or any company in which the Company is interested, such proposals may be divided and a separate resolution considered in relation to each Director. In such case, each such Director (if not otherwise debarred from voting) is entitled to vote (and be counted in the quorum) in respect of each resolution except that resolution concerning his own appointment.

10.   **DIRECTORS**

The Directors (other than alternate Directors) shall be entitled to receive by way of fees for their services as Directors such sum as the Board may from time to time determine (not exceeding £400,000 per annum in aggregate or such other sum as the Company in general meeting shall from time to time determine). Such sum (unless otherwise directed by the resolution of the Company by which it is voted) shall be divided among the Directors in such proportions and in such manner as the Board may determine or, in default of such determination, equally (save where any Director has held office for less than the whole of the relevant period in respect of which the fees are paid).

Each Director shall be entitled to be repaid all reasonable travelling, hotel and other expenses properly incurred by them in or about the performance of his duties as Director. If by arrangement with the Board any Director performs any special duties or services outside his ordinary duties as a Director and not in his capacity as a holder of employment or executive office, he may be paid such reasonable additional remuneration (whether by way of a lump sum or by way of salary, commission, participation in profits or otherwise) as the Board may from time to time determine.

11.   **PENSIONS AND BENEFITS**

The Board may exercise all the powers of the Company to provide pensions or other retirement or superannuation benefits and to provide death or disability benefits or other allowances or gratuities (whether by insurance or otherwise) for any person who is or who has at any time been a Director or any director of a subsidiary company of the Company or allied to or associated with the Company or such subsidiary or predecessor in business of the Company or any such subsidiary (and for any member of his family including a

spouse or former spouse or civil partner or former civil partner or any person who is or was dependent on him). For this purpose the Board may, inter alia, establish, maintain, subscribe and contribute to any scheme, institution, club, trust or fund and pay premiums.

12.    **INDEMNIFICATION OF DIRECTORS**

Subject to, and to the fullest extent permitted by, law, every Director and every director of any associated company, former Director, alternate Director secretary or other officer of the Company (other than an auditor) may (at the discretion of the Board) be fully indemnified out of the assets of the Company against all or any part of any costs, charges, losses, damages and liabilities incurred by him in relation to anything done, omitted or alleged to have been done by him in the actual or purported execution or discharge of his duties or exercise of his powers in relation to the Company or in connection with the Company's activities as trustee of any occupational pension scheme, subject to the exclusions set out in the Articles.

## PART J
## DIRECTORS' INTERESTS

The following Directors hold the following interests in the Company as of the date hereof:

| Name | Position | Number of Ordinary Shares Held |
| --- | --- | --- |
| Alan Harper[1] | Interim Chief Executive Officer | - |
| David Bestwick | Technical Director | 1,301,954 |
| Nigel Fox | Group Financial Director | 134,580 |
| Paul Walsh | Chairman | 230,000 |
| Craig Chobor | Non-Executive Director | - |
| Peter Reed | Non-Executive Director | - |
| Paul Johnson | Non-Executive Director | 10,000 |
| Andrew Green | Senior Independent Director / Non-Executive Director | 21,888 |
| Michael Leitner | Non-Executive Director | - |
| Richard Mastolini | Non-Executive Director | - |
| Christopher McLaughlin | Non-Executive Director | - |

The Directors' interests in the Company will be diluted by the issue of the Exchange Shares to Scheme Creditors pursuant to the Exchange and the issue of ordinary shares to investors pursuant to any additional capital raise.

The Scheme contains customary releases by the Scheme Creditors for any claims or liabilities of the Released Parties (including the Directors) arising from their involvement in the 2023 Notes Restructuring, excluding any claims or liabilities arising out of fraud, gross negligence, wilful default or a Released Party's breach of its express obligations under the Scheme or Restructuring Documents.

---

[1] Note that on 2 February 2018, the Company announced that Kyle Whitehall will join the Company as Chief Executive Officer and that Alan Harper will resume his role as non-executive director of the Company from 3 April 2018.

## PART K
## RISK FACTORS

*Scheme Creditors are urged to evaluate carefully all information included in this Explanatory Statement, consult with their own legal, financial and tax advisers and make their own decision about whether to participate in the wider Restructuring.*

1.   **RISKS RELATING TO THE RESTRUCTURING**

1.1   **Upon the 2021 Notes Restructuring Amendments becoming effective and operative, the 2021 Notes will be subject to the terms of, and bound by, the 2021 Notes Restructuring Amendments.**

Upon the 2021 Notes Restructuring Amendments becoming effective and operative, each and every present and future holder of 2021 Notes will be bound by the 2021 Notes Restructuring Amendments, regardless of whether each holder of 2021 Notes delivered a consent or otherwise affirmatively objected to the 2021 Notes Restructuring Amendments. In such event:

- implementation of the Restructuring will not trigger an Event of Default under the 2021 Notes Indenture and the 2021 Notes will not automatically accelerate;

- the Company will no longer be required to maintain a minimum Consolidated LTM EBITDA pursuant to Section 4.30 of the 2021 Notes Indenture;

- despite its substantial leverage, the Company will be able to incur up to a maximum of $30 million of additional Indebtedness;

- holders of 2021 Notes will be repaid in full on October 1, 2022 instead of October 1, 2021;

- holders of 2021 Notes will receive less interest on the 2021 Notes than if the interest payable on the 2021 Notes had remained at 10% Cash Interest or 15% PIK Interest;

- holders of 2021 Notes will no longer be entitled to any Margin Increase payable on the 2021 Notes if the relevant Minimum Consolidated LTM EBITDA threshold is not met; and

- the Company will be permitted to pay PIK Interest on the 2021 Notes for all future interest periods (excluding the final interest period) if it does not have sufficient cash to satisfy the applicable interest coupon on the 2021 Notes.

1.2   **Scheme Creditors are responsible for assessing the merits of the Restructuring.**

Each Scheme Creditor is responsible for assessing the merits of the Restructuring. None of the members of the Group (other than the Company), the Information and Tabulation Agent, the Custodian, the Notes Trustees, the Security Agents or any director, officer, employee, agent or affiliate thereof, has made or will make any assessment of the merits of the Restructuring as a whole on the interests of the Scheme Creditors, either as classes or as individuals.

## 2.    RISKS RELATING TO THE SCHEME

### 2.1    Scheme Creditors may not approve the Scheme

In order for the Scheme to be approved by the Scheme Creditors, the Scheme must be approved by a majority in number (above 50%) representing at least 75% in value of the Scheme Creditors present in person or by proxy and voting at the relevant Scheme Meeting. Under the terms of the Restructuring Agreement, certain of the Scheme Creditors have given undertakings to vote in favour of the Scheme under which they are a Scheme Creditor. Scheme Creditors representing in excess of 71% of Scheme Creditors by value have signed or acceded to the Restructuring Agreement pursuant to which they have agreed to vote in favour of the Scheme at the relevant Scheme Meeting. Such undertakings may cease to be binding in certain circumstances under the terms of the Restructuring Agreement and the Restructuring Agreement may be terminated. The Scheme may not receive the requisite votes for approval by the Scheme Creditors.

### 2.2    Even if the Scheme Creditors approve the Scheme, the Scheme may not be sanctioned by the Court.

In order for the Scheme to become effective under the law of England and Wales, the Court must separately sanction the Scheme. The Court has discretion whether or not to sanction any scheme of arrangement and will need to be satisfied that (i) the provisions of the Act have been complied with; (ii) the terms of the order convening the Scheme Meeting have been complied with, including that notices were sent as ordered; (iii) the Scheme Meeting were properly held and the necessary majorities were achieved at each Scheme Meeting; (iv) the creditor class was fairly represented by those who attended the Scheme Meeting and the statutory majority are acting bona fide and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent; and (v) the Scheme is a fair one such that an intelligent and honest creditor, a member of the class concerned and acting in respect of its interest, might reasonably vote in favour of it. Even if the Scheme is approved at the Scheme Meeting, any Scheme Creditor which voted (or gave instructions to someone to vote on their behalf) at the Scheme Meeting may appear at the Sanction Hearing in order to make representations that the Scheme should not be approved and to object to the granting of the Sanction Order by the Court. The Court may also be prepared to hear such representations and objections from any other person whom they are satisfied has a substantial economic interest in the Scheme. Therefore, it is possible that objections will be made at or before the Sanction Hearing and that any such objections will delay or possibly prevent the Scheme from being sanctioned and becoming effective. There can therefore, be no assurance that the Court will approve the Scheme. Further, even if the Court approves the Scheme, it is possible for any person who opposed the sanction of a scheme of arrangement at a sanction hearing to appeal against the granting of the Sanction Order by the Court. Any such appeals will likely delay the Scheme becoming effective or possibly prevent the Scheme from becoming effective at all.

## 2.3   The Scheme may not become effective

The issuance of ordinary shares in the Company pursuant to the Exchange will require several approvals of the Company's existing shareholders. There can be no assurance that such approvals or consents will be obtained.

Implementation of the Restructuring is conditional on the granting of the Chapter 15 Order. The failure to obtain the Chapter 15 Order will mean that the Restructuring cannot be implemented. It is not certain that the U.S. Bankruptcy Court will grant the Chapter 15 Order in connection with the Scheme. Whether such order will be granted is subject to a number of considerations by the U.S. Bankruptcy Court under the laws of the United States. Even if the Chapter 15 Order is granted in respect of the Scheme, it may be challenged by a Scheme Creditor.

## 2.4   The implementation of the Scheme and the Restructuring may result in adverse and/or complex tax consequences to the Scheme Creditors

The Scheme Companies are not providing tax advice to any Scheme Creditor in connection with the Restructuring, and each Scheme Creditor should consult its own tax adviser regarding tax consequences of the Schemes and the Restructuring.

## 3.   RISKS RELATING TO A FAILURE TO IMPLEMENT OR A DELAY IN IMPLEMENTING THE SCHEME

### 3.1   Liquidation of the Company and its subsidiaries.

In the event that the Scheme is not sanctioned, the Restructuring would not proceed. The Company's Directors are of the view that, based on the current cash flows of the Group, and in the absence of a successful restructuring (on the same or similar terms to the Restructuring) or without generating additional cash flows from operations in the near term, the Company will at some point within the next twelve months become unable to pay its debt obligations as and when they fall due. The Directors are also concerned that the Company may not be able to make ongoing scheduled interest payments on its indebtedness. These possibilities are considered to be realistic, not remote and therefore, the Company would be forced to act.

### 3.2   Delay in implementing the Scheme.

Factors unknown to the Company as at the date of this Explanatory Statement may result in delays to the completion of the Restructuring (including, as highlighted above, any objections to the Scheme). There is no guarantee that the Restructuring Effective Date will occur by the Longstop Date, at which time those Scheme Creditors who are parties to the Restructuring Agreement will no longer be bound by their obligations under the Restructuring Agreement to support the Restructuring and to refrain from taking action against the Company and/or any member of the Group inconsistent with the terms of the Restructuring Agreement and/or that could reasonably delay, impede or frustrate the implementation of the Restructuring (as applicable), and the Scheme will lapse in accordance with its terms. A prolonged delay in the implementation of the Restructuring may result in the destabilisation of the business of the Group which may impact the Group's ability to obtain new contracts or to extend or obtain options to extend existing

contracts. Such prolonged delay may also result in liquidation of the Company and its subsidiaries.

## 4.   RISKS RELATING TO AN UNSUCCESSFUL COMPLETION OF THE RESTRUCTURING

### 4.1   The Restructuring may not be successfully consummated.

Consummation of the Restructuring and the occurrence of the Restructuring Effective Date is subject to, among other things, (1) the adoption of the 2021 Notes Restructuring Amendments pursuant to the successful completion of the 2021 Notes Consent Solicitation and (2) the successful completion of the 2023 Notes Restructuring pursuant to the Scheme. The Company cannot assure you that all requirements for the implementation of the Restructuring will be successful or that the Restructuring Effective Date will occur.

### 4.2   The Company's auditors have included an emphasis of matter in their audit opinion in relation to the Company's ability to continue as a going concern.

Although the Company's auditors prepared the Financial Statements for the fiscal year ended 30 June 2017 on a going concern basis, the auditors included an emphasis of matter in their audit opinion in relation to the Company's ability to continue as a going concern. In particular, the auditors noted that the Company's ability to continue as a going concern is dependent on the successful completion of the Restructuring (which is conditional upon, among other things, the successful completion of the Consent Solicitations and the Scheme), the negotiation of an additional capital raise of a minimum of $30 million following the completion of the Restructuring and the substantial achievement of cash flow forecasts. These events and conditions, along with the other matters explained in Note 2 to the Financial Statements for the fiscal year ended 30 June 2017 constitute a material uncertainty that may cast significant doubt on the Company's ability to continue as a going concern.

### 4.3   Even if the Restructuring is consummated, the Company will need to raise a minimum of $30 million of additional capital and substantially achieve its cash flow forecasts in order to continue as a going concern.

The Company's ability to continue as a going concern is dependent upon (1) the successful completion of the Restructuring, which will result in the capitalisation of approximately $557 million of 2023 Notes and interest expense savings of approximately $81 million per year and will permit the Company to pay PIK Interest on the Notes in accordance with the terms thereof and will result in an interest expense saving of $11 million per year as a result of the elimination of the margin increase pursuant to the 2021 Notes Restructuring Amendments; (2) the negotiation of an additional capital raise of a minimum of $30 million following the completion of the Restructuring and (3) the substantial achievement of the Company's cash flow forecasts, which significantly exceed cash flows from the prior fiscal year.

As of 31 December 2017, the Company had approximately $68 million of cash and cash equivalents. For the fiscal year ending 30 June 2018, the Company expects its costs will

remain broadly in line with prior years and that it will incur an additional $117.7 million of capital expenditure, primarily related to the launch of HYLAS 4. As of 31 December 2017, the Company had $118 million in aggregate principal amount of indebtedness maturing in 2020, $323.3 million in aggregate principal amount of indebtedness maturing in 2021 and $557 million in aggregate principal amount of indebtedness maturing in 2023. Absent the consummation of the Restructuring, the Company will be required to pay approximately $33.4 million in cash interest expense to Scheme Creditors and approximately $4.4 million in cash interest expense under the Super Senior Facility Agreement on 1 April 2018.

The Company's Directors are, therefore, of the view that, based on the current cash flows of the Group, in the event that the Restructuring is not implemented and a minimum of $30 million of additional capital is not raised and additional cash flows are not generated, the Company may be unable to continue operations for the foreseeable future or realise assets and discharge liabilities in the ordinary course of operations.

### 4.4 Even if the Restructuring is consummated, the Company may not be able to raise new liquidity through the issuance of ordinary shares in the Company and/or additional Indebtedness.

Although the Company currently intends to raise between $30 million and $60 million of additional capital through the issuance of ordinary shares in the Company or through additional Indebtedness, there can be no assurance that such additional capital will be successfully raised.

Discussions in relation to how the additional capital will be raised, and on what terms, are ongoing. As at the date of this Explanatory Statement, there is no certainty as to whether or not these discussions will lead to a successful capital raise. If not, the Company will explore other options as to how it may raise the additional capital, which could include the issue of additional 2021 Notes, subject to the Company obtaining any necessary consents required.

The issuance of ordinary shares in the Company will require the approval of the Company's existing shareholders. The incurrence of additional Indebtedness may require the consent of lenders under the Super Senior Facility Agreement to certain amendments to the Super Senior Facility Agreement to permit such Indebtedness depending on the proposed terms of such Indebtedness. There can be no assurance that such approval or consent will be obtained. If the Company is unable to raise a minimum of $30 million of new liquidity, it will cast significant doubt on the Company's ability to continue as a going concern.

### 4.5 There are risks associated with an unsuccessful completion of the Restructuring.

There can be no assurance that the Restructuring will be consummated. In the event that the Restructuring is not successfully completed, the Company will be highly leveraged with minimal or no EBITDA or free cash flows. As the 2023 Notes will remain outstanding, and both the 2023 Notes and the 2021 Notes will require cash interest payments from 1 October 2018 through maturity, the Company will have significant cash

interest expense obligations of approximately $131.3 million per year that it may not be able to meet.

Under such circumstances, the Company will need to raise additional capital or explore other restructuring options, such as an insolvency procedure under English law or filing for Chapter 11 protection under the U.S. Bankruptcy Code, the consequences of which could include a reduction in the value of the Company's assets available to satisfy the Notes and the imposition of costs and other additional risks to Scheme Creditors. In the event that the Company elects to pursue an alternative restructuring solution, the liquidity, market value and price volatility of the Notes could be adversely affected. In addition, Scheme Creditors may not be able to realise the value of the security interests with respect to the Notes and the Security Agents may not be able to foreclose on such security.

5. **RISKS RELATING TO THE COMPANY'S BUSINESS AND INDEBTEDNESS**

5.1 **The Company has a history of net losses and negative cash flow, and it may not be profitable or have positive cash flow in the future.**

The Company has incurred net losses since inception. For the fiscal years ended 30 June 2015, 2016 and 2017, it incurred consolidated net losses of $73.3 million, $69.2 million and $65.7 million, respectively, and it had negative cash flow in each of those periods. The Company may continue to experience operating losses and negative cash flow in the future and may not become profitable or have positive cash flow if it is unable to generate sufficient revenues to offset its operational costs.

Attaining profitability and positive cash flow will depend on the Company's ability to sell capacity on its satellites and thereby increase revenues and manage costs. Future periods of net losses from operations could result in continued negative cash flow and may hamper ongoing operations and prevent the Company from sustaining or expanding its business. If the Company does not achieve or sustain profitability, its business and ability to repay its indebtedness, including the Notes, will be adversely affected.

5.2 **The Company's business is dependent on the launch of HYLAS 4. Any failure of delivery or launch, or the failure of HYLAS 4 to achieve its designated orbital location after launch, would significantly impact the Company's results of operations and its ability to operate as a going concern.**

The construction and launch of satellites are subject to delays in the construction of the satellites, the periodic unavailability of reliable launch opportunities, possible delays in obtaining regulatory approvals and launch failures. If satellite construction schedules are not met, a launch opportunity may not be available at the time a satellite is ready to be launched. A significant delay in the future delivery of any satellite may adversely affect the Company's marketing plan for the satellite.

The Company's business is dependent on the launch of HYLAS 4. The construction of HYLAS 4 is at an advanced stage but has experienced some delays in the factory. Delivery of HYLAS 4 occurred on 14 February 2018 and it is scheduled to be launched on 16 March 2018. However, satellites require a period of in-orbit testing prior to becoming commercially operational. As such, the Company does not expect HYLAS 4 to generate

revenue until July 2018 at the earliest. Any further delay in the delivery of HYLAS 4 would therefore have a material adverse effect on the Company's results of operations and its ability to operate as a going concern.

Furthermore, satellites are subject to certain risks related to failed launches. Launch failures result in significant delays in the deployment of satellites because of the need both to construct replacement satellites, which can take 24 months or longer, and to obtain other launch opportunities. A significant delay in the launch of the satellite carrying the Company's HYLAS 4 or other future satellites could give customers who have purchased or reserved capacity on that payload the right to terminate their service contracts relating to HYLAS 4. The Company may not be able to accommodate affected customers on other satellites until a replacement satellite is available. A customer's termination of its service contracts with the Company as a result of a launch failure would reduce the customer's backlog. Delay caused by launch failures may also preclude the Company from pursuing new business opportunities and undermine its ability to implement its business strategy.

Launch vehicles may also under-perform, in which case the satellite may still be placed into service by using its onboard electrical propulsion systems to reach the desired orbital location, resulting in a delay in the commencement of operations and a commensurate reduction in its service life.

Any further delay in the delivery of HYLAS 4 or the failure of the satellite to launch or achieve its designated orbital location after launch would significantly impact the Company's results of operations and its ability to operate as a going concern.

## 5.3 The Company's substantial leverage and debt service obligations could materially adversely affect its business and preclude it from satisfying its obligations under the instruments governing its indebtedness.

The Company is highly leveraged and has significant debt service obligations. As of 30 June 2017, the Company had total indebtedness with a face value of $826.5 million outstanding. As of 30 June 2017, on a pro forma basis to give effect to the Restructuring, the Company would have had total indebtedness with a face value of $414.3 million outstanding. Although the 2023 Notes will no longer be outstanding upon the successful completion of the Restructuring, the Company will have the ability to pay PIK Interest in respect of the 2021 Notes for all remaining interest periods in accordance with the terms of the 2021 Notes and, therefore, the Company's indebtedness may be further increased in the future.

The Company's high leverage could have important consequences to you, including, but not limited to:

- increasing the Company's vulnerability to, and reducing its flexibility to respond to, a downturn in its business or general adverse economic and industry conditions;

- limiting the Company's ability to obtain additional financing to fund future operations, capital expenditures, business opportunities, acquisitions and other general corporate purposes and increasing the cost of any future borrowings;

- limiting the Company's flexibility in planning for, or reacting to, changes in its business, the competitive environment and the industries in which it operates; and

- placing the Company at a competitive disadvantage compared to its competitors that are not as highly leveraged.

Any of these or other consequences or events could have a material adverse effect on the Company's ability to satisfy its debt obligations, including the Notes.

5.4 **Assuming the successful completion of the Restructuring, the Company may still not have enough financial resources to pay any of its indebtedness in full at maturity.**

Assuming the successful completion of the Restructuring, the Company will have $323.3 million in aggregate principal amount of 2021 Notes maturing in 2022, which amount would increase upon each payment of PIK Interest as permitted by the 2021 Notes Indenture, and $118 million in aggregate principal amount of Super Senior Debt maturing in 2020. The cash requirement to repay the Notes and the Super Senior Debt at maturity significantly exceeds the Company's currently available cash and cash equivalents, which were $68 million as of 31 December 2017. The Company's ability to generate sufficient cash from operations in the future to repay its indebtedness in full is dependent on the successful generation of revenue by its HYLAS 4 satellite. However, the Company does not expect HYLAS 4 to generate revenue until July 2018 at the earliest. If the Company is unable to generate sufficient cash from operations to repay its indebtedness at maturity, it may seek to refinance some or all of its debt or obtain other financing to pay the principal amount due at maturity. However, the global financial markets may be uncertain, and there may be limited access to such financing in the future, which could adversely affect the Company's ability to raise sufficient funds to repay its debt.

5.5 **HYLAS 3 has experienced, and may continue to experience, significant delays.**

HYLAS 3, a payload on the ESA's EDRS-C satellite, has experienced significant delays and the ESA has now advised the Company not to expect a launch until the first three months of 2019. The Company is currently exploring the best options for the exploitation of HYLAS 3. Any further delay in the delivery of HYLAS 3 or the failure of the ESA's EDRS-C satellite to launch or achieve its designated orbital location after launch would have a material adverse impact on the Company's results of operations.

5.6 **The Company has unused satellite capacity, and its results of operations may be materially adversely affected if it is not able to sell its capacity at profitable prices.**

A key assumption of the Company's plan to increase its revenue is that its satellites will reach any level of utilisation. Fleet utilisation helps to track capacity uptake and gives an indication of revenue potential when the Company's fleet is mature. It is calculated by expressing utilised capacity as a percentage of total available capacity for the fleet of HYLAS 1 (3 GHz), HYLAS 2 (11 GHz) and HYLAS 2B (3GHz). ARTEMIS (1 GHz) has now been re-orbited. In the fiscal year ended 30 June 2017, HYLAS 2-B came online in the period with coverage over France, Germany, Poland and the Baltic Sea. The addition of this new capacity increases the current available capacity from 14GHz to

17GHz, meaning that the utilisation metric was re-based. Consequently, the amended fleet utilisation was in the 30%-35% band in the fiscal year ended 30 June 2017.

There can be no assurance that the Company will sell the remaining unused capacity on its satellites within prescribed timeframes or at all. A delay or inability to obtain customers for this capacity, or an inability to sell some or all of its remaining capacity at profitable prices, would have a negative impact on the Company's revenue generation and cash flow and would adversely affect its operating and financial performance.

5.7    **The Company is subject to competition from the fixed satellite services sector and from other providers of communications capacity.**

Competition from other telecommunications providers could have a material adverse effect on the Company's business and could prevent it from implementing its business strategy and expanding its operations as planned.

The Company faces competition in the regions in which it operates from other satellite operators and suppliers of ground-based communications capacity. The increasing availability of satellite capacity and capacity from other forms of communications technology has historically created an excess supply of telecommunications capacity in certain regions from time to time, in part due to the extended time period typically required for a newly launched satellite to achieve full utilisation. If existing fixed satellite services operators or new market entrants begin to offer Ka-band services, the increased competition could result in lower prices, which in turn could reduce the Company's operating margins and the cash available to fund its operations and service its debt obligations.

Some of the Company's competitors have larger satellite fleets and greater financial resources. If the Company's competitors launch new satellites with Ka-band coverage over the regions that it serves, the Company may experience significant pricing pressure. This in turn could adversely affect its revenue and profitability and further impact its ability to service its debt obligations.

Additionally, any significant improvement or increase in the amount of land-based telecommunications capacity, particularly with respect to the existing fibre optic cable infrastructure and point-to-point applications, may cause the Company's customers to shift their transmissions to land-based capacity or make it more difficult for it to obtain new customers. If fibre optic cable networks or other ground-based high-capacity transmission systems are available to service a particular point, that capacity, when available, is generally less expensive than satellite capacity. As land-based telecommunications services expand, demand for some satellite-based services may be reduced.

Failure to compete effectively with other satellite operators and to adapt to new competition and new technologies, or failure to implement the Company's business strategy while maintaining its existing business, could adversely affect its financial condition and results of operations.

5.8 **The market for data communications services may not grow or may shrink. The Company therefore may not be able to attract new customers, retain its existing customers or implement its business growth strategies.**

The future market for data communication services may not grow or may shrink. Competing technologies, such as fibre optic cable, are continuing to adversely affect the satellite-based point-to-point segment of the data communications services sector in developed markets. In the point-to-multipoint segment, continuing improvements in compression technology have negatively impacted demand for certain satellite-based communication services. Developments that the Company expects to support the growth of the data communications sector, such as continued growth in data traffic, may fail to materialise or may not occur in the manner or to the extent the Company anticipates. Any of these industry dynamics could negatively affect its business. As a result, the Company may not be able to attract customers for the satellite bandwidth and broadband services that it is providing as part of its strategy to sustain its business. Reduced growth in the data communications services sector may also materially adversely affect the Company's ability to retain its existing customers. A shrinking market could reduce the number and value of the Company's customer contracts and would have a material adverse effect on its business and results of operations.

5.9 **Customers may seek to renegotiate or terminate their contracts if the Company does not meet its contractual obligations.**

Some of the Company's contracts with customers permit them to terminate or renegotiate their contracts and/or require the Company to pay service outage credits or damages if it fails to comply with its contractual obligation to provide service. Additionally, some of these contracts contain force majeure provisions that provide that neither the Company nor the customer will be considered to be in breach of the agreement during certain events, including the event of acts of God, political hostilities and other factors beyond their control. If one or more customers were to cancel their contracts or fail to perform under their contracts, the Company may be unable to secure replacement contracts on substantially similar terms or at all, and its revenue and profitability could be materially adversely affected.

5.10 **A large portion of the Company's revenue is generated by its top ten customers, and the loss of, or a significant reduction in, purchases by its largest customers could adversely affect its operations.**

A large portion of the Company's revenue and backlog is generated by its top ten customers. The loss of any of its major customers, failure of any major customer to renew its contract upon expiration or any serious financial difficulty of a major customer that results in an inability to pay for its services could have a material adverse effect on the Company's business.

5.11    **The Company's business operations are dependent on a small number of satellites, and the loss of or damage to any single satellite could have a material adverse effect on its business.**

The Company currently has two operating satellites and one hosted payload in-orbit. As such, its business is dependent upon the performance of a limited number of assets and its risk of loss is concentrated. If any one of its operating satellites were damaged or subject to operational failure, the Company could lose a significant percentage of its revenue that it may not be able to offset, which would negatively impact its business.

5.12    **The Company is subject to political, economic and other risks due to the international nature of its operations, especially in African and Middle Eastern countries.**

The Company's strategy focuses strongly on its growth in African and Middle Eastern countries. Accordingly, it may be subject to greater risks than other companies as a result of the international nature of its business operations. The Company could be harmed financially and operationally by tariffs, taxes and other trade barriers that may be imposed on its services, or by political and economic instability in the countries in which it provides services. If the Company ever needs to pursue legal remedies against its customers or business partners located outside of the United Kingdom, it may be difficult for it to enforce its rights against them depending on their location.

The Company operates in the Middle East and Africa, many parts of which have suffered from regional political instability, armed conflict and general social and civil unrest in recent years. Unrest in those countries may have implications for the wider global economy and may also negatively affect market sentiment towards other countries in the region, including the countries in which the Company operates. Some of these countries are also in the process of transitioning to a market economy and, as a result, are experiencing changes in their economies and their government policies that may affect the Company's investments in these countries. Governments in these jurisdictions and countries, as well as in more developed jurisdictions and countries, may be influenced by political or commercial considerations outside of the Company's control, and may act arbitrarily, selectively or unlawfully, including in a manner that benefits its competitors.

5.13    **The Company is subject to counterparty credit and performance risk.**

The Company operates in a number of emerging markets, where counterparty credit risk may be higher relative to developed markets. Additionally, its customer base includes a number of non-investment grade companies and small, specialised and/or new companies whose credit risk profile relative to larger or more established organisations may be higher. If a customer is not able to honour its payment or performance obligations, the Company may be able to terminate its agreement with that customer and collect damages, but it may not be fully compensated for its services to that customer and may not be able to offset its losses by re-allocating the customer's contracted capacity.

5.14 **The Company may be unable to obtain and maintain insurance for its satellites, and the insurance it obtains may not cover all losses it experiences. Even if its insurance were sufficient, delays in launching a replacement satellite could materially adversely affect the Company's revenues, profitability and cash flow.**

The Company has in-orbit insurance coverage for its fleet of satellites, which provides coverage for physical damage to or loss of the particular satellite based on its current book value, and is subject to annual renewals.

The price, terms and availability of insurance have fluctuated since the Company began offering commercial satellite services. The cost of obtaining insurance can vary as a result of either satellite or launch failures, capacity in insurance in the market or general conditions in the insurance industry. Insurance policies to cover the Company's current and future satellites (including HYLAS 4) may not continue to be available on commercially reasonable terms, or at all, particularly in light of its current financial condition. In addition to higher premiums, insurance policies may provide for higher deductibles, shorter coverage periods and additional satellite health-related policy exclusions. An uninsured failure of one or more of the Company's primary satellites could have a material adverse effect on the Company's financial condition, revenue, profitability and liquidity. In addition, higher premiums on insurance policies would increase its costs, thereby reducing its operating income.

Even where the Company has obtained in-orbit insurance for a satellite, this insurance coverage will not protect it against all losses that might arise as a result of a satellite failure. The Company's current in-orbit insurance policies contain, and any future policies can be expected to contain, specified exclusions and material change limitations customary in the industry at the time the policy is written. These exclusions typically relate to losses resulting from acts of war, insurrection or military action, government confiscation, as well as lasers, directed energy beams, nuclear or anti-satellite devices or radioactive contamination.

In addition, should the Company wish to launch another satellite to replace a failed operational satellite, the timing of such launch would be dependent on the completion of manufacture of such a replacement satellite and prior commitments made by potential suppliers of launch services to other satellite operators. The insurance does not protect the Company against lost or delayed revenue, business interruption or lost business opportunities.

The Company also maintains third-party liability insurance. This insurance may not be adequate or available to cover all third-party damages that may be caused by any of the Company's satellites, and it may not in the future be able to renew its third-party liability cover on reasonable terms and conditions, if at all.

5.15 **Future success depends on the Company's ability to maintain a strong management team and retain skilled employees.**

The Company is dependent on the services of its senior management team, technical and commercial experts and specialists to remain competitive in the satellite service industry. In recent months, it has seen a higher than usual number of employees choose to leave

the Company and some positions remain unfilled as it undergoes a financial restructuring. Any losses of key members of the Company's management team would have an adverse effect until qualified replacements are found. The Company may not be able to replace such individuals with persons of equal experience and capabilities quickly or at all. In the satellite industry, commercial, financial, regulatory, legal and technical expertise depends, to a significant extent, on the work of highly qualified employees. The market for experienced satellite services company managers is competitive. Demand for executive, managerial and skilled personnel in the Company's industry is intense and properly qualified human resources are scarce.

Technological competence and innovation are critical to the Company's business and depend, to a significant degree, on the work of technically skilled employees. The market for the services of these types of employees is competitive. The Company may not be able to attract and retain these employees. If it is unable to attract and retain adequate technically skilled employees, including those supporting the development and provision of its higher bandwidth services, the Company's business could be materially adversely affected.

5.16 **Dependence on outside contractors could result in increased costs and delays related to the launch of new satellites, which would in turn adversely affect the Company's business.**

There is a limited number of companies that the Company is able to use to launch its satellites and a limited number of commercial satellite launch opportunities available in any given time period. Adverse events with respect to its launch service providers, such as satellite launch failures or financial difficulties (which some of these providers have previously experienced), could result in increased costs or delays in the launch of the Company's satellites. General economic conditions may also affect the ability of launch providers to provide launch services on commercially reasonable terms or to fulfil their obligations in terms of launch dates, pricing, or both. Moreover, the limited number of launch service operators reduces the Company's flexibility and options in terms of transferring planned launches from one operator to another. In the event that its launch service providers are unable to fulfil their obligations, the Company may have difficulty procuring alternative services in a timely manner and may incur significant additional expenses as a result. Any such increased costs and delays could have a material adverse effect on the Company's business.

5.17 **The Company relies on third parties to manufacture and supply terminals for end-users to access its services and, as a result, it cannot control the availability of such terminals.**

Terminals used to access the Company's services are built by a limited number of independent manufacturers. Although the Company provides manufacturers with key performance specifications for the terminals, these manufacturers could:

- reduce production of, or cease to manufacture, certain of the terminals that access its services;

- manufacture defective terminals that fail to perform to its specifications;

- fail to build or upgrade terminals that meet end-users' requirements within its target sectors;

- fail to meet delivery schedules or to market or distribute terminals effectively; or

- sell some of its terminals at prices that end-users or potential end-users do not consider attractive.

If any of these third parties decides to cease manufacturing terminals to access its services, the Company may not be able to immediately find a replacement supplier on favourable terms. Also, if any of its suppliers have difficulty manufacturing or obtaining the necessary parts or material to manufacture its products, the Company's business may be adversely affected.

Any of the foregoing could materially adversely affect the ability of the Company's distribution partners to sell its services, which, in turn, could adversely affect its business.

5.18   **The Company is subject to foreign exchange risk.**

The Company uses the U.S. dollar as its functional and reporting currency, while a substantial portion of its overhead is non-dollar denominated. Although the Company generally hedges its foreign currency exposure through natural hedges and forward contracts, there is no assurance that it will be able to adequately manage its foreign currency exposure in the longer term or that its results of operations would not be affected by fluctuations of the pound sterling and the euro against the U.S. dollar.

5.19   **Reductions or changes in security and defence end markets could reduce the Company's revenue and adversely affect its business.**

Security and defence are two key markets within the Company's government end market. Spending on security and defence-related programs by governments has fluctuated in the past, and future levels of expenditures and authorisations for these programs may decrease or shift to programs in areas where the Company does not currently provide services. To the extent governments and their agencies reduce spending on commercial satellite services, this could adversely affect the Company's business.

5.20   **Satellites are subject to significant operational risks while in orbit that, if any such risks were to occur, it could adversely affect the Company's revenues, profitability and liquidity.**

Satellites are subject to significant operational risks while in orbit. These risks include malfunctions, commonly referred to as "anomalies", as a result of various factors, such as satellite manufacturers' errors, problems with the power or control systems of the satellites and general failures resulting from operating satellites in the harsh environment of space.

Any single anomaly or series of anomalies could materially adversely affect the Company's operations, as well as the ability to attract new customers for its services. Anomalies could also reduce the expected useful life of a satellite, thereby reducing the revenue that the Company could generate with that satellite, or create additional expenses due to the need to provide replacement or back-up satellites. The occurrence of future

anomalies could materially adversely affect the Company's ability to insure its satellites at commercially reasonable premiums, if at all.

Meteoroid events pose a potential threat to all in-orbit satellites. The probability that a meteoroid will damage a satellite increases significantly when the earth passes through the particulate stream left behind by comets. Increased solar activity could pose a threat to in-orbit satellites. While the Company has designed its satellites to withstand such solar events, there can be no assurance that high levels of solar activity will not degrade satellite performance in the future.

The loss, damage or destruction of any of the Company's satellites as a result of collision with meteorites, space debris, solar activity, malfunction or other events could have a material adverse effect on its business.

5.21 **The Company may experience a failure of ground operations infrastructure that impairs the commercial performance of its satellites or the services delivered over its satellites, which could lead to lost revenues.**

The Company may experience a failure in necessary equipment in its gateway earth stations or in the communication links between these facilities and remote teleport facilities. It may also experience operational errors. Additionally, the Company may experience a failure in necessary equipment in one of its gateway earth stations or in a third-party teleport. A failure of necessary ground-based communications equipment could lead to a loss of revenues from customers who were not provided with the proper transmission services, which could materially adversely affect the Company's revenues.

A failure or error affecting its tracking, telemetry, control and monitoring operations might cause the Company to be unable to communicate with one or more of its satellites or cause it to transmit an incorrect instruction to the affected satellite(s). This could lead to a temporary or permanent degradation in satellite performance or to the loss of one or more of the Company's satellites. Depending on the nature and extent of the problem, it could cause the Company's revenues and backlog to decline and could materially adversely affect its ability to market its capacity and generate future revenues, profitability, financing needs and ability to use available funds for other purposes.

5.22 **A natural disaster could diminish the Company's ability to provide communications service.**

Natural disasters could damage or destroy the Company's gateway earth stations, resulting in a disruption of service to its customers. The Company has technology to safeguard its antennas and protect its gateway earth stations during natural disasters such as hurricanes, but the collateral effects of disasters such as flooding may impair the functioning of its ground equipment. If a future natural disaster impairs or destroys any of its ground facilities, the Company may be unable to provide service to its customers in the affected area for a period of time.

5.23 **The Company's networks and those of its partners may be vulnerable to security risks.**

The Company expects the secure transmission of confidential information over its networks to continue to be a critical element of its operations. The Company's network and those of its partners and clients have in the past been, and may in the future be, vulnerable to unauthorised access, computer viruses and other security problems. Persons who circumvent the Company's security measures could wrongfully obtain or use information on its network or cause interruptions, delays or malfunctions in its operations, any of which could have a material adverse effect on its revenues, profitability and liquidity. The Company may be required to expend significant resources to protect against the threat of security breaches or to alleviate problems, including reputational harm and litigation, caused by any such breaches. Although the Company has implemented and intends to continue to implement industry-standard security measures, these measures may prove to be inadequate and may result in system failures and delays that could have a material adverse effect on its business.

5.24 **Satellites have limited useful lives, and their actual useful life may be shorter than anticipated.**

A number of factors affect the useful lives of satellites, including, among other things, the quality of their construction, the durability of their component parts, the ability to continue to maintain proper orbit and control over the satellite's functions, the efficiency of the launch vehicle used and the remaining on-board fuel (also referred to as propellant) following orbit insertion. However, satellites are vulnerable to premature failure, and the actual useful lives of satellites can vary from their design lives. Changes in useful lives can have a significant effect on the Company's depreciation charge and affect profitability, and the Company regularly reassesses the useful economic lives of its satellites for financial reporting purposes. There can be no assurance that in the future the Company will not be required to shorten the useful economic lives of its current or future satellites, which could materially adversely affect its business.

5.25 **The Company faces regulation with respect to the transmission of its satellite signals and the provision of its communications services in some countries, which could require it to incur additional costs, expose it to fines and limit its ability to provide existing and new services.**

The maintenance and expansion of the Company's business is dependent upon, among other things, its ability to obtain and maintain required government licenses and authorisations in a timely manner, at reasonable costs and on satisfactory terms and conditions.

Laws, policies and regulations affecting the satellite and communications industries are subject to change in response to industry developments, new technology or political considerations. Legislators or regulatory authorities in various countries are considering, and may in the future adopt, new laws, policies and regulations or changes to existing regulations regarding a variety of matters that could, directly or indirectly, affect the Company's operations or increase the cost of providing its data communications services.

Changes to current laws, policies or regulations or the adoption of new regulations could affect the Company's ability to obtain or retain required government licenses and authorisations or could otherwise have a material adverse effect on its business.

## 5.26 The Company may not be successful in obtaining and maintaining spectrum and orbital resources for its satellites in the future.

The ITU regulates the use of radio frequency bands and orbital locations used by satellite networks to provide communications services. The use of spectrum and orbital resources by the Company and other satellite networks must be coordinated pursuant to the ITU Radio Regulations in order to avoid causing harmful interference between or among the respective satellite networks.

The ITU frequency coordination process has been satisfactorily concluded for: (i) HYLAS 1 in the 27.5-30.0/18.1-20.2 GHz bands; (ii) HYLAS 2 in the 27.5-30.0/17.7-20.2 GHz bands; (iii) HYLAS 3 in the 27.5-30.0/17.7-20.2 GHz bands and (iv) HYLAS 4 in the 27.5-30.0/17.7-20.2 GHz bands. The satellite network filings associated with these operations also have been recorded in the ITU Master International Frequency Register in those Ka-band frequency segments. As such, operations consistent with these Ka-band satellite network filings have appropriate legal protection in a manner prescribed in the ITU Radio Regulations from harmful interference caused by other satellite networks with lower date priority that engage in non-conforming spectrum usage. However, if the Company seeks to launch a new satellite in orbital locations for which it does not have ITU satellite network filings, or seeks to operate those satellites in spectrum with respect to which it does not enjoy date priority, particularly as competition for orbital locations in the Ka-band increases, it may not be successful in coordinating access to an optimum orbital location or may experience delays in obtaining the required agreements.

In addition, it is possible that another operator could establish priority over the Company with respect to the use of Ka-band spectrum other than that which has been notified and coordinated as described above. Since the Company does not enjoy interference protection under the ITU Radio Regulations in that other spectrum, it could be required to coordinate with that operator and potentially limit its operations in that spectrum. The use of the Company's satellites also could be adversely affected if other satellite networks do not conform to the requirements of the ITU's Radio Regulations, resulting in acceptable interference levels being exceeded.

## 5.27 If the Company does not occupy unused orbital locations by specified deadlines, or does not maintain satellites in orbital locations it currently uses, those orbital locations may become available for other satellite operators to use.

If the Company is unable to maintain satellites at the orbital locations that it currently uses, it may lose its rights to use these orbital locations, and the locations could become available for other satellite operators to use. If a satellite is lost or is decommissioned at the end of its useful life, the Company would be required to replace that satellite within a three year period in order to maintain its rights to the satellite's orbital location and associated ITU satellite network spectrum rights. The loss of one or more of its orbital

locations could negatively affect the Company's plans and its ability to implement its business strategy.

**5.28  The Group had trade receivables and accrued income, net of provisions, totalling $42.9 million at 30 June 2017.**

The Directors have assessed the recoverability of each balance, including those where contractually agreed deferred payment terms are in place, in reaching the year end position. Should a material unprovided trade receivable or accrued income amount not be recovered, a material adjustment to the trade receivable balance and bad debt expense would arise in a future financial period. The Group has provided for amounts due from the Ministry of Defense of the Government of Indonesia totalling $16.8 million at year end. The Company contracted with the Ministry of Defense of the Government of Indonesia to provide services on its Artemis satellite and performed all of its obligations under such contract. After an extended period of time in which payment of the outstanding invoices had not been received, the Group terminated the contract and initiated arbitration proceedings in London. The outstanding amount is $16.8 million and has been fully provided for in these accounts. The Ministry of Defense of the Government of Indonesia has not disputed that the amounts are due and payable. The Company is confident that the arbitration panel will rule in the Group's favour and has provided for the debt at year end until the uncertainty related to enforcing the arbitration panel's expected ruling has been sufficiently reduced or eliminated. Should the Group be successful in its attempts to collect the outstanding amounts, a material adjustment to the bad debt provision and expense will be required in a future financial period.

**5.29  The Group may be subject to litigation that, if not resolved in the Group's favour and not sufficiently insured against, could have a material adverse effect on the Group.**

The Group may be, from time to time, involved in various litigation matters. These matters may include, among other things, contract disputes, personal injury claims, environmental claims or proceedings, asbestos and other toxic tort claims, employment matters, governmental claims for taxes or duties, and other litigation that arises in the ordinary course of the Group's business. The Group cannot predict with certainty the outcome or effect of any claim or other litigation matter, and the ultimate outcome of any litigation or the potential costs to resolve them may have a material adverse effect on the Group. Insurance may not be applicable or sufficient in all cases, insurers may not remain solvent and policies may not be located.

**5.30  The Company has been involved in lawsuits, claims, investigations and proceedings which arise in the ordinary course of business, and there can be no assurance that similar proceedings will not be brought against the Company again.**

In May 2017, a complaint was filed against the Company and some of its subsidiaries in New York court by Rimrock High Income Plus (Master) Fund, Ltd., a holder of the Company's 2023 Notes. The complaint alleged that the Company's consent solicitation and exchange offer, which were completed in January 2017 with the consent of approximately 94% of bondholders, were in breach of the indenture governing its 10%

Senior Secured Notes due 2019 and the implied covenant of good faith and fair dealing. In January 2018, the case was dismissed in its entirety because the plaintiffs did not comply with the no-action clause, and the appeals court found that even if Rimrock High Income Plus (Master) Fund Ltd. had complied with the no-action clause, the allegations of purported side deals did not have merit. However, there can be no assurance that Rimrock High Income Plus (Master) Fund, Ltd. or any holder of Notes will not file complaints with respect to the current Restructuring.

# PART L
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

## 1.   CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

The following is a description of the principal U.S. federal income tax consequences that may be relevant to a U.S. Holder (as defined below) as a result of the Scheme, including the consequences of the ownership and disposition of Exchange Shares. This description only applies to 2023 Notes and Exchange Shares held as capital assets and does not address, except as set forth below, aspects of U.S. federal income taxation that may be applicable to Scheme Creditors that are subject to special tax rules, such as:

- financial institutions;

- insurance companies;

- real estate investment trusts;

- regulated investment companies;

- certain former citizens and long-term residents of the United States;

- persons that hold 2023 Notes or Exchange Shares through partnerships or other pass through entities;

- grantor trusts;

- tax-exempt organisations;

- dealers or traders in securities or currencies or other persons who are required to mark to market their holdings;

- persons that hold 2023 Notes or Exchange Shares as part of a straddle, hedging, conversion, constructive sale or other integrated or other risk reduction transaction for U.S. federal income tax purposes;

- persons that hold or beneficially own, directly or indirectly, 10% or more of the total combined voting power of all classes of our stock entitled to vote or 10% or more of the value of our common stock; or

- U.S. Holders that have a functional currency other than the U.S. dollar.

This description does not address the U.S. federal estate and gift tax or alternative minimum tax consequences or the consequences of the tax on net investment income of the Scheme or the ownership and disposition of the Exchange Shares. Each U.S. Holder should consult its tax adviser with respect to the U.S. federal, state, local and non-U.S. tax consequences of the Scheme, including the consequences of the ownership and disposition of Exchange Shares.

This description is based on the Internal Revenue Code of 1986, as amended, existing U.S. Treasury Regulations (the **"Regulations"**), administrative pronouncements and judicial decisions, each as available and in effect on the date hereof. All of the foregoing are subject to

change, possibly with retroactive effect, or differing interpretations which could affect the tax consequences described herein.

For purposes of this description, a "**U.S. Holder**" is a beneficial owner of 2023 Notes or Exchange Shares that, for U.S. federal income tax purposes, is:

- an individual who is a citizen or resident of the United States;

- a corporation created or organised in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (1) such trust validly elects to be treated as a U.S. person for U.S. federal income tax purposes or (2) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust.

For purposes of this description, a "**Non-U.S. Holder**" means a person that is a beneficial owner of a Note or Exchange Share other than a U.S. Holder.

If any entity treated as a partnership for U.S. federal income tax purposes holds 2023 Notes or Exchange Shares, the tax treatment of a partner in such partnership will generally depend on the status of the partner and the activities of the partnership. Such a partner or partnership should consult its own tax adviser as to its tax consequences.

The U.S. federal income tax consequences to a U.S. Holder of 2023 Notes as a result of the Scheme, including the consequences of the ownership and disposition of Exchange Shares, are complex and not entirely clear. No ruling has been or will be sought from the U.S. Internal Revenue Service ("**IRS**") regarding the matters discussed below and there can therefore be no assurance that the IRS will not assert contrary positions to those described below or adopted by the Company. U.S. Holders should consult their own tax advisers concerning the U.S. federal income and other federal, state, local and non-U.S. tax consequences of the Scheme, including the consequences of the ownership and disposition of Exchange Shares, in light of their particular situations.

Under recently enacted legislation, U.S. Holders that beneficially own, directly or indirectly, 10% or more of the total combined voting power of all classes of our stock entitled to vote or 10% or more of the value of our common stock may be subject to special U.S. federal income tax rules in connection with such ownership—including potentially being required to include in taxable income amounts measured by reference to the Company's income, regardless of their receipt of dividends, and potentially being entitled to a deduction equal to the amount of any dividend received (assuming certain requirements, including a holding period requirement, are met). U.S. Holders that believe they may own the applicable amount of stock in the Company after the Restructuring are urged to consult their own tax advisers regarding the potential impact of such legislation on an investment in the Exchange Shares.

2.   **TAX STATUS OF THE 2023 NOTES**

The Company has taken the position that the 2023 Notes are subject to special rules that govern the tax treatment of contingent payment debt instruments ("**CPDIs**") under applicable Regulations (the "**Contingent Payment Debt Regulations**"). The remainder of this discussion assumes the 2023 Notes are so treated.

3.   **CONSEQUENCES OF THE SCHEME**

3.1   **Exchange of 2023 Notes for Exchange Shares**

The exchange of the 2023 Notes for Exchange Shares pursuant to the Scheme will constitute an exchange for U.S. federal income tax purposes. Unless the exchange qualifies as a "recapitalisation", a U.S. Holder of 2023 Notes exchanged for Exchange Shares generally will recognise taxable gain or loss equal to the difference between the amount realised and the U.S. Holder's "tax basis" in the 2023 Notes. Any such gain would be treated as ordinary interest income and any such loss would also be ordinary to the extent the U.S. Holder's total net interest inclusions (taking into account, for this purpose, aggregate positive and negative adjustments under the Contingent Payment Debt Regulations), with any additional loss treated as capital or ordinary under general tax principles. The amount realised will be equal to the value of the Exchange Shares received on the date of the exchange reduced by any net negative adjustment carryforward (as determined under the Contingent Payment Debt Regulations) not otherwise utilised. A U.S. Holder's tax basis in a Note will generally be equal to the amount that the U.S. Holder paid for the Note, increased by any interest previously accrued by the U.S. Holder (determined without regard to any positive or negative adjustments to interest accruals (as determined under the Contingent Payment Debt Regulations)) and decreased by the amount of any projected payments previously scheduled to be made on the 2023 Notes, without regard to the actual amounts paid.

Generally, an exchange would qualify as a recapitalisation for U.S. federal income tax purposes if the 2023 Notes are "securities" for U.S. federal income tax purposes. Whether an instrument like the 2023 Notes constitutes a "security" is unclear and determined based on all the facts and circumstances. Most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. A debt instrument with a term to maturity of five years or less generally does not qualify as a security, and a debt instrument with a term to maturity of ten years or more generally does qualify as a security. The IRS has ruled, however that in some circumstances where the instrument represents a continuation in the holder's investment in substantially the same form, an instrument with a term of less than five years may be treated as a security. Moreover, although the courts and the IRS have focused on an instrument's term, this is not the only characteristic that distinguishes a non-security debt instrument from a security. Other factors, such as the position of an instrument in the capital structure of its issuer and whether the holder has placed funds at risk of the business, e.g., such debt is essential to the survival of the business, are also taken into consideration. The Company intends to take the position, based on the combined term of the 2023 Notes and notes that were previously exchanged into the 2023 Notes and the position in the capital structure, and importance of the 2023

Notes to the business, of the Company, that the 2023 Notes are securities and therefore will treat the exchange pursuant to the Scheme as a recapitalisation.

If the 2023 Notes constitute securities and the exchange qualifies as a "recapitalisation," U.S. Holders whose 2023 Notes are exchanged for Exchange Shares generally will (i) not recognise gain or loss as a result of the exchange, (ii) have a "tax basis" in the Exchange Shares received equal to their adjusted tax basis in the 2023 Notes exchanged and (iii) have a holding period for the Exchange Shares that includes their holding period for the 2023 Notes.

3.2    **Non-U.S. Holders**

Subject to the discussion below under *"—U.S. Backup Withholding Tax and Information Reporting"*, any gain recognised by a Non-U.S. Holder in connection with the exchange will not be subject to U.S. federal income tax, unless (i) such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (or, if a tax treaty applies, such gain is attributable to such Non-U.S. Holder's permanent establishment in the United States) or (ii) the Non-U.S. Holder fails to satisfy certain certification requirements.

3.3    **U.S. Backup Withholding Tax and Information Reporting**

Backup withholding tax and information reporting requirements may apply to the exchange in respect of certain U.S. Holders. The backup withholding tax rate is currently 24 per cent. Backup withholding and information reporting may also apply to Non-U.S. Holders, if the exchange is deemed to occur in the United States or through certain U.S.-related financial intermediaries, unless such Holder complies with certain certification procedures (typically, the provision of the applicable IRS Form W-8).

Backup withholding is not an additional tax. A Holder generally will be entitled to credit any amounts withheld under the backup withholding rules against its U.S. federal income tax liability or claim a refund of the amounts withheld provided the required information is furnished to the IRS in a timely manner.

4.    **CONSEQUENCES TO U.S. HOLDERS OF THE OWNERSHIP AND DISPOSITION OF EXCHANGE SHARES**

4.1    **Dividends**

Subject to the discussion below under *"-Passive Foreign Investment Company Rules,"* any distributions made on the Exchange Shares will constitute a dividend for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Company as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its Exchange Shares. Any such distributions in excess of the U.S. Holder's basis in its Exchange Shares generally will be treated as capital gain. Under current law, dividends received by non-corporate U.S. Holders on the Exchange Shares may be subject to U.S. federal income tax at lower rates than other types of ordinary

income if certain conditions are met, including that the Company is not a passive foreign investment company as discussed below.

The amount of any dividend paid in Pounds Sterling will be the U.S. dollar amount calculated by reference to the exchange rate for converting Pound Sterling into U.S. dollars in effect on the relevant date of receipt regardless of whether the payment is in fact converted into U.S. dollars. If the dividend is converted into U.S. dollars on the relevant date of receipt, a U.S. Holder generally should not be required to recognise foreign currency gain or loss in respect of the dividend income. A U.S. Holder may have foreign currency gain or loss if the dividend is converted into U.S. dollars on a date after the date of receipt, which will be treated as U.S. source ordinary income or loss.

### 4.2 Sale, Exchange or other Taxable Disposition of the Exchange Shares

Subject to the discussion below under "-*Passive Foreign Investment Company Rules,* " U.S. Holders generally will recognise capital gain or loss upon the sale, redemption, or other taxable disposition of Exchange Shares equal to the difference between the amount realised on such disposition and the U.S. Holder's basis in the Exchange Shares. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has a holding period in the Exchange Shares of more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

For purposes of the U.S. foreign tax credit limitations, dividends received by a U.S. Holder with respect to Exchange Shares will be foreign source income and generally will be "passive category income" but could, in the case of certain U.S. Holders, constitute "general category income." In general, gain or loss realised upon sale or exchange of the Exchange Shares by a U.S. Holder will be U.S. source income or loss, as the case may be.

### 4.3 Passive Foreign Investment Company Rules

Certain adverse U.S. federal income tax rules generally apply to a U.S. Holder that owns or disposes of stock in a non-U.S. corporation that is classified as a passive foreign investment company (a "**PFIC**"). In general, a non-U.S. corporation will be classified as a PFIC for any taxable year during which, after applying relevant look-through rules with respect to the income and assets of subsidiaries, either (i) 75% or more of the non-U.S. corporation's gross income is "passive income" or (ii) 50% or more of the gross value (determined on a quarterly basis) of the non-U.S. corporation's assets produce passive income or are held for the production of passive income. For these purposes, passive income generally includes, among other things, dividends, interest, rents, royalties, gains from the disposition of passive assets and gains from commodities and securities transactions (other than certain active business gains from the sale of commodities). In determining whether a non-U.S. corporation is a PFIC, a pro rata portion of the income and assets of each corporation in which it owns, directly or indirectly, at least 25% interest (by value) is taken into account.

The determination as to whether a non-U.S. corporation is a PFIC is based on the composition of the income, expenses and assets of the non-U.S. corporation from time to time and the application of complex U.S. federal income tax rules, which are subject to differing interpretations. In addition, the actual PFIC status for any taxable year is not determinable until after the end of such taxable year. The Company has not made a determination as to whether it has been or will be classified as a PFIC for U.S. federal income tax purposes. If the Company is not a PFIC for any taxable year, then U.S. Holders will be subject to the treatment described above under "-Tax Consequences to U.S. Holders of Exchange Shares." The following U.S. federal income tax consequences will apply to a U.S. Holder if the Company is classified as a PFIC in any taxable year during which the U.S. Holder holds Exchange Shares.

Distributions: To the extent distributions made with respect to the Exchange Shares are treated as "excess distributions" under the Code, such amounts must be treated as realised rateably over the U.S. Holder's holding period with respect to such Exchange Shares. Distributions received in a taxable year generally will be treated as excess distributions if the amount of such distributions is greater than 125% of the average amount of distributions received for each taxable year during the shorter of (i) the three taxable years preceding the year of receipt or (ii) the portion of the U.S. Holder's holding period for its Exchange Shares before the year of receipt. The amounts allocated to the current taxable year, and any taxable years in such U.S. Holder's holding period prior to the first taxable year in which the Company is classified as a PFIC, will be treated as ordinary income. The amount allocated to each other taxable year will be subject to the highest tax rate in effect for individuals or corporations, as applicable, for such taxable year and an additional interest charge will apply to the portion of the U.S. federal income tax liability on such gains or distributions treated under the PFIC rules as having been deferred by the U.S. Holder.

If the Company is a PFIC, U.S. Holders may be deemed to own their proportionate share of certain subsidiaries and other entities in which the Company owns a direct or indirect interest that are PFICs ("**Lower-tier PFICs**"). In such case, U.S. Holders would be subject to U.S. federal income tax according to the rules described above on (i) certain distributions by a Lower-tier PFIC and (ii) a disposition of shares of a Lower-tier PFIC, in each case as if the U.S. Holder held such shares directly, even though such U.S. Holder had not received the proceeds of those distributions or dispositions.

Dispositions: The entire amount of any gain realised upon the U.S. Holder's disposition of Exchange Shares generally will be treated as an excess distribution made in the taxable year during which such disposition occurs, with the consequences described above.

Mark-to-Market Election: In general, the adverse U.S. federal income tax consequences of holding stock of a PFIC described above may be mitigated if a U.S. shareholder of the PFIC makes a valid mark-to-market election with respect to the stock of the PFIC. A mark-to-market election may be made with respect to the stock of a PFIC if such stock constitutes "marketable stock" that is "regularly traded" on a "qualified exchange or other market" (within the meaning of the Code and the applicable Treasury Regulations). If stock of a PFIC is approved for listing on a "qualified exchange or other market" and

more than a de minimis quantity of such stock is traded on at least 15 days during each calendar quarter, then a U.S. Holder may be eligible to make a mark-to-market election with respect to such stock. Application will be made for the Exchange Shares to be admitted to trading on the AIM Market of the London Stock Exchange. However, there is no assurance that the Exchange Shares are or will be considered "marketable stock" for this purpose.

If an effective mark-to-market election were made, a U.S. Holder would take into account each year the appreciation or depreciation in value of its Exchange Shares as if the Exchange Shares were sold at fair market value at the end of the year. Such appreciation or depreciation generally would be treated as ordinary income or ordinary loss (to the extent of the net amount previously included in the U.S. Holder's gross income as a result of the mark-to-market election, with any excess losses generally treated as capital losses), as would gains or losses on actual dispositions of the Exchange Shares. A U.S. Holder's adjusted tax basis in its Exchange Shares will be increased by the amount of income inclusions and decreased by the amount of deductions under the mark-to-market rules. U.S. Holders should be aware, however, that if the Company is determined to be a PFIC, the interest charge regime described above could be applied to indirect distributions or gains deemed to be attributable to U.S. Holders in respect of any lower-tier PFICs, and the mark-to-market election generally would not be effective for such lower-tier PFICs. U.S. Holders should consult their own tax advisers as to the availability of, and the tax consequences of, making a mark-to-market election with respect to the Exchange Shares.

Alternatively, a U.S. Holder can sometimes avoid the rules described above by electing to treat the Company as a "qualified electing fund" under the Code. However, this option is not be available to U.S. Holders of Exchange Shares because the Company does not intend to provide the necessary information to allow U.S. Holders to make such an election.

A U.S. Holder that owns Exchange Shares during any taxable year that the Company is treated as a PFIC generally would be required to file IRS Form 8621, unless specified exceptions apply.

5.    **TAX CONSEQUENCES TO NON-U.S. HOLDERS OF EXCHANGE SHARES**

Except as described below, dividends paid with respect to Exchange Shares held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if a treaty applies, not attributable to such Non-U.S. Holder's permanent establishment in the United States) will not be subject to U.S. federal income tax. Dividends paid with respect to Exchange Shares held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if a treaty applies, are attributable to such Non-U.S. Holder's permanent establishment in the United States) generally will be subject to U.S. federal income tax in the same manner as dividends paid to a U.S. Holder.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realised on the sale or other taxable disposition (including a cash redemption) of Exchange Shares unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition; or

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

6.   **U.S. BACKUP WITHHOLDING TAX AND INFORMATION REPORTING**

Backup withholding tax and information reporting requirements may apply to the payment to a U.S. Holder on the Exchange Shares or proceeds from the sale, exchange or other taxable disposition of the Exchange Shares. The payor will be required to withhold backup withholding tax on such payments made within the United States, or by a U.S. payor or U.S. middleman, to a U.S. Holder, other than an exempt recipient, if the U.S. Holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, the backup withholding requirements. The backup withholding tax rate is currently 24 per cent.

Backup withholding and information reporting may also apply to certain payments to Non-U.S. Holders, if the payment is received in the United States or through certain U.S.-related financial intermediaries, unless such Non-U.S. Holder complies with certain certification procedures (typically, the provision of the applicable IRS Form W-8).

Backup withholding is not an additional tax. Scheme Creditors generally will be entitled to credit any amounts withheld under the backup withholding rules against their U.S. federal income tax liability or claim a refund of the amounts withheld provided the required information is furnished to the IRS in a timely manner.

**The above description is not intended to constitute a complete analysis of all tax consequences relating to the Restructuring.  You should consult your own tax adviser concerning the tax consequences of your particular situation.**

## PART M
### CERTAIN UNITED KINGDOM TAXATION CONSEQUENCES

The following is a general summary of the Company's understanding of certain of the UK tax consequences that will arise as a result of the Restructuring. It is based on current UK legislation and currently published practice of Her Majesty's Revenue and Customs ("**HMRC**") as at the date of this Explanatory Statement, both of which are subject to change, possibly with retrospective effect. It does not purport to be a comprehensive description of all the UK tax considerations that may be relevant to holders of Notes and/or Exchange Shares and does not constitute legal or tax advice.

Unless specifically stated otherwise, the following paragraphs apply only to individuals and companies resident (or, if individuals, temporarily non-UK residents) for tax purposes in the United Kingdom who hold Notes, and/or Exchange Shares, as an investment and who are the absolute beneficial owners of their Notes and/or Exchange Shares.

Certain categories of holder of Notes and/or Exchange Shares, such as traders, broker-dealers, insurance companies, collective investment schemes, and holders that are not domiciled or not resident in the United Kingdom may be subject to special rules not covered in this summary.

Holders of Notes and/or Exchange Shares are strongly advised to consult their tax advisers as to the UK or other tax consequences relating to the implementation of the Restructuring, including the effect of any local tax laws.

## 1.   UK TAX TREATMENT OF THE RESTRUCTURING OF 2023 NOTES

### 1.1   Individuals

The release of any and all 2023 Notes Scheme Claims in respect of accrued but unpaid interest on the 2023 Notes, prior to the subsequent release of all remaining 2023 Notes Scheme Claims, is not expected to have any adverse UK tax consequences for Scheme Creditors who are UK resident individuals.

The UK tax treatment of any Scheme Creditors who are UK resident individuals and who release their 2023 Notes Scheme Claims (other than all accrued but unpaid interest on the 2023 Notes released prior to the Exchange) in consideration for their Scheme Creditor Entitlements, will differ depending on whether the 2023 Notes are "deeply discounted securities" under the legislation contained in Chapter 8 of Part 4 of Income Tax (Trading and Other Income) Act 2005.

The 2023 Notes may qualify as "deeply discounted securities" (although there are arguments to the contrary), for example, because upon certain events defined as constituting a change of control, the Company may be required, under the terms of the 2023 Notes, to repurchase the 2023 Notes at a redemption price equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any.

If the 2023 Notes do qualify as "deeply discounted securities", the 2023 Notes should additionally qualify as "qualifying corporate bonds" for the purposes of UK capital gains tax. In such circumstances, the Exchange should not give rise to a liability to UK capital gains tax for a relevant Scheme Creditor.

However, the disposal of deeply discounted securities may give rise to a UK income tax liability for a Scheme Creditor to the extent that the Scheme Creditor realises a profit on such disposal. For these purposes, the disposal of a deeply discounted security includes not only its redemption but also its exchange. A taxable profit for the purposes of the deeply discounted securities legislation could arise based on the difference between the acquisition price paid by the Scheme Creditor for the 2023 Notes and the value of the Exchange Shares received upon Exchange.

If the 2023 Notes do not qualify as "deeply discounted securities", they should also not qualify as "qualifying corporate bonds" for the purposes of UK capital gains tax. Where this is the case, it is expected that the Exchange will be a conversion of securities under section 132 of the Taxation of Chargeable Gains Act 1992 such that the Exchange will not be treated as giving rise to any disposal or acquisition for UK capital gains tax purposes but instead will be treated as a tax neutral share reorganisation for UK capital gains tax purposes.

## 1.2 Companies

Scheme Creditors who are within the charge to UK corporation tax will be charged to UK tax in relation to the release of accrued but unpaid interest, and the subsequent Exchange, under the UK's loan relationship rules. Under those rules, such Scheme Creditors should be taxed broadly in accordance with the statutory accounting treatment of the release of such accrued but unpaid interest and the Exchange, so long as that accounting treatment accords with generally accepted accounting practice as that term is defined for UK tax purposes.

## 1.3 Withholding Tax

No UK withholding tax is expected to be imposed on the release of all accrued but unpaid interest on the 2023 Notes prior to the Exchange. Furthermore, no UK withholding tax is expected to be imposed upon the subsequent Exchange.

## 1.4 Stamp Duty and Stamp Duty Reserve Tax ("SDRT")

No UK stamp duty or SDRT should be payable in connection with the issue of the Exchange Shares. Where Exchange Shares are issued to the Custodian pursuant to the Scheme, no UK stamp duty or SDRT should be payable upon the subsequent distribution of those Exchange Shares to relevant Scheme Creditors since no consideration is to be given by the Scheme Creditors for such distribution.

The Exchange itself is not expected to constitute either a transfer on sale chargeable to UK stamp duty or an agreement for sale chargeable to SDRT.

## 2.   UK TAX TREATMENT OF THE 2021 NOTES RESTRUCTURING AMENDMENTS

The 2021 Notes Restructuring Amendments are not expected to give rise to adverse UK tax consequences for holders of 2021 Notes.

3.    **UK TAX TREATMENT OF EXCHANGE SHARES**

3.1    **Dividends**

The following statements in this section summarise the expected UK tax treatment of holders of Exchange Shares who receive dividends in respect of the Exchange Shares.

*Individuals*

Holders who are UK resident individuals will be taxed on dividends paid by the Company as follows:

(a)    the first £5,000 of dividend income in any tax year will be exempt from income tax;

(b)    to the extent that the individual's total income exceeds the personal allowance (£11,500 for tax year 2017/18) but does not exceed the basic rate tax band for that tax year (£33,500 for 2017/18), the individual will be liable to income tax on the excess dividend at the rate of 7.5%;

(c)    to the extent that the individual's total income exceeds the basic rate band but does not exceed the higher rate tax band for that tax year (£150,000 for 2017/18), the individual will be liable to income tax on the excess dividend at the rate of 32.5%; and

(d)    to the extent that the individual's total income falls within the additional rate band for that tax year (over £150,000 for 2017/18), the individual will be liable to income tax on the excess dividend at the rate of 38.1%.

Total income means the total of the individual's dividend income and other taxable income for a tax year and excess dividend means the total of that individual's dividend income in that tax year in excess of £5,000.

*Companies*

Holders that are companies within the charge to UK corporation tax will be subject to corporation tax on the gross amount of any dividends paid by the Company unless the dividends fall within an exempt class and certain other conditions are met. It is expected that the dividends paid by the Company would generally fall within an exempt class.

3.2    **Taxation of Disposals**

The following statements in this section summarise the expected UK tax treatment of holders of Exchange Shares who dispose of their Exchange Shares.

*Individuals*

Where a UK resident individual realises a capital gain upon a disposal of Exchange Shares, UK capital gains tax will be levied in accordance with the Taxation of Chargeable Gains Act 1992 to the extent that the gain exceeds the annual exemption (£11,300 for tax year 2017/18) and after taking account of any other exemptions and reliefs available to the individual.

For individuals, the starting rate for capital gains tax is 10%. This rate applies where the individual's income and gains are less than the upper limit of the income tax basic rate

band (£33,500 for tax year 2017/18) after taking into account the individual's personal allowance (£11,500 for tax year 2017/18). To the extent that any chargeable gains, or part of any chargeable gain, aggregated with income arising in a tax year exceed that upper limit of the income tax basic rate band, capital gains tax will be charged at 20%. Where an individual makes a disposal and realises a loss, the loss may be available to offset against other current year gains or carried forward to offset against future gains.

*Companies*

Where a company within the charge to UK corporation tax realises a chargeable gain upon a disposal of Exchange Shares, UK corporation tax will be levied on the chargeable gain, depending on the circumstances and subject to any available exemption or relief. UK corporation tax is charged on chargeable gains at the rate applicable to that company, which is currently 19%.

3.3 **UK Withholding Tax**

No UK withholding tax will be imposed upon dividends paid on the Exchange Shares.

3.4 **UK Stamp Duty and SDRT**

The transfer of Exchange Shares which is effected by a written instrument of transfer may give rise to UK stamp duty at 0.5% of the consideration paid. A charge to SDRT may also arise (at the rate of 0.5% of the consideration paid) on an agreement to transfer Exchange Shares, although that SDRT charge will generally be cancelled and a claim for repayment of any SDRT already paid, generally with interest, may be made provided that an instrument transferring the interest in Exchange Shares is executed in pursuance of the agreement and that instrument is duly stamped within six years of the date on which the agreement was made or, if the agreement was conditional, the date on which the agreement became unconditional. However, given that the Exchange Shares are intended to be admitted to trading on the AIM Market of the London Stock Exchange, which is a "recognised growth market" (as defined in section 99A of the Finance Act 1986), and not otherwise listed on that or any other market, no UK stamp duty or SDRT will be chargeable on the transfer of the Exchange Shares for as long as they remain so admitted and unlisted.

**The above description is not intended to constitute a complete analysis of all tax consequences relating to the Restructuring. You should consult your own tax adviser concerning the tax consequences of your particular situation.**

## PART N
### EXPENSES

The Company has agreed to pay the Information and Tabulation Agent customary fees for its services in connection with the Scheme. The Company has agreed to pay the Custodian customary fees and to reimburse the Custodian for certain of its out-of-pocket expenses and to indemnify it against certain liabilities for its services as Custodian. The Notes Trustees, Security Agents and their respective counsel are entitled to be paid their usual fees and expenses in connection with a request of the type contained in this Explanatory Statement. The Company has agreed to reimburse the Information and Tabulation Agent for certain of its out-of-pocket expenses and to indemnify it against certain liabilities, including liabilities under federal securities laws. Except for the amounts paid to the Information and Tabulation Agent, the Custodian, the Security Agents and the Notes Trustees, the Company will not pay any fees or commissions to any broker, dealer or other person in connection with the Scheme.

The Company has also agreed to pay the fees and expenses of the Ad Hoc Group's professional advisers in connection with the negotiation and implementation of the Restructuring. If the Scheme is approved by the requisite majorities of Scheme Creditors at the Scheme Meeting, the Company shall seek an order from the Court in the Sanction Order that it may pay the fees and expenses of the Ad Hoc Group's professional advisers on the Restructuring Effective Date pursuant to, and in reliance on, section 681(2)(e) of the Act.

## PART O
## CERTAIN DEFINITIONS AND INTERPRETATION

In this Explanatory Statement the following words and expressions shall have the following meanings, except in the Scheme attached as Annex I or where the context otherwise requires.

"**3(a)(10) Exemption**" means the exemption from the requirement to register the offer and issuance of the Exchange Shares to Scheme Creditors available under Section 3(a)(10) of the Securities Act;

"**2016 Sales Process**" means the formal sales process of the Company that commenced in July 2016;

"**2021 Consent Payment**" means the consent payment of $2.50 per $1,000 principal amount of 2021 Notes to be paid in cash on the Restructuring Effective Date to all holders of 2021 Notes that, pursuant to the terms of the 2021 Notes Consent Solicitation validly delivered their Letters of Consent (as defined in the 2021 Notes Consent Solicitation) to the 2021 Notes Consent Solicitation to the Information and Tabulation Agent prior to the Early Consent Time (and do not validly revoke their consent prior to the 90% Revocation Time (as described within the 2021 Notes Consent Solicitation);

"**2021 Notes Fifth Supplemental Indenture**" means the fifth supplemental indenture to the 2021 Notes Indenture dated 8 February 2018;

"**2021 Fourth Supplemental Indenture**" means the fourth supplemental indenture to the 2021 Notes Indenture to effect the Majority Amendments and the Waiver dated 8 February 2018;

"**2021 Notes**" means the 10%/ 15% Senior Secured Notes due 2021 issued by the Company pursuant to the 2021 Notes Indenture (Reg S CUSIP/ISIN: G0713N AF7/USG0713NAF71; 144A CUSIP/ISIN: 05351L AG2/US05351LAG23);

"**2021 Notes Consent Solicitation**" means the consent solicitation launched by the Company pursuant to the 2021 Notes Consent Solicitation Statement;

"**2021 Notes Consent Solicitation Statement**" means the consent solicitation statement dated 25 January 2018 circulated by the Company to holders of 2021 Notes regarding the adoption of the 2021 Notes Restructuring Amendments;

"**2021 Notes Indenture**" means the indenture dated 26 January 2017 among, inter alios, the Company, the 2021 Notes Trustee and the Security Agents, as supplemented, amended and restated from time to time including as amended and restated as of 23 March 2017 and supplemented by a first supplemental indenture dated 29 June 2017, a second supplemental indenture dated 30 June 2017, a third supplemental indenture dated 27 October 2017 and a fourth and fifth supplemental indenture each dated 8 February 2018;

"**2021 Notes Restructuring Amendments**" means the amendments to the terms and conditions of the 2021 Notes Indenture pursuant to the 2021 Notes Consent Solicitation set out in full at PART G;

"**2021 Notes Restructuring Amendments Requisite Consents**" means the consent of holders representing at least 90% in aggregate principal amount of the 2021 Notes in order to adopt the 2021 Notes Restructuring Amendments;

"**2021 Notes Trustee**" means The Bank of New York Mellon, London Branch in its capacity as trustee under the 2021 Notes Indenture;

"**2023 Consent Payment**" means the consent payment of $0.05 per $1,000 principal amount of 2023 Notes to be paid in cash on 16 February 2018 to all holders of 2023 Notes that, pursuant to the terms of the 2023 Notes Consent Solicitation validly delivered their Letters of Consent (as defined in the 2023 Notes Consent Solicitation) to the 2023 Notes Consent Solicitation to the Information and Tabulation Agent prior to the Early Consent Time (and did not validly revoke their consent prior to the 75% Revocation Time (as defined in the 2023 Notes Consent Solicitation);

"**2023 Fourth Supplemental Indenture**" means the fourth supplemental indenture to the 2023 Notes Indenture to effect the Jurisdiction Amendments;

"**2023 Notes**" means the 12%/17.5% Senior Secured Notes due 2023 issued by the Company pursuant to the 2023 Notes Indenture (Reg S CUSIP/ISIN: G0713N AH3/USG0713NAH38; 144A CUSIP/ISIN: 05351L AJ6/US05351LAJ61);

"**2023 Notes Cancellation Order**" means an order instructing DTC to cancel the 2023 Notes;

"**2023 Notes Consent Solicitation**" means the consent solicitation to implement the Jurisdiction Amendments;

"**2023 Notes Indenture**" means the indenture dated 3 October 2013 among, inter alios, the Company, the 2023 Notes Trustee and the Security Agents, as amended, restated and supplemented from time to time, including as amended and restated as of 23 March 2017 and supplemented by a first supplemental indenture dated 30 June 2017, a second supplemental indenture dated 27 October 2017, and a third and fourth supplemental indenture each dated 8 February 2018;

"**2023 Notes Restructuring**" means the restructuring of the 2023 Notes pursuant to the Scheme;

"**2023 Notes Scheme Claims**" means any Claim or Liability, whether present or future, known or unknown, prospective or contingent, against any Group member arising directly or indirectly out of, from or in connection with, the 2023 Notes and the 2023 Notes Indenture, including in respect of any accrued but unpaid interest, other than any Claim or Liability arising after the Restructuring Effective Date and held by a person that is a shareholder of the Company as a result of receiving Scheme Share Allocations pursuant to the Scheme;

"**2023 Notes Trustee**" means The Bank of New York Mellon, London Branch in its capacity as trustee under the 2023 Notes Indenture;

"**2023 Third Supplemental Indenture**" means the third supplemental indenture to the 2023 Notes Indenture to effect the Majority Amendments and the Waiver dated 8 February 2018;

"**Account Holder**" means a person shown as holding an interest as principal in the Global Note for the 2023 Notes held through and shown on the records maintained by DTC;

"**Account Holder Letter**" means the account holder letter in substantially the form set out in Annex III to this Explanatory Statement with such technical amendments as the Information and Tabulation Agent may agree in its sole discretion (acting reasonably);

"**Accruals**" means any dividends, distributions or other rights or benefits paid or distributed to the Custodian from time to time in respect of the Custody Share Allocations;

"**Act**" means the Companies Act 2006;

"**Ad Hoc Group**" means Solus Alternative Asset Management LP, Tennenbaum Capital Partners, LLC and Great Elm Capital Management, Inc.;

"**AlixPartners**" means AlixPartners UK LLP;

"**AP Report**" means the restructuring analysis and estimated outcome report prepared by AlixPartners for the Company;

"**Arianespace**" means Arianespace SA;

"**Articles**" means the articles of association of the Company;

"**Board**" means the board of Directors;

"**Business Day**" means any day on which banks are open for transactions of normal banking business in New York and in London other than a Saturday, Sunday or public holiday;

"**Chairman**" means Nigel Fox, or such alternate chairman of the Scheme Meeting;

"**Chapter 15 Filing**" means a petition filed for recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code;

"**Chapter 15 Hearing**" means the hearing before the U.S. Bankruptcy Court to attain recognition of the Scheme pursuant to the Chapter 15 Filing;

"**Chapter 15 Order**" means the order of the U.S. Bankruptcy Court recognising the Scheme as a "foreign main proceeding" under Chapter 15 of the U.S. Bankruptcy Code;

"**Chapter 15 Representative**" means the representative, or any other person, appointed by the Company and approved by the Court to act as the foreign representative of the Scheme for the purpose of seeking the Chapter 15 Order;

"**Claim**" means all and any actions, causes of action, claims, counterclaims, suits, debts, sums of money, accounts, contracts, agreements, promises, contribution, indemnification, damages, judgments, executions, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of England and Wales or the United States or under any other law in any other jurisdiction howsoever arising and "**Claims**" shall be construed accordingly;

"**Code**" means The City Code on Takeovers and Mergers;

"**Company**" means Avanti Communications Group plc, a public limited company organised under the laws of England and Wales, having its registered office at Cobham House, 20 Black Friars Lane, London, EC4V 6EB and company number 06133927;

"**Confirmation Form**" means a Confirmation Form in respect of a Scheme Creditor in substantially the form set out in Annex IV to this Explanatory Statement with such technical amendments as the Information and Tabulation Agent may agree in its sole discretion;

"**Consent Solicitations**" mean the 2021 Notes Consent Solicitation, the 2023 Notes Consent Solicitation and the Majority Consent Solicitations;

"**Consenting Creditors**" means the Initial Consenting Creditors and certain other holders of 2023 Notes and/or 2021 Notes who have acceded to the Restructuring Agreement since 13 December 2017;

"**Convening Hearing**" means the hearing of the Court at the Company will apply for permission to circulate this Explanatory Statement and to convene the Scheme Meeting;

"**Court**" means the High Court of England and Wales;

"**CREST Regulations**" means the UK Uncertificated Securities Regulations 2001;

"**Custodian**" means The Bank of New York Mellon, London Branch, in its capacity as custodian under the Custody Agreement, or such successor or alternate custodian of the Custody Share Allocations;

"**Custody Agreement**" means the agreement to be entered into between the Company and the Custodian regarding the custody of the Custody Share Allocations;

"**Custody Distribution Instruction**" has the meaning given to such term in the Scheme.

"**Custody Scheme Creditor**" means any Scheme Creditor whose Scheme Share Allocations were issued to the Custodian pursuant to the terms of the Scheme;

"**Custody Share Allocations**" means any Scheme Share Allocations issued to the Custodian on the Restructuring Effective Date pursuant to the terms of the Scheme;

"**Distribution Scheme Creditor**" has the meaning given to that term in the Scheme;

"**Default Shares**" means shares in the Company held by a member, or any other person appearing to be interested in shares held by that member, who has been issued with a notice pursuant to section 793 of the Act and who has failed in relation to any shares to give the Company the information thereby required within the prescribed period from the date of the notice or, who in purported compliance with such notice, has made a statement which is false or inadequate in a material particular;

"**Director**" means a director of the Board the Company;

"**Disenfranchisement Notice**" means a notice served on a holder of Default Shares;

"**Disqualified Recipient**" means any potential or proposed recipient of some or all of a Scheme Share Allocation which is domiciled or resident in, a citizen of or otherwise subject to the laws of any jurisdiction where the issue or distribution of a Scheme Share Allocation to such recipient

is prohibited by law, or would be or be likely to result in the Company being required to comply with any filing, registration, disclosure or other onerous requirement as determined by the Company in its sole discretion;

"**DTC**" means The Depository Trust Company;

"**DTC Custodian**" means Cede & Co, in its capacity as nominee of DTC, as the registered holder of the Global Note;

"**Early Consent Time**" means 5:00 p.m. New York time on 7 February 2018;

"**Entitlement Submission Deadline**" means 5.00 p.m. New York time on 27 March 2018 or such later time as the Information and Tabulation Agent may decide in its sole discretion (acting reasonably);

"**ESA**" means the European Space Agency;

"**Exchange**" means an exchange of the 2023 Notes Scheme Claims (other than accrued but unpaid interest which is released pursuant to the Scheme Implementation Steps) in consideration for the Scheme Creditor Entitlements, which are in turn exchanged for the Scheme Share Allocations;

"**Exchange Shares**" means ordinary shares of the Company representing in aggregate 92.5% of the Company's enlarged share capital on the Restructuring Effective Date;

"**Existing Agents**" means:

(a)    the 2023 Notes Trustee;

(b)    The Bank of New York Mellon, London Branch in its capacity as Principal Paying Agent and London Transfer Agent under the 2023 Notes Indenture;

(c)    The Bank of New York Mellon in its capacity as U.S. Paying Agent and New York Transfer Agent under the 2023 Notes Indenture;

(d)    The Bank of New York Mellon SA/NV Luxembourg Branch in its capacity as Registrar under the 2023 Notes Indenture; and

(e)    the Security Agents.

"**Explanatory Statement**" means this explanatory statement relating to the Scheme dated ____ February 2018;

"**Financial Promotion Order**" means the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005;

"**Financial Statements**" means the Company's audited consolidated financial statements for the years ended 30 June 2015, 2016 and 2017;

"**Global Note**" means the global note held by DTC representing the 2023 Notes;

"**Group**" means the Company and its direct and indirect subsidiaries;

"**Holding Period**" means the period from the Restructuring Effective Date to 5.00 p.m. New York time on the date falling 150 days after the Restructuring Effective Date;

"**Holdings Certification**" means, in respect of a Scheme Creditor:

(a)  Part B of Section 1 (*Holdings Certification*) of a validly completed Account Holder Letter showing the aggregate principal amount of 2023 Notes held by that Scheme Creditor as at the Record Time which has been DTC medallion stamped by the Scheme Creditor or its Account Holder, as applicable; or

(b)  if such a certification cannot be provided, such other evidence of the aggregate principal amount of 2023 Notes held by that Scheme Creditor as at the Record Time as may be acceptable to the Information and Tabulation Agent in its sole discretion (acting reasonably);

"**Indebtedness**" has the meaning given to that term in the Notes Indentures;

"**Information and Tabulation Agent**" means D.F. King Ltd and D.F. King & Co Inc., or any successor information and tabulation agent for the Scheme;

"**Initial Consenting Creditors**" means certain holders of the 2021 Notes and the 2023 Notes representing approximately 60.6% of the 2021 Notes and 53.3% of the 2023 Notes;

"**Initial Consenting Shareholders**" means certain shareholders of the Company representing approximately 36% of the Company's existing issued share capital;

"**Intercreditor Agreement**" means the intercreditor agreement dated 26 January 2017 between the Company, the Security Agents and the other parties named therein, as amended, restated or otherwise modified or varied from time to time;

"**Jefferies**" means Jefferies International Limited;

"**Judgments Regulation**" means the Council Regulation (EU) 1215/2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters;

"**Jurisdiction Amendments**" means the amendment to the submission to jurisdiction provision of the 2023 Notes Indenture to require that, from and after the effective date of the amendment, each party to the 2023 Notes Indenture irrevocably submits to the jurisdiction of the Court until the Restructuring Agreement is either terminated or is no longer in effect pursuant to the terms of the 2023 Notes Consent Solicitation;

"**Liability**" means any debt, loss, damage, liability or obligation whatsoever whether it is present, future, prospective or contingent, known or unknown, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales, the United States or in any other jurisdiction, or in any other manner whatsoever;

"**Longstop Date**" means 30 April 2018 or such later date as may be agreed by the Company and the Majority Scheme Creditors;

"**Majority Amendments**" means the amendments to the Notes Indentures to remove from the definition of Events of Default any event that occurs in connection with the implementation of

the Restructuring, including (without limitation) an application under Chapter 15 of the U.S. Bankruptcy Code for recognition of the Scheme, that may result in an Event of Default under the Notes Indentures;

"**Majority Consent Solicitations**" means the consent solicitations dated 25 January 2018 with respect to both the 2021 Notes and the 2023 Notes seeking consents to adopt the Majority Amendments and the Waiver;

"**Majority Scheme Creditors**" means Scheme Creditors representing in aggregate a simple majority by value of the 2023 Notes Scheme Claims;

"**Milbank**" means Milbank, Tweed, Hadley & McCloy LLP, legal advisers to the Company;

"**Nominated Recipient**" means any person who is, or persons who are, not a Disqualified Recipient and who is or are nominated by a Scheme Creditor in its validly completed Account Holder Letter to receive some or all of that Scheme Creditor's Scheme Share Allocation;

"**Notes**" means the 2023 Notes and the 2021 Notes;

"**Notes Indentures**" means the 2023 Notes Indenture and the 2021 Notes Indenture;

"**Notes Trustees**" means the 2023 Notes Trustee and the 2021 Notes Trustee;

"**Omnibus Proxy**" means the omnibus proxy form provided by DTC in respect of the 2023 Notes as at the Record Time;

"**Orbital**" means Orbital ATK Inc.;

"**PIK Interest**" means the payment of interest in kind by increasing the principal amount of the outstanding 2021 Notes in an amount equal to such interest or by issuing additional 2021 Notes on the same terms and conditions as the current outstanding 2021 Notes (other than the issuance dates and the original issue date from which interest started accruing) in an aggregate principal amount equal to the amount of interest for such interest period;

"**Practice Statement**" means the practice statement issued on 15 April 2002 by the Chancery Division of the High Court of Justice of England and Wales in relation to schemes of arrangement between a company and its creditors;

"**Prior Restructuring**" means the terms of a financial restructuring designed to preserve the Company's short-term liquidity and provide the capital structure required to fund the Company's business through the launch of HYLAS 4 and beyond as agreed between the Company and its key bondholders in December 2016;

"**Prospectus Directive**" means the Prospectus Directive 2003/71/EC as amended from time to time including by Directive 2010/73/EU;

"**Record Time**" means 5.00 p.m. New York Time on 12 March 2018;

"**Registrar of Companies of England and Wales**" means the registrar of Companies for companies registered in England and Wales;

"**Released Advisers**" means Milbank and Osborne Clarke LLP as legal advisers to the Company, the Information and Tabulation Agent, Akin Gump LLP as English legal adviser to

the Ad Hoc Group and Akin Gump Strauss Hauer & Feld LLP as US legal adviser to the Ad Hoc Group and Hogan Lovells International LLP and Hogan Lovells US LLP as legal advisers to the Notes Trustees and the Security Agents;

"**Released Parties**" means each member of the Group as at the Restructuring Effective Date, each Existing Agent, each member of the Ad Hoc Group and each Released Adviser and, in each case, their respective employees, partners, directors, officers, delegates and agents and any partners, directors, officers employees or former partners, directors, officers, employees or any of the foregoing;

"**Restructuring**" means the restructuring of (i) the 2021 Notes pursuant to the 2021 Notes Restructuring Amendments; and (ii) the 2023 Notes pursuant to the Exchange;

"**Restructuring Agreement**" means the lock-up and restructuring agreement dated 13 December 2017, and as amended on 22 December 2017, 16 January 2018 and 14 February 2018 entered into by, inter alios, the Company and the Initial Consenting Creditors pursuant to which, among other things, the Consenting Creditors have agreed to vote in favour of the Scheme and the necessary steps to support the Restructuring;

"**Restructuring Conditions Precedent**" means:

(a)   that the Company's shareholders have provided the necessary consents to:

(i)   approve the issue of, and disapply statutory pre-emption rights relating to the issue of, the Exchange Shares pursuant to the terms of the Scheme; and

(ii)   waive Rule 9 of the Takeover Code in so far as it would require Solus Alternative Asset Management LP and certain of its funds to make a mandatory offer to the Company's shareholders as a result of the Restructuring;

(b)   that the Company's board has approved the issue of the Exchange Shares pursuant to the terms of the Scheme;

(c)   the Custody Agreement has been executed by the Company and the Custodian;

(d)   the Share Registrar has received proof that the application has been made for the Exchange Shares to be admitted to trading on the AIM market of the London Stock Exchange; and

(e)   the Chapter 15 Order has been granted by the U.S. Bankruptcy Court;

"**Restructuring Documents**" means any document, agreement, deed, certificate, notice or form that the Company acting reasonably considers necessary or desirable to facilitate, implement or give effect to the Scheme;

"**Restructuring Effective Date**" means the date on which all the Scheme Implementation Steps have been completed;

"**Restructuring Implementation Date**" means the date notified to the Scheme Creditors through the Scheme Website after the Company has determined all of the Restructuring Conditions Precedent have been satisfied;

"**Sanction Hearing**" means the court hearing at which the Court will consider whether to sanction the Scheme;

"**Sanction Order**" means the order of the Court sanctioning the Scheme under section 899 of the Act;

"**Scheme**" means the scheme of arrangement proposed by the Company under Part 26 of the Act set out at Annex I to this Explanatory Statement;

"**Scheme Creditor Entitlement**" means with respect to each Scheme Creditor, its entitlement to receive its pro rata share of the Exchange Shares in exchange for its 2023 Notes Scheme Claims, as determined pursuant to the terms of the Scheme;

"**Scheme Creditors**" means the persons with the ultimate economic interest as principal in the 2023 Notes held in global form through DTC including by the right to have definitive notes issued to it under the 2023 Notes Indenture and/or the benefit of such right;

"**Scheme Implementation Steps**" has the meaning given to that term in the Scheme;

"**Scheme Lodgement Date**" means the date the Sanction Order is delivered to the Registrar of Companies of England and Wales;

"**Scheme Meeting**" means the meeting of Scheme Creditors in respect of the Scheme, to be held at the offices of Milbank, 10 Gresham Street, London EC2V 7JD, at 10.00 a.m. London time on 20 March 2018;

"**Scheme Share Allocation**" means with respect to each Scheme Creditor, the number of Exchange Shares to be issued to it and/or its Nominated Recipient(s) (as applicable) in exchange for that Scheme Creditor's Scheme Creditor Entitlement as determined pursuant to the terms of the Scheme;

"**Scheme Website**" means the scheme website set up by the Information and Tabulation Agent at https://sites.dfkingltd.com/avanti;

"**Securities Act**" means the United States Securities Act of 1933, as amended;

"**Security Agents**" means The Bank of New York Mellon, London Branch as trustee and primary security agent and Wilmington Trust (London) Limited as secondary security agent under the 2023 Notes Indenture;

"**Share Registrar**" means Neville Registrars Limited or any successor share registrar of the Company;

"**SPR**" means the security position report provided by DTC in respect of the 2023 Notes as at the Record Time;

"**Super Senior Debt**" means the principal and interest outstanding under the terms of the Super Senior Facility Agreement;

"**Super Senior Facility Agreement**" means the agreement dated as of 15 June 2017 among each of the Company, Elavon Financial Services DAC, UK Branch, acting as agent, The Bank

of New York Mellon, London Branch, acting as primary security agent and Wilmington Trust (London) Limited, acting as secondary security agent;

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code, which title includes Chapter 11 and Chapter 15 of that code;

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or other appropriate forum in which the Chapter 15 Representative files a petition for recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code;

"**Voting Submission Deadline**" means 5.00 p.m. New York time on 16 March 2018;

"**Voting Value**" means the amount owing to a Scheme Creditor for the purposes of voting in favour or against the Scheme; and

"**Waiver**" means the waiver to the Notes Indentures to irrevocably waive any Default or Event of Default pursuant to Section 6.01(i) and/or 6.01(j) of the Notes Indentures and rescind any acceleration of the Notes that may arise in connection with the implementation of the Restructuring.

**THE COMPANY**

Avanti Communications Group plc

Cobham House

20 Black Friars Lane

London EC4V 6EB

United Kingdom

*Requests for information in relation to the Scheme should be directed to:*

**THE INFORMATION AND TABULATION AGENT**

D.F. King

Email:   avanti@dfkingltd.com

<u>London</u>

125 Wood Street

London EC2V 7AN

United Kingdom

Telephone: +44 20 7920 9700

<u>New York</u>

48 Wall Street, 22nd Floor

New York, New York 10005

United States

Telephone: +1 212 269 5550

Toll-free: # (800) 714-3311

<u>Hong Kong</u>

Suite 1601, 16/F, Central Tower

28 Queen's Road Central

Hong Kong

Telephone: +852 3953 7230

*or*

---

## LEGAL ADVISERS TO THE COMPANY

10 Gresham Street, London EC2V 7 JD

Contact: Nick Angel / Stuart Swift

Email:   avanti@milbank.com

Tel: +44 207 615 3000

Milbank, Tweed, Hadley & McCloy LLP, United Kingdom

# ANNEX I
## THE SCHEME

IN THE HIGH COURT OF JUSTICE          No. 1278 of 2018
CHANCERY DIVISION
COMPANIES COURT

---

IN THE MATTER OF

AVANTI COMMUNICATIONS GROUP PLC

- and -

THE COMPANIES ACT 2006

-

SCHEME OF ARRANGEMENT (under Part 26 of the
Companies Act 2006)

- between -

AVANTI COMMUNICATIONS GROUP PLC

- and -

The Scheme Creditors
(as defined herein)

1.   **PRELIMINARY**

1.1   **Definitions**

In this Scheme, the following words and expressions shall have the following meanings:

"**2021 Notes Fifth Supplemental Indenture**" has the meaning given to that term in the Explanatory Statement;

"**2023 Notes**" means the 12%/17.5% Senior Secured Notes due 2023 issued by the Company pursuant to the 2023 Notes Indenture (Reg S CUSIP/ISIN: G0713N AH3/USG0713NAH38 and 144A CUSIP/ISIN: 05351L AJ6/US05351LAJ61);

"**2023 Notes Cancellation Order**" means an order instructing DTC to cancel the 2023 Notes;

"**2023 Notes Indenture**" means the indenture dated 3 October 2013 among, inter alios, the Company, the 2023 Notes Trustee and the Security Agents, as amended, restated and supplemented from time to time, including as amended and restated as of 23 March 2017 and supplemented by a first supplemental indenture dated 30 June 2017, a second supplemental indenture dated 27 October 2017, and a third and fourth supplemental indenture each dated 8 February 2018;

"**2023 Notes Restructuring**" means the restructuring of the 2023 Notes pursuant to this Scheme;

"**2023 Notes Scheme Claims**" means any Claim or Liability, whether present or future, known or unknown, prospective or contingent, against any Group member arising directly or indirectly out of, from or in connection with, the 2023 Notes and the 2023 Notes Indenture, including in respect of any accrued but unpaid interest, other than any Claim or Liability arising after the Restructuring Effective Date and held by a person that is a shareholder of the Company as a result of receiving Scheme Share Allocations pursuant to this Scheme;

"**2023 Notes Trustee**" means The Bank of New York Mellon, London Branch in its capacity as trustee under the 2023 Notes Indenture;

"**Account Holder**" means a person shown as holding an interest as principal in the Global Note for the 2023 Notes held through and shown on the records maintained by DTC;

"**Account Holder Letter**" means an account holder letter in substantially the form set out in Annex III to the Explanatory Statement with such technical amendments as the Information and Tabulation Agent may agree in its sole discretion;

"**Accruals**" means any dividends, distributions or other rights or benefits paid or distributed to the Custodian from time to time in respect of the Custody Share Allocations;

"**Act**" means the Companies Act 2006;

"**Ad Hoc Group**" means Solus Alternative Asset Management LP, Tennenbaum Capital Partners, LLC and Great Elm Capital Management, Inc.;

"**Allowed Proceedings**" means any Proceedings by a Scheme Creditor:

(a)    to enforce its rights under this Scheme or the Restructuring Documents (or any one of them) where the Released Party fails to perform its obligations under or in connection with this Scheme and/or the Restructuring Documents; or

(b)    imposing or attempting to impose Liability arising out of fraud, gross negligence or wilful misconduct of the Released Party;

"**Business Day**" means any day on which banks are open for transactions of normal banking business in New York and in London other than a Saturday, Sunday or public holiday;

"**Chapter 15 Order**" means the order of the U.S. Bankruptcy Court recognising this Scheme as a "foreign main proceeding" under Chapter 15 of the U.S. Bankruptcy Code;

"**Claim**" means all and any actions, causes of action, claims, counterclaims, suits, debts, sums of money, accounts, contracts, agreements, promises, contribution, indemnification, damages, judgments, executions, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of England and Wales or the United States or under any other law in any other jurisdiction howsoever arising and "**Claims**" shall be construed accordingly;

"**Code**" means the City Code on Takeovers and Mergers;

"**Company**" means Avanti Communications Group plc, a public limited company organised under the laws of England and Wales, having its registered office at Cobham House, 20 Black Friars Lane, London, EC4V 6EB and company number 06133927;

"**Confirmation Form**" means a Confirmation Form in respect of a Scheme Creditor in substantially the form set out in Annex IV to the Explanatory Statement with such technical amendments as the Information and Tabulation Agent may agree in its sole discretion;

"**Court**" means the High Court of England and Wales;

"**Custodian**" means The Bank of New York Mellon, London Branch, in its capacity as custodian under the Custody Agreement, or such successor or alternate custodian of the Custody Share Allocations;

"**Custody Agreement**" means the agreement to be entered into between the Company and the Custodian regarding the custody of the Custody Share Allocations;

"**Custody Distribution Instruction**" has the meaning given to such term in clause 8.4.

"**Custody Scheme Creditor**" means any Scheme Creditor whose Scheme Share Allocations were issued to the Custodian pursuant to the terms of this Scheme;

"**Custody Share Allocations**" means any Scheme Share Allocations issued to the Custodian on the Restructuring Effective Date pursuant to clause 5.2(c)(ii);

"**Disqualified Recipient**" means any potential or proposed recipient of some or all of a Scheme Share Allocation which is domiciled or resident in, a citizen of or otherwise subject to the laws of any jurisdiction where the issue or distribution of a Scheme Share Allocation to such recipient is prohibited by law, or would be or be likely to result in the Company being required to comply with any filing, registration, disclosure or other onerous requirement as determined by the Company in its sole discretion;

"**Distribution Scheme Creditor**" has the meaning given to that term in clause 8.3;

"**DTC**" means The Depository Trust Company;

"**Entitlement Submission Deadline**" means 5.00 p.m. New York time on 27 March 2018 or such later time as the Information and Tabulation Agent may decide in its sole discretion (acting reasonably);

"**Exchange Shares**" means ordinary shares of the Company representing in aggregate 92.5% of the Company's enlarged share capital on the Restructuring Effective Date;

"**Existing Agents**" means:

(a)   the 2023 Notes Trustee;

(b)   The Bank of New York Mellon, London Branch in its capacity as Principal Paying Agent and London Transfer Agent under the 2023 Notes Indenture;

(c)   The Bank of New York Mellon in its capacity as U.S. Paying Agent and New York Transfer Agent under the 2023 Notes Indenture;

(d)   The Bank of New York Mellon SA/NV, Luxembourg Branch in its capacity as Registrar under the 2023 Notes Indenture; and

(e)   the Security Agents.

"**Explanatory Statement**" means the explanatory statement relating to this Scheme dated 19 February 2018;

"**Group**" means the Company and its direct and indirect subsidiaries;

"**Holding Period**" means the period from the Restructuring Effective Date to 5.00 p.m. New York time on the date falling 150 days after the Restructuring Effective Date;

"**Holdings Certification**" means, in respect of a Scheme Creditor:

(a)   Part B of Section 1 (*Holdings Certification*) of a validly completed Account Holder Letter showing the aggregate principal amount of 2023 Notes held by that Scheme Creditor as at the Record Time, which Account Holder Letter has been DTC medallion stamped by the Scheme Creditor or its Account Holder, as applicable; or

(b)    if such a certification cannot be provided, such other evidence of the aggregate principal amount of 2023 Notes held by that Scheme Creditor as at the Record Time as may be acceptable to the Information and Tabulation Agent in its sole discretion (acting reasonably);

"**Information and Tabulation Agent**" means D.F. King Ltd and D.F. King & Co Inc., or any successor information and tabulation agent for this Scheme;

"**Liability**" means any debt, loss, damage, liability or obligation whatsoever whether it is present, future, prospective or contingent, known or unknown, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales, the United States or in any other jurisdiction, or in any other manner whatsoever;

"**Longstop Date**" means 30 April 2018 or such later date as may be agreed by the Company and the Majority Scheme Creditors;

"**Majority Scheme Creditors**" means Scheme Creditors representing in aggregate a simple majority by value of the 2023 Notes Scheme Claims;

"**Nominated Recipient**" means any person who is, or persons who are, not a Disqualified Recipient and who is or are nominated by a Scheme Creditor in its validly completed Account Holder Letter to receive some or all of that Scheme Creditor's Scheme Share Allocation;

"**Omnibus Proxy**" means the omnibus proxy form provided by DTC in respect of the 2023 Notes as at the Record Time;

"**Proceedings**" means any process, action or other legal proceeding (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security) in any jurisdiction whatsoever;

"**Record Time**" means 5.00 p.m. New York Time on 12 March 2018;

"**Released Advisers**" means Milbank, Tweed, Hadley & McCloy LLP and Osborne Clarke LLP as legal advisers to the Company, the Information and Tabulation Agent, Akin Gump LLP as English legal adviser to the Ad Hoc Group and Akin Gump Strauss Hauer & Feld LLP as US legal adviser to the Ad Hoc Group, and Hogan Lovells International LLP and Hogan Lovells US LLP as legal advisers to the Notes Trustees and the Security Agents;

"**Released Parties**" means each member of the Group as at the Restructuring Effective Date, each Existing Agent, each member of the Ad Hoc Group and each Released Adviser and, in each case, their respective employees, partners, directors, officers, delegates and agents and any partners, directors, officers employees or former partners, directors, officers, employees or any of the foregoing;

"**Restructuring Conditions Precedent**" means:

(a) that the Company's shareholders have provided the necessary consents to:

    (1) approve the issue of, and disapply statutory pre-emption rights relating to the issue of, the Exchange Shares pursuant to the terms of this Scheme; and

    (2) waive Rule 9 of the Code in so far as it would require Solus Alternative Asset Management LP and certain of its funds to make a mandatory offer to the Company's shareholders as a result of the 2023 Notes Restructuring;

(b) that the Company's board has approved the issue of the Exchange Shares pursuant to the terms of this Scheme;

(c) the Custody Agreement has been executed by the Company and the Custodian;

(d) the Share Registrar has received proof that the application has been made for the Exchange Shares to be admitted to trading on the AIM market of the London Stock Exchange; and

(e) the Chapter 15 Order has been granted by the U.S. Bankruptcy Court;

"**Restructuring Documents**" means any document, agreement, deed, certificate, notice or form that the Company acting reasonably considers necessary or desirable to facilitate, implement or give effect to this Scheme;

"**Restructuring Effective Date**" means the date on which all the Scheme Implementation Steps have been completed;

"**Restructuring Implementation Date**" means the date notified to the Scheme Creditors through the Scheme Website after the Company has determined all of the Restructuring Conditions Precedent have been satisfied;

"**Sanction Order**" means the order of the Court sanctioning this Scheme under section 899 of the Act;

"**Scheme**" means this scheme of arrangement proposed by the Company under Part 26 of the Act;

"**Scheme Creditor Entitlement**" means with respect to each Scheme Creditor, its entitlement to receive its pro rata share of the Exchange Shares in exchange for its 2023 Notes Scheme Claims as determined pursuant to clause 7.1;

"**Scheme Creditors**" means the persons with the ultimate economic interest as principal in the 2023 Notes held in global form through DTC including by the right to have definitive notes issued to it under the 2023 Notes Indenture and/or the benefit of such right;

"**Scheme Implementation Steps**" means the steps set out in clause 5.2;

"**Scheme Lodgement Date**" means the date the Sanction Order is delivered to the Registrar of Companies of England and Wales;

"**Scheme Share Allocation**" means with respect to each Scheme Creditor, the number of Exchange Shares to be issued to it and/ or its Nominated Recipient(s) (as applicable) in exchange for that Scheme Creditor's Scheme Creditor Entitlement as determined pursuant to clause 7.1;

"**Scheme Website**" means the scheme website set up by the Information and Tabulation Agent at https://sites.dfkingltd.com/avanti;

"**Security Agents**" means The Bank of New York Mellon, London Branch as trustee and primary security agent and Wilmington Trust (London) Limited as secondary security agent under the 2023 Notes Indenture;

"**Share Registrar**" means Neville Registrars Limited or any successor share registrar of the Company;

"**SPR**" means the security position report provided by DTC in respect of the 2023 Notes as at the Record Time;

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code, which title includes Chapter 11 and Chapter 15 of that code; and

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or other appropriate forum in which the Chapter 15 representative files a petition for recognition of this Scheme under Chapter 15 of the U.S. Bankruptcy Code.

1.2   In this Scheme, unless the context otherwise requires or otherwise expressly provides:

    (a)   references to clauses, recitals and appendices are to clauses, recitals and appendices of this Scheme;

    (b)   references to a person include a reference to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

    (c)   references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re-enacted from time to time;

    (d)   references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

    (e)   the singular includes the plural and vice versa and words importing one gender shall include all genders;

    (f)   references to "including" shall be construed as references to "including without limitation" and "include", "includes" and "included" shall be construed accordingly;

(g)    headings to recitals, clauses, sub-clauses and appendices are for ease of reference only and shall not affect the interpretation of this Scheme;

(h)    references to a period of days shall include Saturdays, Sundays and public holidays and where the date which is the final day of a period of days is not a Business Day, that date will be adjusted so that it is the first following day which is a Business Day; and

(i)    references to time shall be to New York time unless otherwise indicated.

1.3    In the event of any inconsistency between the Explanatory Statement and this Scheme, the terms of this Scheme will prevail.

2.    **APPLICATION AND EFFECTIVENESS OF THE SCHEME**

2.1    This Scheme will become effective in accordance with its terms on the Scheme Lodgement Date.

2.2    The compromise and arrangement effected by this Scheme shall apply to all Scheme Creditors and shall be binding on all Scheme Creditors.

2.3    If the Restructuring Effective Date has not occurred on or before the Longstop Date, the terms of, and obligations on the parties under or pursuant to this Scheme shall lapse and cease to have any effect, except for this clause 2.3, clause 6.2, clause 6.3 and clause 9.

3.    **EFFECT OF THE SCHEME**

(a)    Upon the Restructuring Effective Date, each Scheme Creditor shall and hereby does, to the fullest extent permitted by law, completely and forever waive, cancel and release unconditionally any and all 2023 Notes Scheme Claims in accordance with the Scheme Implementation Steps.

(b)    Following the implementation of all the Scheme Implementation Steps on the Restructuring Effective Date, the Scheme Creditors shall not have any interest in or entitlement to any 2023 Notes Scheme Claims.

4.    **AUTHORISATION TO TAKE ACTIONS TO IMPLEMENT THE SCHEME**

4.1    With effect from the Scheme Lodgement Date, each Scheme Creditor hereby irrevocably authorises and instructs the Company, and appoints the Company as its agent and attorney, to on that Scheme Creditor's behalf:

(a)    enter into, execute and deliver as a deed (as applicable) any Restructuring Documents; and

(b)    give any instructions or carry out any related or ancillary actions that the Company acting reasonably considers necessary or desirable to implement or give effect to this Scheme.

4.2    The authority granted under clause 4.1 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

4.3   The authority granted under clause 4.1 shall terminate on the Restructuring Effective Date, or on the Longstop Date if this Scheme lapses in accordance with clause 2.3.

4.4   With effect from the Scheme Lodgement Date, each Scheme Creditor hereby irrevocably authorises and instructs the 2023 Notes Trustee to take any steps which are necessary or desirable to facilitate, implement or give effect to the terms of this Scheme, including the execution of any Restructuring Documents.

## 5.   THE SCHEME IMPLEMENTATION STEPS

5.1   As soon as reasonably practicable after the Company has determined that the Restructuring Conditions Precedent have been satisfied, the Company shall designate a date prior to the Longstop Date as the Restructuring Implementation Date and notify the Scheme Creditors of the same.

5.2   On the Restructuring Implementation Date the following steps shall be taken in the following order:

   (a)   the Scheme Creditors shall hereby completely and forever waive, cancel and release unconditionally any and all 2023 Notes Scheme Claims in respect of accrued but unpaid interest on the 2023 Notes as at the Restructuring Effective Date;

   (b)   the Scheme Creditors shall hereby completely and forever waive, cancel and release unconditionally any and all 2023 Notes Scheme Claims (other than those waived, cancelled and released pursuant to clause 5.2(a)) in consideration for their Scheme Creditor Entitlements which entitlements shall be deemed to vest upon the exchange of 2023 Notes Scheme Claims for Scheme Creditor Entitlements;

   (c)   the Scheme Creditor Entitlements shall be exchanged for the Scheme Share Allocations by the Company instructing the Share Registrar to issue the Exchange Shares to:

      (i)   the Scheme Creditors and/ or Nominated Recipients who are entitled to receive Scheme Share Allocations on the Restructuring Effective Date pursuant to clause 7.4; and

      (ii)   the Custodian in respect of Scheme Creditors who are not entitled to receive their Scheme Share Allocations on the Restructuring Effective Date pursuant to clause 8.1; and

   (d)   the 2021 Notes Fifth Supplemental Indenture shall become operative in accordance with its terms,

5.3   Upon completion of all the steps in clauses 5.2(a)-(d) above, the Restructuring Effective Date will occur.

5.4   The Company shall promptly inform the Scheme Creditors through the Scheme Website once the Restructuring Effective Date has occurred.

5.5   Promptly following completion of the Scheme Implementation Steps, the Company shall, and is irrevocably authorised by each Scheme Creditor to, send the 2023 Notes

Cancellation Order to DTC, and each Scheme Creditor shall irrevocably authorise the Company and the 2023 Notes Trustee (as applicable) to take any other steps necessary to cancel the 2023 Notes.

6. **SCHEME CREDITOR CONFIRMATIONS, RELEASES AND UNDERTAKINGS**

6.1 Each Scheme Creditor:

(a) irrevocably ratifies and confirms any act which the Released Parties may lawfully do or cause to be done or purport to do in accordance with the terms of this Scheme; and

(b) undertakes to the Company and its directors, officers and other duly appointed representatives to take all such actions as may be reasonably required to implement this Scheme and/or the 2023 Notes Restructuring.

6.2 Each Scheme Creditor to the fullest extent permitted by law, shall and shall be deemed to completely and forever release, waive, acquit, forgive and discharge unconditionally each of the Released Parties from any and all Claims and/or Liabilities arising or resulting from the Released Parties' involvement in the negotiation, execution, performance or implementation of the 2023 Notes Restructuring, except for Claims and/or Liabilities arising out of:

(a) that Released Party's fraud, gross negligence or wilful default; or

(b) any breach by a Released Party of its express obligations under this Scheme or the Restructuring Documents.

6.3 Each Scheme Creditor undertakes to the Company for its own benefit and for the benefit of each of the Released Parties, to the extent permitted by law:

(a) not to bring any Proceedings, other than any Allowed Proceedings, against any Released Party which imposes or attempts to impose upon any of them any Claim or Liability whatsoever in connection with the implementation of this Scheme and/or the 2023 Notes Restructuring; or

(b) not to make, demand or institute (or threaten to institute) any Proceedings against the Existing Agents in connection with this Scheme and/or the 2023 Notes Restructuring, other than an Allowed Proceeding.

6.4 With effect from the Restructuring Effective Date, each Scheme Creditor undertakes to the Company for its own benefit and for the benefit of each of the Released Parties, to the extent permitted by law:

(a) to treat its 2023 Notes Scheme Claims as having been completely and forever waived, cancelled and released with effect from the Restructuring Effective Date in consideration for its Scheme Creditor Entitlements whether or not the Scheme Creditor has had its Scheme Share Allocation issued to it, its Nominated Recipient or the Custodian (as applicable);

(b)     not to bring or continue, or instruct, direct or authorise any other person (including the 2023 Notes Trustee) to bring or continue any Proceedings, other than any Allowed Proceedings, against any of the Released Parties in respect of any 2023 Notes Scheme Claims or otherwise to assert any 2023 Notes Scheme Claims against any of the Released Parties; and

(c)     not to prove, or seek to prove, in the insolvencies of any member of the Group (if any insolvency occurs) in respect of any 2023 Notes Scheme Claims.

7.    **ISSUANCE AND CALCULATION OF SCHEME CREDITOR ENTITLEMENTS AND SCHEME SHARE ALLOCATIONS**

7.1    The Company and the Information and Tabulation Agent shall calculate each Scheme Creditor's Scheme Creditor Entitlements and Scheme Share Allocation by:

(a)     dividing the principal amount of 2023 Notes held by the Scheme Creditor as at the Record Time by the aggregate outstanding principal amount of the 2023 Notes as at the Record Time, as confirmed to the Information and Tabulation Agent by the 2023 Notes Trustee; then

(b)     multiplying the resulting number in 7.1(a) and the total number of Exchange Shares.

7.2    The Company and the Information and Tabulation Agent will calculate Scheme Creditor Entitlements and Scheme Share Allocations based on the Holdings Certifications provided by or on behalf of that Scheme Creditor, the SPR and the Omnibus Proxy. The Information and Tabulation Agent's determination of any Scheme Creditor Entitlements and Scheme Share Allocations will be final absent manifest error.

7.3    Fractions of Scheme Share Allocations will not be issued and will be rounded down to the nearest whole share.

7.4    Scheme Share Allocations will only be issued to a Scheme Creditor and/ or its Nominated Recipient(s) (as applicable) on the Restructuring Effective Date if:

(a)     the Information and Tabulation Agent has received a validly completed Account Holder Letter including a Holdings Certification in respect of that Scheme Creditor and a validly completed Confirmation Form in respect of that Scheme Creditor on or prior to the Entitlement Submission Deadline; and

(b)     that Scheme Creditor is not a Disqualified Recipient, or is a Disqualified Recipient but has nominated one or more Nominated Recipient(s) to receive its entire Scheme Share Allocation.

7.5    If the Information and Tabulation Agent receives notice in writing of an assignment or transfer of a 2023 Notes Scheme Claim after the Record Time but prior to the Restructuring Effective Date, the Information and Tabulation Agent may, in its sole discretion and subject to the production of such evidence or information as it may reasonably require and to any other terms and conditions which the Information and Tabulation Agent or Company may consider necessary or desirable, agree to recognise

that assignment or transfer for the purposes of calculating Scheme Creditor Entitlements and Scheme Share Allocations.

## 8.    CUSTODY AND DISTRIBUTION OF CUSTODY SHARE ALLOCATIONS

8.1    If the Information and Tabulation Agent has not received a validly completed Account Holder Letter (including a Holdings Certification) and a Confirmation Form in respect of a Scheme Creditor on or prior to the Entitlement Submission Deadline, and/or that Scheme Creditor is a Disqualified Recipient and has not nominated one or more Nominated Recipient(s) to receive its entire Scheme Share Allocation, that 2023 Note Creditor's Scheme Share Allocations will be issued to the Custodian on the Restructuring Effective Date, rather than to that Scheme Creditor or its Nominated Recipient(s).

8.2    Any Custody Scheme Creditor may, before the expiration of the Holding Period, deliver a validly completed Account Holder Letter (including a completed Section 4 (*Custody Distribution Instructions*)) to the Information and Tabulation Agent to irrevocably authorise and instruct the Information and Tabulation Agent to deliver a Custody Distribution Instruction to the Company regarding the distribution of that Custody Scheme Creditor's Scheme Share Allocation, along with any Accruals thereon.

8.3    The Information and Tabulation Agent will only be required to deliver a Custody Distribution Instruction in respect of a Custody Scheme Creditor if:

(a)    the Information and Tabulation Agent has received a validly completed Account Holder Letter (including a Holdings Certification) in respect of that Custody Scheme Creditor and a validly completed Confirmation Form in respect of that Custody Scheme Creditor before the expiry of the Holding Period; and

(b)    that Custody Scheme Creditor is not a Disqualified Recipient, or is a Disqualified Recipient but has nominated one or more Nominated Recipient(s) to receive its entire Scheme Share Allocation,

any Custody Scheme Creditor who satisfies both (a) and (b) of this clause 8.3 being a **"Distribution Scheme Creditor"**.

8.4    On the third Business Day of each calendar month until the expiration of the Holding Period and the third Business Day following the expiry of the Holding Period, the Information and Tabulation Agent will send the Company an instruction which will set out:

(a)    the details of the Distribution Scheme Creditors (if any) who have instructed the distribution of their Scheme Share Allocations since:

(i)    the Restructuring Effective Date, in respect of the first calendar month beginning after the Restructuring Effective Date; and

(ii)    thereafter, since the previous Custody Distribution Instruction which was delivered to the Company;

(b)    the Scheme Share Allocations of each such Distribution Scheme Creditor; and

(c)    the details of the accounts to which such Distribution Scheme Creditor's Scheme Share Allocations and any Accruals related to should be distributed,

any such instruction being a "**Custody Distribution Instruction**".

8.5    Upon receipt of a Custody Distribution Instruction, the Company shall promptly instruct the Custodian to make the distributions set out in that Custody Distribution Instruction, or otherwise procure that the Scheme Share Allocations set out in that Custody Distribution Instruction are distributed to the relevant Distribution Scheme Creditor(s) and/ or Nominated Recipient(s). The Company's obligations under this clause shall be enforceable against the Company by the relevant Distribution Scheme Creditor(s).

8.6    If upon the expiration of the Holding Period, the Information and Tabulation Agent has:

(a)    not received a validly completed Account Holder Letter (including a completed Section 4 (*Custody Distribution Instructions*)) in respect of a Custody Scheme Creditor; or

(b)    received a validly completed Account Holder Letter (including a completed Section 4 (*Custody Distribution Instructions*)) in respect of a Custody Scheme Creditor, but such Custody Scheme Creditor has not yet delivered a Confirmation Form to the Information and Tabulation Agent and/ or such Custody Scheme Creditor is a Disqualified Recipient and has not nominated one or more Nominated Recipient(s) to receive its entire Scheme Share Allocation,

the Company shall be irrevocably authorised and instructed by such remaining Custody Scheme Creditors to instruct the Custodian to transfer their Scheme Share Allocations (together with any Accruals thereon) to the Company or as the Company directs free of any claim or interest of the Custody Scheme Creditors and without notice to the Custody Scheme Creditors.

## 9.    GENERAL SCHEME PROVISIONS

### 9.1    Reliance on Section 3(a)(10) exemption

In sanctioning this Scheme, the Court has been apprised of the fact that the Company will rely on the Court's approval of this Scheme as the basis for the Section 3(a)(10) exemption under the United States Securities Act of 1933 for the offer, issuance and distribution of Scheme Share Allocations to Scheme Creditors or their Nominated Recipient(s) in exchange for the 2023 Notes Scheme Claims through the issuance and exchange of the Scheme Creditor Entitlements, which are a mechanic to implement the Exchange, rather than a separate security.

### 9.2    Application to the Court for directions

Without prejudice to any rights that the Company might otherwise have in connection with this Scheme or any aspect of it, the Company shall be entitled, following consultation with the Majority Scheme Creditors, to make an application to the Court for directions at any time in connection with any matter arising under or in relation to this Scheme.

9.3  **Modifications of the Scheme**

The Company may agree on behalf of all Scheme Creditors to any modification of, or addition to, this Scheme and/or the Restructuring Documents or any terms or conditions that the Court may think fit to approve or impose and which would not directly or indirectly have an adverse effect on the rights or interests of Scheme Creditors, or any individual Scheme Creditor, under this Scheme.

9.4  **Notices**

(a)   Any notice or other written communication to be given under or in relation to this Scheme shall be given in writing and shall be deemed to have been duly given if it is delivered by hand or sent by courier, post or e-mail:

    (i)   in the case of the Information and Tabulation Agent:

       (A)   by courier or post to any of:

          (1)   D.F. King, 125 Wood Street, London, EC2V 7AN, United Kingdom; or

          (2)   D.F. King, 48 Wall Street, 22nd Floor, New York, New York, 10005, United States; or

          (3)   D.F. King, Suite 1601, 16/F, Central Tower, 28 Queen's Road Central, Hong Kong; or

       (B)   by email to avanti@dfkingltd.com;

    (ii)   in the case of the Company:

       (A)   by courier or post to Milbank, Tweed, Hadley & McCloy LLP, 10 Gresham St., London, EC2V 7JD, marked for the attention of Stuart Swift; or

       (B)   by email marked for the attention of Nick Angel and Stuart Swift (nangel@milbank.com / sswift@milbank.com); and

    (iii)   in the case of a Scheme Creditor, by publication on the Scheme Website.

(b)   Any notice or other written communication or document made or delivered by one person to another under or in connection with this Scheme will only be effective:

    (i)   if by e-mail, when received by the recipient; or

    (ii)   if delivered by hand or courier on the day of delivery, or, if such a day is not a Business Day, then on the next Business Day of delivery;

    (iii)   if sent by post, on the second Business Day after posting if the recipient's address is in the country of dispatch, otherwise on the seventh Business Day after posting; and

    (iv)   if a particular contact is specified as part of its address details provided in this agreement, if addressed to that contact.

(c)    The failure by any party to send any notice, written communication or other document in accordance with this clause, or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Scheme.

(d)    The Company shall not be responsible for any loss or delay in the transmission of any notices or other documents posted by or to any Scheme Creditors which shall be posted at the risk of such Scheme Creditors.

9.5    **Future liquidation**

The Scheme shall be unaffected by any liquidation, administration or similar insolvency process of any of the Company, member of the Group, or Scheme Creditors after the Restructuring Effective Date and shall continue in full force and effect according to its terms.

9.6    **Governing law and jurisdiction**

(a)    This Scheme, and any dispute or claim (including non-contractual disputes or claims regarding non-contractual obligations) arising out of or in connection with it or its subject matter or formation, shall be governed by, and construed in accordance with, the laws of England and Wales.

(b)    The Company and the Scheme Creditors hereby agree that the courts of England and Wales shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute or claim which may arise out of or in connection with this Scheme or its subject matter or formation, or which may arise out of any action taken or omitted to be taken under this Scheme, or any dispute or claim (including non-contractual disputes or claims regarding non-contractual obligations) arising out of or in connection with it. For such purposes the Scheme Creditors irrevocably submit to the jurisdiction of the courts of England and Wales.

9.7    **Enforcement by Released Parties**

Any Released Party may rely on and enforce the terms of clause 6.

9.8    **Financial assistance exemption**

Pursuant to the Sanction Order, the Court has granted the Company permission to pay certain of the fees and expenses of the Ad Hoc Group's professional advisers on the Restructuring Effective Date pursuant to, and in reliance on, section 681(2)(e) of the Act.

**ANNEX II**
**NOTICE OF SCHEME MEETING**

NOTICE OF SCHEME MEETING

**IN THE HIGH COURT OF JUSTICE**                                    **No. 1278 of 2018**

**CHANCERY DIVISION**

**COMPANIES COURT**

IN THE MATTER OF

AVANTI COMMUNICATIONS GROUP PLC

- and -

THE COMPANIES ACT 2006

NOTICE OF SCHEME MEETING

**NOTICE IS HEREBY GIVEN** that by an Order dated 19 February 2018 made in the above matter, the Court has directed that the Scheme Meeting be convened for the purposes of considering and, if thought fit, approving (with or without modification) the scheme of arrangement proposed to be made between the Scheme Creditors and the Company.

Unless the context otherwise requires, all capitalised terms used in this notice shall have the meanings set out in the explanatory statement dated 19 February 2018 (the "**Explanatory Statement**") relating to the above matter.

The Scheme Meeting to consider the Scheme will be held on 20 March 2018 at the offices of Milbank, Tweed, Hadley & McCloy LLP, 10 Gresham Street, London EC2V 7JD. The Scheme Meeting will commence at 10.00 a.m. Registration for the Scheme Meeting will commence at 09.45 a.m. for Scheme Creditors or their representatives attending in person.

A copy of the terms of the Scheme proposed by the Company and a copy of the Explanatory Statement are available to be downloaded from the Scheme Website at https://sites.dfkingltd.com/avanti. Account Holder Letters for Scheme Creditors to vote on the Scheme may also be downloaded from the Scheme Website. If Scheme Creditors wish to receive hard copies of the Scheme or Explanatory Statement free of charge, they may contact the Company's legal advisers by e-mail to avanti@milbank.com or by telephone (+44 207 615 3000).

Scheme Creditors are requested to liaise with their Account Holder to ensure that a validly completed Account Holder Letter is delivered to the Information and Tabulation Agent in accordance with the terms set out therein as soon as possible after the Record Time (being 5.00 p.m. New York time on 12 March 2018) and in any event to be received no later than the Voting Submission Deadline (being 5.00 p.m. New York time on 16 March 2018), or if the Scheme Creditor or its representative is attending the Scheme Meeting in person, to be handed in at the registration desk prior to the commencement of the Scheme Meeting.

By the Order referred to above, the Court has appointed Nigel Fox to act as Chairman (or, if for any reason he is unable to act, Nick Angel) and has directed the Chairman to report the result of such meeting to the Court.

The Scheme will be subject to the subsequent approval of the Court.

**Dated 19 February 2018**

## ANNEX III
### FORM OF ACCOUNT HOLDER LETTER

## ACCOUNT HOLDER LETTER

**For use by Account Holders (as defined below) in respect of the**

**12%/17.5% Senior Secured Notes due 2023**

(Reg S CUSIP/ISIN: G0713N AH3/USG0713NAH38 and 144A CUSIP/ISIN: 05351L AJ6/US05351LAJ61)

(the "**2023 Notes**")

issued by

## AVANTI COMMUNICATIONS GROUP PLC

(the "**Company**")

in relation to the scheme of arrangement proposed by the Company under Part 26 of the Companies Act 2006 (the "**Scheme**")

**The Scheme will, if implemented, materially affect holders of the 2023 Notes, regardless of whether they voted in favour or against the Scheme or abstained from voting.**

Capitalised terms used in this Account Holder Letter but not defined in it have the same meaning as given to them in the explanatory statement relating to the Scheme dated 19 February 2018 (the "**Explanatory Statement**").

For the purpose of this letter, an "**Account Holder**" is a person shown as holding an interest as principal in the Global Notes for the 2023 Notes held through and shown on the records maintained by DTC, and a "**Scheme Creditor**" is a person with the ultimate economic interest as principal in the 2023 Notes. If an Account Holder has the ultimate economic interest as principal in any 2023 Notes, it will be a Scheme Creditor in respect of those 2023 Notes.

Account Holders must use this Account Holder Letter to register details of each Scheme Creditor's interests in the 2023 Notes and to make certain elections in respect of the Scheme. The Information and Tabulation Agent will determine each Scheme Creditor's Voting Value, Scheme Creditor Entitlement and Scheme Share Allocation based on the information contained in this Account Holder in conjunction with the SPR and Omnibus Proxy provided by DTC.

Account Holders that are not Scheme Creditors are strongly encouraged to obtain whatever information or instructions they require from the underlying Scheme Creditors they represent in sufficient time to allow the Account Holder to return their validly completed Account Holder Letter to the Information and Tabulation Agent.

Scheme Creditors are strongly encouraged to liaise with their Account Holder to ensure that an Account Holder Letter is submitted by the deadlines set out below.

## INSTRUCTIONS FOR COMPLETING THE ACCOUNT HOLDER LETTER

In order to be validly completed, this Account Holder Letter should be completed as follows:

---

**Section 1** (*Relevant Scheme Creditor details*) Parts A and B of this Account Holder Letter must be completed by the Account Holder in all circumstances.

Part C of this Account Holder Letter should only be completed for Scheme Creditors who wish to appoint a Nominated Recipient.

**Section 2** (*Scheme voting instructions*) should be completed for Scheme Creditors who wish to vote on the Scheme.

**Section 3** (*Account Holder confirmations and execution*) of this Account Holder Letter must be completed by the Account Holder in all circumstances.

**Section 4** (*Custody Distribution Instructions*) should only be completed if this Account Holder Letter is being delivered after the "**Entitlement Submission Deadline**", being 5.00 p.m. New York time on 27 March 2018, or such later time as the Information and Tabulation Agent may decide in its sole discretion (acting reasonably).

---

Completed Account Holder Letters must be submitted by email to the Information and Tabulation Agent at avanti@dfkingltd.com.

## DEADLINES FOR SUBMITTING THE ACCOUNT HOLDER LETTER

***Deadline for voting on the Scheme***: Scheme Creditors wishing to vote on the Scheme by proxy must ensure that their Account Holder delivers a validly completed Account Holder Letter in respect of that Scheme Creditor to the Information and Tabulation Agent as soon as possible after 5.00 p.m. New York time on 12 March 2018 (the "**Record Time**") and by no later than 5.00 p.m. New York time on 16 March 2018 (the "**Voting Submission Deadline**"). If this is not done, the Relevant Scheme Creditor (as defined below) will not be entitled to vote by proxy at the relevant Scheme Meeting, though it will retain the right to attend and vote at the Scheme Meeting in person, subject to complying with the voting procedures described in the Explanatory Statement.

***Deadline for receiving Scheme consideration on the Restructuring Effective Date***: If a Scheme Creditor wishes to have its Scheme Share Allocation issued to it or its Nominated Recipient(s) on the Restructuring Effective Date, that Scheme Creditor must both:

(a)     deliver, or ensure that their Account Holder(s) deliver a validly completed Account Holder Letter to the Information and Tabulation Agent, and;

(b)     deliver a validly completed Confirmation Form to the Information and Tabulation Agent,

by the Entitlement Submission Deadline. If either of these things are not done, that Scheme Creditor's Scheme Share Allocation will be issued to the Custodian on the Restructuring Effective Date pursuant to the terms of the Scheme.

2

**Scheme Creditors are strongly advised to read the Explanatory Statement and the Scheme before they complete, or instruct their Account Holder to complete, this Account Holder Letter. All relevant documentation can be found at the Scheme Website at https://sites.dfkingltd.com/avanti.**

This Account Holder Letter and any non-contractual obligations arising out of or in relation to this Account Holder Letter shall be governed by, and interpreted in accordance with, English law.

### FOR ASSISTANCE CONTACT THE INFORMATION AND TABULATION AGENT

**D.F. King**
Information and Tabulation Agent

E-mail: avanti@dfkingltd.com

**London**
125 Wood Street
London EC2V 7AN
United Kingdom
Telephone: +44 20 7920 9700

**New York**
48 Wall Street, 22nd Floor
New York, New York 10005
United States
Telephone: +1 212 269 5550

Toll free: (800) 714-3311

**Hong Kong**
Suite 1601, 16/F, Central Tower
28 Queen's Road Central
Hong Kong
Telephone: +852 3953 7230

Scheme Website: https://sites.dfkingltd.com/avanti

## SECTION 1          RELEVANT SCHEME CREDITOR DETAILS

### PART A          IDENTITY OF RELEVANT SCHEME CREDITOR

If you are an Account Holder who has interests in the Relevant 2023 Notes (as defined in Part B) for your own account and are the holder of the ultimate economic interest in the relevant 2023 Notes as at the Record Time (being 5.00 p.m. New York time on 12 March 2018), **please provide all information required in the table below in respect of yourself.**

If you are an Account Holder who does not have an ultimate economic interest in the relevant 2023 Notes as at the Record Time (being 5.00 p.m. New York time on 12 March 2018), but rather has interests in the Relevant 2023 Notes on behalf of a Scheme Creditor, **please provide all information required in the table below in respect of that Scheme Creditor.**

For the purposes of this Account Holder Letter, the Scheme Creditor identified below shall be the **"Relevant Scheme Creditor".**

| | |
|---|---|
| Full legal name of Scheme Creditor | |
| Jurisdiction of incorporation | |
| Registered address | |
| City | |
| Country of residence | |
| Name of designated contact | |
| Email address | |
| Telephone number (with country code) | |
| CREST Account details[1] | |
| Name of CREST Nominee | |
| CREST Member ID | |
| CREST designation (if applicable) | |

---

[1] CREST account details do not need to be provided if the Relevant Scheme Creditor validly nominates one or more Nominated Recipient(s) to receive 100% of its Scheme Share Allocation – see Part C of Section 1 of this Account Holder Letter for further details.

**PART B      HOLDINGS CERTIFICATION**

This section should be completed by the Account Holder named in section 3 (the "**Relevant Account Holder**") with the details of the principal amount of 2023 Notes held by the Relevant Scheme Creditor as at the Record Time (being 5.00 p.m. New York time on 12 March 2018).

For the purposes of this Account Holder Letter, the 2023 Notes set out below shall be the "**Relevant Notes**".

| CUSIP or ISIN | Principal amount of 2023 Notes held by the Relevant Scheme Creditor as at the Record Time (5.00 p.m. New York time on 12 March 2018) | Name of Account Holder | DTC Account number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

To constitute a Holdings Certification for the purposes of the Scheme, the Relevant Account Holder must affix its Signature Medallion Guarantee Stamp to section 3 of this Account Holder Letter.

5

## PART C   APPOINTMENT OF NOMINATED RECIPIENT(S)

**This section should only be completed for Scheme Creditors who wish to appoint one or more Nominated Recipient(s) to receive some portion or all of their Scheme Share Allocation.**

A Nominated Recipient cannot be a Disqualified Recipient, being any potential or proposed recipient of Scheme Share Allocation which is domiciled or resident in, a citizen of or otherwise subject to the laws of any jurisdiction where the issue or distribution of Scheme Share Allocation to such recipient is prohibited by law, or would be or be likely to result in the Company being required to comply with any filing, registration, disclosure or other onerous requirement as determined by the Company in its sole discretion.

If a Relevant Scheme Creditor wishes to appoint more than one Nominated Recipient, a separate Nominated Recipient Nomination Form in the form set out on the following page should be completed in respect of each Nominated Recipient.

## NOMINATED RECIPIENT NOMINATION FORM – ONE TO BE COMPLETED FOR EACH NOMINATED RECIPIENT

| The Relevant Scheme Creditor hereby irrevocably and unconditionally nominates the following Nominated Recipient: | |
|---|---|
| Full legal name of Nominated Recipient | |
| Jurisdiction of incorporation | |
| Registered address | |
| City | |
| Country of residence | |
| Name of designated contact | |
| Email address | |
| Telephone number (with country code) | |
| Percentage of the Relevant Scheme Creditor's Scheme Share Allocation (and, if applicable, any Accruals thereon) to be issued to the Nominated Recipient named above | ___% |
| Nominated Recipient's CREST Account details | |
| Name of CREST Nominee | |
| CREST Member ID | |
| CREST designation (if applicable) | |

If any of the above details are not provided, invalid CREST account details are provided or the proposed Nominated Recipient is a Disqualified Recipient, the nomination of the Nominated Recipient will be invalid and no Scheme Share Allocation (and, if applicable, Accruals thereon) will be issued to the Nominated Recipient

7

## SECTION 2
## SCHEME VOTING INSTRUCTIONS

**This section must be completed by the Relevant Account Holder if the Relevant Scheme Creditor wishes to vote on the Scheme by proxy.**

**If the Relevant Scheme Creditor does not wish to vote on the Scheme, this Section 2 does not need to be completed.**

**(A) Attendance at Scheme Meeting**

In respect of the Scheme Meeting, the Relevant Scheme Creditor wishes to:

*Tick only ONE of the boxes below*

☐ appoint a proxy to attend and vote on its behalf at the Scheme Meeting (*please now only complete paragraph (B) (Appointment of proxy and proxy voting instructions) below*); or

☐ attend and vote at the Scheme Meeting in person, or have its duly authorised representative attend and vote in person on its behalf (*please now only complete paragraph (C) (Indication of voting intention) below*)

**(B) Appointment of proxy and proxy voting instructions**

The Relevant Scheme Creditor wishes to appoint, and the Relevant Account Holder is hereby authorised to appoint:

*Tick only ONE of the boxes below*

☐ the Chairman of the Scheme Meeting; or

☐ the following individual:

      Name:

      Address:

      Passport number:

      or failing him or her, the Chairman,

as the Relevant Scheme Creditor's proxy and the Relevant Scheme Creditor wishes the proxy to vote:

8

*Tick only ONE of the boxes below*

☐ FOR the Scheme; or

☐ AGAINST the Scheme.

**(C) Indication of voting intention**

The Relevant Scheme Creditor intends to attend the Scheme Meeting in person, or have the following duly authorised representative attend:

      Name:

      Address:

      Passport number:

The Relevant Scheme Creditor intends to vote as follows. The Relevant Scheme Creditor understands that his expression of intention is not binding and that it or its representative may vote as it sees fit at the Scheme Meeting, provided that the authorised representative must bring his or her passport and a copy of this Account Holder Letter.

*Tick only ONE of the boxes below*

☐ FOR the Scheme; or

☐ AGAINST the Scheme.

**SECTION 3**        **ACCOUNT HOLDER CONFIRMATIONS AND EXECUTION**

**The Relevant Account Holder hereby confirms to the Company and the Information and Tabulation Agent as follows (select "yes" or "no" as appropriate for each item):**

A.      That all authority conferred or agreed to be conferred pursuant to this Account Holder Letter and every obligation of the Relevant Account Holder under this Account Holder Letter (including any elections made in this Account Holder Letter) shall be binding upon the successors and assigns of the Relevant Account Holder (in the case of a corporation or institution) or the successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Relevant Account Holder (in the case of a natural person).

☐ Yes

☐ No

B.      That all of the information in this Account Holder Letter is complete and accurate.

☐ Yes

☐ No

C.      That, in relation to the Relevant Notes, the Relevant Account Holder has authority to, if applicable give the voting instructions and make any nominations set out in this Account Holder Letter on behalf of the Relevant Scheme Creditor.

☐ Yes

☐ No

**Any Account Holder who is unable to confirm "yes" in respect of paragraphs A, B or C above should contact the Information and Tabulation Agent for assistance using the contact details set out on page 3 of this Account Holder Letter.**

Full name of Account Holder:                    _____

DTC account number:                             _____

Authorised employee of Account Holder:          _____

                                                          (*print name*)

Telephone number of authorised employee
(with country code):                            _____

Email of authorised employee:                   _____


Authorised employee signature:                  _____

                                                               (*sign*)

Date:                                           _____

---

**Signature Medallion Guarantee Stamp\***




* By affixing its Signature Medallion Guarantee Stamp, the Relevant Account Holder is hereby instructed by the Relevant Scheme Creditor to confirm to the Company and the Information and Tabulation Agent that the Relevant Scheme Creditor holds the Relevant Notes at the Record Time.

---

**Before returning this Account Holder Letter, please make certain that you have provided all the information requested.**

By signing above, the Relevant Account Holder confirms that it has obtained all necessary consents, authorisations, approvals and/or permissions required to be obtained by it under the laws and regulations applicable to it in any jurisdiction in order to sign this Account Holder Letter for itself or on behalf of the Relevant Scheme Creditor (as applicable).

If the Relevant Account Holder is acting on behalf of a Scheme Creditor, such Relevant Account Holder may only complete and submit this Account Holder Letter on behalf of the Scheme Creditor if the Relevant Account Holder has authority to do so.

Scanned PDF copies of this Account Holder Letter will be accepted and originals are not required.

**SECTION 4          CUSTODY DISTRIBUTION INSTRUCTIONS**

**This Section 4 should only be completed if this Account Holder Letter is being delivered in respect of a Scheme Creditor after the Entitlement Submission Deadline, being 5.00 p.m. New York time on 27 March 2018, or such later time as the Information and Tabulation Agent may decide in its sole discretion (acting reasonably). If this Account Holder Letter is being submitted before then, this Section 4 should not be completed.**

Pursuant to the terms of the Scheme, the Relevant Scheme Creditor and the Relevant Account Holder hereby irrevocably instruct and authorise the Information and Tabulation Agent to deliver a Custody Distribution Instruction to the Company regarding the distribution of the Relevant Scheme Creditor's Scheme Share Allocation, along with any Accruals thereon, to it and/or its Nominated Recipient(s) (if applicable).

☐ Yes

An Account Holder who is unable to tick "yes" above should contact the Information and Tabulation Agent using the contact details set out in this Account Holder Letter.

The Relevant Scheme Creditor and Relevant Account Holder confirm to the Information and Tabulation Agent that any cash Accruals relating to the Relevant Scheme Creditor's Scheme Share Allocation should be paid to the following accounts.

| Relevant Scheme Creditor bank account details | |
|---|---|
| Full name of bank account | |
| Account number | |
| Sort Code/ IBAN | |

| Nominated Recipient's bank account details (if applicable) | |
|---|---|
| Full name of bank account | |
| Account number | |
| Sort Code/ IBAN | |

13

## ANNEX IV
## FORM OF CONFIRMATION  FORM

## CONFIRMATION FORM

A Scheme Creditor must validly complete this Confirmation Form to receive its Scheme Share Allocation. An editable PDF version of the Confirmation Form is available on the Scheme Website (https://sites.dfkingltd.com/avanti).

Completed Confirmation Forms should be submitted by email to the Information and Tabulation Agent at avanti@dfkingltd.com.

### DEADLINES FOR SUBMITTING THE CONFIRMATION FORM

If a Scheme Creditor wishes to have its Scheme Share Allocation issued to it or its Nominated Recipient(s) on the Restructuring Effective Date, that Scheme Creditor must both:

(a)    deliver a validly completed Confirmation Form to the Information and Tabulation Agent; and

(b)    deliver, or ensure that their Account Holder(s) deliver a validly completed Account Holder Letter to the Information and Tabulation Agent,

by the Entitlement Submission Deadline, being 5.00 p.m. New York time on 27 March 2018 or such later time as the Information and Tabulation Agent may decide in its sole discretion (acting reasonably). If either of these things are not done, that Scheme Creditor's Scheme Share Allocation will be issued to the Custodian on the Restructuring Effective Date pursuant to the terms of the Scheme.

Any Scheme Creditors whose Scheme Share Allocations are issued to the Custodian pursuant to the Scheme must deliver a validly completed Confirmation Form and Account Holder Letter to the Information and Tabulation Agent before the expiration of the Holding Period, being 5.00 p.m. New York time on the date falling 150 days after the Restructuring Effective Date, if they wish to receive their Scheme Share Allocation.

*************

This Deed is made by:

[FULL LEGAL NAME OF SCHEME CREDITOR], a [SPECIFY LEGAL ENTITY] incorporated under the laws of and registered in [JURISDICTION] whose registered office is at [ADDRESS] (the "**Scheme Creditor**")[1]

FOR THE BENEFIT OF

Avanti Communications Group plc (the "**Company**"); and

D.F. King Ltd. and D.F. King & Co Inc. (together, the "**Information and Tabulation Agent**").

**This Confirmation Form is made by way of deed and is dated [DATE].**

1.  Capitalised terms used in this Confirmation Form but not otherwise defined in it have the same meaning as given to them in the explanatory statement dated ___ February 2018 relating to the scheme of arrangement proposed by Avanti Communications Group plc under Part 26 of the Companies Act 2006 (the "**Explanatory Statement**").

2.  The Scheme Creditor represents, warrants and undertakes to the Company and the Information and Tabulation Agent in its capacity as Scheme Creditor that:

    (a)  it has received and has reviewed the Scheme and the Explanatory Statement and understands that it is consenting to the adoption of the 2023 Notes Restructuring upon the terms and subject to the conditions set forth in the Explanatory Statement and the Scheme;

    (b)  it has complied with all laws and regulations applicable to it with respect to the Scheme, the Account Holder Letter and this Confirmation Form;

    (c)  it is assuming all of the risks inherent in participating in the Scheme and has undertaken all the appropriate analysis of the implications of participating in the Scheme without relying on the Company, any other member of the Group or the Information and Tabulation Agent (other than any representations or warranties given by the Company under the Explanatory Statement);

    (d)  the Relevant Notes specified in the Account Holder Letter relating to the Scheme Creditor delivered by it or by its Account Holder(s) (the "**Relevant Account Holder Letter**") are, at the Record Time held by it (directly or indirectly) or on its behalf;

    (e)  no other person has been appointed by it as a proxyholder in respect of the Relevant Notes (as defined in the Relevant Account Holder Letter) and no voting instruction with respect to the Scheme has been given in relation to the Relevant Notes except as set out in the Relevant Account Holder Letter;

    (f)  neither the Information and Tabulation Agent nor any of their affiliates, directors, officers or employees has made any recommendation to that Scheme Creditor as to whether, or

---

[1] If the Scheme Creditor is not a corporate entity it should contact the Information and Tabulation Agent to obtain the appropriate form of Confirmation Form

how, to vote in relation to the Scheme, and that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(g) the Scheme Creditor acknowledges that it has reviewed the restrictions set forth in the Explanatory Statement and that its participation in the Scheme does not conflict with such restrictions;

(h) all authority conferred or agreed to be conferred pursuant to the Relevant Account Holder Letter and this Confirmation Form shall be binding on the successors and assigns of the Scheme Creditor (in the case of a corporation or institution) or the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Scheme Creditor (in the case of a natural person) and shall not be affected by, and shall survive, the insolvency, bankruptcy, dissolution, death or incapacity (as the case may be) of the Scheme Creditor;

(i) other than as set out in the Explanatory Statement, no information has been provided to it by the Company, the other members of the Group, the Information and Tabulation Agent or any of their respective affiliates, directors, officers, advisers or employees with regard to the tax consequences to that Scheme Creditor arising from voting in favour of the Scheme, and that it is solely liable for any taxes or similar payments imposed on it under the laws of any applicable jurisdiction as a result of voting in favour of the Scheme, and that it will not and does not have any right of recourse (whether by way of reimbursement, indemnity or otherwise) against the Company, the other members of the Group, the Information and Tabulation Agent or any of their affiliates, directors, officers, advisers or employees in respect of such taxes or similar payments;

(j) it (if it is receiving Scheme Share Allocations pursuant to the terms of the Scheme) and/ each of the Nominated Recipient(s) it has appointed in the Relevant Account Holder Letter (if applicable) is not a Disqualified Recipient;

(k) it agrees to be bound by the terms of the Scheme from (and including) the Restructuring Effective Date and agrees it will not take any step, action or proceeding to challenge the Scheme or enforce the terms of the 2023 Notes from the Restructuring Effective Date;

(l) it empowers, authorises, requests and instructs the 2023 Notes Trustee, the Company, the Information and Tabulation Agent and any of their officers, employees or agents to do all such things as are necessary or expedient to carry out or give effect to the Scheme and the Restructuring;

(m) with effect from the Scheme Lodgement Date, it:

   (i) irrevocably ratifies and confirms any act which the Released Parties may lawfully do or cause to be done or purport to do in accordance with the terms of the Scheme; and

   (ii) undertakes to the Company and its directors, officers and other duly appointed representatives to take all such actions as may be reasonably required to implement the Scheme and/or the 2023 Notes Restructuring;

3

(n)   with effect from the Scheme Lodgement Date, it shall and shall be deemed to completely and forever, to the fullest extent permitted by law, release, waive, acquit, forgive and discharge unconditionally each of the Released Parties from any and all Claims and/or Liabilities arising or resulting from the Released Parties' involvement in the negotiation, execution, performance or implementation of the 2023 Notes Restructuring, except for Claims and/or Liabilities arising out of:

   (i)   that Released Party's fraud, gross negligence or wilful default; or

   (ii)  any breach by a Released Party of its express obligations under the Scheme or the Restructuring Documents;

(o)   with effect from the Scheme Lodgement Date, it undertakes to the Company for its own benefit and for the benefit of each of the Released Parties, to the extent permitted by law:

   (i)   not to bring any Proceedings, other than any Allowed Proceedings, against any Released Party which imposes or attempts to impose upon any of them any Claim or Liability whatsoever in connection with the implementation of the Scheme and/or the 2023 Notes Restructuring; or

   (ii)  not to make, demand or institute (or threaten to institute) any Proceedings against the Existing Agents in connection with the Scheme and/or the 2023 Notes Restructuring, other than an Allowed Proceeding; and

(p)   it undertakes, with effect from the Restructuring Effective Date, to the Company for its own benefit and for the benefit of each of the Released Parties, to the extent permitted by law:

   (i)   to treat its 2023 Notes Scheme Claims as having been completely and forever waived, cancelled and released with effect from the Restructuring Effective Date in consideration for its Scheme Creditor Entitlements whether or not the Scheme Creditor has had its Scheme Share Allocation issued to it, its Nominated Recipient or the Custodian (as applicable);

   (ii)  not to bring or continue, or instruct, direct or authorise any other person (including the 2023 Notes Trustee) to bring or continue any Proceedings, other than any Allowed Proceedings, against any of the Released Parties in respect of any 2023 Notes Scheme Claims or otherwise to assert any 2023 Notes Scheme Claims against any of the Released Parties; and

   (iii) not to prove, or seek to prove, in the insolvencies of any member of the Group (if any insolvency occurs) in respect of any 2023 Notes Scheme Claims.

3.   This Confirmation Form and any non-contractual obligations arising out of or in connection with it shall be governed by, and this Confirmation Form shall be construed in accordance with, the laws of England and Wales. The courts of England and Wales shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of or in connection with this Confirmation Form and any non-contractual obligations arising

out of or in connection with it, and for such purposes the Scheme Creditor irrevocably submits to the jurisdiction of the courts of England and Wales.

**IN WITNESS whereof this Confirmation Form has been executed and delivered as a deed on the date specified above.**

*[Remainder of the page intentionally left blank]*

5

**EXECUTED  AS A DEED**  for and on behalf of                  )

**[FULL  LEGAL  NAME  OF SCHEME  CREDITOR]**      )

                                                                                     )

                                                                                     )

acting by **[NAME  OF PERSON  SIGNING]**  acting under      )

authority of the Scheme Creditor in accordance with applicable      )

laws                                                                               )

Signature of authorised signatory:


............................................................................................


in the presence of:

Signature of witness:


............................................................................................


Name  of witness:


............................................................................................


Address of witness:


............................................................................................


............................................................................................

## ANNEX V
## SUMMARY FINANCIAL INFORMATION AND OTHER DATA

The following tables summarise the Company's historical consolidated financial and other data as of the dates and for the periods indicated. The summary consolidated income statement data for the years ended 30 June 2015, 2016 and 2017 and the summary consolidated statement of financial position data as of 30 June 2016 and 2017 have been derived from the Company's audited consolidated financial statements and unaudited condensed interim consolidated financial statements, prepared in accordance with IFRS, as adopted by the European Union and which are expressly incorporated by reference herein.

The financial information below includes certain non-IFRS financial measures that the Company uses to evaluate its economic and financial performance. These measures are not identified as accounting measures under IFRS and therefore should not be considered as an alternative measure to evaluate the performance of the Group.

1.    **CONSOLIDATED INCOME STATEMENT DATA**

| | Year ended 30 June | | |
| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | (audited) ($ millions) | | |
| Revenue | 85.2 | 82.8 | 56.6 |
| Cost of sales | (83.8) | (86.0) | (218.8) |
| **Gross profit/(loss)** | 1.4 | (3.2) | (162.2) |
| Operating expenses | (35.6) | (38.3) | (43.5) |
| Other operating income | 1.4 | 1.5 | 2.0 |
| **Profit/(loss) from operations** | (32.8) | (40.0) | (203.7) |
| Finance expense | (40.5) | (27.0) | 126.0 |
| **Net financing (expense)/income** | (40.5) | (27.0) | 126.0 |
| **Profit/(loss) before taxation** | (73.3) | (67.0) | (77.7) |
| Income tax | - | (2.2) | 12.0 |
| **Profit/(loss) for the year** | (73.3) | (69.2) | (65.7) |

2. **CONSOLIDATED STATEMENT OF CASH FLOWS**

| | Year ended 30 June | | |
|---|---|---|---|
| | 2015 | 2016 | 2017 |
| | | (audited) ($ millions) | |
| Net cash flow from operating activities ................................................................................ | (62.5) | (92.3) | (7.6) |
| Net cash flow from investing activities ................................................................................ | (96.7) | (93.5) | (66.5) |
| Net cash flow from financing activities | 85.2 | 121.4 | 51.9 |
| Cash and cash equivalents at the end of the financial year ................................................................................ | 122.2 | 56.4 | 32.7 |

## ANNEX VI
## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following information should be read in conjunction with the Financial Statements. The Financial Statements are prepared in accordance with IFRS, as adopted by the European Union. Certain amounts presented in this section may not sum due to rounding.*

### 1.    EMPHASIS OF MATTER

As of 31 December 2017, the Company had approximately $68 million of cash and cash equivalents. For the fiscal year ending 30 June 2018, the Company expects its costs will remain broadly in line with prior years and that it will incur an additional $117.7 million of capital expenditure, primarily related to the launch of HYLAS 4. As of 31 December 2017, the Company had $118 million in aggregate principal amount of indebtedness maturing in 2020, $323.3 million in aggregate principal amount of indebtedness maturing in 2021 and $557 million in aggregate principal amount of indebtedness maturing in 2023. Absent the consummation of the Restructuring, the Company will be required to pay approximately $33.4 million in cash interest expense to Scheme Creditors and approximately $4.4 million in cash interest expense under the Super Senior Facility Agreement on 1 April 2018.

Although the Company's auditors prepared the Financial Statements for the fiscal year ended 30 June 2017 on a going concern basis, the auditors included an emphasis of matter in their audit opinion in relation to the Company's ability to continue as a going concern. In particular, the auditors noted that the Company's ability to continue as a going concern is dependent on (1) the successful completion of the Restructuring (which is conditional upon, among other things, the successful completion of the Consent Solicitations and the Scheme), (2) the negotiation of an additional capital raise of a minimum of $30 million following the completion of the Restructuring and (3) the substantial achievement of cash flow forecasts. These events and conditions, along with the other matters explained in Note 2 to the Financial Statements for the fiscal year ended 30 June 2017 constitute a material uncertainty that may cast significant doubt on the Company's ability to continue as a going concern.

### 2.    RECENT DEVELOPMENTS

The Company has been advised by Orbital, the manufacturer of HYLAS 4, to expect delivery of HYLAS 4 in early February 2018. Arianespace has confirmed a launch date for HYLAS 4 of 16 March 2018. The Company expects services to commence in July 2018. As of 30 June 2017, the Company had incurred approximately $237.4 million and expects to incur an additional $121.8 million in connection with the construction, launch and insurance of HYLAS 4.

HYLAS 3 continues to experience delays and the ESA has now advised the Company not to expect a launch until the first three months of 2019. The Company is currently exploring the best options for the exploitation of HYLAS 3. As of 30 June 2017, the Company had incurred approximately $49.5 million and expects to incur an additional $37.5 million in connection with the construction and launch of HYLAS 3.

The Directors forecast that revenue for the current fiscal year will not be less than $50 million. In addition, there is a large infrequently recurring transaction in the pipeline that, if it closes, would add a further $40 million to Group revenue, with $18 million of associated costs, in the current fiscal year. With effect from the end of the current fiscal year, the Company expects substantial growth in revenue drive off the introduction of HYLAS 4 to the fleet, which will open up new markets in sub-Saharan Africa.

Excluding the costs associated with the potential large transaction referred to above, underlying costs remain in line with prior guidance at approximately $75 million per annum. In the following two years, underlying costs are expected to grow at approximately 6% per annum subject to exchange rates and the mix of bandwidth revenues compared to kit and project revenues.

The Company anticipates that utilisation of HYLAS 4 will be 20% to 25% by the end of the fiscal year ending 30 June 2020, based on current operating assumptions.

Capital expenditure of $117 million expected for the fiscal year ending 30 June 2018 primarily relates to the launch of HYLAS 4. This represents an increase from the $92 million capital expenditure expected for the fiscal year ending 30 June 2018 that was reported in the Company's update on outlook on 20 December 2016. This increase is due to the phasing of the expenditure with less spent in the fiscal year ended 30 June 2017 that was forecast at that time. Of the $117 million expected, $14.8 million was incurred in the three months ended 30 September 2017. The balance of $102.2 million can be broken down as follows:

- $40 million due to Orbital, to be paid at the earlier of completion of in-orbit testing or three months post-launch;

- $21.27 million, which was paid to Arianespace in December 2017; and

- the remainder split between launch insurance and the ground infrastructure.

Of the $19 million of capital expenditure expected for the fiscal year ending 30 June 2019 (previously $32 million), the majority relates to the ground earth station in Senegal.

The Company's working capital position has stabilised following the provisions made in the fiscal year ended 30 June 2017. The main variable remains the ongoing arbitration for the recovery of the debt due from the Ministry of Defense of the Government of Indonesia ("GoI"), as discussed in further detail in the Financial Statements for the year ended 30 June 2017. The Company is confident that it will recover the full outstanding amount.

The Company is forecasting a modest increase in working capital through the fiscal year ending 30 June 2019 as the Company sells capacity into new geographies and markets served by HYLAS 4.

The Company does not expect to pay corporation tax in the medium term due to more than $300 million of gross losses accumulated in the fiscal year ended 30 June 2017, mainly related to start-up costs, capitalised interest and capital allowances.

As of 31 December 2017, the Company had cash and cash equivalents of approximately $68 million.

3.    **PRINCIPAL FACTORS AFFECTING THE COMPANY'S RESULTS OF OPERATIONS**

3.1    **Sale of Satellite Bandwidth and Services**

The Company's ability to increase cash flow and attain profitability is dependent on its ability to sell capacity on our satellites to increase revenue. For the fiscal years ended 30 June 2015, 2016 and 2017, the Company's revenue was $85.2 million, $82.8 million and $56.6 million, respectively. The decrease in revenue for the fiscal year ended 30 June 2017 compared to the prior years was primarily due to a lack of revenue from large infrequently occurring items that was seen in the fiscal years ended June 30, 2015 and 2016. In order to increase revenue, the Company will need to realise its existing backlog and sell additional capacity on its satellite fleet to new and existing customers.

The Company's backlog is comprised of customer committed contractual expenditure under existing contracts for the sale of bandwidth, satellite services, consultancy services and equipment sales over their current terms. Backlog does not include the value arising from potential renewal beyond a contract's current term or projected revenue from framework contracts. The Company's backlog totalled $103.9 million as of 30 June 2017.

Due to political and economic difficulties in some of the regions in which the Company operates, a number of the contracts signed with partners in the early years of operations are proving to be impaired. The Company has therefore chosen to remove these from backlog while at the same time working with those partners to find more appropriate terms on which to continue to work.

3.2    **Fixed Costs and Capital Expenditures**

The Company has incurred substantial capital expenditures to construct and launch its satellite fleet, and it is expected that the Company will incur an additional $37.5 million in connection with HYLAS 3 and approximately $121.8 million in connection with HYLAS 4 as of 30 June 2017. However, the Company has a largely fixed operating cost base, with the majority of such costs attributable to construction and launch of its satellite fleet and relatively low maintenance capital expenditures once the satellites are operational. This is expected to result in initial cash outflows being followed by strong cash inflows as the business grows.

3.3    **Satellite Depreciation**

The Company depreciates a satellite once it has commenced commercial operation. Satellite depreciation is on a straight-line basis over its estimated 15-year useful life. This depreciation has a particularly significant effect on the Company's results of operations in the first several years of a satellite's operation, when sales of capacity are comparatively lower and, therefore, the satellite's revenue is unlikely to offset its depreciation costs.

3.4    **Market and Macroeconomic Factors in Regions Where We Operate**

The Company operates in a number of emerging markets, where customers may have a higher credit risk profile than in more developed countries. The Company believes there is rising demand for high speed voice and data services in a number of fast growing

economies in these regions, particularly in areas where terrestrial-based communications infrastructure is less developed and/or not economically viable to develop, and the Company expects this demand to drive its revenue generation.

3.5   **Limited Operational History Affecting Comparability of Results of Operations**

As a relatively new company, the Company has limited customer and operational history. Both of these factors may impact its ability to collect payment for services sold, which is central to the Company's ability to realise backlog, increase revenue and cash flow and attain profitability. The Company's first satellite, HYLAS 1, commenced commercial operation in April 2011 and its second satellite, HYLAS 2, commenced commercial operation in November 2012. The Company acquired its third satellite, Artemis, in December 2013, which was successfully re-orbited in November 2017, thereby ending the life of the former ESA spacecraft. The HYLAS 4 satellite, which will complete the Company's coverage of Europe, the Middle East and Africa, commenced construction in August 2014, is expected to be delivered on 14 February 2018 and is scheduled for launch on 16 March 2018. The Company also leases a steerable Ka-band beam, HYLAS 2-B, which it has operated since November 2016 under an indefeasible right of use agreement entered into in June 2015 with another satellite operator, and also has a payload, HYLAS 3, under construction which will be deployed on the ESA's EDRS-C satellite. HYLAS 3 continues to experience delays and is now scheduled to launch in the first three months of 2019 (although such date is subject to change). As a result, the results of operations and financial condition for the fiscal years ended 30 June 2015, 2016 and 2017 are not comparable.

The Company has incurred, and will continue to incur, significant capital expenditures in connection with the construction and launch of HYLAS 3 and HYLAS 4. As the HYLAS 1 and HYLAS 2 satellites and HYLAS 2-B capacity have commenced commercial operations, the associated capital expenditures have significantly decreased, while the costs of sales have significantly increased due to satellite depreciation and costs associated with gateway earth station operations and tracking, telemetry, control and monitoring.

In the fiscal year ended 30 June 2017, HYLAS 2-B came online with coverage over France, Germany, Poland and the Baltic Sea. The addition of this new capacity, which increases available capacity from 14GHz to 17GHz, means the utilisation metric has been re-based. The amended fleet utilisation is in the 30% to 35% band (fiscal year ended 30 June 2016 re-based: 25% to 30% band).

The Company expects total fleet utilisation, including HYLAS 3 and HYLAS 4, to be in the 20% to 25% range within the next two to three years.

4.   **RESULTS OF OPERATIONS**

The following table shows our results of operations for the periods indicated.

|  | Year ended 30 June | | |
|---|---|---|---|
|  | 2015 | 2016 | 2017 |
|  | (audited) ($ millions) | | |
| Revenue......................................................... | 85.2 | 82.8 | 56.6 |
| Cost of sales ................................................. | (83.8) | (86.0) | (218.8) |
| **Gross profit/(loss)**........................................ | 1.4 | (3.2) | (162.2) |
| Operating expenses ...................................... | (35.6) | (38.3) | (43.5) |
| Other operating income................................ | 1.4 | 1.5 | 2.0 |
| **Profit/(loss) from operations**........................ | (32.8) | (40.0) | (203.7) |
| Finance expense ........................................... | (40.5) | (27.0) | 126.0 |
| **Net financing (expense)/income** .................. | (40.5) | (27.0) | 126.0 |
| **Profit/(loss) before taxation**........................ | (73.3) | (67.0) | (77.7) |
| Income tax..................................................... | - | (2.2) | 12.0 |
| **Profit/(loss) for the year** ............................. | (73.3) | (69.2) | (65.7) |

The Company reports in one operating segment: the provision of satellite services serving four end-markets: Broadband, Government, Enterprise and Backhaul.

5.  **RESULTS OF OPERATIONS FOR THE FISCAL YEAR ENDED 30 JUNE 2017 COMPARED TO THE FISCAL YEAR ENDED 30 JUNE 2016**

5.1  **Revenue**

Revenue for the fiscal year ended 30 June 2017 was $56.6 million, compared to $82.8 million for the fiscal year ended 30 June 2016, a decrease of approximately $26.2 million, or 31.6%. This decrease was primarily due to disruption to the business in the six months ended 31 December 2016, including a significant lengthening of the sales cycle, as a result of the strategic review initiated by the Company in July 2016 and which concluded in December 2016.

5.2  **Cost of Sales**

Cost of sales increased $132.8 million to $218.8 million for the fiscal year ended 30 June 2017 from $86 million for the fiscal year ended 30 June 2016. This increase was primarily due to an impairment of satellites in operation of $114.1 million, and an increase in the bad debt expense.

5.3  **Gross Profit/(Loss)**

Gross loss for the fiscal year ended 30 June 2017 increased from a loss of $3.2 million for the fiscal year ended 30 June 2016 to a loss of $162.2 million. This increase was primarily due to the reasons set forth above.

5.4  **Operating Expenses**

Operating expenses increased $5.2 million to $43.5 million for the fiscal year ended 30 June 2017 from $38.3 million for the fiscal year ended 30 June 2016. The increase was primarily due to an impairment of goodwill for the Filiago business of $9.9 million, offset by a decrease in distribution and administration expenses.

### 5.5    Other Operating Income

Other operating income increased $0.5 million to $2 million for the fiscal year ended 30 June 2017 from $1.5 million for the fiscal year ended 30 June 2016.

### 5.6    Net Financing (Expense)/Income

Net financing income increased by $153 million to $126 million income for the fiscal year ended 30 June 2017, from $27 million expense for the fiscal year ended 30 June 2016. This increase was primarily due to a gain on substantial modification of the terms of debt of $219.2 million and an increase in capitalised interest cost of $19.9 million offset by an increase in loan interest charge in the year of $50.3 million, and costs of refinancing of $22.3 million.

### 5.7    Loss Before Taxation

Loss before taxation increased $10.7 million to $77.7 million for the fiscal year ended 30 June 2017, from $67 million for the fiscal year ended 30 June 2016. This increase was primarily due to the reasons set forth above.

### 5.8    Income Tax

We recognised an income tax credit of $12 million for the fiscal year ended 30 June 2017 compared to an income tax charge of $2.2 million for the fiscal year ended 30 June 2016. The credit primarily arose from the recognition of deferred tax on losses (credit $15.6 million) offset by the impact of changes in the UK tax rate on the deferred tax balances largely driven by future HYLAS 4 profits (charge $3.3 million).

### 5.9    Loss for the Year

Loss for the year decreased $3.5 million to $65.7 million for the fiscal year ended 30 June 2017 from $69.2 million for the fiscal year ended 30 June 2016.

### 6.    RESULTS OF OPERATIONS FOR THE FISCAL YEAR ENDED 30 JUNE 2016 COMPARED TO THE FISCAL YEAR ENDED 30 JUNE 2016

### 6.1    Revenue

Revenue for the fiscal year ended 30 June 2016 was $82.8 million, compared to $85.2 million for the fiscal year ended 30 June 2015, a decrease of approximately $2.4 million, or 2.8%. The decrease was primarily due to a decrease in the level of revenue generated from infrequently occurring items offset by an increase in revenue from capacity, services and equipment.

### 6.2    Cost of Sales

Cost of sales increased $2.2 million to $86 million for the fiscal year ended 30 June 2016 from $83.8 million for the fiscal year ended 30 June 2015. The increase was primarily due to a modest increase in the costs related to delivering satellite services.

6.3   **Gross Profit/(Loss)**

Gross profit/(loss) for the fiscal year ended 30 June 2016 decreased $4.6 million to a loss of $3.2 million compared to a $1.4 million gross profit for the fiscal year ended 30 June 2015. This decrease was primarily due to the reasons set forth above.

6.4   **Operating Expenses**

Operating expenses increased $2.7 million to $38.3 million for the fiscal year ended 30 June 2016 from $35.6 million for the fiscal year ended 30 June 2015. The increase was primarily due to increased administration expenses.

6.5   **Other Operating Income**

Other operating income increased $0.1 million to $1.5 million for the fiscal year ended 30 June 2016 from $1.4 million for the fiscal year ended 30 June 2015.

6.6   **Net Financing (Expense)/Income**

Net financing expense decreased $13.5 million to $27 million for the fiscal year ended 30 June 2016, from $40.5 million for the fiscal year ended 30 June 2015. This decrease was primarily due to a foreign exchange gain of $13.9 million for the year ended 30 June 2016 compared to a loss of $1 million for the fiscal year ended 30 June 2015.

6.7   **Profit/(Loss) Before Taxation**

Loss before taxation decreased $6.3 million to $67 million for the fiscal year ended 30 June 2016, from $73.3 million for the fiscal year ended 30 June 2015. This decrease was primarily due to the reasons set forth above.

6.8   **Income Tax Credit**

We recognised an income tax charge of $2.2 million for the fiscal year ended J30 June 2016, compared to no income tax charge or credit for the fiscal year ended 30 June 2015. The charge primarily arose as a result of changes in the UK tax rate on deferred tax balances.

6.9   **Loss for the Year**

Loss for the year decreased $4.1 million to $69.2 million for the year ended 30 June 2016 from $73.3 million for the year ended 30 June 2015.

7.   **LIQUIDITY AND CAPITAL RESOURCES**

The Company's liquidity has had a substantial impact on our results of operations in the periods presented above, and the Company's results will continue to be impacted by its liquidity following the completion of the Restructuring.

As of 31 December 2017, the Company had approximately $68 million of cash and cash equivalents. For the fiscal year ending 30 June 2018, the Company expects its costs will remain broadly in line with prior years and that it will incur an additional $117.7 million of capital expenditure, primarily related to the launch of HYLAS 4. As of 31 December 2017, the Company had $118 million in aggregate principal amount of indebtedness maturing in 2020, $323.3 million in aggregate principal amount of indebtedness maturing

in 2021 and $557 million in aggregate principal amount of indebtedness maturing in 2023. Absent the consummation of the Restructuring, the Company will be required to pay approximately $33.4 million in cash interest expense to Holders and approximately $4.4 million in cash interest expense under the Super Senior Facility Agreement on 1 April 2018.

Although the Company's auditors prepared the Financial Statements for the fiscal year ended 30 June 2017 on a going concern basis, the auditors noted that the Company's ability to continue as a going concern is dependent on (1) the successful completion of the Restructuring, which will result in the capitalisation of approximately $557 million of 2023 Notes and interest expense savings of approximately $81 million per year, (2) the negotiation of an additional capital raise of a minimum of $30 million following the completion of the Restructuring and (3) the substantial achievement of cash flow forecasts.

The Company's Directors are of the view that, based on the current cash flows of the Group, in the event that the Restructuring is not implemented, a minimum of $30 million of additional capital is not raised and additional cash flows are not generated, the Company will likely become unable to pay its debts as they fall due at some point within the next twelve months it may not be able to make ongoing scheduled interest payments on its indebtedness. In such event, the Company's Directors will likely seek to place the Company into some form of insolvency proceeding, or a creditor may take action to enforce or initiate an insolvency proceeding. Any such proceeding is likely to be highly destructive of the value of the Group.

## 7.1    Historical Cash Flows

The following table sets out our historical cash flows for each of the years presented:

|  | Year ended 30 June | | |
|---|---|---|---|
|  | **2015** | **2016** | **2017** |
|  | (audited) | | |
|  | ($ millions) | | |
| Net cash flow from operating activities...................................... | (62.5) | (92.3) | (7.6) |
| Net cash flow from investing activities ..................................... | (96.7) | (93.5) | (66.5) |
| Net cash flow from financing activities...................................... | 85.2 | 121.4 | 51.9 |
| Cash and cash equivalents at the end of the financial year...... | 122.2 | 56.4 | 32.7 |

## 7.2    Net Cash Flow from Operating Activities

Net cash flow from operating activities represents net cash from operations and returns on investments.

Net cash outflow from operating activities during the fiscal year ended 30 June 2017 was $7.6 million as compared to $92.3 million during the fiscal year ended 30 June 2016. The

decrease of $84.7 million primarily relates to a reduction in interest paid on loans, combined with a reduction in cash tied up in trade and other receivables.

Net cash outflow from operating activities during the fiscal year ended 30 June 2016 was $92.3 million as compared to $62.5 million during the fiscal year ended 30 June 2015. The increase of $29.8 million primarily relates to an increase in working capital requirements as new larger clients demanded longer credit terms.

### 7.3   Net Cash Flow from Investing Activities

Net cash flow from investing activities represents capital expenditures and cash used for financial investments and cash movements resulting from acquisitions and disposals.

Net cash outflow from investing activities during the fiscal year ended 30 June 2017 was $66.5 million as compared with $93.5 million during the fiscal year ended 30 June 2016. The decrease of $27 million primarily relates to decreased payments for property, plant and equipment.

Net cash outflow from investing activities during the fiscal year ended 30 June 2016 was $93.5 million as compared with $96.7 million during the fiscal year ended 30 June 2015. The decrease of $3.2 million primarily relates to decreased payments for property, plant and equipment.

### 7.4   Net Cash Flow from Financing Activities

Net cash flow from financing activities represents cash from financing agreements.

Net cash inflow from financing activities during the fiscal year ended 30 June 2017 was $51.9 million as compared with $121.4 million during the fiscal year ended 30 June 2016. The decrease of $69.5 million primarily relates to the fact that new-money bond issues and equity issued in the year were less than in the prior year.

Net cash inflow from financing activities during the fiscal year ended 30 June 2016 was $121.4 million as compared with $85.2 million during the fiscal year ended 30 June 2015. The increase of $36.2 million primarily relates to the fact that bond issues in the year were greater than equity issued in the prior year.

### 7.5   Financing Agreements

As of the date of this Explanatory Statement, we have the following material financing agreements:

- the Super Senior Facility Agreement;
- the 2021 Notes Indenture;
- the 2023 Notes Indenture; and
- an aggregate of approximately $6 million in finance leases relating to hubs, and other ground infrastructure equipment, in addition to a finance lease liability arising from the accounting treatment of the Indefeasible Rights of Use contract.

Upon completion of the Restructuring, the 2023 Notes Indenture will no longer be outstanding.

### 7.6 Contractual Obligations

The information presented in this table reflects management's estimates of the payments due by period on our current obligations as of 30 June 2017, adjusted to give pro forma effect to (1) the incurrence of Super Senior Debt post-fiscal year end and (2) the Restructuring, including the cancellation of the 2023 Notes, which may differ significantly from the actual payments made under these obligations:

| | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 Year | 1-2 Years | 2-6 Years | After 6 years |
| | ($ millions) | | | | |
| 2021 Notes[1] | 300.8 | - | - | 300.8 | - |
| Super Senior Debt[2] | 118.0 | - | - | 118.0 | |
| Construction of satellite infrastructure | 120.7 | 77.1 | 43.6 | - | - |
| Finance leases[3] | 21.8 | 3.3 | 2.6 | 7.4 | 8.5 |
| Total contractual cash obligations | 561.3 | 80.4 | 46.2 | 426.2 | 8.5 |

---

(1)   Represents principal payments in respect of the 2021 Notes.

(2)   Represents the incurrence of $100 million in aggregate principal amount of Super Senior Debt in July 2017 and $18 million in aggregate principal amount of Super Senior Debt in October 2017.

(3)   Amounts presented reflect contractual amounts (including finance lease liability arising from the accounting treatment in relation to the Indefeasible Rights of Use contract). As of 30 June 2017, the aggregate carrying amount of our finance leases was $13.5 million.

## 8.   OFF BALANCE SHEET ARRANGEMENTS

The Company does not engage in any off-balance sheet arrangements that have or that it believes are reasonably likely to have a current or future effect on its financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

## 9.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The following discussion of estimated amounts generated from a sensitivity analysis is "forward-looking," and involves risks and uncertainties. The Company's actual results could differ materially from those it projects due to actual developments in the global

financial markets. These risks principally include country risk, legal risk and political risk that are not represented in the following analyses. More information on market risk is set out in Note 21 to the Company's financial statements for the year ended 30 June 2015, Note 23 to the financial statements for the year ended 30 June 2016 and Note 24 to the financial statements for the fiscal year ended 30 June 2017.

## 9.1 Foreign Exchange Risk

The Company operates internationally and is exposed to foreign exchange risk arising from various currency exposures, primarily with respect to the Pound Sterling and the Euro. In order to mitigate the foreign currency risk, the Company monitors the level at which natural hedges occur and continually review the need to enter into forward contracts in order to mitigate any material forecast exposure.

At 30 June 2017, if the Euro had weakened/strengthened against the U.S. dollar by 5% with all other variables held constant, post-tax loss would have worsened by $0.8 million or improved by $0.8 million (2016: post tax loss would have worsened by $0.4 million or improved by $0.4 million).

At 30 June 2017, if Sterling had weakened/strengthened against the U.S. dollar by 5% with all other variables held constant, post-tax loss would have worsened by $0.3 million or improved by $0.3 million (2016: post tax loss would have improved by $0.7 million or worsened by $0.7 million).

The Group has a presentational currency of U.S. dollars. While a number of companies within the Group have a functional currency that is also U.S. dollars, certain trading subsidiaries have a functional currency of Sterling or Euro. As a result, the Group experiences translation foreign exchange risk of assets and liabilities of non US Dollar subsidiaries on consolidation in addition to the translation of U.S. dollar inter-company loans to non US Dollar functional currency of subsidiaries that are accounted for as akin to equity. These two factors drive the foreign exchange movements disclosed in the Consolidated Statement of Other Comprehensive Income.

The average volatility of rates during the year compared to the year-end exchange rate was 3.46% and therefore management believes that a 5% sensitivity rate provides a reasonable basis upon which to assess expected changes in foreign exchange rates.

## 9.2 Interest Rate Risk

The Group borrows in Pounds Sterling and U.S. dollars at fixed rates of interest and does not seek to mitigate the effect of adverse movements in interest rates. Cash and deposits earn interest at fixed rates based on the banks' short term treasury deposit rates. The majority of short-term trade and other receivables are interest free. See Note 19 to our financial statements for the fiscal year ended 30 June 2017and Note 18 to our financial statements for the fiscal year ended 30 June 2016 for a discussion of certain instances where we have contractually agreed extended credit terms with fixed rates of interest in place.

### 9.3 Credit Risk

The Group's principal financial assets are cash and short term deposits and trade and other receivables. Cash and cash equivalents are deposited with high-credit quality financial institutions with a minimum rating of A+. Trade receivables are principally from government customers and well established corporations. The credit quality of major customers is assessed before trading commences taking into account their financial position, past experience and other factors.

### 9.4 Liquidity Risk

Liquidity risk is the risk that the Group may have difficulty in obtaining funds in order to be able to meet both its day-to-day operating requirements and its debt servicing obligations. The Group manages its exposure to liquidity risk by regular monitoring of its liabilities. Cash is monitored on a daily basis and cash flow forecasts are monitored on a weekly basis. Our cash requirements are met by a mixture of short term cash deposits, debt and finance leases.

### 9.5 Critical Accounting Policies

Certain of the Company's accounting policies are particularly important to the presentation of its results of operations and require the application of significant judgment made by the Board and senior management.

The preparation of the Company's audited consolidated financial statements in conformity with IFRS requires management to make certain estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the balance sheet date and the reported amounts of revenue and expenses during the reported period. These assumptions and estimates are generally based on factors such as historical experience, trends in our industry and information available from our customers and third parties. The amounts that actually arise in future periods may differ from these estimates, with changes being recognised in the profit and loss account as and when the carrying value is changed.

The Company believes that the most critical accounting policies that involve management judgments and estimates are those set out in Note 3 to the financial statements of the Company for the year ended 30 June 2017. Further information on the Company's accounting policies and recent accounting pronouncements are found in Note 1 to the financial statements for the year ended 30 June 2015 and Note 2 to the financial statements for the years ended 30 June 2016.

### 9.6 Revenue Recognition

The Group uses the percentage of completion method in accounting for its government services projects. Use of the percentage of completion method requires the Group to estimate the services performed to date as a proportion of the total services to be performed. The Group assesses the level of completion at the balance sheet date by reference to a combination of time or cost incurred to date compared to the forecast total required to deliver each service and project.

Should the service completion take substantially more or less time to complete post year-end, the revenue recognised in the current and future financial period would in hindsight be misstated.

The Group also enters into multi-element contracts where there is judgement involved in determining the relative fair value of the delivered and undelivered elements on such contracts. The Group assesses relative fair value by reference to standalone selling prices and bandwidth capacity renewal rates.

9.7   **Trade Receivables and Accrued Income**

The Group had trade receivables and accrued income, net of provisions, totalling $42.9 million at 30 June 2017. The Directors have assessed the recoverability of each balance, including those where contractually agreed deferred payment terms are in place, in reaching the year end position.

Should a material unprovided trade receivable or accrued income amount not be recovered, a material adjustment to the trade receivable balance and bad debt expense would arise in a future financial period.

The Group has provided for amounts due from the GoI totalling $16.8 million at year end. The Company contracted with the GoI to provide services on its Artemis satellite and performed all of its obligations under such contract. After an extended period of time in which payment of the outstanding invoices had not been received, the Group terminated the contract and initiated arbitration proceedings in London. The outstanding amount is $16.8 million and has been fully provided for in these accounts. GoI has not disputed that the amounts are due and payable. The Company is confident that the arbitration panel will rule in the Group's favour and has provided for the debt at year end until the uncertainty related to enforcing the arbitration panel's expected ruling has been sufficiently reduced or eliminated.

Should the Group be successful in its attempts to collect the outstanding amounts, a material adjustment to the bad debt provision and expense will be required in a future financial period.

For more information on the Company's trade receivables and accrued income, see Note 18 to the financial statements for the fiscal year ended 30 June 2017.

9.8   **HYLAS 1 Satellite Impairment Review**

The Group has recognised an impairment charge against the carrying amount of HYLAS 1 of $53.3 million for the year ended 30 June 2017. Such impairment charge is an estimate based on the Group's discounted cash flow forecast for the HYLAS 1 asset. Should the yield, capacity ramp-up, satellite life and factors behind the discount rate in future financial periods materially diverge from the assumptions made in this assessment, the impairment recognised for the fiscal year ended 30 June 2017 may be materially in excess of what was required or a further impairment charge may be required in a future financial period.

For more information on the HYLAS 1 satellite impairment, see Note 13 to the financial statements for the fiscal year ended 30 June 2017.

9.9 **HYLAS 2 Satellite Impairment Review**

The Group has recognised an impairment charge against the carrying amount of HYLAS 1 of $60.8 million for the fiscal year ended 30 June 2017. Such impairment charge is an estimate that is based on the Group's discounted cash flow forecast for the HYLAS 2 asset. Should the yield, capacity ramp-up, satellite life and factors behind the discount rate in future financial periods materially diverge from the assumptions made in this assessment, the impairment recognised for the fiscal year ended 30 June 2017 may be materially in excess of what was required or a further impairment charge may be required in a future financial period.

For more information on the HYLAS 2 satellite impairment, see Note 13 to the financial statements for the year ended 30 June 2017.

9.10 **Filiago Goodwill Impairment Review**

The Group has recognised an impairment charge against the carrying amount of the Filiago goodwill of $9.9 million for the fiscal year ended 30 June 2017. Such impairment charge is an estimate that is based on the Group's discounted cash flow forecast for the Filiago cash generating unit. Should the revenue and operating margins generated by the Filiago business in future financial periods materially diverge from the assumptions made in this assessment, the impairment recognised for the fiscal year ended 30 June 2017 may be materially in excess of what was required. The maximum additional impairment charge that may be required in a future financial period is immaterial at $1.6 million.

For more information on the Filiago goodwill impairment, see Note 14 to the financial statements for the fiscal year ended 30 June 2017.

9.11 **Deferred Tax**

Significant items on which the Group has exercised accounting judgement include recognition of deferred tax assets in respect of losses and accelerated capital allowances in the United Kingdom.

The recognition of deferred tax assets, particularly in respect of tax losses, is based upon whether management judge that it is more likely than not that there will be sufficient and suitable taxable profits in the relevant legal entity or tax group against which to utilise the assets in the future.

Judgement is required when determining probable future taxable profits. In assessing the level of future taxable profits reference is made to the latest available profit forecasts. Changes in the estimates which underpin those profit forecasts could have an impact on the amount of future taxable profits and could have a significant impact on the period over which the deferred tax assets would be recovered and consequently, the extent to which they should be recognised.

The nature of the evidence supporting the recognition of the deferred tax assets included contracted revenue that will be recognised in future periods, revenue from new business

signed in the fiscal year ending 30 June 2018, forecast revenue in future periods from opportunities in the pipeline (including modest expectations in relation to the future capacity sales on HYLAS 4) and taxable temporary differences of an appropriate type that reverse in an appropriate period.

## ANNEX VII
## COMPANY  ACCOUNTS

# AVANTI COMMUNICATIONS GROUP PLC
## ANNUAL REPORT AND ACCOUNTS 2017





WEDNESDAY

*L6M56YIX*

LD2        27/12/2017        #90
COMPANIES HOUSE



**QUALITY. FLEXIBILITY.**

**WWW.AVANTIPLC.COM**

# CONTENTS

**Strategic Report**

01   Key Strengths
02   Highlights
03   Chairman's Statement
04   Chief Executive's Review
06   Market Overview
06   Key Performance Indicators
07   Our Business Model and Strategy
08   Financial Review
12   Sustainability

**Governance**

14   Board of Directors
16   Chairman's Introduction to Governance
17   Corporate Governance Report
21   Audit Committee Report
23   Nominations Committee Report
24   Remuneration Committee Report
27   Report of the Board of Directors
30   Statement of Directors' responsibilities

**Financial Statements**

31   Independent Auditor's Report
35   Consolidated Income Statement
36   Consolidated Statement of Financial Position
37   Company Statement of Financial Position
38   Consolidated and Company Statement of Cash Flows
39   Consolidated and Company Statement of Changes in Equity
40   Notes to the Accounts

## STRATEGIC REPORT
## KEY STRENGTHS

---

### 1. Quality

Our network mirrors the quality of service that terrestrial communications offer. We have market-beating Service Level Agreements and no in-country coverage gaps.

### 2. Flexibility

Avanti has a unique Cloud-based customer interface that provides a single point of co-ordination and control, allowing partners to become virtual network operators without the need to deploy their own capital or expertise.

### 3. Innovation

We've developed proprietary and patented technology which is deployed throughout our network.

### 4. Very high throughput

The HYLAS fleet uses Ka-band which enables our High Throughput Satellites ('HTS') to transmit over 10 times more data per satellite than legacy systems.

### 5. High speed

Our network can provide download speeds of up to 380Mbps, no matter how challenging the location.

### 6. Affordability

Ka-band HTS services are far cheaper than traditional and HTS Ku-band systems.

## STRATEGIC REPORT
### HIGHLIGHTS

———

- Revenue of $56.6m for the full year (2016: $82.8m)

- Significant provision against receivable from the Government of Indonesia

- Impairment charges against HYLAS 1, HYLAS 2, and Filiago

- Finance restructuring plan launched to equitise all of the 2023 notes, and to reduce the interest rate on the 2021 notes.

- Cash at the year end of $32.7m (2016: $56.4m)

- Net debt[1] at the year end of $562.0m (2016: $588.9m)

- David Williams, CEO, steps down shortly after the year end.

[1]  Net debt comprises current and non-current loans and borrowings less cash and cash equivalents.

**Avanti Communications Group plc**
Annual Report and Accounts 2017

# STRATEGIC REPORT
# CHAIRMAN'S STATEMENT

**In the first half of the financial year, Avanti's financial position suffered disruption when the additional debt facilities sought were not forthcoming on suitable terms. After a period of very hard work, our existing bondholders and long term investors supported the Company through a refinancing transaction that provided $242 million of additional liquidity through a mixture of new money and interest deferrals.**

The disruption of the first six months of the year led to a lengthening of the sales cycle as our customers and potential customers waited for the refinancing and strategic review to be completed. Following the completion of the transaction, some confidence did return to the customer base, but the lag in the sales cycle has taken some time to reverse, meaning that our revenues for the year were significantly lower than initially expected.

Nevertheless, Avanti did win some significant business towards the end of the year. The award of a new 3 year contract worth up to $21 million to deploy several hundred services to government sites across Africa with an existing government customer strengthens our business with governments across our target markets. Furthermore, the SaT5G (Satellite and Terrestrial network for 5G) project has started well. This project will research, develop and validate key technologies required to enable the plug-and-play integration of satellite communications into 5G networks. The project will trial and assess these through live testbed demonstrations across Europe

Shortly after the year end David Williams, Chief Executive and co-founder, left the business. Alan Harper, who at the time was a non-executive director of the Company, agreed to take up the role of interim Chief Executive. Alan has 25 years of experience in European and African telecoms markets. He has worked at Vodafone as Group Strategy Director and more recently founded and ran Eaton Towers, which served most of the major telco that are a key part of the strategy for expansion at Avanti. Alan is focussed on rebuilding the sales momentum of the business and ensuring that the Group has a go to market strategy that is fit for the current market. The search for a full time replacement is underway and we hope to make an announcement shortly.

As recently announced, the Board has launched a restructuring of the Company's balance sheet. The restructuring is aimed at correcting the capital structure that has developed given recent trading and will provide the platform for success over the medium-term. It is proposed to issue new shares to repay all of the 2023 notes which would reduce the Group's debt by in excess of $500m. This is subject to the agreement of the shareholders at a General Meeting to be held in early 2018. In addition, the Board has agreed with our Bondholders, subject to necessary consents, to reduce the interest rate on the 2021 notes to 9% with the ability to pay cash or roll up the interest as appropriate. The combined impact of these two developments will reduce the Group's annual interest charge by approximately 70%. I hope that you see fit to support this initiative which will give Avanti a significantly strengthened balance sheet and remove a significant impediment to sales growth.

I would also like to thank our employees, customers, suppliers and investors for their ongoing support.

**Paul Walsh**
Chairman

## STRATEGIC REPORT
## CHIEF EXECUTIVE'S REVIEW

**Our satellites provide high performance, affordable connectivity to governments, businesses and individuals across EMEA either directly through satellite dishes installed at the user location, or by providing backhaul connectivity to mobile networks.**

### Trading

Trading in the first half of the year was slower than hoped for primarily as a result of the uncertainty associated with the strategic review which the Company initiated in July 2016.

This uncertainty manifested itself in lower than normal levels of pipeline conversion and an extension in the sales cycle. Of the high probability pipeline that existed at 30 June 2016, 30% was signed by 31 December 2016 compared to historic conversion rates of over 60%. Since the conclusion of the strategic review and the successful provision of additional financing, we won some significant new business and believe that the pipeline conversion rate should now accelerate.

In late December 2016 we received significant new tender awards and signed contracts in the wi-fi and cellular backhaul markets and in government networks. We also picked up new customers for broadband in Europe, spurred by our launch of new 40Mb platforms – the highest speed satellite broadband in Europe.

In the second half of the year we saw some confidence return to our customer base and secured some excellent contract wins across all four markets of Broadband, Government, Enterprise and Backhaul. A few notable examples are:

Satellite and Terrestrial Network for 5G (SaT5G). This project will research, develop and validate key technologies required to enable the plug-and-play integration of satellite communications into 5G networks. The project will trial and assess these through live testbed demonstrations across Europe. The goal of the project is to deliver the seamless, and economically viable, integration of satellite into 5G networks to ensure ubiquitous 5G access everywhere. The project has identified a range of primary research areas to address the integration of satellite into 5G networks, which include extending 5G security to satellite and multicast for content distribution. Each research area will deliver outputs and benefits in relation to 5G ecosystem stakeholders. Live demonstrations and validations will take place at the testbeds for the project which are located in the UK, Germany and Finland. The project will also drive standardisation, mainly in 3GPP and ETSI, contributing to the definition of the 5G system and integration of satellite communications.

The ERDF contract, which was signed in August 2016, will support the deployment of 40Mbps broadband services to rural businesses across Cornwall and Isles of Scilly. Services are available through Avanti's certified service providers, Bentley Walker and SSW. The service will provide the highest satellite broadband speeds available in Europe via Avanti's Ka-band HYLAS 1 and HYLAS 2 satellites to Cornish businesses, no matter how rural the location.

In March, the Company announced a partnership with leading international telecommunications company Millicom, to bring broadband connectivity to consumer, enterprise and government applications. This will include the deployment of the Avanti ECO initiative across Sub-Saharan Africa, which will provide ECO Wi-Fi services to schools and communities, addressing the digital divide in the region. By combining Avanti's world leading satellite technology with the market reach expertise from Millicom, the partnership will additionally commission a new Gateway Earth Station (GES) in Senegal.

### Pricing

As we reported at the end of the last financial year in order to win volume in certain markets where end-customers are highly price sensitive, such as broadband in Europe, we have adjusted our prices. Our products are sold as Mb or managed accounts or as fully integrated projects but we calculate the Price, or Yield, per MHz per month. Global pricing for satellite capacity is falling in many markets, although each region is different.

Our average price per MHz in the last 12 months across the fleet was $1,400.

## STRATEGIC REPORT
## CHIEF EXECUTIVE'S REVIEW CONTINUED

---

### Satellite assets

You will note from the financial statements that we have impaired the carrying value of HYLAS 1 and HYLAS 2.

HYLAS 1 is 7 years old now and its cost per MHz is high in comparison to the new generation of High Throughput Satellites. The finite life of the satellite combined with falling capacity prices resulted in an accounting impairment of $53.3m. HYLAS 1 remains an integral part of the Avanti fleet, is forecast to generate good EBITDA and cash flows, and continues to serve some important customers in Western Europe.

In addition we have impaired HYLAS 2 by $60.8m, once again reflecting falling capacity prices and the finite life of the satellite. This impairment effectively eliminates previously capitalised financing costs leaving the carrying value close to the Net Book Value of the procured asset cost. HYLAS 2 is expected to generate strong EBITDA and cash flows as revenues grow over the largely fixed operating costs of the business.

The 3GHz 'HYLAS 2-B' satellite payload that joined the fleet in 2015 came online in the period with coverage over France, Germany, Poland and the Baltic Sea. The addition of this new capacity, which increases available capacity from 14GHz to 17GHz means the utilisation metric has been re-based. The amended fleet utilisation is in the 30-35% band (June 2016 re-based: 25-30% band).

The tactical 4 GHz HYLAS 3 is a hosted payload flying on board a European Space Agency ('ESA') satellite, for which the ESA is presently declaring a late-2018 launch which could slip further. We are disappointed in the performance of the manufacturer of this system and are considering all options.

The construction of Avanti's key 28GHz HYLAS 4 satellite is at an advanced stage but has experienced some delays in the factory. The spacecraft is now expected to be delivered in January 2018 with a launch in March 2018. HYLAS 4 will complete Avanti's coverage of EMEA. This will materially enhance the Group's revenue generation potential, largely within the existing fixed cost base. The efficient procurement of HYLAS 4 will bring the overall fleet cost per MHz down significantly, mitigating some of the effects of falling global prices for satellite bandwidth.

In November 2017, we successfully re-orbited Artemis.

### Working Capital

The Company had to make a significant provision against a government receivable at the end of the year. Avanti had contracted with the Government of Indonesia (GoI) to lease capacity on its Artemis satellite to support GoI's need to bring into use and maintain its orbital slot at 123 degrees East. The total contract value was in excess of $30 million. Avanti performed all of its obligations under the contract and had extended payment deadlines for GoI to assist with administrative delays. However, having received in excess of $12m in the earlier stages of the contract, Avanti received no payments for over a year. As a result, Avanti terminated the contract and has initiated arbitration proceedings in London. The outstanding amount at 30 June was $16.8 million and has been fully provided in these accounts. GoI has not disputed that the amounts are due and payable. Avanti is confident that the arbitration panel will rule in the Group's favour and has provided for the debt at the year end until the uncertainty related to the arbitration and particularly enforcing the Group's expectation of the arbitration panel's ruling has been sufficiently reduced.

### Outlook

HYLAS 4 is due for launch in March 2018 with a target of being in orbital position ready for service at the start of the next financial year. We are in discussion with a number of current and new distributors to sign up master partnership distribution agreements with Avanti to market this new capacity which is largely over sub Saharan Africa countries.

**Alan Harper**
Chief Executive

## STRATEGIC REPORT
## MARKET OVERVIEW

**Satellites provide data communications and broadcasting services around the world. Satellites are used versus terrestrial infrastructure in situations where they can provide superior economics to customers or where other forms of communication are not available.**

Avanti operates in the fixed data communications part of the satellite market. Avanti has pioneered the use of Ka-band technology, which enables us to service this market at a lower cost than legacy operators.

In turn, this vastly increases the addressable market for satellite data communications, particularly in the high growth geographies where Avanti's capacity is focused, but also closer to home where Avanti can offer universal superfast broadband across Europe.

In these areas, dispersed populations and huge land areas make terrestrial communications uneconomic to deploy. For example, Africa has the same land mass as Europe, USA, China and India combined, yet a population the same as just India alone.

As a result of this low population density, fibre will not be deployed in European equivalent scale in the local loop during the lifetime of our satellites and so Africa is moving directly to wireless. In wireless technology, Ka-band HTS satellite is the best way to deliver high capacity, low cost, data services.

We estimate that the addressable market for our HTS services across the EMEA region, defined as users who both need satellite connectivity and have the ability to pay for it, is over 1,000 Gbps. Avanti's HYLAS satellite fleet will provide up to 200 Gbps of data throughput. According to Cisco, Africa and Middle East is the fastest growing mobile data market in the World increasing 12-fold over the 5 years to 2021, and therefore Avanti is well placed to serve this growth.

## KEY PERFORMANCE INDICATORS

The Top-20 Customer Bandwidth Revenue Growth metric helps to track Avanti's growth trajectory from core service sales. It is calculated by comparing the revenues from current leading customers on a last 12 month and constant currency basis, to the 12 months preceding that. Revenues from this customer group were 15% lower in the 2017 financial year ($24.6m) versus 2016 ($28.4m). The decrease is as a result of the effect of the strategic review on new business, falling capacity prices and the impact of the termination of a small number of partners with a poor payment record.

The Fleet Utilisation metric helps to track capacity uptake and gives an indication of revenue potential when Avanti's fleet is mature. It is calculated by expressing utilised capacity as a percentage of total available capacity for the fleet of HYLAS 1 (3 GHz), HYLAS 2 (11 GHz), HYLAS 2B (3GHz) and ARTEMIS (1 GHz).. The addition of HYLAS-2B in the current year increases available capacity from 15GHz to 18 GHz and as a result the utilisation metric has been re-based. The amended fleet utilisation is in the 30-35% band (June 2016 re-based: 25-30% band).

### Fleet Utilisation

Tracks capacity uptake and gives an indication of revenue potential when Avanti's fleet is mature

# 30%-35%
**2016: 25%-30%**

### Top-20 Customer Bandwidth Revenue Growth

Tracks Avanti's growth trajectory from core service sales, excluding non-recurring items

# -15%
**2016: 50%**

# STRATEGIC REPORT
# OUR BUSINESS MODEL AND STRATEGY

## Our business model

Avanti generates revenue from the commercial exploitation of its space and network assets. These assets include its spectrum rights, satellites, intellectual property and ground station assets.

Avanti charges its service provider customers for the use of its network and other assets in a number of ways: broadband packages, managed capacity, fully integrated project fees, raw capacity, pure spectrum and a number of other product categories and charging models to suit customer and market circumstances.

Avanti connects people wherever they are – in their homes, businesses, in government and on mobiles. Through the HYLAS satellite fleet serving service providers in 118 countries, the network provides ubiquitous internet service to a quarter of the world's population. Avanti delivers the level of quality and flexibility that the most demanding telecoms customers seek.

Avanti's technology platform is made up of two operational satellites and one hosted payload in orbit, two satellites under construction, and a ground segment infrastructure delivering comprehensive coverage of Europe, the Middle East and Sub-Saharan Africa.

These assets, along with the associated spectrum rights, are turned into a virtual network service accessible by our service provider customers. This is done using the Avanti Cloud, a software based control system that allows all parts of the Avanti network to be controlled and configured online.

Avanti has developed proprietary and patented technology which is deployed throughout its network. This technology has been developed in house by its employees, who are amongst the most experienced in the industry.

Avanti uses the high frequency Ka-band spectrum. This enables our High Throughput Satellites to transmit over 10 times more data per satellite than legacy systems, significantly reducing end-user costs and creating a larger addressable market.

A combination of the efficiencies that are inherent in the use of Ka-band and Avanti's high-powered network design also make our systems significantly more efficient than the emerging Ku-band high throughput networks.

Our network can provide download speeds of up to 380Mbps and we can offer customers price reductions versus legacy Ku-band systems of up to 80%.

Avanti's business model is differentiated from those of legacy satellite operators primarily by its use of Ka-band technology and the Avanti Cloud. The Avanti Cloud enables the sale of satellite capacity as a service, rather than as an infrastructure purchase.

Like other infrastructure companies, Avanti's business model involves significant upfront capital expenditure to launch services and a largely fixed operating cost base. This is expected to result in initial cash outflows being followed by strong cash inflows as the business grows.

The satellite industry has very high barriers to entry. These include the intellectual capital that is needed to design and run a satellite network and the requirement for orbital slots and spectrum. Avanti believes that terrestrial wireless services are rapidly consuming all of the available spectrum globally and recent industry debates show that there is great pressure on spectrum. Thus Avanti's estate of spectrum rights should provide secure long term value to the business.

Avanti seeks to lease and sell spectrum rights to third parties where opportunities arise and to commercially exploit its satellite and ground station assets outside of the operation of its own satellites, for example through satellite interim missions, consultancy projects, engineering services, satellite control services and ground station operation services.

The risks to Avanti's business model through technological change are low, primarily due to the very long lead times needed to develop and launch new satellite technologies.

## Our strategy

The Group has performed a review of its go to market strategy post year end. Avanti is well positioned in the attractive High Throughput Services market with a strategy to pursue a focussed B2B channel push strategy to become the satellite wholesale partner of choice to its target customers.

Avanti's strategy is founded on the assumptions that data usage will continue to grow strongly for the foreseeable future; that terrestrial infrastructure will not satisfy demand; and that high growth markets offer the highest returns.

Avanti's end user application segments, which remain unchanged, are:

- Commercial Mobility
- Enterprise Data – including cellular backhaul
- Government & Military
- Broadband Access

Avanti's focus is on developing deep relationships with a small number of large key channel partners in the following three distribution channels:

- Satellite Operators
- Major Mobile / Telecom Carriers
- Major Satellite Resellers, Integrators and ISPs

## STRATEGIC REPORT
## FINANCIAL REVIEW

---

### Outlook

During the last 18 months, Avanti has taken steps to address the appropriateness of its balance sheet given the current levels of trading experienced in the recent periods and the capital commitments required to launch HYLAS 4.

As reported last year, Avanti entered a period of strategic review in July 2016. As a result the majority of the interest due on 1 October 2016 was rolled into the principal of the outstanding loan notes.

In January 2017, the Company announced that it had reached agreement with its major bondholders to provide additional financing of up to $242 million through new money and the ability to payment-in-kind ('PIK') coupons on both the 2021 and the 2023 notes. We were also pleased at that point to welcome onto the Board Craig Chobor, Michael Leitner and Peter Reed as representatives of key stakeholders.

This new facility also paved the way to add a super senior facility at the top of the security structure. In July 2017 HPS provided an additional $100 million of financing at an annual rate of 7.5% with a maturity of June 2020. After the drawdown of the HPS funds in July 2017 the gross debt of the Company was $926.5 million, as set out in the table below:

| | Maturity | Interest Rate | | Face Value | Book Value |
|---|---|---|---|---|---|
| | | Cash (%) | PIK (%) | $ millions | $ millions |
| Super Senior | June 2020 | | n/a | 100.0 | 95.8 |
| 2021 notes | October 2021 | 10.0 | 15.0 | 300.8 | 287.6 |
| 2023 notes | October 2023 | 12.0 | 17.5 | 512.2 | 293.6 |
| Finance lease | Various | various | n/a | 13.5 | 13.5 |
| **TOTAL** | | | | 926.5 | 689.5 |

In December 2017, the Board announced that subject to the agreement of the bondholders and of the shareholders at a General Meeting in early 2018, the entirety of the 2023 notes will be repaid by issuing new ordinary shares in Avanti Communications Group plc ("debt for equity swap"). In addition, subject to agreement from the 2021 bondholders, the maturity of these notes will be extended by 12 months to October 2022 and the interest rate reduced to 9% for both cash and PIK.

### Income Statement

As previously mentioned on page 3 the strategic review caused some disruption to the business in the six months to December 2016 which included a significant lengthening of the sales cycle. This has taken some months to reverse and has had a direct impact on the revenue recognised in the year to June 2017. As a consequence, we have reported revenue of $56.6 million down from $82.8 million in 2016.

As a result of the significant provision made against the Government of Indonesia debt, total operating costs rose from $75.5 million in 2016 to $89.1 million. Excluding this provision of $13.9 million, costs fell by 0.4%.

Staff costs fell slightly to $23.6 million (2016: $24.3 million) of which $3.9 million (2016: $4.5 million) was capitalised as costs relating to staff working on the construction of HYLAS 3 and HYLAS 4. See note 7 on page 54.

We have taken impairment charges through the income statement as described in the balance sheet section below and more fully described in notes 13 and 14 on pages 58 and 61.

As a result of the financial restructuring in January 2017, there was a substantial modification to the 2023 notes. Therefore we have recorded the liability on the balance sheet at the market value immediately after the restructuring had been completed. The carrying value of the 2023 notes was reduced from $481.6 million to $245.6 million with the difference being credited to the income statement (note 9), along with accelerated amortisation of previously capitalised bond costs of $16.8m.

### Tax

There was a tax credit of $12.0m to the income statement (2016: $2.2m charge). The credit primarily arose from the recognition of deferred tax on losses (credit $15.6m) offset by the impact of changes in the UK tax rate on the deferred tax balances largely driven by future HYLAS 4 profits (charge $3.3m).

### Corporate Interest Restrictions

With effect from April 1st 2017, the tax deductibility of interest costs will broadly be restricted to 30% of 'UK Tax EBITDA' (a new measure based on taxable profit). Disallowed interest is carried forward indefinitely, but will only become deductible if interest costs fall below 30% of UK Tax EBITDA in a future period.

Group forecasts currently assume the Group will not increase its debt from the current (post debt for equity swap) level. This results in the disallowed interest arising in the next few years becoming deductible in the future, supporting the recognition of a deferred tax asset on that disallowed interest ($0.4m at 30 June 2017).

However, if the Group increases its indebtedness (e.g. to finance future missions) interest costs may never fall beneath 30% of UK Tax EBITDA. As a result the disallowed interest costs would become permanently lost.

**STRATEGIC REPORT**
**FINANCIAL REVIEW** continued

---

### Changes to Loss Utilisation Rules

With effect from 1 April 2017, restrictions have been introduced in the UK on the use of brought forward losses, which broadly limit the use of brought forward losses to 50% for taxable profits above £5m. This will result in a slower utilisation of those losses.

### Loss for the year

The loss for the year was $65.7 million (2016: $69.2 million) resulting in a basic loss per share of 44.7 cents (2016: loss 49.3 cents).

### Balance Sheet

**Impairments**

Each year the Group considers the carrying value of its assets and looks for indications of impairment. Falling market prices for satellite services have reduced the ability of future cash generation to make-up for the slower than expected revenue generation in the earlier years of HYLAS 1 and HYLAS 2. With the satellites having a finite life the Group has concluded that it would be appropriate to impair the carrying value of HYLAS 1 and HYLAS 2. With a construction cost of $190.3 million and a carrying value of $117.2 million, HYLAS 1 has a historic cost of $541 per MHz per month. With a construction cost of $389.8 million and a carrying value of $287.6 million, HYLAS 2 has a historic cost of $381 per MHz per month. Using current selling prices and anticipated fill rates together with a discount rate of 10.4% the Company has concluded that more appropriate carrying values are $58.1 million and $234.8 million respectively. As a result an impairment charge of $114.1 million was made at the year end.

In addition, Filiago has not achieved the targets set in the recent past. The Group has decided to make significant changes to the way that business is managed. However, until those changes deliver the required targets the Group has decided to impair the carrying value by $9.9 million.

**Artemis**

The Artemis satellite was re-orbited from its position at 123E in November 2017. This ends the life of the former ESA spacecraft that was launched in July 2001.

**Receivables**

Receivables at 30 June were $60.6 million (2016: $79.5 million).

After the year end, in November 2017, the Group reluctantly terminated a contract with the MOD of Indonesia for persistent non-payment and has initiated arbitration proceedings in London. Given the materiality of the outstanding amounts at the year-end ($16.8 million) the Directors deemed it appropriate to make a full provision for the outstanding amounts in these accounts. Revenue was recognised on this contract during the year on the basis that regular dialogue with the Government of Indonesia was undertaken, formal commitments to pay were received and the debt remains undisputed. Avanti is confident that the arbitration panel will rule in the Group's favour and has provided for the debt at the year end until the uncertainty related to enforcing the arbitration panel's expected ruling has been sufficiently reduced.

During the year we terminated a contract with Osat in Ireland for consistent non-payment. Avanti had the right in its contract to "step-in" and moved the majority of customers to one of our UK based service providers. As a result we made provisions of $0.7 million and $2.5 million against receivables and accrued income respectively associated with the Osat contracts.

**High yield debt**

As described above, the 2023 notes were amended in a consent solicitation process during December 2016 and January 2017. Under the relevant accounting standards, the modification of the terms were deemed to be substantial. As a result the original bonds are required to be de-recognised and the new bonds recorded at market value at that date. In the period after the modification was ratified through the consent solicitation process, the bonds traded down to 51 cents /$1. The consequence was that the carrying value of this tranche of debt was reduced to $245.6 million with the resulting credit of $219.2 million recognised in the income statement as an Exceptional gain on substantial modification of debt. The carrying value of the debt will accrete up to the face value over the maturity of the bonds, giving rise to a higher finance expense than would otherwise be recorded.

**Cash flow**

Net cash outflow from operating activities during the year ended June 30, 2017 was $4.1 million as compared to an outflow of $31.8 million during the year ended June 30, 2016.

Interest paid was $3.5 million (2016: $60.5 million), the significant decrease being due to the coupon payments due on debt being settled through the issue of additional notes rather than the payment of cash.

Capital expenditure fell from $95.7 million in 2016 to $66.5 million in 2017.

Additional financing net of restructuring costs brought in $51.9 million compared to $123.6 million raised in 2016.

Exchange losses accounted for net cash outflow of $1.5 million leaving cash at the year-end of $32.7 million (2016: $56.4 million).

**Insurance**

Avanti maintains a full suite of insurance policies covering not only space assets, but also business interruption associated with the failure of its ground earth stations. The HYLAS 1 and 2 in orbit insurance policies were renewed in November 2017 with an insured value of £112m and $306m respectively.

---

## STRATEGIC REPORT
## FINANCIAL REVIEW .continued

---

### Backlog

Our backlog comprises our customers' committed contractual expenditure under existing contracts for the sale of bandwidth, satellite services, consultancy services and equipment sales over their current terms. Backlog does not include the value arising from potential renewal beyond a contract's current term or projected revenue from framework contracts. Our backlog totalled $103.9m as of June 30, 2017.

Due to political and economic difficulties in some of the regions we operate, a number of the contracts signed with partners in the early years of operations are proving to be impaired. We have chosen to remove these from backlog whilst at the same time working with those partners to find more appropriate terms on which to continue to work. In addition the definition of backlog no longer includes the run rate of consultancy projects.

### Principal risks and uncertainties

The Group faces a number of risks and uncertainties that may adversely affect our business, operations, liquidity, financial position or future performance, not all of which are wholly within our control or known to us. Some such risks may currently be regarded as immaterial and could turn out to be material. We accept risk is an inherent part of doing business, and we manage the risks based on a balance of risk and reward determined through careful assessment of both the potential likelihood and impact as well as risk appetite. The Group faces a number of ongoing operational risks including credit and foreign exchange risk.

### Global economy

The global economy remains fragile and it continues to be difficult to predict customer demand. Avanti is susceptible to decreased growth rates within high growth markets and/or continued economic and market downturn in developing markets. The effects could lead to a decline in demand and deteriorating financial results, which in turn could result in the Group not realising its financial targets.

There are significant trade receivables with customers operating in the African and Middle East regions.These businesses are often operating in immature emerging markets for satellite communication services and may have cashflow difficulties due to the market and geopolitical environment in which they operate.

Continued uncertainty regarding the terms of the UK's exit from the EU may have some effect on our ability to attract suitable UK based staff.

### Foreign exchange risk

We operate internationally and are exposed to foreign exchange risk arising from various currency exposures, primarily with respect to the pound Sterling and the Euro. In order to mitigate the foreign currency risk, the Group monitors the level at which natural hedges occur and continually reviews the need to enter into forward contracts in order to mitigate any material forecast exposure. Our reported results of operations and financial condition are affected by exchange rate fluctuations due to both transaction and translation risks.

### Interest rate risk

We borrow in US Dollars and pounds Sterling at fixed rates of interest and do not seek to mitigate the effect of adverse movements in interest rates. Cash and deposits earn interest at fixed rates based on banks' short-term treasury deposit rates. Short-term trade and other receivables are interest free.

### Credit risk

Credit risk is the risk of financial loss arising from a counterparty's inability to repay or service debt in accordance with contractual terms. Credit risk includes the direct risk of default and the risk of deterioration of creditworthiness. We assess the credit quality of major customers before trading commences, taking into account customers' financial position, past experience and other factors. Generally when a balance becomes more than 90 days past its due date, we consider that the amount will not be fully recoverable.

### Liquidity risk

Liquidity risk is the risk that we may have difficulty in obtaining funds in order to be able to meet both our day-to-day operating requirements and our debt servicing obligations. We manage our exposure to liquidity risk by regularly monitoring our liabilities. Cash and cash forecasts are monitored on a daily basis, and our cash requirements are met by a mixture of short term cash deposits, debt and finance leases.

Future liquidity is also affected by the rate at which we fill the satellites and the yield achieved.

### Launch of HYLAS 4

At this time the launch of HYLAS 4, the most advanced and efficient spacecraft of the Avanti fleet, is critical. Whilst the risk of launch failure is historically very low when using the Arianespace 5 launch vehicle, and the spacecraft is insured for $325 million, any failure would significantly impact the business model. A replacement vehicle would take approximately 30 months to procure.

### Post balance sheet events

In July 2017 the Company drew down $100 million of the super senior facility agreed in June 2017.

In November 2017 the Group terminated its contract with MOD of Indonesia and made provisions against the year-end debt of $16.8 million.

In December 2017 the Company announced that it had reached agreement with the majority of its bondholders and significant equity shareholders to repay the 2023 notes by issuing new shares in Avanti Communication Group plc. In addition the 2021 notes will extend their maturity by one year and the interest rate will be reduced to 9% for both cash and PIK (previously 12%). This remains subject to a formal consent solicitation process with the bondholders and a shareholder vote to be held in early 2018.

**STRATEGIC REPORT**
**FINANCIAL REVIEW** continued

---

**Going Concern**

As fully described in note 2 on pages 40 to 42, these accounts have been prepared on a going concern basis.

In arriving at the conclusion, the Board of Directors were pleased to announce on 13 December 2017 that it proposed to convert the entire 2023 notes into equity, whilst at the same time extending the maturity to the 2021 notes by 12 months and reducing the cash and PIK coupons to 9%. These changes require the formal consent of both the debt holders and the shareholders. With a significant proportion of both parties signatories to the restructuring agreement and lock-up letters, the directors are confident that the restructuring will proceed.

The Directors have concluded that, based on the group's expectation that the Consent Solicitation for a financial restructure will be successful, together with the planned additional fund raise and substantial achievement of cash flow forecasts, the Directors believe that the Group will be able to have sufficient liquidity and will be able to meet its obligations as they fall due. The Directors have accordingly formed the judgement that it is appropriate to prepare the financial statements on a going concern basis. There can, however, be no certainty that the required consents will be received or that the refinancing will be successfully completed. Accordingly, successful completion of the refinancing, planned fund raise and the substantial achievement of cash flow forecasts represent a material uncertainty that may cast significant doubt on the group and the parent company's ability to continue as a going concern. The group and the parent company may, therefore, be unable to continue realising their assets and discharging their liabilities in the normal course of business, but the financial statements do not include any adjustments that would result if the going concern basis of preparation is inappropriate.

**Nigel Fox**
Group Finance Director

## STRATEGIC REPORT
## SUSTAINABILITY

———

Avanti recognises that the long term sustainability of the Group is secured by managing the current impacts of its operations and products, and anticipating the future global business environment.

Avanti's sustainability strategy is designed to ensure that we have in place the following:

- Responsible business practices to underpin business activities and support employees in making the right decisions to drive business performance;
- A safe work environment for employees; and
- A diverse range of talented employees with a broad range of skills and capabilities to deliver against global customer requirements.

The Chief Executive, supported by the Board, has overall responsibility for the Group's ongoing commitment to sustainability to ensure that there are appropriate policies, systems, reporting structures and metrics in place to achieve the Group's sustainability objectives. All Avanti employees also have some responsibility for sustainability, whether it is in their interactions with service providers or making efficiencies to support our environmental aims. The effectiveness of policies and processes is monitored and reviewed on an ongoing basis and risks or opportunities are assessed and managed.

We use targets and metrics to measure our performance and to enhance future performance by learning from our past successes and challenges. Avanti evaluates possible sustainability issues based on their relevance to our current operations and the potential future impact on the business in order to ascertain our priorities. Priorities may change as the business develops and as we receive feedback from our stakeholders, and we therefore review these on a regular basis. For areas identified as having a high importance, we have either already developed strategies and have controls in place and are reporting on performance, or we are developing more detailed strategies within our existing systems to focus on specific aspects. By monitoring our performance in this way we will also get valuable feedback for use in the continual improvement of our policies, processes and procedures. Stakeholder engagement is important to Avanti.

### Talent/Avanti people
To have a sustainable business, Avanti must attract, develop and retain talent and manage it across the business. Avanti contributes to the wider community through the course of its business by creating employment, offering work experience and graduate training opportunities to young people and by investing in good causes that are relevant to the business.

### Attract and retain
Like many companies operating in the technology industry in the UK, Avanti has concerns about current and future talent shortages in the technology and engineering sectors. This is a particular issue as the labour market becomes more fluid. Maximising the available talent pool is at the heart of our recruitment strategy and Avanti uses a diverse range of recruitment methods to achieve this, including: utilising social media and our own database of interested candidates, harnessing our employees' networks, online advertising, and building relationships with universities and other groups.

The measure of voluntary employee turnover provides insight into retention at Avanti. Avanti monitors this on a monthly basis and regular feedback ensures that any potential issues are identified and dealt with. Avanti's target for voluntary turnover (over a 12 month period) is under 15%. This level reflects the current average levels of turnover experienced in London-based commercial businesses, with an appropriate level of churn to refresh the talent base.

To improve retention, Avanti has developed a programme to increase employee engagement. This change has had a positive impact on retention. In the UK currently only 6% of the engineering workforce is female. Avanti continues to buck this trend. Engineers make up 60% of Avanti's workforce and of those 11.6% are female.

At Avanti we continue to actively promote the industry to young people and women through work with universities and colleges and to promote fair and open recruitment and selection practices. Avanti employs people from 33 countries speaking more than 27 languages. Through encouraging diversity within its workforce, Avanti aims to reflect better the diversity of its customer base in order to respond better to its demands.

### Working with young people
Avanti aims to encourage the workforce of the future by supporting science, technology and engineering education through building links with local colleges and universities, in particular through involvement with the National Space Centre. Avanti also offers internships and voluntary work experience placements as well as providing expert technical talks to universities.

## STRATEGIC REPORT
## SUSTAINABILITY continued

-------

### Avanti key behaviours

Avanti's key behaviours set out the principles and standards of business conduct expected of all employees wherever they operate and in whatever role. These behaviours are embedded into our induction and performance review processes. Avanti's key behaviours play a large role in ensuring that the strong values of the Company are maintained as it grows in size. Avanti's culture is an important factor in driving quality and flexibility for customers and other stakeholders in the business.

### Human rights

Avanti requires that its business be conducted with honesty and integrity, and in full compliance with all applicable laws. Company policies establish clear ethical standards and guidelines for how we do business and establish corporate accountability. The Company has clear accountability mechanisms in place to monitor and report on compliance with these directives. Additionally, Avanti supports and upholds the elimination of discriminatory practices with respect to employment and occupation, and promotes and embraces diversity in all aspects of its business operations.

### Developing talent

Robust appraisal and performance management processes are in place to ensure that Avanti is able to deliver quality and flexibility throughout all areas of work by identifying and developing skills and knowledge within the business and empowering employees to suggest improvements and innovation. Avanti offers development opportunities across the business in technical and management skills to ensure that our workforce is ready to adapt to changes in technology and markets. In the 12 months leading up to July, Avanti provided over 400 training sessions for employees and the development activity is paying off. Avanti is proud of its record of developing talent and promoting from within; in the last year, 18% of all vacancies were filled by internal promotion.

### Key next steps

Avanti continues to develop and diversify its recruitment practices and grow its links with relevant universities and other groups to promote engineering and the satellite industry. We also continue to review and improve our practices and policies to ensure that we remain an attractive employer as the labour market is predicted to become more challenging, and that our workforce is flexible and able to adapt quickly to change and growth.

### Health and safety

Avanti wants employees to work in a safe, healthy environment. To achieve this we continue to review and update our policies, procedures and practices to assess and mitigate against any risks. Avanti has a robust health and safety audit and improvement process, and encourages employees to report potential issues and suggest improvements.

### Environment

At Avanti we feel an environmental responsibility to both our service providers and their wider communities. Fortunately, our technology enables us and our service providers to behave in an environmentally responsible way. Services and applications such as teleworking, video conferencing, distance learning and ecommerce allow service providers to exchange information and ideas without actually travelling, saving energy and reducing pollution. Today, service providers can use our wireless services to make the distribution of goods more efficient; help reduce energy use in workshops, offices and homes; and take advantage of telemedicine and distance learning. Reducing the environmental impact Avanti encourages all employees to avoid all unnecessary travel by providing full telephone or video conferencing in meeting rooms at Avanti sites. Employees are expected to consider the necessity of their journeys and to use alternative methods of communication where possible, such as remote accreditation of partners and supporting partners via video conferencing. We also carefully monitor energy usage and waste in our head office in London, and hope to roll out this monitoring across other sites in the near future.

### Stakeholders

Avanti's principal stakeholders include investors, employees, partners, suppliers, government and non-government organisations and the communities in which it operates. Avanti aims to communicate openly with stakeholders about its business in order to better understand their views and concerns, and explain the Company's approach.

### Organisational departments

The structure at Avanti is designed to promote flexibility and excellent customer service by encouraging accountability and allowing for focused working. This is achieved by grouping the functions whose main purposes are customer facing (the partner support, deployment and logistics teams), sales and revenue generation (marketing, sales and pre-sales) and technical operations and innovation (procurement, satellite operations, ground operations and networks). Interdepartmental working is encouraged through the use of project teams and regular meetings of the management team, as well as regular cross-Company training.

The Strategic Report on pages 3 to 13 was approved by the Board of Directors on 27 December 2017 and signed on its behalf by:

**Alan Harper**
Chief Executive

**Nigel Fox**
Group Finance Director

# GOVERNANCE
# BOARD OF DIRECTORS

---

### Paul Walsh· Δ
**Chairman**

Paul is the former CEO of Diageo Plc. He is also Chairman of Compass Group and Chime Communications and a Non-Executive Director of FedEx Corporation and RM2. Paul became Chairman of Avanti in March 2014. Paul is Chairman of the Nominations Committee and a member of the Remuneration Committee.

### Alan Harper
**Interim Chief Executive**

Alan is interim Chief Executive Officer of Avanti. Alan is also Chairman of Azuri Technologies, Chairman and Non-Executive Director at Gigabit Fibre, a Non-Executive Director at MTN, and is a leading figure in the mobile network industry for both the UK and Africa. Alan co-founded Eaton Towers in 2008, a leading telecom tower company and held the position of Chief Executive Officer until early 2015. Operational since 2010, Eaton Towers has established over 5,000 towers across seven African countries, and serves major mobile operators such as Airtel, MTN, Orange, Tigo, Vodacom and Vodafone. Prior to founding Eaton Towers, Alan spent 12 years at Vodafone Group PLC in various roles including MD of Vodafone Ltd and as the Group Strategy Director, focusing notably on growth in emerging markets.

### David Bestwick
**Technical Director**

David is a co-founder of the Company. He graduated from the University of Leicester in 1987 with a BSc in Physics with Astrophysics. Following three years at Marconi Research Centre, he joined VEGA Group plc in 1990 where he worked on a wide range of satellite applications projects. David is responsible for all new technology and project developments.

### Nigel Fox
**Group Finance Director**

Nigel is a Chartered Accountant and has held various senior finance roles before joining Avanti in 2007, including Chief Financial Officer of Climax Group; Group Financial Controller at ARC International; Finance Director of Ruberoid Building Products, and Group Financial Controller of Ruberoid Plc. Nigel is responsible for all aspects of Finance and Administration of the Group.

### Andy Green+· Δ
**Senior Independent Director / Non-Executive Director**

Andy is chairman of IG Group and the Digital Catapult. He was a non-executive director on the Board of ARM Holdings plc and the CBI and, until 2012, Andy was CEO of Logica plc. Prior to joining Logica, Andy was a Board member at BT plc. Andy also is co-chair of the UK Space Leadership Council and Vice Chair of the Disasters and Emergencies Committee. Andy is Chairman of the Remuneration Committee and a member of the Audit Committee and the Nominations Committee.

### Paul Johnson+
**Non-Executive Director**

Paul is a Fellow of the Institute of Chartered Accountants in England and Wales. He spent 24 years as a partner in KPMG, working with companies in a variety of different industries in both the listed and private sectors. For the last 12 years he was Chairman of KPMG's London Region. Paul is the Chairman of the Audit Committee.

### Richard Mastoloni+
**Non-Executive Director**

Richard Mastoloni is an experienced senior executive working in the satellite industry for the past 20 years. From 1997 until 2013, Richard was Senior Vice President and Treasurer at Loral Space & Communications Inc., a multi-billion dollar US based satellite telecommunications company which owned the fourth largest satellites services company, Telesat Canada, as well as one of the largest satellite manufacturers, Space Systems Loral. Prior to Loral, he was a senior banker for JP Morgan Securities.

### Craig Chobor+
**Non-Executive Director**

Craig Chobor is a Managing Director and Director of Research at Solus Alternative Asset Management. Craig joined Solus at its inception in July 2007 and is currently Director of Research as well as the analyst responsible for the telecommunications, media and technology space. Over the last 19 years, he has been directly involved in transactions and restructurings for some of the largest TMT companies. Prior to his current position at Solus, Craig was part of the CDO and hedge fund teams at Stanfield Capital Partners covering a variety of industries including retail, cable, euro cable, printing, publishing, television, radio, media, wireless, and satellite telecommunication. Prior to Stanfield, he was a Senior Associate in the Emerging Markets Group at Scudder Kemper Investments. Craig holds the Chartered Financial Analyst designation and is a member of the New York Society of Securities Analysts and the Association of Investment Management and Research. In connection with his role at Solus, he currently also serves as a board member for TerreStar Corp., Nextwave Holdco LLC, Panavision Corp and FiberTower..

**STRATEGIC REPORT**
**BOARD OF DIRECTORS** continued

---

### Peter Reed·
**Non-Executive Director**

Peter A. Reed is the Chief Investment Officer of Great Elm Capital Management, Inc. (GECM), President and Chief Executive Officer of Great Elm Capital Corp. (GECC) and Chief Executive Officer of Great Elm Capital Group, Inc. (GEC). Peter is Chairman of the Board of GECC and serves on the board of directors of GEC. Prior to joining GECM, Peter was a Portfolio Manager and Partner at a Boston-based registered investment adviser from 2004 to 2017. From 2002 to 2004, Peter was an investment banking analyst at Brown, Gibbons, Lang & Company where he worked on mergers and acquisitions, in-court and out-of-court financial restructurings, and debt and equity private placements for middle market companies.

### · Michael Leitner·
**Non-Executive Director**

Michael is a Managing Partner of Tennenbaum Capital Partners, LLC and a member of its Management Committee. Prior to joining TCP in 2005, he served as Senior Vice President of Corporate Development for WilTel Communications, and before that as President and Chief Executive Officer of GlobeNet Communications, leading the company through a successful turnaround and sale. Previously, Michael was Vice President of Corporate Development of 360networks and additionally developed and managed the Company's global colocation services business. Prior to 360 networks, he served as Senior Director of Corporate Development for Microsoft Corporation, managing corporate investments and acquisitions in the telecommunications, media, managed services, and business applications software sectors. Prior to Microsoft, he was a Vice President in the M&A group at Merrill Lynch. Mr. Leitner currently serves as a Director on the boards of Globecomm Systems, Integra Telecom and Core Media. Mr Leitner has an M.B.A. from the University of Michigan and a B.A. in Economics from the University of California at Los Angeles

### Christopher McLaughlin
**Non-Executive Director**

Chris McLaughlin is a FTSE-experienced, corporate and government marketing and communications specialist. He has an extensive background within new and emerging technology sectors. Joining Inmarsat plc in March 2004, prior to the successful 2005 IPO, Chris was a member of the senior executive management team and Chief Marketing Officer until January 2017. He was responsible for all global government, reputational, CSR, marketing, brand and sponsorship activity at the company. Chris has wide experience in emerging markets and demanding regulatory environments. Producer and host of multiple global partner events, he was also responsible for the technology-proving, Volvo Ocean Race sponsorship from 2005, which continues. He has held similar international roles at Philip Morris International, Visa International, ITV, the BBC and worked in the Private Equity environment, acquiring and operating cable television groups in Europe.

+ Audit committee
· Remuneration committee
Δ Nomination committee

# GOVERNANCE
## CHAIRMAN'S INTRODUCTION TO GOVERNANCE

———

**Avanti firmly supports the upholding of good principles of corporate governance, not only because it is required for compliance purposes but because effective corporate governance serves to ensure that the business is run properly and in the interests of all of its stakeholders.**

The Board of Directors (the 'Board') recognises that it is accountable to shareholders for the Company's activities and that it is responsible for the effectiveness of corporate governance practices. It remains committed to maintaining high standards of corporate governance and, whilst the Company is AIM listed and therefore not required to comply with the UK Corporate Governance Code (the 'Code'), the Board seeks to comply with the Code in all material respects wherever it is practical to do so having regard to the size of the Company and the resources available to it.

As a Board, we monitor closely for developments in legislation, regulation and industry guidelines to ensure that our corporate governance policies are kept up to date and that the Board committees take into account all of the latest guidance in their areas of activity.

The Board takes all appropriate measures to ensure that no conflict of interest can exist between members of the Board and other stakeholders in the Company.

Throughout the year ended 30 June 2017, the Board considers that the Company complied in all material respects with those parts of the Code that it considers appropriate. This Corporate Governance Report, the Report of the Board, the Audit Committee Report, and the Remuneration Report detail how the Company has applied the main principles of the Code.

**Paul Walsh**
Chairman

**Avanti Communications Group plc**
Annual Report and Accounts 2017

# GOVERNANCE
# CORPORATE GOVERNANCE REPORT

----

## Role of the Board

The Board has a collective duty to promote the long term success of the Company for its shareholders. The Board sets the Company's strategy and ensures that the necessary resources are in place to achieve the strategic priorities.

In determining the long term strategy and objectives of the Company, the Board takes into account its duties and responsibilities not just to its shareholders but also to customers, employees and other stakeholders and makes its decisions objectively. It reviews management and financial performance, monitors the delivery of strategy and achievement of objectives and works within a rigorous framework of internal controls and risk management. The Board develops and promotes the collective vision of the Company's purpose, objectives, values and key behaviours.

## Composition of the Board

The Board currently comprises a Non-Executive Chairman, seven other Non-Executive Directors and three Executive Directors. During the financial year, Richard Vos, Michael Walker and Charmaine Eggberry stepped down as Non-Executive Directors and Richard Mastoloni, Craig Chobor, Peter Reed, Michael Leitner and Alan Harper were appointed as Non-Executive Directors. On 1 September 2017, after the financial year end, Christopher McLaughlin was appointed as a Non-Executive Director. The balance of the Board, together with the advice sought from other members of senior management and the Company's external advisors, ensures that no individual has unfettered powers of decision.

## Chairman and the Chief Executive

The Board is chaired by Paul Walsh who provides leadership that demonstrates the values and behaviours of the Company. The Chairman is responsible for creating the conditions for overall Board and individual Director effectiveness. He ensures that both Executive Directors and Non-Executive Directors make available sufficient time to execute their duties in an appropriate manner, that all Directors receive sufficient financial and operational information and that there is proper debate at Board meetings. He is also responsible, in consultation with the Chief Executive and the Company Secretary, for setting the agenda for the Board's meetings.

The Chief Executive is supported by the Finance Director and the Technical Director and he is responsible for the day-to-day management of the Company. He provides leadership to the Company to successfully plan and execute the objectives and strategy agreed by the Board. The roles of the Chairman and Chief Executive are separate with each having clearly defined duties and responsibilities. On 10 August 2017, David Williams resigned as Chief Executive and was replaced by Alan Harper as interim Chief Executive.

## Non-Executive Directors

The Company benefits from the extensive experience of the Non-Executive Directors in areas critical to the long term future success of the Company, encompassing a deep understanding of the industry, technology, corporate strategy, finance and investment. The Non-Executive Directors help the Executive Directors by contributing independent challenge and rigour to the Board's deliberations and assisting in the development of the Company's strategy. In addition, they are responsible for monitoring the performance of the Executive Directors against agreed goals and objectives. Their views are essential in overseeing the performance of the Company.

## Induction and ongoing training

All Directors have access to advice from the Company Secretary and independent professionals at the Company's expense. Training is available for Directors as necessary. New Directors receive an induction programme and all the Directors are encouraged to continue professional education programmes.

## Matters reserved for the Board

The Board recognises that, to ensure the long term success of the Company, certain specific matters should be reserved for the consideration and decision of the Directors alone. Decisions specifically reserved for approval by the Board are formally recorded and include:

- Annual and interim accounts and Financial Statements;
- Dividend policy;
- Board appointments;
- Company strategy and annual operating budget;
- Changes to the Company's capital structure;
- Changes to the Company's management and control structure;
- Major capital expenditure, acquisitions and disposals;
- Treasury policies;
- Risk management strategy;
- Company corporate governance policy; and
- Environmental, health and safety and sustainability policies.

## GOVERNANCE
## CORPORATE GOVERNANCE REPORT CONTINUED

---

### Board meetings

The Board met on seven occasions during the financial year. During the Strategic Review between July and December 2016, the Board also convened weekly telephonic meetings to discuss M&A, restructuring and other related matters. These weekly telephonic meetings are not recorded below. The Directors additionally maintained an open dialogue throughout the year and contact by telephone occurred whenever necessary.

| Board attendance for the financial year 1 July 2016 to 30 June 2017 | | Attended |
|---|---|---|
| **Chairman** | Paul Walsh | 7/7 |
| **Executive Directors** | David Williams (Resigned 10/08/2017) | 7/7 |
| | David Bestwick | 7/7 |
| | Nigel Fox | 7/7 |
| **Non-Executive Directors** | Andrew Green | 6/7 |
| | Paul Johnson | 7/7 |
| | Richard Mastoloni (Appointed 20/12/16) | 3/3 |
| | Craig Chobor (Appointed 27/01/17) | 3/3 |
| | Peter Reed (Appointed 27/01/17) | 3/3 |
| | Michael Leitner (Appointed 27/01/17) | 3/3 |
| | Alan Harper (Appointed 17/03/17) | 2/2 |
| | Michael Walker (Stepped down 27/01/17) | 4/4 |
| | Richard Vos (Stepped down 27/01/17) | 4/4 |
| | Charmaine Eggberry (Stepped down 27/01/17) | 2/4 |

During the year, the Chairman continued the practice of maintaining a 12 month agenda for Board and committee meetings. Agenda items included permanent items such as progress reports from the Executive Directors and the Company Secretary, as well as periodic items such as updates from the Board Committees, review of the risk register and internal controls, strategy and succession planning. Whenever a Director is a related party or interested in a particular transaction being considered by the Board, the Chairman will ensure that the relevant Director will recuse himself/herself from any decisions made in relation to that transaction.

In advance of each meeting, the Board is provided with monthly management reports and other relevant information in a timely manner and in a form and quality that it considers appropriate.

The Chairman and the Board have confidence that the way in which the Board meetings are conducted ensures that they cover all the matters required to be discussed and that sufficient time is allowed for discussion of each matter at the most appropriate meeting in the year, enabling the members of the Board to discharge their duties as Directors effectively.

The Company Secretary attends all Board meetings and is available to advise on any corporate governance issues that may arise.

### Re-appointment of Directors

All Directors are required to retire every three years and may offer themselves for re-appointment, which is not automatic. As a Company with a long-term growth strategy, it is appropriate for Directors to serve on the Board for more than a single term, subject to continuing satisfactory performance.

### Board Committees

The Board has established a number of committees to assist in the discharge of its responsibilities. The principal committees are the Audit Committee, the Nominations Committee and the Remuneration Committee. The responsibilities of each of these Board committees are set out in their individual Terms of Reference. The roles and responsibilities of the committees are discussed further below.

Committee meetings are held independently of Board meetings and invitations to attend are extended by the committee Chairman to other Directors, the Company's advisors and management as appropriate.

### Audit Committee

The Audit Committee is comprised of four Non-Executive Directors: Paul Johnson, Andy Green, Craig Chobor and Richard Mastoloni. The Committee is chaired by Paul Johnson. Through their other business activities, each member of the Committee has significant experience in financial matters. The Company considers that the composition of the Audit Committee is in accordance with the UK Corporate Governance Code. Further information on the activities of the Committee is set out in the Audit Committee Report on pages 21 to 22.

### Nominations Committee

The Nominations Committee is comprised of two Non-Executive Directors: Paul Walsh and Andy Green. It is chaired by Paul Walsh. For further information on the activities of the Committee please refer to page 23.

### Remuneration Committee

The Remuneration Committee is comprised of four Non-Executive Directors: Paul Walsh, Andy Green, Peter Reed and Michael Leitner. It is chaired by Andy Green.

# GOVERNANCE
## CORPORATE GOVERNANCE REPORT continued

---

Executive Directors and senior management attend Remuneration Committee meetings at the invitation of the Committee Chairman only.

The Remuneration Committee meets according to the Company's requirements at least twice a year.

The Remuneration Committee determines, within agreed Terms of Reference, specific remuneration packages for the Chairman, the Executive Directors and the officers of the Company. This includes implementation of Company share incentive plans. In accordance with the Committee's Terms of Reference, no Director may participate in discussions relating to his or her own terms and conditions of service or remuneration.

With regard to the remuneration policy, the Committee considers:

- The pay scales applied to each Director's package;
- The proportion of the different types of reward within each package;
- The period within which performance related elements become payable;
- What proportion of rewards should be related to measurable performance or enhanced shareholder value, and the balance between short and long-term performance elements; and
- Transparency of Directors' remuneration in the annual Financial Statements.

Further information on the activities of the Committee is set out in the Remuneration Committee Report on pages 24 to 26.

## Relations with shareholders

The Board recognises the importance of establishing and maintaining good relationships with all of the Company's shareholders. During the period under review, various Directors have met with analysts and institutional shareholders to keep them informed of significant developments and report to the Board accordingly on the views of these stakeholders.

The Interim Report and the Annual Report and Accounts are the primary means used by the Board for communication during the year with all of the Company's shareholders. The Board also recognises the importance of the internet as a means of communicating widely, immediately and cost effectively and a Company website (www.avantiplc.com) is maintained to facilitate communications with shareholders.

Information available online includes copies of the full and half year Financial Statements, press releases and Company news, corporate governance information and key dates in the financial calendar.

The Board is committed to the constructive use of the Annual General Meeting ('AGM') as a forum to meet with shareholders and to hear their views and answer their questions. The 2017 AGM was held at 9.00 am on 13 December 2017. A further General Meeting will be convened in early 2018 to lay the Annual Report and Accounts before shareholders and approve the re-election and remuneration of the Company's auditors.

Shareholders are encouraged to attend the AGM and General Meetings and to participate in proceedings by asking questions during the formal part of the meeting, voting on resolutions put to the meeting and providing Board members with their views in informal discussions after the meeting. Notices of all AGMs and General Meetings are sent to shareholders and are also available to download on the Company's website.

## Financial reporting

At the half year and the year end, all operating Group companies are required to produce Financial Statements to comply with local accounting regulations and to produce sufficient information to enable the central finance team to produce IFRS-compliant Consolidated Financial Statements.

The Board presents a balanced and understandable assessment of the Company's position and prospects in all interim and price sensitive public reports whilst also reporting to regulators all information required to be presented by statutory requirements.

## Internal control and risk management

The Board has overall responsibility for the Company's system of internal control to safeguard Company assets and shareholders' investments. The risk management process and systems of internal control are designed to manage rather than eliminate the risk of failure in order to achieve the Company's objectives.

The Board has reviewed the effectiveness of the system of internal control for the year ended 30 June 2017 and up to the date of the signing of the Annual Report and Accounts. The Board will continue to develop and implement internal control procedures appropriate to the Company's nature and scale.

The Company does not have an internal audit function due to the small size of the Company's administrative function and the high level of Director review and authorisation of transactions. The Audit Committee believes that these internal controls are adequate for the Group's current size and does not feel that a separate internal audit function is currently warranted. This situation is kept under regular review.

# GOVERNANCE
## CORPORATE GOVERNANCE REPORT continued

The Board recognises that an essential part of its responsibility is the effective safeguarding of assets, the proper recognition of liabilities and the accurate reporting of results. The Company has a comprehensive system for regular reporting to the Board. This includes an annual planning and budgeting system with budgets approved by the Board.

The financial reporting system compares against budget and prior year, and reconsiders its financial year forecast on a monthly basis.

The Board has established a formal policy of authorisation setting out matters which require its approval and certain authorities delegated to the Executive Directors.

The key features of the Group's system of internal control are as follows:

- Management responsibility and accountability: There are clearly defined management responsibilities, reporting lines and limits of authority. The Chief Executive and the Finance Director meet regularly with the Executive Directors and other members of senior management to review progress on financial, commercial, operational, supply chain, HR, health, safety and environmental issues as well as regulatory and legal compliance matters.
- Strategy and planning: The Company updates its strategic plan each year and this is approved by the Board.
- Budgeting and reporting: Detailed management accounts are prepared each month, consolidated and reviewed in detail with senior management.
- Expenditure approval: Authorisation and control procedures are in place for capital expenditure and other major projects. There is also a process to review capital expenditure projects post completion to highlight any issues and improve future projects. Authorisation procedures for operating costs and contractual commitments are reviewed regularly.
- Independence of the finance function: The finance function is encouraged to act independently of general management in the course of its preparation of monthly accounts and exercising of control procedures.
- Insurance and risk management policies: This includes a formal annual risk review report to the Board. Regular meetings are held with insurance and risk advisors to assess the risks throughout the Group.
- Documented policies: There are documented policies for a range of areas including HR matters, expenditure, treasury and financial reporting.
- Cash: The cash and debt position at Group and operational level is monitored daily and any variances from forecast levels are investigated thoroughly. Working capital balances are reviewed on a monthly basis at Group level, and any significant variances are analysed and investigated.
- Effectiveness: The Board continually reviews the effectiveness of the systems of internal control and risk management procedures throughout the year.

## Ethics
The Company prides itself on carrying out its business in a fair, honest and open manner, ensuring that it complies with all relevant laws and regulations.

Under the Companies Act 2006, a Director of a company must avoid a situation in which he or she has, or can have, a direct or indirect interest that conflicts or may possibly conflict with the interests of the company. The Company has a formal procedure in place to manage the disclosure consideration and, if appropriate, the authorisation of any such possible conflict. Directors are aware of the requirement to notify the Board as soon as they become aware of any possible future conflict or a material change to an existing authorisation. Only Directors who have no interest in the matter being considered are able to take the relevant decision.

Details of the Directors' service contracts, emoluments, the interests of the Directors in the share capital of the Company and options to subscribe for shares in the Company are provided in the Remuneration Report on pages 24 to 26.

## Bribery Act 2010
The Board performs an ongoing assessment of the risk environment and has implemented a framework to ensure that the Company trades in compliance with the UK Bribery Act 2010 and all other relevant anti-bribery and corruption legislation.

## Modern Slavery Act 2015
The Company has taken, and is continuing to take, steps to ensure that modern slavery is not taking place within its business or supply chain. A zero tolerance approach to any form of modern slavery has been implemented and the Company is fully committed to acting ethically, transparently and with integrity in all business dealings.

The Company's commitment to conducting business in an ethical and transparent manner is reflected in several of its policies, including its Anti-bribery Policy, Code of Conduct, New Supplier Selection Policy and Supplier Policy. These policies not only set the values expected of the Company's own staff but also the behaviours and values required in the Company's supply chain.

To ensure all service providers comply with these values, the Company undertakes due diligence on all new and existing suppliers. In addition, the Company contracts on the basis that these organisations have in place similar policies to its own, ensuring no part of their business operations contradicts the Company's ethics.

**Avanti Communications Group plc**
Annual Report and Accounts 2017

# GOVERNANCE
# AUDIT COMMITTEE REPORT

Three of the four members of the Audit Committee are independent Non-Executive Directors and the majority have significant, recent and relevant financial experience. The Board is confident that the collective experience of the Audit Committee members enables them, as a group, to act as an effective Committee.

By invitation, the meetings of the Audit Committee may be attended by the Chairman, Chief Executive Officer, Group Finance Director and deputy CFO. The KPMG LLP audit engagement partner is present at the audit committee meetings to ensure full communication of matters relating to the audit. The Chairman of the Audit Committee meets regularly with the Group Finance Director and the external Auditor.

The Audit Committee has particular responsibility for monitoring the financial reporting process, the adequacy and effectiveness of the operation of internal controls and risk management and the integrity of the Financial Statements. This includes a review of significant issues and judgements, policies and disclosures. Its duties include keeping under review the scope and results of the audit and its cost effectiveness, consideration of management's response to any major external audit recommendations and the independence and objectivity of the external Auditor.

During the year to 30 June 2017 the Audit Committee reviewed and endorsed, prior to submission to the Board, half year and full year Financial Statements, interim management statements and results announcements. It considered internal management reports and risk management updates, agreed external audit plans, received updates on management responses to audit recommendations and approved the review of accounting policies. Progress on implementation of processes to meet the requirements of the UK Bribery Act 2010 was also provided to the Committee. Following the issue of high yield bonds in October 2013, the Company commenced limited quarterly reporting and the Audit Committee additionally required KPMG to carry out reviews on revenue recognition and analytical reviews of the quarterly Financial Statements with management. The Audit Committee also reviewed the progress on the Company's preparations for GDPR with the Company's General Counsel.

## Significant accounting matters

During 2017, the Audit Committee considered the significant accounting matters described below. In addressing these issues the Committee considered the appropriateness of management's accounting estimates and key judgements, outlined in note 3 to the consolidated financial statements. The Committee discussed these with the external auditor during the year and, where appropriate, details of how they have been addressed are provided in the Independent Auditors' Report on pages 31 to 34.

1. **Recoverability of trade receivables and accrued income**
   The group has a significant level of trade receivables and accrued income, including balances that may prove challenging to recover due to the market and geopolitical environment in which our customers operate. Management's consideration of whether or not to provide against amounts due from customers reflects a key judgement.

2. **Impairment of space assets (HYLAS 1 and HYLAS 2)**
   The group assesses its space assets for impairment by reviewing forecast performance over the remaining life of the assets in order to estimate the recoverable amounts. There is an inherent uncertainty involved in forecasting and discounting the future cash flows on which this impairment assessment is based.

3. **Revenue recognition on multi-element arrangements**
   Where the group enters into multi element contracts, judgement is required in determining the relative fair value of the delivered and undelivered elements on the contract.

4. **Revenue recognition on Government services contracts**
   The group enters into fixed price contracts with customers, and recognises revenue based on a stage of completion calculation. The subjective inputs into the stage of completion calculation rely on management judgement.

5. **Recoverability of deferred tax assets**
   The group has significant deferred tax assets. In determining whether deferred tax assets are or are not recognised, management are required to estimate future taxable profits. There is an inherent uncertainty involved in forecasting future performance of the business.

6. **Recoverability of parent company's investments in and receivables due from subsidiaries**
   The carrying amount of the parent company's investments in and receivables due from subsidiaries is significant. There is a risk that these amounts may not recoverable due to the performance of subsidiary entities. There is an inherent uncertainty involved in forecasting and discounting the future cash flows on which this impairment assessment is based.

## GOVERNANCE
## AUDIT COMMITTEE REPORT continued

---

### Going Concern

As more fully explained in note 2 to the financial statements, in determining the appropriate basis of preparation of the financial statements, the Directors are required to consider whether the Group can continue in operational existence for the foreseeable future.

In assessing the Group's ability to meet its obligation as they fall due, management prepared cash flow forecasts based on the business plan for a period of 12 months. Management considered various downside scenarios to test the Group's resilience against operational risk including:

- Slower build in fleet/satellite utilisation
- Planned revenue from exploitation of spectrum rights and satellite interim missions doesn't materialise

However, were those downside scenarios to materialise, Management would take mitigating actions, notably the ability to PIK interest payable in October 2018 on the 2021 Notes. Management therefore concluded that the Group's Capital Structure after the planned financial restructuring comprising of the debt for equity swap, and amendment to the economic terms of the PIK Toggle Notes, together with the planned additional fund raise and the substantial achievement of cash flow forecasts, provides sufficient headroom to cushion against downside operational risks.

The Committee challenged management on the key assumptions used in the cash projections and sensitivities applied to arrive at a downside scenario. The Committee was satisfied that the key assumptions had been appropriately scrutinised, stress tested and were sufficiently robust. The Committee was further satisfied that the going concern disclosures in the financial statements were appropriate and that an appropriate basis of preparation of the financial statements had been arrived at.

However, the need for a successful completion of the financial restructuring (announced on 13 December 2017) is conditional upon the Scheme of Arrangement and Consent Solicitation processes in addition to certain shareholder resolutions and this, in addition to the completion of a minimum fund raise of $30m following the completion of the aforementioned restructuring and the substantial achievement of cash flow forecasts represent a material uncertainty about the Group's ability to continue as a going concern as explained in note 2 to the financial statements.

The auditor explained their audit procedures on management's going concern assessment and considered the Group's disclosure on the subject. On the basis of their audit work, the auditor considered that the going concern basis of preparation of the financial statement is appropriate and included an emphasis of matter in relation to the material uncertainty regarding the need for a successful completion of the financial restructuring, a minimum fund raise of $30m following the completion of the aforementioned restructuring and the substantial achievement of cash flow forecasts to enable the settlement of certain interest payments by the issue of Notes. Refer to the auditor's report on pages 31 to 34 for the auditor's opinion on the going concern assumption.

### External Auditor

Auditor objectivity and independence is safeguarded through a variety of mechanisms. To ensure the auditor's independence, the Committee annually reviews the Company's relationship with KPMG. Following the review in 2016, the Company concluded that it continues to have an objective and professional relationship with KPMG and that there are sufficient controls and processes in place to ensure the required level of independence. In addition, the auditor is required to review and confirm its independence to the Committee on a regular basis.

### Non-audit services

The Company's auditor may also be employed where, as a result of its position as auditor, it either must, or is best placed to, perform the work in question.

### Conclusion

Following its review, the Committee was of the opinion that the 2017 Annual Report and Accounts is representative of the year and presents a 'fair, balanced and understandable overview, providing the necessary information for shareholders to assess the Group's position, performance, business model and strategy.

**Paul Johnson**
Audit Committee Chairman

## GOVERNANCE
## NOMINATIONS COMMITTEE REPORT

The Nominations Committee comprises independent Non-Executive Directors. It meets as and when necessary and details of the membership of the Committee are shown on pages 14 to 15. The Committee has responsibility for nominating to the Board candidates for appointment as Directors, bearing in mind the need for diversity and a broad representation of skills across the Board, and its principal responsibility is to ensure that the Board comprises individuals with the most appropriate balance of experience, skills and knowledge to help and support the Company strategy.

The Nominations Committee will also make recommendations to the Board concerning the re-appointment of any independent Non-Executive Director at the conclusion of his or her specified term, the election and re-election of any Director by shareholders and changes to senior management, including Executive Directors.

The Nominations Committee gives full consideration to succession planning in the course of its work, taking into account the challenges and opportunities facing the Company, how to take account of diversity and what skills and expertise are needed on the Board and from senior management in the future. As a result, job specifications, search processes and selection criteria are focused on appointing candidates who not only meet criteria for the role but who can also offer different perspectives.

In the financial year to 30 June 2017, the Committee, in consultation with a number of the other Non-Executive Directors, met a number of times and was heavily involved in the appointment of the new Directors to the Board

**Paul Walsh**
Nominations Committee Chairman

## GOVERNANCE
## REMUNERATION COMMITTEE REPORT

———

The Remuneration Committee comprises independent Non-Executive Directors only. The Committee, on behalf of the Board, meets as and when necessary to review and approve, as appropriate, the remuneration of the Executive Directors and senior management and major remuneration plans for the Company.

The Committee consists of Andrew Green (Chairman) (who replaced Richard Vos in January 2017) Paul Walsh, Peter Reed (appointed in January 2017) and Michael Leitner (appointed in January 2017).

The Committee thanks Richard Vos for his knowledgeable contribution over the past several years.

During the year, the Remuneration Committee met four times.

### Remuneration policy
The Company's policy on remuneration of Directors is to attract, retain and motivate the best people, recognising the input they make to the ongoing success of the business. Consistent with this policy, the remuneration and benefits package awarded to Directors is intended to be competitive and comprises a mix of performance related and non-performance related elements designed to incentivise Directors in the short and longer term, and align their interests with those of shareholders. Their remuneration accordingly consists of base pay, annual bonus, Long Term Incentive Plan ('LTIP'), share options, pension contributions and other benefits such as health care.

Under the Company's LTIP which came into operation in July 2013, shares will vest if specific targets are met after a fixed period of years after they are allocated. The targets set by the Remuneration Committee reflect the desired performance of the Company as it develops from a 'start-up' to a more mature business.

### Remuneration 2017
The remuneration of the Directors for the year is set out below, the previous year's figures being shown for comparison. Remuneration is paid in Sterling, but reported in US Dollars, the exchange rates used being USD 1.27 in 2017 and USD 1.47 in 2016.

**For the year ended 30 June 2017**

| | Salaries $ | Bonus $ | Other benefits $ | Post-employment benefits $ | Total 2017 $ | Total GBP £ |
|---|---|---|---|---|---|---|
| **Executive** | | | | | | |
| D J Williams (Resigned 10 August 2017) | 582,975 | 119,786 | 55,635 | 52,630 | 811,026 | 638,499 |
| D J Beswick | 418,382 | 87,845 | 53,018 | 43,922 | 603,167 | 474,857 |
| NAD Fox (Stepped down 27 January 2017, Re-appointed 12 September 2017) | 201,736* | 70,173 | 23,175 | 25,301 | 320,385 | 252,231 |
| **Non-Executive** | | | | | | |
| P Walsh | 251,538 | – | – | – | 251,538 | 198,029 |
| A Green | 90,810 | – | – | – | 90,810 | 71,492 |
| P R Johnson | 78,078 | – | – | – | 78,078 | 61,469 |
| R Mastoloni (Appointed 20 December 2016) | 30,265** | – | – | – | 30,265 | 23,827 |
| A Harper (Appointed 17 March 2017) | 18,972** | – | – | – | 18,972 | 14,936 |
| CR Vos (Resigned 27 January 2017) | 64,387 | – | – | – | 64,387 | 50,690 |
| M Walker (Resigned 27 January 2017) | 64,387 | – | – | – | 64,387 | 50,690 |
| C Eggberry (Resigned 27 January 2017) | 101,293*** | – | – | 667 | 101,960 | 80,270 |
| **Total** | **1,902,823** | **277,804** | **131,828** | **122,520** | **2,434,975** | **1,916,989** |

\*   Nigel Fox's salary reflects the period 1 July 2016 to 27 January 2017 only
\*\*  Where directors have been appointed in the year the salary disclosed relates to the period from the date of appointment
\*\*\* Charmaine Eggberry's salary reflects a longer notice period

## GOVERNANCE
## REMUNERATION COMMITTEE REPORT continued

**For the year ended 30 June 2016**

| | Salaries $ | Bonus $ | Other benefits $ | Post-employment benefits $ | Total 2016 $ | Total GBP £ |
|---|---|---|---|---|---|---|
| **Executive** | | | | | | |
| D J Williams | 639,529 | – | 85,156 | 60,581 | 785,266 | 538,865 |
| D J Bestwick | 475,242 | – | 57,247 | 88,955 | 621,444 | 424,031 |
| N A D Fox | 366,386 | – | 42,335 | 49,157 | 457,878 | 313,305 |
| M J O'Connor (Resigned 31 March 2016) | 263,771 | – | 26,189 | 26,588 | 316,548 | 215,156 |
| **Non-Executive** | | | | | | |
| F E J G Brackenbury CBE (Resigned 31 March 2016) | 76,300 | – | 10,655 | – | 86,955 | 58,325 |
| M Walker OBE FREng | 106,174 | – | – | – | 106,174 | 72,089 |
| P Walsh | 291,295 | – | – | – | 291,295 | 198,030 |
| C R Vos | 66,769 | – | – | – | 66,769 | 46,103 |
| P R Johnson | 90,421 | – | – | – | 90,421 | 61,470 |
| C Eggberry | 73,681 | – | – | 1,324 | 75,005 | 50,991 |
| A Green | 73,681 | – | – | – | 73,681 | 50,091 |
| **Total** | **2,523,249** | **–** | **221,582** | **226,605** | **2,971,436** | **2,028,456** |

### Basic salary
Base salary is set by the Committee and reviewed annually, taking into account an individual's performance and experience measured by appraisal and market practice. The Executive Directors did not receive a base salary increase for the year ended 30 June 2017.

### Pension
The Company does not operate a specific pension scheme for the Executive Directors. The Executives are entitled to a Company contribution to their private pensions equal to 12.5% of their base salary. All Directors are entitled to participate in the Group workplace pension scheme.

### Cash bonus
Bonus awards, which are not pensionable, are made to the Executive Directors based on Group financial and individual performance.

Bonus payments are generally only payable if the Group meets a specific target threshold. This threshold has was not achieved for 2017 but certain ex gratia payments were made in February 2017 to the Executive Directors in recognition of their work in completing the financial restructuring. Personal performance is appraised against the achievement of challenging objectives set at the start of each financial year, and is linked to the Group's strategic and operational performance.

## GOVERNANCE
## REMUNERATION COMMITTEE REPORT continued

### Directors' share interests

The following Directors held interests in the share capital of the Company:

|  | Fully paid Ordinary Shares of 1p each | |
|---|---|---|
|  | 30 June 2017 | 30 June 2016 |
| D J Williams | **1,714,848** | 1,714,848 |
| D J Bestwick | **1,301,954** | 1,301,954 |
| N A D Fox | **134,580** | 134,580 |
| P Walsh | **230,000** | 230,000 |
| P R Johnson | **10,000** | 10,000 |
| A Green | **21,888** | 21,888 |

### Directors' Long Term Incentive Plans

LTIPs have been established by the Group with approval of the Remuneration Committee and with the advice and assistance of Deloitte Touche Tohmatsu Limited to reward and incentivise the Executive Directors and senior managers of the Group.

All unvested shares are held in the Employee Benefit Trust ('EBT'). The LTIP allocations are in separate sub funds within the EBT and are subject to automatic revocation if certain criteria are not met and continue to be revocable for the entire Trust period.

The total allocation to the executive is subject to specific performance criteria, which must be met a fixed number of years after the grant.

Currently, the criteria are twofold:

Two thirds of an award – 'the Revenue Part' – or a proportion thereof will vest if specific revenue targets are achieved or bettered. Revenue will be based on the Group's audited Financial Statements for the relevant financial year. The Revenue Part will lapse to the extent it does not vest.

One third of an award – 'the Share Price Part' – or a proportion thereof will vest if the three-month average share price to 30 June in the relevant financial year is equal to or above a specified amount. In the event of any variation in the share capital of the Company by way of capitalisation or rights issue, consolidation, subdivision or reduction or otherwise, the Remuneration Committee shall make an appropriate adjustment to the share price targets to reflect this.

The Share Price Part will lapse to the extent it does not vest in accordance with the schedule.

In 2017, the Remuneration Committee determined that the criteria for the 2017 awards had not been met and that the awards should therefore lapse. The Committee decided to review the relevance of the current LTIP scheme to the Group's longer-term ambitions prior to cnsideration of any further LTIP awards. No LTIP awards were made in 2017.

Current allocations are as set out below::

| Outstanding allocations | Potentially vesting 2015 | Potentially vesting 2016 | Potentially vesting 2017 | Potentially vesting 2018 | Total |
|---|---|---|---|---|---|
| David Williams | 153,427 | 329,869 | 338,116 | 355,022 | 1,176,434 |
| David Bestwick | 117,270 | 252,129 | 258,432 | 271,354 | 899,185 |
| Nigel Fox | 44,954 | 96,731 | 99,149 | 104,106 | 344,940 |
| **Total** | **315,651** | **678,729** | **695,697** | **730,482** | **2,420,559** |

### Andrew Green
Remuneration Committee Chairman

# GOVERNANCE
# REPORT OF THE BOARD OF DIRECTORS

The Directors have pleasure in presenting their Annual Report together with the audited Financial Statements for the year ended 30 June 2017.

## Principal activities

The principal activity of the Group is the commercial exploitation of its space and network assets. These assets include its spectrum rights, satellites, intellectual property and ground station assets. Avanti charges its service provider customers for the use of its network and other assets in a number of ways: broadband packages, managed capacity, fully integrated project fees, raw capacity, pure spectrum and a number of other product categories and charging models to suit customer and market circumstances.

The services are principally provided via Ka-band satellites.

Avanti had three satellites (HYLAS 1, HYLAS 2 and ARTEMIS) and one hosted payload (HYLAS 2B) in-orbit during the year. A further two satellites are under construction (HYLAS 3 and HYLAS 4). The ARTEMIS satellite was re-orbited post year-end on 15 December 2017. HYLAS 3 is a payload on ESA's EDRS-C satellite and is scheduled for launch before the end of calendar 2018. Construction of HYLAS 4 commenced in August 2014 and the satellite is scheduled for launch in March 2018.

A review of the Group's business and developments during the year is included in the Chairman's Statement, the Chief Executive's Review and the Strategic Report.

## Going Concern

In determining the appropriate basis for preparation of the financial statements, the Directors are required to consider if it is appropriate to adopt the going concern basis of accounting.

Full disclosure of the Directors' deliberations to determine whether it is appropriate to adopt the going concern basis of accounting is provided in note 2 to the financial statements on page 40.

In summary, the Directors have concluded that based on the Group's expectation that the Consent Solicitation and UK Scheme of Arrangement processes for the financial restructuring described in note 2 will be successful, that a minimum fund raise of $30m is completed following the completion of the aforementioned restructuring and the substantial achievement of cash flow forecasts, that the Group will be able to have sufficient liquidity and will be able to meet its obligations as they fall due, and accordingly have formed the judgement that it is appropriate to prepare the financial statements on a going concern basis. There can, however, be no certainty that the required consents or schemes will be received or approved or that the refinancing will be successfully completed. Accordingly, the factors listed above represent a material uncertainty that may cast significant doubt on the Group and the Company's ability to continue as a going concern.

## Business review and key performance indicators

Avanti operates two performance indicators in order to give investors better insight into the progress that the business is making. The first performance indicator is Top-20 Customer Bandwidth Revenue Growth, which helps to track Avanti's growth trajectory from core service sales, excluding non-recurring items, and is calculated by comparing the revenues from Avanti's current leading customers on a last 12 month basis, to the 12 months preceding that.

The second performance indicator is Fleet Utilisation, which helps to track capacity uptake and gives an indication of revenue potential when Avanti's fleet is mature, and is calculated by dividing average utilised capacity by total available capacity for the fleet.

A review of the Group's business and developments during the year, including these KPIs, is included in the Chairman's Statement and the Chief Executive's Review within the Strategic Report.

## Results and dividends

The results for the year ended 30 June 2017 are shown on page 35. No equity dividend was paid in the year ended 30 June 2017 (2016: $nil). No final dividend is proposed at the year-end (2016: $nil). The loss for the year transferred to shareholders' funds was $65.2m (2016: loss of $68.7m). The net asset position at year end is $133.7m (2016: $201.5m).

## Share capital

The Company issued 14,739,599 new Ordinary Shares during the year ended 30 June 2017 (2016: 5,593,000 new shares). Details of the Company's share capital are given in Note 25 to the Consolidated Financial Statements.

## Qualitative and quantitative disclosures about interest, foreign exchange, credit and liquidity risks

A discussion of the Company's financial risk management objectives and policies and the exposure of the Company to interest rate, foreign exchange, credit and liquidity risk is included on pages 72 to 74 in Note 24 to the Consolidated Financial Statements.

## Research and development

The Company continues to invest in new services and technology through its research and development programmes which can lead to profitable exploitation of Avanti's satellite capacity. These include pure research into new products as well as developing those services which have been demonstrated to have a profitable business case.

## GOVERNANCE
## REPORT OF THE BOARD OF DIRECTORS CONTINUED

### Directors

The Directors who served during the year and were in office up to the date of signing were as follows:

P Walsh
D J Bestwick
NAD Fox (stepped down 27 January 2017 and was re-appointed 12 September 2017)
A Green
P R Johnson
R Mastoloni (appointed 20 December 2016)
C Chobor (appointed 27 January 2017)
P Reed (appointed 27 January 2017)
M Leitner (appointed 27 January 2017)
A Harper (appointed 17 March 2017)
D J Williams (resigned 10 August 2017)
C Eggberry (resigned 27 January 2017)
C R Vos (resigned 27 January 2017)
M Walker OBE FREng (resigned 27 January 2017)

A biography for each Director is provided on pages 14 and 15. In accordance with the Company's Articles of Association, all Directors offer themselves for re-election every three years. The Board believes that the members of the Board continue to be effective and to demonstrate commitment to their roles, the Board and the Company.

### Directors' emoluments

**Remuneration Policy**

The Company's policy on remuneration of Directors is to attract, retain and motivate the best people, recognising the input they have to the ongoing success of the business. Consistent with this policy, the benefit package awarded by Avanti Communications Group plc to its Directors is intended to be competitive. It comprises a mix of performance related and non-performance related remuneration designed to incentivise the Directors and align their interest with those of shareholders and consists of base pay, annual bonus, LTIP, pension contributions and other benefits such as healthcare.

### Major shareholders

At 30 September 2017, the Company had been notified, pursuant to the Financial Conduct Authority's Disclosure & Transparency Rules, of the following notifiable voting rights in the Company's issued Ordinary Share capital 21 December 2017:

| | |
|---|---|
| M & G Investment Management | 16.87% |
| Solus Alternative Asset Management | 15.88% |
| Mast Capital Management | 11.95% |
| Avanti Communications EBT | 4.29% |
| Caledonia Investments | 3.82% |

### Employees

The Company employed 254 people at 30 June 2017 (2016: 240 people).

Employees are key to the Company's success and we rely on the workforce being committed to helping us achieve our business objectives.

Employees are regularly updated about market and industry developments.

Communication between the Board and employees at all levels is highly valued and this is achieved through regular staff presentations given by the Chief Executive and regular email communication.

The Company believes in equal opportunities for all employees and prospective employees irrespective of nationality, ethnicity, religion, age, gender, sexuality or disability. The Company has zero tolerance of discrimination in any form.

## GOVERNANCE
## REPORT OF THE BOARD OF DIRECTORS CONTINUED

---

### Political donations

During the year the Company made no political donations (2016: £nil).

### Corporate Governance

The Corporate Governance Report is provided on pages 17 to 20 and includes reports from the Board's Audit, Nominations and Remuneration Committees.

### Notice of Annual General Meeting

The notice of the Company's AGM was sent to shareholders on 20 November 2017.

### Disclosure of information to the auditors

Each of the persons who is a Director at the date of approval of this report confirms that:

1. So far as the Director is aware, there is no relevant audit information of which the Company's auditor is unaware.

2. The Director has taken all steps that he ought to have taken as a Director in order to make him aware of any relevant audit information and to ensure that the Company's auditor is aware of that information.

This confirmation is given and should be interpreted in accordance with the provisions of section 418 of the Companies Act 2006.

### Directors' and Officers' liability insurance

The Company maintains appropriate insurance to cover Directors' and Officers' liability for itself and its subsidiaries. At the date upon which this report was approved and for the year ended 30 June 2017, the Company provided an indemnity in respect of all of the Company's Directors in respect of all losses arising out of or in connection with the execution of their powers, duties and responsibilities as Directors to the extent permitted by the Companies Act 2006 and the Company's Articles of Association.

**Patrick Willcocks**
Company Secretary

# GOVERNANCE
## STATEMENT OF DIRECTORS' RESPONSIBILITIES IN RESPECT OF THE ANNUAL REPORT AND THE FINANCIAL STATEMENTS

The directors are responsible for preparing the Annual Report and the Group and parent Company financial statements in accordance with applicable law and regulations.

Company law requires the directors to prepare Group and parent Company financial statements for each financial year. As required by the AIM Rules of the London Stock Exchange, they are required to prepare the Group financial statements in accordance with International Financial Reporting Standards as adopted by the EU (IFRSs as adopted by the EU) and applicable law and have elected to prepare the parent Company financial statements on the same basis.

Under company law, the directors must not approve the financial statements unless they are satisfied that they give a true and fair view of the state of affairs of the Group and parent Company and of their profit or loss for that period. In preparing each of the Group and parent Company financial statements, the directors are required to:

- select suitable accounting policies and then apply them consistently;
- make judgements and estimates that are reasonable, relevant and reliable;
- state whether they have been prepared in accordance with IFRSs as adopted by the EU;
- assess the Group and parent Company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern; and
- use the going concern basis of accounting unless they either intend to liquidate the Group or the parent Company or to cease operations, or have no realistic alternative but to do so.

The directors are responsible for keeping adequate accounting records that are sufficient to show and explain the parent Company's transactions and disclose with reasonable accuracy at any time the financial position of the parent Company and enable them to ensure that its financial statements comply with the Companies Act 2006. They are responsible for such internal control as they determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error, and have general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the Group and to prevent and detect fraud and other irregularities.

Under applicable law and regulations, the directors are also responsible for preparing a Strategic Report and a Directors' Report that complies with that law and those regulations.

The directors are responsible for the maintenance and integrity of the corporate and financial information included on the company's website. Legislation in the UK governing the preparation and dissemination of financial statements may differ from legislation in other jurisdictions.

**Alan Harper**
Chief Executive

# INDEPENDENT AUDITOR'S REPORT
# TO THE MEMBERS OF AVANTI COMMUNICATIONS GROUP PLC

## 1. Our opinion is unmodified

We have audited the financial statements of Avanti Communications Group plc ("the Company") for the year ended 30 June 2017 which comprise the Consolidated Income Statement, Consolidated Statement of Comprehensive Income, Consolidated Statement of Financial Position, consolidated Statement of Cash Flows and Consolidated Statement of Changes in Equity and the related notes, including the accounting policies in note 2.

In our opinion:

- the financial statements give a true and fair view of the state of the Group's and of the parent Company's affairs as at 30 June 2017 and of the Group's loss for the year then ended;
- the group financial statements have been properly prepared in accordance with International Financial Reporting Standards as adopted by the European Union (IFRSs as adopted by the EU);
- the parent Company financial statements have been properly prepared in accordance with IFRSs as adopted by the EU and as applied in accordance with the provisions of the Companies Act 2006; and
- the financial statements have been prepared in accordance with the requirements of the Companies Act 2006.

### Basis for opinion

We conducted our audit in accordance with International Standards on Auditing (UK) ("ISAs (UK)") and applicable law. Our responsibilities are described below. We have fulfilled our ethical responsibilities under, and are independent of the Group in accordance with, UK ethical requirements including the FRC Ethical Standard as applied to listed entities. We believe that the audit evidence we have obtained is a sufficient and appropriate basis for our opinion.

## 2. Material uncertainty related to going concern

We draw attention to note 2 to the financial statements which indicates that the Group's and the parent company's ability to continue as a going concern is dependent upon the successful completion of the financial restructuring announced on 13 December 2017 (that is itself conditional upon the Consent Solicitation and Scheme of Arrangement process, which requires approval of existing debt and equity holders), the negotiation of an additional fund raise of $30m following the completion of the aforementioned restructuring, and the substantial achievement of cash flow forecasts. These events and conditions, along with the other matters explained in note 2 to the financial statements, constitute a material uncertainty that may cast significant doubt on the Group's and the parent company's ability to continue as a going concern. Our opinion is not modified in respect of this matter.

### The risk – Disclosure quality

Clear and full disclosure of the of the facts and the directors' rationale for the use of the going concern basis of preparation, including that there is a related material uncertainty, is a key financial statement disclosure. Auditing standards require such matters to be reported as a key audit matter.

### Our response

Our procedures included:

- Assessing transparency: Assessing the going concern disclosure for clarity, including that there is disclosure of a material uncertainty by:
  - reviewing refinancing documentation including level of initial consenting investors to corroborate financing situation; and
  - evaluating assumptions used in forecast models, in particular those relating to forecast revenue and cash collection; and
  - evaluating track record of assumptions, including forecast revenue, versus actual results; and
  - assessing reasonably possible downside scenarios that would result in the cash flow falling such that the headroom against available facilities reduced to nil.

## 3. Key audit matters: our assessment of risks of material misstatement

Key audit matters are those matters that, in our professional judgment, were of most significance in the audit of the financial statements and include the most significant assessed risks of material misstatement (whether or not due to fraud) identified by us, including those which had the greatest effect on: the overall audit strategy; the allocation of resources in the audit; and directing the efforts of the engagement team. Going concern is a significant key audit matter and is described in section 2 above. We summarise below the other key audit matters in arriving at our audit opinion above, together with our key audit procedures to address the matters. All of the key audit matters were addressed in the context of our audit of the financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters. In arriving at our audit opinion above, the key audit matters, in decreasing order of audit significance, were as follows:

### Group: Recoverability of trade receivables and accrued income

Net trade receivables $22.8 million; 2016: $5.5 million
Accrued income $13.7 million; 2016: $17.2 million

Refer to page 21 (Audit Committee Report), page 49 (accounting policy) and page 64 - 65 (financial disclosures).

### The risk - Subjective estimate

There are significant trade receivables and accrued income balances with customers operating in the African and Middle East regions.

These businesses are often operating in immature emerging markets for satellite communication services and may have cashflow difficulties due to the market and geopolitical environment in which they operate.

### Our response

Our procedures included:

- Historical comparisons: evaluating the directors' assumptions behind the provision against trade receivables with reference to historical track record with the same or similar customers and our own knowledge of recent bad debts and cash collection; and
- Tests of details: assessing bad debt provisions against aged receivables and accrued income balances analysis and cash receipts subsequent to year end; and
- Assessing transparency: assessing the adequacy of the group's disclosures about the level of provision.

## INDEPENDENT AUDITOR'S REPORT
## TO THE MEMBERS OF AVANTI COMMUNICATIONS GROUP PLC
CONTINUED

**Group: Impairment of space assets (HYLAS 1 and HYLAS 2)**

Carrying value of HYLAS 1 $58.1 million; 2016: $130.4 million and impairment $53.3 million; 2016: nil

Carrying value of HYLAS 2 $234.8 million; 2016: $310.9 million and impairment $60.8 million; 2016: nil

Refer to page 21 (Audit Committee Report), page 47 - 48 (accounting policy) and page 59 - 60 (financial disclosures).

**The risk - Forecast-based valuation**

Given the lack of track record and ongoing challenges around fleet utilisation, and falling market prices for Ka band services, there is a risk of impairment of certain space assets (HYLAS 1 and HYLAS 2 assets).

The estimated recoverable amount is subjective due to the inherent uncertainty involved in forecasting and discounting future cash flows.

**Our response**

Our procedures included:

- Our experience: evaluating assumptions used, in particular those relating to the Group's forecast revenue growth specific to each asset; and
- Historical comparisons: evaluating track record of assumptions used, such as forecast revenue, versus actual results; and
- Benchmarking assumptions: comparing the group's assumptions to externally derived data in relation to key inputs such as cost inflation and discount rates; and
- Sensitivity analysis: considering reasonably possible changes in assumptions including forecast revenue and discount rate including, and their impact on the outcome of the impairment assessment; and
- Assessing transparency: assessing whether the group's disclosures about the sensitivity of the outcome of the impairment assessment to changes in key assumptions reflected the risks inherent in the carrying value of the space assets.

**Group: Revenue recognition on multi-element arrangements**

Total revenue (excluding Government services contracts) $39.8 million; 2016: $66.1 million

Refer to page 21 (Audit Committee Report), page 44 (accounting policy) and page 50 and 52 (financial disclosures).

**The risk - Subjective estimate**

The group enters into multi element contracts. There is judgement involved in allocating the total consideration under the contract to each element of the contract using their relative fair values. That judgement is particularly important when some elements have been delivered and revenue recognised at the balance sheet date and other elements will only be delivered in future periods.

**Our response**

Our procedures included:

- Our expertise: Inspecting contracts contributing the highest levels of revenue and critically assessing the fair value of delivered or

undelivered elements, such as future bandwidth or free of charge equipment; and
- Tests of details: Assessing the appropriateness of the Directors' judgements in determining the fair value of each element of the selected contracts by reference to standalone selling prices, or bandwidth capacity renewal rates; and
- Assessing transparency: Assessing the adequacy of the Group's disclosures in respect of the judgements and estimates made in accounting for multi element revenue arrangements.

**Group: Revenue recognition on Government services contracts**

$16.8 million; 2016: $16.7 million
Total revenue is $56.6 million; 2016: $82.8 million

Refer to page 21 (Audit Committee Report), page 44 (accounting policy) and page 50 and 52 (financial disclosures).

**The risk - Subjective estimate**

The group enters into fixed price contracts with customers. There is judgement involved in determining the subjective inputs into the stage of completion calculation.

**Our response**

Our procedures included:

- Historical comparison: evaluating the track record of assumptions such as forecast costs to complete versus actual performance; and
- Personnel interviews: corroborating judgments on forecast costs to complete through discussions with management including project level staff; and
- Test of details: corroborating percentage of completion to customer acceptance by reference to payment received; and
- Assessing transparency: assessing the adequacy of the Group's disclosures in respect of assessing stage of completion as a significant judgement.

**Group: Recoverability of deferred tax assets**

$66.0 million; 2016: $28.0 million

Refer to page 21 (Audit Committee Report), page 47 (accounting policy) and page 66 (financial disclosures).

**The risk - Forecast-based valuation**

The group has significant deferred tax assets. There is inherent uncertainty involved in forecasting future taxable profits, which determines the extent to which deferred tax assets are or are not recognised.

**Our response**

Our procedures included:

- Our experience: evaluating assumptions used, in particular those relating to forecast revenue and useful economic life of the Group's assets; and
- Historical comparisons: evaluating track record of assumptions, such as forecast revenue versus actual results; and

## INDEPENDENT AUDITOR'S REPORT
## TO THE MEMBERS OF AVANTI COMMUNICATIONS GROUP PLC
### CONTINUED

---

- Sensitivity analysis: performing sensitivity analysis on the forecast revenue assumption noted above, paying particular attention to reasonably possible changes in assumptions that could have a material impact on the deferred tax asset recorded ; and
- Our tax expertise: use of our own tax specialists to assist us in assessing the recoverability of the tax losses against the forecast future taxable profits, taking into account the group's tax position, the timing of forecast taxable profits, and our knowledge and experience of the application of relevant tax legislation; and
- Assessing transparency: assessing the adequacy of the group's disclosures in respect of the nature of the evidence to support the deferred tax asset recognised.

### Parent: Recoverability of investments in and receivables due from subsidiaries

Recoverability of investments in subsidiaries $148.7 million; 2016: $148.7 million

Receivables due from subsidiaries $747.1 million; 2016: $998.0 million; Impairment $400 million; 2016: nil

Refer to page 21 (Audit Committee Report), page 48 - 49 (accounting policy) and page 62 and 85 (financial disclosures).

### The risk - Forecast-based valuation

The carrying amount of the parent company's investments in and receivables due from subsidiaries is significant and at risk of not being recoverable due to the ongoing challenges around fleet utilisation, and falling market prices for Ka band services.

The estimated recoverable amount of these balances is subjective due to the inherent uncertainty involved in forecasting and discounting future cash flows.

The recoverable amount of these investments is related to and determined in a similar way to the recoverable amount of the space assets, being discounted cash flows generated by the asset of the subsidiary.

### Our response

Our procedures included:

- Our experience: evaluating assumptions used, in particular those relating to forecast revenue growth specific to each asset; and
- Historical comparisons: evaluating track record of assumptions, such as forecast revenue versus actual results; and
- Benchmarking assumptions: comparing the group's assumptions to externally derived data in relation to key inputs such as cost inflation and discount rates; and
- Sensitivity analysis: considering reasonably possible changes in assumptions including forecast revenue and discount rate including, and their impact on the outcome of the impairment assessment; and
- Assessing transparency: assessing whether the group's disclosures about the sensitivity of the outcome of the impairment assessment to changes in key assumptions reflected the risks inherent in the valuation of the parent's investment in and receivables from subsidiaries.

### 4. Our application of materiality and an overview of the scope of our audit

Materiality for the group financial statements as a whole was set at $8m, determined with reference to a benchmark of total assets, of which it represents 1%.

Materiality for the parent company financial statements as a whole was set at $3m, determined with reference to a benchmark of company total assets, of which it represents 2%.

We agreed to report to the Audit Committee any corrected or uncorrected identified misstatements exceeding $0.4m, in addition to other identified misstatements that warranted reporting on qualitative grounds.

Of the group's 16 reporting components, we subjected six to full scope audits for group purposes.

The components within the scope of our work accounted for 95% of total group revenue, 94% of group loss before tax and 97% of total group assets.

The remaining 5% of total group revenue, 6% of group loss before tax and 3% of total group assets is represented by 10 reporting components, none of which individually represented more than 4% of any of total group revenue, group loss before tax or total group assets. For these residual components, we performed analysis at an aggregated group level to re-examine our assessment that there were no significant risks of material misstatement within these.

The Group team instructed component auditors as to the significant areas to be covered, including the relevant risks detailed above and the information to be reported back. The Group team approved the component materialities, which ranged from $0.3m to $6.7m, having regard to the mix of size and risk profile of the Group across the components. The work on all components was performed by the Group team, including the audit of the parent company.

### 5. We have nothing to report on the other information in the Annual Report

The directors are responsible for the other information presented in the Annual Report together with the financial statements. Our opinion on the financial statements does not cover the other information and, accordingly, we do not express an audit opinion or, except as explicitly stated below, any form of assurance conclusion thereon.

Our responsibility is to read the other information and, in doing so, consider whether, based on our financial statements audit work, the information therein is materially misstated or inconsistent with the financial statements or our audit knowledge. Based solely on that work we have not identified material misstatements in the other information.

### Strategic report and directors' report

Based solely on our work on the other information:

- we have not identified material misstatements in the strategic report and the directors' report;

## INDEPENDENT AUDITOR'S REPORT
## TO THE MEMBERS OF AVANTI COMMUNICATIONS GROUP PLC
CONTINUED

- in our opinion the information given in those reports for the financial year is consistent with the financial statements; and
- in our opinion those reports have been prepared in accordance with the Companies Act 2006.

### 6. We have nothing to report on the other matters on which we are required to report by exception
Under the Companies Act 2006, we are required to report to you if, in our opinion:

- adequate accounting records have not been kept by the parent Company, or returns adequate for our audit have not been received from branches not visited by us; or
- the parent Company financial statements are not in agreement with the accounting records and returns; or
- certain disclosures of directors' remuneration specified by law are not made; or
- we have not received all the information and explanations we require for our audit.

We have nothing to report in these respects.

### 7. Respective responsibilities
*Directors' responsibilities*
As explained more fully in their statement set out on page 30, the directors are responsible for: the preparation of the financial statements including being satisfied that they give a true and fair view; such internal control as they determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error; assessing the Group and parent Company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern; and using the going concern basis of accounting unless they either intend to liquidate the Group or the parent Company or to cease operations, or have no realistic alternative but to do so.

*Auditor's responsibilities*
Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue our opinion in an auditor's report. Reasonable assurance is a high level of assurance, but does not guarantee that an audit conducted in accordance with ISAs (UK) will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of the financial statements.

A fuller description of our responsibilities is provided on the FRC's website at www.frc.org.uk/auditorsresponsibilities.

### 8. The purpose of our audit work and to whom we owe our responsibilities
This report is made solely to the Company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006. Our audit work has been undertaken so that we might state to the Company's members those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's members, as a body, for our audit work, for this report, or for the opinions we have formed.

**Tudor Aw**
**(Senior Statutory Auditor)**
**for and on behalf of KPMG LLP, Statutory Auditor**
Chartered Accountants
15 Canada Square
London
E14 5GL
27 December 2017

# FINANCIAL STATEMENTS
# CONSOLIDATED INCOME STATEMENT
Year ended 30 June 2017

| | Notes | Year ended 30 June 2017 $'m | Year ended 30 June 2016 $'m |
|---|---|---|---|
| **Revenue** | | | |
| Capacity, services and equipment | 4 | **56.6** | 74.5 |
| Sale of exclusivity rights* | 4 | **–** | 8.3 |
| **Total Revenue** | | **56.6** | 82.8 |
| Cost of sales - capacity, services and equipment (excluding satellite depreciation) | | **(59.4)** | (40.9) |
| Staff costs | 7 | **(19.7)** | (19.8) |
| Other operating expenses | 5 | **(12.0)** | (16.3) |
| Other operating income | 8 | **2.0** | 1.5 |
| **EBITDA**** | | **(32.5)** | 7.3 |
| Depreciation and amortisation | 5 | **(47.2)** | (47.3) |
| Impairment of satellites in operation | 5 | **(114.1)** | – |
| Impairment of goodwill | 5 | **(9.9)** | – |
| Operating loss | | **(203.7)** | (40.0) |
| Finance income | 9 | **–** | 13.9 |
| Finance expense | 9 | **(93.2)** | (40.9) |
| Exceptional gain on substantial modification of debt | 9 | **219.2** | – |
| Loss before taxation | | **(77.7)** | (67.0) |
| Income tax | 10 | **12.0** | (2.2) |
| Loss for the year | | **(65.7)** | (69.2) |
| | | | |
| Loss attributable to: | | | |
| Equity holders of the parent | | **(65.2)** | (68.7) |
| Non-controlling interests | | **(0.5)** | (0.5) |
| Basic loss per share (cents) | 11 | **(44.74c)** | (49.27c) |
| Diluted loss per share (cents) | 11 | **(44.74c)** | (49.27c) |

\* There were no directly attributable costs related to the sale of exclusivity rights.
\*\* Earnings before interest, tax, depreciation, amortisation, and impairment of non-current assets.
The Notes on pages 40 to 86 are an integral part of these consolidated financial statements.

## CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME
Year ended 30 June 2017

| | Year ended 30 June 2017 $'m | Year ended 30 June 2016 $'m |
|---|---|---|
| Loss for the year | **(65.7)** | (69.2) |
| Other comprehensive income | | |
| Exchange differences on translation of foreign operations and investments that may be recycled to the Income Statement: | | |
| Foreign currency translation differences on foreign operations | **3.7** | 13.8 |
| Monetary items that form part of the net investment in a foreign operation | **(9.7)** | (58.9) |
| Total comprehensive loss for the year | **(71.7)** | (114.3) |
| **Attributable to:** | | |
| Equity holders of the parent | **(71.2)** | (113.8) |
| Non-controlling interests | **(0.5)** | (0.5) |

The Notes on pages 40 to 86 are an integral part of these consolidated financial statements..

## FINANCIAL STATEMENTS
## CONSOLIDATED STATEMENT OF FINANCIAL POSITION
As at 30 June 2017

| | Notes | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property, plant and equipment | 13 | **671.8** | 775.1 |
| Intangible assets | 14 | **9.3** | 10.8 |
| Deferred tax assets | 20 | **30.8** | 18.6 |
| **Total non-current assets** | | **711.9** | 804.5 |
| **Current Assets** | | | |
| Inventories | 18 | **2.6** | 1.9 |
| Trade and other receivables | 19 | **60.6** | 79.5 |
| Cash and cash equivalents | 21 | **32.7** | 56.4 |
| **Total current assets** | | **95.9** | 137.8 |
| **Total assets** | | **807.8** | 942.3 |
| | | | |
| **LIABILITIES AND EQUITY** | | | |
| **Current liabilities** | | | |
| Trade and other payables | 22 | **70.3** | 82.8 |
| Loans and other borrowings | 23 | **2.1** | 3.3 |
| **Total current liabilities** | | **72.4** | 86.1 |
| **Non-current liabilities** | | | |
| Trade and other payables | 22 | **9.1** | 12.7 |
| Loans and other borrowings | 23 | **592.6** | 642.0 |
| **Total non-current liabilities** | | **601.7** | 654.7 |
| **Total liabilities** | | **674.1** | 740.8 |
| **Equity** | | | |
| Share capital | 25 | **2.7** | 2.5 |
| EBT shares | 25 | **(0.1)** | (0.1) |
| Share premium | 25 | **519.4** | 515.9 |
| Retained earnings | | **(317.7)** | (252.7) |
| Foreign currency translation reserve | | **(67.5)** | (61.5) |
| **Total parent shareholders' equity** | | **136.8** | 204.1 |
| Non-controlling interests | | **(3.1)** | (2.6) |
| **Total equity** | | **133.7** | 201.5 |
| **Total liabilities and equity** | | **807.8** | 942.3 |

The financial statements of company number 6133927 on pages 35 to 86 were approved by the Board of Directors on 27 December 2017 and signed on its behalf by:

**Nigel Fox**
Group Finance Director

# FINANCIAL STATEMENTS
## COMPANY STATEMENT OF FINANCIAL POSITION
As at 30 June 2017

| | Notes | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Investments | 16 | **148.7** | 148.7 |
| Loan receivable | 19 | **663.0** | 642.5 |
| Deferred tax assets | 20 | **–** | 0.5 |
| **Total non-current assets** | | **811.7** | 791.7 |
| **Current Assets** | | | |
| Trade and other receivables | 19 | **164.1** | 390.7 |
| Cash and cash equivalents | 21 | **0.9** | – |
| **Total current assets** | | **165.0** | 390.7 |
| **Total assets** | | **976.7** | 1,182.4 |
| **LIABILITIES AND EQUITY** | | | |
| Current liabilities | | | |
| Trade and other payables | 22 | **110.9** | 46.2 |
| Loans and other borrowings | 23 | **1.4** | 2.8 |
| Total current liabilities | | **112.3** | 49.0 |
| **Non-current liabilities** | | | |
| Loans and other borrowings | 23 | **582.9** | 632.2 |
| Deferred tax liabilities | 20 | **35.2** | – |
| **Total non-current liabilities** | | **618.1** | 632.2 |
| **Total liabilities** | | **730.4** | 681.2 |
| **Equity** | | | |
| Share capital | 25 | **2.7** | 2.5 |
| EBT shares | 25 | **(0.1)** | (0.1) |
| Share premium | 25 | **519.4** | 515.9 |
| Retained earnings | | **(259.8)** | (1.2) |
| Foreign currency translation reserve | | **(15.9)** | (15.9) |
| **Total shareholders' equity** | | **246.3** | 501.2 |
| **Total liabilities and equity** | | **976.7** | 1,182.4 |

The financial statements of company number 6133927 on pages 35 to 86 were approved by the Board of Directors on 27 December 2017 and signed on its behalf by

**Nigel Fox**
Group Finance Director

## FINANCIAL STATEMENTS
## CONSOLIDATED AND COMPANY STATEMENT OF CASH FLOWS
Year ended 30 June 2017

|  | Notes | Group Year ended 30 June 2017 $'m | Group Year ended 30 June 2016 $'m | Company Year ended 30 June 2017 $'m | Company Year ended 30 June 2016 $'m |
|---|---|---|---|---|---|
| **Cash flow from operating activities** |  |  |  |  |  |
| **Cash absorbed by operations** | 31 | **(4.1)** | (31.8) | **(48.7)** | (121.1) |
| Interest paid |  | **(3.5)** | (60.5) | **(3.4)** | (60.5) |
| Interest received |  | **–** | – | **–** | 63.0 |
| **Net cash absorbed by operating activities** |  | **(7.6)** | (92.3) | **(52.1)** | (118.6) |
| **Cash flows from investing activities** |  |  |  |  |  |
| Payments for other financial assets and investments |  | **–** | – | **–** | (5.0) |
| Payments for property, plant and equipment |  | **(66.5)** | (95.7) | **–** | – |
| Proceeds from sale and leaseback |  | **–** | 2.2 | **–** | 2.2 |
| **Net cash used in investing activities** |  | **(66.5)** | (93.5) | **–** | (2.8) |
| **Cash flows from financing activities** |  |  |  |  |  |
| Net proceeds from bond issue |  | **78.7** | 114.8 | **78.7** | 114.8 |
| Net proceeds from share issue |  | **0.2** | 10.7 | **0.2** | 10.7 |
| Payment of finance lease liabilities |  | **(3.8)** | (4.1) | **(2.7)** | (4.1) |
| Debt restructuring costs |  | **(23.2)** | – | **(23.2)** | – |
| **Net cash received from financing activities** |  | **51.9** | 121.4 | **53.0** | 121.4 |
| Effects of exchange rate on the balances of cash and cash equivalents |  | **(1.5)** | (1.4) | **–** | – |
| **Net decrease in cash and cash equivalents** |  | **(23.7)** | (65.8) | **0.9** | – |
| Cash and cash equivalents at the beginning of the financial year |  | 56.4 | 122.2 | **–** | – |
| **Cash and cash equivalents at the end of the financial year** | 21 | **32.7** | 56.4 | **0.9** | – |

The Notes on pages 40 to 86 are an integral part of these consolidated financial statements.

## FINANCIAL STATEMENTS
## CONSOLIDATED AND COMPANY STATEMENT OF CHANGES IN EQUITY

Year ended 30 June 2017

**Consolidated**

| | Notes | Share capital $'m | Employee benefit trust (EBT) $'m | Share premium $'m | Retained earnings $'m | Foreign currency translation reserve $'m | Non-controlling interests $'m | Total equity $'m |
|---|---|---|---|---|---|---|---|---|
| **2016** | | | | | | | | |
| At 1 July 2015 | | 2.4 | (0.1) | 505.3 | (184.4) | (16.4) | (2.1) | 304.7 |
| Loss for the year | | – | – | – | (68.7) | – | (0.5) | (69.2) |
| Other comprehensive income | | – | – | – | – | (45.1) | – | (45.1) |
| Issue of share capital | | 0.1 | – | 10.6 | – | – | – | 10.7 |
| Share based payments | 26 | – | – | – | 0.4 | – | – | 0.4 |
| At 30 June 2016 | | 2.5 | (0.1) | 515.9 | (252.7) | (61.5) | (2.6) | 201.5 |
| **2017** | | | | | | | | |
| At 1 July 2016 | | **2.5** | **(0.1)** | **515.9** | **(252.7)** | **(61.5)** | **(2.6)** | **201.5** |
| Loss for the year | | – | – | – | (65.2) | – | (0.5) | (65.7) |
| Other comprehensive income | | – | – | – | – | (6.0) | – | (6.0) |
| Issue of share capital | | 0.2 | – | 3.5 | – | – | – | 3.7 |
| Share based payments | 26 | – | – | – | 0.2 | – | – | 0.2 |
| **At 30 June 2017** | | **2.7** | **(0.1)** | **519.4** | **(317.7)** | **(67.5)** | **(3.1)** | **133.7** |

**Company**

| | Notes | Share capital $'m | Employee benefit trust (EBT) $'m | Share premium $'m | Retained earnings $'m | Foreign currency translation reserve $'m | Total equity $'m |
|---|---|---|---|---|---|---|---|
| **2016** | | | | | | | |
| At 1 July 2015 | | 2.4 | (0.1) | 505.3 | (3.4) | (15.9) | 488.3 |
| Profit/ (loss) for the year | | – | – | – | 1.7 | – | 1.7 |
| Issue of share capital | | 0.1 | – | 10.6 | – | – | 10.7 |
| Share based payments | 26 | – | – | – | 0.5 | – | 0.5 |
| At 30 June 2016 | | 2.5 | (0.1) | 515.9 | (1.2) | (15.9) | 501.2 |
| **2017** | | | | | | | |
| At 1 July 2016 | | **2.5** | **(0.1)** | **515.9** | **(1.2)** | **(15.9)** | **501.2** |
| Profit/ (loss) for the year | | – | – | – | (258.8) | – | (258.8) |
| Issue of share capital | | 0.2 | – | 3.5 | – | – | 3.7 |
| Share based payments | 26 | – | – | – | 0.2 | – | 0.2 |
| **At 30 June 2017** | | **2.7** | **(0.1)** | **519.4** | **(259.8)** | **(15.9)** | **246.3** |

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS

---

### 1. General information

The consolidated financial statements of Avanti Communications Group plc (the 'Group') for the year ended 30 June 2017 were authorised for issue in accordance with a resolution of the Directors on 27 December 2017.

Avanti Communications Group plc (the 'Company' or together with its subsidiaries, the 'Group') is a company incorporated in the United Kingdom and domiciled in England and Wales. The address of its registered office is Cobham House, 20 Black Friars Lane, London, EC4V 6EB. The nature of the Group's operations and its principal activities are set out in note 2.

The Company is a public limited company, which is listed on the Alternative Investment Market ('AIM') and trades under the ticker 'AVN.L' on the London Stock Exchange.

### 2. Principal accounting policies

The principal accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated.

**Basis of preparation**

The Group financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the EU ('IFRS'), International Financial Reporting Interpretations Committee Interpretations, and the Companies Act 2006 applicable to companies preparing their accounts under IFRS. The financial statements have been prepared under the historical cost convention except for certain financial instruments that have been measured at fair value, as described later in these accounting policies.

The Company has taken the exemption under section 408 of the Companies Act 2006 to not present the parent Company Income Statement or Statement of Comprehensive Income.

**Going concern**

The financial statements have been prepared on a going concern basis. In reaching their assessment, the Directors have considered a period extending at least 12 months from the date of approval of these financial statements. This assessment has focused on the status of the financial restructuring announced by the Group on 13 December as well as those factors considered on an annual basis such as forecast trading performance of the Group for the foreseeable future, key assumptions, sensitivities and available cash balances and facilities. As at the date of approval of these financial statements, the successful completion of the financial restructuring is conditional upon the Consent Solicitation and Scheme of Arrangement processes described further below and while the Directors believe that these processes will be completed successfully, there remains a material uncertainty until the remaining consents and approvals have been received.

As described in Note 23, the Group has the following debt instruments, excluding finance leases, as at the date of approval of the financial statements:

| Instrument | Nominal Value | Lien | Due |
|---|---|---|---|
| Super Senior Facility | $118.0m* | 1st lien | 21 June 2020 |
| PIK Toggle Notes | $323.0m | 2nd lien | 1 October 2021 |
| Amended Existing Notes | $557.0m | 3rd lien | 1 October 2022 |

*$118m was drawn down from the super senior facility post year-end.

The financial restructuring announced on 13 December comprised the following components which are described in further detail below:

1. Debt for equity Swap - Exchange of all of the Amended Existing Notes for ordinary share capital of the Company
2. Amendment to the economic terms of the PIK Toggle Notes

The restructuring, which is described in Note 32, culminated on 13 December 2017 when a Lock-Up & Restructuring Agreement was signed by the Company with a group of its largest holders of PIK Toggle Notes, Amended Existing Notes and ordinary share capital ('Initial Consenting Investors'). The Company and the Initial Consenting Investors, representing approximately:

- 62% of the aggregate principal amount of the existing PIK Toggle Notes
- 55% of the aggregate principal amount of the existing Amended Existing Notes and
- 34% of the ordinary share capital

The Group entered into the Restructuring Agreement on 13 December 2017 pursuant to which the Initial Consenting Investors contractually agreed to:

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

----

### 2. Principal Accounting Policies continued
**Going concern** continued

- approve the Amended Existing Notes restructuring by voting in favour of the Scheme, tendering their Amended Existing Notes in the exchange offer and voting in favour of the related shareholder resolutions;
- approve the PIK Toggle Notes restructuring by delivering Consents in connection with the Solicitation, or approvals in connect with the scheme of arrangement.

### 1. Repayment of the Amended Existing Notes

The exchange of all of the Amended Existing Notes for 92.5% of Avanti's enlarged outstanding share capital. This debt for equity swap will involve the settlement of the 3rd lien debt with a nominal value of $557.0m and accrued interest of approximately $22.4m through the issue of approximately 2.0 billion ordinary shares of 1p each in the Company. The holders of the current Amended Existing Notes will hold 92.5% of the Company's enlarged share capital following completion of this restructuring.

The debt for equity swap approval will be sought under an English law scheme of arrangement (the 'Scheme') which requires approval from 75% of the holders of the Amended Existing Notes.

The Scheme of Arrangement will commence in early January 2018 and the process will last for approximately 6-8 weeks. This process will result in one of the two following outcomes:

1. Receipt of consents from note holders equating to at least 75% of the Existing Notes by number and value. This will result in the terms of the restructuring being approved and applied to 100% of the Amended Existing Notes. The Initial Consenting Investors are contractually committed to providing their consents and equate to 55% of the Existing Notes.

2. Consents will be received amounting to less than 75% of the Existing Noteholders. This is considered unlikely given that the Initial Consenting Investors are contractually committed to providing their consents and equate to 55% of the Existing Notes. In this scenario, the restructuring would fail and the Group would need to successfully complete an alternative restructuring or raise new money in order to have sufficient resources to continue in operational existence for the foreseeable future.

### 2. Amendment to economic terms of the 2021 Notes

The amendment to the terms of the 2nd lien as follows:

- extend the final maturity date from October 1, 2021 to October 1, 2022;
- change the interest rate payable on the 2021 Notes from 10% Cash / 15% PIK to 9% Cash / 9% PIK for all remaining interest periods commencing October 1, 2017;
- eliminate the step up in interest payable on the 2021 Notes if the relevant minimum consolidated LTM EBITDA threshold is not met;
- eliminate the Maintenance of Minimum Consolidated LTM EBITDA covenant contained in the indenture governing the 2021 Notes;
- require interest payments on the 2021 Notes for all remaining interest periods commencing October 1, 2017 (but excluding the final interest payment) to be made in cash so long as Avanti has sufficient cash, pro forma, to satisfy the applicable interest coupon, the next cash interest payment due on the Super Senior Debt and any necessary working capital requirements (i.e. 'Pay If You Can' Interest).

The amendment to the economic terms of the PIK Toggle Notes will be sought under a Consent Solicitation process. Under the terms of the PIK Toggle Notes Indenture, consent to the changes is required from holders of 90% of the PIK Toggle Notes. Should approval not be received from 90% or more of the PIK Toggle Note holders, an English law scheme of arrangement will be prepared which requires approval from 75% of the holders of the PIK Toggle Notes.

The Consent Solicitation will commence in early January 2018 and will last for a maximum of 10 business days. This process will result in one of the following outcomes:

1. Receipt of consents from note holders equating to at least 90% of the 2021 Notes by number and value. This will result in the terms of the restructuring being approved and applied to 100% of the 2021 Notes. The Initial Consenting Investors are contractually committed to providing their consents and equate to 62% of the Existing Notes.
2. Receipt of consents will be received amounting to less than 90% of the Existing Noteholders. In this scenario, an English law scheme of arrangement would commence, seeking approval via an alternative mechanism for the amendment to the economic terms of the PIK Toggle Notes. The Scheme of Arrangement would run for approximately 6-8 weeks and would result in one of the two following outcomes:
3. Receipt of consents from note holders equating to at least 75% of the Existing Notes by number and value. This will result in the terms of the restructuring being approved and applied to 100% of the Amended Existing Notes. The Initial Consenting Investors are contractually committed to providing their consents and equate to 62% of the Existing Notes.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

———

### 2. Principal Accounting Policies continued
### 2. Amendment to economic terms of the 2021 Notes continued

4. Consents will be received amounting to less than 75% of the Existing Noteholders. This is considered unlikely given that the Initial Consenting Investors are contractually committed to providing their consents and equate to 62% of the Existing Notes. In this scenario, the restructuring would fail and the Group would need to successfully complete an alternative restructuring or raise new money in order to have sufficient resources to continue in operational existence for the foreseeable future.

In addition to the consents required from the holders of the Amended Existing Notes to have their notes converted into ordinary share capital, the holders of the Company's ordinary share capital pre-reorganisation also need to approve three shareholder resolutions in order for the debt for equity swap to be successfully completed:

1. An ordinary resolution to approve the issue of approximately 2.0 billion new ordinary shares of 1p each in the Company. This resolution requires greater than 50% of votes cast to be passed.
2. A special resolution to disapply pre-emption rights with respect to the issue of these shares. This resolution requires greater than 75% of votes cast to be passed.
3. A resolution for the waiver of rights of independent shareholders to receive a mandatory takeover offer from one of the Initial Consenting Investors who will hold in excess of 30% of the ordinary share capital of the Company following the proposed restructuring. This resolution requires greater than 50% of votes cast by independent shareholders to be passed.

Should any of these shareholder resolutions not be passed, the restructuring of the Amended Existing Notes would fail and the Group would need to successfully complete an alternative restructuring or raise new money in order to have sufficient resources to continue in operational existence for the foreseeable future. The Initial Consenting Investors hold 34% of the ordinary share capital in the Company and are committed to voting in favour of these resolutions.

#### Additional fund raise

Following and contingent upon completion of the restructuring, an additional fund raising will be completed in the form of equity, new PIK Toggle Notes or a combination of both instruments. The minimum value is likely to be $30.0m but may be adjusted dependent on demand. The directors of the Company have received assurances from members of the Initial Consenting Investors that they will participate in the additional fund raising. Should this additional fund raising not be completed successfully, the Group would need to raise cash through another route such as an alternative fund raising or asset sale in order to have sufficient resources to continue in operational existence for the foreseeable future.

Following the signing of the Lock-Up & Restructuring Agreement, which is the platform for a successful financial restructuring, and in order to prepare and approve these Financial Statements, the Directors have assessed forecast future cash flows for the foreseeable future, being a period of at least a year following the approval of the accounts. In assessing the Group's ability to meet its obligation as they fall due, management prepared cash flow forecasts based on the business plan for a period of 12 months. Management considered various downside scenarios to test the Group's resilience against operational risk including:

- Slower build in fleet/satellite utilisation
- Planned revenue from exploitation of spectrum rights and satellite interim missions doesn't materialise

However, were those downside scenarios to materialise, Management would take mitigating actions, notably the ability to PIK interest payable in October 2018 on the 2021 Notes. Management therefore concluded that the Group's Capital Structure after the planned financial restructuring comprising of the debt for equity swap, and amendment to the economic terms of the PIK Toggle Notes, together with the planned additional fund raise and the substantial achievement of cash flow forecasts, provides sufficient headroom to cushion against downside operational risks.

Management concluded that the Group's Capital Structure after the planned financial restructuring comprised of the debt for equity swap, and amendment to the economic terms of the PIK Toggle Notes, together with the planned additional fund raise and the substantial achievement of cash flow forecasts, provides sufficient headroom to cushion against downside operational risks.

In summary, the Directors have concluded that, based on the group's expectation that the Consent Solicitation for a financial restructure will be successful, together with the planned additional fund raise and substantial achievement of cash flow forecasts, the Directors believe that the Group will be able to have sufficient liquidity and will be able to meet its obligations as they fall due. The Directors have accordingly formed the judgement that it is appropriate to prepare the financial statements on a going concern basis. There can, however, be no certainty that the required consents will be received or that the refinancing will be successfully completed. Accordingly, successful completion of the refinancing, planned fund raise and the substantial achievement of cash flow forecasts represent a material uncertainty that may cast significant doubt on the group and the parent company's ability to continue as a going concern. The group and the parent company may, therefore, be unable to continue realising their assets and discharging their liabilities in the normal course of business, but the financial statements do not include any adjustments that would result if the going concern basis of preparation is inappropriate.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

———

### 2. Principal Accounting Policies continued

**Basis of accounting**

The consolidated financial statements are presented in US Dollars, the functional currency of the Company and most of the Group's subsidiaries. The preparation of the consolidated financial statements in conformity with IFRS requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the balance sheet date and the reported amounts of revenue and expenses during the year. Although these estimates are based on management's best estimate of the amount, event or actions, the actual results ultimately may differ from these estimates. Further discussion on these estimates and assumptions are disclosed in Note 3.

**Accounting Policy Changes**

*New and amended accounting standards adopted by the Group*

There are no new IFRS or IFRIC Interpretations that are effective for this financial year that have had a material impact on the Group.

*New and amended accounting standards that have been issued but are not yet effective and have not been early adopted*

IFRS 15 'Revenue from contracts with customers' was issued in May 2014 and subsequent amendments, 'Clarifications to IFRS15', were issued in April 2016. IFRS 15, as amended, and will be effective for periods beginning on or after 1 January 2018. The standard sets out the requirements for recognising revenue from contracts with customers, and will supersede the current revenue recognition guidance including IAS 18 'Revenue', IAS 11 'Construction Contracts' and the related interpretations. IFRS 15 will require the Group to apportion revenue earned from contracts to each deliverable that qualifies as a 'performance obligation'. The transaction price receivable from customers must be allocated to each performance obligation on a relative stand-alone selling price basis, based on a five-step model. The Group is currently assessing the impact of this standard on the financial statements.

IFRS 16 'Leases' was issued in January 2016 and will be effective for periods beginning on or after 1 January 2019, subject to endorsement by the EU. The standard sets out requirements for recognising assets and liabilities in respect of leases, and will supersede the existing accounting guidance in IAS 17 'Leases' and the related interpretations. IFRS 16 will require the Group, where it is the lessee, to recognise assets and liabilities for most leases, however there is little change to IAS 17 where the Group is the lessor. The Group is currently assessing the impact of this standard on the financial statements.

IFRS 9 'Financial Instruments' was issued in July 2014 and will be effective for periods beginning on or after 1 January 2018. The standard will impact the classification and measurement of financial instruments and will supersede IAS 39 'Financial Instruments: Recognition and Measurement'. While the Group has not finalised its assessment of this standard, it does not expect the changes to have a material impact on the financial statements. There are no other IFRS or IFRIC Interpretations that are not yet effective that would be expected to have a material impact on the Group.

**Basis of consolidation**

The consolidated financial statements comprise the financial statements of the Company and its controlled undertakings ('subsidiaries'), after the elimination of all material inter-company transactions. Subsidiaries are consolidated from the date the Company obtains control until such time as control ceases. Acquisitions of subsidiaries are accounted for using the purchase method of accounting. The financial statements of subsidiaries are prepared for the same reporting period as the Company, using consistent accounting policies. Adjustments are made to bring into line any dissimilar accounting policies that may exist. For details regarding the subsidiaries included in the consolidated financial statements see Note (17).

Non-controlling interests in the net assets of consolidated subsidiaries which consist of the amounts of those interests at the date of the original business combination and the non-controlling interests' share of changes in equity since the date of the combination, are not material to the Group's financial statements.

**Business Combinations**

Business combinations are accounted for using the acquisition method. When the Group acquires a business, it identifies the assets and liabilities of the acquiree at the date of acquisition and measures them at fair value. Only separately identifiable intangible assets are recognised.

Consideration is the fair value at the acquisition date of the assets transferred and liabilities incurred in acquiring the business. Acquisition-related costs are expensed as incurred and included in operating costs.

Goodwill is initially measured at cost as the difference between the fair value of the consideration for the acquisition and fair value of the net identifiable assets acquired, including any intangible assets other than goodwill. If the assessment of goodwill results in an excess of the fair value of net assets acquired over the aggregate consideration transferred, then the gain is recognised in the income statement. After initial recognition, goodwill is measured at cost less any accumulated impairment losses. For the purpose of impairment testing, goodwill is allocated to each of the Group's cash-generating units (CGUs) that are expected to benefit from the business combination, irrespective of whether other assets or liabilities of the acquiree are assigned to those units.

The Group recognises any non-controlling interest in the acquiree on an acquisition-by-acquisition basis, either at fair value or at the non-controlling interest's proportionate share of the recognised amounts of acquiree's identifiable net assets.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

**2. Principal Accounting Policies** continued
**Revenue recognition**
*Business Model*
The Group's business model is the commercial exploitation of its space assets, namely its spectrum rights, satellites intellectual property and ground station assets. The Group generates its revenues from the commercialisation of these assets either directly or through the Group's extensive partner base using product categories and charging models to suit customer and market circumstances.

The Group generates its revenues primarily from:

- Capacity - Sale of satellite broadband packages and capacity to customers
- Spectrum - Sale and leasing of spectrum rights
- Services - Sale of services in addition to satellite broadband capacity, typically to Government customers
- Equipment - Sale of terminals and other satellite communications equipment
- Exclusivity rights – Sale of exclusivity rights across a region or product type

Additional product categories and charging models which generate revenue include, and are not limited to, satellite interim missions, the sale of exclusive distribution rights, consultancy projects, engineering services, satellite control services and ground station operation services.

*Capacity, services and equipment*
Revenue for satellite broadband communications services is recognised for Avanti's three main products as follows:

- Pure – raw bandwidth – customers have exclusive use of a defined number of MHz in specific beams. The proportion of the total contract value recognised as revenue in a period equates to the proportion of the total contracted capacity provided in that period.
- Custom – managed IP service – customers have exclusive use of a defined number of Mb in specific beams. The proportion of the total contract value recognised as revenue in a period equates to the proportion of the total contracted capacity provided in that period.
- Select – packaged broadband – customers buy individual broadband user accounts, which are managed and defined by Avanti. Revenues are recognised in the period in which the service is delivered based on the number of user accounts and contracted prices per account.

Capacity revenue includes the sale of transponders in addition to the sale of indefeasible rights of use where the revenue recognition criteria are met.

Revenue from services sold as a fully integrated package with satellite capacity, consultancy and other services contracts connected with the utilisation of the Group's space assets are recognised by reference to the stage of completion of the contract activity at the reporting date. The contracts are broken down into separable elements which are all judged individually on a percentage of completion basis in order to ascertain the completeness of an overall project. By their nature, these projects require a certain element of judgement by management. Contract costs are recognised as an expense in the period they are incurred. Where Avanti is judged to be the prime partner, revenues are recognised on a gross basis in line with the risks and rewards of the contract.

Revenue from the sale of terminals and other satellite communication equipment is recognised when the risks and rewards of ownership have transferred to the customer.

*Spectrum co-ordination*
Revenue from spectrum co-ordination agreements is typically recognised on a straight-line basis over the period where spectrum is leased and immediately where the Group sells spectrum assets in perpetuity.

*Exclusivity rights*
Revenue from the sale of exclusive distribution rights across a region or product type for a fixed term are recognised over the period of the agreement. Revenue from the sale of exclusive distribution rights in perpetuity are recognised immediately where the revenue recognition criteria are met. Specifically that the sale is for a fixed, non-refundable fee under a non-cancellable agreement and there is no significant further managerial involvement required.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

————

### 2. Principal Accounting Policies continued
**Revenue recognition** continued
*Policies applicable to all revenue streams*
The Group offers certain products and services as part of multi-deliverable arrangements. Multi-deliverable arrangements are divided into separate units of accounting provided: 1) the deliverable has a stand-alone value to the customer if it is sold separately, and 2) the fair value of the item can be objectively and reliably determined. Consideration for these items is measured and allocated to each separate unit based on its relative fair value and the relevant revenue recognition policy is applied to it.

Where goods or services are provided in exchange for dissimilar goods or services, the revenue is measured at the fair value of the goods or services received where these can be reliably measured, otherwise at the fair value of the goods or services given up, adjusted by the amount of cash or cash equivalents received.

The Group discloses the amount of each significant category of revenue recognised during the year in a note to the Financial Statements. The Group presents revenue from a given transaction or revenue stream separately on the face of the Income Statement when such presentation is relevant to an understanding of the Group's financial performance. Factors including the nature and function of items of revenue are considered in determining the appropriate presentation.

Accrued income represents the excess of revenue recognised over amounts invoiced. Deferred income represents any unearned balances remaining from amounts received from customers pursuant to prepaid contracts.

**Indefeasible rights of use**
Where the Group enters into an arrangement which constitutes an indefeasible right of use ('IRU'), the arrangement is reviewed to establish whether the IRU is a lease, a service contract or a sale of goods. Whether an arrangement contains a lease is assessed by considering whether the provision of a service depends on the use of one or more specific assets and whether the agreement conveys a right to use those assets.

Once it has been determined that an IRU is, or contains, a lease, the arrangement is accounted for in accordance with the leased assets accounting policy.

**Leased assets**
The determination of whether an arrangement is, or contains, a lease is based on the substance of the arrangement and requires an assessment of whether the fulfilment of the arrangement is dependent on the use of a specific asset or assets and whether the arrangement conveys the right to use the asset.

Leases of property, plant and equipment where the Group holds substantially all the risks and rewards of ownership are classified as finance leases. Assets acquired under hire purchase or a finance lease are capitalised in the Statement of Financial Position. Those held under hire purchase and finance lease contracts are depreciated over the shorter of either their estimated useful lives or the term of the lease. The interest element of these obligations is charged to the Income Statement over the relevant period. The capital element of the future payments is treated as a liability.

Leases where a significant portion of the risks and rewards are held by the lessor are classified as operating leases. Rentals are charged to the Income Statement on a straight line basis over the period of the lease.

**Interest income and expense**
Borrowing costs incurred for the construction of the satellite assets are capitalised during the period of time required to complete and prepare the assets for their intended use, in accordance with IAS 23 'Borrowing Costs'. Other borrowing costs are expensed in the Income Statement.

Interest income on cash deposits is recognised on an effective interest rate methodology, taking into account the principal amounts outstanding and the interest rates applicable.

**Foreign currency**
Transactions entered into by the Group entities in a currency other than the currency of the primary economic environment in which it operates (the 'functional currency') are recorded at the rates ruling when the transactions occur. Foreign currency monetary assets and liabilities are translated at the rate ruling at the reporting date. Exchange differences arising on the retranslation of unsettled monetary assets and liabilities are recognised immediately in the Income Statement.

The presentational currency of the Group is US Dollars.

On consolidation, assets and liabilities of foreign undertakings are translated into US Dollars at year end exchange rates. The results of foreign undertakings are translated into US Dollars at average rates of exchange for the year (unless this average is not a reasonable approximation of the cumulative effects of the rates prevailing on the transaction dates, in which case income and expenses are translated at the dates of the transactions).

# FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

———

### 2. Principal Accounting Policies continued

**Foreign currency** continued

Foreign exchange differences arising on retranslation are recognised directly in a separate component of equity, the foreign currency translation reserve.

In the event of the disposal of an undertaking with assets and liabilities denominated in a foreign currency, the cumulative translation difference associated with the undertaking in the translation reserve is charged or credited to the gain or loss on disposal recognised in the Income Statement.

**Pension schemes**

Employees have the option to participate in the Group's defined contribution pension scheme or to establish their own pension scheme to which the Group will match employee contributions up to a maximum amount. There is no ongoing liability to the Group beyond the period that the contributions are made. The costs of such contributions are charged to the Income Statement when incurred.

**Share based payments**

The Group operates a number of equity settled share based payment arrangements, under which the Group receives services from employees as consideration for equity instruments (share options and shares) of the Group. Equity settled share based payments are measured at fair value (excluding the effect of non-market based vesting conditions) at the date of grant, but include any market based performance criteria and the impact of vesting conditions. The fair value determined at the grant date is recognised on a straight line basis over the vesting period, based on the Group's estimate of the options or shares that will eventually vest and adjusted for the effect of non-market based vesting conditions.

Fair value is measured using either the Binomial options pricing model, the Black-Scholes model or Monte Carlo simulations, whichever is most appropriate to the award.

Service and performance conditions are vesting conditions. Any other conditions are non-vesting conditions which have to be taken into account to determine the fair value of equity instruments granted. In the case that an award or option does not vest as a result of a failure to meet a non-vesting condition that is within the control of either counterparty, this is accounted for as a cancellation. Cancellations must be treated as accelerated vesting and all remaining future charges are immediately recognised. As the requirement to save under an employee share save arrangement is a non-vesting condition, employee cancellations must be treated as an accelerated vesting.

**Current tax**

The charge for taxation is based on taxable profits for the year. Taxable profit differs from profit as reported in the Income Statement because it excludes items of income and expenses that are taxable or deductible in other years and it further excludes items that are never taxable or deductible.

The tax expense for the period comprises current and deferred tax. Tax is recognised in the Income Statement, except to the extent that it relates to items recognised in other comprehensive income or directly in equity. In this case the tax is also recognised in other comprehensive income or directly in equity respectively.

Current tax assets and liabilities are measured at the amount expected to be recovered from or paid to the taxation authorities based on tax rates that have been enacted or substantially enacted by the reporting date.

**Deferred tax**

Deferred tax is recognised on differences between the carrying amount of assets and liabilities in the Financial Statements and the corresponding tax bases used in the computation of taxable profit, and is accounted for using the balance sheet liability method. Deferred tax liabilities are generally recognised for all taxable temporary differences, and deferred tax assets are generally recognised for all deductible temporary differences to the extent that it is probable that taxable profits will be available against which those deductible temporary differences can be utilised.

The carrying amount of deferred tax assets is reviewed at each reporting date and reduced to the extent that it is no longer probable that sufficient taxable profits will be available to allow all or part of the asset to be recovered.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply in the period in which the liability is settled or the asset realised, based on tax rates that have been enacted or substantively enacted by the reporting date. The measurement of the deferred tax liabilities and assets reflects the tax consequences that would follow from the manner in which the Group expects, at the reporting date, to recover or settle the carrying amount of its assets and liabilities.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

### 2. Principal Accounting Policies continued
**Deferred tax** continued
Deferred tax assets and liabilities are offset when the Group has a legally enforceable right to offset current tax assets and liabilities and the deferred tax assets and liabilities relate to taxes levied by the same taxation authority on either the same taxable Group company or different Group entities which intend either to settle current tax assets and liabilities on a net basis, or to realise the assets and settle the liability simultaneously, in each future period in which significant amounts of deferred tax assets or liabilities are expected to be settled or recovered.

**Property, plant and equipment**
Property, plant and equipment are stated at cost less accumulated depreciation and any accumulated impairment losses. Depreciation is provided so as to write off the cost of assets, other than assets under construction, over their estimated useful lives using the straight line method. Depreciation on satellite assets commences once in-orbit testing has been completed and the satellite is available for use.

Cost includes the original purchase price of the asset and the costs directly attributable to bringing the asset to its working condition for its intended use. Property, plant and equipment is depreciated using the straight line method based on the following useful lives:

| | |
|---|---|
| Motor vehicles 25% per annum | Plant and machinery 25% per annum |
| Network assets 20–25% per annum | Leasehold improvements 25% per annum |
| Fixtures and fittings 25% per annum | Satellite in construction Nil |
| Satellite in operation 6.67% per annum | |

The estimated useful lives, residual values and depreciation method are reviewed at each year end, with the effect of any changes in estimate accounted for on a prospective basis. The gain or loss arising on the disposal of assets is charged to the Income Statement account and is calculated as the difference between the disposal proceeds and the carrying amount of the assets.

Assets held under finance leases are depreciated over their expected useful lives on the same basis as owned assets or, where shorter, the term of the relevant lease.

Satellites in construction assets relate to costs (including employee-related costs) directly attributable to the construction of the HYLAS satellites. Once the satellites become operational and placed into service, the assets are transferred to a space asset category and depreciated over the life of the satellites.

Where the conditions are not met, the costs are expensed through the Income Statement.

**Intangible assets**
Intangible assets are stated at cost less accumulated amortisation and any accumulated impairment losses. Amortisation is provided so as to write off the cost of assets, other than assets under construction, over their estimated useful lives using the straight line method. The amortisation rate on computer software is 25%. Newly acquired intangible assets as part of the business combination, customer lists and trade name are amortised over 15 and 5 years respectively.

Cost includes the original purchase price of the asset and the costs attributable to bringing the asset to its working condition for its intended use.

The estimated useful lives, residual values and amortisation method are reviewed at each year end, with the effect of any changes in estimate accounted for on a prospective basis. The gain or loss arising on the disposal of assets is charged to the Income Statement and is calculated as the difference between the disposal proceeds and the carrying amount of the assets.

Research and development costs in relation to the satellites are capitalised if they meet the conditions set out in IAS 38 'Intangible Assets' which are that development costs are only capitalised once a business case has been demonstrated as to the technical feasibility and commercial viability. Capitalised development costs are amortised over the expected useful life of the assets.

**Impairment of non-financial assets**
Assets that have an indefinite useful life, for example goodwill or intangible assets not ready for use, are not subject to amortisation and will be tested annually for impairment.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

**2. Principal Accounting Policies** continued
**Impairment of non-financial assets** continued
Assets that are subject to amortisation and depreciation are reviewed for impairment when events or changes in circumstances indicate that the carrying amount may not be fully recoverable. The impairment review comprises a comparison of the carrying amount of the fixed asset with its recoverable amount, which is the higher of fair value less costs to sell and value in use.

Fair value less costs to sell is calculated by reference to the amount at which the asset could be disposed of. Value in use is calculated by discounting the expected future cash flows obtainable as a result of the asset's continued use, including those resulting from its ultimate disposal, at a market based discount rate on a pre-tax basis.

An impairment loss is recognised in the Income Statement whenever the carrying amount of an asset exceeds its recoverable amount.

The carrying amount will only be increased where an impairment loss recognised in a previous period for an asset either no longer exists or has decreased, up to the amount that it would have been had the original impairment not occurred.

For the purpose of conducting impairment reviews, CGUs are identified as groups of assets and liabilities that generate cash flows that are largely independent of other cash flow streams. The assets and liabilities include those directly involved in generating the cash flows and an appropriate proportion of corporate assets. For the purposes of impairment, individual satellites are treated as individual CGUs.

For the purpose of impairment testing of goodwill, goodwill is allocated to a group of CGUs (being subsidiaries acquired in each acquisition). Such group of CGUs represent the lowest level within the Group for which the goodwill is monitored for internal management purposes.

**Investments**
Investments are recorded at cost. Investments are reviewed for indicators of impairment on an annual basis when events or changes in circumstances indicate that the carrying amount may not be fully recoverable.

Investments in subsidiaries are stated at cost less provision for impairment, and reviewed for indicators of impairment on an annual basis.

If such indicators exist and an impairment review is required, the impairment review comprises a comparison of the carrying amount of the investment with its recoverable amount, which is the higher of fair value less costs to sell and value in use.

Fair value less costs to sell is calculated by reference to the amount at which the investment could be disposed of. Value in use is calculated by discounting the expected future cash flows obtainable as a result of the investment's continued use, including those resulting from its ultimate disposal, at a market based discount rate on a pre-tax basis.

An impairment loss is recognised in the Income Statement whenever the carrying amount of an investment exceeds its recoverable amount.

**Grant funding**
Other grant income which has capital expenditure and job creation/safeguarding targets is recognised on a straight line basis over the relevant period irrespective of cash and claims, and is disclosed as other operating income.

**Inventories**
Inventories are stated at the lower of cost and net realisable value. Cost comprises all costs of purchase, cost of conversion and other costs incurred in bringing the inventories to their present location and condition.

Cost is determined by the first-in first-out method.

Net realisable value is based on estimated selling price less any further costs expected to be incurred to completion and disposal.

**Equity Instruments**
Equity instruments issued by the Company are recorded at the proceeds received, net of directly attributable issue costs.

**Avanti Communications Group plc**
Annual Report and Accounts 2017

# FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

### 2. Principal Accounting Policies continued

**Trade receivables and other financial assets**

Trade and loan receivables are measured at initial recognition at fair value and are subsequently measured at amortised cost using the effective interest rate method where the time value of money is material. Appropriate allowances for estimating irrecoverable amounts are recognised in the Income Statement where there is evidence that the asset is impaired. This impairment would be recognised within cost of sales.

Appropriate allowances for estimated irrecoverable amounts are recognised as an expense when there is objective evidence that trade receivables are impaired.

**Cash and cash equivalents**

Cash and cash equivalents in the Statement of Financial Position are comprised of cash in hand and demand deposits, and other short term highly liquid investments that are readily convertible into known amounts of cash and are subject to an insignificant risk of change in value. For the purpose of the Consolidated Cash Flow Statement, cash and cash equivalents are stated net of outstanding bank overdrafts.

**Provisions**

Provisions are recognised when the Group has a legal or constructive obligation to transfer economic benefits arising from past events and the amount of the obligation can be estimated reliably. Provisions are not recognised unless the outflow of economic benefits to settle the obligation is more likely than not to occur.

**Borrowings**

Interest-bearing bank loans and overdrafts are measured initially at fair value, net of transaction costs incurred. Borrowings are subsequently stated at amortised cost; any difference between the proceeds and the redemption value is recognised in the Income Statement over the period of the borrowings using the effective interest method.

Borrowings are classified as current liabilities unless the Group has an unconditional right to defer settlement of the liability for at least 12 months after the reporting date.

Where a substantial modification to the terms of existing debt has taken place, the original debt is de-recognised and 'new' debt recorded at market value at the date of modification. The difference is taken to the income statement.

**Trade payables**

Trade payables are initially measured at fair value, and are subsequently measured at amortised cost.

**Derivative financial instruments**

Financial assets and financial liabilities are recognised on the Group's Statement of Financial Position when the Group becomes a party to the contractual provisions of the instrument.

The Group uses derivative financial instruments mainly to reduce exposure to foreign exchange risks. The Group does not hold or issue derivative financial instruments for trading purposes. Derivatives are recognised at fair value on the date a contract is entered into and are subsequently remeasured at their fair value. Fair value is measured using the closing bank rate compared with the contract rate.

Hedge accounting is currently not applied. Changes in fair value of derivative financial instruments are recognised in the Income Statement as they arise.

**Segment reporting**

Operating segment(s) are reported in a manner consistent with the internal reporting provided to the chief operating decision maker. The chief operating decision maker, who is responsible for allocating resources and assessing performance of the operating segment(s), has been identified as the Avanti Executive Board who make the strategic decisions.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

———

### 3. Critical accounting estimates and management judgement

The presentation of Financial Statements in conformity with IFRS requires the use of certain critical accounting estimates. It also requires management to exercise its judgement in the process of applying the Group's accounting policies.

The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are addressed below.

#### (a) Revenue recognition

The Group uses the percentage of completion method in accounting for its Government services projects. Use of the percentage of completion method requires the Group to estimate the services performed to date as a proportion of the total services to be performed. The Group assesses the level of completion at the balance sheet date by reference to a combination of time or cost incurred to date compared to the forecast total required to deliver each service and project.

Should the service completion take substantially more or less time to complete post year-end, the revenue recognised in the current and future financial period would in hindsight be misstated.

The group also enters into multi-element contracts where there is judgement involved in determining the relative fair value of the delivered and undelivered elements on the contract. The Group assess relative fair value by reference to standalone selling prices, and bandwidth capacity renewal rates.

#### (b) Trade receivables and accrued income

The Group has trade receivables and accrued income, net of provisions, totalling $42.9m at the balance sheet date. The directors have assessed the recoverability of each balance, including those where contractually agreed deferred payment terms are in place, in reaching the year end position.

Should a material unprovided trade receivable or accrued income amount not be recovered, a material adjustment to the trade receivable balance and bad debt expense would arise in a future financial period.

The Group has provided for amounts due from the Government of Indonesia totalling $16.8m at the financial year end. Avanti contracted with the Government of Indonesia (GoI) to provide services on its Artemis satellite and performed all of its obligations under that contract. After an extended period of time in which payment of the outstanding invoices had not been received, the Group terminated the contract and initiated arbitration proceedings in London. The outstanding amount is $16.8m and has been fully provided for in these accounts. GoI has not disputed that the amounts are due and payable. Avanti is confident that the arbitration panel will rule in the Group's favour and has provided for the debt at the year end until the uncertainty related to enforcing the arbitration panel's expected ruling has been sufficiently reduced or eliminated.

Should the Group be successful in attempts to collect the outstanding amounts, a material adjustment to the bad debt provision and expense will be required in a future financial period.

Further disclosure can be found in Note 18.

#### (c) HYLAS 1 satellite impairment review

The Group has recognised an impairment charge against the carrying amount of HYLAS 1 of $53.3m in the current financial year. As is more fully disclosed in Note 13, the impairment charge is an estimate that is based on the Group's discounted cash flow forecast for the HYLAS 1 asset. Should the yield, capacity ramp-up, satellite life and factors behind the discount rate in future financial periods materially diverge from the assumptions made in this assessment, the impairment recognised in the current financial year may be materially in excess of what was required or a further impairment charge may be required in a future financial period.

#### (d) HYLAS 2 satellite impairment review

The Group has recognised an impairment charge against the carrying amount of HYLAS 1 of $60.8m in the current financial year. As is more fully disclosed in Note 13, the impairment charge is an estimate that is based on the Group's discounted cash flow forecast for the HYLAS 2 asset. Should the yield, capacity ramp-up, satellite life and factors behind the discount rate in future financial periods materially diverge from the assumptions made in this assessment, the impairment recognised in the current financial year may be materially in excess of what was required or a further impairment charge may be required in a future financial period.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

### 3. Critical accounting estimates and management judgement continued

#### (e) Filiago goodwill impairment review

The Group has recognised an impairment charge against the carrying amount of the Filiago goodwill of $9.9m in the current financial year. As is more fully disclosed in Note 14, the impairment charge is an estimate that is based on the Group's discounted cash flow forecast for the Filiago cash generating unit. Should the revenue and operating margins generated by the Filiago business in future financial periods materially diverge from the assumptions made in this assessment, the impairment recognised in the current financial year may be materially in excess of what was required. The maximum additional impairment charge that may be required in a future financial period is immaterial at $1.6m.

#### (f) Deferred tax

Significant items on which the Group has exercised accounting judgement include recognition of deferred tax assets in respect of losses and accelerated capital allowances in the United Kingdom.

The recognition of deferred tax assets, particularly in respect of tax losses, is based upon whether management judge that it is more likely than not that there will be sufficient and suitable taxable profits in the relevant legal entity or tax group against which to utilise the assets in the future.

Judgement is required when determining probable future taxable profits. In assessing the level of future taxable profits reference is made to the latest available profit forecasts. Changes in the estimates which underpin those profit forecasts could have an impact on the amount of future taxable profits and could have a significant impact on the period over which the deferred tax assets would be recovered and consequently the extent to which they should be recognised.

The nature of the evidence supporting the recognition of the deferred tax assets included contracted revenue that will be recognised in future periods, revenue from new business signed in FY18, forecast revenue in future periods from opportunities in the pipeline (including modest expectations in relation to future capacity sales on HYLAS 4) and taxable temporary differences of an appropriate type that reverse in an appropriate period.

#### (g) Recoverability of parent company investments in and receivables from subsidiary undertakings

The Company has recognised a provision against the carrying amount of receivables from group entities of $400.0m in the current financial year.

The estimated recoverable amount of these balances is an estimate determined in a similar way to the recoverable amount of the space assets, being discounted discounted value of the assets of the subsidiary. Should the yield, capacity ramp-up, satellite life and factors behind the discount rate in future financial periods materially diverge from the assumptions made in this assessment, the impairment recognised in the current financial year may be materially in excess of what was required or a further impairment charge may be required in a future financial period,

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

### 4. Revenue

As stated in Note 2, the Group generates its revenues from the utilisation of its space assets, namely its spectrum rights and satellites. These revenues include the sale of satellite broadband services, the sale and leasing of spectrum rights, the sale of services, typically to Government customers, and the sale of terminals and other satellite communications equipment.

The Avanti Executive Board, which is the chief operating decision-maker in the Group's corporate governance structure, manages the business and the allocation of resources on the basis of the utilisation of its space assets, resulting in one segment.

Revenue generated for the year was as follows:

| | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Capacity, services and equipment revenue | 56.6 | 74.5 |
| Exclusivity rights | – | 8.3 |
| Total revenue | 56.6 | 82.8 |

The majority of total revenue for the year represents the sale of satellite broadband capacity and related services provided to external customers and the sale of terminals and other satellite communications equipment. Of this, $5.3m (2016: $13.2m) relates to the sale of terminals and other satellite communications equipment.

The Group derived $11.1m (2016: $19.9m) of its turnover from European countries outside the United Kingdom, $25.3m (2016: $39.7m) from countries outside Europe and $20.2m (2016: $23.2m) from the United Kingdom.

**Sale of exclusivity rights**

$8.3m was recognised during the prior financial year from the sale of exclusivity rights.

During the year ended 30 June 2016, the Group entered into an agreement with Eurona Wireless Telekom SA ('Eurona'), a Spanish based Internet service provider, under which Eurona were sold the exclusive rights in perpetuity to the provision of services to the consumer broadband market in Spain and Portugal ('Iberia') from any existing or future Avanti satellite.

Eurona are required to pay a fixed, non-refundable fee of €7.5m under a non-cancellable agreement in consideration for the rights. As a result, Eurona have sole rights to sell capacity directed over Iberia on any Avanti satellite for use in delivering service to the consumer broadband market. The exclusivity right does not convey or include any satellite capacity, which must be purchased separately.

At the same time, Eurona entered into an agreement to purchase substantial initial capacity over Iberia with a value of €17.2m over a 10 year period. The provision of capacity commenced in the 2017 financial year and revenue has been recognised within the sale of capacity, services and equipment. The sale of €2.5m of satellite communications equipment was recognised during the prior financial year and a further €1.5m was recognised in the current year under a modification to the original agreement.

The agreement with Eurona was assessed under the Group's accounting policy for multi-deliverable arrangements. An assessment was made as to whether the sale of exclusivity rights, capacity and equipment represented separate units of account. This assessment concluded that each component was separable on the basis that each deliverable has stand-alone value to Eurona and the fair-value of the item can be objectively and reliably determined.

The fair value of the undelivered components (residual value method) was used to assess the fair value of the exclusivity rights and equipment recorded in the prior year, and the equipment recorded in the current year. This assessment led to the conclusion that there was no material difference between the contractual value of $8.3m (€7.5m) and the fair value of the exclusivity components, and of the contractual value and fair value of the equipment components.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

_____

## 5. Operating expenses

Operating expenses by function are as follows:

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Distribution | 3.7 | 6.7 |
| Administration | 28.0 | 31.5 |
|  | 31.7 | 38.2 |

Loss from operations for the year is stated after charging the following:

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| **Cost of sales:** |  |  |
| Recognition of ESA grant income | (1.2) | (1.2) |
| Satellite services | 21.1 | 15.4 |
| Materials purchased | 7.9 | 13.5 |
| Sub contractors | 10.3 | 7.8 |
| Bad debt expense (Note 19) | 19.1 | 2.7 |
|  |  |  |
| **Operating expenses:** |  |  |
| Employee benefit expense | 19.7 | 19.8 |
| Operating lease expenses | 2.1 | 2.3 |
|  |  |  |
| **Depreciation and amortisation:** |  |  |
| Space asset depreciation | 45.3 | 45.1 |
| Depreciation of property, plant and equipment | 0.7 | 2.0 |
| Amortisation of intangible assets | 1.2 | 0.2 |
|  |  |  |
| **Impairment:** |  |  |
| Impairment of satellites in operation [Note 13] | 114.1 | – |
| Impairment of goodwill [Note 14] | 9.9 | – |

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

### 6. Auditor remuneration

Remuneration payable to the Group's auditor, KPMG LLP and its associates in the year is analysed below:

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Audit fees: |  |  |
| Annual audit of the Company | **0.2** | 0.2 |
| Annual audit of subsidiary companies | **–** | – |
| **Total audit fees** | **0.2** | 0.2 |
| Transactions services | **0.1** | – |
| **Total audit and audit-related fees** | **0.3** | 0.2 |
| Tax compliance services | **–** | – |
| **Total non-audit services** | **–** | – |
| **Total auditor's remuneration** | **0.3** | 0.2 |

### 7. Employee benefit costs

The aggregate remuneration of all employees comprised:

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Wages and salaries | **20.6** | 20.9 |
| Social security costs | **2.2** | 2.4 |
| Pension costs | **0.6** | 0.6 |
| Share based payment expense | **0.2** | 0.4 |
|  | **23.6** | 24.3 |
| Less: costs capitalised as satellite in construction | **(3.9)** | (4.5) |
|  | **19.7** | 19.8 |

#### Employee numbers

The average monthly number of people (including the Executive Directors) employed during the year by category of employment:

|  | 30 June 2017 No. employees | 30 June 2016 No. employees |
|---|---|---|
| Operations | **82** | 81 |
| Sales and marketing | **73** | 73 |
| Development and engineering | **26** | 25 |
| Administration and executive | **50** | 54 |
|  | **231** | 233 |

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

### 8. Other operating income

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Other grant income | **2.0** | 1.5 |

Other grant income relates to a Regional Growth Fund grant linked to capital expenditure and job creation/safeguarding targets in the South West of the UK and is recognised on a straight line basis over 6 years.

### 9. Net finance expense

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| **Finance income** | | |
| Foreign exchange gain | **–** | 13.9 |
|  | **–** | 13.9 |
|  | | |
| **Finance expense** | | |
| Interest expense on loans and other borrowings | **(117.7)** | (67.4) |
| Foreign exchange loss | **0.1** | – |
| Finance lease expense | **(1.5)** | (1.8) |
| Costs of refinancing | **(22.3)** | – |
| Less: interest capitalised to satellite in construction | **48.2** | 28.3 |
|  | **(93.2)** | (40.9) |
|  | | |
| **Exceptional gain on substantial modification of debt** | **219.2** | – |
|  | | |
| **Net finance income/(expense)** | **126.0** | (27.0) |

The exceptional gain on substantial modification of debt arose from a component of the financial restructuring completed by the Group on 27 January 2017. See Note 23 for disclosure of the financial restructuring and the specific modification that gave rise to the exception gain on substantial modification of debt.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

———

## 10. Income tax charge

|  | 30 June 2017 $m | 30 June 2016 $m |
|---|---|---|
| **Current tax** | | |
| Current tax expense | – | – |
| Overseas tax | – | 0.1 |
| Adjustment in respect of prior periods | 0.2 | 0.1 |
| Total current tax | 0.2 | 0.2 |
| | | |
| **Deferred tax** | | |
| Origination and reversal of temporary differences | (15.9) | (4.2) |
| Adjustment in respect of prior periods | 0.4 | 4.1 |
| Impact of change in UK tax rate | 3.3 | 2.1 |
| **Total deferred tax** | (12.2) | 2.0 |
| **Total income tax (credit)/charge** | (12.0) | 2.2 |

The tax on the Group's loss before tax differs from the theoretical amount that would arise using the weighted average tax rate applicable to profits of the consolidated entities as follows:

|  | 30 June 2017 $m | 30 June 2016 $m |
|---|---|---|
| Loss before tax | (77.7) | (67.2) |
| | | |
| Tax (credit) at the UK corporation tax rate of 19.75% (2016: 20%) | (15.3) | (13.4) |
| Tax effect of non-deductible expenses | 13.1 | – |
| Adjustment in respect of prior periods | 0.5 | 4.2 |
| Effect of tax rates in foreign jurisdictions | – | 1.0 |
| Impact of change in UK tax rate | 3.3 | 2.1 |
| Temporary differences for which no deferred tax has been recognised | 2.4 | 14.1 |
| Recognition of previously unrecognised temporary differences | (30.3) | (5.8) |
| Derecognition of previously recognised temporary differences | 14.3 | |
| | | |
| Income tax (credit)/charge | (12.0) | 2.2 |
| | | |
| Income tax (credit)/charge recognised in the income statement | (12.0) | 2.2 |

The standard rate of corporation tax in the UK fell from 20% to 19% with effect from 1 April 2017. Accordingly, the Group's profits for this accounting period are taxed at an effective rate of 19.75% (2016: 20.0%).

The income tax credit of $12.0m (2016: $2.2m charge) equates to an effective tax rate of 15% (2015: (3%)). This effective rate is lower than the effective rate of tax of 19.75% due to a number of items shown above. The rate is primarily driven by the Group recognising a credit in respect of tax losses arising in prior years as a result of forecast profit streams (in particular related to HYLAS 4) against which these losses can be offset, and expenses that are not deductible for tax purposes.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

**10. Income tax charge** continued
*Factors that may affect future tax charges*
Changes to reduce the UK corporation tax rate to 19% from 1 April 2017 and to 17% from 1 April 2020 were substantially enacted on 15 September 2016. The deferred tax balance as at the year end has been recognised at 17% (2016: 18%) which materially reflects the rate for the period in which the deferred tax assets and liabilities are expected to reverse.

*Tax losses*
At the balance sheet date the Group has unrecognised deferred tax assets of $29.5m (2016: $37.2m) available for offset against future profits. A deferred tax asset has been recognised in respect of $64.3m (2016: $28.0m). No deferred tax asset has been recognised in respect of the remaining losses and other temporary differences on the basis that their future economic benefit is uncertain.

Under present tax legislation, these losses and other temporary differences may be carried forward indefinitely. In the future if these assets are recognised there will be a positive impact to the Group's effective tax rate. Conversely, if revenues generated by HYLAS 4 fall materially short of expectations there will be a negative impact to the Group's effective tax rate.

In the UK, with effect from 1 April 2017, only 50% of profits above $5m may be offset by losses brought forwards. This will slow the rate at which the deferred tax asset on losses can be utilised, and hence will result in the Group paying cash tax in the UK earlier than would otherwise be the case.

**11. Loss per share**

|  | 30 June 2017 cents | 30 June 2016 cents |
|---|---|---|
| Basic loss per share | **(44.74)** | (49.27) |
| Diluted loss per share | **(44.74)** | (49.27) |

The calculation of basic and diluted loss per share is based on the earnings attributable to ordinary shareholders divided by the weighted average number of shares in issue during the year.

|  | 30 June 2017 | 30 June 2016 |
|---|---|---|
| Loss for the year attributable to equity holders of the parent Company | **$(65.2)m** | $(68.7)m |
| Weighted average number of ordinary shares for the purpose of basic earnings per share | **145,625,369** | 139,428,427 |
| Weighted average number of ordinary shares for the purpose of diluted earnings per share | **145,625,369** | 139,428,427 |

**12. Profit of the parent Company**
As permitted by section 408 of the Companies Act 2006, the Income Statement of the parent Company is not presented as part of these accounts. The loss after tax of the parent Company for the year ended 30 June 2017 amounted to $258.8m (2016: $1.8m profit).

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

### 13. Property, plant and equipment

| | Leasehold improvements $'m | Network assets $'m | Fixtures and fittings $'m | Satellites in operation $'m | Satellites in construction $'m | Group total $'m |
|---|---|---|---|---|---|---|
| **Cost** | | | | | | |
| Balance at 30 June 2015 | 1.8 | 13.0 | 2.6 | 691.0 | 144.6 | 853.0 |
| Additions | – | 2.8 | 0.4 | 0.5 | 167.2 | 170.9 |
| Disposals | – | – | – | 0.2 | (8.0) | (7.8) |
| Effect of movements in exchange rates | (0.2) | (3.1) | (0.4) | (34.7) | (7.1) | (45.5) |
| Balance at 30 June 2016 | 1.6 | 12.7 | 2.6 | 657.0 | 296.7 | 970.6 |
| Additions | – | 3.0 | 0.1 | 1.4 | 64.0 | 68.5 |
| Reclassification* | – | (1.1) | – | (5.8) | – | (6.9) |
| Effect of movements in exchange rates | 0.1 | 1.4 | – | (7.6) | (1.2) | (7.3) |
| **Balance at 30 June 2017** | 1.7 | 16.0 | 2.7 | 645.0 | 359.5 | 1,024.9 |
| | | | | | | |
| **Accumulated depreciation and impairment** | | | | | | |
| Balance at 30 June 2015 | 1.1 | 10.1 | 1.9 | 148.9 | – | 162.0 |
| Charge for the year | 0.3 | 1.4 | 0.4 | 45.1 | – | 47.2 |
| Disposals | – | – | – | – | – | – |
| Effect of movements in exchange rates | (0.2) | (2.1) | (0.3) | (11.1) | – | (13.7) |
| Balance at 30 June 2016 | 1.2 | 9.4 | 2.0 | 182.9 | – | 195.5 |
| Charge for the year | 0.4 | 2.2 | 0.3 | 43.1 | – | 46.0 |
| Reclassification* | – | (0.6) | – | (0.2) | – | (0.8) |
| Impairment | – | – | – | 114.1 | – | 114.1 |
| Effect of movements in exchange rates | (0.1) | 0.7 | – | (2.3) | – | (1.7) |
| **Balance at 30 June 2017** | 1.5 | 11.7 | 2.3 | 337.6 | – | 353.1 |
| **Net book value** | | | | | | |
| **Balance at 30 June 2017** | 0.2 | 4.3 | 0.4 | 307.4 | 359.5 | 671.8 |
| Balance at 30 June 2016 | 0.4 | 3.3 | 0.6 | 474.1 | 296.7 | 775.1 |

* Reclassifications relate to the reclassification of satellite control software between tangible and intangible assets.

**Avanti Communications Group plc**
Annual Report and Accounts 2017

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

———

**Property, plant and equipment under finance lease**
At 30 June 2017, the Group held assets under finance lease agreements with a net book value of $39.8m (2016: $47.8m). A depreciation charge for the year of $2.3m (2016: $1.7m) has been provided on these assets. These assets are included in network assets.

**Satellites in operation**
Satellites in operation include the following:

- HYLAS 1 - Came into service on 1 April 2011
- HYLAS 2 - Came into service on 1 October 2012
- HYLAS 2B - Indefeasible right to the use of a payload received as consideration on 24 June 2015 and came into service on 7 November 2016
- ARTEMIS - Acquired on 31 December 2013

All four satellites and their related ground infrastructure have been depreciated from the date that they came into operational service.

**Satellite in construction**
The satellites in construction assets of $359.5m relate to HYLAS 3 and HYLAS 4 (2016: $296.7m in relation to HYLAS 3 and HYLAS 4).

**Capitalised finance costs**
Included in the satellites in operation and satellites in construction are capitalised finance costs of $145.7m (2016: $97.4m) related to the HYLAS 2 and HYLAS 4 satellites.

**HYLAS 1 satellite impairment review**
HYLAS 1 is a 3 Ghz Ka-band High Throughput Satellite that came into operational service on 1 April 2011. Each year the Group consider the carrying value of its assets and looks for indications of impairment. An impairment review was conducted for the HYLAS 1 satellite and associated network infrastructure ('HYLAS 1'), at 30 June 2017 as a result of growth in revenues being slower than forecast.

With falling market prices for Ka-band services reducing the ability of future cash generation to make-up for the slower than expected revenue generation in the earlier years of HYLAS 1, the review showed that an impairment of $53.3m was required to bring the the carrying value of HYLAS 1 to $58.1m.

The recoverable amount of HYLAS 1 was determined using value-in-use, which is calculated by using the discounted cash flow method. This method considers the forecast cash flows of the HYLAS 1 satellite and associated network infrastructure over the remaining useful economic life of the asset of approximately 9.5 years.

Estimates of future cash flows originate from the detailed budget for the year to 30 June 2018 as reviewed and approved by the Board.

Forecasts for the subsequent periods are driven by the following key assumptions:

1. Capacity ramp - The discounted cash flow forecast assumes a ramp up in capacity utilisation of 8% per year to full utilisation at the end of FY24, from a combination of contractual ramps, development of existing customer relationships and new business development
2. Yield - price per unit of capacity - The discounted cash flow forecast makes assumptions about the price per unit of capacity which is driven by both market conditions and the efficiency of data throughput which varies due to a number of factors such as customer type and hardware platform
3. Satellite life - The discounted cash flow forecast is prepared over the estimated remaining useful economic life of the asset
4. Discount rate - The present value of the cash flows is calculated by using a pre-tax discount rate of 10.4% derived using the Group's incremental cost of borrowing

Sensitivity analysis was carried out by management over the assumptions made in the impairment model relating to yield, growth in utilisation and the discount factor applied. This sensitivity analysis was performed as a part of the impairment exercise in order to provide insight into the sensitivity of the impairment charge to changes in these key assumptions.

- a 10% decrease in the forecast yield on the uncontracted capacity over the life of the cash flow forecast would increase the impairment charge by $3.7m. A 10% increase in the forecast yield would have an equivalent impact in decreasing the impairment charge.
- a scenario in which the ramp-up of the currently unutilised capacity occurs at 80% of the forecast growth would increase the impairment charge by $7.4m.
- a 1% increase in discount factor applied would increase the impairment charge by $2.7m

The position adopted in the HYLAS 1 impairment review represent management's best estimate of the forecasts and assumptions.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

_____

### 13. Property, plant and equipment continued

**HYLAS 2 satellite impairment review**

HYLAS 2 is an 11 Ghz Ka-band High Throughput Satellite that came into operational service on 1 October 2012. Each year the Group considers the carrying value of its assets and looks for indications of impairment. An impairment review was conducted for the HYLAS 2 satellite and associated network infrastructure ('HYLAS 2'), at 30 June 2017 as a result of growth in revenues being slower than forecast.

With falling market prices for Ka-band services reducing the ability of future cash generation to make-up for the slower than expected revenue generation in the earlier years of HYLAS 2, the review showed that an impairment of $60.8m was required to bring the carrying value of HYLAS 2 to $234.8m.

The recoverable amount of HYLAS 2 was determined using value-in-use, which is calculated by using the discounted cash flow method.

This method considers the forecast cash flows of the HYLAS 2 satellite and associated network infrastructure over the remaining useful economic life of the asset of approximately 10.5 years.

Estimates of future cash flows originate from the detailed budget for the year to 30 June 2018 as reviewed and approved by the Board. Forecasts for the subsequent periods are driven by the following key assumptions:

1.  Capacity sold - The discounted cash flow forecast assumes a ramp up in capacity utilisation of 12% per year to the end of FY23, with modest incremental growth thereafter, from a combination of contractual ramps, development of existing customer relationships and new business development
2.  Yield - price per unit of capacity - The discounted cash flow forecast makes assumptions about the price per unit of capacity which is driven by both market conditions and the efficiency of data throughput which varies due to a number of factors such as customer type and hardware platform
3.  Satellite life - The discounted cash flow forecast is prepared over the estimated remaining useful economic life of the asset
4.  Discount rate - The present value of the cash flows is calculated by using a pre-tax discount rate of 10.4% derived using the Group's incremental cost of borrowing

Sensitivity analysis was carried out by management over the assumptions made in the impairment model relating to yield, growth in utilisation and the discount factor applied. This sensitivity analysis was performed as a part of the impairment exercise in order to provide insight into the sensitivity of the impairment charge to changes in these key assumptions.

- a 10% decrease in the forecast yield on the uncontracted capacity over the life of the cash flow forecast would increase the impairment charge by $19.3m. A 10% increase in the forecast yield would have an equivalent impact in decreasing the impairment charge.
- a scenario in which the ramp-up of the currently unutilised capacity occurs at 80% of the forecast growth would increase the impairment charge by $38.5m.
- a 1% increase in discount factor applied would increase the impairment charge by $13.4m.

The position adopted in the HYLAS 2 impairment review represent management's best estimate of the forecasts and assumptions.

**Impairment of other assets**

There are no indicators of impairment for any other assets within Property, plant and equipment.

**HYLAS-2B**

Satellites in operation also includes a Ka-band payload that the Group operates under an indefeasible right of use ('IRU') agreement entered into in June 2015 for the estimated remaining useful life of the payload of 13.5 years. This payload is known as HYLAS-2B and Note 4 provides more detail on the transaction through which this payload was received. The IRU agreement is accounted for as a finance lease and a net book value ('NBV') of $33.4m is included within satellites in operation and also within the assets held under finance lease disclosure provided above.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

### 14. Intangible assets

| | Computer software $'m | Brand name $'m | Customer lists $'m | Goodwill $'m | Group total $'m |
|---|---|---|---|---|---|
| **Cost** | | | | | |
| Balance at 30 June 2015 | 0.6 | 0.2 | 1.9 | 9.7 | 12.4 |
| Effect of movements in exchange rates | – | – | – | – | – |
| Balance at 30 June 2016 | 0.6 | 0.2 | 1.9 | 9.7 | 12.4 |
| Additions | 3.0 | – | – | – | 3.0 |
| Reclassification* | 6.9 | – | – | – | 6.9 |
| Effect of movements in exchange rates | – | – | 0.1 | 0.3 | 0.4 |
| **Balance at 30 June 2017** | 10.5 | 0.2 | 2.0 | 10.0 | 22.7 |
| | | | | | |
| **Accumulated amortisation and impairment** | | | | | |
| Balance at 30 June 2015 | 0.6 | 0.2 | 0.6 | – | 1.4 |
| Charge for the year | – | – | 0.2 | – | 0.2 |
| Balance at 30 June 2016 | 0.6 | 0.2 | 0.8 | – | 1.6 |
| Charge for the year | 1.1 | – | 0.1 | – | 1.2 |
| Reclassification* | 0.8 | – | – | – | 0.8 |
| Impairment | – | – | – | 9.9 | 9.9 |
| Effect of movements in exchange rates | – | – | (0.1) | – | (0.1) |
| **Balance at 30 June 2017** | 2.5 | 0.2 | 0.8 | 9.9 | 13.4 |
| **Net book value** | | | | | |
| **Balance at 30 June 2017** | 8.0 | – | 1.2 | 0.1 | 9.3 |
| Balance at 30 June 2016 | – | – | 1.1 | 9.7 | 10.8 |

\* Reclassifications relate to the reclassification of satellite control software between tangible and intangible assets.

**Filiago impairment review**

The goodwill, customer lists and brand name intangibles arose from the Group obtaining control of Filiago GmbH & Co ('Filiago') on 1 November 2011. Filiago is a German based Internet service provider specialising in the sale of satellite broadband services to consumer and enterprise customers. The Filiago operation is considered a Cash Generating Unit ('CGU').

The Filiago goodwill is not subject to amortisation and so is required to be reviewed annually for impairment. Filiago's goodwill impairment review performed for the 30 June 2017 year end showed that an impairment of all of the goodwill was required. The impairment review also showed that the present value of the forecast cash flows supported the customer list intangible of $1.2m on the balance sheet at the year end.

The recoverable amount of the Filiago CGU was determined using the value-in-use approach. The value-in-use was estimated by preparing a discounted cash flow forecast for Filiago over a five year period with a terminal value forecast into perpetuity after that period.

Underlying the forecast cashflow is the position that Filiago's current management team have not been successful at achieving revenue targets that have been set for recent financial years. Whilst the business has been capable of maintaining a largely steady state, it has not been able to capitalise on the significant advantage it has been bestowed as a result of Avanti's HYLAS-2B payload coming into operational service early in FY17. As a result, the Group has decided to make significant changes to the way that the company is managed. However, when preparing the current year's impairment review, the Group has used forecasts based on what it is confident can be delivered, given the actual performance in recent years.

The discounted cash flow forecast assumes a revenue growth rate of 5% per annum over the 5 year forecast period with a 2% growth rate applied in the terminal value calculation. Management consider that the 5% growth rate is modest based on the commercial advantages that Filiago has as a result of access to the HYLAS 2-B platform; namely the fastest consumer satellite broadband speeds in Europe, pan-Germany coverage and access to capacity in a market where supply is limited.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

**14. Intangible assets** continued
**Filiago Impairment review** continued
Sensitivity analysis was carried out by management over the revenue growth assumptions. An increase in the growth rate to 10% from the third year of the forecast period, predicated on the new management team delivering stronger performance, would reduce the impairment charge by $2.2m. A forecast which assumes flat revenue growth during the 5 year forecast period would result in an increase in the impairment charge of $1.6m such that the Filiago intangible assets were fully impaired. Management do not consider that no growth during the forecast period is an appropriate assumption based on the commercial and market advantages Filiago has at its disposal. Similarly, in preparing this impairment review, management is exercising caution in forecasting future growth rates given the failure of the business to deliver these in recent years. Management also noted that the variance in the impairment charges under the sensitivity analysis were not material to the Group's depreciation, amortisation and impairment charge nor its profit before tax.

The present value of the forecast cash flows was calculated using the Group's estimated pre-tax cost of capital of approximately 10.5% and is not considered to have a significant impact on the impairment conclusions.

The brand names acquired in the course of the Filiago business combination have been fully amortised. The customer lists acquired of $2.4m are amortised on a straight line basis over a period of 15 years. At the year end, the carrying amount of the customer lists is $1.2m (2016: $1.1m) after charging $0.1m (2016: $0.1m) of amortisation in the year.

**15. Impairment**

Group

| Impairment of satellites in operation | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| HYLAS 1 | 53.3 | – |
| HYLAS 2 | 60.8 | – |
| | 114.1 | – |

| Impairment of goodwill | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Filiago | 9.9 | – |
| | 9.9 | – |

A detailed description of the assumptions and method used to carry out the impairment reviews are in Note 13 and Note 14.

**16. Investments**

Company
Shares in subsidiary undertakings

| | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Beginning and end of the year | 148.7 | 148.7 |
| | 148.7 | 148.7 |

The Directors believe that the carrying value of the investments is supported by the underlying net assets recorded on the balance sheet of those subsidiaries, the value of spectrum rights that have no corresponding balance sheet asset and the future forecast cash flows of those subsidiaries.

A full list of the Company's subsidiaries is disclosed in Note 17.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

### 17. Subsidiaries

As at the end of the year the Group and Company held the following investments in subsidiary companies:

| Name of subsidiary | Nature of business | Place of Incorporation | Address |
|---|---|---|---|
| Avanti Communications Limited | Satellite services and consultancy | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Space Limited | Satellite services | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Local TV Services Limited* | Satellite services | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Space 3 Limited* | Satellite services | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Launch Services Limited | Management services | Isle of Man | First Floor, Millennium House, Victoria Road, Douglas, Isle of Man IM2 4RW |
| Avanti Broadband Limited | Satellite services | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Broadband (Ire) Limited* | Satellite services | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti HYLAS 2 Limited | Satellite services | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti HYLAS 2 Launch Services Limited | Management services | Isle of Man | First Floor, Millennium House, Victoria Road, Douglas, Isle of Man IM2 4RW |
| Avanti Communications Infrastructure Limited* | Holding company | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Employee Benefit Trust | Employee benefit trust | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti HYLAS 2 Cyprus Limited | Satellite services | Cyprus | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti HYLAS Services Limited | Project management services | Cyprus | 6th Floor, Lophitis Business Centre II, 237, 28 October St., CY-3035 Limassol Cyprus |
| Avanti Communications Marketing Services Limited | Sales and marketing | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Communications Germany GmbH | Satellite services | Germany | c/o Osborne Clarke, Innere Kanalstraße 15, 50823 Köln, Germany |
| Avanti Communications Sweden AB | Satellite services | Sweden | c/o Hellstrom Law, Kungsgatan 33, Box 7305, 103 90 Stockholm Sweden |
| Avanti Turkey Uydu Telekomunikasyon Limited Sirketi | Sales and marketing | Turkey | Büyükdere Cad. No: 127 Astoria A Kule, Kat: 8/9/10 34394 Esentepe, Şişli |
| Avanti Communications South Africa Pty Limited | Sales and marketing | South Africa | Building A, Wedgefield Office Park, 17 Muswell Road, South Bryanston, Gauteng 2012, South Africa |
| Hybeam Limited | Satellite services | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Communications Kenya Limited | Sales and marketing | Kenya | Africa Registrars, Ground Floor, Kenya-Re Towers, Upperhill, Off Ragati Road, PO Box 1243-00100, Nairobi, Kenya |
| Avanti Communications Africa Infrastructure Limited* | Holding company | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Communications Africa Infrastructure 1 Limited* | Holding company | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Communications Africa Infrastructure 2 Limited* | Holding company | England & Wales | Cobham House, 20 Black Friars Lane, London, EC4V 6EB |
| Avanti Satellite Communications Services CC Limited | Sales and marketing | Nigeria | c/o Udo Udoma & Belo-Osagie, St. Nicholas House (10th and 13th Floors), Catholic Mission Street, Lagos, Nigeria |
| Avanti Communications Tanzania Limited | Sales and marketing | Tanzania | Plot No. 18, Rukwa Street, P.O. Box 38192, Dar Es Salaam |

* Company was dormant in the year ending 30 June 2017

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

**17. Subsidiaries** continued

The Company holds 100% ownership interest and voting power in all the above entities.

On 1 November 2011 (the 'date of control') the Group took effective control of Filiago by enhancing the security over its loans with Filiago. The terms of the enhanced security gave the Group power over Avanti through Board control, continued exposure to variable returns of the loans provided to Filiago and the ability for Avanti to use its power over Filiago to affect the Group's returns.

Since the date of control, Filiago has been accounted for as a subsidiary in the Consolidated Financial Statements because of the control now held but, because the Group has not purchased any equity shares in the Company, a 100% non-controlling interest is recognised ithe Statement of Financial Position.

### 18. Inventories

**Group**

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Finished goods | 2.5 | 1.9 |
| Spectrum | 0.1 | – |
|  | 2.6 | 1.9 |

Finished goods represent customer premises equipment which includes dishes, modems and outdoor unit transceivers.

The cost of inventories recognised as an expense during the period was $7.9m (2016: $13.5m).

There have been no write-downs of inventory during the year.

### 19. Trade and other receivables

|  | Group | | Company | |
|---|---|---|---|---|
|  | 30 June 2017 $'m | 30 June 2016 $'m | 30 June 2017 $'m | 30 June 2016 $'m |
| Trade receivables | 44.3 | 45.8 | 5.5 | 0.1 |
| Less provision for impairment of trade receivables | (21.5) | (6.5) | – | – |
| Net trade receivables | 22.8 | 39.3 | 5.5 | 0.1 |
| Accrued income | 13.7 | 27.7 | 17.2 | – |
| Prepayments | 17.7 | 10.3 | 4.0 | 5.2 |
| Amounts due from Group companies | – | – | 132.6 | 385.4 |
| Other receivables | 6.4 | 2.2 | 4.8 | – |
|  | 60.6 | 79.5 | 164.1 | 390.7 |

**FINANCIAL STATEMENTS
NOTES TO THE ACCOUNTS CONTINUED**

---

**19. Trade and other receivables** continued

Net trade receivables and accrued income have decreased mainly as a result of a significant provision made against a government receivable, described below, in addition to the comparative balance being high due to contracts reaching milestones at the end of the final quarter of that financial year which resulted in invoicing or revenue accruals. Of the accrued income balance $9.6m (2016: $16.4m) was due from investment grade customers who are either Governments or very well established corporations whose underlying customer is a government. The credit terms associated with the components within accrued income are largely consistent with the Group's trade receivables which are in the range of 30 to 90 days.

**Government of Indonesia**

The provision for impairment of trade receivables includes $16.8m (2016: Nil) related to a full provision for the receivable due from the Government of Indonesia ('GoI') at the end of the year. This provision comprised a bad debt expense of $12.4m and following termination of the contract post year end, the reclassification of $4.4m from deferred income to the bad debt provision related to amounts billed but for which services had not been delivered at 30 June 2017.

Avanti had contracted with the Government of Indonesia (GoI) to provide services on its Artemis satellite related to GoI's need to firstly bring into use, and secondly to maintain its orbital slot at 123 degrees east. The total contract value was in excess of $30 million. Avanti performed all of its obligations under the contract and had extended payment deadlines for GoI to assist with administrative delays. However, after no payments had been received for a significant period of time, Avanti terminated the contract and has initiated arbitration proceedings in London. The outstanding amount is $16.8m and has been fully provided in these accounts. GoI has not disputed that the amounts are due and payable. Avanti is confident that the arbitration panel will rule in the Group's favour and has provided for the debt at the year end until the uncertainty related to enforcing the arbitration panel's ruling has been sufficiently reduced.

**Long Term Receivables**

Included in the Group's trade receivables balance at 30 June 2017 are two contractual long term receivables:

- $4.4m (2016: $7.2m) related to an agreement where the outstanding debt is payable in quarterly instalments ending on 30 June 2019. 63% of the original balance has already been collected as at the date of approval of this Annual Report. In addition to the instalments payable, interest is payable at 5.25% per annum.
- €10.15m (2016: €10.5m) related to an agreement where the outstanding debt is payable in quarterly instalments over periods ranging from 3-5 years. 27% of the original balance has already been collected as at the date of approval of this Annual Report. In addition to the instalments payable, interest is payable at rates ranging between 3.5% and 5.25% per annum.

For discussion of credit risk, refer to Note 24(b).

**Company Receivables**

The Company has non-current trade and other receivables of $663.0m (2016: $642.5m) relating to amounts due from Group companies classified as loans receivable. The Company has current trade and other receivables of £5.5m relating to amounts due from Group companies.

In light of the impairment of HYLAS 1 and HYLAS 2 assets during the year, the Directors have reviewed intercompany receivables owed to the Company and as at 30 June 2017. Based on the underlying net assets recorded on the balance sheet of each subsidiary, the value of spectrum rights that have no corresponding balance sheet asset and the future forecast cash flows of those subsidiaries, the Directors have made a provision against $400.0m of intercompany receivables. The remaining carrying value of the outstanding debt of $741.6m (Note 30) is believed to be supported by the underlying assets of the subsidiaries.

The provision against intercompany receivables is an estimate which is based on the difference between the book value of the receivables and the forecast net present value of the cash flows that the business will generate from assets held by the subsidiaries. The sensitivities referred to in the Property, plant and equipment note (Note 13) give an indication of how upward or downward changes in the forecast performance of the HYLAS 1 and HYLAS 2 assets would impact the impairment assessment. Those sensitivities also apply to the provision for intercompany receivables. In addition, the assessment also notably includes HYLAS 4 cash flows forecast for a period of 19 years following that satellite coming into service. Sensitivity analysis was carried out by management over the assumptions made in the HYLAS 4 forecasts relating to yield and growth in utilisation, with the following sensitivities identified:

- a 10% decrease in the forecast yield over the life of the cash flow forecast would increase the provision by $57.7m.
- a scenario in which the ramp-up of the capacity occurs at 80% of the forecast growth would increase the provision by $126.7m.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

### 20. Deferred taxation

Deferred income tax assets and liabilities are offset when there is a legally enforceable right to offset current tax assets against current tax liabilities and when the deferred income taxes relate to the same fiscal authority. The offset amounts are as follows:

| | Group | | Company | |
|---|---|---|---|---|
| | 30 June 2017 $'m | 30 June 2016 $'m | 30 June 2017 $'m | 30 June 2016 $'m |
| Deferred tax assets | 66.0 | 28.0 | – | 0.5 |
| Deferred tax liabilities | (35.2) | (9.4) | (35.2) | – |
| | 30.8 | 18.6 | (35.2) | 0.5 |

The net movement on the deferred income tax account is as follows:

| | Group | | Company | |
|---|---|---|---|---|
| Balance at 1 July 2016 | 18.6 | 19.5 | 0.5 | 0.5 |
| Income tax recognised in the income statement | 12.2 | (1.9) | (35.5) | – |
| Effects of movements in exchange rates | – | 1.0 | (0.2) | – |
| Balance at 30 June 2017 | 30.8 | 18.6 | (35.2) | 0.5 |

| Group **30 June 2017** | Opening balance $'m | Credited/ (charged) to the income statement $'m | (Credited)/ charged to equity $'m | Effects of movements in exchange rates $'m | Closing balance $'m |
|---|---|---|---|---|---|
| **Tax assets** | | | | | |
| Unused tax losses | 25.9 | 29.1 | – | (0.8) | 54.2 |
| Property, plant and equipment | (9.4) | 18.7 | – | 0.8 | 10.1 |
| Provisions and deferred income | 2.1 | (0.2) | – | (0.2) | 1.7 |
| Share based payment | – | (0.1) | – | 0.1 | – |
| Total tax assets | 18.6 | 47.5 | – | (0.1) | 66.0 |
| | | | | | |
| **Tax liabilities** | | | | | |
| Financial instruments[1] | – | (35.2) | – | – | (35.2) |
| Total tax liabilities | – | (35.2) | – | – | (35.2) |
| Net deferred tax asset/(liability) | 18.6 | 12.3 | – | (0.1) | 30.8 |

[1] The credit recognised in the income statement on the modification of the terms of the 10% Senior Secured Notes did not give rise to an immediate tax charge but as a result the subsequent amortisation of this amount will not be deductible for tax purposes. A taxable temporary difference of $35.2m (2016: NIL) has therefore been recognised and is included above. The deferred tax liability is expected to reverse in the year ended 30 June 2018 once the recently announced debt for equity swap has concluded.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

## 20. Deferred taxation continued

| Group | Opening balance $'m | Credited/ (charged) to the income statement $'m | (Credited)/ charged to equity $'m | Effects of movements in exchange rates $'m | Closing balance $'m |
|---|---|---|---|---|---|
| **30 June 2016** | | | | | |
| **Tax assets** | | | | | |
| Unused tax losses | 25.7 | 3.0 | – | (2.8) | 25.9 |
| Provisions and deferred income | 3.7 | (1.0) | – | (0.6) | 2.1 |
| Share based payment | 1.1 | (1.2) | – | 0.1 | – |
| Total tax assets | 30.5 | 0.8 | – | (3.3) | 28.0 |
| | | | | | |
| **Tax liabilities** | | | | | |
| Property, plant and equipment | (11.0) | (2.7) | – | 4.3 | (9.4) |
| Total tax liabilities | (11.0) | (2.7) | – | 4.3 | (9.4) |
| **Net deferred tax asset/(liability)** | 19.5 | (1.9) | – | 1.0 | 18.6 |

| Company | Opening balance $'m | Credited/ (charged) to the income statement $'m | (Credited)/ charged to equity $'m | Effects of movements in exchange rates $'m | Closing balance $'m |
|---|---|---|---|---|---|
| **30 June 2017** | | | | | |
| **Tax assets** | | | | | |
| Share-based payment | 0.1 | (0.1) | – | – | – |
| Unused tax losses | 0.4 | (0.4) | – | – | – |
| Total tax assets | **0.5** | **(0.5)** | **–** | **–** | **–** |
| | | | | | |
| **Tax liabilities** | | | | | |
| Financial instruments[1] | – | (35.0) | – | (0.2) | (35.2) |
| Total tax liabilities | **–** | **(35.0)** | **–** | **(0.2)** | **(35.2)** |
| **Net deferred tax asset/(liability)** | **0.5** | **(35.5)** | **–** | **(0.2)** | **(35.2)** |

| Company | Opening balance $'m | Credited/ (charged) to the income statement $'m | (Credited)/ charged to equity $'m | Effects of movements in exchange rates $'m | Closing balance $'m |
|---|---|---|---|---|---|
| **30 June 2016** | | | | | |
| **Tax assets** | | | | | |
| Share-based payment | 0.1 | – | – | – | 0.1 |
| Unused tax losses | 0.4 | – | – | – | 0.4 |
| Total tax assets | 0.5 | – | – | – | 0.5 |
| | | | | | |
| **Net deferred tax asset/(liability)** | 0.5 | – | – | – | 0.5 |

At 30 June 2017:

- $0.5m (2016: nil) of the deferred tax asset of $64.2m (2016: $28.0m) is expected to be recovered in the next 12 months
- $35.1m (2016: nil) of the deferred tax liability of $35.2m (2016: $9.4m) is expected to be settled in the next 12 months
- the unrecognised deferred tax asset totalled $29.5m (2016: $37.2m). This is made up of unused tax losses of $27.8m (2016: $37.2m) and decelerated capital allowances of $1.7m (2016: $Nil).

## FINANCIAL STATEMENTS
### NOTES TO THE ACCOUNTS CONTINUED

———

**20. Deferred taxation** continued

The recognition of deferred tax assets is based upon whether it is more likely than not that sufficient and suitable taxable profits will be available in the future against which the reversal of temporary differences can be deducted. To determine the future taxable profits, reference is made to the latest available profit forecasts. Where the temporary differences are related to losses, relevant tax law is considered to determine the availability of the losses to offset against the future taxable profits.

Recognition therefore involves judgement regarding the future financial performance of the particular legal entity or tax group in which the deferred tax asset has been recognised.

Significant items on which the Group has exercised accounting judgement include recognition of deferred tax assets in respect of losses and accelerated capital allowances in the United Kingdom.

The amounts recognised in the consolidated financial statements in respect of each matter are derived from the Group's best estimation and judgement as described above. The inherent uncertainty regarding the outcome of these items means eventual resolution could differ from the accounting estimates and therefore impact the Group's results and cash flows. The nature of the evidence supporting the recognition of the deferred tax asset included contracted revenue that will be recognised in future periods, revenue from new business signed in FY18, forecast revenue in future periods from opportunities in the pipeline (including modest expectations in relation to future capacity sales on HYLAS 4) and taxable temporary differences of an appropriate type that reverse in an appropriate period.

**21. Cash and cash equivalents**

Cash and cash equivalents at the end of the financial year as shown in the Statement of Financial Position and the Cash Flow Statement is shown in the table below. The Group has no bank overdrafts.

| | Group | | Company | |
| --- | --- | --- | --- | --- |
| | 30 June 2017 $'m | 30 June 2016 $'m | 30 June 2017 $'m | 30 June 2016 $'m |
| Cash and bank balances | 31.4 | 55.0 | 0.9 | – |
| Short-term deposits | 1.3 | 1.4 | – | – |
| Net cash and cash equivalents | 32.7 | 56.4 | 0.9 | – |

**22. Trade and other payables**

| | Group | | Company | |
| --- | --- | --- | --- | --- |
| | 30 June 2017 $'m | 30 June 2016 $'m | 30 June 2017 $'m | 30 June 2016 $'m |
| **Current** | | | | |
| Trade payables | 9.9 | 49.5 | 1.1 | 0.1 |
| Social security and other taxes | 0.5 | 0.7 | – | – |
| Other payables | 7.2 | 3.8 | – | – |
| Accruals | 42.1 | 22.0 | 55.9 | 16.2 |
| Deferred income | 10.6 | 6.8 | – | |
| Amounts due to Group companies | – | – | 54.0 | 29.9 |
| | 70.3 | 82.8 | 111.0 | 46.2 |
| | | | | |
| **Non-current** | | | | |
| Deferred income | 9.1 | 12.7 | – | – |
| | 9.1 | 12.7 | – | – |

Accruals and deferred income above includes the interest accrued in the Company of $33.9m (2016: $16.1m) in relation to loans and borrowings. See note 23 Loans and other borrowings for further details.

# FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

## 23. Loans and other borrowings

| | Group current | | Group non-current | |
|---|---|---|---|---|
| | **30 June 2017**<br>**$'m** | 30 June 2016<br>$'m | **30 June 2017**<br>**$'m** | 30 June 2016<br>$'m |
| **Amortised cost** | | | | |
| High Yield Bonds - Original notes | – | – | – | 629.5 |
| High Yield Bonds - Amended Existing Notes | – | – | 293.6 | – |
| High Yield Bonds - PIK Toggle Notes | – | – | 287.6 | – |
| Finance lease liabilities (i) (note 27) | 2.1 | 3.3 | 11.4 | 12.5 |
| | **2.1** | 3.3 | **592.6** | 642.0 |

| | Company current | | Company non-current | |
|---|---|---|---|---|
| | **30 June 2017**<br>**$'m** | 30 June 2016<br>$'m | **30 June 2017**<br>**$'m** | 30 June 2016<br>$ m |
| **Amortised cost** | | | | |
| High Yield Bonds - Original notes | – | – | – | 629.5 |
| High Yield Bonds - Amended Existing Notes | – | – | 293.6 | – |
| High Yield Bonds - PIK Toggle Notes | – | – | 287.6 | – |
| Finance lease liabilities (i) (note 27) | 1.4 | 2.8 | 1.7 | 2.7 |
| | **1.4** | 2.8 | **582.9** | 632.2 |

(i) Finance lease obligations are secured by retention of title to the related assets. The borrowings are on fixed interest rate debt with repayment periods between 3 and 13.5 years

### High yield bonds
#### October 2016 Coupon Capitalisation
The Company had 10% Senior Secured Notes ('Original Notes') with a nominal value of $645.0m in issue at the beginning of the year. On 17 October 2016, the Company announced the result of a successful consent solicitation process. The Company received consents from holders of 89.5% of its Senior Secured Notes to permit paying the interest due on 1 October 2016 in respect of consenting holders' Senior Secured Notes in the form of additional Senior Secured Notes on the same terms as the existing Senior Secured Notes in lieu of cash. As a result, additional Senior Secured Notes with a nominal value of $40.4m were were issued in lieu of $28.9m of the cash coupon due on that date. A cash coupon of $3.4m was paid to the 10.5% of holders from whom consent was not received in October 2016.

#### January 2017 Senior Secured Notes Restructuring
On 23 January 2017, the Group completed a financial restructuring which, inter alia, modified the Senior Secured Notes with a nominal value of $685.4m in issue at that date into two tranches of Notes as follows:

- $203.8m of the Original Notes were converted into $203.8m of 10%/15% Senior Secured Notes ('PIK Toggle Notes')
- $481.6m of the Original Notes were converted into $481.6m of 12%/17.5% Senior Secured Notes ('Amended Existing Notes')

In addition $6.5m of additional PIK Toggle Notes were issued on completion of the restructuring to settle the accrued interest on the proportion of Original Notes that were converted into PIK Toggle Notes. The accrued interest at the restructuring date on the proportion of the Original Notes that were converted into Amended Existing Notes was settled on 1 April 2017 as described below under the heading April 2017 Coupon.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

———

**23. Loans and other borrowings** continued

**PIK Toggle Notes**
The PIK Toggle Notes included the following primary modifications to the terms of the Original Notes:

- the ability to PIK the April 2017 and October 2017 coupon payments, subject to a minimum cash threshold metric
- an extension of the maturity date from 1 October 2019 to 1 October 2021
- the introduction of a Margin Increase mechanism which could see the cash coupon rate of 10% and the PIK rate of 15% increase by a maximum of 2.5% in two steps of 1.25%, dependent on the Group's performance against EBITDA targets

The Group performed an assessment under its accounting policies and the requirements of IAS 39 as to whether the restructuring of the terms of the Original Notes into PIK Toggle Notes represented a substantial modification. As the net present value of the cash flows under the original terms and the modified terms was less than 10% different, the modification was accounted for as non-substantial.

As a result, the existing debt converted of $203.8m remained on the balance sheet at its current carrying value. The debt will be accreted up to its final redemption value over the extended term to maturity using an amended Effective Interest Rate.

**Amended Existing Notes**
The Amended Existing Notes included the following primary modifications to the terms of the Original Notes:

- an increase in the cash coupon from 10% to 12%
- the ability to PIK the April 2017, October 2017 and April 2018 coupon payments, subject to a minimum cash threshold metric
- an extension of the maturity date from 1 October 2019 to 1 October 2022
- the introduction of a Margin Increase mechanism which could see the cash coupon rate of 10% and the PIK rate of 15% increase by a maximum of 2.5% in two steps of 1.25%, dependent on the Group's performance against EBITDA targets

The Group performed an assessment under its accounting policies and the requirements of IAS 39 as to whether the restructuring of the terms of the Original Notes into Amended Existing Notes represented a substantial modification. As the net present value of the cash flows under the original terms and the modified terms was greater than 10% different, the modification was accounted for as substantial.

As a result, on completion of the restructuring, the carrying value of the Original Notes converted into Amended Existing Notes of $481.6m was de-recognised and the Amended Existing Notes with a nominal value of $481.6m were recognised on the balance sheet at the date of modification at their fair value of $245.6m. The fair value at the date of modification of $0.51 per note was obtained from the price of the first trade in the Amended Existing Notes after modification. The gain arising on substantial modification of $219.2m (Note 9) comprises the $236.0m difference between the derecognised financial liability and fair value of the new financial liability in addition to $16.8m of unamortised costs of issues and discounts related to the substantially modified Original Notes.

**New Money**
As a part of the same restructuring completed on 23 January 2017, the Group issued new PIK Toggle Notes with a nominal value of $82.5m with a 3% discount.

*April 2017 Coupon*

The April 2017 coupon payments due on the PIK Toggle Notes and Amended Existing Notes were both settled through the issue of additional notes rather than the payment of cash. $7.9m of PIK Toggle Notes were issued in respect of interest due on these notes between 23 January 2017 and 1 April 2017. $30.6m of Amended Existing Notes were issued in respect of interest due on these notes between 2 October 2016 and 1 April 2017. The interest accrued as at 23 January 2017 on the portion of the Original Notes converted into PIK Toggle Notes was settled through the issue of $6.5m of additional PIK Toggle Notes on the date that the restructuring was completed.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

### 23. Loans and other borrowings continued
*New Money* continued
**30 June 2017**

| Issuer | Original notional value | Description of Instrument | Due |
|---|---|---|---|
| Avanti Communications Group plc | $512.2m | Amended Existing Notes | 1 October 2022 |
| Avanti Communications Group plc | $300.8m | PIK Toggle Notes | 1 October 2021 |

30 June 2016

| Issuer | Original notional value | Description of Instrument | Due |
|---|---|---|---|
| Avanti Communications Group plc | $645m | 10% Senior Secured Notes | 1 October 2019 |

The high yield bonds are disclosed in non-current loans and borrowings as detailed below:

| | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| High yield bonds | 813.0 | 645.0 |
| Add: Unamortised issue premium | – | 4.6 |
| Less: Unamortised credit on substantial modification | (218.6) | – |
| Less: Unamortised issue discount | (13.2) | (7.8) |
| Less: Unamortised debt issuance costs | – | (12.3) |
| | 581.2. | 629.5 |

### 24. Financial instruments and risk management
**Group**

The Group's principal financial instruments comprise Bonds, finance leases, and cash and short-term deposits. The main purpose of these financial instruments is to provide finance for the Group' operations. The Group has various other financial assets and liabilities such as trade receivables and payables which arise directly from operations.

The Group is subject to the risks arising from adverse movements in interest rates and foreign currency. Credit risk and liquidity risk also arise from the Group's financial instruments. The managing of these risks, along with the day-to-day managing of treasury activities, is performed by the finance team.

All financial instruments have been measured at amortised cost. As such, financial assets being cash & cash equivalents and trade and other receivables are classified as 'Loans and receivables' and financial liabilities being trade and other payables and interest-bearing liabilities have been classified as 'Other financial liabilities'.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

———

### 24. Financial instruments and risk management continued
**Group** continued
**a) Market risk**
*i) Foreign exchange risk management*
The Group operates internationally and is exposed to foreign exchange risk arising from various currency exposures, primarily with respect to GBP and the Euro. In order to mitigate the foreign currency risk, the Group monitors the level at which natural hedges occur and continually reviews the need to enter into forward contracts in order to mitigate any material forecast exposure.

At 30 June 2017, if the Euro had weakened/strengthened against the US Dollar by 5% with all other variables held constant, post tax loss would have worsened by $0.8m or improved by $0.8m (2016: post tax loss would have worsened by $0.4m or improved by $0.4m).

At 30 June 2017, if Sterling had weakened/strengthened against the US Dollar by 5% with all other variables held constant, post tax loss would have worsened by $0.3m or improved by $0.3m (2016: post tax loss would have improved by $0.7m or worsened by $0.7m).

The Group has a presentational currency of US Dollars. Whilst a number of companies within the Group have a functional currency that is also US Dollars, certain trading subsidiaries have a functional currency of Sterling or Euro. As a result, the Group experiences translation foreign exchange risk of assets and liabilities of non US Dollar subsidiaries on consolidation in addition to the translation of US Dollar inter-company loans to non US Dollar functional currency of subsidiaries that are accounted for as akin to Equity. These two factors drive the foreign exchange movements disclosed in the Consolidated Statement of Other Comprehensive Income.

The average volatility of rates during the year compared to the year end exchange rate was 3.46% and therefore management believes that a 5% sensitivity rate provides a reasonable basis upon which to assess expected changes in foreign exchange rates.

*ii) Interest risk management*
The Group borrows in pounds Sterling and US Dollars at fixed rates of interest and does not seek to mitigate the effect of adverse movements in interest rates. Cash and deposits earn interest at fixed rates based on the banks' short term treasury deposit rates. Short-term trade and other receivables are interest free.

**b) Credit risk management**
The Group's principal financial assets are cash and short term deposits and trade and other receivables. Cash and cash equivalents are deposited with high-credit quality financial institutions with a minimum rating of A+. Trade receivables are principally from Government customers and well established corporations. The credit quality of major customers is assessed before trading commences taking into account their financial position, past experience and other factors.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

**24. Financial instruments and risk management** continued
Group continued
**b) Credit risk management** continued

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Trade receivables | **28.8** | 39.3 |
| Total | **28.8** | 39.3 |

The ageing of trade receivables and other financial assets which have not been impaired was as follows:

|  | Not past due $'m | 1–30 days $'m | 31–60 days $'m | 60+ days $'m | Total $'m |
|---|---|---|---|---|---|
| **30 June 2017** | **23.6** | **10.4** | **0.5** | **9.9** | **44.3** |
| **30 June 2016** | 29.5 | 5.4 | 1.0 | 3.4 | 39.3 |

Movements in the provision for impairment of trade receivables are as follows:

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| At 1 July 2016 | **6.5** | 4.4 |
| Allowances made in the period | **19.1** | 2.4 |
| Amounts used and reversal of unused amounts | **(4.1)** | (0.3) |
| **At 30 June 2017** | **21.5** | 6.5 |

The provision of $21.5m (2016: $6.5m) has been raised against gross trade receivables of $44.3m (2016: $45.8m). Every major customer is assessed on an individual basis and we provide for bad debts when an impairment has been identified.

In addition to trade receivables, the year-end balance sheet includes $13.7m accrued income (2016: $27.7m). $9.6m (2016: $16.4m) of accrued income was due from investment grade counter parties who are either Government's or very well established corporations whose underlying customer is a government. The credit terms associated with the components within accrued income are largely consistent to the Group's trade receivables which are in the range of 30 to 90 days.

**c) Liquidity risk management**
Liquidity risk is the risk that the Group may have difficulty in obtaining funds in order to be able to meet both its day-to-day operating requirements and its debt servicing obligations. The Group manages its exposure to liquidity risk by regular monitoring of its liabilities. Cash and cash forecasts are monitored on a daily basis and our cash requirements are met by a mixture of short term cash deposits, debt and finance leases.

The following table analyses the Group's financial liabilities into relevant maturity groupings based on the expected undiscounted cash flows.

|  | Within 1 year $'m | 1–2 years $'m | 2–5 years $'m | 5+ years $'m | Contractual amount $'m | Carrying amount $'m |
|---|---|---|---|---|---|---|
| **30 June 2017** |  |  |  |  |  |  |
| High yield bonds | **–** | **–** | **300.8** | **512.2** | **813.0** | **581.2** |
| Finance leases | **3.2** | **2.5** | **5.7** | **10.1** | **21.6** | **13.5** |
| Trade payables | **9.9** | **–** | **–** | **–** | **9.9** | **9.9** |
| **30 June 2016** |  |  |  |  |  |  |
| High yield bonds | – | – | 645.0 | – | 645.0 | 629.6 |
| Finance leases | 4.7 | 3.3 | 6.9 | 11.6 | 26.5 | 16.1 |
| Trade payables | 49.5 | – | – | – | 49.5 | 49.5 |

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

**24. Financial instruments and risk management** continued
**Group** continued
**c) Liquidity risk management** continued
Interest is payable on the high yield bonds at 7.5%-17.5% per annum over the three year remaining life of the bonds.

In addition, the Company has net intercompany receivables carried at $382.6m (2016: net receivables carried at $355.5m). The contractual amount is the carrying amount.

**d) Capital risk management**
The Group's objectives when managing capital are to safeguard the Group's ability to continue as a going concern in order to provide returns for shareholders and benefits for other stakeholders and to maintain an optimal capital structure to reduce the cost of capital.

The capital structure of the Group consists of debt, which includes borrowings (Note 23), cash and cash equivalents (Note 21) and equity attributable to equity holders of the parent, comprising Ordinary Share capital, share premium, other reserves and retained earnings retained earnings.

We endeavour to maximise earnings and minimise risk through an appropriate balance of debt and equity.

**e) Financial instruments by category**
**Group**

| Assets as per balance sheet | Loans and receivables $'m | Total $'m |
|---|---|---|
| **30 June 2017** | | |
| Trade and other receivables (excl prepayments) | **42.8** | **42.8** |
| Cash and cash equivalents | **32.7** | **32.7** |
| | **75.5** | **75.5** |
| **30 June 2016** | | |
| Trade and other receivables (excl prepayments) | 69.2 | 69.2 |
| Cash and cash equivalents | 56.4 | 56.4 |
| | 125.6 | 125.6 |

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

**24. Financial instruments and risk management** continued
**Group** continued
**e) Financial instruments by category** continued

| Liabilities as per balance sheet | Other financial liabilities at amortised cost $'m | Total $'m |
|---|---|---|
| **30 June 2017** | | |
| Borrowings (excl finance lease liabilities) | **581.2** | **581.2** |
| Finance lease liabilities | **13.5** | **13.5** |
| Trade and other payables (excl non-financial liabilities) | **59.7** | **59.7** |
| | **654.4** | **654.4** |
| **30 June 2016** | | |
| Borrowings (excl finance lease liabilities) | 629.5 | 629.5 |
| Finance lease liabilities | 15.8 | 15.8 |
| Trade and other payables (excl non-financial liabilities) | 94.9 | 94.9 |
| | 740.2 | 740.2 |

**Company**

| Assets as per balance sheet | Loans and receivables $'m | Total $'m |
|---|---|---|
| **30 June 2017** | | |
| Trade and other receivables (excl prepayments) | **160.1** | **160.1** |
| Cash and cash equivalents | **0.9** | **0.9** |
| | **161.0** | **161.0** |
| **30 June 2016** | | |
| Trade and other receivables (excl prepayments) | 385.5 | 385.5 |
| | 385.5 | 385.5 |

| Liabilities as per balance sheet | Other financial liabilities at amortised cost $'m | Total $'m |
|---|---|---|
| **30 June 2017** | | |
| Borrowings (excl finance lease liabilities) | **581.2** | **581.2** |
| Finance lease liabilities | **3.1** | **3.1** |
| Trade and other payables (excl non-financial liabilities) | **57.0** | **57.0** |
| | **641.3** | **641.3** |
| **30 June 2016** | | |
| Borrowings (excl finance lease liabilities) | 629.5 | 629.5 |
| Finance lease liabilities | 5.5 | 5.5 |
| Trade and other payables (excl non-financial liabilities) | 46.2 | 46.2 |
| | 681.2 | 681.2 |

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

### 24. Financial instruments and risk management continued
**Group** continued
**e) Financial instruments by category** continued

The Group has no financial instruments carried at fair value through profit or loss. All financial liabilities are carried at amortised cost and all loans and receivables are measured at initial recognition at fair value and are subsequently measured at amortised cost using the effective interest rate method where the time value of money is material. Appropriate allowances for estimating irrecoverable amounts are recognised in the Income Statement where there is evidence that the asset is impaired.

**Company**
Overall interest rate risk, foreign exchange risk, market risk, credit risk and liquidity risk are managed on a Group wide basis. Any derivatives, of which there are none (2016: none) are measured at fair value and intercompany balances and accruals are measured at amortised cost. All intercompany balances are repayable on demand and accruals and derivatives mature in less than 1 year. There is a $400.0m provision for impairment against the Company's receiveables due from subsidiaries.

### 25. Share capital – issued and fully paid

| | Number of shares '000 | Group and Company ordinary Shares £0.01 per share $'m | EBT | shares $'m | Group and company share premium $'m |
|---|---|---|---|---|---|
| At 1 July 2016 | 147,396 | 2.5 | (0.1) | | 515.9 |
| Shares issued | 14,740 | 0.2 | | – | 3.5 |
| Issue of treasury shares to EBT | – | – | – | – | – |
| **At 30 June 2017** | **162,136** | **2.7** | **(0.1)** | | **519.4** |

On 9 February 2017, the Group issued 14,739,599 shares at £0.20 per share. As at 30 June 2017, 967,106 shares were unpaid up, and were subsequently settled on 17 August 2017

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

### 26. Share based payments

The fair value of share based payments charged to the Income Statement in the period was S0.2m (2016: S0.5m). The full fair value of these share based payments is recognised over their respective vesting period. All share based payment plans are equity settled and details of these plans are set out below.

The Company has established 18 share based payment schemes:

- Enterprise Management Incentives scheme ('EMI')
- Long Term Incentive Plan ('LTIP')
- Unapproved share option plan (2007)
- Unapproved share option plan (March 2010)
- Unapproved share option plan (July 2010)
- Unapproved share option plan (October 2010)
- Unapproved share option plan (April 2011)
- Unapproved share option plan (July 2011)
- Unapproved share option plan (October 2011)
- Unapproved share option plan (October 2011) key management personnel
- Save As You Earn scheme ('SAYE') (November 2011)
- Unapproved share option plan (March 2012)
- Unapproved share option plan (April 2012)
- Long Term Incentive Plan ('LTIP') (July 2013)
- Unapproved share option plan (October 2013)
- Save As You Earn scheme ('SAYE') (November 2013)
- Unapproved share option plan (May 2014)
- Unapproved share option plan (May 2015)

The 2016 charges for each of the significant plans above were as follows:

|  | 2017 charge S'm | 2016 charge S m |
|---|---|---|
| LTIP schemes | – | – |
| Unapproved schemes | 0.2 | 0.4 |
|  | 0.2 | 0.4 |

To date all share based payments (with exception of the SAYE scheme) have been granted with a strike price of 1 pence. The strike price on the SAYE scheme 2011 is £3.09, and £2.10 on the SAYE scheme 2013.

In July 2007 an Employee Benefit Trust ('EBT') was established. The EBT is managed by Bedell Trustees in Jersey. The results of the EBT have been consolidated into the Group's results.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

**26. Share based payments** continued

The table below sets out the number and weighted average exercise prices ('WAEP') of, and movements in, the share schemes during the year:

|  | 2017 No. | 2017 WAEP | 2016 No. | 2016 WAEP |
|---|---|---|---|---|
| **EMI** |  |  |  |  |
| Outstanding at the beginning of the year | 118,344 | £0.01 | 126,344 | £0.01 |
| Granted during the year | – | – | – | – |
| Forfeited in the year | – | – | – | – |
| Exercised during the year | (11,000) | – | (8,000) | £0.01 |
| Outstanding at the end of the year | 107,344 | £0.01 | 118,344 | £0.01 |
|  |  |  |  |  |
| **Unapproved schemes** |  |  |  |  |
| Outstanding at the beginning of the year | 1,047,162 | £0.01 | 1,218,162 | £0.01 |
| Granted during the year | – | – | 11,000 | £0.01 |
| Forfeited in the year | (363,850) | – | (91,000) | £0.01 |
| Exercised during the year | (18,000) | – | (91,000) | £0.01 |
| Cancelled in the year | – | – | – | – |
| Reissued in the year | – | – | – | – |
| Outstanding at the end of the year | 665,312 | £0.01 | 1,047,162 | £0.01 |
|  |  |  |  |  |
| **SAVE schemes** |  |  |  |  |
| Outstanding at the beginning of the year | 96,015 | £2.1 | 96,015 | £2.10 |
| Granted during the year | – | – | – | – |
| Forfeited in the year | – | – | – | – |
| Exercised during the year | – | – | – | – |
| Outstanding at the end of the year | 96015 | £2.1 | 96,015 | £2.10 |

The weighted average share price for the year ended 30 June 2017 was £0.22 (2016: £1.56). 118,344 (2016: 118,344) of the EMI options were exercisable at 30 June 2017.

The exercise price of the share based payments outstanding at 30 June 2017 was £0.01 and the weighted average remaining contractual life was 7.5 years (2016: 8.5 years).

Each model has slightly different exercise criteria and therefore separate valuation models were used.

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

-------

### 26. Share based payments continued

**EMI Scheme**

The EMI scheme was used to issue share based payments to staff on 24 July 2007 at an exercise price of 1p. The new share based payments were issued for 10 years with 25% vesting at the end of years 3, 4, 5 and 6. Those staff who had previously held unvested share based payments in the former parent Company at the time of the de-merger were given a shorter vesting period for these new share based payments. There are no performance criteria associatedperformance criteria associated with these options and they are exercisable as long as the option holder remains an employee of the Company.

The weighted average inputs to the Black-Scholes model are as follows:

| | |
|---|---|
| Share price at date of grant | £2.16 |
| Fair value | £2.04 |
| Expected volatility | 35% |
| Weighted average exercise price | £0.01 |
| Expected life | 4 years |
| Expected dividend yield | 1% |
| Risk-free interest rate | 5.5% |

Expected volatility was determined by calculating the actual volatility of the Group's share price since flotation. The expected life used in the model has been adjusted, based on management's best estimate, for the effects of non-transferability, exercise restrictions, and behavioural considerations.

**Long Term Incentive Plan**

The LTIP was established by the Company with approval from the Remuneration Committee to reward and incentivise the Executive Directors and senior managers of the Company.

The LTIP allocations are in separate sub funds within the EBT and are subject to a discretionary Trust. The shares are subject to automatic revocation if certain criteria (set out below) are not met and continue to be revocable for the entire Trust period.

The allocations into the LTIP vary for each executive. The total remaining allocation to each executive falls into the following tranches.

**i) The Core Tranche**

This element of the grant became exercisable in seven equal instalments. The first instalment was exercisable on grant and the second on 30 June 2008. The remaining five were exercisable yearly thereafter.

**ii) The Exceptional Achievement Tranche**

This element of the grant was amended during 2010. Originally, these options were only exercisable if the average market value of the share exceeded £5.00 for a consecutive period of six months prior to 30 June 2010. Given the unprecedented market conditions over the previous year, the Remuneration Committee considered that whilst the executives had performed well and that the share price had outperformed the FTSE 100 and AIM All Share Index since the LTIPs were granted, the target set in the LTIP rules may still not be achieved.

In May 2010, the Remuneration Committee agreed to extend the target date to 31 December 2010 and that the six month average target price should be increased £5.50. The benchmark for this tranche of LTIP was satisfied in November 2010.

**(iii) The Extraordinary Achievement Tranche**

This element of the grant was only exercisable if the market value of a share exceeded £10.00 for a consecutive period of six months before 30 June 2013. At 30 June 2013, the criteria of the extraordinary achievement tranche had not been met, therefore the outstanding shares were returned to the EBT.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

**26. Share based payments** continued
**(iii) The Extraordinary Achievement Tranche** continued

| | Executive Directors No. | Senior managers No. |
|---|---|---|
| Original allocations: | | |
| Core | 1,192,960 | 125,000 |
| Exceptional | 679,570 | 62,500 |
| Extraordinary | 679,213 | 62,500 |
| Additional grant July 2010 | 400,000 | – |
| Total allocation | 2,951,743 | 250,000 |
| Core vested | (1,192,960) | (125,000) |
| Exceptional vested | (679,570) | (62,500) |
| Unvested balance returned to the EBT | (1,079,213) | (62,500) |
| Outstanding balance at 30 June 2016 and 2017 | – | – |

**iv) The Share Award Tranche**
The share award LTIP 2015 was issued 30 July 2013 to 30 June 2015. Two-thirds of the award was based on revenue performance for the year ending 30 June 2015. One-third of the award was based on the share price as at 30 June 2015.

In 2015, the Remuneration Committee determined that 50% of the 2015 award should be made but that, in the longer term interests of the Company, vesting should be made subject to the achievement of an additional criterion that the share price should remain at or above a certain level for three consecutive months. This amended award shall lapse if this is not achieved by 30 June 2020.

A second LTIP award was issued on 14 January 2014 to 30 June 2016. Consistent with the earlier LTIP, two-thirds of the award is based on revenue performance for the year ending 30 June 2016. Therefore there is no charge relating to that part of the LTIP. One-third of the award is based on the share price as at 30 June 2016. The revenue performance and share price criteria were not met as at 30 June 2016. However, the Remuneration Committee determined that, in the longer term interests of the Company, the award should remain extant but vesting should be made subject to the achievement of an additional criterion that the share price should remain at or above a certain level for three consecutive months. This amended award shall lapse if this is not achieved by 30 June 2020.

A third LTIP award was issued on 5 November 2014 to 30 June 2017. As consistent with the earlier LTIP awards, two-thirds of the award is based on revenue performance for the year ending 30 June 2017. Therefore there is no charge relating to that part of the LTIP. One-third of the award is based on the share price as at 30 June 2017. The revenue performance and share price criteria were not met as at 30 June 2017. However, the Remuneration Committee determined that, in the longer term interests of the Company, the award should remain extant but vesting should be made subject to the achievement of an additional criterion that the share price should remain at or above a certain level for three consecutive months. This amended award shall lapse if this is not achieved by 30 June 2020.

A fourth LTIP award was issued on 9 October 2015 to 30 June 2018. Consistent with the earlier LTIP awards, two-thirds of the award is based on revenue performance for the year ending 30 June 2018. Therefore there is no charge relating to that part of LTIP. One-third of the award is based on a share price as at 30 June 2018.

No LTIP award was made in the financial year ending 30 June 2017.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

## 26. Share based payments continued
### iv) The Share Award Tranche continued
The total number of options issued under the awards was as follows:

| | 30 June 2015 | 30 June 2016 | | |
|---|---|---|---|---|
| | Amended Award | Total award | Two-thirds | One-third |
| | Dependent on share price | | Dependent on revenue performance | Dependent on share price |
| Executive Directors | 315,651 | 678,729 | 452,486 | 226,243 |
| Senior managers | 104,773 | 221,289 | 147,526 | 73,763 |
| | 420,424 | 900,018 | 600,012 | 300,006 |

| | 30 June 2017 | | | 30 June 2018 | | |
|---|---|---|---|---|---|---|
| | Total award | Two-thirds | One-third | Total award | Two-thirds | One-third |
| | | Dependent on revenue performance | Dependent on share price | | Dependent on revenue performance | Dependent on share price |
| Executive Directors | 695,697 | 463,798 | 231,899 | 730,482 | 486,988 | 243,494 |
| Senior managers | 304,877 | 203,251 | 101,626 | 318,097 | 212,065 | 106,032 |
| | 1,000,574 | 667,049 | 333,525 | 1,048,579 | 699,053 | 349,526 |

## Unapproved Schemes
At 30 June 2017, there were 13 unapproved schemes in place, established at various dates since 2007.

Under each scheme, the options are issued for 10 years with 33% vesting at the end of years 3, 4 and 5.

Prior to 1 May 2015, nine of the schemes (noted below) required the market value of the shares to be £10.00 or more per share for a consecutive period of six months in order for the vesting conditions to be met. On 1 May 2016, the remaining options in these schemes were cancelled, and reissued where the option holder continued to be employed by the Group. The reissued options require the market value of the shares to be £5.00 or more per share for a consecutive period of six months in order for the vesting conditions to be met. Other terms remained the same.

Unapproved schemes reissued with £5.00 share price vesting criteria:

- Unapproved share option plan (March 2010)
- Unapproved share option plan (October 2010)
- Unapproved share option plan (April 2011)
- Unapproved share option plan (July 2011)
- Unapproved share option plan (October 2011)
- Unapproved share option plan (March 2012)
- Unapproved share option plan (April 2012)
- Unapproved share option plan (July 2013)
- Unapproved share option plan (May 2014)
- Unapproved share option plan (May 2015)

For all other schemes, there are no performance criteria and the options are exercisable as long as the time vesting criteria are met and the option holder remains with the company.

### Save as you earn ('SAYE') schemes
The SAYE schemes were established in November 2011 and November 2013 and were open to all employees of the Company at the time.

SAYE is an HMRC approved all employee savings-related share option scheme under which employees save up to a limit of £250.00 on a four weekly basis with an option to buy shares in the Company at the end of a three year period at a discount of up to 20% of the market value on the grant date. Options are not subject to performance conditions. All options are exercisable from three years from the date of grant. All options expire six months from their exercise date.

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

———

### 27. Obligations under finance leases
**Leasing arrangements**
Finance leases relate to capital equipment with typical lease terms of three to five years. The Group has the option to purchase the equipment for a nominal value at the conclusion of the lease agreement. The Group's obligations under finance leases are secured by the lessor's title to the leased assets.

Also included under finance leases is the 13.5 year IRU agreement described in Note 2.

The present value of the minimum lease payments in relation to this agreement and included below is $10.0m of which $0.5m is current and $9.5m is non-current.

**Finance lease liabilities**

| | Group | | Group Present value of lease payments | |
|---|---|---|---|---|
| | 30 June **2017** **$'m** | 30 June 2016 $'m | 30 June **2017** **$'m** | 30 June 2016 $'m |
| No later than 1 year | **3.3** | 4.7 | **2.1** | 3.3 |
| Later than 1 year no later than 5 years | **8.4** | 10.2 | **4.2** | 5.4 |
| Later than 5 years | **10.1** | 11.6 | **7.2** | 7.1 |
| | **21.8** | 26.5 | **13.5** | 15.8 |
| Less future finance charge | **(8.3)** | (10.7) | **–** | – |
| | **13.5** | 15.8 | **13.5** | 15.8 |

| | Company | | Company Present value | |
|---|---|---|---|---|
| | 30 June **2017** **$'m** | 30 June 2016 $'m | 30 June **2017** **$'m** | 30 June 2016 $'m |
| No later than 1 year | **1.6** | 3.1 | **1.4** | 2.8 |
| Later than 1 year no later than 5 years | **2.0** | 3.8 | **1.7** | 2.7 |
| | **3.6** | 6.9 | **3.1** | 5.5 |
| Less future finance charge | **(0.5)** | (1.4) | **–** | – |
| | **3.1** | 5.5 | **3.1** | 5.5 |

Included in the Financial Statements as:

| | Group | | Company | |
|---|---|---|---|---|
| | 30 June **2017** **$'m** | 30 June 2016 $'m | 30 June **2017** **$'m** | 30 June 2016 $'m |
| Current borrowings | **2.1** | 3.3 | **1.4** | 2.8 |
| Non-current borrowings | **11.4** | 12.5 | **1.7** | 2.7 |
| **Present value of minimum lease payments** | **13.5** | 15.8 | **3.1** | 5.5 |

**FINANCIAL STATEMENTS**
**NOTES TO THE ACCOUNTS CONTINUED**

---

### 28. Obligations under operating leases

The Group's future aggregate minimum lease payments under non-cancellable operating leases are as follows:

|  | 30 June 2017 Land & Buildings $'m | 30 June 2017 Equipment $'m | 30 June 2017 Total $'m | 30 June 2016 Land & Buildings $'m |
|---|---|---|---|---|
| No later than one year | 1.7 | 0.1 | 1.8 | 1.8 |
| Later than 1 year no later than 5 years | 6.7 | – | 6.7 | 6.9 |
| After 5 years | 18.1 | – | 18.1 | 20.4 |
|  | 26.5 | 0.1 | 26.6 | 29.1 |

Operating lease commitments principally relate to leased office space of the Group's head office. The Group entered in a 20 year lease on the property on 6 May 2013, with annual rent of $1.7m.

### 29. Capital commitments

As at 30 June 2017 the Group has contracted but not provided for capital commitments of $43.6m in relation to the procurement of HYLAS3 (2016: $42.7m) and $77.0m in relation to the procurement of HYLAS 4 (2016: $82.3m).

### 30. Related party transactions and directors' emoluments

**Transactions with Directors**

Details of the Directors' remuneration are set out below in aggregate for each of the categories specified in the Companies Act 2006.

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Salaries and other short term employee benefits | 2.0 | 2.7 |
| Bonus | 0.3 | – |
|  | 2.3 | 2.7 |
| Payments into defined contribution schemes | 0.1 | 0.2 |
|  | 2.4 | 2.9 |

Pension contributions amounting to $0.1m (2016: $0.2m) were made into personal pension schemes in respect of three (2016: four) of the Directors.

No Non-Executive directors exercised share options in the period.

The emoluments of the highest paid Director totalled $0.9m (2016: $0.8m), made up of:

| Total emoluments | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Salaries and other short term employee benefits | 0.7 | 0.7 |
| Bonus | 0.1 | – |
| Payments into defined contribution schemes | 0.1 | 0.1 |
| Total emoluments | 0.9 | 0.8 |

# FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

**30. Related party transactions and directors' emoluments** continued
**Transactions with Directors and key management personnel – Group and Company**
Details of the remuneration of Directors and key management personnel are set out below in aggregate for each of the categories specified in IAS 24 'Related Party Disclosures'.

Key management personnel are considered to be the executive Board, the general counsel, the head of regulatory, and the managing director of the consulting division.

| | Group | | Company | |
|---|---|---|---|---|
| **Total emoluments** | **30 June 2017 $'m** | 30 June 2016 $'m | **30 June 2017 $'m** | 30 June 2016 $'m |
| Salaries and other short term employee benefits | **3.0** | 3.1 | **–** | 0.4 |
| Bonus | **0.6** | 0.1 | **–** | – |
| Payments into defined contribution schemes | **0.2** | 0.3 | **–** | – |
| | **3.8** | 3.5 | **–** | 0.4 |

**Other related party transactions**
Of the non-executive directors, Craig Chobor is a Managing Director of Solus Alternative Asset Management ("Solus"), Michael Leitner is a managing partner of Tennenbaum Capital Partners ("Tennenbaum"), and Peter Reed is Chief Investment Officer at Great Elm Capital Management ("Great Elm"). Each of those funds were significant holders of Avanti's High Yield Bonds during the reporting period and at the year end. Solus is also a major shareholder of the Company's Ordinary Share capital. These non-executive directors were appointed as directors on 27 January 2017 immediately following the successful completion of a debt restructuring. The Company considers that the directors became related parties from the date of their appointment as directors. The terms of the debt restructuring that immediately preceded the directors appointment was completed on the same terms for all holders of the same class of notes.

During the period from 27 January 2017 up to the balance sheet date, transactions with these related parties related to accrued interest of $27.1m, $7.8m, and $6.0m for Solus, Tennenbaum, and Great Elm Capital respectively on the outstanding loan notes on terms consistent with the contractual terms of the notes and as a result consistent with all other holders of the same class of Notes. On 1 April 2017, the accrued interest on the 2021 Notes and the 2023 Notes of $18.5m, $5.3m, and $4.1m owed to Solus, Tennenbaum, and Great Elm Capital respectively was settled through the issue of additional loan notes. There was $16.2m, $4.7m, and $3.6m accrued interest payable to Solus, Tennenbaum, and Great Elm Capital respectively at 30 June 2017, included within accruals.

**Subsidiaries**
Intra-Group transactions are eliminated on consolidation and are not reported in the Group accounts. The Company charged the following management fees to its subsidiaries:

| | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Avanti Communications Limited | **5.9** | 2.9 |
| Avanti Broadband Limited | **3.1** | 4.6 |
| Avanti Space Limited | **1.6** | 1.6 |
| Avanti HYLAS 2 Cyprus Limited | **4.7** | – |
| Avanti HYLAS 2 Limited | **1.9** | 1.9 |
| | **17.2** | 11.0 |

# FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

**30. Related party transactions and directors' emoluments** continued

The parent Company had the following intercompany balances outstanding at the year end:

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Avanti Space Limited | **0.4** | 9.6 |
| Avanti Turkey Uydu Telekomunikasyon Limited | **16.7** | – |
| Avanti HYLAS 2 Limited | **609.0** | 612.6 |
| Avanti Communications Infrastructure Limited | **115.5** | 375.8 |
|  | **741.6** | 998.0 |

Intercompany balances are unsecured and repayable on demand. The above is stated net of a provision against intercompany receivables of $400.0m which was made in the year.

The parent Company had the following trade intercompany balances outstanding at the year end included within trade and other receivables:

|  | 30 June 2017 $'m | 30 June 2016 $'m |
|---|---|---|
| Avanti Communications Limited | **0.4** | – |
| Avanti Broadband Limited | **3.5** | – |
| Avanti Space Limited | **0.1** | – |
| Avanti HYLAS 2 Cyprus Limited | **1.4** | – |
| Avanti Communications Marketing Services Limited | **0.1** | – |
|  | **5.5** | – |

## 31. Cash (absorbed by)/generated from operations

|  | Group 30 June 2017 $'m | Group 30 June 2016 $'m | Company 30 June 2017 $'m | Company 30 June 2016 $'m |
|---|---|---|---|---|
| Profit/ (Loss) before taxation | **(77.7)** | (67.2) | **178.5** | 1.7 |
| Interest receivable | **–** | – | **(99.1)** | (67.7) |
| Interest payable | **74.4** | 38.8 | **118.7** | 63.2 |
| Amortised bond issue costs | **19.0** | 2.2 | **19.0** | 2.4 |
| Foreign exchange loss/(gain) | **(0.1)** | (13.6) | **0.1** | (1.5) |
| Depreciation and amortisation of non-current assets | **47.2** | 47.3 | **–** | – |
| Provision for doubtful debts | **15.0** | 1.5 | **–** | – |
| Exceptional credit on substantial modification | **(219.2)** | – | **(219.2)** | – |
| Share based payment expense | **0.2** | 0.4 | **0.2** | 0.4 |
| Impairment | **124.0** | – | **–** | – |
| (Increase)/decrease in stock | **(0.8)** | 0.6 | **–** | – |
| Decrease/(increase) in debtors | **(95.5)** | (50.9) | **(47.1)** | (0.1) |
| (Decrease)/increase in trade and other payables | **104.4** | 10.6 | **0.6** | (119.5) |
| Effects of exchange rate on the balances of working capital | **5.0** | (1.5) | **–** | – |
| Cash absorbed by operations | **(4.1)** | (31.8) | **(48.7)** | (121.1) |

## FINANCIAL STATEMENTS
## NOTES TO THE ACCOUNTS CONTINUED

---

### 32. Post balance sheet events

In July 2017 the Company drew down $100 million of the three-year super senior facility agreed in June 2017 which has an interest rate of 7.5%.

In November 2017 the Group terminated its contract with MOD of Indonesia and made provisions against the year-end debt of $16.8 million.

As described in the going concern accounting policy in Note 2, on 13 December 2017, the Company announced that it had reached agreement with noteholders representing approximately 62% of its outstanding 2021 Notes and 55% of its outstanding 2023 Notes (together, the "Majority Holders") and shareholders representing 34% of its existing issued share capital to implement a restructuring of the Group's indebtedness.

The restructuring consists of repayment of the outstanding 12%/17.5% Senior Secured Notes due 2023 of $557 million by issuing approximately 2.0 billion new ordinary shares of 1 pence each in Avanti Communication Group plc which will represent approximately 92.5% of the Company's issued ordinary share capital. This remains subject to approval by the Group's shareholders in addition to a consent solicitation process, and UK Scheme of Arrangement process if needed, which will be completed in January and February 2018.

In addition the terms of the 10%/15% Senior Secured Notes due 2021 will be revised such that the interest rate will be reduced to 9% for both cash and PIK and their maturity will be extended by one year to 2022. This remains subject to a formal UK Scheme of Arrangement process with the bondholders.

**<u>EXHIBIT D</u>**

(Restructuring Agreement)

CONFORMED VERSION

---

Dated 13 December 2017
as amended on 22 December 2017, 16 January 2018 and 15
February 2018

**LOCK-UP AND RESTRUCTURING AGREEMENT**

between

**AVANTI COMMUNICATIONS GROUP PLC**

and

**THE CONSENTING CREDITORS**

and

**THE CONSENTING SHAREHOLDERS**

---

**MILBANK, TWEED, HADLEY & McCLOY LLP**
**London**

# CONTENTS

**Clause**                                                                                           **Page**

1.    Definitions and Interpretation ................................................................................ 1
2.    Effectiveness of this Agreement ............................................................................. 13
3.    Relationship with Other Documents ....................................................................... 13
4.    Each Party's Rights and Obligations........................................................................ 13
5.    Reserved ................................................................................................................ 14
6.    Undertakings ......................................................................................................... 14
7.    Accession and Transfers ........................................................................................ 20
8.    Representations of the Consenting Creditors and Consenting Shareholders .......... 22
9.    Representations of Avanti ...................................................................................... 23
10.   Ad Hoc Group and Ad Hoc Group Adviser.............................................................. 25
11.   Termination............................................................................................................ 27
12.   Costs and Expenses ............................................................................................... 30
13.   Notices .................................................................................................................. 30
14.   Partial Invalidity.................................................................................................... 32
15.   Obligors' Agent...................................................................................................... 32
16.   Amendment and Waivers ....................................................................................... 33
17.   Confidentiality ...................................................................................................... 33
18.   Governing Law ...................................................................................................... 36
19.   Enforcement .......................................................................................................... 36
20.   Counterparts .......................................................................................................... 37
Schedule 1      Initial Consenting Creditors .................................................................... 38
Schedule 2      Initial Consenting Shareholders .............................................................. 39
Schedule 3      Additional Obligors................................................................................. 40
Schedule 4      Restructuring Terms................................................................................ 41
Schedule 5      Restructuring Steps ................................................................................ 55
Schedule 6      Restructuring Documents........................................................................ 58
Schedule 7      Accession Deed....................................................................................... 59
Schedule 8      Lock-Up Notice....................................................................................... 62
Schedule 9      Restructuring Agreement Announcement ................................................. 64
Schedule 10     Conditions Precedent .............................................................................. 69
Schedule 11     Ad Hoc Group ........................................................................................ 70
Schedule 12     Indicative Timetable................................................................................ 71

**THIS AGREEMENT** is dated 13 December 2017 and made between:

(1)  **AVANTI COMMUNICATIONS GROUP PLC**, a public company with limited liability incorporated under the laws of England and Wales with its registered office at Cobham House, 20 Black Friars Lane, London, EC4V 6EB with company registration number 06133927 ("**Avanti**");

(2)  **THE INITIAL CONSENTING CREDITORS** (as defined below); and

(3)  **THE INITIAL CONSENTING SHAREHOLDERS** (as defined below),

(together with any Additional Consenting Creditor or Additional Consenting Shareholder, each a "**Party**" to this Agreement).

**RECITALS**:

(A)  Avanti, the Ad Hoc Group (as defined below) and certain other stakeholders have been in negotiations with the objective of reaching an agreement on the terms of a restructuring of the indebtedness of the Group (as defined below).

(B)  The Parties have agreed to the terms of the Restructuring (as defined below) pursuant to which, among other things, (i) Avanti will seek to implement an exchange of all of its outstanding 2023 Notes (as defined below) for 92.5% of the then enlarged issued Shares (as defined below), and (ii) the 2021 Notes Indenture (as defined below) will be amended as described in the Restructuring Terms (as defined below).

(C)  The Parties have agreed to enter into this Agreement in order to facilitate the implementation of the Restructuring and to set out the terms on which they agree to refrain from (whether alone or in concert with any other person) taking, advising, encouraging, assisting or supporting (or instructing or procuring that any other person takes, advises, encourages, assists or supports) any action which would frustrate, delay or impede the Restructuring.

**IT IS AGREED** as follows:

1.  **DEFINITIONS AND INTERPRETATION**

1.1  **Definitions**

In this Agreement:

"**2021 Notes**" means the 10%/15% Senior Secured Notes due 2021 issued by Avanti pursuant to the 2021 Notes Indenture.

"**2021 Notes Indenture**" means the indenture, dated as of 26 January 2017, as amended and restated as of 23 March 2017 and as further supplemented by a first supplemental indenture, dated as of 29 June 2017, a second supplemental indenture, dated as of 30 June 2017, and a third supplemental indenture, dated as of 27 October 2017, among, *inter alios*, Avanti as issuer, the Additional Obligors as guarantors, the 2021 Notes Trustee as trustee and primary security agent and Wilmington Trust (London) Limited as secondary security agent, under which the 2021 Notes were issued, as supplemented, amended and restated from time to time.

"**2021 Notes Trustee**" means The Bank of New York Mellon, London Branch in its capacity as trustee under the 2021 Notes Indenture.

"**2023 Notes**" means the 12%/17.5% Senior Secured Notes due 2023 issued by Avanti pursuant to the 2023 Notes Indenture.

"**2023 Notes Indenture**" means the indenture, dated as of 3 October 2013, as amended and restated as of 23 March 2017 and as further supplemented by a first supplemental indenture, dated as of 30 June 2017, and a second supplemental indenture, dated as of 27 October 2017, among, *inter alios*, Avanti as issuer, the Additional Obligors as guarantors, the 2023 Notes Trustee as trustee and primary security agent and Wilmington Trust (London) Limited as secondary security agent, under which the 2023 Notes were issued, as supplemented, amended and restated from time to time.

"**2023 Notes Trustee**" means The Bank of New York Mellon, London Branch in its capacity as trustee under the 2023 Notes Indenture.

"**90% Consent Solicitation**" has the meaning given to it in the Restructuring Terms.

"**90% Consent Solicitation Deadline**" has the meaning given to it in Clause 6.5(a).

"**90% Proposed Amendments**" has the meaning given to it in the Restructuring Terms.

"**90% Requisite Consents**" has the meaning given to it in the Restructuring Terms.

"**Accession Deed**" means a deed poll by which a person becomes a Party as an Additional Consenting Creditor or an Additional Consenting Shareholder, or, in respect of a transfer of Locked-Up Notes or Locked-Up Shares, a Consenting Creditor or Consenting Shareholder (as applicable) in:

(a)     substantially the form set out in Schedule 7 (*Accession Deed*); or

(b)     a form that is otherwise satisfactory to Avanti and the Majority Consenting Creditors (each acting reasonably).

"**Account Holder**" means, in respect of a beneficial owner of the Notes, the Direct Participant in whose name those Notes are held on its behalf.

"**Account Holder Letter**" means the account holder letter substantially in the form set out in the Scheme Explanatory Statement.

"**Act**" means the Companies Act 2006.

"**Ad Hoc Group**" means, for so long as they hold Notes, those Note Creditors listed in Schedule 11 (*Ad Hoc Group*).

"**Ad Hoc Group Adviser**" means Akin Gump LLP and its US affiliates.

"**Ad Hoc Group Adviser Fee Letter**" means the fee letter dated 12 December 2017 between Avanti and the Ad Hoc Group Adviser.

"**Additional Capital Raise**" has the meaning given to it in the Restructuring Terms.

"**Additional Consenting Creditor**" means a Note Creditor which has agreed to be bound by the terms of this Agreement as a Consenting Creditor in accordance with Clause 7 (*Accession and Transfers*).

"**Additional Consenting Shareholder**" means a Shareholder which has agreed to be bound by the terms of this Agreement as a Consenting Shareholder in accordance with Clause 7 (*Accession and Transfers*).

"**Additional Obligor**" means each of the companies listed in Schedule 3 (*Additional Obligors*).

"**Advisers**" means the Ad Hoc Group Adviser and the Parent Adviser.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Agreement**" means this lock-up and restructuring agreement together with its Schedules.

"**AIM Rules**" means the AIM Rules for Companies published by the London Stock Exchange and as amended from time to time.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York.

"**Change of Control**" has the meaning given to that term in each of the Note Indentures.

"**Chapter 15 Filing**" means the filing of a petition for recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code.

"**Chapter 15 Order**" means the order for the recognition of the Scheme as a 'foreign main proceeding' under Chapter 15 of the U.S. Bankruptcy Code.

"**Chapter 15 Recognition Hearing**" means the hearing before the U.S. Bankruptcy Court to obtain recognition of the Scheme as a 'foreign main proceeding' pursuant to the Chapter 15 Filing.

"**Chapter 15 Representative**" means a representative appointed by Avanti for the purpose of recognition proceedings under Chapter 15 of the U.S. Bankruptcy Code.

"**Cleansing Announcement**" means an announcement by Avanti pursuant to which Non-Public Information will be made publicly available in accordance with normal market procedures for the dissemination of inside information.

"**Collateral**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Consent Solicitations**" mean the 90% Consent Solicitation and the Majority Consent Solicitations.

"**Consenting Creditor**" means each Initial Consenting Creditor and each Additional Consenting Creditor.

"**Consenting Creditor Directors**" means each of Mr. Craig Chobor, Mr. Peter Reed and Mr. Michael Leitner in their capacity as non-executive directors of the Board of Directors of Avanti and any of their successors or replacements from time to time.

"**Consenting Shareholder**" means each Initial Consenting Shareholder and each Additional Consenting Shareholder.

"**Court**" means the High Court of Justice in England and Wales.

"**Direct Participant**" means each person who is shown in the records of the clearing and settlement systems of DTC as a holder of the 2021 Notes or the 2023 Notes.

"**DTC**" means The Depository Trust Company.

"**Effective Date**" has the meaning given to it in Clause 2.2 (*Effectiveness of this Agreement*).

"**Encumbrance**" means any mortgage, pledge, lien, charge or other security interest.

"**Enforcement Action**" means, in relation to any Finance Document:

(a)    the acceleration of any sum payable under the Finance Documents or the making of any declaration that any sum payable under the Finance Documents is due and payable or payable on demand;

(b)    the making of any demand against any member of the Group under any guarantee or surety provided by that member of the Group to any of the Consenting Creditors;

(c)    the suing for, commencing or joining of any legal or arbitration proceedings against any member of the Group to recover any sums payable under the Finance Documents;

(d)    the taking of any steps to enforce or require the enforcement of any Collateral granted by any member of the Group in favour of any of the Consenting Creditors; or

(e)    the petitioning, applying or voting for any Insolvency Proceedings in relation to any member of the Group.

"**Exchange**" has the meaning given to it in the Restructuring Terms.

"**Finance Documents**" means the Notes, the Note Indentures, the Intercreditor Agreement and the Super Senior Facility Agreement.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a)    moneys borrowed (including debit balances at banks or other financial institutions);

(b)    any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds (including convertible bonds and redeemable shares), notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with IFRS, be treated as a finance or capital lease;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold or discounted on a non-recourse basis);

(f)     any amount raised under any other transaction (including any forward sale or purchase agreement or sale, sale back and leaseback agreement) having the commercial effect of a borrowing;

(g)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(h)     any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i)     the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency of such body, or any court or arbitrator (public or private).

"**Group**" means Avanti and each of its Subsidiaries.

"**Holding Company**" means, in relation to a person, any other person in respect of which it is a Subsidiary.

"**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002.

"**Indicative Timetable**" means the indicative timetable set out in Schedule 12 (*Indicative Timetable*).

"**Initial Consenting Creditor**" means a Note Creditor that is an original party to this Agreement as listed in Schedule 1 (*Initial Consenting Creditors*).

"**Initial Consenting Shareholder**" means a Shareholder that is an original party to this Agreement as listed in Schedule 2 (*Initial Consenting Shareholders*).

"**Initial Lock-up Notices**" means the Lock-up Notices to be provided by the Initial Consenting Creditors and the Initial Consenting Shareholders pursuant to Clause 7 (*Accession and Transfers*).

"**Insolvency Proceeding**" means any corporate action, legal proceedings or other procedure or step taken in relation to:

(a)   the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition or reorganisation (by way of voluntary arrangement, scheme or otherwise) of any member of the Group;

(b)   a composition, conciliation, compromise or arrangement with the creditors generally of any member of the Group or an assignment by any member of the Group of its assets for the benefit of its creditors generally or any member of the Group becoming subject to a distribution of its assets;

(c)   the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any member of the Group or any of its assets;

(d)   enforcement of any security over any assets of any member of the Group; or

(e)   any procedure or step in any jurisdiction analogous to those set out in paragraphs (a) to (d) above.

"**Intercreditor Agreement**" means the intercreditor agreement dated 26 January 2017, as amended and restated as of 3 July 2017, made between, among others, Avanti, the 2021 Notes Trustee, the 2023 Notes Trustee and the super senior lenders defined therein.

"**Launch Date**" means the date on which Avanti launches the Consent Solicitations.

"**Launch Date Announcement**" has the meaning given to it in Clause 17.7(b).

"**Lock-up Notice**" means a notice substantially in the form set out in Schedule 8 (*Lock-Up Notice*).

"**Locked-up Notes**" means, at any time, with respect to a Consenting Creditor, the aggregate amount of its claims against Avanti with respect to:

(a)   the aggregate principal amount of Notes held or controlled by that Consenting Creditor as specified in its Initial Lock-up Notice or Accession Deed, as applicable;

(b)   the aggregate principal amount of any additional Notes purchased or otherwise acquired by it after the Effective Date or the date of its Accession Deed, as applicable;

(c)   less the aggregate principal amount of any Notes sold, transferred, assigned, or otherwise disposed of by that Consenting Creditor in accordance with Clause 7 (*Accession and Transfers*),

which shall include the aggregate principal amount of Notes held or controlled or acquired by that Consenting Creditor's broker dealer business unit on its own account but which shall exclude (i) the aggregate principal amount of any Notes held by it in custody for a third party, and (ii) the aggregate principal amount of any Notes held or controlled by one or more of its trading desks acting as a market maker in each case which (x) are not specified in its Initial Lock-up Notice or Accession Deed, as applicable, or (y) were not previously subject to the terms of this Agreement and are purchased or otherwise acquired

by it after the date of its Initial Lock-up Notice or Accession Deed, as applicable, from a Note Creditor that is not a Consenting Creditor or advised or managed by a Consenting Creditor.

"**Locked-up Shares**" means, at any time, with respect to a Consenting Shareholder:

(a)     the aggregate number of Shares held or controlled by that Consenting Shareholder as specified in its Initial Lock-up Notice or Accession Deed, as applicable; and

(b)     the aggregate number of any additional Shares purchased or otherwise acquired by it after the Effective Date or the date of its Accession Deed, as applicable;

(c)     less the aggregate number of any Shares sold, transferred, assigned, or otherwise disposed of by that Consenting Shareholder in accordance with Clause 7 (*Accession and Transfers*),

which shall include the number of Shares held or controlled or acquired by that Consenting Shareholder's broker dealer business unit on its own account but which shall exclude (i) the aggregate number of any Shares held by it in custody for a third party, and (ii) the aggregate number of any Shares held or controlled by one or more of its trading desks acting as a market maker in each case which (x) are not specified in its Initial Lock-up Notice or Accession Deed, as applicable, or (y) were not previously subject to the terms of this Agreement and are purchased or otherwise acquired by it after the date of its Initial Lock-up Notice or Accession Deed, as applicable, from a Shareholder that is not a Consenting Shareholder or advised or managed by a Consenting Shareholder.

"**Longstop Date**" has the meaning given to it in Clause 11.2(c).

"**Majority Consent Solicitations**" has the meaning given to it in the Restructuring Terms.

"**Majority Consenting Creditors**" means any two or more Consenting Creditors who together hold, or who advise, manage or act on behalf of Note Creditors who hold, Notes with an aggregate principal value of more than 55% of the aggregate principal amount of Notes in issue.

"**Majority Proposed Amendments**" has the meaning given to it in the Restructuring Terms.

"**Majority Proposed Waiver**" has the meaning given to it in the Restructuring Terms.

"**Majority Requisite Consents**" has the meaning given to it in the Restructuring Terms.

"**Material Adverse Effect**" means any changes, events, or circumstances which could adversely affect the business, operations, or condition (financial or otherwise) of the Group such that the Group may not be able to perform their material obligations in accordance with the Restructuring Terms and the Restructuring Steps or such that the Restructuring is not capable of being implemented, or which could otherwise have a material adverse effect on or material adverse change in the consolidated financial condition, assets or business of the Group taken as a whole.

"**Non-Public Information**" means any information which, in the opinion of the Majority Consenting Creditors (acting reasonably) is or may be material, non-public and price sensitive information or information that would otherwise prevent any Note Creditor or Shareholder from trading their respective Notes or Shares under applicable inside dealing laws or regulations.

"**Note Creditors**" means each Direct Participant and each beneficial owner of the Notes holding such Notes, directly or indirectly, in an account in the name of a Direct Participant acting on such beneficial owner's behalf.

"**Note Indentures**" means the 2021 Notes Indenture and the 2023 Notes Indenture.

"**Notes**" means the 2021 Notes and the 2023 Notes.

"**Obligors**" means Avanti and each Additional Obligor.

"**Parent Adviser**" means Milbank, Tweed, Hadley & McCloy LLP.

"**Pari Passu Debt for Equity Swap**" has the meaning given to it in the Super Senior Facility Agreement.

"**Permitted Restructuring**" has the meaning given to it in the Intercreditor Agreement.

"**PIK**" means pay-in-kind interest.

"**Practice Statement Letter**" means a letter relating to the Scheme as required under Practice Statement (Companies: Scheme of Arrangement).

"**Quasi Collateral**" means, in relation to a member of the Group:

(a)   any sale, transfer or other disposal of any of its assets on terms whereby they are or may be leased to or re-acquired by a member of the Group;

(b)   any sale, transfer or other disposal of any of its receivables on recourse terms;

(c)   the entry into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(d)   the entry into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

"**Registrar of Companies**" means the Registrar of Companies of England and Wales.

"**Representative**" means in respect of any Party, any of its partners, directors, agents, officers, employees and professional advisers and any of its advisory, supervisory or management board members.

"**Requisite Consenting Shareholders**" means any two or more Consenting Shareholders who together hold, or who advise, manage or act on behalf of Shareholders who hold, Shares with an aggregate principal value of more than 33% of the aggregate amount of Shares in issue.

"**Restructuring**" means a restructuring of the Group's indebtedness implemented in accordance with the Restructuring Steps and the Restructuring Terms.

"**Restructuring Agreement Announcement**" has the meaning given to it in Clause 17.7(a).

"**Restructuring Conditions Precedent**" means the conditions precedent set out in the Restructuring Documents which are to be satisfied or waived in accordance with the terms thereof.

"**Restructuring Documents**" means this Agreement and all other documents, agreements and instruments entered into (or to be entered into) pursuant to, or in connection with, the implementation or consummation of the Restructuring in accordance with this Agreement and the Restructuring Terms, including but not limited to the documents listed in Schedule 6 (*Restructuring Documents*).

"**Restructuring Effective Date**" means the first date on which all of the Restructuring Conditions Precedent have been satisfied or waived (if applicable) in accordance with the Restructuring Documents and each Restructuring Document is in full force and effect in accordance with its terms.

"**Restructuring Period**" means the period from and including the Effective Date to the Termination Date.

"**Restructuring Steps**" means the steps to implement the Restructuring as set out in Schedule 5 (*Restructuring Steps*) and the Indicative Timetable.

"**Restructuring Terms**" means the terms for the Restructuring as set out in Schedule 4 (*Restructuring Terms*), including the Exhibits thereto.

"**Rule 9 Waiver**" means the waiver to be agreed by the Takeover Panel and to be approved by independent Shareholders of the obligation that would otherwise require Solus Alternative Asset Management LP to make an offer for the existing issued share capital of Avanti not already held by it pursuant to Rule 9 of the Takeover Code in respect of the Exchange.

"**Scheme**" means one or more schemes of arrangement under Part 26 of the Act proposed by Avanti to implement the Restructuring.

"**Scheme Claim Form**" means a claim form relating to the Scheme, together with related evidence, required under Part 49 of the Civil Procedure Rules 1998 and section 897 of the Act.

"**Scheme Directions Hearing**" means a hearing of the Court for the purposes of convening the Scheme Meeting, including adjournment thereof.

"**Scheme Effective Conditions**" means the conditions to the Scheme becoming effective and binding in accordance with section 899(3) of the Act as described in the Scheme Explanatory Statement.

"**Scheme Explanatory Statement**" means the explanatory statement to be circulated by Avanti to Note Creditors in respect of the Scheme and substantially in the form agreed between Avanti and the Majority Consenting Creditors.

"**Scheme Meeting**" means the meeting of the Note Creditors to vote on the Scheme convened pursuant to an order of the Court (and any adjournment of such meetings).

"**Scheme Sanction Hearing**" means a hearing of the Court for the purpose of sanctioning the Scheme, including adjournment thereof.

"**Scheme Sanction Order**" means an order of the Court sanctioning the Scheme under section 899 of the Act.

"**Scheme Voting Record Time**" means the day that is two Business Days before the Scheme Meeting or such later date as Avanti and the Majority Consenting Creditors agree.

"**Self-Cleansing Statement**" has the meaning given it to it in Clause 17.7 (*Cleansing of Information*).

"**Shareholder Consents**" means any consents, authorisations or the resolutions of the Shareholders required to implement the Restructuring, including without limitation authorisation of the issuance of additional Shares in connection with the Exchange, the Additional Capital Raise and the Rule 9 Waiver.

"**Shareholders**" means holders of Shares from time to time.

"**Shares**" means the ordinary shares in the equity capital of Avanti.

"**Solicitation Statements**" means the consent solicitation statements and the related letters of consent to be circulated by Avanti to Note Creditors in respect of the Consent Solicitations substantially in the form agreed between Avanti and the Majority Consenting Creditors.

"**Specified Fund or Separate Account**" has the meaning given to it in Clause 1.4(a) (*Execution by Consenting Creditors*).

"**Subsidiary**" and "**Subsidiaries**" have the meaning given to them in Section 1159 of the Act.

"**Super Senior Debt**" means the super senior indebtedness issued pursuant to the Super Senior Facility Agreement.

"**Super Senior Facility Agreement**" means the agreement dated as of 15 June 2017 among each of Avanti, Elavon Financial Services DAC, UK Branch, acting as agent, The Bank of New York Mellon, London Branch, acting as primary security agent and Wilmington Trust (London) Limited, acting as secondary security agent.

"**Takeover Code**" means the City Code on Takeovers and Mergers.

"**Takeover Panel**" means The Panel on Takeovers and Mergers.

"**Takeover Panel Approvals**" means the confirmations from the Takeover Panel that:

(a)    no members of the Ad Hoc Group are acting in concert; and

(b)    it agrees to the seeking of the Rule 9 Waiver,

and any other approvals, consents and dispensations as are required from the Takeover Panel from time to time in connection with the Restructuring.

"**Termination Date**" means the date upon which this Agreement is terminated in accordance with Clause 11 (*Termination*).

"**U.S. Bankruptcy Code**" means title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

1.2    **Construction**

(a)    The headings in this Agreement and the Schedules are for convenience only and shall not affect its or their construction or interpretation.  References to this Agreement include its Schedules.

(b)    In this Agreement, unless the context otherwise requires:

(i)    words denoting the singular number shall include the plural and vice versa;

(ii)    the masculine gender shall include the feminine gender and vice versa;

(iii)    a "**Clause**", "**paragraph**", "**Schedule**" or "**recital**" shall, subject to any contrary indication, be construed as a reference to a clause, paragraph, schedule or recital, as the case may be, in or to this Agreement;

(iv)    a reference to any enactment or treaty or provision of law shall include a reference to such enactment or provision as re-enacted, amended or extended;

(v)    a reference to any "**Restructuring Document**", "**Finance Document**" or any other agreement, document or instrument is a reference to such "**Restructuring Document**", "**Finance Document**" or other agreement, document or instrument as amended, varied, supplemented, amended and restated, novated or replaced from time to time;

(vi)    a "**holder**" of Notes refers to the owner of, or an investment manager for or adviser to certain discretionary accounts or funds that are the owner of, the legal or beneficial interest in those Notes and the terms "**holding**", "**hold**", "**held**", "**held by**", "holdings", shall be construed accordingly; and

(vii)    a reference to "**$**" or "**dollars**" is to the lawful currency for the time being of the United States of America.

(c)    References in this Agreement to the Parties include their respective permitted assignees and/or the respective successors in title to substantially the whole of their respective undertakings.

(d)   In this Agreement, the words "**include**" and "**including**" shall be deemed to be followed by the words "without limitation" where not so followed.

### 1.3   Third Party Rights

(a)   Unless expressly provided to the contrary in this Agreement, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b)   Any director, manager or officer of an Obligor shall be entitled to the benefit of and to enforce the provisions of Clause 6.10 (*No Obligation)* (as applicable).

(c)   The Ad Hoc Group Adviser shall be entitled to the benefit of and to enforce the provisions of Clauses 12 (*Costs and Expenses*), 10 (*Ad Hoc Group and Ad Hoc Group Adviser*) and 17 (*Confidentiality*).

(d)   Any partner, director, officer, employee or agent of the Ad Hoc Group Adviser or any member of the Ad Hoc Group shall be entitled to the benefit of and to enforce the provisions of Clause 10 (*Ad Hoc Group and Ad Hoc Group Adviser*).

(e)   The Parent Adviser shall be entitled to the benefit of and to enforce the provisions of Clause 12 (*Costs and Expenses*).

(f)   The Consenting Creditor Directors shall be entitled to the benefit of and to enforce the provisions of Clause 17.7 (*Cleansing of Information*).

### 1.4   Execution by Consenting Creditors and Consenting Shareholders

(a)   Where a Consenting Creditor and/or Consenting Shareholder enters into or accedes to this Agreement in its capacity as investment adviser or manager on behalf of funds or accounts it advises or manages (a "**Specified Fund or Separate Account**"), this Agreement shall apply only to the investment adviser or manager with respect to that Specified Fund or Separate Account and will not apply to any other fund or account advised or managed by that investment adviser or manager or to its or their Affiliates and any funds or accounts advised or managed by its or their Affiliates.

(b)   To the extent that any investment manager, investment adviser, depository, agent and/or custodian (as applicable) is executing this Agreement on behalf of any Consenting Creditor and/or Consenting Shareholder each other Party acknowledges that:

(i)   the relevant investment manager, investment adviser, depository, agent and/or custodian (as applicable) is not executing this Agreement in any personal capacity;

(ii)   the relevant investment manager, investment adviser, depository, agent and/or custodian (as applicable) is executing this Agreement pursuant to, and to the extent of its authority to act in such capacity on behalf of any Consenting Creditor and/or Consenting Shareholder; and

> (iii)    the relevant investment manager, investment adviser, depository, agent and/or custodian (as applicable) does not make any representations, warranties or undertakings of any kind in any personal capacity to any Party, and shall have no personal liability whatsoever to any Party, under or in connection with this Agreement, and no Party will have any recourse to it in any personal capacity in any way whatsoever.

## 2.    EFFECTIVENESS OF THIS AGREEMENT

2.1    Subject to Clause 2.3, the obligations of the Parties under this Agreement shall become effective and binding on each of the Parties on the later to occur of:

> (a)    the date on which Avanti has received a copy of this Agreement duly executed by each of (i) Avanti, (ii) the Initial Consenting Creditors; and (iii) the Initial Consenting Shareholders; and

> (b)    the date on which Avanti has received written confirmation from the Majority Consenting Creditors (or the Ad Hoc Group Adviser on behalf of the Majority Consenting Creditors to the extent that those Majority Consenting Creditors are all members of the Ad Hoc Group) that the requisite consents, instructions, documents and other requirements specified in Schedule 10 (*Conditions Precedent*) have been received by or evidenced to the Majority Consenting Creditors (or the Ad Hoc Group Adviser on behalf of the Majority Consenting Creditors to the extent that those Majority Consenting Creditors are all members of the Ad Hoc Group) in form and substance satisfactory to them acting reasonably,

(such date being the "**Effective Date**").

2.2    Avanti shall promptly notify each of the other Parties in writing that the Effective Date has occurred.

2.3    The obligations of any Additional Consenting Creditor or Additional Consenting Shareholder shall become effective and binding on that Additional Consenting Creditor or Additional Consenting Shareholder when that Additional Consenting Creditor or Additional Consenting Shareholder delivers a duly executed Accession Deed to Avanti.

## 3.    RELATIONSHIP WITH OTHER DOCUMENTS

3.1    Notwithstanding the terms of this Agreement, the Finance Documents shall continue in full force and effect, subject to the terms of this Agreement.

3.2    Without prejudice to any of the Finance Documents which shall continue in full force and effect, this Agreement sets out the Parties' entire understanding of the matters set out in this Agreement and supersedes any previous agreement between any of the Parties with respect to the matters set out in this Agreement, and any such previous agreement shall cease to be binding on the Parties.

## 4.    EACH PARTY'S RIGHTS AND OBLIGATIONS

4.1    The rights of each Party under or in connection with this Agreement are separate and independent rights.  A Party may separately enforce its rights under this Agreement.

4.2    The obligations of each Party under this Agreement are separate and independent obligations.  Failure by a Party to perform its obligations under this Agreement does not affect the obligations of any other Parties.  No Party is responsible for the obligations of any other Party.

5.    **RESERVED**

6.    **UNDERTAKINGS**

*All Parties' Undertakings*

6.1    During the Restructuring Period, each Party undertakes, and Avanti undertakes to procure that each Additional Obligor shall undertake, for the benefit of each of the other Parties, to:

(a)    support the Restructuring;

(b)    take all steps which it is able to take and which are reasonably necessary and consistent with the Restructuring Terms and the Restructuring Steps to implement and finalise the Restructuring;

(c)    in so far as applicable to it, execute and/or deliver, within any reasonably requested time period, all documents, agreements, instructions, proxies, directions, and to consent, and file all notices, and take such other action that is consistent with and reasonably necessary to implement the Restructuring;

(d)    refrain from taking, encouraging, or supporting (or procuring that any person, takes, encourages or supports) proceedings or litigation which is inconsistent with this Agreement and/or could be reasonably expected to delay, impede, or frustrate the implementation of the Restructuring (including without limitation any steps, actions, litigation or claims against any Obligor (or any of their respective direct or indirect shareholders), the Group or any of their respective directors or Affiliates); and

(e)    promptly notify each other Party of:

(i)    any representation or statement made or deemed to be made by it under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made; and

(ii)    the details of any breach by it of any undertaking given by it under this Agreement.

*Restructuring Documents and Steps*

6.2    As soon as reasonably practicable following the Effective Date, Avanti and the Majority Consenting Creditors will negotiate, in good faith, the Restructuring Documents (other than this Agreement) with a view to agreeing those Restructuring Documents in a form consistent with the Restructuring Terms so that the Restructuring may be implemented as soon as is reasonably practicable.

6.3    If at any time following the Effective Date, Avanti or the Majority Consenting Creditors

reasonably believes that the Restructuring Effective Date will not occur before the Longstop Date, Avanti or the Majority Consenting Creditors (as applicable) shall promptly deliver a notice to the other Parties notifying them of that belief.

6.4 If at any time following the Effective Date, in the reasonable opinion of Avanti and the Majority Consenting Creditors, alternative or additional restructuring steps are required or would be a more effective way of implementing the Restructuring, Avanti and the Majority Consenting Creditors will, in good faith, negotiate and seek to agree the form of alternative or additional restructuring steps to be pursued to effect the Restructuring in a manner which is economically and legally consistent with the Restructuring Terms and in that event:

(a) Avanti shall promptly notify each Consenting Creditor and Consenting Shareholder in writing of the details of the alternative or additional steps and why they are to be implemented together with a revised version of Schedule 5 (*Restructuring Steps*) and, if the alternative or additional restructuring steps would affect the Indicative Timetable, a revised version of Schedule 12 (*Indicative Timetable*); and

(b) Avanti and the Ad Hoc Group shall instruct their respective Advisers to prepare the Restructuring Documents (applicable to each of them) in a manner that is substantially consistent with the revised version of Schedule 5 (*Restructuring Steps*) and the revised version of Schedule 12 (*Indicative Timetable*).

***Avanti Undertakings***

6.5 During the Restructuring Period, Avanti undertakes, and shall procure that each Additional Obligor undertakes, to promptly (where applicable, in accordance with the Indicative Timetable):

(a) commence the Consent Solicitations and use all reasonable endeavours to obtain (i) the Majority Requisite Consents on or before the date that is 10 Business Days after the Launch Date, and (ii) the 90% Requisite Consents on or before the date that is 20 Business Days after the Launch Date (the "**90% Consent Solicitation Deadline**"), and if the 90% Requisite Consents are obtained by such date withdraw the Scheme in relation to the 90% Proposed Amendments;

(b) convene a general meeting of Shareholders and use reasonable endeavours to obtain the Shareholder Consents;

(c) send the Practice Statement Letter to propose the Scheme to, and use all reasonable endeavours to obtain the approval of, the applicable Note Creditors to the Scheme and to request the sanction of the Scheme by the Court;

(d) progress all matters with the Takeover Panel as are necessary in connection with the Restructuring, including seeking, or providing all reasonable assistance to the relevant Consenting Creditors seeking, the Takeover Panel Approvals;

(e) appoint the Chapter 15 Representative and submit the Chapter 15 Filing and use all reasonable endeavours to seek the Chapter 15 Order at the Chapter 15 Recognition Hearing;

(f)    convene all meetings of the creditors of Avanti which are required to consider any resolutions and/or decisions in relation to the Scheme, including specific approvals as are required in relation to the Scheme;

(g)    convene all meetings of its directors and/or shareholders which are required to consider any resolutions and/or decisions in relation to the Restructuring;

(h)    vote in favour and deliver within any applicable time periods any proxies, instructions, directions, or consents in respect of any shares in any member of the Group held or controlled by it, in favour of any shareholder resolution, including, without limitation, any action or inaction proposed by Avanti, to the extent reasonably required in order to implement the Restructuring;

(i)    agree with the Majority Consenting Creditors the content of any public announcement to be made regarding the Restructuring provided that nothing shall restrict the issuance by any member of the Group of any public announcement which may be required by law (including the duties of the directors of any Obligor), regulation or the AIM Rules following reasonable consultation with the Ad Hoc Group Adviser, provided that such consultation would not itself be contrary to any law or regulation;

(j)    keep the Consenting Creditors and Consenting Shareholders reasonably informed in relation to the status and progress of the Restructuring, including obtaining any necessary or desirable Authorisations (including any consents) from each Consenting Creditor or Consenting Shareholder, any competent judicial, banking, taxation, supervisory or regulatory body, Governmental Body, or any stock exchange;

(k)    notify, if and only to the extent that such notification is not required to be made by Avanti in compliance with its listing obligations, the Consenting Creditors and the Consenting Shareholders if, after the date of this Agreement, a Material Adverse Effect occurs;

(l)    make all securities and other filings and announcements and publish all documents and make all submissions required in connection with the matters contemplated by this Agreement as and when necessary to comply with all applicable laws;

(m)    provide such assistance as may reasonably be required by the Consenting Creditors and/or the Consenting Shareholders for the purpose of any Authorisation or clearance in connection with the Restructuring;

(n)    [deleted]

(o)    on the Launch Date, make the Solicitation Statements available for public inspection whether at its offices during normal business hours or on its own website or a website maintained in connection with the Restructuring (in either case, which is accessible without using a password), or as otherwise agreed with the Majority Consenting Creditors; and

(p)     as soon as reasonably practicable after the Scheme Directions Hearing make the Scheme and Scheme Explanatory Statement available for public inspection, whether at its offices during normal business hours or on its own website or a website maintained in connection with the Restructuring (in either case, which is accessible without using a password), or as otherwise agreed with the Majority Consenting Creditors.

6.6    During the Restructuring Period, Avanti undertakes, and shall procure that each member of the Group undertakes, not to enter into any arrangement in respect of the Notes (including with any individual Note Creditor irrespective of whether it becomes a Consenting Creditor) on terms that are not reflected in the Restructuring Terms or that are better than the terms offered to the Note Creditors under the Restructuring Terms, including any cash payments or grant of additional Collateral or Quasi Collateral.

***Consenting Creditors' Undertakings***

6.7    During the Restructuring Period and in accordance with the terms of this Agreement, each Consenting Creditor undertakes:

(a)     in respect of the Consent Solicitations, promptly to deliver an instruction to its Account Holder in respect of all Locked-up Notes held by it at the relevant time instructing the Account Holder to validly deliver (and not revoke) on or before the date that is 10 Business Days after the Launch Date, its consent to the Majority Consent Solicitations and the 90% Consent Solicitation;

(b)     in respect of the Scheme, promptly to procure that its Account Holder executes and delivers on its behalf an Account Holder Letter in respect of the Locked-up Notes held by it at the relevant time prior to the Scheme Voting Record Time voting in favour of the Scheme;

(c)     to progress all matters with the Takeover Panel as are necessary in connection with the Restructuring Terms, including seeking, or providing all reasonable assistance in the seeking of, the Takeover Panel Approvals (if applicable);

(d)     use its reasonable endeavours to provide such assistance or information as may reasonably be required by Avanti or any other Obligor for the purpose of any regulatory or statutory clearance required in connection with the Restructuring;

(e)     not to propose, file, support or vote for any restructuring, refinancing, workout, plan or scheme of arrangement or reorganisation or other recapitalisation transaction in respect of the Obligors other than the Restructuring;

(f)     to notify the Parent Adviser of any change (whether an increase or decrease) to the aggregate principal amount of its Locked-up Notes as soon as reasonably practicable, and in any event within two Business Days from the date of such change, by sending a Lock-up Notice by email to the Parent Adviser at the email address specified in Clause 13.2 (*Addresses*);

(g)    not to assign, novate, or otherwise transfer to any person any of its Locked-up Notes (including its interest and rights therein and accruing thereon) other than in accordance with Clause 7 (*Accession and Transfers*); and

(h)    not to grant any Encumbrances in respect of any Locked-up Notes, or agree to grant any Encumbrances in respect of any such Locked-up Notes, or enter into any trust, option, pre-emption, sub-participation or other contractual arrangement of any kind whatsoever which would prevent or materially impede or delay it from complying with its obligations under this Agreement.

### *Consenting Shareholder Undertakings*

6.8    During the Restructuring Period, and in accordance with the terms of this Agreement, each Consenting Shareholder undertakes:

(a)    to vote its Shares in favour of any Shareholder vote or resolution on which it is eligible to vote to provide the Shareholder Consents; and

(b)    to provide all reasonable assistance in the seeking of, the Takeover Panel Approvals (if applicable);

(c)    to use its reasonable endeavours to provide such assistance or information as may reasonably be required by Avanti or any other Obligor for the purpose of any regulatory or statutory clearance required in connection with the Restructuring;

(d)    not to propose, file, support or vote for any restructuring, refinancing, workout, plan or scheme of arrangement or reorganisation or other recapitalisation transaction in respect of Avanti other than the Restructuring;

(e)    to notify the Advisers of any change (whether an increase or decrease) to the aggregate number of its Locked-up Shares soon as reasonably practicable, and in any event within two Business Days from the date of such change, by sending a Lock-up Notice by email to Avanti at the email address specified in Clause 13.2 (*Addresses*);

(f)    not to assign, novate, or otherwise transfer to any person any of its Locked-up Shares (including its interest and rights therein and accruing thereon) other than in accordance with Clause 7 (*Accession and Transfers*); and

(g)    not to grant any Encumbrances in respect of any Locked-up Shares, or agree to grant any Encumbrances in respect of any such Locked-up Shares, or enter into any trust, option, pre-emption, or other contractual arrangement of any kind whatsoever which would prevent or materially impede or delay it from complying with its obligations under this Agreement.

### *No delay or impediment to the Restructuring*

6.9    At all times during the Restructuring Period, each Party undertakes for so long as it remains a Party (and in its capacity as a Party only):

(a)    not to take any steps, and not to direct any of its Representatives or its Affiliates to take any steps, to:

(i) delay, impede, or otherwise prevent the Restructuring or act in a manner that is otherwise inconsistent with the terms of this Agreement;

(ii) instruct any third party, delegate, nominee, or agent to take or refrain from taking any action, where taking such action or refraining from taking such action (as the case may be) would be inconsistent with the terms of this Agreement, the Restructuring Terms or the Restructuring Steps;

(iii) act, whether alone or in concert with any other person, to advise, assist, support, or encourage any person to act in a manner which could reasonably be expected to delay, frustrate, impede or otherwise prevent the Restructuring or act in a manner that is otherwise inconsistent with the terms of this Agreement, including entering into or continuing, facilitating or encouraging, any discussions, negotiations, agreements or arrangements with any person relating to a financial restructuring of any Obligor (other than the Restructuring) or related transaction; or

(iv) cause to be sold, through an enforcement sale or otherwise, any material assets of any Obligor; and

(b) other than pursuant to the Restructuring, to refrain from taking any steps and from directing its Representatives or Affiliates to take any steps to or in relation to supporting, negotiating or preparing, and to cast all votes that are controlled by it (if applicable) against:

(i) any proposed restructuring, reorganisation, arrangement, composition, or other restructuring procedure or Insolvency Proceedings in respect of any member of the Group; and/or

(ii) any attempt by any person to acquire all or substantially all the assets of any member of the Group.

### *No Obligation*

6.10 Nothing in this Agreement shall:

(a) require any Party (or any director, manager or officer of that Party) to take any action which is prohibited or otherwise restricted by applicable law or regulation or direction of any governmental authority or to waive or forego the benefit of any applicable legal professional privilege;

(b) prevent any Party from taking action which is required by applicable law or regulation or direction of any governmental authority;

(c) restrict any director, manager or officer of an Obligor from taking any steps to prepare contingency plans or from taking any action or refrain from taking any action as is necessary in order to comply with any legal obligations, legal and/or fiduciary duties or obligations including, without limitation, in relation to the commencement of an Insolvency Proceeding;

(d)     require any Consenting Creditor or Consenting Shareholder to incur any out-of-pocket expense or other financial obligation (including providing any additional capital or financing), other than *de minimis* amounts, or to provide any indemnity in favour of any person;

(e)     require any Consenting Creditor, as a noteholder or as an expected equity holder, by reason of this Agreement or the transactions contemplated by it, to make, seek or receive any filings, notifications, consents, determinations, authorisations, permits, approvals, licenses or the like or provide any documentation or information to any regulatory or self-regulatory bodies having jurisdiction over Avanti or the Consenting Creditor;

(f)     require Avanti or any Consenting Shareholder to take any action or refrain from taking any action where to do so would constitute a breach of the Takeover Code; or

(g)     require Avanti or any Consenting Shareholder to take action which, under the Takeover Code requires the consent of the Takeover Panel, without having first obtained such consent.

## 7.     ACCESSION AND TRANSFERS

### 7.1   Obligors

Avanti shall not, and shall procure that no Additional Obligor shall, assign, novate, sub-participate, encumber, grant a trust over or otherwise dispose of all or any part of its legal or beneficial interests, rights, benefits or obligations under this Agreement or the Finance Documents.

### 7.2   Initial Lock-up Notices

Each Initial Consenting Creditor and Initial Consenting Shareholder shall provide a Lock-up Notice to Avanti on the Effective Date.

### 7.3   Additional Consenting Creditors and Additional Consenting Shareholders

A Note Creditor or Shareholder who is not a Party to this Agreement may accede to this Agreement as an Additional Consenting Creditor or Additional Consenting Shareholder (as applicable) by delivering a properly completed and executed Accession Deed to Avanti.

7.4     Each Party, any Additional Consenting Shareholder and any Additional Consenting Creditor agrees that any Additional Consenting Creditor or Additional Consenting Shareholder shall be:

(a)     a party to this Agreement; and

(b)     bound by, and entitled to enforce, the terms of this Agreement as if they were an original party to this Agreement,

in each case, on and from the date its Accession Deed is delivered to Avanti.

7.5    **Transfers**

(a)    No Consenting Creditor shall assign, novate, sub-participate, encumber (other than in the ordinary course of its business), grant a trust over or otherwise dispose of all or any part of its legal or beneficial interests, rights, benefits or obligations (a "**Transfer**") under or in respect of any of the Locked-up Notes held by it (the "**Debt Interests**") other than in accordance with Clause 7.5(b) below.

(b)    Subject to Clause 7.5(g), during the Restructuring Period, a Transfer by a Consenting Creditor will only be effective if:

　　(i)    the Transfer is made in accordance with and permitted under the terms of the 2021 Notes Indenture or 2023 Notes Indenture; and

　　(ii)    the relevant transferee is either a Consenting Creditor (in the same capacity as the transferor) or has first agreed to be bound by the terms of this Agreement as a Consenting Creditor by acceding to this Agreement by delivering a properly completed and executed Accession Deed to Avanti.

(c)    No Consenting Shareholder shall assign, novate, sub-participate, encumber (other than in the ordinary course of its business), grant a trust over or otherwise dispose of all or any part of its legal or beneficial interests, rights, benefits or obligations (a "**Transfer**") under or in respect of any of its Locked-Up Shares other than in accordance with Clause 7.5(d) below.

(d)    Subject to Clause 7.5(g), during the Restructuring Period, a Transfer by a Consenting Shareholder will only be effective if the relevant transferee is either a Consenting Shareholder or has first agreed to be bound by the terms of this Agreement as a Consenting Shareholder by delivering a properly completed and executed Accession Deed to Avanti.

(e)    An Accession Deed will take effect on and from the date on which it is delivered to the Parent Adviser, in the manner contemplated in the Accession Deed and Clause 7.3 (*Additional Consenting Creditors and Additional Consenting Shareholders*) or 7.5(b) (as applicable) above, and with effect from that date:

　　(i)    any transferor party shall be discharged from all its obligations towards the other Parties under this Agreement in respect of the Debt Interests and/or Shares (as applicable) transferred and their respective rights against one another in respect of those Debt Interests and/or Shares (as applicable) shall be cancelled (except in each case for those rights which arose prior to that date); and

　　(ii)    the replacement or new creditor and/or Shareholder, if it is not already a Consenting Creditor and/or Consenting Shareholder (as applicable), shall become a Party to this Agreement as a Consenting Creditor and/or Consenting Shareholder (as applicable) and shall assume the same obligations and become entitled to the same rights and shall be entitled to

enforce the terms of this Agreement, as if it had been an original Party to this Agreement in that capacity.

(f) Without prejudice to Clauses 7.5 and 7.5(d) above, if any Consenting Creditor and/or Consenting Shareholder (as applicable) purports to effect a Transfer before the relevant transferee is bound by the terms of this Agreement in accordance with Clause 7.5, that Consenting Creditor and/or Consenting Shareholder (as applicable) shall remain liable as a Consenting Creditor and/or Consenting Shareholder (as applicable) in respect of its obligations and liabilities under this Agreement until the relevant transferee is bound by the terms of this Agreement in accordance with Clause 7.5.

(g) A Qualified Marketmaker (as defined below) that acquires any of the Locked-up Notes and/or Locked-up Shares with the purpose and intent of acting as a Qualified Marketmaker in respect of those Locked-up Notes and/or Locked-up Shares, shall not be required to accede to this Agreement or otherwise agree to be bound by the terms and conditions of this Agreement in respect of those Locked-up Notes and/or Locked-up Shares only if that Qualified Marketmaker transfers those Locked-up Notes and/or Locked-up Shares (by purchase, sale, assignment, participation, or otherwise) within five Business Days of its acquisition of the Locked-up Notes to a Consenting Creditor and/or Locked-up Shares to a Consenting Shareholder or to a transferee who executes and delivers an Accession Deed in accordance with Clause 7.5(b). For the purposes of this Clause 7.5(g), the term "Qualified Marketmaker" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers, and sell to customers, Notes or Shares (or enter with customers into long and short positions in respect of the Notes or Shares), in its capacity as a dealer or market maker in the Notes or Shares and (b) is, in fact, regularly in the business of making a two-way market in the Notes or Shares.

## 8. REPRESENTATIONS OF THE CONSENTING CREDITORS AND CONSENTING SHAREHOLDERS

8.1 Each Consenting Creditor and each Consenting Shareholder makes the following representations and warranties on the Effective Date or the date of its Accession Deed to each of the other Parties:

(a) it is duly incorporated (if a corporate person) or duly established (in any other case) and validly existing under the laws of its jurisdiction of incorporation or formation and has the power to own its material assets and carry on business in all material respects as currently conducted;

(b) the obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law));

(c)   the entry into and performance by it of this Agreement do not conflict in any material respect with any law or regulation applicable to it or in any material respect with its constitutional documents or any agreement or instrument binding on it or any of its assets;

(d)   it has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of this Agreement; and

(e)   all Authorisations and consents required for the performance by it of this Agreement and to make this Agreement admissible in evidence in its jurisdiction of incorporation and any jurisdiction where it conducts its business have been obtained or effected and are in full force and effect,

provided, however, to the extent that this Agreement is executed on behalf of a Specified Fund or Separate Account, the foregoing representations and warranties shall apply to the investment adviser or manager in regard to such Specified Fund or Separate Account.

8.2   Each Consenting Creditor makes the following additional representations and warranties on the Effective Date or the date of its Accession Deed to each of the other Parties:

(a)   it is either the holder of the Locked-up Notes or it is authorised and legally entitled and able to control the exercise and the casting of votes in relation to its Locked-up Notes in order to comply with the terms of this Agreement; and

(b)   as at the Effective Date, the date of its Accession Deed and at the date of any further Lock-up Notices (as applicable), the aggregate principal amount of its Locked-up Notes is as set out in its Initial Lock-up Notice, Accession Deed and/or any further Lock-up Notices (as applicable) provided to Avanti.

8.3   Each Consenting Shareholder makes the following additional representations and warranties on the Effective Date or the date of its Accession Deed to each of the other Parties:

(a)   it is either the holder of the Locked-up Shares or it is authorised and legally entitled and able to control the exercise and the casting of votes in relation to its Locked-up Shares in order to comply with the terms of this Agreement; and

(b)   as at the Effective Date, the date of its Accession Deed and at the date of any further Lock-up Notices (as applicable), the aggregate principal amount of its Locked-up Shares is as set out in its Initial Lock-up Notice, Accession Deed and/or any further Lock-up Notices (as applicable) provided to Avanti.

9.   **REPRESENTATIONS OF AVANTI**

9.1   Avanti makes the following representations and warranties on the Effective Date to the Consenting Creditors and Consenting Shareholders:

(a)   it, and each Additional Obligor, is duly incorporated and validly existing under the laws of its jurisdiction of incorporation or formation and has the power to own its material assets and carry on business in all material respects as currently conducted;

(b)    the obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law));

(c)    the entry into this Agreement will not conflict:

   (i)    in any material respect with any laws or regulations applicable to it; or

   (ii)   in any material respect with its or any of its Subsidiaries' constitutional documents or any agreement or instrument binding on it or any of its Subsidiaries or any of its or their assets;

(d)    it has complied with all necessary corporate formalities required in connection with, and has the power and authority to enter into, perform and comply with, its obligations under this Agreement;

(e)    all Authorisations and consents required for the performance by it of this Agreement and to make this Agreement admissible in evidence in its jurisdiction of incorporation and any jurisdiction where it conducts its business have been obtained or effected and are in full force and effect;

(f)    no member of the Group is the legal owner of, or has any beneficial interest in, any indebtedness under the Finance Documents as at the Effective Date;

(g)    to the best of its knowledge having made all reasonable enquiries, no order has been made, petition presented or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of it or any other member of the Group, and no analogous procedure has been commenced in any jurisdiction;

(h)    save as disclosed by Avanti to the Consenting Creditors and Consenting Shareholders on or prior to the Effective Date, no litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency which, if adversely determined, would reasonably be expected to have a Material Adverse Effect have been started or (to the best of its knowledge and belief) threatened against any member of the Group, nor are there any circumstances reasonably likely to give rise to any such litigation, arbitration or administrative proceedings; and

(i)    no labour disputes which would reasonably be expected to have a Material Adverse Effect have been started or (to the best of its knowledge and belief) threatened against any member of the Group, nor are there any circumstances reasonably likely to give rise to any such disputes.

9.2    On the Effective Date, Avanti represents and warrants, on behalf of itself and each Additional Obligor, that it has not, and no member of the Group has, entered into any arrangement in respect of the Notes, with any Note Creditor (including with any individual Note Creditor irrespective of whether it is or is to become a Consenting Creditor) on terms that are not reflected in the Restructuring Terms or that are better than

the terms offered to the Note Creditors generally under the Restructuring Terms, including any cash payments or grant of additional Collateral or Quasi Collateral.

## 10. AD HOC GROUP AND AD HOC GROUP ADVISER

### 10.1 Ad Hoc Group Advisers and Ad Hoc Group do not represent Consenting Creditors

(a) The Parties agree and acknowledge that, notwithstanding that as at the Effective Date the Ad Hoc Group constitute the Majority Consenting Creditors, neither the Ad Hoc Group members nor the Ad Hoc Group Advisers act for the Consenting Creditors in any representative capacity and have no fiduciary or other duties or obligations to the Consenting Creditors or any other Party.

(b) Neither the Ad Hoc Group Adviser nor the Ad Hoc Group members are under any obligation to advise or to consult with any Consenting Creditor on any matter related to this Agreement.

### 10.2 Ad Hoc Group Advisers represent Ad Hoc Group

The Parties agree that the Ad Hoc Group Adviser represents the Ad Hoc Group, and acknowledge that the Ad Hoc Group Adviser is duly authorised to negotiate the Restructuring Documents, any amendments to the Restructuring Steps in accordance with Clause 6.4 on behalf of the Ad Hoc Group to the extent that they constitute the Majority Consenting Creditors for the purposes of that Clause.

### 10.3 Role of the Ad Hoc Group

Except as specifically provided in this Agreement, neither the Ad Hoc Group nor any member of the Ad Hoc Group (in its capacity as such) has any obligations of any kind to any other Party under or in connection with the Restructuring or this Agreement.

### 10.4 Dealings with the Obligors

(a) The Ad Hoc Group members will remain free to deal with the Obligors, each on its own account and will therefore not be bound to account to any Note Creditor or any other party for any sum, or the profit element of any sum, received by it for its own account.

(b) Nothing in this Agreement shall restrict any member of the Ad Hoc Group from accepting deposits from, lending money to and generally engaging in any kind of banking or other business with any Obligor, any Party or any other person.

### 10.5 No Disclosure Obligation

No information or knowledge regarding any of the Obligors or its affairs received or produced by any member of the Ad Hoc Group in its capacity as a Note Creditor (or as an investment manager to any Note Creditor) shall be imputed to any other member of the Ad Hoc Group.

### 10.6 Ad Hoc Group members can seek their own advice

The Ad Hoc Group members will remain free to seek advice from their own professional advisers regarding their exposure to the Obligors and will as regards their exposure as

Note Creditors and Shareholders at all times continue to be solely responsible for making their own independent investigation and appraisal of the business, financial condition, credit-worthiness, status and affairs of the Obligors.

10.7 **Ad Hoc Group Adviser and Ad Hoc Group shall not be required to breach their other duties**

Neither the Ad Hoc Group Adviser nor any Ad Hoc Group member shall be obliged to do anything if taking such action would, or might in its reasonable opinion, constitute a breach of any law or regulation (including any provision of a treaty or statute of the European Union or arising therefrom) or a breach of any fiduciary duty or duty of confidentiality which it is required to comply with or if such action would be otherwise actionable at the suit of any person (and may do anything which in its reasonable opinion is necessary to comply with any such law, regulation or duty or to avoid any such suit).

10.8 **Assumptions as to authorisation**

(a) The Ad Hoc Group may assume that (and shall not be under any obligation to any person to verify or arrange, co-ordinate or facilitate the verification of):

   (i) any representation, notice or document delivered to them is genuine, correct and appropriately authorised; and

   (ii) any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within that person's knowledge or within that person's power to verify is within that person's knowledge or within that person's power to verify.

10.9 **Responsibility for documentation**

None of the Ad Hoc Group or any member of the Ad Hoc Group:

(a) shall be responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by any other Note Creditor, Shareholder, Avanti, any Additional Obligor or any other person given in or in connection with the Restructuring, the Restructuring Documents and any associated documentation or the transactions contemplated therein;

(b) shall be responsible for the legality, validity, effectiveness, completeness, adequacy or enforceability of the Restructuring, the Restructuring Documents or any other agreement, arrangement or document entered into, made or duly executed in anticipation of or in connection with the Restructuring;

(c) shall be responsible for any determination as to whether any information provided or to be provided to any Note Creditor or Shareholder is Non-Public Information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise;

(d) shall be responsible for verifying that any information provided to the Note Creditors or any other Party (using reasonable endeavours and usual methods of transmission such as email or post) has actually been received and/or considered by

such Party. The Ad Hoc Group shall not be liable for any unintentional failure to provide information to any Party; and

(e)     shall be bound to distribute to any Note Creditor or to any other Party or person, information received by it in a capacity other than as a member of the Ad Hoc Group.

### 10.10 Exclusion of Liability

(a)     Without limiting paragraph (b) below, neither the Ad Hoc Group Adviser nor any member of the Ad Hoc Group will be liable for any action taken by it (or any inaction) under or in connection with the Restructuring or this Agreement other than in respect of fraud or, in the case of the Ad Hoc Group, their own breach of any term of this Agreement.

(b)     Other than pursuant to the engagement letter of the Ad Hoc Group Adviser, no Party may take any proceedings against any partner, director, officer, employee or agent of either the Ad Hoc Group Adviser or any member of the Ad Hoc Group, in respect of any claim it might have against the Ad Hoc Group Adviser or any member of the Ad Hoc Group or in respect of any act or omission of any kind by that partner, director, officer, employee or agent in relation to the Restructuring or this Agreement.

## 11.   TERMINATION

### 11.1 Voluntary Termination

This Agreement may be terminated:

(a)     by the mutual written agreement of Avanti and the Majority Consenting Creditors;

(b)     at the election of Avanti by the delivery of a notice of termination to the Consenting Creditors and Consenting Shareholders, if:

(i)     any Consenting Creditor or Consenting Shareholder does not comply with any undertaking in this Agreement and that failure has, or could reasonably be expected to have, a Material Adverse Effect, unless the failure to comply is capable of remedy and is remedied within five Business Days of Avanti delivering a notice to the relevant Consenting Creditor or Consenting Shareholder alleging such failure to comply;

(ii)    an order of a Governmental Body or court of competent jurisdiction restraining or otherwise preventing the implementation of the Restructuring has been made and has not been revoked or dismissed within 30 days of it being made (other than an order made at the instigation of, or on the application of, the Party, or any of its Affiliates which is directed to do so by that Party, purporting to terminate this Agreement under this sub-clause 11.1(b)(ii)); or

(iii)   the U.S. Bankruptcy Court entering an order (i) dismissing any Chapter 15 filing; (ii) declining to recognise and give full force and effect to any Scheme

       Sanction Order in connection with the Restructuring; or (iii) rejecting this Agreement.

(c)    at the election of the Majority Consenting Creditors or the Requisite Consenting Shareholders by and upon the delivery of a notice of termination to the other Parties, if:

    (i)    any Party does not comply with any undertaking in this Agreement and that failure has, or could reasonably be expected to have, a Material Adverse Effect, in each case unless the failure to comply is capable of remedy and is remedied within five Business Days of the Majority Consenting Creditors or the Requisite Consenting Shareholders (as applicable) delivering a notice to the relevant Party alleging such a failure to comply (provided that (x) any Consenting Creditor which has failed to comply with any such undertaking shall not be included in the calculation of "Majority Consenting Creditors" for the purpose of this Clause 11.1(c)(i), and (y) any Consenting Shareholder which has failed to comply with any such undertaking shall not be included in the calculation of "Requisite Consenting Shareholders" for the purpose of this Clause 11.1(c)(i));

    (ii)    any Obligor fails to take any Restructuring Step applicable to it by the date specified in the Indicative Timetable;

    (iii)    Insolvency Proceedings in relation to any Obligor (other than, pursuant to the Restructuring Steps, the Scheme and/or a Chapter 15 Filing) are commenced and, in respect of a petition for winding up only, are not dismissed or discharged within 10 Business Days;

    (iv)    a Material Adverse Effect occurs;

    (v)    a Change of Control occurs other than as contemplated under the Restructuring Terms (without prejudice to any right of prepayment under the applicable Finance Documents in relation to that Change of Control); or

    (vi)    an order of a Governmental Body or court of competent jurisdiction restraining or otherwise preventing the implementation of the Restructuring has been made and has not been revoked or dismissed within 30 days of it being made (other than an order made at the instigation of, or on the application of, the Party, or any of its Affiliates which is directed to do so by that Party, purporting to terminate this Agreement under this sub-clause 11.1(c)(vi));

(d)    at the election of either Avanti or the Majority Consenting Creditors if:

    (i)    a notice under Clause 6.3 is served on the Parties; or

    (ii)    any Enforcement Action occurs (other than as a result of a breach of this Agreement) in respect of a sum of greater than $5,000,000.

(e)    at the election of the Majority Consenting Creditors if:

(i)    [*deleted*]

(ii)    any of the Restructuring Steps have not occurred by the relevant date set out in the Indicative Timetable (or such later date as agreed by Avanti and the Majority Consenting Creditors).

11.2  **Automatic Termination**

Subject to any prior termination in accordance with Clause 11.1 (*Voluntary Termination*), this Agreement shall terminate, in respect of all Parties, upon the occurrence of any of the following events:

(a)    Avanti has not received (and evidenced to the Consenting Creditors) a copy of this Agreement duly executed by M&G Securities Ltd. by 5:00pm London time on Friday, 15th December 2017, unless otherwise agreed by Avanti and the Majority Consenting Creditors;

(b)    the occurrence of the Restructuring Effective Date;

(c)    the date which is three months following the Launch Date (or such later date as agreed by Avanti and the Majority Consenting Creditors) (the "**Longstop Date**"); or

(d)    the Court granting a final order declining to sanction any Scheme (following any appeal process).

11.3  **Individual Right to Terminate**

Each Consenting Creditor or Consenting Shareholder may by written notice to Avanti terminate this Agreement in respect only of itself and rescind any consent previously provided by it to acceptance of the Restructuring:

(a)    if an order of a Governmental Body or court of competent jurisdiction restraining or otherwise preventing implementation of the Restructuring has been made and is continuing; or

(b)    if entry into the Restructuring would be reasonably likely to put the Consenting Creditor or Consenting Shareholder in breach of any law or regulation applicable to it.

11.4  **Effect of Termination**

(a)    Upon any termination in accordance with this Clause 11, the Parties shall be immediately released from all their obligations and shall have no rights under this Agreement, provided that such termination and release:

(i)    shall not limit or prejudice the rights of any Party against the other Party which have accrued or relate to breaches of the terms of this Agreement at the time or prior to termination;

(ii)    in the case of a right of termination expressed to apply solely in respect of a Party, shall not affect the rights, obligations, and liabilities of the other Parties; and

(iii)    shall not limit the effect of Clauses 11 (Termination), 13 (*Notices*), 14 (*Partial Invalidity*), 16 (*Amendment and Waivers*), 17 (*Confidentiality*), 18 (*Governing Law*) and 19 (*Enforcement*), which shall continue to apply.

(b)    Avanti shall promptly notify each Consenting Creditor and Consenting Shareholder of the occurrence of any event listed under Clause 11.2 (*Automatic Termination*) or of any notice delivered by a Consenting Creditor or Consenting Shareholder under Clause 11.1 (*Voluntary Termination*) or Clause 11.3 (*Individual Right to Terminate*).

## 12.    COSTS AND EXPENSES

12.1    Avanti undertakes to comply with its obligations under, and unless instructed by the Ad Hoc Group not to terminate, the Ad Hoc Group Adviser Fee Letter and to pay all amounts outstanding under the Ad Hoc Group Adviser Fee Letter.

## 13.    NOTICES

### 13.1    Communications in Writing

Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by letter or (in accordance with Clause 13.5 (*Electronic Communication*)) by email.

### 13.2    Addresses

The address and electronic communication details (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with this Agreement is:

(a)    in the case of Avanti or any Additional Obligor:

| | |
|---|---|
| Address: | Milbank, Tweed, Hadley & McCloy LLP |
| | 10 Gresham Street |
| | London, EC2V 7JD |
| Telephone: | 00 44 (0) 20 7615 3008 / 00 44 (0) 20 7615 3118 |
| Attention: | Nick Angel / Edward Rasp |
| Email: | nangel@milbank.com; erasp@milbank.com |

(b)    in the case of each Consenting Creditor or Consenting Shareholder, that notified in writing to Avanti on or prior to the date on which it becomes a Party or any substitute address or email address or department or officer as the Party may notify to Avanti by not less than five Business Days' notice; and

(c)    in the case of the Ad Hoc Group:

| | |
|---|---|
| Address: | Akin Gump LLP |
| | Ten Bishops Square |
| | Eighth Floor |

|  | London, E1 6EG |
|  | United Kingdom |
| Telephone: | 00 44 (0) 20 7661 5430 / 00 44 (0) 20 7661 5417 |
| Attention: | Neil Devaney / Lois Deasey |
| Email: | neil.devaney@akingump.com |
|  | lois.deasey@akingump.com |
|  | and |
| Address: | Akin Gump Strauss Hauer & Feld LLP |
|  | One Bryant Park |
|  | New York, NY 10036 |
|  | USA |
| Telephone: | 001 212 872 8083 |
| Attention: | Phil Dublin |
| Email: | pdublin@akingump.com |

### 13.3 Delivery

(a) Any communication or document made or delivered by one person to another under or in connection with this Agreement will only be effective:

   (i) if by way of letter, when it has been left at the relevant address or five Business Days after being couriered by a reputable courier service (courier prepaid) in an envelope addressed to it at that address; or

   (ii) if by way of electronic communication, any electronic communication made between any of the Parties will be effective only when actually received in readable form,

and, if a particular department, officer or individual(s) is specified as part of its address details provided under Clause 13.2 (*Addresses*), if addressed to that department, officer or individual(s).

(b) Any communication or document made or delivered to Avanti in accordance with this Clause 13.3 (*Delivery*) will be deemed to have been made or delivered to each of the Obligors.

### 13.4 Notification of Address

Promptly upon receipt of notification of an address or change of address pursuant to Clause 13.2 (*Addresses*) or changing its own address, Avanti shall notify the other Parties.

13.5 **Electronic Communication**

(a) Any communication to be made between any of the Parties may be made by unencrypted electronic mail or other electronic means to such electronic mail address as they may from time to time notify to Avanti.

(b) Any electronic communication made between any of the Parties will be effective only when actually received in readable form.

13.6 **English language**

Any communication to be made or document to be given under or in connection with this Agreement must be:

(a) in English; or

(b) if not in English, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

14. **PARTIAL INVALIDITY**

14.1 If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

14.2 The Parties agree that if the Takeover Panel determines that any provision of this Agreement that requires Avanti to take or not take any action, whether as a direct obligation or as a condition to any other person's obligation (however expressed), is not permitted by rule 21.2 of the Takeover Code, then:

(a) that provision shall have no effect and shall be disregarded;

(b) as soon as reasonably practicable after Avanti receives notice of such determination, Avanti shall inform the Ad Hoc Group of the Takeover Panel's determination, including, to the extent provided by the Takeover Panel, the reasons for its determination; and

(c) Avanti shall make such representations (or, at the request of the Ad Hoc Group acting reasonably, join with the Ad Hoc Group in making such representations) to the Takeover Panel as the Ad Hoc Group may reasonably require.

15. **OBLIGORS' AGENT**

15.1 For purposes of this Agreement, Avanti represents and warrants that it has authority from each Additional Obligor to act on its behalf as its agent in relation to this Agreement and is authorised:

(a) to supply all information concerning itself contemplated by this Agreement and to give all notices and instructions, to make such agreements and to effect the relevant amendments, supplements and variations capable of being given, made or effected

by any Additional Obligor notwithstanding that they may affect that Additional Obligor, without further reference to or the consent of that Additional Obligor; and

(b)    each Consenting Creditor, Consenting Shareholder and Ad Hoc Group Adviser to give any notice, demand or other communication to that Obligor pursuant to this Agreement, to Avanti,

and in each case the relevant Additional Obligor shall be bound as though the Additional Obligor itself had given the notices and instructions or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

15.2   Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by Avanti or given to Avanti under this Agreement on behalf of an Additional Obligor or in connection with any Restructuring Document shall be binding for all purposes on that Additional Obligor as if that Additional Obligor had expressly made, given or concurred with it.  In the event of any conflict between any notices or other communications of Avanti and any Additional Obligor, those of Avanti shall prevail.

## 16.    AMENDMENT AND WAIVERS

16.1   Except as provided in Clause 16.2, any term of this Agreement (including any term of any Schedule hereto) may be amended or waived in writing by the Majority Consenting Creditors and Avanti and such amendment shall be binding on all Parties.

16.2   An amendment or waiver:

(a)    which has the effect of changing (i) the definition of Requisite Consenting Shareholders, or (ii) any provision of this Agreement which expressly requires the consent of and/or confers rights on, the Requisite Consenting Shareholders, may in each case be made in writing by Avanti and the Requisite Consenting Shareholders;

(b)    which is a material amendment or change to the proportion of 2023 Notes exchanged for Shares pursuant to the Exchange may be made in writing by Avanti, the Majority Consenting Creditors and the Requisite Consenting Shareholders; and

(c)    which may impose new or additional obligations on or withdraw or reduce the rights of any Party (other than in the case of a Consenting Creditor or a Consenting Shareholder, in a way which affects or would affect Consenting Creditors or Consenting Shareholders (as applicable) of that Party's class generally) may only be made with the consent of that Party is required,

and in each case such amendment shall be binding on all Parties.

## 17.    CONFIDENTIALITY

17.1   Other than as set out this Clause 17 (*Confidentiality*), no Party may disclose the terms of this Agreement or the information within the Lock-up Notices (other than to permit the disclosure of the aggregate Locked-up Notes held by Consenting Creditors and aggregate

Locked-Up Shares held by Consenting Shareholders to the Parties), without the prior agreement of Avanti and the Majority Consenting Creditors.

17.2   Each Party may disclose the terms of this Agreement including the Schedules, and details of the aggregate Locked-up Notes:

(a)   to its Affiliates and any company or legal entity (the "**Affiliated Company**") which (a) Controls either directly or indirectly such Party, or (b) which is Controlled directly or indirectly by such Party, or (c) is directly or indirectly Controlled by a company or entity which directly or indirectly controls such Party, or (d) manages or advises such party (the "**Investment Manager**"), or (e) any other entities managed or advised by that Investment Manager. "**Control**" means the right to (a) exercise more than 50% of the voting rights of such company or entity or (b) appoint a majority of the directors or management board of such company or entity;

(b)   to its professional advisers (including attorneys, accountants and financial advisers), its auditors, its insurers and insurance brokers, its employees (including contractors where they are performing services on a full time basis as part of the relevant Party's or Affiliated Company's workforce, as applicable), officers, representatives and directors of the relevant Party or of an Affiliated Company;

(c)   for the purposes of this Clause 17.2, including any information referred to in Clause 17.1 above, as required or requested by law or regulation, by any court of competent jurisdiction or any competent judicial, governmental, banking, taxation, supervisory or regulatory body (including without limitation the Takeover Panel), or the rules of any relevant stock exchange;

(d)   to any potential counterparty to a Transfer (whether such Transfer is ultimately effected or not and provided that the potential counterparty agrees to keep confidential the terms of this Agreement);

(e)   to the extent such terms have become publicly available (other than by its breach of the terms of this Clause 17);

(f)   to a Note Creditor or Shareholder solely for the purpose of giving it an opportunity to accede to this Agreement (provided that such Note Creditor or Shareholder agrees to keep confidential the terms of this Agreement), provided that such Note Creditor or Shareholder may disclose such confidential information to its professional advisers (including attorneys, accountants and financial advisers), its auditors, its insurers and insurance brokers, its employees (including contractors where they are performing services on a full-time basis as part of the relevant Party's or its Affiliate's workforce, as applicable), officers, representatives and directors of the relevant Party or its Affiliates;

(g)   to any other Party and its professional advisers (including attorneys, accountants and financial advisers), its auditors, its insurers and insurance brokers, its employees (including contractors where they are performing services on a full-time basis as part of the relevant Party's or Affiliate's workforce, as applicable), officers, representatives and directors of the relevant Party's Affiliate; or

(h)    to the 2021 Notes Trustee, the 2023 Notes Trustee and the agent under the Super Senior Facility Agreement.

17.3   Avanti, or any of the other Obligors (as may be applicable), shall be permitted to disclose the terms of this Agreement:

(a)    to the Court as part of the evidence to be submitted in respect of the Scheme;

(b)    to the U.S. Bankruptcy Court in connection with the Chapter 15 Filing; and

(c)    to the extent required for the purposes of making a Cleansing Announcement.

17.4   **RESERVED**

17.5   **RESERVED**

17.6   **RESERVED**

17.7   **Cleansing of Information**

(a)    On the Effective Date, Avanti shall issue a Cleansing Announcement substantially in the form set out in Schedule 9 (*Restructuring Agreement Announcement*), disclosing the existence and material terms of this Agreement and any other information contained in or relating to the material terms of this Agreement which constitutes Non-Public Information (the "**Restructuring Agreement Announcement**").

(b)    On or prior to the Launch Date (or such other date as may be agreed by Avanti and the Majority Consenting Creditors), Avanti shall issue a Cleansing Announcement disclosing any Non-Public Information received by (i) the Consenting Creditors under or in connection with this Agreement in their capacity as Consenting Creditor, or Consenting Shareholder, and (ii) by the Consenting Creditor Directors in their capacity as Consenting Creditor Directors (the "**Launch Date Announcement**").

(c)    Avanti shall provide the Consenting Creditors and the Consenting Creditor Directors with a draft of the Launch Date Announcement at least 10 Business Days prior to the Launch Date in order to agree its form and content with the Consenting Creditors and the Consenting Creditor Directors.  If any Consenting Creditor or Consenting Creditor Director objects to the content and/or completeness of the draft Launch Date Announcement, such Consenting Creditor or Consenting Creditor Director (as applicable) shall notify Avanti and Avanti and that Consenting Creditor or Consenting Creditor Director (as applicable) shall confer in good faith and consult with counsel to ensure that all Non-Public Information is included therein.

(d)    In the event that Avanti fails to disclose all Non-Public Information on or prior to the Launch Date, or the manner of disclosure does not result in appropriate public dissemination of Non-Public Information, then Avanti agrees that the Majority Consenting Creditors shall be entitled to make available to the public (including, but not limited to, issuing a press release) on or after 8:00 a.m. (London time) on the day after the Launch Date such Non-Public Information in any format or medium deemed appropriate by the Majority Consenting Creditors in their sole

discretion (the "**Self-Cleansing Statement**") and without recourse from, or liability to, Avanti or any member of the Group, provided that the Majority Consenting Creditors shall provide to Avanti notice of the Self-Cleansing Statement at least 12 hours before the Self-Cleansing Statement is to be made public.

(e)     Following the issue of any Cleansing Announcement pursuant to this Clause 17.7, Avanti shall promptly confirm in writing to the Consenting Creditors and Consenting Creditor Directors (in the case of the Launch Date Announcement) that they have been cleansed by the issue of such Cleansing Announcement.

## 18.     GOVERNING LAW

This Agreement and all non-contractual obligations arising from or connected with it are governed by English law.

## 19.     ENFORCEMENT

### 19.1     Jurisdiction of English Courts

The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement).

### 19.2     Service of Process

(a)     Without prejudice to any other mode of service allowed under any relevant law or regulation and, to the extent it does not have a place of business in England and Wales, each Party:

    (i)     if an Obligor, shall (in each case at the sole cost of Avanti) irrevocably appoint Avanti; or

    (ii)     if a Consenting Creditor or Consenting Shareholder, shall (in each case at its sole cost) irrevocably appoint a person (to be incorporated in England and Wales),

as their respective agents for service of process (in each case, a "**Process Agent**") in relation to any proceedings before the English courts in connection with this Agreement.

(b)     Each of the relevant Parties agrees that failure by a Process Agent to notify the relevant party of the process will not invalidate the proceedings concerned.

(c)     If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the relevant Party must immediately (and in any event within 10 Business Days of such event taking place) appoint another agent.

(d)     Each Consenting Creditor and Consenting Shareholder shall inform Avanti of the identity and address for service of any Process Agent it appoints pursuant to either

sub-clause (a)(ii) or (c) above as soon as reasonably practicable and in any event within five Business Days of the appointment.

19.3 **Waiver of Immunity**

Each Obligor waives all immunity, whether from suit, against execution of any judgment or otherwise, that it or its property may have.  In particular, but without limitation, it consents to:

(a)   the jurisdiction of the English Courts in accordance with Clause 19.1 (*Jurisdiction of English Courts*);

(b)   the giving of any relief by way of injunction or order for specific performance or for the recovery of land or other property; and

(c)   the issue of any process against its property for the enforcement of a judgment.

19.4 **Specific Performance**

The Parties agree that damages may not be a sufficient remedy for the breach by any Party of any terms of this Agreement.  Any non-breaching Party may seek specific performance and injunction or other equitable relief as a remedy for any such breach.  Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any remedies which any Party may be entitled under this Agreement or otherwise.

20. **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

**Schedule 1**
**Initial Consenting Creditors**

1.    Solus Alternative Asset Management LP

2.    Great Elm Capital Management, Inc.

**Schedule 2**
**Initial Consenting Shareholders**

1.   Solus Alternative Asset Management LP

2.   Great Elm Capital Management, INC.

**Schedule 3**
**Additional Obligors**

1.    Avanti Broadband (Ire) Limited

2.    Avanti Broadband Limited

3.    Avanti Communications Africa Infrastructure Limited

4.    Avanti Communications Africa Infrastructure 1 Limited

5.    Avanti Communications Africa Infrastructure 2 Limited

6.    Avanti Communications Germany GmbH

7.    Avanti Communications Infrastructure Limited

8.    Avanti Communications Kenya Limited

9.    Avanti Communications Limited

10.   Avanti Communications Marketing Services Limited

11.   Avanti Communications South Africa (Pty) Ltd

12.   Avanti Communications Sweden AB

13.   Avanti Communications Tanzania Limited

14.   Avanti HYLAS 2 Cyprus Limited

15.   Avanti HYLAS 2 Launch Services Limited

16.   Avanti HYLAS 2 Limited

17.   Avanti HYLAS Services Limited

18.   Avanti Launch Services Limited

19.   Avanti Local TV Services Limited

20.   Avanti Satellite Communications Services Limited

21.   Avanti Space Limited

22.   Avanti Space 3 Limited

**Schedule 4**
**Restructuring Terms**

| Overview | This term sheet describes certain interconditional restructuring transactions with respect to Avanti's capital structure (the "**Restructuring Terms**") on the terms set forth in the Agreement to which these Restructuring Terms are attached as Schedule 4. Capitalised terms used but not defined herein shall have the meanings given to them in the Agreement or in the relevant Finance Document (as applicable). |
|---|---|
| **Equitisation of the 2023 Notes** | Avanti will seek:<br><br>(a)   to implement an exchange of all of its outstanding 2023 Notes for 92.5% of its enlarged outstanding issued share capital (the "**Exchange**") pursuant to an English law scheme of arrangement (the "**Scheme**");<br><br>(b)   to implement the Scheme and the Exchange in compliance with the exemption from registration provided by Section 3(a)(10) of the U.S. Securities Act of 1933, as amended; and<br><br>(c)   recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code. |
| **Amendment of the 2021 Notes** | Avanti will launch a consent solicitation (the "**90% Consent Solicitation**") to amend the terms of the 2021 Notes to:<br><br>(a)   eliminate the Maintenance of Minimum Consolidated LTM EBITDA covenant contained in Section 4.30 of the 2021 Notes Indenture, which would require testing on the last day of each fiscal quarter commencing March 31, 2018 and ending on March 31, 2020;<br><br>(b)   permit the issuance of up to a maximum of $30 million of additional Indebtedness, which shall rank junior to or *pari passu* with the 2021 Notes and may be subject to cash and/or PIK interest;<br><br>(c)   extend the final maturity date from October 1, 2021 to October 1, 2022;<br><br>(d)   change the interest rate payable on the 2021 Notes from 10% Cash / 15% PIK to 9% Cash / 9% PIK for all remaining interest periods commencing October 1, 2017; |

|  | (e)    eliminate the Margin Increase payable on the 2021 Notes if the relevant Minimum Consolidated LTM EBITDA threshold was not met; and<br><br>(f)    permit interest payments on the 2021 Notes for all remaining interest periods commencing October 1, 2017 (but excluding the final interest payment) to be paid as PIK Interest if Avanti does not have sufficient cash to satisfy the applicable interest coupon,<br><br>collectively, the "**90% Proposed Amendments**."<br><br>Adoption of the 90% Proposed Amendments requires the consent of holders representing at least 90% in aggregate principal amount of the 2021 Notes (the "**90% Requisite Consents**").<br><br>See Exhibit A hereto for the text of the 90% Proposed Amendments.<br><br>In the event that the 90% Consent Solicitation is successful, Avanti will execute a supplemental indenture to effect the 90% Proposed Amendments and will pay a consent fee of $2.50 per $1,000 principal amount of 2021 Notes to each holder that validly delivers a consent in the 90% Consent Solicitation prior to an early consent deadline falling 10 Business Days from the date of the launch of the 90% Consent Solicitation. The early consent deadline may be extended by Avanti and the Majority Consenting Creditors. The effectiveness of the 90% Proposed Amendments will be conditional upon the occurrence of the Restructuring Effective Date and the satisfaction of the Restructuring Conditions Precedent.<br><br>If the 90% Consent Solicitation is unsuccessful, Avanti will seek to implement the 90% Proposed Amendments pursuant to the Scheme.<br><br>In the event that the 90% Consent Solicitation is successful, the Scheme with respect to the 90% Proposed Amendments will be withdrawn. |
|---|---|

| | |
|---|---|
| **Amendment and Waiver of Bankruptcy-Related Events of Default** | The Company will concurrently commence consent solicitations (the "**Majority Consent Solicitations**") with respect to both the 2021 Notes and the 2023 Notes to seek consents to:<br><br>(a)    authorise, direct and request that the Trustee and Security Agents enter into the Fourth Supplemental Indenture to remove from the definition of Events of Default any event that occurs in connection with, or results from, the implementation of the Restructuring, including (without limitation) an application under Chapter 15 of the U.S. Bankruptcy Code for recognition of the Scheme (the "**Majority Proposed Amendments**"); and<br><br>(b)    direct the Trustee to irrevocably waive any Default or Event of Default pursuant to sections 6.01(i) and 6.01(j) of the Notes Indentures and rescind any acceleration of the Notes that may arise in connection with, or result from, the implementation of the Restructuring (the "**Majority Proposed Waiver**").<br><br>Adoption of the Majority Proposed Amendments and the Majority Proposed Waiver requires the consent of holders representing at least a majority in aggregate principal amount of each series of Notes (the "**Majority Requisite Consents**").<br><br>See Exhibit B hereto for the text of the Majority Proposed Amendments.<br><br>No consent fee will be payable in connection with the Majority Consent Solicitations. |
| **Additional Capital Raise** | Following and contingent upon the adoption of the 90% Proposed Amendments and the completion of the Exchange, Avanti intends to seek up to a maximum of $30 million of additional capital, through the issuance of:<br><br>(a)    Shares; and/or<br><br>(b)    Indebtedness which shall rank junior to or *pari passu* with the 2021 Notes and may be subject to cash and/or PIK interest<br><br>(the "**Additional Capital Raise**"). For the avoidance of doubt, the Additional Capital Raise may include the issuance of additional 2021 Notes.<br><br>The Board of Directors of Avanti shall determine the timing, structure and terms of the Additional Capital Raise. |

| | |
|---|---|
| | To the extent that the Additional Capital Raise takes the form of Indebtedness, Avanti will notify holders of the 2021 Notes of the proposed terms and conditions of the Indebtedness and holders of the 2021 Notes shall have [thirty (30)] days to elect whether to participate in funding the Indebtedness *pro rata* to their holdings of 2021 Notes at that time. If any holder of the 2021 Notes declines to participate in funding such Indebtedness, then the participating holders of 2021 Notes may elect to subscribe for such unsubscribed amount on a *pro rata* basis. Any portion of the Indebtedness for which the holders of the 2021 Notes do not subscribe may be funded on the terms and conditions of the offer by any other Person. |
| **Shareholder Vote** | Avanti will distribute all required materials for the general meeting of shareholders (the "**Meeting**") to, amongst other things, approve the issue of Shares pursuant to the Exchange and the Additional Capital Raise, if applicable.<br><br>It is expected that, immediately following the Exchange, Solus Alternative Asset Management LP ("**Solus**") would hold approximately 41.5% of the issued ordinary share capital of Avanti. Accordingly, in order to avoid Solus having to make a general offer for the existing issued share capital not already held by it, the Company will seek the prior approval of the Takeover Panel and, subsequently, the approval of independent shareholders at the Meeting for a dispensation from Rule 9 of the City Code on Takeovers and Mergers. |
| **AIM Listing Covenant** | As part of the Scheme, Avanti will covenant to use commercially reasonable efforts to maintain the admission of its shares to trading on the AIM market of the London Stock Exchange for at least one year following the closing date of the Restructuring. |
| **Super Senior Debt** | The Super Senior Debt will remain in its current form except that an amendment to the terms of the Super Senior Facility Agreement to permit the issuance of up to a maximum of $30 million of Indebtedness, which shall rank junior to or *pari passu* with the 2021 Notes. |
| **Intercreditor Agreement** | The Intercreditor Agreement will remain in its current form, except that the trustee for the 2023 Notes will withdraw as a party thereto. |

**EXHIBIT A**

**90% Proposed Amendments**

By delivering a consent pursuant to the 90% Consent Solicitation, each Consenting Creditor will be deemed to have authorized, directed and requested that the Trustee and the Security Agents, upon receipt of the 90% Requisite Consents and all required documentation in the 2021 Indenture, enter into a supplemental indenture to give effect to the 90% Proposed Amendments.

The terms of the 90% Proposed Amendments are as follows (deleted text: ~~deleted text~~; added text: <u>added text</u>).

Section 1.01              *Definitions*

"*Applicable Premium*" means, with respect to any Note on any redemption date, the excess (if any) of:

(a)    the present value at such redemption date of (i) the scheduled principal amount of the Note at the Maturity Date, plus (ii) all required interest payments due on the Note through the Maturity Date (excluding accrued but unpaid interest to the redemption date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(b)   the principal amount of such Note.

For purposes of calculating the Applicable Premium, (i) interest for any ~~PIK Election~~ Interest Period that begins after the redemption date will be calculated as PIK Interest at the Applicable Rate of ~~15~~<u>9</u>.000% per annum ~~(plus, to the extent that one or more Margin Increases has occurred with respect to any Interest Period prior to the redemption date, the aggregate rate of all such Margin Increases)~~, which PIK Interest will be deemed capitalized and added to the principal amount of the Notes, and interest for all other Interest Periods that begin after the redemption date will be calculated as Cash Interest at the Applicable Rate of ~~10~~<u>9</u>.000% per annum ~~(plus, to the extent that one or more Margin Increases has occurred with respect to any Interest Period prior to the redemption date, the aggregate rate of all such Margin Increases)~~, and (ii) the Maturity Date shall refer to the Maturity Date as in effect on the date of the notice of redemption provided pursuant to Section 3.03.

The calculation of the Applicable Premium shall be performed by the Issuer or on behalf of the Issuer by such Person as the Issuer may engage.

"*Maturity Date*" means October 1, ~~2021~~<u>2022</u>~~; provided that the Maturity Date shall be extended by one year to and shall mean October 1, 2022, if Holders representing at least 60% in aggregate principal amount of then-outstanding Notes consent prior to April 1, 2021 to extend the maturity of the Notes by one year to October 1, 2022~~.

"*Permitted Collateral Liens*" means:

(10)    Liens on the Collateral to secure Indebtedness permitted by Section 4.09(b)(23), which Indebtedness may have super seniority priority status in accordance with the terms of the Security Documents; ~~and~~

(11)     Liens on the Collateral to secure Indebtedness permitted by Section 4.09(b)(23), which Indebtedness may have super seniority priority status in accordance with the terms of the Security Documents.; and

(12)     Liens on the Collateral to secure Indebtedness permitted by Section 4.09(b)(25); *provided* that (A) such Indebtedness is secured on a junior or pari passu basis with the Notes, (B) the creditors in respect of such Indebtedness are or will become a party to the Intercreditor Agreement prior to or substantially simultaneously with providing the relevant Indebtedness and (C) the final maturity date and/or scheduled repayments in respect of such Indebtedness each fall after the applicable Super Senior Termination Date.

Section 1.02          *Other Definitions*

"*Cash Available for Debt Service*" ................................................................. Exhibit A
"*Margin Increase*" ............................................................................................ Exhibit A
"*Minimum Cash Balance*" ................................................................................ Exhibit A
"*PIK Election Interest Period*" ........................................................................ Exhibit A

*Section 4.09          Incurrence of Indebtedness and Issuance of Preferred Stock*

(b)     Section 4.09(a) will not prohibit any of the following (collectively, "*Permitted Debt*"):

(23)     the incurrence of Indebtedness represented by Super Senior Debt and Permitted Refinancing Indebtedness in respect thereof (and guarantees thereof) in an aggregate principal amount not to exceed at any one time outstanding the sum of (a) $132.5 82.5 million *plus* (b) an amount equal to the applicable redemption premium payable upon the optional redemption of the aggregate principal amount of Notes required to be redeemed with the proceeds of Super Senior Debt pursuant to this Indenture *plus* (c) an amount equal to the aggregate amount of fees, expenses or charges related to the incurrence or issuance of any Super Senior Debt; the net proceeds of which Super Senior Debt will be used deposited into the HYLAS 4 Reserve Account for the purposes of HYLAS 4 Funding or for the redemption of PIK Toggle Notes as required pursuant to Section 3.07; *provided* that if any Indebtedness is to be incurred under this clause (23) other than Indebtedness under the Super Senior Facility or if any Indebtedness outstanding under this clause (23) is renewed, refunded, refinanced, replaced or exchanged, or the terms thereof are amended, supplemented or otherwise modified, then such resulting Indebtedness shall only be included in the definition of Permitted Debt under this clause (23) if such incurrence, renewal, refunding, refinancing, replacement, exchange, amendment, supplement or modification is consented to prior to its effectiveness by Holders representing at least 60% in aggregate principal amount of then-outstanding Notes; and

(24)     the incurrence of (i) Indebtedness (if the net proceeds of such Indebtedness are deposited into the Segregated Account) and Permitted Refinancing Indebtedness in respect thereof in an aggregate principal amount at any one time outstanding under this subclause (i) not to exceed $50.0 million and (ii) any

Indebtedness issued as payment-in-kind interest in respect of Indebtedness under this clause (24) and Permitted Refinancing Indebtedness in respect thereof, and in each case, the guarantees thereof.; *provided* that if any Indebtedness is to be incurred under this clause (24) other than Indebtedness under the Super Senior Facility or if any Indebtedness outstanding under this clause (24) is renewed, refunded, refinanced, replaced or exchanged, or the terms thereof are amended, supplemented or otherwise modified, then such resulting Indebtedness shall only be included in the definition of Permitted Debt under this clause (24) if such incurrence, renewal, refunding, refinancing, replacement, exchange, amendment, supplement or modification is consented to prior to its effectiveness by Holders representing at least 60% in aggregate principal amount of then-outstanding Notes;

*provided* that, prior to the incurrence of super senior Indebtedness pursuant to Sections 4.09(b)(23) and 4.09(b)(24) which would result in greater than $100.0 million in aggregate principal amount of super senior Indebtedness being outstanding at any one time (excluding any payment-in-kind interest in respect of such super senior Indebtedness), such incurrence must be consented to by Holders representing at least 60% in aggregate principal amount of then-outstanding Notes if the terms of such super senior Indebtedness are different than those provided in the Super Senior Facility (excluding minor or administrative differences). and

(25)   the incurrence by the Issuer or any Guarantor of Indebtedness, including Additional Notes, in an aggregate principal amount not to exceed at any one time outstanding the sum of (a) $30.0 million, (b) an amount equal to the aggregate amount of fees, expenses or charges related to the incurrence or issuance of such Indebtedness and (c) any payment-in-kind interest in respect thereof and the related Guarantees thereof; *provided* that the Issuer and the Guarantors shall have complied with the procedures set forth in Section 4.09(h) of this Indenture.

(h) The Issuer or the Guarantor(s) who propose to incur Indebtedness under Section 4.09(b)(25) of this Indenture shall, prior to incurring any such Indebtedness, offer the Holders the opportunity to fund such Indebtedness on the same terms and conditions as the Indebtedness is proposed to be incurred, which may include additional 2021 Notes. The Issuer shall send a notice to the Holders containing a description of the terms and conditions of the Indebtedness, and the Holders shall have [thirty (30)] days to elect whether to participate in funding the Indebtedness. Such offer shall be made to all Holders on a pro rata basis based on the aggregate principal amount of Notes held by such Holder at the time of such notice. If any Holder declines to participate, participating Holders shall have the right to subscribe for the unsubscribed amount (and if more than one Holder subscribes for the unsubscribed amount, such Holders shall subscribe for their pro rata portion of the unsubscribed amount, where the numerator is such Holder's aggregate principal amount of Notes and the denominator is the aggregate principal amount of Notes held by all Holders who are subscribing for the unsubscribed amount). Any portion of the Indebtedness for which the Holders do not subscribe may be funded on the terms and conditions of the offer by any other Person.

Section 4.30          *Maintenance of Minimum Consolidated LTM EBITDA*

          The Issuer shall maintain a minimum Consolidated LTM EBITDA as of the last day of any fiscal quarter, beginning on March 31, 2018 and ending on March 31, 2020, based on the following:

| EBITDA Testing Date | Minimum Consolidated LTM EBITDA ($'000) |
|---|---|
| March 31, 2018 | $1 |
| June 30, 2018 | $2,000 |
| September 30, 2018 | $5,000 |
| December 31, 2018 | $7,500 |
| March 31, 2019 | $11,000 |
| June 30, 2019 | $15,000 |
| September 30, 2019 | $20,000 |
| December 31, 2019 | $25,000 |
| March 31, 2020 | $31,000 |

Section 9.01          *Without Consent of Holders of Notes.*

          (g) to provide for the issuance of (i) Additional Notes in accordance with the limitations set forth in this Indenture as of the Exchange Offer Settlement Date and (ii) additional notes that are substantially identical to the Notes in existence immediately prior to such issuance, other than issue date, issue price (including original issue discount), and "CUSIP" number, if any, which additional notes and the Notes shall be treated as a single class for all purposes under this Indenture except as necessary to reflect such differences;

Section 9.02          *With Consent of Holders of Notes.*

(b)     reduce the principal of or change the fixed maturity of any Note or alter the provisions with respect to the redemption of the Notes (except as provided above with respect to Section 3.07, Section 3.10, Section 4.11 and Section 4.15 hereof); provided that the Maturity Date shall be extended by one year to October 1, 2022 hereunder if consented to prior to April 1, 2021 by Holders representing at least 60% of the aggregate principal amount of then outstanding Notes;

Form of Note

AVANTI COMMUNICATIONS GROUP PLC, a public limited company organized under the laws of England and Wales, promises to pay to _____, or registered assigns, upon surrender hereof, the principal sum of _____ dollars, subject to any adjustments listed in the Schedule of Exchanges of Interests in the Global Note attached hereto, on October 1, 202~~1~~2 (the "*Maturity Date*")~~; *provided* that the Maturity Date shall be extended by one year to October 1, 2022 hereunder if consented to prior to April 1, 2021 by Holders representing at least 60% of the aggregate principal amount of then-outstanding Notes~~.

1. *INTEREST.*  Avanti Communications Group plc, a public limited company incorporated under the laws of England and Wales (including any and all successors thereto, the "*Issuer*"), promises to pay or cause to be paid interest on the principal amount of this Note at the rate ~~*per annum*~~ (the "*Applicable Rate*") of ~~10~~9.000% *per annum*~~,~~ with respect to <u>interest payments paid in cash</u> ~~any~~ ("*Cash Interest*") ~~(as defined herein)~~, and ~~15~~9.000% *per annum*~~,~~ with respect to any <u>interest paid in kind by increasing the principal amount of the outstanding Notes in a principal amount equal to such interest or by issuing Additional Notes in a principal amount equal to such interest</u> ("*PIK Interest*") ~~(as defined herein)~~ ~~from and after the Exchange Offer Settlement Date~~ <u>for all Interest Periods commencing October 1, 2017.</u> ~~; *provided* that (i) if on a Determination Date (as defined herein) the Issuer's Consolidated LTM EBITDA on either (but not both) of the two EBITDA Testing Dates immediately preceding such Determination Date is less than the minimum Consolidated LTM EBITDA specified in respect of such EBITDA Testing Date in the table immediately following this paragraph, the Applicable Rate with respect to (x) Cash Interest shall be 11.250% *per annum* and (y) PIK Interest shall be 16.250% *per annum*, in each case, for the Interest Period following such Determination Date and (ii) if on such Determination Date the Issuer's Consolidated LTM EBITDA on both of the two EBITDA Testing Dates immediately preceding such Determination Date is less than the minimum Consolidated LTM EBITDA specified in respect of such EBITDA Testing Dates in the table immediately following this paragraph, the Applicable Rate with respect to (x) Cash Interest shall be 12.500% *per annum* and (y) PIK Interest shall be 17.500% *per annum*, in each case, for the Interest Period following such Determination Date (any such increase in the Applicable Rate with respect to Cash Interest or PIK Interest, a "*Margin Increase*").  A Margin Increase with respect to any Interest Period shall not carry forward into subsequent Interest Periods.~~

| ~~EBITDA Testing Date~~ | ~~Minimum Consolidated LTM EBITDA~~ |
|---|---|
| ~~June 30, 2017~~ | ~~$12.0 million~~ |
| ~~September 30, 2017~~ | ~~$23.0 million~~ |
| ~~December 31, 2017~~ | ~~$32.0 million~~ |
| ~~March 31, 2018~~ | ~~$42.0 million~~ |
| ~~June 30, 2018~~ | ~~$47.0 million~~ |

The Issuer will pay interest semi-annually in arrears on April 1 and October 1 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "*Interest Payment Date*"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; *provided* that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; ~~*provided further* that the first Interest Payment Date after the Exchange Offer Settlement Date shall be April 1, 2017~~. The Issuer will, to the extent lawful, pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at a rate that is 2.000% *per annum* higher than the then applicable interest rate on the Notes, and will, to the extent lawful, pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Amounts (without regard to any applicable grace periods) at the same rate. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

~~Except as provided in the immediately succeeding sentence, interest on the Notes shall be payable entirely in cash ("*Cash Interest*"). For the Interest Periods ending on April 1, 2017 and October 1, 2017 (each such Interest Period, a "*PIK Election Interest Period*"), if (x) no Default or Event of Default exists, and (y) the Minimum Cash Balance (as defined herein) on the Determination Date in respect of such Interest Period is below the Minimum Cash Balance Threshold specified in respect of such Determination Date in the table immediately following this paragraph, then the Issuer shall pay interest on 100% of the then outstanding principal amount of the Notes by increasing the principal amount of the outstanding Notes or by issuing Additional Notes in a principal amount equal to such interest ("*PIK Interest*").~~

| ~~Determination Date~~ | ~~Minimum Cash Balance Threshold~~ |
|---|---|
| ~~March 16, 2017~~ | ~~$40.0 million~~ |
| ~~September 15, 2017~~ | ~~$42.0 million~~ |

<u>Commencing October 1, 2017, for any Interest Period (other than the final Interest Period ending on the Stated Maturity of the Notes), if the Cash Available for Debt Service as determined on the Determination Date (each, as defined herein) for such Interest Period is less than the aggregate amount of Cash Interest that would otherwise be due on the relevant Interest Payment Date, then the Issuer may, at its option, elect to pay all or part of the interest on the then outstanding principal amount of the Notes as PIK Interest in an amount equal to all or a portion of the excess of the aggregate amount of Cash Interest due on the relevant Interest Payment Date over the Cash Available for Debt Service.</u>

~~In the event that the Issuer shall be entitled to pay PIK Interest for any Interest Period~~ If interest on the Notes with respect to an Interest Period will not be paid entirely as Cash Interest, ~~then~~ the Issuer shall deliver a notice to the Trustee (copied to the Paying Agent) following the Determination Date but not less than five Business Days prior to the Interest Payment Date in respect of the relevant Interest Period, which notice shall state the total amount of interest to be paid on such Interest Payment Date and the amount of such interest to be paid as PIK Interest. The Issuer shall cause such notice to be delivered to DTC for communication to Participants in any Global Note. Such notice shall be binding on the Issuer, shall include a calculation of the ~~Minimum Cash Balance~~ Cash Available for Debt Service certified by the chief financial officer of the Issuer and shall set forth in reasonable detail the Issuer's good faith determination of ~~each component of Minimum Cash Balance~~ Cash Available for Debt Service~~, identifying the applicable restriction(s) and the Issuer's good faith determination of the maximum amount of funds that may be paid after giving effect to such restriction~~. If the Issuer is required pursuant to this paragraph and the preceding paragraph to pay Cash Interest on the Interest Payment Date, to the extent that on such Interest Payment Date the Issuer would not otherwise have sufficient cash or Cash Equivalents on hand to pay such amount of Cash Interest on such Interest Payment Date in full, the Issuer shall, and shall cause each of its Restricted Subsidiaries to, take all such shareholder, member, corporate, limited liability company and other corporate or similar entity actions required to permit the making of any such dividends or distributions as are within the control of the Issuer and its Subsidiaries and that would not violate any applicable law. If the Issuer pays a portion of interest on the Notes as Cash Interest and a portion as PIK Interest, such Cash Interest and PIK Interest shall each be paid to the Holders pro rata in accordance with their holdings.

~~The insufficiency or lack of funds available to the Issuer to pay Cash Interest as required by the preceding two paragraphs shall not permit the Issuer to pay PIK Interest in respect of any Interest Period. The sole right of the Issuer to elect to pay PIK Interest shall be as (and to the extent) provided in the preceding two paragraphs.~~

As used herein:

"*Determination Date*", with respect to each Interest Period, shall be the 15th calendar day immediately prior to the Interest Payment Date in respect of such Interest Period.

"~~*Minimum Cash Balance*~~ Cash Available for Debt Service," as of any Determination Date, shall be the amount equal to the balance of cash and Cash Equivalents on hand at the Issuer and its Restricted Subsidiaries as of such Determination Date, excluding:

~~(a)    excluding any cash and Cash Equivalents on hand at the Issuer that have been distributed to the Issuer and the distribution of which was conditioned in good faith upon such cash and Cash Equivalents being utilized for a purpose which is not that of paying Cash Interest (including amounts permitted to be distributed to the Issuer solely for the purpose of paying taxes attributable to the Issuer's consolidated Subsidiaries) as the result of restrictions on the ability to make such dividends or distributions provided such restrictions are otherwise permitted by Section 4.08 of the Indenture (including, without limitation, any restrictions and limitations in Indebtedness of any Restricted Subsidiaries in existence on the Exchange Offer Settlement Date; provided the incurrence and terms of such Indebtedness do not violate the Indenture, or any agreement that amends, modifies, renews, increases, supplements, refunds, replaces or refinances such Indebtedness);~~

(b) ~~including undrawn amounts under any revolving credit facilities or local working capital facilities (other than capital lease facilities) of the Issuer and its Restricted Subsidiaries; and~~

(a)      $30 million;

(b)      any cash on hand constituting proceeds from the Super Senior Debt, ~~or~~ Other Indebtedness or the issuance of equity of the Issuer,

(c)      any cash held by the Issuer or any Restricted Subsidiary classified as restricted cash under IFRS, and

(d)      any cash or Cash Equivalents necessary for purposes of HYLAS 4 Funding or working capital purposes as determined in good faith by the board of directors of the Issuer to be prudent to be retained for the purposes of satisfying actual, contingent and prospective liabilities of the Issuer as at that date,

determined on a *pro forma* basis to give effect to (i) the payment of any Cash Interest payable under the Notes on such Interest Payment Date, and (ii) the payment of cash interest on the Super Senior Debt on the next succeeding interest payment date thereunder.

**EXHIBIT B**

**Majority Proposed Amendments and Majority Proposed Waiver**

By delivering a consent pursuant to each of the Majority Consent Solicitations, each Consenting Creditor will be deemed to have (1) authorized, directed and requested that the Trustee and the Security Agents, upon receipt of the Majority Requisite Consents in each Majority Consent Solicitation and all required documentation in each Indenture, enter into supplemental indentures to give effect to the Majority Proposed Amendment, (2) provided written notice to the Trustee to irrevocably waive any Default or Event of Default pursuant to Sections 6.01(i) and 6.01(j) of each Indenture and rescind any acceleration of the Notes that may arise in connection with the implementation of the Restructuring and (3) directed the Trustee to effect any such waiver or rescission.

The terms of the Majority Proposed Amendments are as follows (deleted text: ~~deleted text~~; added text: <u>added text</u>).

Section 1.01          *Definitions*

"*Excluded Party*" means any of MAST Capital Management, LLC, Solus Alternative Asset Management, LLC, <u>Great Elm Capital Management, Inc., KKR TFO Partners L.P.</u> and Tennenbaum Capital Partners, LLC.

"<u>*Restructuring*</u>" <u>means a restructuring of the Issuer's and the Guarantors' indebtedness and related events as set forth in the Restructuring Agreement, dated __ December 2017, among the Issuer, the Guarantors, the Consenting Creditors named therein and the Consenting Shareholders named therein.</u>

"<u>*Restructuring Event of Default*</u>" <u>means any event that occurs in connection with the implementation of the Restructuring, including (without limitation) an application under Chapter 15 of the U.S. Bankruptcy Code for recognition of the Schemes, that would result in an Event of Default under Section 6.01(i) or (j) hereof.</u>

"<u>*Schemes*</u>" <u>means one or more schemes of arrangement under Part 26 of the Companies Act 2006 proposed by the Issuer to implement the Restructuring.</u>

Section 6.01          *Events of Default*

(i)          <u>other than a Restructuring Event of Default,</u> the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary pursuant to or within the meaning of Bankruptcy Law:

(1)          commences a voluntary case under any applicable Bankruptcy Law or any other case to be adjudicated bankrupt or insolvent;

(2)          consents to the entry of an order for relief against it in an involuntary case or to the commencement of any bankruptcy or insolvency proceedings against it;

(3)    consents to the appointment of, or taking possession by, an administrator, custodian, receiver, liquidator, trustee, sequestrator or similar official of it or for all or substantially all of its property;

(4)    makes a general assignment for the benefit of its creditors;

(5)    admits in writing its inability to pay its debts generally as they become due;

(6)    files a petition or answer or consent seeking reorganization for relief under any applicable Bankruptcy Law (other than a solvent reorganization for purposes of transferring assets among the Issuer and the Restricted Subsidiaries);

(j)    other than a Restructuring Event of Default, a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(1)    is for relief against the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary in an involuntary case in which the Issuer, such Restricted Subsidiary that is a Significant Subsidiary or such group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, is to be adjudicated bankrupt;

(2)    appoints a custodian or administrator of the Issuer, or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary or for all or substantially all of the property of the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary; or

(3)    orders the liquidation of the Issuer or any Restricted Subsidiary that is a Significant Subsidiary or any group of the Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary;

## Schedule 5
## Restructuring Steps

It is anticipated that the following principal steps (details of which will be more fully explained in the Scheme Explanatory Statement) will occur as part of the Restructuring and shall take effect in substantially the order set out below.

1. **PRELIMINARY IMPLEMENTATION STEPS**

1.1    As soon as reasonably practicable after the Effective Date, Avanti will convene a meeting of Avanti's board of directors to approve and/or authorise the taking of any steps that, in the view of the board of directors, are considered necessary or desirable in connection with the Restructuring.

1.2    [*deleted*]

1.3    As soon as reasonably practicable, upon completion of the steps set out in paragraph 1.1 above, Avanti will launch:

(a)    the Majority Consent Solicitations to effect the Majority Proposed Amendments and Majority Proposed Waiver necessary to launch the Scheme and the Chapter 15 Filing and each Consenting Creditor will procure that its Account Holder promptly and validly delivers (and does not revoke) its consent to each Majority Consent Solicitation within 10 Business Days; and

(b)    the 90% Consent Solicitation and each Consenting Creditor will procure that its Account Holder promptly and validly delivers (and does not revoke) its consent to the 90% Consent Solicitation within 20 Business Days.

2. **SCHEME SPECIFIC IMPLEMENTATION STEPS**

2.1    At the same time as launching the Consent Solicitations as set out in paragraph 1.3 above or as soon as reasonably practicable thereafter, Avanti will:

(a)    use all reasonable endeavours to issue the Practice Statement Letters to all Note Creditors; and

(b)    file the Scheme Claim Form with the Court and take any other steps considered to be necessary or desirable to enable the Scheme Directions Hearing to take place as soon as reasonably practicable.

2.2    As soon as reasonably practicable, upon completion of the steps set out in paragraph 2.1 above, Avanti will proceed with the Scheme Directions Hearing and will apply to the Court for an order that, amongst other things, the Scheme Meeting be convened to consider the Schemes; provided that if the 90% Requisite Consents are received prior to the 90% Consent Solicitation Deadline, Avanti shall withdraw the Scheme in respect of the 90% Proposed Amendments.

2.3    Provided the Court has ordered that the Scheme Meeting be convened to consider the Scheme, as soon as reasonably practicable after the Scheme Directions Hearing:

(a) Avanti will use all reasonable endeavours to make the Scheme Explanatory Statement available to all Note Creditors and take any other steps directed by the Court at the Scheme Directions Hearing;

(b) Avanti will use all reasonable endeavours to implement the Scheme and the Exchange in compliance with the exemption from registration provided by Section 3(a)(10) of the U.S. Securities Act of 1933, as amended;

(c) each of the Consenting Creditors will procure that its Account Holder promptly and validly executes and delivers to Avanti a completed Account Holder Letter voting in favour of the Scheme; and

(d) unless Avanti concludes it is desirable to postpone this step, Avanti will proceed with the Chapter 15 Filing and request the U.S. Bankruptcy Court to enter the Chapter 15 Orders giving full force and effect to the Scheme(s), if sanctioned, in the United States.

2.4 Avanti will convene the Scheme Meeting in accordance with the order of the Court at the Scheme Directions Hearing.

2.5 If the relevant consent thresholds in relation to the Scheme are reached, Avanti will proceed with the Scheme Sanction Hearing to request that the Scheme Sanction Order be granted.

2.6 If the Scheme Sanction Order is granted, Avanti will proceed with the Chapter 15 Recognition Hearing to obtain the Chapter 15 Order.

2.7 On the Business Day on which the Chapter 15 Order has been granted by the Court, or as soon as possible thereafter, Avanti will file the Scheme Sanction Order with the Registrar of Companies.

3. **COMMON IMPLEMENTATION STEPS**

3.1 Avanti will convene a general meeting of the Shareholders to approve any resolutions required to provide the Shareholder Consents and each Consenting Shareholder will procure that it promptly votes its Shares in favour of the Shareholder Consents on which it is eligible to vote.

3.2 Following the date on which the Scheme Effective Conditions have been satisfied or waived (if applicable):

(a) the Avanti will sign, and will procure that the Additional Obligors will sign, the Restructuring Documents to which they are party;

(b) Avanti will, to the extent authorised by the Scheme, sign for and on behalf of the Note Creditors the Restructuring Documents to which the Note Creditors are party; and

(c) the 2021 Notes Trustee and the 2023 Notes Trustee will sign the Restructuring Documents to which they are party and sign for and on behalf of the Note Creditors the Restructuring Documents to which the Note Creditors are party,

in accordance with the terms of the Scheme.

3.3    Upon the satisfaction of all conditions to the Restructuring Documents and the Scheme, the Restructuring Documents shall become immediately effective in accordance with their terms.

3.4    The relevant Parties will take the steps necessary for the Restructuring Effective Date to occur.

3.5    Avanti shall publicly announce completion of the Restructuring.

**Schedule 6**
**Restructuring Documents**

1.    Solicitation Statements

2.    Third Supplemental Indenture to 2023 Notes Indenture (to effect Majority Proposed Amendments) and Notice of Waiver (as applicable)

3.    Fourth Supplemental Indenture to 2021 Notes Indenture (to effect Majority Proposed Amendments) and Notice of Waiver (as applicable)

4.    Fifth Supplemental Indenture to 2021 Notes (to effect 90% Proposed Amendments)

5.    Cancellation Order for 2023 Notes and Trustee Compliance with Cancellation Order

6.    Release of 2023 Notes Collateral and 2023 Notes Guarantees

7.    Practice Statement Letter

8.    Scheme Explanatory Statement and other documents

9.    Chapter 15 documents (as applicable)

10.    Shareholder Consents

**Schedule 7**
**Accession Deed**

To:              Avanti Communications Group plc

From:          [NAME]

Date:          _____

Dear Sirs

**Avanti Communications Group plc – Lock-Up and Restructuring Agreement dated ___**
**(as amended and/or amended and restated from time to time, the "Lock-Up and**
**Restructuring Agreement")**

We refer to the Lock-Up and Restructuring Agreement. This deed poll is an Accession Deed as defined in the Lock-Up and Restructuring Agreement. Except as otherwise defined herein, terms defined in the Lock-Up and Restructuring Agreement have the same meaning when used in this Accession Deed.

We agree, for the benefit of each Party, to be a [Consenting Creditor][and][Consenting Shareholder] under the Lock-Up and Restructuring Agreement and to be bound by the terms of the Lock-Up and Restructuring Agreement as a [Consenting Creditor][and][Consenting Shareholder] (in our capacity as a [Consenting Creditor][and][Consenting Shareholder]).

We agree, represent and warrant to each other Party on the date of this Accession Deed that (subject to any Transfers effected in accordance with Clause 7 (*Accession and Transfers*) of the Lock-Up and Restructuring Agreement), we or the entity that we represent (if applicable) are the beneficial owner of and have full power to vote in respect of, deal with, approve changes to, dispose of and transfer (free and clear of any and all Encumbrances) (or are able to direct the legal and beneficial owner of) the Shares and/or Notes held by it specified below.

The contact details of [NAME] for any communication or document to be made or delivered under or in connection with the Lock-Up and Restructuring Agreement are as follows:

Address:                    [●]

Fax number:                 [●]

Email:                      [●]

For the attention of:       [●]

Copy to:                    [●]

Address:                    [●]

Fax number:                 [●]

Email:                              [●]

We confirm that as at the date of this Accession Deed, the aggregate amount of principal of our Locked-up Notes is as follows:

|  | Principal at issue amount of notes and/or loans held or controlled by it as at the date of this Accession Deed |
|---|---|
| **2021 Notes** |  |
| **2023 Notes** |  |

We confirm that as at the date of this Accession Deed, the number of our Locked-Up Shares is as follows:

|  | Aggregate number of Shares held or controlled by it as at the date of this Accession Deed |
|---|---|
| **Shares** |  |

This Accession Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

We would request that you treat the existence and contents of this Accession Deed with the utmost confidence and that you do not disclose these to any person without our prior written consent.

**SIGNED** and **DELIVERED** as a **DEED** for and
on behalf of [●]

acting by its lawfully appointed attorney:


………..……....................................
                                                    Attorney

in the presence of:

Witness Signature:           ...........................................

Witness Name:               ...........................................

Witness Address:            ...........................................

                            ...........................................

                            ...........................................

Witness Occupation:         ...........................................

We agree and acknowledge the terms of this Accession Deed.

..........................................

For and on behalf of **AVANTI COMMUNICATIONS GROUP PLC**

**Schedule 8**
**Lock-Up Notice**

BY EMAIL

Date:

TO:              Avanti Communications Group plc (Avanti)

Attention:      [●]

Email:          [●]

FROM:       [Name of Consenting Creditor/ Consenting Shareholder and Address]

1.     We refer to the Lock-Up and Restructuring Agreement dated ____ December 2017 between, amongst others, Avanti, the Initial Consenting Creditors and the Initial Consenting Shareholders.  Capitalised terms in the Lock-Up and Restructuring Agreement have the same meaning as in this notice.

2.     This is a Lock-up Notice.  We hereby notify you that, as at the date of this notice, the aggregate principal of our Locked-up Notes is as follows:

|  | Principal at issue amount of notes and/or loans held or controlled by it as at the date of this Notice |
| --- | --- |
| **2021 Notes** | |
| **2023 Notes** | |

**Please specify the identity of the Note Creditor if different to the Consenting Creditor:**

_____

3.     We hereby notify you that, as at the date of this notice, the aggregate number of our Locked-Up Shares is as follows:

|  | Aggregate number of Shares held or controlled by it as at the date of this Notice |
| --- | --- |
| **Shares** | |

4.     This Lock-Up Notice and any non-contractual obligations arising out of or in connection with it are governed by English law.

5.      We would request that you treat the existence and contents of this Lock-up Notice with the utmost confidence and that you do not disclose these to any person without our prior written consent.

Yours faithfully,

_____

**Schedule 9**

**Restructuring Agreement Announcement**

**THIS ANNOUNCEMENT AND THE INFORMATION CONTAINED HEREIN IS RESTRICTED AND IS NOT FOR RELEASE, PUBLICATION OR DISTRIBUTION, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, IN, INTO OR FROM ANY OTHER JURISDICTION IN WHICH SUCH RELEASE, PUBLICATION OR DISTRIBUTION WOULD BE UNLAWFUL.**

**THIS ANNOUNCEMENT CONTAINS INSIDE INFORMATION**

**For immediate release**

**13 December 2017**

**Avanti Communications Group PLC**

**Announcement of Proposed Restructuring**

Avanti Communications Group PLC (AIM: AVN), ("**Avanti**", the "**Company**" and, together with its subsidiary undertakings, the "**Group**") today announces that it has entered into an agreement (the "**Restructuring Agreement**") with noteholders representing approximately 60% of its outstanding 2021 Notes (as defined herein) and 53% of its outstanding 2023 Notes (as defined herein) (together, the "**Majority Holders**") and shareholders representing 15.8% of its existing issued share capital (the "**Major Shareholders**") to implement a restructuring (the "**Restructuring**") of the Group's indebtedness. The Restructuring, the material terms of which are described below, would, if implemented, substantially reduce the Company's outstanding indebtedness, decrease its future interest expense and potentially raise new liquidity.

<u>**Summary of the Restructuring**</u>

<u>**Debt for equity swap for the 2023 Notes**</u>

In order to substantially reduce its outstanding indebtedness and significantly decrease its future interest expense, the Company will seek to implement an exchange (the "**Debt for Equity Swap**") of all of its outstanding 12%/17.5% Senior Secured Notes due 2023 (the "2023 Notes") for approximately 2 billion new ordinary shares of 1 pence each in the capital of the Company ("**New Ordinary Shares**"), which will represent approximately 92.5% of the Company's issued ordinary share capital following completion of the Debt for Equity Swap (the "**Enlarged Share Capital**").

As of the date of this announcement, the Company has US$557 million in aggregate principal amount of 2023 Notes outstanding.

It is proposed that the Debt for Equity Swap will be implemented through a Court-approved scheme of arrangement pursuant to Part 26 of the Companies Act 2006 (the "**Scheme**").

In order to approve the Scheme, a majority in number of noteholders representing at least 75% in aggregate principal amount of the 2023 Notes held by those holders present in person, or by proxy at a meeting of holders, must vote in favour of the Scheme.

It is expected that, immediately following the Debt for Equity Swap, Solus Alternative Asset Management LP ("**Solus**") would hold approximately 41.5% of the Enlarged Share Capital. Accordingly, in order to avoid Solus being required to make a general offer for the existing issued share capital not already held by it, the Company will seek the prior approval of the Takeover Panel and, subsequently, the approval of independent shareholders at a general meeting for a dispensation from Rule 9 of the City Code on Takeovers and Mergers (the "**Rule 9 Waiver**").

Avanti will therefore convene a general meeting of its shareholders (the "**General Meeting**") for the purposes of obtaining the necessary approvals to, inter alia, allot the New Ordinary Shares pursuant to the Debt for Equity Swap and to obtain the approval from a majority of independent shareholders, on a poll, of the Rule 9 Waiver.

It is expected that a circular containing, amongst other things, further details of the Debt for Equity Swap, the Scheme and the notice of the General Meeting will be published during the first quarter of 2018.

### Amendment of 2021 Notes

In addition to the proposed reduction in indebtedness and interest expense resulting from the Debt for Equity Swap, the Company will seek to further decrease its future interest expense, improve its debt maturity profile and liquidity and eliminate onerous financial covenants by amending certain terms of its 10%/15% Senior Secured Notes due 2021 (the "**2021 Notes**") in order to:

- extend the final maturity date of the 2021 Notes from 2021 to 2022;

- permit the issuance of up to a maximum of $30 million of indebtedness, which shall rank junior to or *pari passu* with the 2021 Notes and may be subject to cash and/or PIK interest;

- eliminate the Maintenance of Minimum Consolidated LTM EBITDA covenant contained in the indenture governing the 2021 Notes;

- change the interest rate payable on the 2021 Notes for all remaining interest periods commencing 1 October 2017 from 10% cash interest and 15% payment in kind ("**PIK**") interest to 9% cash interest and 9% PIK interest;

- eliminate the margin increase payable on the 2021 Notes if the relevant Minimum Consolidated LTM EBITDA threshold was not met; and

- permit interest payments on the 2021 Notes to be paid as PIK interest if Avanti does not have sufficient cash to satisfy the applicable interest coupon,

(collectively, the "**90% Proposed Amendments**").

In order to implement the 90% Proposed Amendments, the Company will seek consents from holders of the 2021 Notes to the 90% Proposed Amendments pursuant to a consent solicitation

(the "**2021 Consent Solicitation**"). Approval of the 90% Proposed Amendments requires consent from holders representing at least 90% in aggregate principal amount of the 2021 Notes (the "**90% Requisite Consents**").

In the event that the 90% Requisite Consents are not received in the 2021 Consent Solicitation, the Company will seek to implement the 90% Proposed Amendments pursuant to the terms of a scheme of arrangement. Implementation of the 90% Proposed Amendments pursuant to a scheme of arrangement will be conditioned upon, among other things, a majority in number of holders of 2021 Notes representing at least 75% in aggregate principal amount of the 2021 Notes held by those holders present in person or by proxy at a meeting of holders voting in favour of the scheme of arrangement.

The implementation of each of the Debt for Equity Swap and the 90% Proposed Amendments will be conditional on the other.

### Common Amendments and Waivers

Avanti will also concurrently commence consent solicitations with respect to both the 2021 Notes and the 2023 Notes to amend and waive certain standard events of default that might otherwise be triggered by the Restructuring.

### Summary of the Restructuring Agreement

The Restructuring Agreement sets out the terms and conditions pursuant to which the Majority Holders and Majority Shareholders have agreed with Avanti that they will take certain actions to support the implementation of the Restructuring, including, among other things, consenting to the 90% Proposed Amendments and the Debt for Equity Swap, voting in favour of the Scheme, and approving the Enlarged Share Capital and the Rule 9 Waiver.

In the Restructuring Agreement, the parties agree that if the Takeover Panel determines that any provision of the agreement that requires Avanti to take or not take any action, whether as a direct obligation or as a condition to any other person's obligation (however expressed), is not permitted by Rule 21.2 of the City Code on Takeovers and Mergers, that provision shall have no effect and shall be disregarded.

### Potential capital raise

Following and contingent upon the adoption of the 90% Proposed Amendments and the completion of the Debt for Equity Swap, the Company may seek to raise up to a maximum of $30 million of additional capital in the New Year. This potential capital raise may take the form of new equity and/or indebtedness which shall rank junior to or *pari passu* with the 2021 Notes and may be subject to cash and/or PIK interest. Should the Board decide to proceed with such a capital raise it will update shareholders accordingly.

### Related Party Transactions

The entering into of the Restructuring Agreement with Solus (the "**Related Party**"), who holds approximately 15.8% of the Company's existing issued ordinary share capital, constitutes a related party transaction, pursuant to Rule 13 of the AIM Rules for Companies (the "**Related Party Transaction**"). The independent directors of Avanti (namely Paul Walsh, Alan Harper,

Nigel Fox, David Bestwick, Andy Green, Paul Johnson, Richard Mastoloni and Chris McLaughlin) consider, having consulted with Cenkos Securities plc ("**Cenkos**"), the Company's nominated adviser, that the terms of the Related Party Transaction are fair and reasonable insofar as the Company's shareholders are concerned.

**Positive outcome for the Group and its shareholders**

The directors of Avanti believe that the Restructuring, if implemented, will help to create a sustainable long-term capital structure and is in the best interest of all those with an economic interest in the Group. Consummation of the Debt for Equity Swap pursuant to the Scheme would result in the capitalisation of US$557 million in aggregate principal amount of 2023 Notes and approximately US$81 million in interest expense savings per year. Adoption of the 90% Proposed Amendments, either pursuant to the 90% Consent Solicitation or, if applicable, a scheme of arrangement, would result in interest expense savings of approximately US$11 million per year, as a result of the elimination of the margin increase and assuming the Company pays PIK interest at 9% on the 2021 Notes for all remaining interest periods.

**It should be noted that the proposals set out in this announcement are subject to various conditions, including the agreement of definitive legal documentation. There is, therefore, no certainty that such definitive legal documentation will be agreed or that the Debt for Equity Swap and the 90% Proposed Amendments will proceed. If the Restructuring is not successful, then based on the projected cash flows of the Group or without generating additional cash flow from operations in the near to medium term, the Company could at some point in the future become unlikely to pay its debt obligations under the 2021 Notes and 2023 Notes as and when they fall due for payment. Should this occur, the existing equity may have little or no value.**

The person responsible for arranging the release of this announcement on behalf of the Company is Patrick Willcocks, Company Secretary and General Counsel.

**Enquiries**

| | |
|---|---|
| **Avanti** | Nigel Fox, Patrick Willcocks<br><br>Tel: +44 20 7749 1600 |
| **Cenkos Securities (Nomad)** | Max Hartley, Mark Connelly, Nicholas Wells<br><br>Tel: +44 207 397 8900 |

_**Important Notices**_

_This announcement may contain forward-looking statements regarding future events or the future financial performance of Avanti. You can identify forward looking statements by terms such as "expect", "believe", "estimate", "anticipate", "intend", "will", "could", "may", or "might", the negative of such terms or other similar expressions. These forward-looking statements include matters that are_

*not historical facts and statements regarding Avanti's intentions, beliefs or current expectations concerning, among other things, the expected outcome of the Restructuring. By their nature, forward-looking statements involve risks and uncertainties, because they relate to events and depend on circumstances that may or may not occur in the future. Avanti cautions you that forward-looking statements are not guarantees of future performance and that Avanti's actual results may differ materially from those described in or suggested by the forward-looking statements contained in this announcement. In addition, even if Avanti's results are consistent with the forward-looking statements contained in this announcement, those results or developments may not be indicative of results or developments in future periods. Avanti does not intend to update these statements to reflect events and circumstances occurring after the date hereof or to reflect the occurrence of unanticipated events. Many factors could cause the actual results to differ materially from those contained in forward-looking statements of Avanti, including, among others, general economic conditions, the competitive environment and the many other risks specifically related to Avanti and its operations, including those discussed in this announcement.*

*This announcement is for information purposes only and is not intended to, and does not, constitute or form part of any offer, invitation or the solicitation of an offer to purchase, otherwise acquire, subscribe for, sell or otherwise dispose of, any securities whether pursuant to this announcement or otherwise. The terms of each of the Debt for Equity Swap, the 90% Consent Solicitation and the Majority Consent Solicitations, if commenced, will be contained in the relevant offering and related documents and will be distributed to holders in accordance with the terms therein.*

*The distribution of this announcement in jurisdictions outside the United Kingdom may be restricted by law and therefore persons into whose possession this announcement comes should inform themselves about, and observe such restrictions. Any failure to comply with the restrictions may constitute a violation of the securities law of any such jurisdiction.*

*In particular, this announcement is not an offer of securities for sale in the United States. Securities may not be offered or sold in the United States absent registration or an exemption from registration under the United States Securities Act of 1933. Any securities mentioned herein have not been and will not be registered under the United States Securities Act of 1933, and no public offering will be made in the United States.*

*Unless otherwise stated, no statement in this announcement is intended to be a profit forecast or estimate and no statement in this announcement should be interpreted to mean that earnings per share of the Company for the current or future financial years would necessarily match or exceed the historical published earnings per share of the Company.*

*Cenkos is authorised and regulated by the Financial Conduct Authority in the United Kingdom and is acting exclusively for the Company and no one else in connection with the Related Party Transactions, and Cenkos will not be responsible to anyone other than the Company for providing the protections afforded to its clients or for providing advice in relation to the Related Party Transactions or any other matters referred to in this announcement.*

## News type:

RNS

**Date:** ● December 2017

## Schedule 10
## Conditions Precedent

1.    An officer's certificate for Avanti attaching:

    (a)    copies of its constitutional documents as in force on the date of this Agreement;

    (b)    the resolution or an extract of the minutes of the decision of its board of directors authorising the execution of this Agreement; and

    (c)    a specimen of the signature of each person authorised on behalf of Avanti to execute this Agreement.

**Schedule 11**
**Ad Hoc Group**

Solus Alternative Asset Management LP

Tennenbaum Capital Partners, LLC

Great Elm Capital Management, Inc.

## Schedule 12
## Indicative Timetable

| | | |
|---|---|---|
| 1. | Avanti launches the Consent Solicitations (the "**Launch Date**") | By no later than 31 January 2018 |
| 2. | Avanti issues Practice Statement Letter to Note Creditors | By no later than 1 February 2018 |
| 3. | Majority Consent Solicitations Deadline | 5:00p.m. New York time on the tenth New York Business Day after the Launch Date |
| 4. | 90% Consent Solicitation Fee Deadline | 5:00p.m. New York time on the tenth New York Business Day after the Launch Date |
| 5. | 90% Consent Solicitation Deadline | 5:00p.m. New York time on the twentieth New York Business Day after the Launch Date |
| 6. | Avanti issues Scheme Explanatory Statement to Note Creditors to launch Scheme | By no later than 5.00 p.m. U.K. time on the second Business Day following the day on which the Court issued the convening order for the Scheme Meeting or such later date as the Court shall order. |
| 7. | Agreed form Restructuring Documents lodged at Court | By no later than 2.00 p.m. U.K. time two Business Days before the Scheme Directions Hearing |
| 8. | Commencement of the Scheme Directions Hearing | By no later than 19 February 2018 |
| 9. | Chapter 15 Filing | By no later than 5.00 p.m. U.K. time on the second Business Day following the day on which the Court issued the convening order for the Scheme Meeting. |

| 10. | Scheme Voting Record Time | 5.00 p.m. U.K. time on the day that is no later than five Business Days before the Scheme Meeting |
| 11. | Scheme Meeting | By no later than 20 March 2018 or such later date as the Court shall order |
| 12. | Commencement of the Scheme Sanction Hearing | By no later than 26 March 2018 or such later date as the Court shall order |
| 13. | Commencement of the Chapter 15 Recognition Hearing | By no later than 27 March 2018 or such later date as the U.S. Bankruptcy Court shall order |
| 14. | Shareholder General Meeting | By no later than 4 April 2018 |
| 15. | Scheme Settlement Date | By no later than 5 April 2018 or such later date as the Court shall order |

**SIGNATORIES**

**AVANTI COMMUNICATIONS GROUP PLC**

By: _____

Name:

Title:

**INITIAL CONSENTING CREDITORS**

**<u>EXHIBIT E</u>**
(Practice Statement Letter)

**avanti**

Avanti Communications Group plc

Cobham House
20, Black Friars Lane
London EC4V 6EB
United Kingdom

T + 44 (0) 20 7749 1600
F + 44 (0) 20 7749 1633

www.avantiplc.com

From:  Avanti Communications Group plc ("**Avanti**")

To:  The Bank of New York Mellon, London branch, as trustee (the "**Trustee**")

The Scheme Creditors (as defined below)

Cc:  Cede & Co., in its capacity as nominee of the Depository Trust Company ("**DTC**"), the registered holder of the global notes representing the Notes (defined below)

D.F. King (the "**Information and Tabulation Agent**")

Date: 1 February 2018

Dear Sir or Madam,

**Proposed scheme of arrangement in relation to Avanti**

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS. YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

1.    **Purpose of this letter**

1.1    Avanti is sending you this letter (the "**Letter**") in accordance with the practice statement issued on 15 April 2002 by the Chancery Division of the High Court of Justice of England and Wales (the "**Court**") in relation to schemes of arrangement between a company and its creditors (the "**Practice Statement**"). The purpose of this Letter is to:

(a)    notify you of a proposed scheme of arrangement pursuant to Part 26 of the Companies Act 2006 of England and Wales (the "**Scheme**") in relation to Avanti's 2023 Notes and 2021 Notes (as defined below);

(b)    notify you that Avanti intends to apply to the Court at the Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 7NL at a Court hearing scheduled to be held on 19 February 2018 (the "**Convening Hearing**") for an order granting certain directions in relation to the Scheme including permission to convene a meeting or meetings of certain of its creditors (the "**Scheme Meeting(s)**") for the purpose of considering and, if thought fit, approving the Scheme;

(c)    inform you of the proposed objectives of the Scheme; and

(d)    inform you of the proposed composition of the classes of creditors who will be voting on the Scheme at the Scheme Meeting(s).

1.2    In this Letter, the following words shall have the following meanings:

(a)    "**2021 Notes**" means the 10%/15% Senior Secured Notes due 2021 (Reg S CUSIP/ISIN: G0713N AF7 / USG0713NAF71; 144A CUSIP/ISIN: 05351L AG2 / US05351LAG23) issued by Avanti pursuant to the 2021 Notes Indenture;

(b)   "**2021 Notes Creditors**" means the persons with the ultimate economic interest as principal in the 2021 Notes held in global form through DTC including by the right to have issued definitive notes under the 2021 Notes Indenture and/or the benefit of such right;

(c)   "**2021 Notes Indenture**" means the indenture dated as of 26 January 2017 under which the 2021 Notes were issued as amended, restated and supplemented from time to time;

(d)   "**2023 Notes**" means the 12%/17.5% Senior Secured Notes due 2023 (Reg S CUSIP/ISIN: G0713N AH3/USG0713NAH38; 144A CUSIP/ISIN: 05351L AJ6/ US05351LAJ61) issued by Avanti pursuant to the 2023 Notes Indenture;

(e)   "**2023 Notes Creditors**" means the persons with the ultimate economic interest as principal in the 2023 Notes held in global form through DTC including by the right to have issued definitive notes under the 2021 Notes Indenture and/or the benefit of such right;

(f)   "**2023 Notes Indenture**" means the indenture dated as of 3 October 2013 under which the 2023 Notes were issued as amended, restated and supplemented from time to time;

(g)   "**Account Holders**" means any persons recorded directly in the records of Cede & Co./DTC as holding an interest in any Notes in an account with DTC;

(h)   "**Notes**" means the 2021 Notes and the 2023 Notes;

(i)   "**Notes Indentures**" means the 2021 Notes Indenture and the 2023 Notes Indenture; and

(j)   "**Scheme Creditors**" means the 2021 Notes Creditors and the 2023 Notes Creditors.

1.3   This letter is addressed to:

(a)   the 2021 Notes Creditors;

(b)   the 2023 Notes Creditors; and

(c)   the Trustee in its capacity as notes trustee in respect of the 2021 Notes and the 2023 Notes.

1.4   This Letter is being sent to Scheme Creditors via DTC, Euroclear S.A./N.V. and Clearstream Banking, *société anonyme* (the "**Clearing Systems**") in accordance with the ordinary way of communicating with and notifying Account Holders and/or those with an underlying economic interest in the Notes.  In addition, an electronic copy shall be made available to all Scheme Creditors at https://sites.dfkingltd.com/avanti (the "**Scheme Website**").

1.5   If you have assigned, sold or otherwise transferred your interests in the Notes, or intend to do so before the date of the Scheme Meeting(s), you should forward a copy of this Letter to the person or persons to whom you have assigned, sold or otherwise transferred, or the person or persons to whom you intend to assign, sell or transfer, such interests as soon as possible as this letter contains important information affecting the Notes.

2.   **What is a scheme of arrangement?**

2.1   A scheme of arrangement is a statutory procedure under English law which allows a company to agree a compromise or arrangement with its creditors (or class of creditors) and for the terms of that compromise or arrangement to bind any non-consenting or opposing minority creditors.

2.2   If the Court is satisfied at the convening hearing that the proposed scheme of arrangement has a prospect of being approved, and that the proposed classes of creditors for voting purposes have been correctly constituted, the Court will order a meeting or meetings of the relevant classes of creditors to be convened.

2.3   In order to become effective, a scheme of arrangement must be:

(a)   approved by a majority in number (above 50%) representing at least 75% in value of creditors present and voting at each scheme meeting;

(b)   sanctioned by the Court (the "**Sanction Order**"); and

(c)   delivered to the Registrar of Companies for England and Wales with a copy of the Sanction Order.

2.4   If the scheme of arrangement becomes effective, it will be binding upon the company and all the members of that class of creditors according to its terms, including those creditors who did not vote on the scheme or who voted against it, irrespective of where in the world those creditors reside or have their seat.

3.   **Proposed Scheme**

3.1   As you may be aware from its announcements on 13 December 2017 and 25 January 2018 and the consent solicitation statements issued on 25 January 2018, Avanti is proposing the Scheme to implement certain transactions relating to the 2023 Notes and, if required, the 2021 Notes (the "**Restructuring**").   An overview of the terms of the Restructuring is set out below at paragraph 5. The Scheme may not be required in respect of the 2021 Notes if the requisite threshold for the consent solicitation in respect of the 2021 Notes, described in paragraph 5.5 below, is met.

3.2   Avanti intends to apply to the Court at the Convening Hearing for permission to convene the Scheme Meeting(s), being: (a) a meeting of the 2023 Notes Creditors, and, (b) if Avanti does not receive the requisite consent from the 2021 Notes Creditors pursuant to the consent solicitation in respect of the 2021 Notes, an additional meeting of the 2021 Notes Creditors. The Convening Hearing is currently scheduled to take place on 19 February 2018. Scheme Creditors will be notified in advance if there is a change to the proposed date via the Clearing Systems and a notice published on the Scheme Website.

3.3   Avanti is a company incorporated under the laws of England and Wales.   For this reason, Avanti considers that the Court has jurisdiction under the Companies Act 2006 to convene the Scheme Meeting(s).   In addition, Avanti believes that Scheme Creditors are domiciled in the UK for the purpose of Council Regulation No 1215/2012 on civil jurisdiction and judgments.

4.   **Background to the Group and the Restructuring**

**Overview of Avanti**

4.1    Avanti, and its direct and indirect subsidiaries (the "**Group**"), is a satellite operator providing fixed satellite services in Europe, the Middle East and Africa through its fleet of Ka-band satellites. Avanti sells satellite data communications services on a wholesale basis to a range of service providers who supply four key end markets: Enterprise, Broadband, Backhaul and Government. Avanti's satellite fleet is positioned in orbital slots that are recorded in the International Telecoms Union Master International Frequency Register, providing coverage in Europe, the Middle East and Africa.

**Background to the proposed Scheme**

4.2    As of 31 December 2017, Avanti had (a) $118 million in aggregate principal amount of indebtedness under a super senior term loan facility agreement, maturing in 2020, (b) $323.3 million in aggregate principal amount of indebtedness under the 2021 Notes, maturing in 2021, and (c) $557 million in aggregate principal amount of indebtedness under the 2023 Notes, maturing in 2023. Avanti's directors are of the view that, based on the current cash flows of the Group, and in the absence of a successful restructuring (on the same or similar terms to the Restructuring outlined below) or without generating additional cash flows from operations in the near term, Avanti will likely at some point in the future become unable to pay its debt obligations as and when they fall due. The directors are also concerned that Avanti may not be able to make ongoing scheduled interest payments on its indebtedness. These possibilities are considered to be realistic, not remote.

4.3    The ability to generate additional cash flows from operations is linked to a successful restructuring because until the uncertainty regarding the Group's financial position and its ability to meet its future obligations is addressed:

(a)    it will be more difficult for the Group to attract and retain customers, staff and suppliers, which will continue to put it at a competitive disadvantage;

(b)    the Group's high debt service obligations will reduce its liquidity, prohibit it from investing in its business and could ultimately result in the Group filing for insolvency; and

(c)    commercial counterparties may seek to terminate or limit their business relationships with the Group.

4.4    In the event that a successful restructuring is not implemented and/or additional cash flows are not generated, Avanti will likely become unable to pay its debts as they fall due at some point in the future. In such event, Avanti's directors will likely seek to place Avanti into some form of insolvency proceeding, or a creditor may take action to enforce or initiate an insolvency proceeding. Any such proceeding is likely to be highly destructive of the value of the Group.

4.5    Furthermore, the directors of Avanti believe that there is no reasonable prospect that a restructuring at a later date would produce a better outcome for the Scheme Creditors, as well as Avanti's other stakeholders, when compared to the Restructuring currently proposed. There is no reason to believe that such a restructuring would be proposed or would be accepted by Avanti or the Scheme Creditors. Therefore, it is the directors' view that a comprehensive restructuring is required now in order to avoid the risk of a downward-spiral that would prejudice both Avanti and the Scheme Creditors. The proposed Restructuring, which is supported by the Consenting Creditors (as defined

below) who represent a substantial majority of Avanti's creditors by value, would avoid such risk, and no other proposal has been put forward that has the same high-level of support.

4.6   **For these reasons, Avanti encourages all Scheme Creditors to support the Scheme.**

**Negotiations regarding and support for the Restructuring**

4.7   In light of the above challenges, Avanti commenced negotiations with an ad hoc group of holders of 2021 Notes and 2023 Notes, (the "**Ad Hoc Group**") regarding a proposed comprehensive restructuring of its indebtedness that would create a sustainable long-term capital structure from which to further develop its business. Given the nature of the transactions contemplated by the proposed Restructuring (as described in further detail below), certain key shareholders were also involved in the negotiations.  On 13 December 2017, Avanti entered into a restructuring agreement (the "**Restructuring Agreement**") with certain members of the Ad Hoc Group (the "**Initial Consenting Creditors**"), who between them represent approximately 60% by value of the 2021 Notes and 53% by value of the 2023 Notes.  Pursuant to the terms of the Restructuring Agreement, the Initial Consenting Creditors have agreed to support the Restructuring.

4.8   Since the Restructuring Agreement was signed, certain other Scheme Creditors have acceded to the Restructuring Agreement so that the aggregate level of support for the Restructuring by value of Notes held by those Scheme Creditors and the Initial Consenting Creditors (the "**Consenting Creditors**"), is, at the date of this letter, approximately 80% by value of the 2021 Notes and 71% by value of the 2023 Notes.

4.9   A copy of the Restructuring Agreement is available to all Scheme Creditors on request to Avanti's legal advisors, Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**"). Contact details for Milbank are provided at the end of this Letter. Avanti encourages any Scheme Creditors wishing to support the Restructuring to accede to the Restructuring Agreement as soon as possible.  Any Scheme Creditors wishing to accede to the Restructuring Agreement should contact Milbank as soon as possible following receipt of this Letter.

5.   **Overview and key aspects of the Restructuring**

5.1   The principal elements of the proposed Restructuring are as follows:

(a)   the amendment and waiver of certain bankruptcy-related events of default within the 2023 Notes Indenture and the 2021 Notes Indenture (the "**Majority Proposed Amendments and Proposed Waiver**");

(b)   certain amendments to the 2021 Notes Indenture including, amongst others, an extension of the final maturity date from 1 October 2021 to 1 October 2022 and reduction of the interest payable from 10% Cash or 15% PIK to 9% Cash or 9% PIK (the "**2021 Notes Restructuring Amendments**");  and

(c)   an exchange of all of Avanti's outstanding 2023 Notes for 92.5% of its then enlarged outstanding issued share capital (the "**Exchange**"),

each as described further below and which shall be more fully set out in the explanatory statement to be provided to Scheme Creditors following the Convening Hearing (the "**Explanatory Statement**").

5.2 The principal elements of the Restructuring outlined above, and the steps required to implement them, will be inter-conditional with each other (whether implemented by means of the Scheme and the 2021 Notes Consent Solicitation (as defined below) or the Scheme only).

5.3 To facilitate the effectiveness of the Scheme outside the U.K., Avanti intends to seek recognition and assistance pursuant to Chapter 15 of the U.S. Bankruptcy Code, which is anticipated to follow the sanction of the Scheme and be a condition to the effectiveness of the Restructuring.

5.4 **The Exchange**

All of Avanti's outstanding 2023 Notes will be exchanged for 92.5% of Avanti's issued share capital immediately after completion of the Restructuring (the "**Exchange Shares**"). The Exchange Shares shall be allocated and issued to the 2023 Notes Creditors on a pro rata basis based on each 2023 Notes Creditor's holding of 2023 Notes as at the record time, as determined pursuant to the Scheme.

Consummation of the Exchange pursuant to the Scheme would result in the capitalization of $557 million in aggregate principal amount of 2023 Notes and approximately $81 million in interest expense savings per year.

5.5 **2021 Notes Restructuring Amendments[1]**

Certain terms of the 2021 Notes Indenture shall be amended to:

(a) eliminate the Maintenance of Minimum Consolidated LTM EBITDA covenant contained in Section 4.30 of the 2021 Notes Indenture, which would require testing on the last day of each fiscal quarter commencing 31 March 2018 and ending on 31 March 2020;

(b) permit the issuance of additional Indebtedness which shall be capped at $30 million and rank junior to or *pari passu* with the 2021 Notes;

(c) extend the final maturity date of the 2021 Notes from 1 October 2021 to 1 October 2022;

(d) change the interest rate payable on the 2021 Notes from 10% Cash Interest or 15% PIK Interest to 9% Cash Interest or 9% PIK Interest for all remaining interest periods commencing 1 October 2017;

(e) eliminate the Margin Increase payable on the 2021 Notes if the relevant Minimum Consolidated LTM EBITDA threshold was not met; and

(f) permit interest payments on the 2021 Notes for all remaining interest periods commencing 1 October 2017 (but excluding the final interest payment) to be paid as PIK Interest if Avanti does not have sufficient cash to satisfy the applicable interest coupon.

---

[1] For the purposes of this paragraph 5.5, capitalised terms not otherwise defined in this Letter shall have the same meaning as in the 2021 Notes Indenture.

Avanti is seeking to implement the 2021 Notes Restructuring Amendments pursuant to a consent solicitation statement and related letter of consent, each dated 25 January 2018, which were distributed to the 2021 Notes Creditors (the "**2021 Notes Consent Solicitation**"). Implementation of the 2021 Notes Restructuring Amendments pursuant to the 2021 Notes Consent Solicitation requires the receipt of consents from holders representing at least 90% in  aggregate principal amount of the outstanding 2021 Notes at or prior to 22 February 2018, the expiration time for the 2021 Notes Consent Solicitation (unless such date is extended). If the requisite consents are not received in the 2021 Notes Consent Solicitation, Avanti intends to implement the 2021 Notes Restructuring Amendments through the Scheme. If, however, the requisite consents are received and the 2021 Notes Restructuring Amendments can be implemented through the 2021 Notes Consent Solicitation, the elements of the Scheme relating to the 2021 Notes Restructuring Amendments shall be withdrawn.

Adoption of the 2021 Notes Restructuring Amendments, either pursuant to the 2021 Notes Consent Solicitation or the Scheme, will result in interest expense savings of approximately $11 million per year as a result of the elimination of the Margin Increase and assuming Avanti pays interest at 9% per annum on the 2021 Notes for all remaining periods up to maturity.

5.6   **Majority Proposed Amendments and Proposed Waiver**

In order to prevent the occurrence of an event of default under the Notes and related automatic acceleration of the Notes from being triggered by the filing of a petition for recognition of the Scheme pursuant to Chapter 15 of the U.S. Bankruptcy Code or by any other part of the Restructuring, Avanti commenced consent solicitations from holders of the Notes on 25 January 2018 (the "**Majority Consent Solicitations**") to:

(a)   remove from the definition of events of default in the Notes Indentures any event that occurs in connection with the implementation of the Restructuring, including (without limitation) the filing of a petition under Chapter 15 of the U.S. Bankruptcy Code for recognition of the Scheme, that would result in an event of default under Section 6.01(i) or 6.01(j) of the Notes Indentures; and

(b)   irrevocably waive any default or event of default pursuant to Sections 6.01(i) and 6.01(j) of the Notes Indentures and rescind any acceleration of the Notes that may otherwise arise in connection with the implementation of the Restructuring.

Implementation of the Amendments and Waiver Consent requires the receipt of consents from holders representing at least 50% in aggregate principal amount of each of the 2021 Notes and the 2023 Notes at or prior to 7 February 2018, the expiration time for the Amendments and Waiver Consent Solicitations (unless such date is extended). Avanti anticipates the Majority Proposed Amendments and Proposed Waiver will be implemented before this date, given the aggregate holdings of Notes of the Consenting Creditors and their obligations pursuant to the Restructuring Agreement to consent to the Notes Amendment and Waiver.

6.   **Additional Capital Raise**

In order to raise new liquidity to grow its business, following and contingent upon the implementation of the Restructuring, Avanti intends to seek to raise a minimum of $30 million of

additional capital through the issuance of ordinary shares in Avanti and/or additional indebtedness which indebtedness shall be capped at $30 million and rank junior to or *pari passu* with the 2021 Notes.

## 7.   **Classes of Scheme Creditors**

7.1   As part of the Scheme, the Scheme Meeting(s) must be convened to consider, and if thought fit, approve the proposed Scheme. A separate meeting must be held for each class of creditors whose rights are so dissimilar as to make it impossible for them to consult together with a view to their common interest.

7.2   Under the Practice Statement, it is Avanti's responsibility to formulate the classes of creditors voting on the Scheme and to notify those Scheme Creditors affected by it.

7.3   Avanti has considered the present rights of each of the Scheme Creditors under the terms of the Notes Indentures and the way in which those rights will be compromised under the Scheme. Having taken into account previous decisions of the Court, and consulted its legal advisers, Avanti has concluded that if the Scheme proceeds solely with respect to the 2023 Notes, there will be one class of creditors (consisting of the 2023 Notes Creditors) voting at a single creditor meeting. If the Scheme proceeds with respect to the 2023 Notes and the 2021 Notes, there will be two classes of creditors (consisting of the 2023 Notes Creditors in one class and the 2021 Notes Creditors in the other class) voting at two, separate creditor meetings.

7.4   Avanti's conclusion that the 2023 Notes Creditors, and, if applicable, the 2021 Notes Creditors each constitute a separate class for the purposes of voting on the Scheme is largely based on the following:

(a)   holders within each series of Notes, in their capacity as holders of the relevant Notes, all have materially the same rights against Avanti and benefit equally from the guarantees and security provided under those Notes;

(b)   all 2023 Notes Creditors will be treated in the same way under the Scheme;

(c)   if the Scheme proceeds with respect to the 2021 Notes, all 2021 Notes Creditors will be treated in the same way under the Scheme; and

(d)   all 2023 Notes Creditors, on the one hand, and all 2021 Notes Creditors, on the other, each have different rights relative to one another against Avanti and, further, each is to receive a different treatment under the Scheme, as described above.

**Consenting Creditors and the Restructuring Agreement**

7.5   The Consenting Creditors, being a substantial majority of both the 2023 Notes Creditors and the 2021 Notes Creditors, have signed the Restructuring Agreement, and consequently are obliged to support the Restructuring, including by voting in favour of the Scheme at the Scheme Meeting(s) (as applicable). In Avanti's view, this does not mean that the Consenting Creditors should form a separate class (or classes) from the other 2021 Notes Creditors and the 2023 Notes Creditors (as applicable) because:

(a)   the Restructuring Agreement does not itself vary or affect the relevant rights of the Consenting Creditors under the Notes;

(b)   any 2023 Notes Creditor or 2021 Notes Creditor is able to accede to the Restructuring Agreement;

(c)   there is no fee payable to any person for entry into the Restructuring Agreement (save that, in respect of the Ad Hoc Group, Avanti has agreed to pay the fees and expenses of the Ad Hoc Group's professional advisers in connection with the negotiation and implementation of the Restructuring; however, Avanti's view is that this is not a material difference or one that would mean that the members of the Ad Hoc Group should form a different class from either the 2021 Notes Creditors and/or the 2023 Notes Creditors); and

(d)   the Consenting Creditors' obligations under the Restructuring Agreement to support the Restructuring are not irrevocable as the Restructuring Agreement is terminable upon the occurrence of certain events, including a material adverse effect to the business, operations or conditions of the Group.

Avanti has therefore concluded that 2023 Notes Creditors can consult together with a view to their common interest and, if the Scheme is to be proposed in respect of the 2021 Notes, that the 2021 Notes Creditors can also consult together with a view to their common interest, in each case irrespective of whether or not they are Consenting Creditors and/or members of the Ad Hoc Group.

7.6   **IMPORTANT: If any Scheme Creditor has comments as to the constitution of the classes of creditors which are proposed, or any other concerns which they consider should be raised with the Court, they should in the first instance contact Milbank using the contact details set out at the end of this Letter.**

8.   **The Convening Hearing**

8.1   Avanti will draw any issue raised by any Scheme Creditor to the Court's attention at the Convening Hearing. Scheme Creditors have the right to attend the Convening Hearing in person or through counsel and to make representations at the Convening Hearing.

8.2   This Letter is intended to provide Scheme Creditors with sufficient information regarding the Scheme and the proposals for convening the Scheme Meeting(s) so that, should they wish to raise any issues that relate to the jurisdiction of the Court to sanction the Scheme, or to raise any other issue in relation to the constitution of the Scheme Meeting(s) or which might otherwise affect the conduct of such Scheme Meeting(s), they may attend and be represented before the Court at the Convening Hearing.

8.3   Scheme Creditors should be aware that under the terms of the Practice Statement, the Court has indicated that issues which arise as to the constitution of meetings of creditors, the proposals for convening the Scheme Meeting(s) or which otherwise affect the conduct of those meetings, or which affect the jurisdiction of the Court to sanction a scheme of arrangement (each "**Creditor Concerns**") should be raised at the Convening Hearing. If Scheme Creditors fail to raise these matters at the Convening Hearing, whilst they will still be able to appear and raise objections at the later hearing of the Court to sanction the Scheme (the "**Sanction Hearing**"), the Court at the

Sanction Hearing would expect those Scheme Creditors to provide compelling reasons to explain why they had not previously raised any Creditor Concerns. If at all possible, Scheme Creditors should therefore raise any Creditor Concerns at the Convening Hearing.

8.4 If the Court orders the Scheme Meeting(s) to be convened at the Convening Hearing, then Scheme Creditors will have the opportunity to raise objections at the Sanction Hearing at which the Court will decide whether to exercise its discretion to sanction the Scheme (assuming that the Scheme is approved at the Scheme Meeting(s) by the requisite majority). It is anticipated that the Sanction Hearing will be held on or around 26 March 2018.

9.   **Scheme Website**

9.1  The Information and Tabulation Agent has set up the Scheme Website https://sites.dfkingltd.com/avanti to disseminate information and communications about the Scheme. Scheme Creditors will be able to view and download Scheme documents, including this Letter and further documents related to the Scheme to be circulated in future, including the Explanatory Statement.

10.  **Next Steps for Scheme Creditors**

10.1 If the Court grants leave to convene the Scheme Meeting(s) at the Convening Hearing, then Scheme Creditors will be provided with the following important documents (amongst other information):

(a)  a notice convening the Scheme Meeting(s), including details of how Scheme Creditors can vote, an indicative timetable and key dates for the Scheme (including the date of the Scheme Meetings and the anticipated Sanction Hearing);

(b)  the Explanatory Statement;

(c)  an account holder letter, containing, amongst other things, a voting and proxy form that Scheme Creditors will need to complete in order to vote at or appoint a proxy to attend and vote on their behalf at the Scheme Meeting(s); and

(d)  the Scheme and all accompanying documentation,

(together, the "**Scheme Documentation**").

10.2 The Scheme Documentation will also be made available to the Scheme Creditors by the Information and Tabulation Agent via the Scheme Website. Until the date of the Scheme Meeting(s), Scheme Creditors may also request hard copies of the Scheme Documentation free of charge from Milbank, at whose offices the Scheme Documentation will also be made available for inspection at least 14 days before the day appointed for the Scheme Meeting(s).

10.3 If you have any questions in relation to this Letter or the Scheme, please contact either Milbank or the Information and Tabulation Agent using the contact details below:

**D.F. King**
Information and Tabulation Agent

E-mail: avanti@dfkingltd.com

**London**
125 Wood Street
London EC2V 7AN
United Kingdom
Telephone: +44 20 7920 9700

**New York**
48 Wall Street, 22nd Floor
New York, New York 10005
United States
Telephone: +1 212 269 5550
Toll free: (800) 714-3311

**Hong Kong**
Suite 1601, 16/F, Central Tower
28 Queen's Road Central
Hong Kong
Telephone: +852 3953 7230

**Milbank, Tweed, Hadley & McCloy LLP**
Legal advisers to Avanti

Contact: Nick Angel / Stuart Swift
Tel: +44 207 615 3000
E-Mail: nangel@milbank.com
sswift@milbank.com

10 Gresham St., London, EC2V 7JD,
United Kingdom

Yours faithfully,

For and on behalf of Avanti Communications Group plc

Cobham House
20 Black Friars Lane
London EC4V 6EB
United Kingdom

Registered number: 6133927. Registered Office: Cobham House, 20 Black Friars Lane, London EC4V 6EB United Kingdom