**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 18-_____ (__) |
| | ) |
| AVANTI COMMUNICATIONS GROUP PLC, [1] | ) Chapter 15 |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

### DECLARATION OF NICHOLAS ANGEL AS ENGLISH COUNSEL TO DEBTOR IN SUPPORT OF VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF

I, NICHOLAS ANGEL, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a solicitor duly admitted to practice in England and Wales and a partner with the law firm Milbank, Tweed, Hadley & M$^c$Cloy LLP ("Milbank"),[2] counsel to the Debtor and Patrick Willcocks, in his capacity as the duly authorized foreign representative (the "Foreign Representative") of Avanti Communications Group plc (the "Debtor").  I submit this declaration (the "Declaration") in support of the *Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* (the "Verified Petition"),[3] filed contemporaneously herewith.

2.      As of the date hereof, the Debtor is the subject of proceedings (the "English Proceeding") currently pending before the High Court of Justice of England and Wales (the "English Court"), concerning a scheme of arrangement (the "Scheme"), pursuant to Part 26 of the

---

[1]      Avanti Communications Group plc is the Debtor in this chapter 15 case (the "Chapter 15 Case") and the identifying four digits of the tax identification number of such Debtor are: Avanti Communications Group plc (0137). The location of the Debtor's corporate headquarters and registered office is Cobham House, 20 Black Friars Lane, London, EC4V 6EB, United Kingdom.  The Debtor's company registration number is 06133927.

[2]      Except as otherwise indicated, capitalised terms used herein shall have the meaning ascribed to them in the Verified Petition (as defined below).

[3]      The Verified Petition, together with the Voluntary Chapter 15 Petition, the "Petition."

Companies Act 2006 of England and Wales (as modified, amended or re-enacted from time to time, the "Companies Act").

3.        The Petition seeks, among other relief, entry of an order granting: (a) recognition the English Proceeding as a "foreign main proceeding" pursuant to chapter 15 of sections 105(a), 1504, 1507, 1515, 1517, 1520 and 1521 of title 11 of the United States Code (the "Bankruptcy Code") and (b) recognizing and enforcing the Releases set out in the Scheme, including the Guarantor Releases.

4.        The Debtor's headquarters and chief place of business is in London, England.

5.        In preparing this Declaration, I reviewed (a) the Verified Petition and (b) relevant provisions of the Companies Act, and other provisions of English law and the laws of the European Union as they relate to chapter 15 of the Bankruptcy Code and other aspects of U.S. bankruptcy law.  All facts set forth in this Declaration are based on: (a) my knowledge; (b) my review of relevant documents; or (c) my opinion based upon my experience and knowledge of the Debtor's operations.  If called upon to testify, I could and would testify competently to the facts set forth herein.

6.        This Declaration comprises matters that are statements of legal opinion and/or statements of fact.   Where the matters stated in this Declaration are statements of legal opinion, such statements represent my view of English law as a practicing lawyer admitted and licensed to practice in England and Wales.  Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true.  Where the matters stated in this Declaration that are statements of fact are not within my personal knowledge, they are derived from documents or information supplied to me by or on behalf of the Debtor and are true to the best of my knowledge, information, and belief.

7.      In this Declaration, after describing my background and qualifications, I provide a description of English law and practice relevant to this Court's consideration of the Petition. Thereafter, I also summarise the procedures and schedule of events relating to the Scheme currently underway with respect to the Debtor.

## PERSONAL BACKGROUND AND QUALIFICATIONS

8.      I earned a L.L.B. from Bristol University.  I was admitted as a solicitor in England and Wales in 1989 and joined Ashurst LLP where I was promoted to partnership in 1997 and subsequently became head of the restructuring group until 2009, when I was elected to partnership at Milbank. I am currently co-head of Milbank's London financial restructuring group.  I have over 25 years of experience in advising distressed companies (both listed and privately owned), distressed funds, commercial banks, insolvency practitioners and buyers of distressed companies on large complex restructuring transactions spanning a broad range of industry sectors and often involving cross-border challenges.

9.      I am, together with other partners and associates at my firm, English counsel to the Debtor in connection with its English Proceeding before the English Court.  Milbank has served as the Debtor's legal adviser for numerous years, and has advised the Debtor with respect to the current Restructuring, including the Consent Solicitations and the Scheme, and the extraterritorial effects of recognition of the same since around September 2017.

## STATEMENTS OF ENGLISH LAW AND PRACTICE

### A.    Schemes of Arrangement

10.      Part 26 of the Companies Act allows English companies (and certain foreign companies) to use a well-established statutory tool known as a "scheme of arrangement" to impose a compromise or arrangement, including restructuring of liabilities, agreed with a statutory majority of the company's creditors (or any class of creditors) upon each and every creditor of the

relevant creditor class subject to the scheme, as applicable.[4]  A scheme of arrangement is therefore a very useful tool for restructuring all or a certain part of a company's debt, as, for example, it can be used to impose the agreed restructuring upon dissenting minority creditors who withhold their consent to a restructuring.  Notably, a company does not need to be insolvent, or near insolvency, to propose and implement a scheme of arrangement.

11.    The scheme process can be commenced by a company, a creditor of a company, a liquidator of a company being wound up, or an administrator of a company in administration. The applicant begins with the preliminary step of circulating a letter (known as a "practice statement letter") to the creditors who will be subject to the compromise or arrangement contemplated by the proposed scheme. Among other things, the practice statement letter will typically set out the applicant's proposed scheme classes and the applicant's case for why the English court has jurisdiction for the scheme.  The practice statement letter will notify the recipient creditors that they have the right to attend the court hearings for the scheme and to object.

12.    The scheme process begins when an application is made to the English Court in accordance with Part 26 of the Companies Act requesting permission for a hearing (known as a convening hearing) to convene a meeting (known as a scheme meeting) of the company's creditors proposed to be subject to the scheme to enable them to consider and vote on the proposed compromise or arrangement.  Under English law, creditors of a company will form a class for the purpose of voting on the scheme if those creditors' rights against the company, both before and after the compromise or arrangement in the proposed scheme is implemented, are not so dissimilar as to make it impossible for them to consult together in relation to the proposed compromise or

---

[4]    Schemes of arrangement can also be used to implement compromises or arrangements with the members of a company, or any class of members of a company.  For brevity's sake this declaration shall only focus on creditor schemes.

arrangement with a view to their common interest taking into account, among other things, the relevant comparator. The applicant for the scheme will propose the proposed creditor classes to the English Court as part of its convening hearing application, but the decision as to whether or not the split is correct is ultimately one for the English Court, and it has the power to require a split of the proposed classes if it feels they are not properly constituted (for example, if certain creditors are obtaining a material benefit through the scheme which is not being made available to the wider creditor body). Scheme creditors are entitled to attend the convening hearing to voice any concerns regarding the proposed scheme, including the composition of the proposed voting class or classes of scheme creditors.

13.       The scheme application is supported by a witness statement and a draft explanatory statement, which is the disclosure document for scheme creditors (described below in more detail). At the convening hearing, the English Court will decide whether to grant the applicant permission to convene meetings of the relevant creditor class(es) to consider and vote upon the proposed compromise or arrangement. In making its decision, the English Court will consider jurisdictional issues as well as review the composition of the proposed voting class or classes of scheme creditors. It will also consider whether or not the requisite majority consents are likely to be obtained at any scheme meeting. If the English Court does grant the application, it will issue an order authorizing the company to convene the scheme meeting(s).

14.       To become legally binding on the company and on all the creditors in the relevant class(es):

(a)       a majority in number representing not less than 75% in value of each class of creditors, present and voting in person or by proxy, must vote in favour of the scheme of arrangement at the scheme meeting for that creditor class;

(b)     the English Court must subsequently sanction the scheme of arrangement as approved by the creditors at the scheme meeting(s); and

(c)     a copy of the order of the English Court to that effect must subsequently be delivered to the Registrar of Companies in England and Wales, at which point the scheme becomes binding.

15.     Under section 895(2) of the Companies Act, the English Court has jurisdiction to sanction a scheme in relation to any company liable to be wound up under the Insolvency Act. This captures companies registered under the Companies Act in England and Wales, such as the Debtor.  A number of recent cases have raised the question of whether it is also necessary for the English Court to be satisfied that it has jurisdiction under the recast Regulation (EU) 1215/2012 of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the "Recast Judgments Regulation"), which provides that any person domiciled in an EU member state (other than Denmark) should be sued in the courts of that member state, unless certain exceptions apply.  As it has yet to be definitively judicially determined whether schemes of arrangement fall within the ambit of the Recast Judgments Regulation, the English Court has adopted the practice of considering whether the English Court nonetheless has jurisdiction under the Recast Judgments Regulation in schemes involving a company and/ or creditors domiciled in member states other than England and Wales, either on the basis of Article 8 of the Recast Judgments Regulations, which allows a person domiciled in one member state to be sued in the courts of another member state if the action involves a number of closely connected claims and it is expedient to determine them together, or on the basis of Article 25 of the Recast Judgments Regulation, which allows parties to be sued in any member state regardless of their domicile if they have agreed that the courts of that member state are to

have jurisdiction in respect of any disputes arising in connection with a particular legal relationship. The English Court must also be reasonably assured that the scheme will be recognised and given effect in each relevant foreign jurisdiction where the company (and any obligors that will be released from their obligations pursuant to the scheme) has material assets.

16.     Once the convening order is issued, notice of the scheme meeting(s) must be given to all scheme creditors prior to the meeting(s) in accordance with the convening order.  Such notice must be accompanied by the explanatory statement containing sufficient information regarding the company and the effects of the proposed compromise or arrangement so as to allow a typical scheme creditor to make a reasonable decision regarding whether or not to support the proposed scheme.  I understand that the explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of votes on a chapter 11 plan. Scheme creditors are entitled to attend the scheme meeting in person or by proxy and to ask questions regarding the proposed scheme.

17.     As noted above, each class of scheme creditors will consider and vote on the proposed scheme separately.  A majority in number of those present and voting in person or by proxy at the scheme meeting of each class of creditors, representing at least 75% in value of that class of scheme creditors, must vote in favour of the scheme in order for the scheme to be approved. If any class of scheme creditors does not approve the scheme, the scheme cannot proceed.  In other words, non-consenting scheme creditors can be bound by the terms of a scheme only if they are within a class voting in favour of the scheme.  Thus, unlike the confirmation provisions of chapter 11 of the Bankruptcy Code, a scheme does not have a mechanism for "cramming down" entire classes of dissenting creditors.

18.     The voting majorities are confirmed by a chairman appointed for the purposes of the scheme meeting(s).  To confirm the voting majorities, the chairman (often with the assistance of an agent appointed specifically to assist the company with this task) tabulates the votes of scheme creditors submitted.  The value of each scheme creditor's claim for voting purposes will typically be the face value of the actual and contingent claim of that scheme creditor against the company under the existing debt documents as at a specific date fixed prior to the scheme meeting.[5] If the requisite majorities of attending and voting scheme creditors approve the scheme, the chairman provides a sworn statement to the court as evidence of the result.

19.     Following the scheme meetings, the company will apply to the English Court to sanction the scheme at a second hearing which is referred to as a "fairness" hearing, or sanction hearing, to determine whether the English Court should "sanction" the scheme and make the compromise or arrangement binding on all of the scheme creditors, whether or not they voted in favour of the scheme.  I understand that the sanction hearing is comparable to a confirmation hearing on a chapter 11 plan of reorganization under section 1128 of the Bankruptcy Code. All scheme creditors have an opportunity to raise questions and objections to the scheme and present evidence at the sanction hearing.

20.     The English Court may sanction the scheme unconditionally, may sanction the scheme conditional upon certain modifications or amendments to the scheme, or may refuse to sanction the scheme.  In deciding whether or not to sanction the scheme at the sanction hearing, the English Court will consider whether:

---

[5]     In the case of the Scheme, voting will be by the principal amount of 2023 Notes and the record date has been fixed at 5 p.m. (New York time) on March 12, 2018.

(a)     the compromise or arrangement proposed by the scheme is such that an intelligent and honest person, being a member of the relevant class of scheme creditors concerned and acting in respect of his interests, might reasonably approve;

(b)     the scheme is fair, taking into account the interests of the scheme creditors, the nature of the scheme's impact upon dissenting scheme creditors, and whether each class was fairly represented by those attending the scheme meeting(s) acting in good faith; and

(c)     the applicable statutory and procedural requirements have been fulfilled, including whether the requisite majorities of voting scheme creditors approved the scheme.

21.     The English Court does not judge the business merits of proposed schemes and generally refrains from second-guessing commercial decisions made at scheme meetings.

22.     If the English Court sanctions a scheme, the scheme will only take effect once a certified copy of the English Court's order sanctioning the scheme, known as a sanction order, has been delivered to the Registrar of Companies of England and Wales.  Upon such delivery, the scheme is binding and effective according to its terms on all scheme creditors, irrespective of notice and their participation at any scheme meeting.

**B.      Third Party Releases**

23.     It is commonplace for a scheme that releases the scheme creditors' claims against a principal obligor to require that scheme creditors also release their claims against third parties

which are designed to recover the same liability.[6]    Such a release ensures, among other things, that the company is free from claims of counter-indemnity that might otherwise be brought against it by those third parties, which would otherwise undermine the compromise or arrangement provided for by the scheme.  It is also commonplace for schemes to provide for scheme creditors to release any claims they have or may in the future have arising in connection with the scheme itself (and/or related restructuring, if applicable).  I understand the Foreign Representative will be seeking such releases with respect to the Debtor in the Chapter 15 Case.

### Negotiations with Creditors and the Restructuring Agreement

24.    I have worked with the Debtor with respect to its Restructuring.  Owing to the Debtor's worsening financial condition in part as a result of the delays in the launch of the Debtor's HYLAS 3 and HYLAS 4 satellites, the Debtor entered into preliminary discussions with the Ad Hoc Group regarding a proposed comprehensive restructuring of its indebtedness that would create a sustainable long-term capital structure from which to further develop its business.  On December 13, 2017 and thereafter, the Debtor and certain members of the Ad Hoc Group and other holders

---

[6]    See, e.g., In re T & N Ltd and others (No 4) [2006] EWHC 1447 (Ch) (the court held a scheme did not necessarily prohibit the alteration of third party rights, in this case, creditors' rights to pursue asbestos claims against insurers); Re Lehman Brothers International (Europe) (In administration) (No 2) [2009] EWCA Civ 1161 (following, T&N, Patten LJ held (at paragraph 63) that it was *"entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third parties designed to recover the same loss. The release of such third party claims is merely ancillary to the arrangement between the company and its own creditors.");* In Re La Seda de Barcelona SA [2010] EWHC 1364 (Ch) (Proudman J applied T&N and Lehman, and concluded that a third party subsidiary guarantor could be released pursuant to a deed of release executed on behalf of scheme creditors).

Examples of recent schemes which involved releases are: Re Magyar Telecom BV [2013] EWHC 3800 (Ch) (scheme company executed a deed of covenant for each note creditor whereby scheme claims (including guarantee claims of group guarantor companies) were irrevocably released); In the Matter of New World Resources N.V [2014] EWHC 3143 (Ch) (scheme provided for broad release of claims arising out of finance documents, among other things, against subsidiary guarantors); and Codere Finance (UK) Limited [2015] EWHC 3778 (Ch) (scheme creditors irrevocably waived and released scheme claims (including claims against group company guarantors) and undertook to treat the scheme claims as waived and released subject to carve-outs). For the court's convenience, the judgements of the cases and the sanction orders of the schemes cited are attached at Annex 1.

of the Notes (together, the "<u>Consenting Creditors</u>") have become party to a restructuring agreement (the "<u>Restructuring Agreement</u>"),[7] pursuant to which the parties agreed to implement the Restructuring comprised primarily of the 2023 Notes Equitization and the 2021 Notes Amendments.

25.    Pursuant to the Restructuring Agreement, the Consenting Creditors and the Debtor agreed that the 2023 Notes would be equitized pursuant to the Scheme, the 2021 Notes would be amended and extended pursuant to a consent solicitation, or in the event that the consent solicitation failed, pursuant to the Scheme, and certain supporting ancillary amendments would be made to both the 2021 Notes and 2023 Notes by way of consent solicitation.  I understand that these consent solicitations have been successful in obtaining the required majority to approve the amendments.

26.    As noted above, the Scheme also contains certain releases to be granted to the Debtor and its subsidiaries by the holders of the 2023 Notes.  Such releases are typical to those releases given in similar types of restructurings.

27.    The filing of the Chapter 15 Case is also a condition precedent of the Restructuring.

### The English Proceedings

28.    On February 1, 2018, the Debtor issued a practice statement letter (the "<u>Practice Statement Letter</u>") through DTC and the 2023 Trustee to the holders of the 2023 Notes, who are the sole creditors that will be affected by the Scheme.  Among other things, the Practice Statement Letter notified the holders of the 2023 Notes of the Debtor's intention to propose the Scheme, the Debtor's intention to apply to the English Court for permission to convene a scheme meeting (the "<u>Scheme Meeting</u>") for the purpose of voting on the Scheme, and the composition of the single

---

[7]    A copy of the Restructuring Agreement is attached to the Willcocks Declaration as <u>Exhibit D</u>.

class of creditors to vote on the Scheme.[8]   A copy of the Practice Statement Letter is attached as

Exhibit E to the Willcocks Declaration.     The Practice Statement Letter was circulated to the

Scheme Creditors through DTC and the 2023 Trustee, and by posting on the Scheme website at

https://sites.dfkingltd.com/avanti.

29.     On February 15, 2018, the Debtor applied to the English Court for permission to

convene the Scheme Meeting on the basis that the Scheme Creditors should constitute a single

class of creditors for the purpose of voting on the Scheme.   The application to the English Court

was accompanied by a draft explanatory statement (the "Explanatory Statement") and all

documents appended thereto (including the Scheme, which is attached as Annex I to the

Explanatory Statement), which is attached as Exhibit C to the Willcocks Declaration.

30.     On February 19, 2018, the English Court held the convening hearing and

subsequently issued a convening order (the "Convening Order"), which is attached as Exhibit B to

the Willcocks Declaration.   The English Court found that it had jurisdiction in relation to the

Scheme and ordered, among other things, that: (i) the Debtor convene the Scheme Meeting to be

held at 10:00 am (London time) on March 20, 2018 at the London offices of Milbank; and (ii) the

Explanatory Statement, together with an account holder letter for use by the Scheme Creditors in

connection with the Scheme Meeting, be distributed to all Scheme Creditors.     The Convening

Order further authorizes Patrick Willcocks of the Debtor to act as the foreign representative of the

Debtor in respect of any chapter 15 case that may be commenced in the United States.

---

[8]     At the time the Practice Statement Letter was circulated, it was envisaged that the Scheme may also be used
to implement the 2021 Notes Restructuring Amendments, which would have resulted in another class of 2021
Noteholders voting separately from the 2023 Noteholders.  However, the scheme did not need to proceed in
respect of the 2021 Notes once the requisite consents to the 2021 Note Restructuring Amendments were
obtained through the 2021 Notes Consent Solicitation.

31.     The provisions of the Convening Order are appropriate and advisable, and provide for procedural fairness with respect to the manner in which the subsequent events relating to the Scheme will proceed.  The provisions ensure that the Scheme Creditors are properly notified of the Scheme Meeting and therefore will have the opportunity to raise questions and objections to the Scheme at the Scheme Meeting.

32.     It is currently anticipated that the Sanction Hearing in respect of the Scheme (the "Sanction Hearing") will be held on March 26, 2018.  If the English Court approves the Sanction Order, the Scheme will become effective, and thereby binding as a matter of English law on all holders of the 2023 Notes, wherever located, upon delivery of the Sanction Order to the Registrar of Companies of England and Wales.  Because this Court's issuance of an order recognising and enforcing the Scheme in the United States under chapter 15 of the Bankruptcy Code is a condition precedent to the implementation of the Scheme, although the Scheme will become effective upon delivery of the Sanction Order to the Registrar of Companies of England and Wales, the Scheme will not be implemented unless and until this Court has issued an order recognising and enforcing the Scheme in the United States under chapter 15 of the Bankruptcy Code and all other conditions precedent to the Restructuring and the Scheme have been satisfied.

33.     Accordingly, the relief requested by the Foreign Representative under chapter 15 of the Bankruptcy Code is necessary to both implement the Scheme and give effect to the Scheme in the United States and will best assure an economical, expeditious, and fair and efficient administration of the Scheme that protects the interests of the Debtor and the Scheme Creditors. Based on the foregoing, I believe that the relief requested in the Debtor's Chapter 15 Case should be granted in full.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 21, 2018
      London, England

/s/ Nicholas Angel
NICHOLAS ANGEL

**Annex 1**

# Codere Finance (UK) Limited

No. 8609/2015

High Court of Justice Chancery Division Companies Court

17 December 2015

**[2015] EWHC 3778 (Ch)**

**2015 WL 09917859**

Before: Mr. Justice Newey

Thursday, 17th December 2015

In the Matter of the Companies Act 2006

An In the Matter of

## Representation

Mr. D. Allison QC and Mr. R. Perkins (instructed by Clifford Chance LLP ) appeared on behalf of the Scheme Company.

Mr. A. Zacaroli QC and Miss C. Cooke (instructed by Linklaters ) appeared on behalf of the Ad Hoc Committee.

## Judgment

Mr. Justice Newey:

1 I have before me an application for an order sanctioning a scheme of arrangement under Part 26 of the Companies Act 2006 .

2 The application is made by Codere Finance (UK) Ltd., an English incorporated subsidiary of Codere SA, a Spanish company. Codere SA is the ultimate parent of a group of companies that carries on business by way of gaming and similar activities in Latin America, Italy and Spain. Codere SA's shares are listed on a number of Spanish stock exchanges.

3 Financing for the group has principally been provided under a senior facilities agreement and, more importantly for present purposes, by the issue of notes. Two series of notes have been issued by Codere Finance (Luxembourg) SA, a Luxembourg incorporated subsidiary of Codere SA. Both series of notes are governed by New York law, guaranteed by Codere SA and other group companies and subject to an English law intercreditor agreement originally made in 2005.

4 As at 28th August of this year, the group had outstanding gross debts of some &euro;1,460 million. The notes accounted for the great majority of that indebtedness: about &euro;1,214 million. The group is not in a position to meet all its debts.

5 Negotiations with a view to achieving a restructuring began more than two years ago. Consideration was given to invoking the restructuring mechanisms available in jurisdictions other than this one. It was concluded, however, that the available options would involve some form of insolvency proceedings. That, it was thought, could put at risk licences on which the group depends and so diminish its value. The view was thus taken that the best course was to seek to use the scheme jurisdiction that exists in England and Wales. As was stressed to me by Mr. Antony Zacaroli QC, who appears with Miss Charlotte Cooke for an ad hoc committee of creditors, the use of the English scheme jurisdiction has been driven from the outset by creditors.

6 Codere Finance (UK) Ltd. (which I shall call "the company") was acquired to that end. Its

shares were acquired by Codere SA in October of last year, and in February of this year it agreed to assume a primary, joint and several obligation in respect of all Codere Finance's obligations as regards the notes. The accession of the company as a co-obligor in relation to the notes was undertaken pursuant to an instruction from Codere SA as the company's sole shareholder and with the agreement of more than 97 percent of the noteholders.

7 The restructuring that the scheme is intended to achieve is complex. It relates to both the obligations under the notes and the structure of the group. In the broadest of terms, it provides for the existing notes to be cancelled in exchange for shares and other notes; for &euro;400 million of new money to be injected; and for the hive down of Codere SA's assets to a new Spanish company and the subsequent interposition of two Luxembourg-registered entities between Codere SA and the new Spanish company.

8 Implementation of the scheme is to be conditional on the company obtaining an order recognising the scheme and its effects under Chapter 15 of the US Bankruptcy Code . In that regard, a hearing has been arranged for next Tuesday. Chapter 15 approval is a non-waivable condition precedent.

9 The scheme is expected to result in noteholders receiving recoveries equal to at least 47 percent of liabilities. In contrast, the group has been advised that the recovery rate could drop to zero if the scheme does not proceed. In other words, scheme creditors could lose some &euro;600 million.

10 That being so, it is not surprising that the scheme has received strong endorsement from noteholders. At the meeting held on 14th December 140 creditors, with claims totalling US$ 1,370,324,488 (or 98.78 percent of the total indebtedness), voted in favour of the scheme and not a single creditor voted against it. The chances are that the scheme would have enjoyed even greater support but for the fact that the company has not succeeded in identifying some 1.22 percent of the scheme creditors.

11 Guidance as to the approach that the court should take when deciding whether to sanction a scheme of arrangement is to be found in the much-quoted judgment of Mr. Justice Plowman in *Re National Bank Ltd. [1966] 1 WLR 819* . Mr. Justice Plowman endorsed a passage from Buckley on the Companies Acts (13th ed.) which read as follows:

> "In exercising its power of sanction the court will see, first, that the provisions of the statute have been complied with; secondly, that the class was fairly represented by those who attended the meeting and that the statutory majority are acting bona fide and are not coercing the minority in order to promote interest adverse to those of the class whom they purport to represent, and thirdly, that the arrangement is such as an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve.

> The court does not sit merely to see that the majority are acting bona fide and thereupon to register the decision at the meeting; but at the same time the court will be slow to differ from the meeting, unless either the class has not been properly consulted, or the meeting has not considered the matter with a view to the interests of the class which it is empowered to bind, or some blot is found in the scheme".

12 In the present case, Mr. David Allison QC, who appears with Mr. Ryan Perkins for the company, has satisfied me on each of the three particular points identified in Buckley. It is evident that the relevant provisions of the Companies Act have been complied with; that the creditors who voted at the meeting fairly represented those who will be bound by the scheme, if approved, and are not coercing a minority; and that the scheme is one that an intelligent and honest person could reasonably approve.

13 The point on which I should say something further arises from the fact that the group acquired the company only quite recently and with a view to using this court's scheme jurisdiction. This feature was evidently of some concern to Mr. Justice Nugee when the matter came before him on 29th October. He remarked in para.8 of his judgment that this seemed to him, "at first blush, to be quite an extreme form of forum shopping, in which the restructuring is brought in the UK purely by incorporating a company to take on very large liabilities".

14 Mr. Justice Nugee's observation has been the subject of submissions to me from both Mr. Allison and Mr. Zacaroli. With the benefit of those submissions (which have been far more extensive on this aspect than were advanced to Mr. Justice Nugee), I am satisfied that the concern that Mr. Justice Nugee understandably expressed should not deter me from sanctioning the scheme.

15 The scheme relates to an English company which has its centre of main interests here. In the light of the line of authorities culminating most recently in *Re Van Ganswinkel Groep BV [2015] EWHC 2151 (Ch)* , I do not think that either the Insolvency Regulation or the recast Judgments Regulation could present any obstacle to my making an order. So far as the Judgments Regulation is concerned, the evidence indicates that some 18 creditors holding around &euro;250 million of notes (approximately 22 percent by value of scheme creditors) are domiciled in England. Further, the expert evidence placed before me indicates that the scheme is likely to be effective in other relevant jurisdictions, either directly or as a consequence of the grant of relief in the United States under Chapter 15 . As I have already mentioned, the grant of such relief is a condition precedent of the scheme.

16 It can also be noted that, even apart from the group's recent acquisition of the company, there are other connections with this jurisdiction. I have referred already to the intercreditor agreement dating back to 2005 which, as I have said, is governed by English law. I have mentioned, too, the fact that a significant percentage of the noteholders are domiciled in England, and it is noteworthy too that some 97 percent of the noteholders by value have now submitted to the jurisdiction of the English court. On top of those features, it can be said that the note trustee and security trustee have, since the notes were issued, performed their functions from offices in London and that other relevant documents, including for example the lock-up agreements which have been entered into, are also governed by English law. In the circumstances, the fact that the company is incorporated in England is not the only connection with this jurisdiction.

17 Aside, however, from that fact, the authorities show that over recent years the English courts have become comfortable with exercising the scheme jurisdiction in relation to companies which have not had longstanding connections with this jurisdiction. Mr. Allison has reviewed the authorities in detail in his skeleton argument, referring me, for example, to cases dealing with companies which have shifted their centres of main interest; a relatively recent authority in which there was a change of governing law; and, by way of perhaps particular analogy to the present case, a line of authorities including the decision of Mr. Justice Norris this year in *Re A I Scheme Ltd. reported at the convening stage at [2015] EWHC 1233 (Ch) and, at the sanction stage, at [2015] EWHC 2038 (Ch)* . In that case, a company had voluntarily assumed liabilities with a view to the scheme jurisdiction being exercised. Mr. Justice Norris did not consider that that fact prevented the English court from sanctioning the proposed scheme.

18 In a sense, of course, what was done in the A I Scheme case, and what is sought to be achieved in the present case, is forum shopping. Debtors are seeking to give the English court jurisdiction so that they can take advantage of the scheme jurisdiction available here and which is not widely available, if available at all, elsewhere. Plainly forum shopping can be undesirable. That can potentially be so, for example, where a debtor seeks to move his COMI with a view to taking advantage of a more favourable bankruptcy regime and so escaping his debts. In cases such as the present, however, what is being attempted is to achieve a position where resort can be had to the law of a particular jurisdiction, not in order to evade debts but rather with a view to achieving the best possible outcome for creditors. If in those circumstances it is appropriate to speak of forum shopping at all, it must be on the basis that there can sometimes be good forum shopping.

19 In the particular circumstances of this case, I cannot see that the fact that the company has been acquired only recently, and with a view to invoking the scheme jurisdiction, should cause me, in the exercise of my discretion, to decline to sanction the scheme. For reasons I have already touched on, the scheme appears to be very much in the interests of the group's creditors. I bear in mind in that context the fact that it was devised following close consultation with creditors; the overwhelming level of support that it has enjoyed from creditors; the fact that no creditor has opposed the scheme; the lack of alternatives available to the group in other jurisdictions; and the fact that, on the evidence, my declining to sanction the scheme could cause the group and its creditors a loss of value of around &euro;600 million, by any standards a large sum.

20 In short, therefore, I am satisfied both that the formal requirements for sanctioning the scheme have been met and that, in all the circumstances, it is appropriate for me to exercise my discretion to sanction the scheme. That, therefore, is what I shall do. As asked, I shall make an order along the lines of that at tab 3 of the first core bundle.

Crown copyright

© 2016 Sweet & Maxwell



# In the Matter of: New World Resources N.V.

No. 5347 of 2014

High Court of Justice Chancery Division Companies Court

5 September 2014

## [2014] EWHC 3143 (CH)

## 2014 WL 6686164

Before: Mr. Justice Norris

Friday, 5th September 2014

## Representation

Mr. D. Allison QC (instructed by White & Case LLP ) appeared on behalf of the Applicant.

## Judgment

Mr. Justice Norris:

1 This is an application for the sanction of the court to a scheme of arrangement in relation to the affairs of New World Resources N.V. ('New World'). New World is the principal finance and holding vehicle in a coal mining group. It is itself a Dutch company. The operating companies operate in the Czech Republic and in Poland.

2 New World is primarily a finance vehicle which performs only limited administrative services for other companies in the group, but it is the parent company of (a) OKD A.S., a Czech company, through which the Czech mining operations are conducted at four bases in the Upper Silesian Coal Basin, and (b) Karbonia S.A., a Polish company which operates two mining projects in the Upper Silesian region of Poland.

3 New World has raised debt finance for group operations by way of two note issues, amongst other means. First, there are some senior secured notes governed by New York law. These secured notes are repayable in 2018 and are issued in the principle sum of &euro;500million. They are secured by pledges over the entire shareholdings of OKD and Karbonia and are supported by guarantees from these companies.

4 Secondly, there is a run of unsecured notes which, as their name suggests, depend entirely upon the covenant of New World and are unsecured in nature. These are repayable in 2021. The principle issued is &euro;275million.

5 Having raised those funds and applied them in funding the group operations, New World's principal asset consists of its equity holdings and the benefit of intercompany loan arrangements.

6 The group, as at present constituted, is a fundamentally sound business operation. Its product has a high calorific value and low sulphur content which makes it attractive both in the coking coal and thermal coal markets. But the difficulty is that there has been a most dramatic fall in the prices obtainable for both coking coal and thermal coal. This has had the effect of halving the revenue of the group's operations. However, since the costs of extraction remain fixed there is a consequent extreme pressure on liquidity. The position is that New World has not generated sufficient operating cash to cover its financial obligations.

7 It has endeavoured to address that position by selling non-core assets; by implementing expenditure cuts and expenditure savings and deferrals, and by closing one of its mining operations. But these steps do not enable it to trade soundly. That is partly because the asset realisations, (because of the terms of the notes that have been issued) are not freely available to

fund the group's operations. Having taken advice, the directors of New World do not consider that their duties allow them to move cash to the operating companies beyond a certain limit.

8 In these circumstances, there are immediate debt problems. New World has failed to pay the last instalment due in respect of the interest on the unsecured notes. In addition, there are long-term debt problems as the notes mature. In these circumstances New World has negotiated a restructuring package with its creditors.

9 Before doing so it contemplated what alternatives there were. A commercial sale of the operating companies was rejected on the grounds that the price likely to be achieved in the prevailing market would be significantly lower than the amount of the outstanding group debt. A consensual restructuring, involving enforcement of existing security rights, was rejected, both because of the uncertainties inherent in the process and because there is no precedent in either the Czech Republic or Poland for such a scheme in a cross-border context. A Dutch insolvency of New World itself was rejected because of the present impossibility under Dutch law of implementing a pre-agreed restructuring plan and the risks inherent in having an insolvency process supervised by an appointed insolvency practitioner with whom neither New World nor its creditors had previously engaged. Nor was a consensual exchange of existing notes for new issued notes possible because of the consent levels required for such an exercise under the terms of the existing notes. The notes are governed by New York law but a careful consideration of the options under New York law led to the view that the costs of the exercise were prohibitively expensive.

10 In the circumstances, what the company has decided to do is to negotiate a scheme of arrangement under English law.

11 What is proposed is an alternative restructuring scheme. Under the first, and inherently most probable, scheme the claims of the senior noteholders will be compromised and released and, in return, they will receive a pro rata share of some new senior notes to be issued by New World at a higher rate of interest, including a facility for capitalising unpaid interest at a higher rate, secured by a new guarantee and security package. The senior noteholders will also have the right to participate in an issue of new convertible notes repayable in six years and convertible into ordinary shares in New World's immediate holding company (which is itself a listed company, listed on the London, Warsaw and Prague exchanges). In addition, the senior noteholders will receive some further common participation rights.

12 As to the unsecured noteholders, they are to be given a share of the new convertible notes to be issued and they are also to be given the right to participate in what are called "contingent value rights", which will have the effect of conferring repayment rights if the group attains certain financial targets in future trading, thereby enhancing the value of their new notes.

13 Both the secured noteholders and the unsecured noteholders are also to be given certain further common participation rights. Shortly put, these are the rights to participate in a new "super senior facility" and, in that event, the right to participate in new equity which is to be issued, and also a right to tender notes for repurchase in the case of the secured noteholders this is at a variable price which secures that New World will obtain the maximum redemption for the available sum and, in the case of the unsecured noteholders, on terms that if they participate in the equity issue they will have an enhanced right to tender in the tendering process.

14 As to the alternative scheme, what is shortly proposed would be that New World would enter administration; it would sell its shareholdings in OKD and Karbonia to a new company, these shareholdings representing the value in the group and its only assets; a scheme would be promoted which bound only the secured noteholders, and the unsecured noteholders would be left with their claims against New World in administration. It is extremely unlikely that this alternative restructuring scheme would be implemented. It was originally promoted in the event that the scheme was rejected by one of the two classes of creditor voting upon it, but in the event both classes have overwhelmingly voted in favour of the scheme.

15 There is a residual risk that one of the preconditions to the first scheme, which is that New World's ultimate holding company should subscribe for new equity under a rights issue, is not satisfied. But since that ultimate holding company has given an irrevocable undertaking to subscribe to the rights issue, the prospect of the condition not being satisfied is extremely remote. I therefore only mention the alternative scheme in bare outline.

16 The effect of the new scheme will be to provide additional liquidity for the group's operations through the injection of new equity. It will improve the capital structure of the group by reducing its current debt burden of some &euro;825million to &euro;570million, of which &euro;150million will itself be convertible in six years' time. It will reduce the interest burden, not least because of the roll- up option in relation to the new notes, and it will reduce the overall burden of interest rate payments. The company will therefore have, and the group will have, a stable platform through which to trade through the present reduction in coal prices and into an anticipated increase in prices for the quality of coal produced by the group's operations.

17 This is the hearing to sanction the scheme, Mrs. Justice Rose having given directions as to the convening of meetings. I must briefly advert to my jurisdiction to sanction the scheme. The ground is familiar in the context of schemes of arrangement for foreign companies whose creditors have rights under foreign law. I will therefore deal with the matter shortly.

18 I am satisfied that New World is an overseas company over which the court has jurisdiction. I am satisfied that New World has a sufficient connection with England and Wales for that jurisdiction to be exercisable. New World has moved its centre of main interests to London. That is now where its head office and principal place of business is located; where, under its amended articles of association, its centre of main interests may be located; where the meetings of its board of directors must take place; where under the Articles meetings of the shareholders must take place; it is where its key employees are now located, and where its management function is now discharged. These changes have been extensively advertised and it is plain that any creditor seeking to conduct business with New World would understand that the centre of its main interests is now located in London, at its London address; its London fax number; its London telephone numbers, and its London contacts as listed on its website. There is therefore no doubt that there is a sufficient connection with this jurisdiction.

19 I am satisfied that the Judgments Regulation does not require that any proceedings relating to the company's indebtedness must be conducted in some other jurisdiction under the provisions of the Regulation. That is because, at the very least, there are a sufficient number of creditors domiciled in England and Wales to found the jurisdiction to commence proceedings in this jurisdiction, proceedings into which other non-domiciled creditors could properly be joined under Article 6 of the Regulation.

20 I am satisfied also that in the event that I make an order sanctioning the scheme, that order will be effective in the other jurisdictions with which New World and its creditors are connected.

21 So far as concerns the enforcement of rights arising from the bonds, according to New York law, which are judiciable in the New York courts, I am satisfied that under US law an English scheme approved by the court would be recognised as "a foreign main proceeding" under Chapter 15 of the US Bankruptcy Code, having regard to the opinion of Mr. Daniel Glosband. Furthermore, I am satisfied that it is likely that a New York court would not only recognise the scheme but would assist in its enforcement by granting an order under which each scheme creditor, irrevocably and unconditionally, fully and finally waived and released and forever discharged claims under the existing notes. I am satisfied by the opinion of Professor Pavel Sturma that the scheme is likely to be recognised and given effect to under the law of the Czech Republic. I am satisfied by the opinion of Professor Feliks Zedler that the scheme is likely to be recognised and given effect to under the laws of Poland.

22 Since the COMI of New World is now relocated in England and Wales, it is unlikely that Dutch law would be of relevance. That is because, as Mr. Justice David Richards pointed out in Magyar Telecom [2013] EWHC 3800 at para.23, the significance of moving COMI to England lies not so much in the establishment of an abstract connection between the company and England but because any insolvency process will now be undertaken under English law in England, so providing a solid basis and background for an English scheme. But if Dutch law is relevant, I am satisfied by the opinion of Mr. Toon Huydecoper that the scheme is likely to be recognised and given effect to in the Netherlands.

23 Accordingly, I am satisfied that I do have jurisdiction to consider the scheme and may properly exercise it.

24 The exercise of the jurisdiction is a familiar one and I have been reminded of the summary of the correct approach made by Mr. Justice David Richards in *Re Telewest Communications No. 2*

*[2005] 1 BCLC 772* at paras.20-22. I am satisfied that the provisions of the statute have been complied with and that meetings have been duly held in accordance with the directions of Mrs. Justice Rose. I am satisfied by the attendance and vote at those meetings that each class of creditor was fairly represented by those attending and that those attending acted *bona fide* .

25 The attendance at the meetings was high. 91% by number, 98% by value, of the secured 2018 noteholders attended and approved the scheme. 85% by number and 95% by value of the unsecured 2021 noteholders attended and approved the scheme.

26 I am satisfied that the scheme is a fair one. Each of the overwhelming numbers voting at the meeting of course voted in their own interest and they are the best judges of their own interest. Nonetheless, I must, of course, consider whether overall the scheme is fair. By "fair" is meant the scheme is such as an intelligent and honest man, being a member of the relevant class acting in respect of his interest, might reasonably approve. I am satisfied that that test is well passed.

27 The alternative to the scheme is an insolvency. Insolvency is to be avoided if possible. A realisation of value within an insolvency process is much more uncertain than the implementation of a scheme negotiated between and approved by a large body of the creditors of the company.

28 I am satisfied that there is no blot upon the scheme. There was a suggestion that some of the features of the scheme, to which I have briefly referred, might amount to the giving of unlawful financial assistance within the meaning of s.678(1) of the Companies Act 2006 . In particular, the grant of a share pledge by indirect subsidiaries as part of the transaction and also the issue of new convertible notes that will convert into shares in the immediate holding company. It is, I think, highly debatable whether these features constitute "financial assistance" in any sense, but in any event s.681(2)(e) of the Companies Act 2006 says that nothing done pursuant to a scheme of arrangement which has been sanctioned by the court is capable of amounting to unlawful financial assistance. Since I am satisfied as to the soundness and fairness of the scheme, and intend to sanction it, s.681(2)(e) provides the answer.

29 For these reasons, as I have indicated, I intend to sanction the scheme.

30 The scheme presented for my approval contains certain minor modifications from that originally promoted; but the original scheme always contained within it the power to effect minor and insubstantial modifications and that is the scheme that was approved by the creditors. I am satisfied that the modifications are indeed minor and insubstantial and they do not stand in the way of approval. In the circumstances, I sanction the scheme.

Crown copyright

© 2017 Sweet & Maxwell



# Re: La Seda De Barcelona Sa

Claim No: 2325 of 2010

High Court of Justice Chancery Division

26 May 2010

## [2010] EWHC 1364 (Ch)

## 2010 WL 2515023

Before: Mrs Justice Proudman

Wednesday, 26 May 2010

## Representation

Mr M Pascoe QC and Mr T Smith (instructed by Freshfields Bruckhaus Deringer LLP ) appeared on behalf of the Applicant Company.

Ms C Bryant (instructed by Dickinson Dees ) appeared on behalf of a company (not a party).

## Approved Judgment

Mrs Justice Proudman:

1 This is an application by La Seda De Barcelona SA, a company incorporated in Spain, for an order sanctioning a scheme of arrangement pursuant to section 899 of the Companies Act 2006 . On 30 April last, Newey J directed the convening of a single meeting of scheme creditors. It was duly convened and took place on 21 May, and, as recorded in the chairman's report, the scheme was approved in accordance with the statutory majorities. The percentage of scheme creditors voting in favour exceeded 95 per cent by value.

2 The company is a parent company of the La Seda group which includes companies incorporated in Spain, the UK and elsewhere. The group's business is the manufacture of a substance used in food and beverage packing. The scheme concerns the rights of lenders under a senior facilities agreement which is governed by English law and which is subject to a jurisdiction clause in favour of the courts of England, which provides working capital for the group. There are four facilities, three term loans and a revolving facility. All liabilities rank *pari passu* .

3 The company's obligations under the agreement are secured by charges over shares in several of the subsidiaries. A number of group companies, including Artenius UK Limited, are guarantors.

4 Partly as a result of the recession, the group's performance has deteriorated over the past couple of years leading to a severe lack of liquidity and closure of plants. There has been a series of defaults under the agreement. Artenius has gone into administration. The directors believe that without restructuring part or all of the group it will enter into insolvency proceedings in Spain and elsewhere.

5 Under the proposed restructuring there will be a new equity investment of at least £150 million for new ordinary shares in the company. Three groups of investors have indicated an intention to invest £100 million and the company is seeking other equity investors. If successful the new investment will account for £150 million of the proposed £300 million increase in the share capital of the company. The scheme proposes that the rights of senior lenders under the agreement will be settled and replaced by a combination of debt and equity pro rata to the interests of the scheme creditors under the agreement, consisting of an allotment of new ordinary shares taking up the remaining £150 million, an allocation of unsecured debt under an amended facilities

agreement, and an allocation of unsecured debt under a new payment in kind loan facility under the amended facilities agreement. If the equity investment does not come through and if certain other conditions are not satisfied by a certain date, the scheme will terminate.

6 The restructuring and the scheme are designed as a means to rectify the currently unsustainable position in the interests of all who have an interest in the group. The board believes that there is no credible alternative to the scheme which is intended to create a stronger foundation for continuing the company's business.

7 The scheme has been explained to me in some detail and I note the aspects to which my attention has been drawn. There are three points with which I need to deal.

## Jurisdiction in relation to an overseas company

8 First there is the fact that the company is a company established in Spain. At the hearing at which he authorised the scheme meeting Newey J considered the question of jurisdiction under this head. He held that the court had jurisdiction to sanction the scheme. I have seen the submissions made to him which led to that conclusion and I see no reason to revisit it.

## Compliance with statutory requirements as to formalities

9 Secondly, there is the question of compliance with statutory requirements as to formalities. The scheme meeting was summoned, convened and conducted in accordance with Newey J's order and the scheme was approved by the requisite majorities in number and value. Newey J approved the constitution of classes and I do not propose reopen that question either.

10 However, as a result of developments between the provision of documentation and the meeting, certain modifications were made to the scheme and it was appropriate to bring certain further information to the attention of scheme creditors. Negotiations also continued as to the precise drafting of contractual documents required to implement the scheme. Three further notices were circulated referring in particular to the guarantors' position, to the subordinated debt position to the extension of key dates and drawing attention to changes to the scheme. Those notices were posted on the Intralink website. The company has taken further steps to ensure that the creditors who submitted proxies for the meeting were actually aware of them and of the amendments to the scheme and did not wish to change their vote as a result.

11 I am satisfied that those voting in favour of the scheme were aware of the relevant matters. The scheme creditors are all sophisticated financial institutions and none sought an adjournment to the scheme meeting or opposes sanction of the scheme today. In my judgment, the amendments do not substantially alter the provisions of the scheme and I believe I would have jurisdiction to sanction it in any event.

## Release of Artenius, a non-party to the scheme

12 The third matter arises out of the fact that the scheme provides for the release by scheme creditors of Artenius' liabilities under the agreement. The terms of Artenius's release within and without the scheme have been negotiated up to and including today. For the reasons given by Miss Bryant, it seems to me that the amendments so made are not such as would be considered by scheme creditors to be material to their decision whether or not to approve the scheme.

13 However, there is a more fundamental underlying point since I have to decide whether the court has jurisdiction to sanction the scheme which includes amongst its terms the release of Artenius although Artenius is not a party to the scheme. Any scheme of arrangement made with creditors must be made with them in their capacity as creditors.

14 The releases given by the scheme creditors are given in order that Artenius will release its own claims against companies in the group, estimated, potentially at any rate, at over £80 million. Artenius wants to eliminate doubt as to the jurisdiction as it proposes to make a dividend which is dependent on the validity of the scheme.

15 I accept Miss Bryant's submission that the court does have jurisdiction in present

circumstances, provided that there is an element of what she describes as give and take. I have been taken to the decision of David Richards J in *T&N Limited (No. 3) [2007] 1 BCLC 563* . I have also been taken to the decision of the *Court of Appeal in Lehman Brothers International (Europe) (in administration) [2009] EWCA Civ 1161* and the reference therein to a number of relevant Australian authorities.

16 Miss Bryant has analysed those authorities also and has satisfied me that the controversy in Australia has now been laid to rest after the appellate decision by the High Court of Australia on 14 April 2010 in City of Swan v Lehman Brothers Australia Limited [2009] FCAFC 130 . It appears that there can now be no doubt about the correctness of the decision in T&N Limited .

17 Although T&N Limited was distinguished on the facts of Lehman Brothers in the Court of Appeal , it is evident that the Court of Appeal was satisfied that the decision itself was correct because, in the words of Neuberger LJ at paragraph 83, the scheme claimant's rights:

> "(a) were closely connected with their rights against the company as creditors; (b) were personal, not proprietary, rights; and (c) if exercised and leading to a payment by the insurers, would have resulted in a reduction of the creditors' claims against the company."

18 Patten LJ had said at paragraph 63:

> "It seems to me entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third parties designed to recover the same loss. The release of such third party claims is merely ancillary to the arrangement between the company and its own creditors."

19 In my judgment, the release in this case does give rise to the requisite element of give and take between the scheme creditors and the company and falls more clearly within the scope of the statute even than the schemes of arrangement in T&N Limited (No. 3) . Here the release affects the deal embodied in the settlement agreement whereby (a) Artenius will release the company and its group companies from Artenius's claims, which might otherwise trigger the insolvency of a company which would have escalated group bankruptcy proceedings; and (b) the scheme creditors, together with Deutsche Bank, release Artenius from its liabilities as guarantor under the agreement.

20 The release of Artenius benefits the scheme creditors because Artenius' release of the company and other group companies improves the financial position of the company and the other group companies.

21 Secondly, Artenius is a guarantor of the liabilities of the company and the group companies under the agreement. The scheme creditors' rights of action against Artenius are designed to recover the same loss as arises from the scheme creditors' claims against the company and can fairly be described as ancillary to the arrangement between the company and the scheme creditors.

22 Thirdly, the scheme claimants' rights against Artenius by virtue of Artenius's liability as guarantor (a) are closely connected with the scheme creditors' rights against the company as creditors; (b) are personal and not proprietary rights; and (c) if exercised and leading to a payment by Artenius would have resulted in a reduction of the scheme creditors' claims against the company.

23 I therefore conclude that I do have jurisdiction and I so find.

24 I have considered Mr Pascoe QC's submissions as to the merits of the scheme and I am satisfied that it is one that an intelligent and honest man, a member of the class and acting in respect of his interest, might reasonably approve. I propose to approve it in the exercise of my discretion.

Crown copyright

© 2018 Thomson Reuters



Status: C Positive or Neutral Judicial Treatment

## *272* Re Lehman Brothers International (Europe)

Court of Appeal (Civil Division)

6 November 2009

### [2009] EWCA Civ 1161

### [2010] B.C.C. 272

Lord Neuberger M.R. , Longmore and Patten L.JJ.

November 6, 2009

H1. *Administration—Scheme of arrangement—Trust assets—Compromise or arrangement proposed between company and its creditors or any class of creditors—Company providing prime brokerage services to institutional clients—Custody of securities—Clients obtaining or retaining proprietary interest in assets held by or on behalf of company—Uncertainties involved in dealing with trust assets in administration—Scheme proposed to deal with proprietary claims for return of trust property—Scheme creditors would be only those with proprietary and pecuniary claims—Whether court had jurisdiction to sanction scheme concerned with distribution of trust property—Companies Act 2006 Pt 26.*

H2. This was an appeal by the administrators of a company from a decision ([2009] EWHC 2141 (Ch)) that the court had no jurisdiction under the Companies Act 2006 Pt 26 to sanction a scheme of arrangement concerned with the distribution by the company of property held or controlled by it on trust for its clients and which varied or extinguished those property rights.

H3. The company, "LBIE", went into administration in September 2008. Until then one of its major business areas was the provision of prime brokerage services to various institutional clients including hedge funds. The services in question included the execution, clearing and settlement of securities and derivative trades and the custody and valuation of the clients' portfolios. Those services were provided under a variety of standard form agreements under which the client commonly obtained or retained proprietary interests in the assets held by or on behalf of LBIE. LBIE held the assets through various depositories, exchanges, clearing systems and sub-custodians depending on the type of asset and the systems through which they were traded. But none of those arrangements effected any material change in beneficial ownership.

H4. At an early stage of the administration the administrators took steps to identify whether money or securities were subject to trust or proprietary claims by seeking information from account holders. However uncertainties remained in respect of trust assets because of a lack of response from clients to enquiries made about the transactions in which they were involved, the inability of the administrators to rely on LBIE's books and records and the failure of custodians, depositories and affiliates to provide information about the assets held on behalf of LBIE.

H5. In order to produce some finality for the clients and for the process of administration in respect of the trust claims, the administrators proposed a scheme of arrangement under Pt 26 of the Companies Act 2006 between LBIE and the persons who were creditors and made claims to trust property. The scheme provided in outline that a client of LBIE who qualified as a "scheme creditor", in that the client had, or potentially had, a pecuniary claim against LBIE and was the owner of a particular asset held or controlled by LBIE, would have that asset claim satisfied on a pooled basis, ranking alongside *273* others who could establish ownership claims to the same asset, to the extent that the securities comprising that asset were available to meet the claims; the unrecovered value of the client's asset claims and any balance due to the client on computing the client's net contractual position with LBIE resulting from the closing out of all financial contracts between the client and LBIE were to rank as unsecured claims against LBIE; all other pecuniary claims of the client against LBIE were foregone.

H6. A question arose as to whether a scheme which interfered with the property rights of LBIE's clients in that way fell within the provisions of Pt 26 . The judge held that the court had no jurisdiction to sanction the scheme since it did not affect clients of LBIE in their capacity as

creditors of the company in so far as it purported to deal with and discharge their proprietary rights over the securities and other assets held to their account by LBIE. The administrators appealed arguing that a scheme of arrangement could legitimately alter the property rights of creditors. They relied on *Re T&N Ltd (No.3) [2006] EWHC 1447 (Ch)* and Re Opes Prime Stockbroking Ltd (2009) 258 A.L.R. 362 as indicating that the rights which could be released or re-organised under a scheme were not limited to those enjoyed by scheme creditors as creditors of the company. Both cases indicated that they could include rights against third parties related to and essential for the operation of the scheme.

H7. **Held** , dismissing the appeal:

H8. An arrangement between a company and its creditors under Pt 26 had to mean an arrangement which dealt with their rights inter se as debtor and creditor. That formulation did not prevent the inclusion in the scheme of the release of contractual rights or rights of action against related third parties necessary in order to give effect to the arrangement proposed for the disposition of the debts and liabilities of the company to its own creditors. But it did exclude from the jurisdiction rights of creditors over their own property which was held by the company for their benefit as opposed to their rights in the company's own property held by them merely as security. The court did not have jurisdiction to sanction the compromise or removal of rights which the creditor did not hold as a creditor. That would be inconsistent with the expressed purpose of the legislation which was to allow the company to re-arrange its contractual or similar liabilities with those who qualified as its creditors. A person was the creditor of a company only in respect of debts or similar liabilities due to him from the company. A proprietary claim to trust property was not a claim in respect of a debt or liability of the company. Parliament could not have intended to allow creditors to be compelled (if necessary) to give up not merely those contractual rights but also their entitlement to their own property held by the company on their behalf. ( *Re T&N Ltd* (above) and Re Opes Prime Stockbroking Ltd (above) considered.)

## H9. Cases referred to:

*Alabama, New Orleans, Texas and Pacific Junction Railway Co, Re [1891] 1 Ch. 213*

*Barclays Bank Ltd v Quistclose Investments Ltd [1970] A.C. 567*

City of Swan v Lehman Bros Australia Ltd [2009] F.C.A.F.C. 130

*Empire Mining Co, Re (1890) L.R. 44 Ch. D. 402*

*Lehman Brothers International (Europe) (in admin.), Re [2009] EWHC 2545 (Ch)*

*Midland Coal, Coke & Iron Co, Re [1895] 1 Ch. 267*

*National Farmers Union Development Trusts, Re [1972] 1 W.L.R. 1548*

Opes Prime Stockbroking Ltd, Re (2009) 258 A.L.R. 362

*Savoy Hotel Ltd, Re [1981] Ch. 351*

*Sharp (Official Receiver) v Jackson [1899] A.C. 419*

*Sinclair v Wilson (1855) 20 Beav. 324; 52 E.R. 627*

T&N Ltd, Re [2005] EWHC 2870 (Ch); [2006] 1 W.L.R. 1728
*274


*T&N Ltd (No.3), Re [2006] EWHC 1447 (Ch)*


*Webb v Stenton (1882–83) L.R. 11 Q.B.D. 518*


H10. **Representation**

William Trower Q.C. and Daniel Bayfield (instructed by Linklaters LLP ) for the administrators.

Richard Snowden Q.C. and Andrew Thornton (instructed by Freshfields Bruckhaus Deringer LLP ) for the London Investment Banking Association.

Anthony Zacaroli Q.C. (instructed by Allen & Overy LLP ) for GLG Partners LP.


**JUDGMENT**

Patten L.J.:

**Introduction**

1. Lehman Brothers International (Europe) ("LBIE") entered administration on September 15, 2008. Until then one of its major business areas was the provision of what are described in the evidence as prime services to various institutional clients. Most of these were hedge funds. The services in question included the execution, clearing and settlement of securities and derivative trades and the custody and valuation of the clients' portfolios.

2. Hedge funds do not have substantial back office functions of their own. They therefore require a third party to deal with the trades themselves and thereafter to provide custodial and reporting services. As part of these transactional arrangements, prime brokers such as LBIE lent cash and securities to the hedge funds and provided foreign exchange services. Any finance was usually secured against the assets of the hedge fund held by or through the prime broker.

3. These services were provided under a variety of standard form agreements which I will come to in a little more detail later in this judgment. The principal contracts under consideration in these proceedings are International prime brokerage agreements, master custody agreements, margin lending agreements and what is referred to as the credit support annex to the ISDA master agreement. As the names suggest, LBIE's prime service clients ranged from hedge funds who used the company to provide the full range of services described above to clients who placed securities with LBIE for safe custody.

4. It is common ground that a key feature of all these transactions was that the counterparty client obtained (or, in the case of pure custody agreements, retained) proprietary interests in the assets held by or on behalf of LBIE. LBIE held the assets through various depositories, exchanges, clearing systems and sub-custodians depending on the type of asset and the systems through which they were traded. But none of these arrangements is said to have effected any material change in beneficial ownership.

5. The administrators have therefore recognised that the contracts described above give many of the counterparties specific claims over the cash and securities transferred to LBIE. But they are faced with the serious difficulty that, as things stand, they cannot be certain who is entitled to the trust property in their hands. Therefore any distribution of the assets without the protection of

some kind of approval from the court is likely to give rise to claims against LBIE and the administrators for breach of trust by those who claim to be entitled to the property adversely to the counterparties to whom it is in fact distributed. For the same reasons, the recipients of the assets are also at risk. Conversely, if no distribution takes place or delays in distributions continue, the administrators are likely to face proceedings for the return of the assets from those who claim to be entitled to them. In *\*275* relation to some classes of asset, these may exceed the quantity of the relevant securities which remain available for distribution.

6. The uncertainties involved in dealing with the trust assets have three primary causes: a lack of response from clients to enquiries made about the transactions in which they were involved; the inability of the administrators to rely on LBIE's books and records; and the failure of custodians, depositories and affiliates to provide information about the assets held on behalf of LBIE.

7. These difficulties have been recognised for some time. On October 7, 2008, at an early stage in the administration, directions were obtained from Blackburne J. as the designated judge under which the administrators were to take appropriate steps to identify whether money or securities might be subject to trust or proprietary claims. This order envisaged requests for information being sent to counterparties and for Linklaters (the administrators' solicitors) to devise and set up a programme for identifying the legal issues which needed to be determined before a proposal for the distribution of trust property could be prepared.

8. The administrators have written to 1,707 account holders who are thought to have potential claims against LBIE for the return of trust property. The letters ask for details of any such claims, rights or other interests in the assets in question; confirmation of the positions and balances held with LBIE immediately prior to the making of the administration order on September 15, 2008; copies of all relevant documentation; and details of any positions which have been terminated or closed since the making of the administration order. Similar requests for information have been added to the administrators' website.

9. As of May 29, 2009, 950 responses have been received, some of which are incomplete. In the same period the administrators have received some 1,214 claims for the return of trust assets. A number of these have been identified as priority claims by a Hardship and Prioritisation Committee set up by the administrators in accordance with the prioritisation principles referred to in the order of Blackburne J. dated October 7, 2008.

10. Aside from issues of priority, the administrators have had to expend considerable resources on making requests for information from clients and locating documents within LBIE's records in order to conduct a line-by-line reconciliation of the clients' positions. Where assets have been distributed, the clients have been required to enter into deeds of undertaking which give the administrators a right to recover the assets or their value where they subsequently turn out to be subject to competing claims. It goes without saying that these measures add to the cost and uncertainties involved in the distribution process.

11. In order to produce some finality for the clients and for the process of administration in respect of these claims, permission was sought from Blackburne J. that the administrators should be at liberty to propose a scheme of arrangement under Pt 26 of the Companies Act 2006 between LBIE and the persons who are its creditors in relation to trust property as defined in para.9 of what is referred to as the Pearson statement. This is a witness statement made by Mr Steven Pearson, one of the administrators, on February 25, 2009, which explains the steps taken to process the proprietary claims and the reasons for seeking to promote a scheme. Mr Pearson says in para.9:

> "As set out in my First Statement, made in relation to the application for the Trust Property Order, a redacted version of which has been placed on the Court file and is available on the section of the PwC website dedicated to the administration of LBIE, the Administrators wished to adopt a system for dealing with all property of, or held in the name of, or otherwise to the order of, LBIE which is subject to trust or proprietary claims, whether comprising monies under the FSA's Client Money Rules ('Client Money') or other monies or assets ('Trust Assets') *\*276* (together with 'Trust Property') in an orderly and efficient manner and one which balanced the importance of dealing with the potential proprietary claims and the achievement of the statutory purpose for which we have been appointed."

12. On March 16, 2009, Blackburne J. gave the administrators liberty to propose a scheme of arrangement of the type sought. Section 899 of the Companies Act 2006 empowers the court to sanction a compromise or arrangement proposed between a company and its creditors or any class of creditors when it has previously been agreed to in class meetings by a majority in number representing 75 per cent in value of the creditors or class of creditors in question.

13. There is no statutory definition of "creditor", "compromise" or "arrangement" but a scheme has been prepared under which (subject to certain exceptions which I will come to in more detail later) "scheme creditors" (as defined) who can establish proprietary claims to the assets held by LBIE at the time of administration will release those claims and any associated pecuniary claims for damages or equitable compensation and will receive, in return, what are described as new claims. They will give to each scheme creditor a right to receive, on a pooled basis, securities or other assets of the type claimed and (when it occurs) will leave the counterparty to recover as an unsecured creditor the value of any shortfall in its proprietary claim caused by the shortage of the relevant assets.

14. Scheme creditors will therefore be required under the scheme to release proprietary rights in assets which are held for their benefit by LBIE as trustee and the combination of the necessary majorities in suitably constituted class meetings and the court's sanction of the scheme will be effective to enforce those provisions against any dissenting minority of creditors who would be otherwise unwilling to give up their property rights. A question arose as to whether a scheme which has this effect falls within the provisions of Pt 26 . The administrators therefore applied, pursuant to paras 63 and 68(2) of Sch.B1 to the Insolvency Act 1986 , for a determination of this question by the court in advance of any further directions being given for the preparation of the scheme and the constitution of the class meetings. After hearing argument from the administrators and a representative of some hedge funds (GLG Partners LP) who support the scheme and from the London Investment Banking Association ("LIBA"), a trade association for firms in the investment banking and securities industry, who oppose the scheme on jurisdictional grounds, Blackburne J. decided that, insofar as the proposed scheme of arrangement is concerned with the distribution by LBIE of property held or controlled by it on trust for any of its creditors and to the extent that it varies or extinguishes those property rights, the court has no jurisdiction under Pt 26 to sanction the scheme. The administrators now appeal from that decision with the leave of the judge.

## The contractual arrangements

15. As mentioned earlier, the administrators have identified four principal contracts under which the counterparties will retain proprietary interests in the cash or securities held by LBIE. The issue of jurisdiction raised before the judge and on this appeal can be determined as a matter of principle without any detailed consideration of the provisions of the particular contracts which give rise to the proprietary interests. But it is useful to have in mind the various types of agreement and some of their key provisions when considering Mr Trower's submissions about the proper approach to be applied to commercial arrangements which utilise a trust mechanism in relation to the assets involved. I can therefore deal with the individual contracts quite shortly by commenting on two of the agreements which illustrate the point. *\*277*

## (1) International Prime Brokerage Agreement ("IPBA")

16. This governed all acquisitions and disposals of securities by LBIE as prime broker together with the provision of any related advances of cash and securities. Under the agreement LBIE acted as the counterparty's agent in settling the transactions and delivering the securities. Cash accounts were opened into which all advances of cash made to the counterparty were entered as credits. Securities delivered by the counterparty to LBIE as prime broker or received by LBIE in settlement of third party transactions were entered as debits in a securities account.

17. Clause 5.2 of the IPBA provides that:

> "5.2 The parties acknowledge and agree that any cash held by us for you is received by us as collateral with full ownership under a collateral arrangement and is subject to

the security interest contained in the Agreement. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash held by the Prime Broker will not be segregated from the money of the Prime Broker or any other counterparty of the Prime Broker and will be held free and clear of all trusts. The parties further agree that the Prime Broker will use such cash in the course of its business and the Counterparty will, therefore, rank as a general creditor of the Prime Broker in respect of such cash."

18. This is in contrast to the position in relation to securities. Clause 17.1 provides that:

"With the exception of any assets transferred to the Prime Broker pursuant to Clause 11, any securities debited to the Securities Accounts shall be held by the Prime Broker as custodian, and the Counterparty hereby appoints the Prime Broker, and the Prime Broker agrees to act, as its custodian, in accordance with the terms of Schedule 2."

19. Paragraph 2 of Sch.2 requires LBIE to segregate assets by identifying in its books and records that the securities belong to a particular counterparty and not to LBIE and requiring any sub-custodians to do the same. But, subject to this, LBIE is authorised by para.9 of Sch.2 to hold securities in fungible accounts with the securities of other customers designated as customer accounts. The reference in cl.17.1 to cl.11 is to the right of use granted by the client to LBIE as prime broker to borrow, lend, charge or dispose of any securities charged to it under the provisions of cl.10 of the agreement. Where this right of use is exercised, the securities become the absolute property of LBIE: see cl.11.2(a). The charge granted by cl.10 in respect of the liabilities of the counterparty to LBIE includes securities debited to the Securities Account subject to a number of specific exceptions including securities where the certificates of title are deposited with a Lehman company and all cash credited to any Cash Account.

20. These provisions were recently considered in some detail by Briggs J. in his judgment in *Re Lehman Brothers International (Europe) (in admin.) [2009] EWHC 2545 (Ch)* where he rejected an argument that the existence of a trustee/beneficiary relationship subsisting between LBIE and the counterparty in respect of securities held by LBIE was inconsistent with the right of use provisions and the permission to hold the counterparty's assets in a fungible account. The judge also decided that the provisions of cl.5.2 had no application to cash derived from securities and received by LBIE or any of its sub-custodians on or after the making of the administration order on September 15, 2008. These monies would include the proceeds of any redemptions together with receipts in the forms of dividends or coupons. Those moneys therefore remain trust assets in the administrators' hands. *278*

21. Clause 13 of the IPBA entitles a counterparty to terminate the agreement in the event of a failure by LBIE to provide the prime services contracted for. But the exercise of this power has the effect of making any outstanding loans from LBIE immediately repayable and of converting the obligations of the company under cl.7 to deliver the securities in specie to the counterparty on request into an unsecured obligation to pay a net cash balance arrived at by setting off against the value of the securities and any other assets held by LBIE for the client on closure of the client's liabilities to LBIE.

## (2) Master custody agreement ("MCA")

22. The MCA covers holdings of both securities and cash on behalf of the client. It was used when only custody services were provided by LBIE and in investment banking transactions where such services were provided to the client as part of a larger transaction.

23. In earlier versions of the agreement, LBIE is granted a general lien over the property until satisfaction of all liabilities of the client to it or to any other Lehman Brothers entity. But, subject to this, all versions of the agreement contain provisions requiring LBIE to separately identify property of the client in its records and to provide the client with an annual statement of the

property held to the client's account. Subject to this, LBIE was entitled, in appropriate cases, to pool the property with that of other clients.

**The scheme**

24. The key provisions of the proposed scheme ("the scheme") are conveniently summarised in the judgment of Blackburne J. as follows:

> "22. The scheme is intended to deal with persons who are described as 'scheme creditors'. These are persons who have claims against LBIE at the time it was placed in administration (the 'time of administration') for or in respect of what are described as 'segregated assets'. The claims must be capable of being satisfied by the delivery, in whole or in part, of the segregated assets. Segregated assets are defined as 'any security which at the time of administration was held on a segregated basis' meaning that the asset 'was recorded as being held separately from LBIE's own securities in both the books and records of LBIE and also at LBIE's custodian or depository (the Intermediary) …' 'Security' is defined as any financial instrument, including any share, instrument creating or acknowledging indebtedness, instrument creating or acknowledging entitlements to investments, warrant and unit in a collective investment scheme … It excludes money. I was told that there are approximately 28,000 different categories of security to be dealt with.
>
> 23. A scheme creditor is expressly described as excluding anyone whose claims 'are not proprietary but are only unsecured'. Equally, as Mr Trower explained in the course of argument, a scheme creditor will not include anyone who has no kind of pecuniary claim, however contingent, against LBIE. Thus, a client with a claim to a particular security but who renounces any pecuniary claim (for example, for damages for late delivery of the security) and confines his claim to its return will not be included. In short, a person is only a scheme creditor if that person (1) has a pecuniary claim against LBIE and (2) has a proprietary claim to a security which was held on a segregated basis at the time of administration.
>
> 24. The scheme explains, in what is described as 'Key Concept 2', that 'the subject matter of the scheme is trust property'. Trust property is wider than 'segregated assets' because it includes *279 assets, referred to as 'derived assets', which are derived from segregated assets, and 'recovered assets'. Recovered assets are assets received by LBIE from a source which has an obligation to redeliver to LBIE a security which had been delivered by LBIE to that source after the time of administration but prior to the date ('the effective date') when a copy of the court's order sanctioning the scheme under Pt 26 (assuming such an order is made) is delivered to the registrar of companies.
>
> 25. The scheme is intended to deal with all of a scheme creditor's proprietary claims against LBIE for the return of trust property. It extends to property which LBIE should have held even if in fact it does not. This is subject only to the requirement that LBIE must hold some property of the scheme creditor and means therefore that if the claim is confined to an unsecured pecuniary claim against LBIE, the claim will not be dealt with under the scheme.
>
> 26. The key provision of the scheme, set out in Part 2 of Section 4 of the proposal, is that scheme creditors release all claims (save for certain 'excluded claims') against LBIE, the scheme supervisors, the administrators and other scheme creditors, including all claims for or in respect of (1) any 'asset claim' (meaning, put shortly, a claim against LBIE in respect of any trust property), (2) any payment for or on account of any asset which is or was at any time the subject of an asset claim, (3) damages, indemnity or contribution in respect of any loss, cost or expense in connection with any asset which is or was at any time the subject of an asset claim, (4) all liabilities for breach of contract, loss or damage, indemnity or contribution of any nature, (5) all rights to seek or enforce judgment, exercise any remedy or apply any set-off, netting, withholding, combination of accounts or retention or similar rights against LBIE in respect of any claim or liability, and (6) all rights in respect of any financial contract. These are defined

as 'released claims'.

27. In exchange for their released claims, scheme creditors are given what are described as 'new claims'. Broadly stated, these are (1) the right of each creditor to have its net contractual position (as earlier summarised) and what are described as 'allocations and distributions' determined on the basis set out in the scheme, (2) the right to have such part of the trust property as is available for distribution under the scheme allocated to and then delivered to the creditor, alternatively appropriated by LBIE in or towards discharge of the creditor's liabilities to LBIE (or certain affiliates or other third parties), (3) the right to claim against LBIE in accordance with the scheme for the amount of that creditor's net contractual position (assuming that the position has resulted in an amount owing by LBIE to that creditor) as a new obligation of LBIE and (4) the right to claim in LBIE's winding-up or any other distribution of LBIE's assets for such amount as is determined under the scheme. The new claims are subject to an overriding proviso that no scheme creditor is entitled to recover more than once in respect of the same asset or claim.

28. The reference to 'allocations' is, shortly stated, to the right of LBIE to allocate trust property available for distribution under the scheme to a scheme creditor by reference to individual stock lines (for example the quantity of a particular quoted security) held as trust property. Paragraph 10.7 of 'Key Concept 6' (concerned with 'allocations and shortfalls') provides in terms that 'a scheme creditor's entitlement to participate in an allocation will be based on its asset claim'. This in turn is to be determined by LBIE based on certain information available to it. The scheme creditor has the opportunity to challenge the determination through a dispute resolution mechanism. Paragraph 10.8 requires the scheme creditor when receiving anything in respect of its asset claim to account for any assets received from an intermediary (rather than from LBIE direct) and para.10.10 provides, in effect, that if the allocations made to a scheme creditor result in a shortfall then the value of that shortfall is to rank as an unsecured claim against LBIE. *280

29. The broad effect, although the drafting of the scheme is a little dense at this point, is that, subject to certain exceptions, LBIE will match a scheme creditor to a particular stock line where LBIE can be satisfied on the information available to it that the creditor has a proprietary claim (the so-called 'asset claim') to assets answering the description of that stock line. This is on the basis that the creditor's claim will be satisfied (by means of the 'distribution') out of that stock line so far as is possible having regard (1) to the overall quantity of the stock line available for distribution and (2) to the competing claims of other creditors to the same stock line.

30. But there is an important qualification to this which is set out in Part 3 of Section 4. This is the provision of a cut-off date (the 'Bar Date') for the submission of claims under the scheme. The date envisaged is either 31 December 2009 or, if later, the last business day of the second full calendar month following the effective date. Paragraph 21.1 provides that '[a]ny claim submitted after the bar date can be disregarded by LBIE'. But this is subject to an exception: if by the bar date a scheme creditor has failed to submit a claim (by completing a pro forma claim form) LBIE will calculate that scheme creditor's entitlement under the scheme using 'Relevant Information'. This is information capable of ascertainment from LBIE's books and records, information contained in the scheme creditor's claim form (if one has been submitted) and also, shortly stated, information from various notices delivered under the scheme as well as information made available by intermediaries, affiliates and any relevant exchange. Once the bar date has passed LBIE will start allocating, appropriating and distributing on the basis of pre-bar date claim forms and other relevant information. This means that if a secured creditor fails to submit a claim form by the bar date and, by that date, LBIE is without any relevant information in relation to that scheme creditor's claim, the claim may be disregarded.

31. However, as Mr Trower explained in the course of argument, the imposition of a bar date is not intended to have the consequence that the late claim is altogether barred. If the scheme creditor can substantiate its claim, then, notwithstanding that this is after the bar date, it may share in the particular stock line, but it may only do so if and to the extent that there is any surplus in that stock line. Thus, if there are no other claimants to

a particular stock line (or the claims of those other claimants have been fully satisfied), the late claimant is unaffected by the bar date. Conversely, if there is insufficient in the stock line to satisfy the accepted claims of pre-bar date claimants, the later claimant will be left to claim as an unsecured creditor. In short, there is no 'catch-up' concept for late claimants as regards any distribution: they must await the full satisfaction of the accepted claims of pre-bar date established claims.

32. For present purposes, the scheme may be summarised by saying that a client of LBIE who qualifies as a scheme creditor – in that the client has, or potentially has, a pecuniary claim against LBIE and is the owner of a particular asset held or controlled by LBIE (for example a quantity of a particular quoted security) – will have that asset claim satisfied on a pooled basis, ranking alongside (and in competition with) others who can establish ownership claims to the same asset, to the extent that the securities comprising that asset are available to meet the claims. The unrecovered value of the client's asset claims and any balance due to the client on computing the client's net contractual position with LBIE resulting from the closing out of all financial contracts between the client and LBIE are to rank as unsecured claims against LBIE. All other pecuniary claims of the client against LBIE are foregone."

25. As the judge recognised, there will be cases where the claims of some of those counterparties are sufficiently well documented to establish a clear entitlement to particular securities ahead of any other potential claimants. In such cases the conversion of a counterparty's existing proprietary claims *\*281* into new claims as defined will inevitably involve a loss of priority in cases where the pool of assets of a particular type (e.g. a particular stock line) held by LBIE is insufficient to meet the claims of all clients who are able to establish a right to assets of that kind. Clients in that position have least to gain from the scheme but are at risk of having their property rights compulsorily acquired in order to permit a speedy and effective distribution of available assets amongst the entire class of relevant claimants.

26. Likewise the scheme creditor who fails to submit a claim by the bar date in circumstances where the administrators have no relevant information as defined may find that it effectively forfeits its right over securities it once owned and is limited to recovering from any surplus of assets once the claims to that stock line by the pre-bar date claimants have been satisfied.

27. Blackburne J. held that the court has no jurisdiction under Pt 26 to sanction a scheme which interferes with the property rights of the clients of LBIE in this way. Although the potential effect of the bar date on some scheme creditors is perhaps the most striking example of the way in which existing property rights could be removed, the issue of principle raised before the judge and on this appeal does not turn on those particular provisions of the scheme. LIBA's objection on jurisdictional grounds centres on the identity of the scheme creditors and the nature of the rights which the scheme attempts to deal with. The judge identified the key question as being whether the scheme affects clients of LBIE in their capacity as creditors of the company. His view was that it did not insofar as it purported to deal with and discharge their proprietary rights over the securities and other assets held for their account by LBIE. There is, of course, no dispute that in respect of any pecuniary claims which they may have against the company for damages or equitable compensation for breach of trust, they are, to that extent, creditors. But the judge held that this was insufficient to entitle the court in the exercise of its Pt 26 jurisdiction to sanction a scheme insofar as it compromised or removed their rights over trust property.

## Jurisdiction

28. The argument advanced by Mr Snowden on behalf of LIBA which the judge accepted can be expressed quite shortly. Part 26 of the Companies Act 2006 confers on the court a jurisdiction to sanction compromises or arrangements between the company and its creditors which have been approved by a majority in value of creditors according to the conditions set out in s.899(1) . Although the discretion to approve the scheme is a general one to be exercised judicially having regard to the objects of the scheme and its general fairness in relation to creditors, the jurisdiction is not an unlimited one. The "arrangement" must have the necessary features of give and take described by Brightman J. in *Re National Farmers Union Development Trusts [1972] 1 W.L.R. 1548* and it has to be an arrangement between a company and its creditors or members.

29. There is no statutory definition of "creditor" or "arrangement" for the purposes of Pt 26 and, in relation to "arrangement", the courts have been careful not to attempt to provide one beyond the limited criteria described in Re NFU Development Trust Ltd . But Mr Snowden contends that, in order to be a creditor of the company, it is necessary to be owed money either immediately or in the future pursuant to a present obligation or to have a contingent claim for a sum against the company which depends upon the happening of a future event such as the successful outcome of some litigation. Although a creditor for the purposes of Pt 26 is not therefore limited to someone with an immediately provable debt in a liquidation, it does require that person to have a pecuniary claim against the company which (once payable) would be satisfied out of the assets as a debt due from the company. *282

30. As support for this, we were referred to the decision of the Court of Appeal in Re Midland Coal, Coke & Iron Co [1895] 1 Ch. 267 in which it was accepted that a person with a contingent claim against the company qualified as a creditor under a scheme of arrangement made under the Joint Stock Companies Arrangement Act 1870 . Lindley L.J. (at 277) said that he agreed that:

> "... the word 'creditor' is used in the Act of 1870 in the widest sense, and that it includes all persons having any pecuniary claims against the company. Any other construction would render the Act practically useless."

31. Based on this decision, David Richards J. concluded in Re T&N Ltd [2005] EWHC 2870 (Ch); [2006] 1 W.L.R. 1728 that persons with contingent claims for damages against a company were creditors within what is now Pt 26 :

> "[40] In my judgment, 'creditors' in s 425 is not limited to those persons who would have a provable claim in the windingup of the company, although it clearly includes all those who would have such a claim. As was submitted by Mr Snowden and other counsel, one of the recognised purposes of s 425 is to encourage arrangements with creditors which avoid liquidation and facilitate the financial rehabilitation of the company: see, for example, Sea Assets Ltd v PT Garuda Indonesia [2001] EWCA Civ 1696 at para 2. This suggests that as wide a meaning as possible should be given to 'creditors' in the section. Having said that, it is important to bear in mind that s 425 is designed as a mechanism whereby an arrangement may be imposed on dissenting or non-participating members of the class and such a power is not to be construed as extending so as to bind persons who cannot properly be described as 'creditors'."

32. These cases were not, of course, concerned with the status of claimants who were asserting proprietary interests over the assets held by the company. But LIBA fastens on the reference in Lindley L.J.'s judgment to the widest use of the words being capable of extending to contingent creditors as at least an indication that the concept of a creditor does not extend further to include those whose relationship is not that of a debtor/creditor at all.

33. The foundation of Mr Snowden's argument is that a beneficiary under a trust is not ipso facto a creditor of the trustee. Although the trust relationship may give rise to unsecured claims against the trustee for breach of trust or even negligence and may sometimes exist in a wider contractual framework, it remains at its core a different legal relationship. Subject to the terms of the trust instrument, the trustee holds the trust property for the benefit of those beneficially entitled to it and has a primary obligation to maintain those particular assets (or any which replace them) to the exclusion of all other claims. The trust property does not form part of the trustee's estate in the event of insolvency so as to be available to meet the claims of general creditors and the beneficiary is entitled to the property in specie free of any such claims.

34. If authority is needed to make good the distinction between a creditor and a beneficiary then Mr Snowden relies, by way of example, on the decision of Sir John Romilly M.R. in Sinclair v Wilson (1855) 20 Beav. 324; 52 E.R. 627 that the restoration of trust property from the estate of a bankrupt to a beneficiary did not amount to a fraudulent preference in favour of a creditor.

35. He therefore submits that the definition of a scheme creditor so as to include only counterparties who have both a proprietary claim and an unsecured pecuniary claim against the company is not sufficient to enable the court to exercise the Pt 26 scheme jurisdiction so as to

encompass the property rights of those involved. The proposed scheme is, in that respect, not an arrangement between LBIE and the counterparties in their capacity as creditors. The court may therefore only sanction it (if at all) so far as it compromises the ancillary money claims. ***283***

36. In response to this argument Mr Trower submits that the judge focused too much on the removal or variation of existing property rights under the scheme and failed to apply the correct statutory test which is simply whether the scheme constitutes an arrangement between the company and its creditors. The wording of s.895(1) does not impose, he says, a jurisdictional requirement that a scheme of arrangement should be made with creditors only in their capacity as creditors and if the judge based his decision to that effect on the word "arrangement" then he was wrong to do so. The courts have steadfastly refused to attach a narrow definition to that term.

37. Mr Trower submits that once a person qualifies as a creditor in the sense accepted by LIBA, the scheme jurisdiction is engaged and extends to all of his rights against the company and not merely to those which give rise to a claim in debt. If this is right then the court could only refuse to sanction the scheme as an exercise of discretion under s.899 .

38. Mr Trower is clearly right to say that the scheme creditors are, on any view, creditors of the company, at least insofar as they have monetary claims against LBIE either for the net balance due on their cash accounts or because LBIE has committed breaches of contract or trust in connection with the management of the cash and securities it held. Most of these claims would be provable in a liquidation under the provisions of r.13.12 of the Insolvency Rules but, as mentioned above, it is accepted that this is not a pre-condition to the claimant being a creditor for the purposes of Pt 26 .

39. What is said to follow from this is that the existence of a trust relationship is not inimical to the existence of a debtor/creditor relationship and may be the source of it. A claim for damages or equitable compensation for breach of trust arises out of the trust relationship. To that extent, a beneficiary will be a creditor of the trustee. The duty of the trustee to account to the beneficiary for trust property and to make restitution for any such property which has been lost is carried out in substitution for the trustee's core duty to preserve and disburse the trust fund in accordance with the terms of the trust instrument. It is artificial, Mr Trower contends, in the context of a scheme to distinguish between the enforcement of this duty which gives rise to a monetary award in favour of the beneficiary (and thereby makes him a creditor) and the right of a beneficiary to the trust asset itself. They are simply opposite sides of the same coin.

40. He also emphasises that the fact that a creditor may have proprietary rights relating to his claim against the relevant company is not in itself a bar to the exercise of the scheme jurisdiction. The most obvious examples are debenture-holders and other secured creditors who are undoubtedly creditors of the company but commonly have their security removed or modified under a scheme of arrangement.

41. So in *Re Empire Mining Co (1890) L.R. 44 Ch. D. 402* North J. sanctioned a scheme under the 1870 Act between the company and its debenture-holders on the basis that they were creditors. At 409 the judge said that:

> "The Act gives the Court power to bind 'creditors', and debenture-holders are creditors. The word "creditor" in the Act is general. No distinction is made between different kinds of creditors; there is nothing to except any particular class of creditors from the jurisdiction of the Court."

42. In *Re Alabama, New Orleans, Texas and Pacific Junction Railway Co [1891] 1 Ch. 213* the Court of Appeal rejected an argument that a scheme which deprived debenture-holders of their security fell outside the scope of the 1870 Act. The decision of North J. that debenture-holders were creditors was affirmed. In relation to whether the removal of a security could be included in a scheme, Fry L.J. (at 246) said this:

> "But again, what kind of compromise or arrangement is the most common? Surely the most common kind of compromise or arrangement is one in which secured creditors diminish or alter ***284*** the amount of their security. I repeat, that the Legislature having used the largest language, such as 'any compromise or any arrangement between a

company and any class of its creditors', I think, if we were to exclude from that class of creditors the secured creditors, or if we were to exclude from the arrangements or compromises to be made an arrangement or compromise which affected the security, we should be putting a most unwarrantable restriction on the generality of the language used in the Act, and therefore I have no hesitation in saying that in my judgment the court has jurisdiction in this matter."

43. We were also taken to a number of authorities in which, in other contexts, beneficiaries under a trust have been treated as creditors of the trustee. In *Webb v Stenton (1882–83) L.R. 11 Q.B.D. 518* an application was made to garnishee the money payable to a judgment debtor by way of income as a life tenant under a trust. Before the order could be made the money had in fact been paid to the debtor but Lindley L.J. (at 526) expressed the view that a liquidated sum payable in equity by the trustee to the life tenant constituted an "equitable debt" which was capable of being attached. Similarly in *Sharp (Official Receiver) v Jackson [1899] A.C. 419* the House of Lords (following earlier decisions in the Court of Appeal) held that transfers of property to beneficiaries under a trust made by an insolvent trustee in order to make good previous breaches of trust did not amount to a fraudulent preference. The decision was based on there being no intention to prefer in the circumstances, but Mr Trower referred us to a passage in the speech of the Earl of Halsbury L.C. (at 426) about whether the beneficiary in that case could be a creditor:

"It has been suggested that there was a proposition which could be maintained, as to which I confess I entertain grave doubts whether any decision goes to that extent, namely, that the relation between a cestui que trust and a trustee who has misappropriated the trust fund is not that of debtor and creditor. That it may be something more than that is true, but that it is that of debtor and creditor I can entertain no doubt. As that question has been mooted and brought before your Lordships' House as one question for decision here, I certainly have no hesitation in saying that in my opinion no such proposition can properly be maintained, and that although there are other and peculiar elements in the relation between a cestui que trust and a trustee, undoubtedly the relation of debtor and creditor can and does exist."

44. I find these cases of very limited assistance in relation to what we have to decide. The interpretation of the rules of court governing the making of garnishee orders is far removed from the issues which arise in relation to Pt 26 . *Sharp v Jackson* is closer in context but the beneficiary in that case had a claim against the insolvent trustee for breach of trust which it is common ground would have made him a creditor for the purposes of a scheme. The issue in this case is whether the clients of LBIE are to be treated as creditors in respect of the rights in rem which they enjoy over the property held by the company. These are the elements of the trustee/beneficiary relationship which Lord Halsbury described as "other and peculiar". If anything, this reference is helpful to Mr Snowden's argument. But it certainly does not indicate that the Lord Chancellor thought that beneficiaries ought to be regarded as creditors in respect of their proprietary claims.

45. Mr Trower's principal submission that a scheme of arrangement can legitimately alter the property rights of creditors begins with the unrestricted meaning to be given to the word "arrangement" in the context of Pt 26 . This is, of course, common ground. As mentioned earlier, judges have deliberately avoided giving the word a narrow meaning beyond indicating that it cannot amount simply to a surrender or confiscation. Subject to that, however, the judges of the Companies Court frequently sanction arrangements where the rights of creditors not only against the company but also *\*285* inter se are varied or where creditors are required to give up rights against third parties such as under guarantees. The use of the scheme jurisdiction in relation to takeovers makes this almost essential.

46. A particular illustration of this relied upon by Mr Trower is the scheme of arrangement considered by David Richards J. in *Re T&N Ltd (No.3) [2006] EWHC 1447 (Ch)* . The proposed scheme in that case was between T&N Ltd and various associate companies and employees and former employees who had claims for personal injuries arising out of their exposure to asbestos. The claims included in the scheme were restricted to those covered by employers' liability insurance. The insurers had disputed liability but agreed to pay the sum of £36.74 million to the

administrators of the T&N companies on terms that a binding scheme of arrangement was put into place and approved by the court under which actual and potential claimants would agree not to bring claims against the insurers in return for being paid a dividend out of that fund.

47. One complication in the scheme was the effect of s.1 of the Third Parties (Rights Against Insurers) Act 1930 . On entering administration, the rights of T&N and the other companies under the policies (in respect of liabilities which had by then been incurred) were transferred to those claimants. These rights had to be compromised as a term of the scheme. One of the arguments addressed to the judge was that the scheme did not constitute an "arrangement" under what was then s.425 of the Companies Act 1985 because it only affected the rights between the employee claimants and the insurers and was not therefore a compromise or arrangement made between T&N and its creditors.

48. David Richards J. dismissed this objection on the grounds that the rights which the claimants had against the insurers were sufficiently connected with the claimants' rights against T&N to bring the proposed arrangement within the scope of s.425 :

> "45. The first and obvious point to make is that, whatever the precise meaning of a compromise or arrangement, it must be proposed with creditors or members of a company. It is implicit that it must be made with them in their capacity as creditors or members and that it must at least concern their position as creditors or members of the company. For the reasons already given, even those EL Claimants to whom T&N's rights against the EL Insurers have been transferred by operation of the 1930 Act remain creditors of T&N. The extent to which certain other persons with EL Claims are creditors for the purposes of section 425 is considered later in this judgment.
>
> …
>
> 52. The settlement of the litigation is therefore in substance and form a tripartite matter, involving T&N, insurers and claimants. That is reflected in the proposed scheme, with T&N and the claimants as parties and with the EL Insurers appearing before the court to consent to the scheme and to undertake to be bound by its terms. It is true that the scheme has no effect on the present rights of EL Claimants against T&N. The right of claimants to assert their claims against T&N, and the right of T&N to defend those claims, are unaffected, and claimants are not obliged to proceed first against the trust to be established by the scheme. However, if a claimant establishes a claim under the trust distribution procedures and receives a payment, it will diminish the amount which T&N would otherwise be required to pay in respect of the claim, if the EL Insurers succeeded in avoiding the policies or in limiting the cover. Although not immediately affecting rights against T&N, the scheme is likely therefore to have an impact on those rights. Mr Chivers objected that these effects resulted not from the scheme but from the settlement agreement and arrangements constituted by the trust deed and trust distribution procedures which took effect outside the scheme. In my view, it is not possible to divorce the arrangements in this way. The *\*286* scheme of arrangement is an integral part of a single proposal affecting all the parties, which includes also the trust and the trust distribution procedures to be established pursuant to the scheme.
>
> 53. In my judgment it is not a necessary element of an arrangement for the purposes of section 425 that it should alter the rights existing between the company and the creditors or members with whom it is made. No doubt in most cases it will alter those rights. But, provided that the context and content of the scheme are such as properly to constitute an arrangement between the company and the members or creditors concerned, it will fall within section 425. It is, as Nourse J observed, neither necessary nor desirable to attempt a definition of arrangement. The legislature has not done so. To insist on an alteration of rights, or a termination of rights as in the case of schemes to effect takeovers or mergers, is to impose a restriction which is neither warranted by the statutory language nor justified by the courts' approach over many years to give the term its widest meaning. Nor is an arrangement necessarily outside the section, because its effect is to alter the rights of creditors against another party or because such alteration could be achieved by a scheme of arrangement with that other party."

49. Mr Trower relies on the judge's reasoning as including an acceptance that the scheme

jurisdiction can extend to rights held by the creditors that are connected to the subject matter of their claims against the company but are not rights as creditors against the company. Claims against third party sureties under a guarantee would fall into the same category. If an arrangement under Pt 26 can extend this far then there is no reason in principle, he says, why it should not embrace other claims which the creditor does have against the company, although of a proprietary nature. The abandonment of claims against third parties is as much a release of property rights as any variation of the property claims which the counterparties have against LBIE. There is nothing in the language of Pt 26 to exclude such claims from an arrangement between the company and its creditors and any objections to their inclusion as a term of the scheme should be addressed, if at all, on the merits at the sanction hearing.

50. The question whether the scheme jurisdiction can be used to require creditors to release rights against third parties has been considered in Australia in two recent decisions of the Federal Court of Australia. In Re Opes Prime Stockbroking Ltd (2009) 258 A.L.R. 362 a scheme of arrangement under s.411 of the Corporations Act 2001 (which closely resembles the provisions of Pt 26 ) included machinery under which creditors of the scheme companies were required to release claims against third party financiers (ANZ and Merrill Lynch) who had provided the scheme companies with cash and other securities in return for the securities which the scheme companies had received from their own clients. As part of an overall settlement of claims by the creditors against the scheme companies, ANZ and Merrill Lynch, a fund was created for the benefit of creditors into which the two finance companies paid some $226 million in cash and released cash and assets of the scheme companies valued at a further $27 million. It was a term of the scheme of arrangement that, in return for being able to prove against the fund, ANZ and Merrill Lynch would be released from any claims by either the scheme creditors or the scheme companies. The circumstances were therefore very similar to those considered by David Richards J. in *Re T&N Ltd (No.3)* .

51. The judge at first instance rejected a submission by a creditor that he had no jurisdiction under s.411 to sanction an arrangement which required the release of the creditor's third party claims against ANZ and Merrill Lynch. He approved the scheme. A Full Federal Court dismissed the creditor's appeal. *\*287*

52. The submission made to the Federal Court was that a scheme of arrangement could not affect interests other than those of a creditor qua creditor of the company and that s.411 did not authorise the court to approve an arrangement between the company and its creditors which extinguished rights belonging to the creditor in some other capacity: in that case as a creditor of ANZ and Merrill Lynch. The Federal Court rejected that argument for the following reasons:

> "66. Doubtless there are limitations on the extent to which a scheme of arrangement purporting to be between a company and its creditors or a class of its creditors can purport to affect property of the creditor that has no connection with the company or the relationship of creditor and debtor between the creditor and the company. The mere fact that a person or entity is a creditor of a company would not, of itself, justify an arrangement between that person or entity on the one hand and the company on the other whereby property of the person or entity were confiscated without any benefit to the person or entity. Such an arrangement would not be approved by the Court pursuant to s 411(4)(b).
>
> 67. A purported scheme of arrangement must involve some arrangement in a sense that is to be construed liberally. No narrow interpretation should be given to the expressions 'compromise' or 'arrangement'. An arrangement within the meaning of s 411 connotes some element of give and take. A proposal that conferred no benefit on creditors and constituted the mere confiscation of interests would not be an arrangement within the meaning of s 411. An arrangement must involve some bargain giving benefit to both sides. However, there is no reason to construe the term in s 411 as restricting in any way the nature of the bargain that might be made between company and creditors ( Re Sonodyne International Ltd (1994) 15 ASCR 494 at 497-8), subject only to the additional requirement that the arrangement must be within the power of the company and not in contravention of the Corporations Act.
>
> 68. A scheme of arrangement between a company and its creditors or a class of creditors is no more than a proposal to vary or modify the company's obligations in

relation to its debts and liabilities owed to the creditors or class of creditors. There is nothing to prevent the company from posing, as part of the arrangement, a term to the effect that, in consideration of what the company has provided under the scheme, the creditors will discharge not only the debts and liabilities of the company, but also the liabilities of, for example, sureties for the same debts and liabilities of the company.

69. It is permissible to incorporate in a scheme of arrangement an involvement or participation by an outsider, being a person or entity who is not a party to the scheme as a company or creditor (see Re Glendale Land Development Ltd (In liquidation) (1982) 1 ACLA 540. Such arrangements are commonplace in relation to schemes involving takeovers. A scheme of arrangement made between a company and its creditors under s 411 binds only the company and the creditors. Nevertheless, there is no reason why a bargain might not be struck between a company and creditors whereby the creditors are bound to enter into an arrangement with third parties. So long as there is some element of give and take, such that the creditors receive something in return for the benefit conferred on a third party, there is no reason in principle why that term could not be part of a scheme of arrangement as contemplated by s 411"

53. This decision is consistent with the reasoning of David Richards J. in *Re T&N Ltd (No.3)* but it has not met with universal approval in Australia. In a subsequent decision of the Federal Court in City of Swan v Lehman Bros Australia Ltd [2009] FCAFC 130 which was concerned not with the approval of a scheme of arrangement under s.411 but with a deed of company arrangement made pursuant to s.444D(1) of the Corporations Act , another full court held that a deed of company ***288*** arrangement did not have the effect of releasing creditor claims against a third party but only those against the company.

54. The relevant statutory language in s.444D(1) is that:

"(1) a deed of company arrangement binds all creditors of the company, so far as concerns claims arising on or before the day specified in the deed under paragraph 444A(4)(i)."

55. The judgments in City of Swan distinguish between these provisions and those of s.411 on the grounds that the deed of company arrangement procedure is unsupervised and therefore more restricted in what it is intended to achieve. But, in some of the judgments, the members of the full court are careful not to endorse the correctness of the decision in Opes and even go so far as to suggest that it is inconsistent with earlier Australian authorities.

## Conclusions

56. So that there should be no doubt about it, I accept (as the judge did) that the proposed scheme represents a considered attempt to overcome the difficulties faced by the administrators in reconciling the entries in the company's books and records with the claims made against the assets held. I also accept that although the scheme, if implemented, will undoubtedly remove any existing proprietary rights over the assets in question, it will do so with a view to substituting for them a distribution of the securities amongst the relevant clients which is designed to secure for them the return of their property so far as that is possible consistently with a fair apportionment of available assets. But we are not concerned on this appeal with the fairness or reasonableness of the proposal. Whether the removal of vested and provable rights in this way is fair and reasonable as between the various classes of creditors is a matter to be addressed (if at all) at a sanction hearing. It is not necessary for this court to express any view about that.

57. The question whether the court's power to sanction a scheme of arrangement under Pt 26 can extend to the release of rights over property held by the company under a trust is one of statutory construction. Considerations of expediency and convenience are only relevant if and so far as they can be assumed to have influenced the legislature when the statutory provisions were formulated. We have not been asked to treat the Companies Act 2006 as a consolidation

measure for the purposes of Pt 26 but it is evident that the current provisions have remained essentially unchanged since they first appeared in the 1870 Act and there is nothing to suggest that Parliament has recently intended to give them any different or wider meaning.

58. Conceptually no statutory power can be unlimited and, in this case, the court's jurisdiction is circumscribed by the requirement that the scheme should be an arrangement between the company and its creditors. When the constituent parts of this formula are looked at in isolation there is a considerable measure of agreement as to what they can include. As mentioned earlier, a "creditor" will consist of anyone who has a monetary claim against the company which, when payable, will constitute a debt. Contingent claims are included for this purpose. A claim (e.g.) for damages in tort is still a legal liability of the company which will ultimately result in either an agreed payment or a judgment debt. The scheme has been drafted so as to exclude anyone whose only claim against the company will be one in rem. To be a scheme creditor one has to have a current or contingent claim for damages or equitable compensation against the company, either of which is sufficient to render the claimant a creditor at least in that respect.

59. Mr Snowden, of course, relies upon this as an implicit acceptance by the administrators that a purely proprietary claimant does not qualify as a creditor. The requirement that all scheme creditors *289 should have both an unsecured monetary claim as well as their proprietary claims is criticised as a device to enable, as he put it, the tail to wag the dog. But the resolution of these issues does not depend on a resort to canine metaphors. It is obvious that someone with a purely proprietary claim against the company is not its creditor in any conventional sense of that word. As a matter of ordinary language, a creditor is someone to whom money is owed. The use of this word with that meaning is a long-established and essential part of English company law. The Companies Act (and now the Insolvency Act ) regime for the administration of insolvent companies and their assets depends upon being able to identify creditors and not to confuse them with those whose property rights do not fall into the insolvent estate: see, for example, Barclays Bank Ltd v Quistclose Investments Ltd [1970] A.C. 567 . Given that "creditor" is not defined in the legislation, it is inconceivable that Parliament should have used the word in the 2006 Act in any but its literal sense.

60. For these reasons, one gets no real assistance from the cases on secured creditors. No one can dispute that a creditor with security for what is owed remains a creditor of the company. Their security exists and is only enforceable to the extent and for so long as the underlying indebtedness continues. All that Empire Trading and Alabama establish is that a creditor with security is nonetheless a creditor for the purposes of the scheme jurisdiction. That conclusion is hardly surprising given the absence from the legislation of any restriction of what is now Pt 26 to unsecured creditors. Nor is it to the point that under a scheme of arrangement a debenture-holder or other secured creditor may be required to give up the whole or part of his security. The charges in question will have been granted by the company over its own property. The interests granted to secured creditors (which, in the case of real property, amount to a legal estate) are only ever held as security interests subject to the debtor's equity of redemption. An arrangement under which that indebtedness is re-organised will therefore necessarily impact on any security held in respect of it and may involve the repatriation of the debtor's property free from the charge. When this occurs the secured creditor is simply returning to the debtor property which the creditor never owned beneficially and was only ever held as security for the debt. Blackburne J. was quite right to regard this as wholly different from the converse case of property which has never formed part of the company's assets but is held by it only as trustee.

61. What then of an "arrangement"? As described earlier, the court's approach has been to give this a relatively unrestricted meaning. Mr Trower relies on this to support his argument that there is nothing in the statutory language to restrict the content of an arrangement to the re-organisation of rights enjoyed by creditors qua creditors. But the question whether s.895 imposes that restriction has to be determined not by the meaning of "arrangement" alone, but by the use of the word in the phrase "an arrangement between a company and its creditors". Although "arrangement" is a wide expression, it is given content and meaning by the parties to it.

62. In terms of authority Mr Trower places some weight on the decisions in Re T&N Ltd (No.3) and Opes as indicating that the rights which can be released or re-organised under a scheme are not limited to those enjoyed by scheme creditors as creditors. Both cases indicate that they can include rights against third parties related to and essential for the operation of the scheme. At first sight these authorities are helpful to the administrators in that they do establish that a scheme can extend beyond monetary claims by the creditors against the scheme

company alone. But what they do not do is to suggest that claims which do lie against the company can be included if they are proprietary rather than contractual or tortious in nature.

63. Although the decision in *Re T&N Ltd (No.3)* has not been the subject of any judicial criticism in this country, the principle it establishes has proved controversial at least in Australia. It seems to me entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account *290* and release rights of action against third parties designed to recover the same loss. The release of such third party claims is merely ancillary to the arrangement between the company and its own creditors. Mr Snowden has not invited us to overrule *T&N Ltd (No.3)* and it would not be appropriate for us to do so without hearing full argument on the point.

64. But when properly analysed, these cases do not, in my judgment, really assist Mr Trower in his argument. It seems to me tolerably clear from the judgments in both cases that the courts did not consider that they were changing the basic criteria for the approval of a scheme of arrangement. David Richards J. (in the passage in [45] of his judgment quoted above) refers expressly to it being implicit in s.425 that the arrangement must be made with creditors in their capacity as creditors and must concern their position as creditors. In Opes (at [68]) the Federal Court describes a scheme of arrangement as no more than a proposal to vary or modify the company's obligations in relation to its debts and liabilities owed to the creditors or class of creditors.

65. It seems to me that an arrangement between a company and its creditors must mean an arrangement which deals with their rights inter se as debtor and creditor. That formulation does not prevent the inclusion in the scheme of the release of contractual rights or rights of action against related third parties necessary in order to give effect to the arrangement proposed for the disposition of the debts and liabilities of the company to its own creditors. But it does exclude from the jurisdiction rights of creditors over their own property which is held by the company for their benefit as opposed to their rights in the company's own property held by them merely as security.

66. I do not accept Mr Trower's submission that the reference to a creditor was intended to act as no more than a gateway to the inclusion of that person in the scheme and that s.895 leaves the court with jurisdiction to sanction the compromise or removal of rights which the creditor does not hold as a creditor. That would, I think, be inconsistent with the expressed purpose of the legislation which must be to allow the company to re-arrange its contractual or similar liabilities with those who qualify as its creditors. A person is the creditor of a company only in respect of debts or similar liabilities due to him from the company. I am not persuaded that Parliament can have intended to allow creditors to be compelled (if necessary) to give up not merely those contractual rights but also their entitlement to their own property held by the company on their behalf.

67. A proprietary claim to trust property is not a claim in respect of a debt or liability of the company. The beneficiary is entitled in equity to the property in the company's hands and is asserting his own proprietary rights over it against the trustee. The failure by a trustee to preserve that property in accordance with the terms of the trust may give rise to a secondary liability to make financial restitution for the loss which results, but that is a consequence of the trust relationship and not a definition of it.

68. Part of Mr Trower's argument seeks to minimise these legal distinctions by treating agreements such as the IPBA as an overall commercial arrangement which should be looked at in the round for the purposes of Pt 26 . The commercial nature of these agreements is not in dispute but the trust mechanism has long been regarded as an important safeguard against insolvency and has been imported into commercial contracts for that very reason. In the case of pure custody agreements, it is, of course, paramount. I do not therefore accept that the trust element in these arrangements ought in some way to be merged into the general contractual framework and treated merely as ancillary when considering the limits of the scheme jurisdiction or (which is more important) that Parliament ever intended to deal with it in that manner.

69. The language of s.895 ought therefore in my view to be read in the way that Blackburne J. construed it. I would therefore dismiss this appeal. *291*

Longmore L.J.:

70. I agree with the judgment of Patten L.J. and with the judgment of the Master of the Rolls.

Lord Neuberger M.R.:

71. I agree that this appeal must be dismissed. Despite the undoubted attraction of implementing the proposed scheme of arrangement in this case ("the scheme"), it seems to me that Blackburne J. was right to hold that he had no jurisdiction to approve the scheme insofar as it was concerned with the distribution of property held or controlled by it on trust for any of its creditors. I entirely agree with the reasons given for this conclusion given by Patten L.J., and indeed by the judge below. However, as the point is of some importance, I will briefly express my reasons in my own words.

72. The terms of the scheme are long and complex, and the detailed provisions of the standard form "international prime brokerage agreement" and "master custody agreement" used by Lehman Brothers International (Europe) ("LBIE") are not simple. However, as Patten L.J. has explained, the question thrown up by this appeal is one of principle, albeit that it can be expressed in more than one way. Mr William Trower Q.C., for the administrators of LBIE ("the administrators"), put it thus: can a scheme of arrangement be approved by the court under s.895 of the Companies Act 2006 if it varies proprietary rights? I prefer to express it rather more specifically, if more wordily: can a scheme be approved under s.895 if it extends to property which is held on trust by the company concerned (a) generally; or alternatively (b) where the persons for whose benefit the property is held on trust are also creditors of the company? The judge held that the answer to the question was no.

73. Part 26 of the 2006 Act is concerned with "Arrangements and Reconstructions", and s.895 , whose origins go back to s.2 of the Stock Companies Arrangement Act 1870 , states, in subs.(1) , that it applies "where a compromise or arrangement is proposed between a company and (a) its creditors, … or (b) its members …".

74. It has been held that the expression "creditors" in s.895 should be given a wide meaning (see *Re Alabama, New Orleans, Texas and Pacific Junction Railway Co [1891] 1 Ch. 213* , 236-237 and *Re Midland Coal, Coke & Iron Co [1895] 1 Ch. 267* , 277), and the same principle seems to apply to the meaning of "arrangement" ( *Re Savoy Hotel Ltd [1981] Ch. 351* , 359 and 361). Bearing in mind the purpose of s.895 , as discussed by David Richards J. in Re T&N Ltd [2005] EWHC 2870 (Ch); [2006] 1 W.L.R. 1728 , [32]–[40], and in *Re T&N Ltd (No.3) [2006] EWHC 1447 (Ch)* , [43]–[55], it is plainly right that that is so.

75. It was argued by Mr Trower that, in the light of the very wide meaning which is to be accorded to the word "creditors" in s.895(1)(a) , it is capable of extending to a beneficiary under a trust. However, I find it very hard to see how it could be said that a person ("a beneficiary") who has the beneficial interest in property ("trust property") held on trust by the company is thereby a "creditor" of the company, even bearing the wide meaning that word is to be given in s.895 .

76. As Mr Richard Snowden Q.C., appearing for the London Investment Banking Association ("LIBA" who oppose the appeal because of what they regard as the unfortunate implications for London as a world financial centre should the administrators succeed on this appeal), says, in relation to such property, the beneficiary is "not a creditor of the [company] but … the owner of certain specific property in the possession of the [company]"—to adapt an observation of Romilly M.R. in *Sinclair v Wilson (1855) 20 Beav. 324* , 331. The duty of a trustee is thus to account to the beneficiary for trust property. Although a breach of trust by the trustee will normally give rise to a claim which constitutes the beneficiary a creditor, the trustee-beneficiary relationship will not of itself give rise to the beneficiary having any "pecuniary claims" (to quote from the very passage relied on by the administrators in the judgment of Lindley L.J. in *Re Midland Coal, Coke & Iron Co [1895] 1 Ch. 267* , 277) **\*292** against the trustee. It would also be surprising if a scheme under what is now s.895 could have been proposed and sanctioned in relation to trust property for over 100 years without anyone, including all the writers of the leading company law and trust law textbooks, apparently being aware of this important feature of the company law legislation. And it seems most unlikely that the legislature would have intended beneficiaries' rights to be capable of being altered by a scheme if the trustee was a company, when there would be no such possibility if the trustee was an individual.

77. As an alternative, Mr Trower has a more subtle argument. It is that, where a person has the beneficial proprietary interest in property held in the name of a company, a scheme in relation to

that property can be validly approved under s.895 provided that the person concerned is also a creditor of the company. In other words, even though (on this alternative argument) such a person is not a creditor of the company qua beneficiary, and therefore a scheme could not extend to the trust property if he was not also a creditor, the argument is that, provided the beneficiary is also a creditor of the company, a scheme could extend to the trust property. So, on the administrators' case, once a person is, to any extent, a creditor of the company, a s.895 scheme in respect of the company can extend to any property or interest of that person.

78. In the absence of clear and binding authority to support that contention, I consider that this alternative submission should also be rejected. As a matter of ordinary language, s.895 appears quite clearly to be dealing with arrangements between a company and one or both of two groups of people—its members and its creditors. If a person's claim cannot be said to render him a creditor or a member, then it appears to me to follow that the subject matter of the claim could not be covered by the arrangement. The fact that he may, in connection with a different claim, be a creditor, does not justify him being treated as a creditor for the purpose of the first claim.

79. The practical consequences of the alternative contention would also be startling. Why should the mere fact that a beneficiary happens also to be a creditor of the company entitle the company, or its liquidators or administrators, to include his property in a scheme, when they could not otherwise do so? What commercial sense or logic is there in the notion, which would follow from the contention, that a beneficiary who is also a creditor could take the trust property out of the potential grasp of a scheme by waiving the debt, or by assigning the debt to another person? Equally, what commercial sense or logic is there in the notion that the company could engineer trust property being potentially brought within a scheme by breaching the trust, thereby creating a claim, and thus a debt, in favour of the beneficiary?

80. However, Mr Trower raised a number of arguments which, he contended, call into question the views I have expressed as to his arguments. First, he relied on the wide meaning of the term "arrangement" in s.895 , to which I have already referred. That gets the administrators no further: however generous a meaning is given to the word, there is no getting away from the fact that, in order to be within s.895 , an arrangement must be made with the "creditors" (or members) of the company concerned.

81. Secondly, it was said that the court always has a discretion to refuse to sanction a scheme even when it satisfies the formal requirements of the section. This point, again, does not address the central problem faced by the administrators, namely that a beneficiary is not a creditor within s.895(1)(a) . In any event, the relatively loose rein which the court normally adopts when approving a scheme which has been approved by the requisite majority of the various classes of creditors would scarcely be appropriate when it was sanctioning a scheme which extended to trust property.

82. Mr Trower's third point was that it has been authoritatively established more than 100 years ago, ever since the Court of Appeal decided *Re Alabama, New Orleans, Texas and Pacific Junction Railway Co [1891] 1 Ch. 213* , 236–237, that schemes can affect proprietary rights, and in particular **\*293**  creditors' rights in respect of the security they enjoy over the company's assets. In my view, that principle, which I accept unreservedly, does not assist the administrators here. In the case of a secured creditor, the security is an incident of the debt; to put the point another way, it is parasitic on the debt. If there is no longer any debt, there is no security (save that it can survive in some sort of inchoate form to underwrite future debts). Accordingly, as s.895 enables a scheme which varies the debt, then it must follow that the variation must, as it were, be followed through to the security. No such argument can be mounted in relation to trust property held in the name of the company, which also happens to have a debt to the beneficiary, even if the debt arises out of the trustee-beneficiary relationship. Further, as Mr Snowden said, a secured creditor merely has the right to look to his security to enable his debt to be repaid: unlike the beneficiary in relation to the trust property, he does not own the security. So, if the sale of the security realises more than he is owed, the rest of the proceeds of sale are available to other creditors.

83. Fourthly, Mr Trower relied on the fact that, in *Re T&N Ltd (No.3) [2006] EWHC 1447 (Ch)* , a scheme was held to be capable of extending to, and varying, claims which creditors of the company had against third parties. In *T&N (No.3)* , [53], it was held that statutory rights which creditors of the company enjoyed against insurers could be varied as part of an arrangement under s.425 of the 1985 Act (the predecessor of s.895 of the 2006 Act) between those creditors

and the company. However, unlike the rights of beneficiaries in respect of trust property, the creditors' rights against the insurers in *T&N (No.3) Ltd* (a) were closely connected with their rights against the company as creditors, (b) were personal, not proprietary, rights and (c) if exercised and leading to a payment by the insurers, would have resulted in a reduction of the creditors' claims against the company. Bearing in mind these three factors, it seems to me, as it does to Patten L.J., that the decision of David Richards J. was correct, but is of no help to the administrators in this case. Indeed, like the security enjoyed by a secured creditor, the rights of the creditors against the insurers were effectively contingent on the existence of the creditors' claims against the company. It is right to add that, at least as presently advised, I am of the view that the decision in *T&N Ltd (No.3)* on this point was near the outer limits of the scope of s.895 .

84. Fifthly, there is the argument (which was put to Mr Trower, rather than raised by him) that there could be said to be some support from the cases for the administrators' contention in the fact that money, such as sums received as dividends or rent paid in respect of trust property, owed from the trust to the beneficiary, can be characterised as an "equitable debt" due from the trustee to the beneficiary: if money due from the trust is such a debt, then it can be said that it would render the beneficiary, at least to that extent, a creditor, and, on that basis, logic might suggest that he should be treated as a creditor in respect of the trust assets. In my view, however, there is nothing in that point for the purposes of this appeal. As Mr Trower realistically accepted, a beneficiary would not be a creditor of the company for the purpose of s.895 , if the trust fund, of which the company was bare trustee, included money, whether or not it was received as income derived from trust property: the money would beneficially be his property just like any asset held in the trust. Cases such as *Webb v Stenton (1882–83) L.R. 11 Q.B.D. 518* may support the proposition that in some contexts (in that case, for the purpose of an attachment order) an equitable debt arises when money is due and payable from a trust fund to a beneficiary (see, in ascending order of force, at 522, 526–527 and 530). However, even if that is right, it cannot begin to justify the notion that, in the case of a bare trust, income, received by the trustee qua trustee and held in the trust, is a debt to the beneficiary such that he can be to that extent treated as a creditor of the company for the purpose of s.895 .

85. Finally, it is worth noting that, far from there being any authority to support the administrators' contention, such judicial observation as there is on the point tends to support Blackburne J.'s approach. **\*294**  In *T&N Ltd (No.3) Ltd* [45] David Richards J., who has considerable experience of company law, described it as an "obvious point" and that it was "implicit" in the immediate statutory predecessor to s.895 (namely, as mentioned, s.425 of the Companies Act 1985 ) that a scheme of arrangement thereunder "must be made with [the creditors or members] in their capacity as creditors or members and that it must at least concern their position as creditors or members of the company".

86. Like Patten L.J. and Blackburne J., I have some sympathy with the administrators' desire to have a scheme under s.895 which extends to trust property, in the light of the difficulties which would otherwise almost certainly arise in connection with seeking to satisfy the rights of beneficiaries in relation to trust property held in the name of LBIE. However, as Blackburne J. held, the fact that such a scheme might well represent a reasonable proposal in this case is plainly not enough to bring it within the ambit of s.895 , and, as is evidenced by the opposition to the proposed scheme mounted by LIBA, it may, viewed in the wider perspective, be positively undesirable that such a scheme could be approved under s.895 . I hope, indeed I would expect, that, if the administrators decide to make an application under the Trustee Acts or pursuant to the court's inherent equitable jurisdiction, in relation to dealing with beneficiaries' rights, the court will provide effective assistance, by arriving at a practical and fair outcome, while ensuring that delay and cost are kept to a minimum.

87. As it is, however, I, too, would dismiss this appeal.

*(Appeal dismissed)*
**\*295**

© 2018 Thomson Reuters



# RE MAGYAR TELECOM BV

Chancery Division (Companies Court)

David Richards J.: 3 December 2013

[2013] EWHC 3800 (Ch); [2014] B.C.C. 448

**H1.** *Schemes of arrangement—Jurisdiction—Sanction—Netherlands company—Group business mainly in Hungary—Loan notes issued—Notes subject to New York law and non-exclusive jurisdiction of New York courts—Company's centre of main interests moved to England—Application to English court to sanction scheme of arrangement of notes debt—Scheme approved by requisite majority at single class meeting—Whether English court had jurisdiction to sanction scheme—Whether company could be wound up in England—Whether sufficient connection with the jurisdiction—Whether EC Judgments Regulation 44/2001 applied—Company insolvent—Whether court should sanction the scheme—Companies Act 2006 ss.895, 899—EC Insolvency Regulation 1346/2000—EC Judgments Regulation 44/2001 art.1(1), (2).*

**H2.** This was an application by a company incorporated and registered in the Netherlands, which was a member of a group whose principal business was the operation of telecommunication services in Hungary, for an order sanctioning a scheme of arrangement proposed by the company pursuant to Pt 26 of the Companies Act 2006 concerning a principal debt of notes governed by New York law.

**H3.** The company was incorporated and registered in the Netherlands as a member of a group whose principal business was the operation of telecommunication services in Hungary. The company owned all but a small proportion of the share capital of the main operating company in the group, a Hungarian company "Invitel", and the company acted as the principal financing vehicle for the group. The ultimate parent of the group was a private investment firm incorporated in Guernsey and primarily managed by a company regulated by the Financial Conduct Authority in the United Kingdom and with its headquarters in London. The company's principal liabilities arose under an issue pursuant to an indenture dated 16 December 2009 of €345 million 9.5 per cent loan notes due 2016. The notes were governed by the law of the state of New York and subject to the non-exclusive jurisdiction of the courts of that state in favour of noteholders. The company's obligations under the notes were guaranteed by Invitel and other companies in the group. The notes were secured by a pledge over shares in the company and over the shares held by the company in Invitel and by other liens on substantially all the assets of the group. A scheme of arrangement was proposed to be made with "note creditors" with a beneficial interest in the notes with a principal value of €21.041 million, although the note creditors were not strictly speaking creditors of the company unless and until notes were registered in their names: they were contingent creditors of the company and thus "creditors" for the purposes of s.899 of the Companies Act 2006. Approval of a scheme was required under s.899 of the Companies Act 2006 by a majority in number representing 75 per cent in value of each class of creditors voting. About 70 per cent of the note creditors had previously signed a restructuring agreement, for which a consent fee was payable, but the English court had ordered a single class

meeting to consider approving the scheme. The scheme meeting approved the scheme by a majority of more than 97 per cent in number representing more than 99 per cent in value of those voting on the scheme on a very high turn-out where 326 note creditors entitled in aggregate to almost 90 per cent by value of the notes attended and voted. The company applied to the court for sanction of the scheme and the issue arose whether the English court had jurisdiction to do so.

**H4.** *Held,* sanctioning the scheme:

**H5.** 1. The company satisfied the jurisdictional requirement for a "company" under s.895(2) of the Companies Act 2006 that it should be liable to be wound up under the Insolvency Act 1986. A foreign-incorporated company was so liable even if its circumstances at the time of the application to the court were such that the English court would not at that time exercise its jurisdiction to wind up the company provided there was sufficient connection with this jurisdiction. (*Re Drax Holdings Ltd* [2003] EWHC 2743 (Ch); [2004] 1 W.L.R. 1049; [2004] B.C.C. 334, *Re DAP Holding NV* [2005] EWHC 2092 (Ch); [2006] B.C.C. 48, and *Re Rodenstock GmbH* [2011] EWHC 1104 (Ch); [2012] B.C.C. 459 applied.)

**H6.** 2. As to the composition of the class of creditors, the rights conferred by the notes and the rights to be received in exchange for the notes under the scheme were identical as regards all note creditors. Although about 70 per cent of the note creditors agreed a consent fee no note creditor appeared on the sanction hearing to raise any contrary submissions against there being a single class of creditors and there was no basis for departing from the decision of the judge who convened the class meeting as a single class.

**H7.** 3. Normally the fact that the rights of the relevant creditors were governed by English law and that the English courts have an exclusive or non-exclusive jurisdiction in respect of disputes was a sufficient connection to the jurisdiction. (*Re Rodenstock GmbH* (above), *Primacom Holdings GmbH v Credit Agricole* [2011] EWHC 3746 (Ch) and [2012] EWHC 164 (Ch); [2013] B.C.C. 201, and *Re Vietnam Shipbuilding Industry Group* [2013] EWHC 2476 (Ch); [2014] B.C.C. 433 applied.) However the purpose of the scheme was to affect the rights enjoyed by the note creditors under New York law. The English court would not generally make any order which has no substantial effect and, before the court would sanction a scheme, it would need to be satisfied that the scheme would achieve its purpose: *Sompo Japan Insurance Inc v Transfercom Ltd* [2007] EWHC 146 (Ch), *Re Rodenstock GmbH* (above).

**H8.** 4. The only practical alternative to the restructuring proposed in the scheme or some other restructuring would be a formal insolvency process for the company, and as the company's centre of main interests under the EC Insolvency Regulation 1346/2000 had transferred to England, it followed that the insolvency would proceed under English law and in the English courts. Detailed expert evidence of US law established that it was likely that the US courts would, under Ch.15 of the US Bankruptcy Code 1978, which gave effect to the UNCITRAL Model Law on Cross-Border Insolvency, recognise and give effect to the scheme, notwithstanding that it altered and replaced rights governed by New York law. Similarly, there was expert evidence that the courts of the Netherlands would recognise and give effect to the scheme, as would the courts of Hungary where some of the guaranteeing companies and secured assets were located. On any footing, the circumstances of this case and the evidence filed in support of the application established that there existed a sufficient connection with England and that the scheme would substantially achieve its purpose so that the English court should sanction it.

**H9.** 5. There did not appear any issue arising under the Judgments Regulation 44/2001. An application to sanction a scheme of arrangement was a civil and commercial matter for the purposes of art.1(1) of the Regulation and in the absence of formal insolvency proceedings did not fall within

the exclusion contained in art.1(2)(b). As schemes of arrangement were not insolvency proceedings falling within the Insolvency Regulation and as it was generally accepted that the purpose of art.1(2)(b) of the Judgments Regulation was to enable that Regulation and the Insolvency Regulation to dovetail almost completely with each other, it logically followed that the exclusion in art.1(2)(b) did not extend to a scheme of arrangement involving an insolvent company, at least unless the company was the subject of an insolvency proceeding falling within the Insolvency Regulation. The order sanctioning the scheme would be entitled to recognition and enforcement under Ch.III of the Judgments Regulation. As a number of note creditors were domiciled in England, those domiciled in other Member States could be "sued" in the jurisdiction if Ch.II of the Judgments Regulation applied.

### H10. Cases referred to:

*Compania Merabello San Nicholas SA, Re* [1973] Ch. 75

*DAP Holding NV, Re* [2005] EWHC 2092 (Ch); [2006] B.C.C. 48

*Drax Holdings Ltd, Re* [2003] EWHC 2743 (Ch); [2004] 1 W.L.R. 1049; [2004] B.C.C. 334

*Eurofood IFSC Ltd* (Case C-341/04) [2006] Ch. 508; [2006] B.C.C. 397

*Interedil Srl v Fallimento Interedil Srl* (Case C-396/09) [2012] B.C.C. 851

*Lehman Brothers International (Europe), Re* [2009] EWCA Civ 1161; [2010] B.C.C. 272

*Primacom Holdings GmbH v Credit Agricole (No.1) and (No.2)* [2011] EWHC 3746 (Ch) and [2012] EWHC 164 (Ch); [2013] B.C.C. 201

*Rodenstock GmbH, Re* [2011] EWHC 1104 (Ch); [2012] B.C.C. 459

*Sompo Japan Insurance Inc v Transfercom Ltd* [2007] EWHC 146 (Ch)

*T&N Ltd (No.4), Re* [2006] EWHC 1447 (Ch); [2007] Bus. L.R. 1411

*Vietnam Shipbuilding Industry Group, Re* [2013] EWHC 2476 (Ch); [2014] B.C.C. 433

**H11.** *Daniel Bayfield* (instructed by White & Case LLP) for the applicant company.

### JUDGMENT

### DAVID RICHARDS J.:

**1.** This is an application by Magyar Telecom BV ("the company") for an order sanctioning a scheme of arrangement proposed by it pursuant to Pt 26 of the Companies Act 2006. At a hearing on 29 November 2013, I sanctioned the scheme and I now set out in writing my reasons for doing so.

**2.** The company was incorporated and is registered in the Netherlands. The company is a member of a group, whose principal business is the operation of telecommunication services in Hungary. The main operating company is a Hungarian company called Invitel Távközlési Zrt ("Invitel"). All but a very small proportion of the share capital of Invitel is owned by the company, which also acts as the principal financing vehicle for the group. The ultimate parent of the group is Hungarian Telecom LP, a private investment firm incorporated in Guernsey and managed primarily by Mid Europa Partners Ltd, which has its headquarters in London and is authorised and regulated by the Financial Conduct Authority.

**3.** The principal liabilities of the company arise under an issue of €345 million 9.5 per cent notes due 2016 ("the notes") which were issued pursuant to an indenture dated 16 December 2009. The notes are governed by the law of the State of New York and are subject to the non-exclusive jurisdiction of the courts of that state in favour of noteholders. The company's obligations under the notes are guaranteed by Invitel and other companies in the group. The notes are secured by a pledge over shares in the company and over the shares held by the company in Invitel and by other liens on substantially all the assets of the group.

**4.** Interests in the notes are traded through Euroclear and Clearstream. The notes are held in global form through the Bank of New York Depository (Nominees) Ltd as common depository for Euroclear and Clearstream.

**5.** The scheme is proposed to be made with the persons described in the scheme as the note creditors. They are defined as the persons with a beneficial interest as principal in the notes, excluding the company itself as owner of notes with a principal value of €21.041 million. The note creditors are not strictly speaking creditors of the company unless and until notes are registered in their names. There are, however, under the indenture circumstances in which notes may be registered in their names, and they are accordingly contingent creditors of the company and thus "creditors" for the purposes of s.899 of the Companies Act 2006.

**6.** The scheme is proposed as part of a financial restructuring of the group. The company is presently unable to service its obligations under the notes, having defaulted in the payment of half-yearly interest of over €15.6 million due in June 2013, and the group is unable to provide the necessary funds from its revenues or otherwise. The directors of the company believe that if the restructuring is not implemented, and in the absence of some other restructuring, it is likely that the company and other companies in the group will be forced to enter formal insolvency proceedings. Such a step would be likely to result in a significant destruction of value in the group, and recoveries for holders of the notes would be likely to be significantly less than if the restructuring proceeds.

**7.** Under the proposed scheme, the note creditors will give up their rights under the notes, including their rights against the guarantors of the notes, in exchange for (i) new notes to be issued by the company with an aggregate nominal value of €155 million and (ii) a 100 per cent equity interest in a new company which will hold 49 per cent of the share capital of the company, thereby giving an indirect interest of almost 49 per cent in Invitel.

**8.** By an order made on 28 October 2013 by Arnold J., the company was directed to convene a meeting of the note creditors to be held on 27 November 2013 for the purpose of considering and, if thought fit, approving the scheme. The order contained detailed directions as to the steps to be taken to convene and hold the meeting. The evidence filed in support of the present application shows that those directions were followed.

**9.** The meeting was duly held and the scheme was approved by very substantial majorities. Section 899(1) of the Companies Act 2006 requires a scheme to be approved by a majority in number representing 75 per cent in value of the creditors present and voting in person or by proxy at the meeting. This scheme was approved by a majority of more than 97 per cent in number representing more than 99 per cent in value of those voting on the scheme. There was a very high turn-out at the meeting. 326 note creditors entitled in aggregate to almost 90 per cent by value of the notes attended and voted.

**10.** Before the court can exercise its power to sanction a scheme of arrangement, it must be satisfied that the company proposing the scheme is a "company" for the purposes of Pt 26 and that the class or classes of creditors were properly constituted for the purposes of the scheme. The practice of the court is to address these issues at the earlier stage of the application to convene the meeting or meetings. This was the course followed in this case and Arnold J. was satisfied on both counts.

**11.** The only jurisdictional requirement for a "company" is that it should be liable to be wound up under the Insolvency Act 1986: [CA 2006] s.895(2). A foreign-incorporated company is so liable, even if its circumstances at the time of the application to the court are such that the English court would not at that time exercise its jurisdiction to wind up the company: *Re Drax Holdings Ltd* [2003] EWHC 2743 (Ch); [2004] 1 W.L.R. 1049; [2004] B.C.C. 334, *Re DAP Holding NV* [2005] EWHC

2092 (Ch); [2006] B.C.C. 48, and *Re Rodenstock GmbH* [2011] EWHC 1104 (Ch); [2012] B.C.C. 459. The company in this case therefore satisfies that requirement.

**12.** As to the composition of the class of creditors, the rights conferred by the notes and the rights to be received in exchange for the notes under the scheme are identical as regards all note creditors. The only distinction between them is that some 70 per cent of note creditors signed a restructuring agreement, committing them to vote in favour of the scheme and not to take any action in the meantime to enforce rights under the notes. Under that agreement, a consent fee is payable to all creditors who signed it, in an amount which is small when compared to the claims of creditors. The opportunity to enter into the restructuring agreement and become entitled to payment of the fee was available to all note creditors. In these circumstances Arnold J. was satisfied that it was proper to convene a meeting of a single class of the note creditors. No note creditor has appeared on this hearing to raise any contrary submissions and there is no basis for departing from the decision of Arnold J. on that issue.

**13.** Because the company is registered in the Netherlands and because the notes are governed by New York law, serious issues arise as to whether this court would consider it appropriate to sanction the scheme. Although not going to jurisdiction, they are sufficiently fundamental to an exercise of the court's power under Pt 26 that the court might decline jurisdiction even if there were no opposition from any creditors to the scheme. Accordingly, they were properly raised before Arnold J. on the application to convene the scheme meeting and were the subject of detailed submissions to him by Mr Bayfield on behalf of the company, as they have been before me.

**14.** The fact that a foreign company would not be wound up by the English court in the circumstances prevailing at the time of the scheme is not a bar to the court sanctioning the scheme, provided that there is a sufficient connection with this jurisdiction. In *Re Drax Holdings Ltd* (above), Lawrence Collins J. said at [29]:

> "That the companies fall within the definition of companies for the purpose of s.425 [of the Companies Act 1985, now s.899 of the Companies Act 2006] does not, of course, mean that there are no limitations to the exercise of jurisdiction under s.425. The court should not, and will not, exercise its jurisdiction unless a sufficient connection with England is shown."

In that case, Lawrence Collins J. found that there were many factors which pointed to the exercise of the jurisdiction being both legitimate and appropriate. Foremost among them was that the claims of creditors falling within the relevant class were governed by English law and were subject to a non-exclusive submission to the jurisdiction of the English court, as were the associated security documents, and that the security included very substantial assets within England.

**15.** In a number of recent cases, a sufficient connection has been found solely or principally in the fact that the rights of the relevant creditors were governed by English law and that the English courts have an exclusive or non-exclusive jurisdiction in respect of disputes: see, among others, *Re Rodenstock GmbH* (above), *Primacom Holdings GmbH v Credit Agricole* [2011] EWHC 3746 (Ch) and [2012] EWHC 164 (Ch); [2013] B.C.C. 201, and *Re Vietnam Shipbuilding Industry Group* [2013] EWHC 2476 (Ch); [2014] B.C.C. 433. Under generally accepted principles of private international law, a variation or discharge of contractual rights in accordance with the governing law of the contract will usually be given effect in other countries. This is also the effect of the Rome Convention, and of Council Regulation (EC) 593/2008 (the Rome I Regulation) which applies to contracts concluded as from 17 December 2009, the day after the date of the indenture in this case.

**16.** In this case, however, not only is the company registered in the Netherlands but the notes are governed not by English law but by New York law. The purpose of this scheme is to affect the rights enjoyed by the note creditors under New York law by exchanging the existing notes for new notes

and equity. The court will not generally make any order which has no substantial effect and, before the court will sanction a scheme, it will need to be satisfied that the scheme will achieve its purpose: *Sompo Japan Insurance Inc v Transfercom Ltd* [2007] EWHC 146 (Ch), *Re Rodenstock GmbH* (above) at [73]–[77].

**17.** The case made by the company on the present application is that the requirements for a sufficient connection with the jurisdiction and for the scheme achieving its purpose can be satisfied.

**18.** Steps were taken from mid-August 2013, some time before the application to convene the meeting of creditors was issued, but in anticipation of it, to move the centre of main interests ("COMI") of the company from the Netherlands to England. Detailed evidence has been provided to the court that as at the date of the application and for some time before then, the COMI was located in England for the purposes of Council Regulation (EC) No 1346/2000 ("the Insolvency Regulation"), as interpreted by decisions of the European Court of Justice in *Eurofood IFSC Ltd* (Case C-341/04) [2006] Ch. 508; [2006] B.C.C. 397 and *Interedil Srl v Fallimento Interedil Srl* (Case C-396/09) [2012] B.C.C. 851. On the application before him, Arnold J. was satisfied that the COMI of the company was indeed in England and it is clear that it remains so. As the only practical alternative to the restructuring proposed in the scheme or some other restructuring would be a formal insolvency process for the company, it follows that the insolvency would proceed under English law and in the English courts.

**19.** The detailed expert evidence of US law establishes that it is likely that the US courts would, under Ch.15 of the US Bankruptcy Code 1978 which gives effect to the UNCITRAL Model Law on Cross-Border Insolvency, recognise and give effect to the scheme, notwithstanding that it alters and replaces rights governed by New York law. This evidence deals at some length both with the approach of the US courts to questions of COMI under Ch.15 and to the recognition of non-US plans of reorganisation, and in particular schemes of arrangement under English law. It is not entirely clear to me from this evidence whether the move of the COMI of the company to England is relevant to the issue of recognition of the scheme under Ch.15. In circumstances where the practical alternative to the scheme is an insolvency process in, say, England, there is an obvious logic in treating a scheme approved under English law as effective to alter the rights of creditors, even though those rights are governed by the law of a different country. In the event of an insolvency process, the rights of the creditors to recover against the assets of the company would be governed by the insolvency law and recognition would be likely given to a scheme approved in the course of the insolvency process just as it would be given to the insolvency process itself. It may, however, be that in other appropriate circumstances the US courts would be prepared to recognise and give effect to schemes altering such rights. Either way, the expert evidence is clear that it is reasonably likely that the US court would recognise the present scheme and give effect to it.

**20.** Similarly, there is expert evidence that the courts of the Netherlands would recognise and give effect to the scheme, as would the courts of Hungary where some of the guaranteeing companies and secured assets are located.

**21.** I am inclined to the view that the requirement to show a connection with England and the need to show that the scheme, if approved, will have a substantial effect are not wholly separate questions but, if not aspects of the same question, at least closely related. In applying the requirement for a sufficient connection with England to the exercise of the court's jurisdiction to sanction a scheme, Lawrence Collins J. in *Re Drax Holdings Ltd* (above) was applying the requirement that, before the court would make a winding-up order, there must be a sufficient connection with England. This may, but does not necessarily have to, consist of assets within the jurisdiction. The reason for such connection in the context of winding up is not the product of abstract theory but the need for the winding-up

order to have a practical effect: see, for example, *Re Compania Merabello San Nicholas SA* [1973] Ch. 75 at 86G–H per Megarry J. Although in theory a winding-up order against a foreign company has as a matter of English law worldwide effect, the courts have always recognised that in practice its effect will be confined to the United Kingdom. (I leave aside here the effect of the Insolvency Regulation and the UNCITRAL Model Law.) The presence of assets within the jurisdiction is but the most obvious example of a connection which will give practical effect to a winding-up order.

**22.** Likewise, the presence in England of substantial assets belonging to a company proposing a scheme with its creditors could in an appropriate case provide the requisite connection, because the scheme if sanctioned would have the practical affect of preventing execution by the relevant creditors against those assets, save in accordance with the terms of the scheme. The presence of a sufficient number of creditors in England subject to the personal jurisdiction of the court might also supply the necessary connection, as those creditors would be bound to act in accordance with the scheme, both within and outside the jurisdiction. The importance of the connection provided in cases where the rights of creditors are governed by English law lies in the effect which foreign courts may be expected to give to an alteration of those rights in accordance with English law.

**23.** In the present case, the significance of moving the COMI of the company to England again lies not so much in the establishment in the abstract of a connection between the company and England but, on the basis that any insolvency process for the company would be undertaken under English law in England, providing a solid basis and background for a scheme under English law which altered contractual rights governed by a foreign law.

**24.** Of course, it may be that expert evidence of US law would show that the US courts would give effect to an English scheme which altered the rights of the note creditors governed by New York law even though the COMI of the company had not been moved to England and therefore there was no basis for contending that an English insolvency process was in fact the alternative to the scheme. I do not have to decide on this application whether, if that were the case, it would provide a sufficient basis for the court to exercise its jurisdiction to sanction a scheme under s.899.

**25.** On any footing, the circumstances of this case and the evidence filed in support of the application establish that there exists a sufficient connection with England and that the scheme will substantially achieve its purpose.

**26.** The scheme provides that it will not become effective unless the company obtains an order of the US Bankruptcy Court for the recognition of the scheme under Ch.15 of the US Bankruptcy Code. The scheme further provides that this condition may be waived by the company with the prior written consent of the trustee under the indenture. The company has filed a petition for recognition of the scheme which is due for hearing by the US Bankruptcy Court for the Southern District of New York on 3 December 2013. The company nonetheless wishes to preserve this right of waiver in the particular circumstances of this case. Even if an order for recognition is not obtained, the level of support for the scheme and the very high percentage of note creditors who have signed the securities confirmation form as a necessary precondition to receiving their entitlements under the scheme, including all of the nine note creditors who voted against the scheme, indicate that the scheme will very largely achieve its purpose. All note creditors who voted in favour of the scheme did so on the basis that it contained this right of waiver. In these circumstances, I do not consider it necessary to require the deletion of the right of waiver.

**27.** There is one point of practice in relation to the expert evidence of foreign law filed by the company in this case. The evidence of US law and Hungarian law was given by partners in White & Case in New York and Hungary respectively. White & Case, acting by their London office, are the solicitors acting for the company. While I am satisfied that the reports provided on US and Hungarian

law have been expertly and conscientiously prepared, I consider that the important feature of independence would be enhanced if such reports were provided by experts unconnected with law firms professionally engaged in the scheme. This consideration is all the more important in cases where there is no opposition to the application.

**28.** It did not appear to Arnold J., and it does not appear to me, that any issue arises under Council Regulation (EC) No 44/2001 ("the Judgments Regulation"). In my judgment an application to sanction a scheme of arrangement is a civil and commercial matter for the purposes of art.1(1) and, at least in the absence of formal insolvency proceedings, does not fall within the exclusion contained in art.1(2)(b). On the scope of art.1(1), I agree with the conclusion reached by Briggs J. in *Re Rodenstock GmbH* at [47]–[51].

**29.** As to the exclusion in art.1(2)(b), Briggs J. left open at [51] the question whether schemes in relation to insolvent companies are within the scope of the Judgments Regulation, even if they are not made as part of insolvency proceedings. As schemes of arrangements are not insolvency proceedings falling within the Insolvency Regulation and as it is generally accepted that the purpose of art.1(2)(b) is to enable the Judgments Regulation and the Insolvency Regulation to dovetail almost completely with each other (see the Schlosser Report cited by Briggs J. at [47]), it logically follows that the exclusion in art.1(2)(b) does not extend to a scheme of arrangement involving an insolvent company, at least unless the company is the subject of an insolvency proceeding falling within the Insolvency Regulation. In other words, an order sanctioning a scheme between an insolvent company and creditors is subject to the Judgments Regulation, at least if the company is not subject to insolvency proceedings to which the Insolvency Regulation applies. For these purposes, insolvency proceedings are those listed in Annex A to the Insolvency Regulation. Although it may well be that a scheme of arrangement proposed by a company which is subject to such insolvency proceedings falls within the exclusion in art.1(2)(b) of the Judgments Regulation, it does not necessarily follow, given that a scheme of arrangement under the Companies Act 2006 is not an insolvency proceeding to which the Insolvency Regulation applies. It could still be that an order sanctioning a scheme of arrangement in those circumstances is entitled to recognition under the Judgments Regulation. This is not an issue which arises for decision on this application.

**30.** The evidence on the financial position of the company in the present case demonstrates that it is insolvent and will only cease to be so if the scheme is sanctioned or another restructuring is agreed. For the reasons given above, the order sanctioning the scheme will nonetheless be entitled to recognition and enforcement under Ch.III of the Judgments Regulation.

**31.** There remains the issue whether Ch.II of the Judgments Regulation applies and, if so, whether the present application falls within one of the exceptions to the general rule stated in art.2(1). Whether Ch.II applies depends on whether an application to sanction a scheme involves persons domiciled in a Member State being "sued". That may fairly be described at present as an open question, but even if it does, the company relies on the exception contained in art.6, enabling a person domiciled in a Member State to be sued, where he is one of a number of defendants, in the courts for the place where any of the defendants is domiciled, provided that the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings. A number of the note creditors are domiciled in England and therefore, if Ch.II applies, note creditors domiciled in other Member States may be "sued" in this jurisdiction.

**32.** As far as the merits of the scheme are concerned, there is nothing in the proposals or in the material put to creditors and before the court which would suggest that the court should differ from the assessment of the commercial interests of the note creditors evidenced by the very high voting

figures in favour of the scheme. The high turn-out of creditors voting on the scheme assures the court that the class was well represented at the meeting.

**33.** As well as affecting the rights of the note creditors against the company itself, the scheme releases their rights against a number of guarantor companies. This is not an extraneous feature but is a commercially important part of the proposals and indeed is integral to them. There would be little point in proceeding with the proposed exchange of the existing notes for new notes and equity, while leaving the guarantees in place. The authorities establish that the variation or release of rights against third parties can properly form part of, or even in the right circumstances constitute, the proposals embodied in a scheme: see *Re T&N Ltd (No.4)* [2006] EWHC 1447 (Ch); [2007] Bus. L.R. 1411, *Re Lehman Brothers International (Europe)* [2009] EWCA Civ 1161; [2010] B.C.C. 272.

**34.** I am accordingly satisfied that the court should sanction this scheme and I therefore do so.

*(Order accordingly)*

Status: C Positive or Neutral Judicial Treatment

### *1411 In re T & N Ltd and others (No 4)

Chancery Division

16 June 2006

### [2006] EWHC 1447 (Ch)

### [2007] Bus. L.R. 1411

David Richards J

2005 November 21, 22, 23; December 2; 2006 January 23, 24; March 20; April 6; June 9; 16

*Company—Scheme of arrangement—Arrangement—Companies' liabilities to creditors insured against under policies of insurance—Companies entering administration—Companies' rights against insurers transferred to creditors—Proposed schemes of arrangement compromising rights as between creditors and insurers—Whether "arrangement"— Companies Act 1985 (c 6), s 425 Company—Scheme of arrangement—Creditor—Asbestos-related claims brought against companies by employees—Companies entering administration—Settlement agreement proposing schemes of arrangement—Whether current and potential future dependants of employees "creditors" for purposes of schemes of arrangement—Whether persons having potential contribution claims against companies "creditors" for purposes of schemes of arrangement—Whether contribution claimants forming separate class of creditors— Civil Liability (Contribution) Act 1978 (c 47), s 1 — Companies Act 1985 (c 6), s 425 Insurance—Liability insurance—Employers' liability—Companies' liabilities to employees insured against under policies of insurance—Companies entering administration—Companies' rights against insurers transferred to employees—Proposed schemes of arrangement compromising rights as between employees and insurers—Proposed amendment to policies to exclude claims by future dependants of employees—Whether companies' statutory obligations to take out and maintain insurance extending beyond period of insurance policy—Whether schemes or amendment to policies contravening companies' obligations — Employers' Liability (Compulsory Insurance) Act 1969 (c 57), ss 1, 5*

The company and a number of its associate companies were engaged in the manufacture, distribution, sale and installation of asbestos-containing products. The companies went into administration after a large number of personal injuries claims were brought against them, some by employees and former employees who had developed diseases as a result of exposure to asbestos. On entering administration the rights of the companies under their employers' liability insurance policies were transferred to the third parties to whom the liabilities had been incurred, pursuant to section 1 of the Third Parties (Rights against Insurers) Act 1930[1] , giving them direct claims against the insurers. Those third parties ("the employers' liability claimants") fell into three categories, namely (i) those employees or former employees of the companies who had or might in the future have claims for damages for personal injuries arising out of exposure to asbestos, (ii) dependants or relatives of such employees who had or might in the future have claims under the Fatal Accidents Act 1976 , and (iii) persons, principally employers, who had or might in the future have contribution claims under section 1 of the Civil Liability (Contribution) Act 1978 [2] in respect of claims by employees or their dependants. The companies' administrators commenced proceedings against the two insurers who had provided the companies *1412 with employers' liability insurance in the United Kingdom in order to determine the extent of the cover provided by the policies. During settlement discussions, the parties agreed to compromise those proceedings provided that the court sanctioned certain schemes of arrangement between the companies and the employers' liability claimants. Under the proposed schemes of arrangement all present and future rights of the employers' liability claimants against the insurers would be assigned absolutely to the trustees of a trust to be established pursuant to the schemes, into which the sum of £36·74m would be paid by the insurers. Any claimant who established a claim in accordance with procedures prescribed by the relevant scheme would receive a payment from the trust fund which reflected the value of the underlying claim which that claimant had assigned to the trust.

The administrators applied for leave to convene meetings of the employers' liability claimants, as

creditors of the companies, under section 425 of the Companies Act 1985[3] to consider the proposed schemes of arrangement and for the court to determine a number of issues in advance of those meetings, including: (i) whether, given that the schemes did not purport to compromise rights as between the company and its creditors but compromised the creditors' rights against the insurers, each of the schemes was a "compromise or arrangement proposed between a company and its creditors" within the meaning of section 425 of the 1985 Act; (ii) in what circumstances contingent contribution claimants constituted creditors for the purposes of section 425 of the 1985 Act; (iii) in what circumstances present or future dependants with potential claims under the 1976 Act constituted creditors for the purposes of section 425 of the 1985 Act; (iv) whether there should be a single meeting of all creditors, in the case of each company, or whether they should be divided into two or more classes; and (v) whether the companies' obligations under section 1 of the Employers' Liability (Compulsory Insurance) Act 1969 [4] to take out and maintain employers' liability insurance would be contravened either by the adoption of the schemes or by the amendment of the insurance policies to exclude claims by future dependants under the 1976 Act.

On the application—

*Held* , (1) that it was not a necessary element of an "arrangement" for the purposes of section 425 of the Companies Act 1985 that it should alter the rights existing between the company and the creditors or members with whom it was made, nor was an arrangement necessarily outside the section because its effect was to alter the rights of creditors against another party or because such alteration could be achieved by a scheme of arrangement with that other party; that provided that the context and content of the scheme were such as properly to constitute an arrangement between the company and the members or creditors concerned, it would fall within section 425 ; and that, accordingly, the schemes fell within section 425 (post, para 53).

(2) That since section 1 of the Civil Liability (Contribution) Act 1978 created an entitlement to contribution, an actual or potential claimant for contribution under that section was a "creditor" for the purposes of section 425 of the Companies Act 1985 , at the latest when it had an accrued right to claim contribution; that such a right would have accrued once the employee had accrued causes of action against both the contribution claimant and the employer from whom the contribution was to be claimed; and that, further, if the employee had not yet suffered any actionable damage the contribution claimant was none the less a creditor of the employer from ***1413*** whom the contribution was to be claimed for the purposes of section 425 , since liability was only contingent on whether actionable damage developed (post, paras 71, 73–75).

*Glenister v Rowe [2000] Ch 76, CA distinguished* .

(3) That since current dependants of employees who had developed an asbestos- related disease would in due course have claims against the companies under the 1976 Act, subject only to the contingencies that the employee's death was caused by the disease, that the dependants were dependants at the time of death and that the employee did not compromise his claim before his death, such dependants were creditors for the purposes of section 425 of the Companies Act 1985 ; that since current dependants of employees who had not yet developed an asbestos-related disease would also in due course have claims against the companies under the 1976 Act, subject only to the additional contingency that the employee developed an asbestos-related disease, such dependants were also creditors for the purposes of section 425 ; but that future dependants of employees who had already developed or might in the future develop an asbestos-related disease were not creditors for the purposes of section 425 of the 1985 Act and a provision in the schemes purporting to compromise their claims against the insurers would not be binding (post, paras 80, 8 1, 83).

*In re T & N Ltd [2006] 1 WLR 1728 applied* .

(4) That although the schemes of arrangement were proposed between the individual companies and their creditors, the effect of each scheme was to compromise the creditors' actual or potential rights against the insurers; that, in respect of each company, all members of the proposed single class of creditors had the same claim against the insurers; that, therefore, the rights of the contribution claimants on the one hand and all other claimants on the other hand were not so dissimilar as to make it impossible for them to consult together in one meeting with a view to their common interest; and that, accordingly, it was appropriate for there to be a single meeting of all creditors in respect of each company (post, paras 87, 88, 9 4, 99).

(5) That there was nothing in the Employers' Liability (Compulsory Insurance) Act 1969 which curtailed the right of an insurer who had issued a policy within the meaning of the Act to avoid the policy or which curtailed the rights of employees to compromise claims of or against insurers where the employer's rights against the insurers had been transferred to the employees under the Third Parties (Rights against Insurers) Act 1930 ; that, therefore, the scheme combined with the compromise of the claimants' claims against the insurers would not involve a contravention of the 1969 Act; that the requirement in section 1 of the 1969 Act was restricted to having in place on each day on which the employer was carrying on business a policy covering events, whether it was injuries and diseases sustained or injuries and diseases caused, on that day; that the requirement in section 1 that the employer "shall insure" referred to taking out the policy and the requirement to "maintain insurance" referred to keeping the policy in place, for example by paying periodic premiums, during the policy period; that the 1969 Act was not directed to the continuing force of policies after the expiry of the policy period; that, therefore, the 1969 Act would not be contravened if, after the expiry of the policy period, the policy was terminated or its terms were amended so that the policy no longer complied with the Act; and that, accordingly, an amendment to the insurance policies to exclude from cover claims made under the Fatal Accidents Act 1976 by future dependants would not contravene the 1969 Act and the companies would not thereafter be committing an offence contrary to section 5 of the 1969 Act by not having a replacement policy to provide against possible liability to future dependants (post, paras 104, 116, 117, 123, 124).

The following cases are referred to in the judgment:

*1414 *1415

Adams v Cape Industries plc [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All ER 929; [1990] BCLC 479, CA *1414 *1415

Anglo American Insurance Ltd, In re [2001] 1 BCLC 755

BTR plc, In re [1999] 2 BCLC 675

Barker v Corus UK Ltd [2006] UKHL 20; [2006] 2 AC 572; [2006] 2 WLR 1027; [2006] ICR 809; [2006] 3 All ER 785, HL(E)

Bradley v Eagle Star Insurance Co Ltd [1989] AC 957; [1989] 2 WLR 568; [1989] ICR 301; [1989] 1 All ER 961; [1989] 1 Lloyd's Rep 465; [1989] BCLC 469, HL(E)

Brian Warwicker Partnership plc v HOK International Ltd [2005] EWCA Civ 962; [2006] PNLR 79, CA

British Aviation Insurance Co Ltd, In re [2005] EWHC 1621 (Ch); [2006] 1 BCLC 665

Carruth v Imperial Chemical Industries Ltd [1937] AC 707; [1937] 2 All ER 422, HL(E)

Centre Reinsurance International Co v Freakley [2005] EWCA Civ 115; [2005] 2 All ER (Comm) 65; [2006] 1 BCLC 225, CA

Cox v Bankside Members Agency Ltd [1995] 2 Lloyd's Rep 437, CA

Dunbar v A & B Painters Ltd [1986] 2 Lloyd's Rep 38, CA

Edwards v Attorney General (2004) 208 ALR 605

*Fairchild v Glenhaven Funeral Services Ltd [2002] UKHL 22; [2003] 1 AC 32; [2002] 3 WLR 89; [2002] ICR 798; [2002] 3 All ER 305, HL(E)*

*Glenister v Rowe [2000] Ch 76; [1999] 3 WLR 716; [1999] 3 All ER 452, CA*

*Guardian Assurance Co, In re [1917] 1 Ch 431, CA*

*Hawk Insurance Co Ltd, In re [2001] EWCA Civ 241; [2001] 2 BCLC 480, CA*

*Hockley (William) Ltd, In re [1962] 1 WLR 555; [1962] 2 All ER 111*

*MyTravel Group plc, In re [2004] EWCA Civ 1734; [2005] 2 BCLC 123, CA*

*NFU Development Trust Ltd, In re [1972] 1 WLR 1548; [1973] 1 All ER 135*

*National Bank Ltd, In re [1966] 1 WLR 819; [1966] 1 All ER 1006*

*Nunan v Southern Railway Co [1923] 2 KB 703*

*OT Computers Ltd, In re [2004] EWCA Civ 653; [2004] Ch 317; [2004] 3 WLR 886; [2004] 2 All ER (Comm) 331; [2004] 2 BCLC 682, CA*

*Post Office v Norwich Union Fire Insurance Society Ltd [1967] 2 QB 363; [1967] 2 WLR 709; [1967] 1 All ER 577; [1967] 1 Lloyd's Rep 216, CA*

*Practice Statement (Companies: Schemes of Arrangement) [2002] 1 WLR 1345; [2002] 3 All ER 96*

R (Steele) v Birmingham City Council [2005] EWHC 783 (Admin); [2005] RVR 374; [2005] EWCA Civ 1824; [2006] 1 WLR 2380; [2006] ICR 869; [2007] 1 All ER 73, CA

Read v Great Eastern Railway Co (1868) LR 3 QB 555

*Re-Source America International Ltd v Platt Site Services Ltd [2005] EWCA Civ 97; [2005] 2 Lloyd's Rep 50, CA*

*Richardson v Pitt-Stanley [1995] QB 123; [1995] 2 WLR 26; [1995] ICR 303; [1995] 1 All ER 460, CA*

*Rothwell v Chemical & Insulating Co Ltd [2006] EWCA Civ 27; [2006] ICR 1458; [2006] 4 All ER 1161, CA*

*SBA Properties Ltd, In re [1967] 1 WLR 799; [1967] 2 All ER 615*

*Savoy Hotel Ltd, In re [1981] Ch 351; [1981] 3 WLR 441; [1981] 3 All ER 646*

*Sovereign Life Assurance Co v Dodd [1892] 2 QB 573, CA*

*Sutherland, decd, In re [1963] AC 235; [1961] 3 WLR 1062; [1961] 3 All ER 855, HL(E)*

T & N Ltd, In re [2004] EWHC 2361 (Ch); [2005] 2 BCLC 488

T & N Ltd, In re [2005] EWHC 2870 (Ch); [2006] 1 WLR 1728; [2006] 3 All ER 697; [2006] 2 BCLC 374

T & N Ltd v Royal and Sun Alliance plc [2003] EWHC 1016 (Ch); [2003] 2 All ER (Comm) 939

Telewest Communications plc, In re (No 1) [2004] EWHC 924 (Ch); [2005] 1 BCLC 752 *1415*

UDL Holdings Ltd, In re [2002] 1 HKC 172

*Virgo Steamship Co SA v Skaarup Shipping Corpn (The Kapetan Georgis) [1988] 1 Lloyd's Rep 352*

No additional cases were cited in argument.

The following additional cases, although not cited, were referred to in the skeleton arguments:

*Aitken v Independent Insurance Co Ltd 2001 SLT 376*

Bank of Adelaide, In re (1979) 22 SASR 481

*Birse Construction Ltd v Haiste Ltd [1996] 1 WLR 675; [1996] 2 All ER 1; 76 BLR 31; 47 Con LR 162, CA*

*British Fame (Owners) v Macgregor (Owners) (The Macgregor) [1943] AC 197; [1943] 1 All ER 33, HL(E)*

*Calgary and Edmonton Land Co Ltd, In re [1975] 1 WLR 355; [1975] 1 All ER 1046*

*Cancol Ltd, In re [1996] 1 All ER 37; [1996] 1 BCLC 101*

*Cartledge v E Jopling and Sons Ltd [1963] AC 758; [1963] 2 WLR 210; [1963] 1 All ER 341; [1963] 1 Lloyd's Rep 1, HL(E)*

Child (RL) & Co Pty Ltd, In re (1986) 4 ACLC 312

*Downs v Chappell [1997] 1 WLR 426; [1996] 3 All ER 344, CA*

East v Bennett Bros Ltd [1911] 1 Ch 63

*English, Scottish and Australian Chartered Bank, In re [1893] 3 Ch 385*

*Gammell v Wilson [1982] AC 27; [1981] 2 WLR 248; [1981] 1 All ER 578, HL(E)*

*General Motor Cab Co Ltd, In re [1913] 1 Ch 377, CA*

Glendale Land Development Ltd, In re (1982) 7 ACLR 171

*Harvest Lane Motor Bodies Ltd, In re [1969] 1 Ch 457; [1968] 3 WLR 220; [1968] 2 All ER 1012*

Ingram v United Automobile Service Ltd [1943] 1 KB 612; [1943] 2 All ER 71, CA

International Harvester Co of Australia Pty Ltd, In re [1953] VLR 669

Isles v Daily Mail Newspaper Ltd (1912) 14 CLR 193

*Jackson v Greenfield [1998] BPIR 699*

*MJ Shanley Contracting Ltd (1979) 124 SJ 239*

*Midland Coal, Coke and Iron Co, In re [1895] 1 Ch 267, CA*

*Normid Housing Association Ltd v Ralphs [1989] 1 Lloyd's Rep 265*

*Pickett v British Rail Engineering Ltd [1980] AC 136; [1978] 3 WLR 955; [1979] 1 All ER 774; [1979] 1 Lloyd's Rep 519, HL(E)*

*R v Roberts [1993] 1 All ER 583*

*RAC Motoring Services Ltd, In re [2000] 1 BCLC 307*

*Ronex Properties Ltd v John Laing Construction Ltd [1983] QB 398; [1982] 3 WLR 875; [1982] 3 All ER 961, CA*

Sanitary Carbon Co, In re [1877] WN 223

*Shaw v Royce Ltd [1911] 1 Ch 138*

*Singer Manufacturing Co v Robinow 1971 SC 11*

*Woolwich Building Society v Taylor [1995] 1 BCLC 132*


## APPLICATION

The administrators of T & N Ltd and other associated companies applied for leave to convene meetings of the companies' creditors under section 425 of the Companies Act 1985 . The meetings were to consider schemes of arrangement between the companies and certain of their creditors,

namely, the companies' employees, former employees, dependants of those employees and also other asbestos manufacturing companies outside the T & N group who had or may have contribution claims against the scheme companies as employers. The schemes proposed a compromise which was to be binding upon the scheme companies and their creditors and was to deal *1416* with any present and future claims brought against Royal and Sun Alliance plc and Lloyd's Syndicate 45/117, the insurers who had provided the companies with employers' liability insurance cover.

The administrators applied to the court, in accordance with *Practice Statement (Companies: Schemes of Arrangement) [2002] 1 WLR 1345* , for the court to determine certain issues in advance of the meetings. The issues for the court's determination were as follows: (i) whether claimants to whom rights against the insurers had been transferred by operation of section 1 of the Third Parties (Rights Against Insurers) Act 1930 were creditors of scheme companies and whether the schemes would be rendered ineffective by section 3 of the 1930 Act; (ii) whether the schemes were compromises or arrangements between the scheme companies and their creditors for the purposes of section 425 of the Companies Act 1985 ; (iii) in what circumstances would contingent contribution claimants constitute creditors for the purposes of section 425 of the 1985 Act; (iv) in what circumstances would present or future dependants with potential claims under the Fatal Accidents Act 1976 constitute creditors for the purposes of section 425 of the 1985 Act; (v) whether, in respect of each company, there should be a single meeting of creditors or whether they should be divided into two or more classes; and (vi) whether either the schemes or a proposed amendment to the insurance policies contravened the Employers' Liability (Compulsory Insurance) Act 1969 .

The facts are stated in the judgment.

*Richard Snowden QC* , *Paul Stanley* and *Ceri Bryant* for the administrators.

*William Trower QC* and *Jeffrey Terry* for Royal and Sun Alliance plc.

*William Trower QC* and *Stephen Robins* for Lloyd's Syndicate 45/117.

*David Chivers QC* for Cape Insulation Ltd.

*Patrick Field QC* for the employees, former employees and their dependants.

*Cur adv vult*

16 June 2006.

David Richards J

handed down the following judgment.

## Introduction

1 This is an application by the administrators of T & N Ltd ("T & N") and 57 associated companies for leave to convene meetings of certain creditors of those companies under section 425 of the Companies Act 1985 to consider schemes of arrangements between the companies and those creditors. The application raised several issues of principle, which were the subject of a number of different hearings. In this judgment I give the reasons for decisions announced on earlier occasions.

2 The schemes of arrangement are proposed to be made with those employees and former employees of the companies who have or may in the future have claims for damages for personal injuries arising out of exposure to asbestos, with dependants or relatives of such employees who have or may in the future have claims under the Fatal Accidents Act 1976 or equivalent legislation in other jurisdictions and with persons, principally *1417* other employers, who have or may in the future have contribution claims in respect of claims by employees or their dependants. In each case the claims are restricted to those covered by employers' liability insurance in place between 1 October 1969 and 30 April 1995.

3 T & N and some of the other companies proposing schemes were for many years engaged in the manufacture, distribution, sale and installation of asbestos-containing products. In the course of their employment, many employees were exposed to asbestos dust. Some employees have developed diseases and other conditions partly or wholly as a result of this exposure, and it is certain that others will do so in the future. In previous judgments, I have referred in more detail to the business and financial circumstances of T & N and its associated companies and the personal injuries claims

against them, and to particular features of asbestos-related conditions: see *In re T & N Ltd [2005] 2 BCLC 488* , paras 6–44 and *In re T & N Ltd [2006] 1 WLR 1728* , paras 3–11 and 24. A particular feature of asbestos- related conditions is the long period between exposure to asbestos dust and either the start of the condition or the appearance of symptoms of the condition. It may be many years before any condition starts at all, for example in the case of mesothelioma by the development of the first malignant cell, and many years after that before any symptoms become apparent.

4 T & N and its associated companies are the subject of a very large number of personal injuries claims in the United States, and of a smaller but none the less significant number of claims in the United Kingdom. While most of the US claims are in respect of product liability, the claims in the UK are made mainly by former employees or their dependants.

5 Insurance cover for employers' liability in the United Kingdom was provided to T & N and some of the other companies proposing schemes under employers' liability policies issued by Royal and Sun Alliance plc ("RSA") or its predecessor for the period from 1 October 1969 to 31 March 1977 and by Syndicate 45/117 at Lloyd's ("the syndicate") for the whole or part of the period from 1 April 1977 to 30 April 1995. I refer to RSA and the syndicate as "the EL insurers" and to the policies issued by them as "the EL policies". Employers' liability insurance for earlier periods was commuted before the appointment of the administrators.

6 The EL insurers have asserted that the EL policies excluded all asbestos-related claims and that in any event they were entitled to avoid the policies on grounds of alleged misrepresentation and non-disclosure. In May 2002 the administrators commenced proceedings in the name of T & N and associated companies against, among others, the EL insurers to determine the extent of the cover provided by the EL policies. The EL insurers denied liability for asbestos-related claims and claimed to avoid the policies. The Court of Appeal directed that the coverage issues should be tried first. After a two-week trial, involving extensive factual and expert evidence, Lawrence Collins J *[2003] 2 All ER (Comm) 939 gave judgment on 9 May 2003* , and held in favour of T & N and its associated companies. With the judge's permission, the EL insurers appealed. A hearing of the appeal was fixed first for November 2003, then deferred to May 2004, but settlement discussions between the parties reached the point where, by consent, the Court of Appeal ordered that the hearing be vacated and all *\*1418* further proceedings both in the appeal and in the High Court proceedings be stayed until June 2006.

7 Non-binding terms were set out in an exchange of correspondence and a sum of £36·74m was placed in escrow by the EL insurers. It is a term of the heads of agreement that the proposed schemes of arrangement should be sanctioned by the court, in order to give effect to the proposals for the compromise and to make them binding on those who can now or may in the future be able to claim under the EL policies.

8 The essential features of the scheme are that, by way of compromise of the claims in the litigation, the scheme companies and actual or potential claimants in respect of asbestos-related diseases and conditions will not assert claims against the EL insurers, and the sum of £36·74m paid into escrow will be held by trustees to pay a dividend on such claims as and when they are made and established. The fund will be available to meet both present and future claims.

## Outline of the schemes

9 The claims which will be covered by the schemes fall into three broad categories. First, personal injury claims by employees and former employees for damages for asbestos-related diseases. The claims covered will be those made by a person who was employed by a scheme company during at least part of the period from 1 October 1969 to 30 April 1995 and who has developed or may in the future develop a disease caused by exposure to asbestos during their employment with the scheme company. Secondly, claims under the Fatal Accidents Act 1976 or equivalent legislation by dependants or relatives of former employees whose deaths are caused by asbestos-related diseases. Thirdly, contribution and other claims made in respect of claims in the first two categories. Contribution claims will principally be made by other employers outside the T & N group. The claims covered by the schemes include not only those which have already been asserted or could now be asserted but also those which are contingent at present but which may be capable of being made in the future. Finality in respect of such claims is considered essential by the EL insurers. I will return to this feature of the proposed schemes.

10 The claims covered by the scheme ("EL claims") are defined as follows:

> "A claim against the EL insurers under the EL policies arising out of a claim against a scheme company in relation to asbestos exposure to an injured person which occurred in the cover period and during and in the course of his employment as an employee including but not limited to: (i) a claim by an injured person, or on behalf of his estate pursuant to the Administration of Estates Act 1925 , the Damages (Scotland) Act 1976 or the Administration of Justice Act 1982 , for damages and/or compensation for an asbestos disease, or a claim by the CRU in respect of such a claim; or (ii) a claim by a contribution claimant in respect of a claim as described in sub-paragraph (i) above or (iii) below; or (iii) a claim by or on behalf of a current dependant or by or on behalf of a current relative or by or on behalf of any person akin to a current dependant or current relative pursuant to any equivalent legislation wherever and whenever enacted, except in each case a claim where a TUPE transfer of the scheme company's undertaking has occurred before 1 October 2001 (which will be a TUPE claim)."

EL claimant is defined as:

> "A person who immediately prior to the EL schemes taking effect has or may have at any time in the future an EL claim, and who is a creditor within the meaning of section 425 of the Companies Act 1985 , or a non- scheme EL claimant who is treated as being an EL claimant pursuant to clause 14 of the EL schemes."

"Injured person" is defined as: "Any person who suffers, at any time after commencement of the cover period, an asbestos disease caused partly or wholly by asbestos exposure." "Asbestos disease" means any injury, disease or condition caused partly or wholly by asbestos exposure and "asbestos exposure" means the use of and/or exposure to asbestos. "Current dependants" means persons who at the effective date under the scheme are dependants, as defined in section 1(3) of the Fatal Accidents Act 1976 , of an injured person, and "current relatives" means persons who at the effective date under the scheme are relatives, as defined in the Damages (Scotland) Act 1976 , of an injured person.

11 The effect of section 1 of the Third Parties (Rights against Insurers) Act 1930 is that on entering administration in 2001 the rights of T & N and the other companies under the EL policies in respect of liabilities which had by then been incurred to EL claimants were transferred to those EL claimants, whether or not they had then in fact made a claim. As and when any such liability was subsequently incurred or is in the future incurred, the rights under the policies in respect of such liability was, or will be, likewise transferred. By definition, all claimants to whom the schemes will apply either now possess or will in the future possess direct claims against the EL insurers by virtue of this statutory transfer. I will later in this judgment consider further certain aspects of this transfer of rights. The schemes will compromise rights against the EL insurers but not rights against the scheme companies.

12 As recited in the draft schemes, it is a requirement of the EL insurers that the schemes provide finality in respect of claims which might otherwise be brought against them under the EL policies in respect of asbestos diseases and that the litigation is settled. The schemes must ensure that no relevant claimant or scheme company is entitled to claim or assert any rights against the EL insurers in respect of any past, present or future EL claim. To this end, the schemes provide that all present and future rights of the EL claimants against the EL insurers, and the fruits of any action to enforce such rights, shall be assigned absolutely to the trustees of a trust to be established pursuant to the schemes and referred to below. They further provide that none of the EL claimants, the trustees or the scheme companies will be entitled to make any claim or assert any right against the EL insurers in respect of the EL policies or any EL claim.

13 Under the proposed schemes, a trust will be established and the sum of £36·74m together with accrued interest will be paid to the trustees. The trustees will hold and administer the resulting fund in accordance with the trust deed and a set of trust distribution procedures. The purpose of the schemes is to enable the EL claims to be established, ascertained and paid *\*1420* from the trust fund in accordance with and subject to the provisions of the schemes, trust deed and trust distribution procedures, and to preclude such claims from being brought against the EL insurers.

14 The "core objective" set out in the schemes is:

> "(i) to enable EL claimants with established claims to receive a payment or payments from the trust fund which: (a) reflect the value of the underlying EL claim assigned to the trust by the EL claimant; (b) are fair and proportionate having regard to the interests of other EL claimants with similar EL claims; (c) are calculated in an efficient and cost-effective manner following an efficient and cost-effective review of the EL claim; and (ii) to enable the EL insurers to benefit from the payments, releases and other rights provided to them by the EL scheme."

To that end the trust distribution procedures set out procedures for establishing the value of a claim. There is an expedited review procedure, which uses a set of specific liquidated values for each major asbestos-related disease as applied to claims satisfying certain medical and exposure criteria. Alternatively, a claimant may elect for the individual review process, under which the amount of any admitted claim will be individually assessed, subject to a maximum value specified for each disease. Any claimant dissatisfied with the decision under either procedure may refer it for adjudication by an independent expert.

15 Claims may therefore be made as and when asbestos-related diseases become apparent. They will be subject to the limitation periods applicable to such claims. The trust will have a duration of at least ten years and will thereafter continue until the trustees declare by deed that they have discharged or provided for the discharge of all liability under the trust deed and trust distribution procedures to all EL claimants and the EL insurers, subject to a maximum term of 80 years. It is expected that the trust will continue for at least 40 years.

16 When a claim is established in accordance with the trust distribution procedures, there will as soon as practicable be paid to the claimant a sum equal to the "payment percentage" of the claim current at that time. Payments will also be made in respect of legal and medical costs incurred in establishing the claim. The payment percentage will be fixed initially, and thereafter periodically reviewed, in accordance with an assessment of the value of present and future claims, the size of the fund and projected costs and investment returns. The reserving policy under the trust distribution procedures aims to ensure that current and future EL claimants receive an equivalent level of payment percentage of their established claims. The trustees will have power to pay additional dividends at a later stage if the assessment shows that this can be done without prejudice to the position of unpaid and future claims. The actuaries retained by the administrators have advised that the likely payment percentage at the outset of the schemes will be 75% and that, if there are no further changes in the law following *Barker v Corus UK Ltd [2006] 2 AC 572* , there should be an additional dividend of 25%.

17 The schemes contain special provisions to deal with particular circumstances. First, businesses of some scheme companies have been the subject of a transfer to which the Transfer of Undertakings (Protection of Employment) Regulations 1981 (SI 1981/1794) and 2006 ( SI 2006/246 ) *1421* apply. The effect of such a transfer is that there is a transfer of liability in respect of employee claims to the transferee company. Employees or former employees whose claims have been transferred in this way will not qualify as EL claimants and will not be bound by the schemes. If any such claim is established and paid by the EL insurers, they will be entitled to payment from the trust fund of a sum equal to the current payment percentage of the claim. Secondly, there are some companies within the group (non-scheme companies) for which it is anticipated that schemes will be proposed but will not be sanctioned because so few (if any) EL claimants will vote that the statutory majorities will not be achieved. Claims arising out of the exposure of employees of those companies to asbestos which would be EL claims if the schemes involved those companies will, at the election of the claimant, be treated as an EL claim and will therefore be subject to the determination and payment provisions of the trust distribution procedures. Such a claimant will be required to waive all rights against the EL insurers. The settlement sum paid by the EL insurers has been calculated on the footing that such claims should be met out of it. If a claimant does not agree to the treatment of his claim in this way, the EL insurers will be fully indemnified out of the trust fund for any payments made by them to the claimant. Thirdly, the scheme contains provisions to deal with the EL insurers' rights of indemnity against the scheme companies, to the extent that they were upheld by Lawrence Collins J.

## Procedural aspects of the application

18 Following the decision of the *Court of Appeal in In re Hawk Insurance Co Ltd [2001] 2 BCLC 480* , the practice as regards applications under section 425 to convene meetings was changed. So far as

possible, issues arising on the composition of classes should be decided at that stage, rather than on the later application to sanction the scheme of arrangement if approved at the meeting(s). The revised practice is set out in the *Practice Statement (Companies: Schemes of Arrangement) [2002] 1 WLR 1345* . The responsibility as to the constitution of classes and as to the number of meetings lies with the applicant, but para 4 of the Practice Statement requires the applicant to draw the attention of the court as soon as possible to any issues which may arise as to the constitution of the meetings or which may otherwise affect the conduct of the meetings. Unless there are good reasons for not doing so, the applicant must also take all steps reasonably open to it to notify any person affected by the scheme of the intention to promote the scheme and of its purpose and of the proposed composition of classes. The court will, if necessary, give directions for the resolution of any such issues and in particular will hear interested parties. The Practice Statement concludes by stating that the court will expect any creditor who raises any such issue at the hearing to sanction the scheme to show good cause why they did not raise it at an earlier stage.

19 This practice is to avoid the waste of costs and court time which results if it is not until the sanction hearing that it is determined that the classes were wrongly constituted. If the classes have been wrongly constituted, the court has no jurisdiction to sanction the scheme. The purpose underlying this revised practice shows also that if there are known ***\*1422*** to be other issues which would go to the jurisdiction of the court to sanction the scheme, they too are best raised at the stage of the application to convene the meetings: see *In re Savoy Hotel Ltd [1981] Ch 351* and *In re MyTravel Group plc [2005] 2 BCLC 123* . The same is true also of issues which, although not strictly going to jurisdiction, are such that they would unquestionably lead the court to refuse to sanction the scheme. Examples in this category of issue on the present application are the questions arising under the Employers' Liability (Compulsory Insurance) Act 1969 .

20 On a preliminary application, the administrators drew the court's attention to the existence of a number of essentially jurisdictional issues which arose in relation to the proposed schemes. For the reasons given above, I considered it right that those issues should be dealt with at this stage. Further issues were subsequently raised and argued. Just as the Practice Statement makes clear that determination of a creditor issue at this stage cannot altogether preclude the issue being raised at the sanction hearing, so the same applies to the other jurisdictional issues which have been raised. This applies with greater force in the present case in view of the limited notification process referred to below. It was explicitly on this basis that the administrators made the application.

21 A further issue on the pre-convening application was the notification to be given of the convening application. Para 4 of the Practice Statement requires the applicant to take all steps reasonably open to it to notify any person affected by the scheme, unless there are good reasons for not doing so. The EL claimants are a very large class. T & N and its group companies employed very large numbers of people over a long period. Many of the factories and other work places have long since closed, many former employees will have died or moved from their last known addresses and many of the addresses can no longer be identified. I was satisfied on the administrators' evidence that it was impracticable, and to a considerable degree futile, to extract names and addresses from the very extensive records held by the companies and send notification to those addresses.

22 Instead of attempting a mass notification of EL claimants, the administrators proposed, and I directed, steps designed to bring the issues to the attention of those actively involved on behalf of claimants and to ensure proper argument on the issues. Notification of the application was given to the EL insurers, three companies which are the principal contribution claimants, the creditors' committees of each of the scheme companies (which include representatives of many of the firms of solicitors which regularly act for claimants with asbestos-related disease) and the Transport and General Workers' Union, which had the largest union membership among employees.

23 The administrators also approached two firms of solicitors, Thompsons and Travers Smith, who agreed to instruct counsel to present argument on the issues. Thompsons have extensive experience of claims in this area and currently act on behalf of about 250 claimants against T & N. In particular they act for the personal representatives of Ronald Laidler and for George Scott. Mr Laidler was employed during the period covered by the EL policies and was joined as a party to the litigation against the EL insurers, as a representative of current and future claimants with an interest in the policies. He had obtained a judgment against a scheme ***\*1423*** company before the administration orders were made. He has since died and his widow has a claim for damages under the Fatal Accidents Act 1976 . Mr Scott was employed by a scheme company during the period covered by the EL policies and has a claim for damages in respect of an asbestos-related disease but has not yet obtained judgment. Thompsons instructed Patrick Field to present submissions on the issues which

affected employees, former employees and their dependants, but not so as to bind any clients of Thompsons or other EL claimants. As to the purpose of the schemes and their impact on EL claimants, Mr Field stated in his skeleton argument:

> "Thompsons are firmly of the view that the aims and intentions of the proposed schemes, namely to provide fair compensation for injured claimants in an efficient way, are commendable. In the absence of a workable and enforceable scheme the options appear to be chaos and uncertainty, neither of which benefits the claimants."

24 Travers Smith act for Cape Insulation Ltd ("Cape") which was itself a manufacturer of asbestos products and is one of the principal employers with contribution claims against T & N and other scheme companies. They instructed David Chivers to present submissions on the issues which affect them. It should be recorded that Cape is a subsidiary of Cape plc which is itself promoting a scheme of arrangement with a view to putting in place a mechanism for dealing with the Cape group's exposure to asbestos-related claims. Unlike T & N and its associated companies, Cape plc and its subsidiaries are solvent. Importantly they are not affected by claims in the United States: see *Adams v Cape Industries plc [1990] Ch 433* .

25 The administrators were represented by Richard Snowden, Paul Stanley and Ceri Bryant (with Mr Stanley and Miss Bryant dealing with separate issues at the hearing in January 2006) and the EL insurers by William Trower, with Jeffrey Terry for RSA and Stephen Robins for the syndicate. Mr Terry dealt with the issues on behalf of RSA at the hearing in January 2006, when the syndicate were not represented.

## Issues

26 The issues which arose for decision were as follows. (i) Issues under the Third Parties (Rights against Insurers) Act 1930 : (a) are EL claimants to whom rights against the EL insurers have been transferred by operation of section 1 of the Act creditors of scheme companies?; (b) would the scheme be rendered ineffective by section 3 ? (ii) Are the schemes compromises or arrangements between the scheme companies and their EL claimants for the purposes of section 425 of the Companies Act 1985 ? (iii) In what circumstances do contingent contribution claimants constitute creditors for the purposes of section 425 ? (iv) In what circumstances are present or future dependants with potential claims under the Fatal Accidents Act 1976 creditors for the purposes of section 425 ? (v) Issues as to the proper composition of classes of creditors. (vi) Whether either the schemes or a proposed amendment to the EL policies would contravene the Employers' Liability (Compulsory Insurance) Act 1969 . (vii) Directions as to convening and holding the meetings.

27 For convenience, I shall generally refer only to the scheme between T & N and its EL claimants, I shall use "employees" to refer to present and **\*1424** former employees, and I shall use "dependants" to refer to any person who would have a claim under the Fatal Accidents Act 1976 or equivalent legislation elsewhere, whatever they might be called under such legislation.

## Third Parties (Rights against Insurers) Act 1930

28 The rights of EL claimants against the EL insurers which will be compromised by the scheme are those transferred to the EL claimants by the operation of the Third Parties (Rights against Insurers) Act 1930 . The transfer is effected by section 1(1) which, as amended by article 4 of and paragraph 2 of the Schedule to the Enterprise Act 2002 (Insolvency) Order 2003 (SI 2003/2096), provides:

> "Where under any contract of insurance a person (hereinafter referred to as the insured) is insured against liabilities to third parties which he may incur, then—(a) in the event of the insured becoming bankrupt or making a composition or arrangement with his creditors; or (b) in the case of the insured being a company, in the event of a winding up order being made, or a resolution for a voluntary winding up being passed, with respect to the company, or of the company entering administration, or of a receiver or manager of the company's business or undertaking being duly appointed, or of possession being taken, by or on behalf of the holders of any debentures secured by a floating charge, of any property comprised in or subject to the charge or of a voluntary arrangement

proposed for the purposes of Part I of the Insolvency Act 1986 being approved under that Part; if, either before or after that event, any such liability as aforesaid is incurred by the insured, his rights against the insurer under the contract in respect of the liability shall, notwithstanding anything in any Act or rule of law to the contrary, be transferred to and vest in the third party to whom the liability was so incurred."

29 The effect of the transfer is set out in section 1(4) , which provides:

"Upon a transfer under subsection (1) or subsection (2) of this section, the insurer shall, subject to the provisions of section 3 of this Act, be under the same liability to the third party as he would have been under to the insured, but—(a) if the liability of the insurer of the insured exceeds the liability of the insured to the third party, nothing in this Act shall affect the rights of the insured against the insurer in respect of the excess; and (b) if the liability of the insurer to the insured is less than the liability of the insured to the third party, nothing in this Act shall affect the rights of the third party against the insured in respect of the balance."

30 There are vested in the transferee only those rights which the insured has against the insurer, so that, under typical liability policies, the transferee must establish his claim against the insured, as to both liability and quantum, before he can seek payment from the insurer: *Bradley v Eagle Star Insurance Co Ltd [1989] AC 957* , approving *Post Office v Norwich Union Fire Insurance Society Ltd [1967] 2 QB 363* . None the less the statutory transfer is effected at an earlier stage. In cases where the facts constituting the cause of action against the insured have occurred before the commencement of its liquidation, administration or other insolvency event specified in section 1(1) , the transfer takes effect on such commencement. ***1425*** It is immaterial that the liability of the insured has not at that time been established. In *Cox v Bankside Members Agency Ltd [1995] 2 Lloyd's Rep 437* , 467 Saville LJ said:

"Under the Act the rights of the insured against the insurer are transferred to the third party on (in the case of an insured company) the making of a winding up order etc: see section 1(b) of the Act. It follows from this that a statutory transfer can take place before the obligation of the insurer to pay arises i e before the liability of the insured has been established. In such an event, since it is clear from the authorities that the third party is to be put in no better position than the insured, the third party does not obtain the right to immediate payment until the liability of the insured is established."

31 Although this statement may have been obiter, Longmore LJ (with whom Jonathan Parker and Maurice Kay LJJ agreed) said in *In re OT Computers Ltd [2004] Ch 317* , para 46:

"Whether or not this court is strictly bound by this part of the decision in Cox v Bankside Members Agency Ltd , the question of the date of transfer to the third party of the rights of insured against the insurer should now, in my judgment, be regarded as conclusively determined, at the level of the Court of Appeal, in favour of the view that the transfer takes place on the event of insolvency."

32 This was accepted as correct by the *Court of Appeal in Centre Reinsurance International Co v Freakley [2005] 2 All ER (Comm) 65* . In both *Cox v Bankside Members Agency Ltd [1995] 2 Lloyd's Rep 437* and *In re OT Computers Ltd [2004] Ch 317* , the causes of action had occurred before the date of commencement of the liquidation or administration. The requirement for a transfer under section 1(1) , that a liability to the third party is incurred by the insured, had therefore been satisfied by that date. Likewise, in the present case, there was transferred to all EL claimants who had a cause of action subsisting at the commencement of the administration, the rights of T & N against the EL insurers in respect of those causes of action.

33 What is the position where the cause of action against T & N does not accrue until after the commencement of the administration? The words "any such liability as aforesaid is incurred by the insured" in section 1(1) refers to the accrual of a cause of action in respect of the liability: see, for

example, *Post Office v Norwich Union Fire Insurance Society Ltd [1967] 2 QB 363* , 373, per Lord Denning MR, cited with approval in *Bradley v Eagle Star Insurance Co Ltd [1989] AC 957* . Accordingly, the transfer will take effect at the accrual of the cause of action. There are therefore in this respect three categories of actual or potential claimants against the EL insurers pursuant to the 1930 Act. First, there are those claimants whose causes of action had accrued before the date of commencement of the administration and to whom therefore T & N's rights against the EL insurers were transferred at that date. Secondly, there are those claimants whose causes of action have accrued since the commencement of the administration and to whom therefore T & N's rights against the EL insurers were transferred when their causes of action accrued. Thirdly, there *\*1426* are those potential claimants who do not presently have, and may never have, an accrued cause of action for substantial damages against T & N. T & N's rights against the EL insurers have not as yet been transferred to such potential claimants and will only be transferred if and when a cause of action does accrue. It may be noted that, unlike the future tort claimants considered in *In re T & N Ltd [2006] 1 WLR 1728* , the great majority of EL claimants are likely to be employees who were wrongfully exposed to asbestos and therefore have accrued causes of action in contract for breach of a contractual duty of care. If they have not as yet developed any disease or condition constituting actionable damage, their claim at present against T & N is for nominal damages only.

34 I will consider these various distinctions when dealing with the composition of classes for the purposes of the scheme.

35 An issue considered in only one of the authorities referred to above is the nature of the third party's rights against the insured once the transfer of rights against the insurer has taken effect. This was considered in the judgments in the *Court of Appeal in Centre Reinsurance International Co v Freakley [2005] 2 All ER (Comm) 65* , a case which concerned other insurance and reinsurance arrangements as regards asbestos-related liabilities put in place by T & N. Chadwick LJ, at para 35, identified four classes of asbestos claimants relevant to the issues in that case, of which the third was:

> "asbestos claimants whose claims are established after the statutory event has occurred and after the retained limit has been reached, but before the cover under the policy has been exhausted by the limit of insurance. The insured is entitled to be indemnified by the insurer in respect of those claims; and the insured's rights to indemnity are transferred to the asbestos claimants."

He said, at para 36:

> "asbestos claimants in the third class can enforce claims against the insurer (once those claims are established) but cannot enforce claims against the insured (save to the extent that their claims are not met by the insurer—see section 1(4)(b) of the 1930 Act)."

36 Chadwick LJ continued, at para 37:

> "I have referred, in the previous paragraph to section 1(4)(b) of the 1930 Act. It seems to me implicit in that provision that, in a case where the rights of the insured against the insurer under the policy in respect of the insured's liability to the third party have been transferred to the third party under section 1(1), the third party must look first to the insurer for payment (to the extent of the rights transferred) rather than to the insured. I would accept that there is nothing in the 1930 Act which can have the effect of extinguishing the underlying cause of action against the insured. As section 1(4)(b) makes clear, the insured remains liable to the third party, at least to the extent that the third party's rights against the insured exceed the rights which are the subject of the statutory transfer. But, as it seems to me, Parliament plainly intended that, following the statutory transfer to the third party of the insured's rights against the insurer in respect of the third party's claim, the responsibility *\*1427* for meeting that claim should (as between insurer and insured) lie with the insurer. If that were not so, (i) there would be a risk of double recovery if the third party were to sue both insurer and insured and (ii) there would be a risk that the insured would be liable to the third party in respect of a claim in which he no longer had any right of indemnity under the policy—because his right had been transferred to the third party by the statute. It would, of course, be a strange case in which the third party chose to pursue the insolvent insured rather than

the solvent insurer. But the question whether (and for what) the third party could prove in the insolvency of the insured would have to be addressed if the insurer were also insolvent."

37 However, Arden LJ expressed her reservations on this part of the judgment of Chadwick LJ. She agreed that the third party's cause of action against the insured is not extinguished but as regards Chadwick LJ's view that the third party is unable to enforce his claim against the insured, she said, at paras 136–137:

"136 … It may not be necessary to the decision in this case, and (as it was not argued on this appeal) I wish merely to ensure that the point is left open for full argument and decision on another occasion if it becomes material. It could, as Chadwick LJ accepts, become important if the insurer were to become insolvent or (being a corporation) was dissolved and could not be revived or its assets were located in a jurisdiction where the third party's claim could not be enforced.

"137. I agree that the apparent assumption in section 1(4)(b) is, as Chadwick LJ concludes, that the third party would only be able to enforce any claim against the insured to the extent that the amount of the claim exceeded the amount for which the insured was held covered. However, the third party must first bring proceedings against the insured, and obtain judgment against him, in order to establish the existence and amount of the liability owed to him by the insured ( *Bradley v Eagle Star Insurance Co Ltd [1989] AC 957* ). Moreover, the object of the 1930 Act was to give new and additional rights to the third party (see the judgment of Chadwick LJ at para 30), not to reduce them, as would happen if, for example, the insurer was in fact less solvent than the insured or, being a corporation, had ceased to exist (in circumstances where it was no longer possible to revive it). If, on the other hand, the insured was held liable and, in consequence, paid a claim that was covered by the insurance in question, my provisional view is that, one way or another, he would be entitled to obtain recovery from the insurer. In addition, in my judgment (which is provisional as the matter has not been argued), neither the insured nor the insurer could be made liable to pay the third party a second time to the extent that this would result in the third party receiving more than is needed to compensate him for his loss. On this basis, paragraphs (a) and (b) of section 1(4) of the 1930 Act merely amplify the opening words of that section, and accordingly are to be read simply as explicatory of the effect of the statutory transfer on the insurer."

Latham LJ also reserved his position in relation to this issue.

38 This issue would be of importance in this case if, by being deprived of any right to enforce payment of their claims against T & N, the *1428 EL claimants to whom rights against the EL insurers had been transferred by the 1930 Act thereby ceased to be creditors of T & N. If that were the case, there could be no scheme of arrangement between T & N and those EL claimants. However, as it seems to me, it is not an issue which arises for decision in the circumstances of this case. The underlying premise of the scheme is that there is a genuine and substantial dispute about the validity of the EL policies and whether they cover asbestos-related claims. If the EL insurers are right on either of those points, there are no rights against the EL insurers to be transferred to the EL claimants under the 1930 Act. In that event, the EL claimants will be creditors of T & N. Only if the litigation were fought to a conclusion would those issues be determined and the purpose of the proposed settlement and of the scheme is to avoid the risks involved in that course for all parties. Therefore, if Chadwick LJ is correct in his view, the EL claimants are at least contingent creditors of T & N. If Arden LJ is correct in her provisional view, the EL claimants are in any event actual creditors of T & N.

39 Two further issues arise on the 1930 Act, both in relation to section 3 , which provides, as amended by section 235(1) of and paragraph 7(4) of Schedule 8 to the Insolvency Act 1985 :

"Where the insured has become bankrupt or where, in the case of the insured being a company, a winding-up order or an administration order has been made or a resolution for a voluntary winding-up has been passed, with respect to the company, no agreement made between the insurer and the insured after liability has been incurred to

> a third party and after the commencement of the bankruptcy or winding-up or the day of the making of the administration order, as the case may be, nor any waiver, assignment, or other disposition made by, or payment made to the insured after the commencement or day aforesaid shall be effective to defeat or affect the rights transferred to the third party under this Act, but those rights shall be the same as if no such agreement, waiver, assignment, disposition or payment had been made."

40 The first, and fundamental, issue is whether section 3 renders the scheme ineffective so far as it provides for the assignment to the trustees of the rights of EL claimants against the EL insurers and the waiver of any entitlement to make any claim or assert any right against the EL insurers. Mr Snowden, Mr Trower and Mr Field submitted that section 3 does not render the scheme ineffective, while Mr Chivers submitted that it does so. Section 3 applies in terms to any "agreement made between the insurers and the insured" and to "any waiver, assignment, or other disposition made by … the insured". The insured is, of course, T & N. The evident purpose of the section is to prevent arrangements between the original parties to the contract of insurance, or a unilateral act by the insured, prejudicing the persons to whom rights are transferred under section 1 of the 1930 Act.

41 Section 3 does not, in my judgment, apply to the scheme. First, even if the word "agreement" could in the context of section 3 encompass a scheme of arrangement, the scheme is not made between the EL insurers and T & N. It is made with the EL claimants. Secondly, the assignment and waiver of rights against the EL insurers are not made by T & N. They will be made by the EL claimants under a scheme which will be binding on them *\*1429* only if approved by at least the statutory majority at their meeting and sanctioned by the court. The parallel is not an assignment and waiver by T & N, but an assignment and waiver by the EL claimants. All counsel agreed that an assignment or waiver made individually by an EL claimant would be outside the section. The scheme does no more than make the assignment and waiver binding on all the EL claimants where it is impossible or impracticable to obtain their individual assents.

42 The second issue relates to a proposed amendment to the EL policies to exclude claims under the Fatal Accidents Act 1976 by future dependants. Any person who is a dependant, as defined in the 1976 Act, at the time of the death of an employee caused by a wrongful act or omission of T & N has a claim against T & N. The present dependants of an employee who is still living and who was exposed to asbestos by the act or omission of T & N will have a claim under the 1976 Act against T & N if he dies as a result of such exposure and they continue then to be his dependants. They are presently identifiable persons with potential claims subject to two contingencies. By "future dependants" are meant persons who are not currently dependants of employees and are not therefore identifiable. The proposed amendment to the EL policies results from my decision, for the reasons given below, that future dependants are not creditors of T & N and cannot be bound by the scheme. In order to achieve the finality required by the EL insurers, it is proposed that the policy terms will be amended to exclude them upon terms that they will be entitled to make claims against the trust fund as if they were EL claimants for the purposes of the scheme. It is clear that section 3 does not render ineffective the proposed amendment. An agreement between the insurer and the insured is ineffective only if made "after liability has been incurred to a third party". No liability has been incurred to future dependants.

## Compromise or arrangement for the purposes of section 425

43 The issue is whether the scheme falls within section 425 of the Companies Act 1985 as being a compromise or arrangement proposed between T & N and a class of its creditors. The administrators and the EL insurers submitted that the scheme is an arrangement for the purposes of section 425 , while Mr Chivers for Cape submitted that it was not.

44 Mr Chivers's straightforward submission was that, as the scheme does not purport to affect the rights between T & N and its EL claimants, it is not a compromise or arrangement between T & N and the EL claimants. Their rights against T & N remain unaltered. It is their rights against the EL insurers, vested in them by operation of the Third Parties (Rights against Insurers) Act 1930 , which are compromised by the scheme. That is properly the subject of a compromise, whether by way of scheme of arrangement or otherwise, between the EL insurers and the EL claimants. In fact, there could not be a scheme of arrangement with the syndicate, because it is a collection of individuals, not a company as defined in section 425(6)(a) of the 1985 Act. Mr Chivers submitted that such a

compromise cannot be achieved by a scheme of arrangement between T & N and the EL claimants. The scheme involves also a compromise of T & N's rights against the EL insurers, but that does not itself involve the EL claimants and does not provide a basis for the proposed scheme. However broadly the word *1430 "arrangement" in section 425 is construed, it must be between a company and its creditors, and a proposal which leaves the relationship between the company and its creditors unaltered cannot fall within the section.

45 The first and obvious point to make is that, whatever the precise meaning of a compromise or arrangement, it must be proposed with creditors or members of a company. It is implicit that it must be made with them in their capacity as creditors or members and that it must at least concern their position as creditors or members of the company. For the reasons already given, even those EL claimants to whom T & N's rights against the EL insurers have been transferred by operation of the 1930 Act remain creditors of T & N. The extent to which certain other persons with EL claims are creditors for the purposes of section 425 is considered later in this judgment.

46 The word "arrangement" has a very broad meaning. It is not defined for the purposes of section 425 , except that by section 425(6)(b) it includes particular types of reorganisation of share capital. In In re National Bank Ltd [1966] 1 WLR 819 , 829, Plowman J said:

"As regards Mr Suenson-Taylor's second objection, namely, that the scheme really ought to be treated as a section 209 case needing a 90% majority, I cannot accede to that proposition. In the first place, it seems to me to involve imposing a limitation or qualification either on the generality of the word 'arrangement' in section 206 or else on the discretion of the court under that section. The legislature has not seen fit to impose any such limitation in terms and I see no reason for implying any."

47 The decision of the Court of Appeal in In re Guardian Assurance Co [1917] 1 Ch 431 established that compromise and arrangement are separate concepts and that an arrangement need not involve a compromise or be confined to a case of dispute or difficulty. The scheme involved a merger of Guardian Assurance Co and Reliance Marine Insurance Co Ltd. Guardian made a general offer to the shareholders of Reliance Marine to acquire their shares in consideration of a cash payment and shares in Guardian. The scheme was proposed in order to provide for the transfer of a proportion of the shareholding of each member of Guardian to the Reliance shareholders, so as to give effect to the offer. Clearly there was no dispute or difference which was to be compromised by the scheme, although a transfer of existing shares, rather than an issue of new shares, was then an unusual proposal, and would be an unusual proposal today. At first instance, Younger J held that it was not a scheme within section 120 of the Companies (Consolidation) Act 1908 (8 Edw 7, c 69), the equivalent of section 425 , because there was no prior difficulty or doubt requiring resolution. He considered that, although different from a compromise, an arrangement was none the less analogous to a compromise.

48 The Court of Appeal reversed the decision of Younger J. AT Lawrence LJ said, at p 450:

"I do not think there is any sufficient ground for limiting the meaning of the word 'arrangement' in this section. To my mind, any risk is sufficiently guarded against by the fact that the sanction of the court must be obtained. The section is not meant to be limited merely to a *1431 compromise, it is to apply also to something that is an arrangement. This proposal seems fairly to come within the word 'arrangement', and I do not see any object in limiting its meaning so as to exclude a scheme which is admittedly beneficial to all parties concerned."

49 It is fair to say that the great majority of schemes of arrangement involving members do not involve a compromise. For example, schemes providing for the acquisition of companies by a third party, whether by way of transfer of existing shares or the cancellation of existing shares and the issue of new shares to the acquiring third party, on terms that the third party provides the consideration to the members, are not compromises. But they are arrangements between the company and its members, because they involve a change in the membership of the company: see, for example, In re Savoy Hotel Ltd [1981] Ch 351 .

50 A scheme of arrangement which did no more than expropriate the interest of a member or creditor would not be a compromise or arrangement within section 425 : In re NFU Development Trust Ltd

*[1972] 1 WLR 1548* . Brightman J observed that a compromise implies some element of accommodation on each side and that an arrangement implies some element of give and take. Total surrender or confiscation was not within either of them. In commenting on this decision in *In re Savoy Hotel Ltd [1981] Ch 351* , 359, Nourse J said that the word "arrangement" in section 425 and its predecessors is one of very wide import, a proposition which was by no means diminished by Brightman J's judgment: "All that that case shows is that there must be some element of give and take. Beyond that it is neither necessary nor desirable to attempt a definition of arrangement'." As members' schemes such as that in In re Savoy Hotel Ltd show, the give and take need not be between the members and the company, but may be between the members and a third party purchaser, with the company's only function being to register the transfer of shares and thereby terminate the existing members' status as members.

51 The rights of the EL claimants against the EL insurers which are affected, and indeed compromised, by the EL scheme are in no sense unconnected with T & N or the EL claimants' rights against T & N. The claims of EL claimants arise out of T & N's obligations to its employees and out of their exposure to asbestos in the course of their employment. As a result of such exposure claims for damages or contribution lie against T & N. The insurance cover against such claims provided by the EL policies was purchased by T & N for its own protection and, indirectly while it remained solvent and directly once the 1930 Act applied, for the protection of those with claims against it. The claims of the EL insurers to exclude asbestos-related diseases from cover and to avoid the policies affects the position of both T & N and the EL claimants. If the EL claimants were unable to enforce their claims against the EL insurers, such claims would still lie against T & N, and its assets (including any other available insurance cover) would be diminished accordingly. Moreover, T & N has a continuing direct interest in the EL policies because, if binding and applicable to asbestos-related claims, they would in the future respond to claims in cases where a disease has yet to start and where therefore there has not yet been any transfer of rights arising in respect of tort claims pursuant to the 1930 Act. The litigation concerning the EL policies and its compromise therefore *1432 has a direct impact on the EL insurers, T & N and the EL claimants alike. As regards the litigation, this is reflected in the parties, which included not only T & N as a claimant but also Mr Laidler as a representative employee.

52 The settlement of the litigation is therefore in substance and form a tripartite matter, involving T & N, insurers and claimants. That is reflected in the proposed scheme, with T & N and the claimants as parties and with the EL insurers appearing before the court to consent to the scheme and to undertake to be bound by its terms. It is true that the scheme has no effect on the present rights of EL claimants against T & N. The right of claimants to assert their claims against T & N, and the right of T & N to defend those claims, are unaffected, and claimants are not obliged to proceed first against the trust to be established by the scheme. However, if a claimant establishes a claim under the trust distribution procedures and receives a payment, it will diminish the amount which T & N would otherwise be required to pay in respect of the claim, if the EL insurers succeeded in avoiding the policies or in limiting the cover. Although not immediately affecting rights against T & N, the scheme is likely therefore to have an impact on those rights. Mr Chivers objected that these effects resulted not from the scheme but from the settlement agreement and arrangements constituted by the trust deed and trust distribution procedures which took effect outside the scheme. In my view, it is not possible to divorce the arrangements in this way. The scheme of arrangement is an integral part of a single proposal affecting all the parties, which includes also the trust and the trust distribution procedures to be established pursuant to the scheme.

53 In my judgment it is not a necessary element of an arrangement for the purposes of section 425 of the 1985 Act that it should alter the rights existing between the company and the creditors or members with whom it is made. No doubt in most cases it will alter those rights. But, provided that the context and content of the scheme are such as properly to constitute an arrangement between the company and the members or creditors concerned, it will fall within section 425 . It is, as Nourse J observed, neither necessary nor desirable to attempt a definition of arrangement. The legislature has not done so. To insist on an alteration of rights, or a termination of rights as in the case of schemes to effect takeovers or mergers, is to impose a restriction which is neither warranted by the statutory language nor justified by the courts' approach over many years to give the term its widest meaning. Nor is an arrangement necessarily outside the section, because its effect is to alter the rights of creditors against another party or because such alteration could be achieved by a scheme of arrangement with that other party.

54 These considerations all go to the meaning of arrangement in section 425 and hence the jurisdiction of the court under the section to sanction a scheme of arrangement. They do not fetter the discretion as to whether to sanction a scheme of arrangement. The looser the connection between

the subject matter of the scheme and the relationship between the company and creditors concerned, the more substantial might be the objections on discretionary grounds to sanctioning the scheme.

55 Mr Chivers also submitted that a compromise of the rights of the EL claimants against the EL insurers cannot be achieved by a scheme of arrangement between T & N and the EL claimants. The binding effect of the court's sanction to the scheme applies only to the parties to it, that is, T & N *1433 and the EL claimants. While this latter point is correct, it does not establish the first point. There are mechanisms regularly used whereby a third party can be bound by and obtain the benefit of a scheme. In a typical scheme to effect a merger or takeover, the members' obligation to transfer their shares will be enforceable through the appointment of an attorney to sign the share transfers, and for its part the acquirer will undertake to the court to be bound by the scheme and can therefore be obliged to give effect to it. Likewise, in this case the EL claimants are obliged to assign to the trustee the benefit of their claims against the EL insurers and the fruits of any action, and authority to effect the assignment, if necessary, is conferred by the scheme on an attorney. Their covenant not to make claims against the EL insurers is enforceable by T & N.

## EL claimants: status as creditors

56 All employees who were exposed to asbestos by T & N in breach of duty and who have as a result developed diseases or conditions recognised as actionable damage are creditors, unless their claim has been satisfied by payment of a final award of damages or a sum in final compromise. Likewise, in the case of certain diseases, other employers who exposed the employees to asbestos in breach of duty are creditors in respect of contribution claims, although the circumstances in which they qualify as creditors is in dispute on this application. Where such employees have died, their dependants or relatives are creditors in respect of claims under the Fatal Accidents Act 1976 or equivalent legislation. These are all claimants with accrued causes of action.

57 In *In re T & N Ltd [2006] 1 WLR 1728* issues were raised in respect of individuals who had been exposed to asbestos by T & N in breach of duty and who would have claims in tort if and when as a result they developed a disease or condition recognised in law as actionable damage. I held that they were creditors in respect of such contingent claims (future tort claims) for the purposes of schemes of arrangement under section 425 of the Companies Act 1985 and company voluntary arrangements under Part I of the Insolvency Act 1986 . I also held that, by reason of the relevant provisions of the Insolvency Rules 1986 , such claims were not provable debts in a liquidation of T & N.

58 In the context of the EL schemes, the principal significance of this decision relates to contingent contribution claims and contingent claims under the Fatal Accidents Act 1976 . Particular issues arise in respect of both categories of claims, to which I refer later in this judgment. Employees are in a different position, because not only will they be able to claim against T & N in tort or for breach of statutory duty if and when they develop a disease or condition, but they have an accrued cause of action in contract for breach of express or implied duties of care. Although only nominal damages would now be recoverable, their contingent claim for substantial damages arises out of the same cause of action and would be admissible to proof in liquidation. Irrespective of my earlier decision, they are therefore creditors in respect of such claims for the purposes of section 425 .

59 I should mention two matters in relation to my earlier judgment. First, when dealing with the issue as to whether future tort claims were provable debts in a winding up, I referred briefly to the decision at first *1434 instance in *R (Steele) v Birmingham City Council [2005] RVR 374* . Two days after I handed down my judgment, the Court of Appeal heard and allowed an appeal in *Steele's case [2006] 1 WLR 2380* . The issue was whether an obligation to repay an overpaid allowance was a provable debt in the bankruptcy of the debtor where the obligation arose exclusively from a decision of the Secretary of State for Work and Pensions taken under the applicable statutory provisions after the commencement of the bankruptcy. The Court of Appeal unanimously held that it was not provable, by reason of the provisions governing proof of debts in a bankruptcy which are principally contained in the Insolvency Act 1986 . Sir Martin Nourse based his decision on the requirement for a decision by the Secretary of State before any obligation could arise, thus making it indistinguishable from the decision of the *Court of Appeal in Glenister v Rowe [2000] Ch 76* . In that case it was held that costs incurred before the bankruptcy in litigation against the bankrupt, which were the subject of a costs order against the bankrupt made after the commencement of the bankruptcy, were not a provable debt. I had referred to that decision and the principle established by it in para 64 of my judgment. Arden LJ agreed with Sir Martin Nourse but as an additional ground held that the claim in *Steele's case [2006] 1 WLR 2380* was not in any case a contingent debt within the meaning of the relevant

provisions in the 1986 Act because there was no pre-existing obligation from which it arose. In that context she considered the decisions of the majority of the *House of Lords in In re Sutherland, decd [1963] AC 235* , which give a wide meaning, in a different context, to contingent liability. On the basis of the wording of the provisions governing provable debts in a bankruptcy, she was of the view that the wider meaning given in In re Sutherland did not apply. (Reliance was placed on the decision of Pennycuick J in *In re William Hockley Ltd [1962] 1 WLR 555* , in which In re Sutherland was not cited, but it would appear that there was not cited to the Court of Appeal the later decision of Pennycuick J in *In re SBA Properties Ltd [1967] 1 WLR 799* in which he adopted the approach of the House of Lords in the Sutherland case in the context of a winding up petition.) May LJ agreed with the reasons given by both Sir Martin Nourse and Arden LJ.

60 The decision and reasoning of the *Court of Appeal in R (Steele) v Birmingham City Council [2006] 1 WLR 2380* does not affect my decision that future tort claimants are creditors for the purposes of *section 425 of the Companies Act 1985* and *Part I of the Insolvency Act 1986* , nor of course my decision that they were not provable debts in a liquidation. Arden LJ made clear, at para 27, that she was dealing only with the particular context of that case:

> "I would also add that I am only considering the meaning of contingent liability for the purposes of *section 382 of the Insolvency Act 1986* . It may well have a different meaning for the purpose of other statutory provisions or for the purposes of a particular written instrument."

61 The second matter is a judgment of the Court of Appeal of New South Wales in Edwards v Attorney General (2004) 208 ALR 605 , of which counsel and I were unaware. The impact of asbestos claims is international and different legal systems are seeking means of addressing it. The case has ***1435*** as its background the reorganisation of an Australian group of companies which included companies engaged over many years in the manufacture and distribution of asbestos products. By a reorganisation carried out in 2001, it was sought to insulate the rest of the group from those companies and their asbestos liabilities on terms including the provision of further funds to those companies. The actuarial evidence suggested that while there were sufficient funds to meet claims in the short term, the funds would be exhausted well before many claims were formulated or adjudicated. This caused considerable public concern, and led to the appointment of an inquiry. The directors of the companies with the asbestos liabilities applied to the court for directions as to whether they should continue to pay claims in full as and when established. The applications were referred to the Court of Appeal of New South Wales which heard the application at first instance.

62 One of the legal assumptions accepted by all parties as correct and set out in the judgment of Young CJ in Eq was that future asbestos claimants (defined to include not only persons who had been exposed to asbestos by the companies in breach of duty but who had not as yet developed any actionable disease or condition but also persons who had not yet been exposed to asbestos) were not contingent creditors for the purposes of a liquidation and were not creditors for the purposes of schemes of arrangement under section 511 of the Corporations Act 2001 , which is in similar terms to *section 425 of the Companies Act 1985* . The position is set out in the judgment of Young CJ in Eq, 208 ALR 605 , paras 56ff, the relevant parts of which are:

> "56. On the information available to the court, the probabilities are that at least until 2040 claims will be made by persons suffering from asbestos-related illnesses or their relatives. In many cases the people concerned do not know at this stage that they have within them the seeds of destruction caused by asbestos and this will only become manifested sometime between now and 2040 or thereabouts. It is hard to see how future claimants can be protected by any scheme. The basal problem is that the class of so-called future claimants is largely comprised of people who may not yet have suffered damage as a result of exposure to asbestos products of Amaca and Amaba.

> "57. The legal position was well defined by counsel for the plaintiffs in their advice. Although this is a confidential document, the passage from which I have really borrowed below is acknowledged by all counsel to represent the law.

> "58. On current authority, persons injured through exposure to asbestos manufactured or supplied by Amaca or Amaba do not have a completed cause of action until damage is suffered and that usually involves manifestation of the disease: Orica Ltd v CGU

Insurance Ltd (2003) 59 NSWLR 14 . Indeed, some of the future claimants could be in the more extreme category where the people concerned have not yet been exposed to the asbestos such as home renovators doing future renovations or may even be people not yet born who might be involved in demolishing an asbestos-ridden building somewhere in 2030. No one can currently know the identity of the future claimant.

"59. This type of liability must be distinguished from the case of a contingent creditor. A contingent creditor is a person to whom a *1436 corporation owes an existing obligation out of which a liability on its part to pay a sum of money will arise in a future event, whether that event be one which must happen or only an event which may happen: Community Development Pty Ltd v Engwirda Construction Co (1969) 120 CLR 455 and In re International Harvester Australia (1983) 1 ACLC 700 , 703. Again, the liabilities in this case must be distinguished from the case of a prospective creditor, a prospective creditor being one who is owed a sum of money not immediately payable but which will certainly become due in the future either on some date which has already been determined, or on some date determinable by reference to future events: *Stonegate Securities Ltd v Gregory [1980] Ch 576* and Comr of Taxation v Simionato Holdings Pty Ltd (1997) 15 ACLC 477 .

"60. The distinction is vital because whilst contingent or prospective creditors are taken into account in assessing solvency, possible future claims that might crystallise are not. The great probabilities are that if Amaca and Amaba were to go into provisional liquidation now, then the only claims that would be paid by the liquidator would be those which have crystallised and, after paying the doubtless heavy expenses of liquidation, there would be a distribution of surplus funds to the shareholder Medical Research and Compensation Foundation which would be used for the purpose of the alleged charitable fund. The future creditors would get nothing and this may very well be the case even if the claim matured the day after the liquidation commenced.

"61. Accordingly, the choice between continuing to pay claims at present and going into liquidation will not advantage the future claimants one whit. Moreover, going into liquidation would preclude any possibility of further funds being injected into the pool to meet future claims. The material before the court shows that there is at the very least a realistic possibility that there might be a further injection of funds into the pool.

"62. It is very difficult to see any other course that could be taken other than liquidation or continuing to go on as usual. Of course, some completely unanticipated event might occur such as the large injection of funds or special legislation, but at least, short of this, there is no way in which any alternative method can protect the future claimants."

"66. Further, there can be no scheme of arrangement under section 411 of the Corporations Act because any arrangement would not be between the members or the creditors as defined. It would seem also that there can be no scheme of arrangement under section 510 of the Corporations Act under which the companies could set aside a fund for future creditors as, unless all creditors consented, there could be no arrangement at all.

"67. This must be so even though the authorities show that there is a lesser test as to who is a creditor for a scheme of arrangement, namely, a person with an arguable case that it is an actual or contingent creditor: see e g National Australia Bank Ltd v Market Holdings Pty Ltd (2000) 50 NSWLR 465 , 469 and Bovis Lend Lease Pty Ltd v Wily (2003) 45 ACSR 612 , 685. The reason for this is that there is still the requirement to show an actual or contingent debt merely that it is arguable rather than established: see also Dean-Willcocks v Soluble Solution Hydroponics Pty Ltd (1997) 42 NSWLR 209 ."

*1437

63 I have carefully considered what is said in Edwards's case. The grounds given for the assumption that future tort claimants are not contingent creditors was at the centre of the submissions before me. While not suggesting that the assumptions are not correct as a matter of Australian law, they were not the subject of debate or submissions in Edwards's case. There is nothing in Edwards's case which causes me to revise either my conclusion or my reasons as to the status of future tort claimants as creditors for the purposes of schemes of arrangement and company voluntary arrangements,

provided that they have been exposed to asbestos. I agree that a person who has not been exposed to asbestos is not a contingent creditor. One of the other assumptions made in Edwards's case was that if there were a surplus in a liquidation it would be payable to shareholders and would not be available to pay tort claimants whose causes of action accrued after the commencement of the liquidation. I heard submissions to the same effect as a matter of English law, which I rejected for the reasons given in paras 106–107 of my judgment in *In re T & N Ltd [2006] 1 WLR 1728* . Again I see no reason to revise my conclusion or reasons on that issue.

## Contingent contribution claimants: status as creditors

64  Asbestos-related diseases may be divided between the malignant and the non-malignant. Non-malignant conditions, such as asbestosis and pleural thickening, are the result of a cumulative exposure to asbestos. Where a claimant with such a condition has been exposed to asbestos by more than one employer, liability is divided between each employer and the employee has a separate claim against each employer for its share of the loss. In respect of these divisible diseases, no claims for contribution between employers can arise.

65  In contrast, malignant diseases, such as mesothelioma and lung cancer, may result from a single exposure to asbestos. In the present state of scientific knowledge, it is impossible for a claimant to establish which of a number of employers is responsible for the exposure which caused the disease. In these circumstances, the *House of Lords held in Fairchild v Glenhaven Funeral Services Ltd [2003] 1 AC 32* that, rather than the claim failing due to an inability to prove causation against any particular employer, the claimant was entitled to claim damages against all or any of the employers who had exposed him to asbestos, and had materially increased the risk of contracting the disease. Until the decision of the *House of Lords in Barker v Corus UK Ltd [2006] 2 AC 572* , it was widely thought, and the Court of Appeal in that case held, that the employee could obtain judgment for the full amount of his damages against any of the employers, who would then be liable to make contribution claims against the other employers. The House of Lords reversed the decision of the Court of Appeal and held that the liability to pay damages to the claimant must be apportioned among the employers. There will not accordingly be contribution claims between employers where each employer has exposed an employee to asbestos if the exposure occurred on different occasions or over different periods of time. There remain circumstances in which contribution claims may be made, for example where T & N and another person are liable in respect of the same period or incident of exposure to asbestos. An example would be a case in which T & N failed to provide **\*1438** adequate safety equipment to an employee who was working on the premises of another person who in turn failed to provide a safe workplace or who was liable as occupier of the premises. Most claims will now be made under the Civil Liability (Contribution) Act 1978 , although any case in which the relevant damage occurred, viz, the undetected commencement of the disease, before 1 January 1979 may be governed by the Law Reform (Married Women and Tortfeasors) Act 1935 which for present purposes is substantially the same.

66  The relevant provisions of the Civil Liability (Contribution) Act 1978 are sections 1(1) to (4) and 2(1) and (2) :

"1

(1) Subject to the following provisions of this section any person liable in respect of any damage suffered by another person may recover contribution from any other person liable in respect of the same damage (whether jointly with him or otherwise).

"(2) A person shall be entitled to recover contribution by virtue of subsection (1) above notwithstanding that he has ceased to be liable in respect of the damage in question since the time when the damage occurred, provided that he was so liable immediately before he made or was ordered or agreed to make the payment in respect of which the contribution is sought.

"(3) A person shall be liable to make contribution by virtue of subsection (1) above notwithstanding that he has ceased to be liable in respect of the damage in question since the time when the damage occurred, unless he ceased to be liable by virtue of the expiry of a period of limitation or prescription which extinguished the right on which the claim against him in respect of the damage was based.

"(4) A person who has made or agreed to make any payment in bona fide settlement or compromise of any claim made against him in respect of any damage (including a payment into court which has been accepted) shall be entitled to recover contribution in accordance with this section without regard to whether or not he himself is or ever was liable in respect of the damage, provided, however, that he would have been liable assuming that the factual basis of the claim against him could be established."

"2

(1) Subject to subsection (3) below, in any proceedings for contribution under section 1 above the amount of the contribution recoverable from any person shall be such as may be found by the court to be just and equitable having regard to the extent of that person's responsibility for the damage in question.

"(2) Subject to subsection (3) below, the court shall have power in any such proceedings to exempt any person from liability to make contribution, or to direct that the contribution to be recovered from any person shall amount to a complete indemnity."

67 The definition of EL claimant includes any person who has or may at any time in the future have a claim for contribution against T & N arising out of other types of EL claims. Plainly any existing judgment against T & N or agreement with T & N for the payment of contribution creates a debt in respect of which the contribution claimant is a creditor. Beyond that, the following issues were raised. First, does any contingent liability exist before *1439  a judgment is entered or agreement is made to pay contribution? Secondly, in circumstances where a person has been wrongfully exposed to asbestos by T & N and by another employer but has yet to develop any disease or condition recognised as actionable damage and may never do so, so that either (applying my decision in *In re T & N Ltd [2006] 1 WLR 1728* ) he is a creditor of each employer for the purposes of section 425 , or as an employee he has an accrued cause of action in contract for nominal damages against each, is the other employer a creditor for the purposes of section 425 in respect of a contingent claim for contribution? Thirdly, in circumstances where the employee has yet to be exposed to asbestos by another employer or has yet to be employed by another employer who may expose him to asbestos, are such actual or potential employers creditors of T & N for the purposes of section 425 in respect of possible future contribution claims.

68 The position of the parties on these issues was a little complicated. On the third issue, only Mr Trower for the EL insurers submitted that actual or potential employers in those circumstances could be creditors for the purposes of section 425 . On the first and second issues, Mr Snowden for the administrators and Mr Trower submitted that there was a contingent liability before judgment or agreement and that the employers identified in the second issue were creditors. Mr Field provided assistance on the subject of contribution claims but did not adopt any position on the issues. Mr Chivers for Cape submitted a skeleton argument which set out arguments against the position adopted by the administrators and/or the EL insurers on these issues, but was instructed not to pursue the arguments in oral submissions.

69 The first issue is whether even an actual contribution claimant is a contingent creditor, and thus a creditor for the purposes of section 425 , before his claim has been quantified by judgment or agreement. The argument is that there is no liability of any sort until the court has exercised its discretion under section 2 of the 1978 Act, or until the parties have agreed a sum by way of contribution. The argument is based on the decision of the *Court of Appeal in Glenister v Rowe [2000] Ch 76* that a party to litigation does not have a provable debt in the bankruptcy of another party in respect of pre-bankruptcy costs unless the order for costs in its favour was made before the commencement of the bankruptcy. The grounds for the decision, in which *In re Sutherland, decd [1963] AC 235 was distinguished* , was that the existence of any liability for costs was based on the exercise by the court of its discretion to make a costs order and that until the discretion was exercised there was no liability, actual or contingent.

70 It might be enough for present purposes to draw attention to the fact that Glenister v Rowe was concerned only with the status of provable debts in bankruptcy and not with any other and different question, such as the meaning of creditors in section 425 . As I have already mentioned, this was emphasised by the *Court of Appeal in R (Steele) v Birmingham City Council [2006] 1 WLR 2380* . Creditors for the purposes of section 425 are not restricted to creditors with provable debts in bankruptcy or liquidation.

71 In any event, I do not consider that a claim for contribution is analogous to a claim for litigation costs. The right to any costs is entirely dependent on an exercise by the court of its discretion to order costs. In contrast, section 1 of the 1978 Act creates an entitlement to contribution, *1440* while section 2 is concerned with the assessment of the amount of contribution. Section 1(2) states that a person "shall be entitled to recover contribution" notwithstanding certain circumstances, and section 1(3) provides that a person "shall be liable to make contribution" notwithstanding certain other circumstances. Likewise section 1(4) states that a person who has compromised a claim against him "shall be entitled to recover contribution". The creation by section 1 of a right to recover contribution is recognised by section 10 of the Limitation Act 1980 . It creates "a cause of action in its own right": *Virgo Steamship Co SA v Skaarup Shipping Corpn [1988] 1 Lloyd's Rep 352* , 357, per Hirst J. It would be a very odd result that a person who has issued a claim to enforce an accrued cause of action for contribution was not a contingent creditor as regards any contribution which he might recover.

72 Section 2 of the 1978 Act is in terms directed not to the right to contribution but to determining "the amount of the contribution recoverable from any person". Such assessment must be of the amount found by the court to be just and equitable having regard (but not exclusively) to the extent of responsibility for the damage in question: *Re-Source America International Ltd v Platt Site Services Ltd [2005] 2 Lloyd's Rep 50* and Brian Warwicker Partnership plc v HOK International Ltd [2006] PNLR 79 . The court may decide to award no contribution at all, but it is telling that this is expressed in section 2(2) as a "power in any such proceedings to exempt any person from liability to make contribution". Unless exempted, the liability exists, albeit in an amount to be assessed by the court.

73 In my judgment, therefore, an actual or potential claimant for contribution is a creditor for the purposes of section 425 , at the latest when it has an accrued right to claim contribution.

74 The second issue raises for consideration whether a potential claimant for contribution is a creditor for the purposes to section 425 at any earlier stage. The right to recover contribution accrues when the contribution claimant is held liable in respect of relevant damage by judgment or arbitration award or when he compromises the claim. There will be an obvious right to claim contribution, contingent on the claimant being held liable in respect of the relevant damage, once the employee has accrued causes of action against the two employers. The potential contribution claimant in such circumstances is a creditor for the purposes of section 425 .

75 This assumes that the person with the principal claim has suffered the actionable damage. If that person has been exposed to asbestos by two potential defendants, but has not as yet suffered any actionable damage, he will none the less be a creditor of those potential defendants for the purposes of section 425 : *In re T & N Ltd [2006] 1 WLR 1728* . In each case the potential defendant has been guilty of wrongful acts or omissions, in breach of common law, statutory or contractual duties of care, and its liability depends entirely on whether a disease or condition recognised as actionable damage develops as a result. The contingency is the same, whether it is the victim's claim for damages or the claim for contribution which is being considered. In these circumstances, the contribution claimants are for the purposes of section 425 as much creditors of each other as the victim is a creditor of each.

*1441*

76 The third issue cannot arise under the law as settled by *Barker v Corus UK Ltd [2006] 2 AC 572* . It related to the status of possible contribution claimants who either have yet to expose the victim to asbestos or, still more remotely, have yet to employ him. The latter cannot be creditors. The victim may never be employed again and, even if he is, his future employers are unknown and unknowable. As regards present employers who have yet to expose an employee to asbestos, they are not contingent creditors of former employers who did expose the employee to asbestos, any more than the employee is a creditor of his present employer in respect of possible future exposures. Nothing has been done by the present employer which could result in either a claim against him or a claim for contribution by him. The prerequisite for the creation of a contingent liability as discussed in *In re Sutherland, decd [1963] AC 235* is missing.

## Claimants under the Fatal Accidents Act 1976: status as creditors

77 Regrettably, some of the employees of T & N who develop asbestos- related diseases will die as a result of those diseases. This is likely to be true of those who develop mesothelioma and may be true in the case of other diseases such as lung cancer. Subject to the satisfaction of certain criteria, if

English law is applicable the dependants of such employees at the date of death will have a cause of action against T & N under the Fatal Accidents Act 1976 , as amended. It is a new cause of action arising on the employee's death and it is distinct from any cause of action which the deceased's estate may have under the Law Reform (Miscellaneous Provisions) Act 1934 . As a matter of procedure, it is in the first instance for the executor or administrator to bring the action, but all or any of the dependants may bring an action if there is no executor or administrator or no action has been brought within six months after death. In either case such action is brought for the benefit of the dependants and only one action may be brought.

78 There are two principal heads of damages. First, damages for bereavement of an amount currently fixed at £10,000 will be awarded but only for the benefit of the deceased's wife, husband or civil partner, subject to immaterial special provisions. Secondly, there are damages for "the injury resulting from the death to the dependants respectively". This will mean pecuniary loss, either directly by the loss of actual or prospective financial support or indirectly by the loss of gratuitous services provided by the deceased. In order to qualify for a claim in respect of financial loss, a dependant must (a) come within a defined category of dependant set out in section 1(3) and (b) have been wholly or partly dependent financially on the deceased at the time of death. An action for such damages will not lie where the deceased had already recovered final damages by action or agreement in respect of his claim resulting from the exposure to asbestos. Damages in respect of funeral expenses may also be awarded.

79 It is clear that where a former employee has died, without compromising his claim, his dependants with the right to make claims under the 1976 Act against T & N are creditors for the purposes of section 425 of the Companies Act 1985 . They have an accrued cause of action. It may be that some dependants do not appreciate that they have the benefit of these claims, because they are unaware that the deceased was employed by T & N or was exposed to asbestos or that such exposure caused or may have caused *1442 his death or that such claims exist in law. These are not factors which prevent their proper classification as creditors. They are factors which a court could take into account in exercising its discretion to sanction the scheme.

80 There are a number of categories of potential or contingent claimants under the 1976 Act. First, there are current dependants of employees who have developed an asbestos-related disease. They will in due course have claims as dependants, subject to three contingencies: the employee's death is caused by the disease (or a disease which develops from it), the claimants are dependants at the time of death and the employee does not compromise his claim before his death. The first is a contingency that has yet to occur. The second and third must be satisfied but they will be unless there is a subsequent change in circumstances. Applying the reasoning of my decision in In re T & N Ltd [2006] 1 WLR 1728 that future tort claimants are creditors for the purposes of section 425 , the current dependants of the employee who has developed an asbestos-related disease are also creditors for those purposes.

81 Secondly, there are current dependants of an employee who was exposed to asbestos during his employment with T & N but has not as yet developed an asbestos-related disease. In the case of his dependants there is therefore the additional and prior contingency that he develops an asbestos-related disease which causes his death. Although the contingency is now more remote, the same reasoning underlying the decision that future tort claimants are creditors means that these dependants are also creditors for the purposes of section 425 .

82 Thirdly, an employee, who was exposed to asbestos during his employment with T & N and who either has already developed an asbestos- related disease or may do so in the future, may at the date of his death have dependants who are not currently dependants. Obvious examples are future spouses or civil partners and children who are born in the future. Although it is likely that there will be some future dependants, the class does not by definition exist at present.

83 Mr Trower submitted that the scheme could become effective now so as to be binding on these potential claimants, as and when they become dependants with a claim under the 1976 Act, by virtue of the approval of the employees at the meetings of the EL claimants. He correctly pointed out that, by settling his own claim against T & N, an employee deprives his dependants of their separate claim under the Act: Read v Great Eastern Railway Co (1868) LR 3 QB 555 and Nunan v Southern Railway Co [1923] 2 KB 703 . Mr Field told me that in practice those diagnosed with mesothelioma are faced with the choice, in the year or so during which they survive, between reaching a final settlement or adjudication of their claim through the fast-track procedures which have been established to deal with these cases or letting their dependants in due course pursue their claims under the Act. If the effect of

the scheme was to settle the employees' claims against T & N, this would have the effect of depriving their dependants of their statutory claims. However, as already discussed, the scheme deals with their claims against the EL insurers, but not against T & N. Mr Trower submitted that the employees could by an appropriate provision to that effect in the scheme compromise their future dependants' claims against the *1443 EL insurers. In my judgment they have no power to do so and such a scheme would not bind their future dependants. The statutory claims of dependants are personal to them, as are the rights in due course vested in them under the 1930 Act. The employees have no authority under the Act or at common law to compromise or waive those claims, either individually or through a scheme of arrangement.

## Composition of classes

84 The issue here is whether, as the administrators propose, there should be a single meeting of all EL claimants, in the case of each company, or whether they divide into two or more classes, so requiring separate meetings.

85 Separate meetings are required only if there are separate classes of creditors. It is the rights of creditors, not their separate commercial or other interests, which determine whether they form a single class or separate classes: *In re BTR plc [1999] 2 BCLC 675* , *In re Hawk Insurance Co Ltd [2001] 2 BCLC 480* and In re UDL Holdings Ltd [2002] 1 HKC 172 , 184–1 85, per Lord Millett NPJ. Conflicting interests can be taken into account when considering whether, as a matter of discretion, to sanction the scheme. The rights of those included in a single class need not be identical, provided they are "not so dissimilar as to make it impossible for them to consult together with a view to their common interest": *Sovereign Life Assurance Co v Dodd [1892] 2 QB 573* , 583, per Bowen LJ.

86 The application of this test requires a consideration of (a) the rights of creditors in the absence of the scheme and (b) any new rights to which the creditors become entitled under the scheme. If there is a material difference between the rights of different groups of creditors under (a) or (b), they may constitute different classes for the purposes of section 425 . Whether they do so will depend on a judgment as to whether such differences make it impossible for the different groups to consult together with a view to their common interest: *In re Anglo American Insurance Ltd [2001] 1 BCLC 755* , *In re Hawk Insurance Co Ltd [2001] 2 BCLC 480* and *In re Telewest Communications plc (No 1) [2005] 1 BCLC 752* .

87 In considering the rights of creditors which are to be affected by the scheme, it is essential to identify the correct comparator. In the case of rights against an insolvent company, where the scheme is proposed as an alternative to an insolvent liquidation, it is their rights as creditors in an insolvent liquidation of the company: *In re Hawk Insurance Co Ltd [2001] 2 BCLC 480* . Those rights may be very different from the creditors' rights against a company which is solvent and will continue in business. In the latter case the creditors' rights against the company as a continuing entity are the appropriate comparator: *In re British Aviation Insurance Co Ltd [2006] 1 BCLC 665* .

88 In the present case, although the schemes will be proposed between the companies and their respective EL claimants, it is the EL claimants' actual or potential rights against the EL insurers, arising as a result of the operation of the 1930 Act, which are to be compromised. Those rights are themselves subject to the insurers' coverage and avoidance claims. It is the existence of disputed rights against the insurers which provides the appropriate comparator. Without the scheme, the litigation with the *1444 insurers is not compromised and the EL claimants, whether or not they yet have rights against the EL insurers and whatever stage any claims against T & N or the EL insurers have reached, share an interest in the litigation and its resolution.

89 It is important to note that the scheme will put in place a run-off, against the trust fund, with claims being paid at a percentage designed to ensure so far as possible that all admissible claims are treated equally over the term of the run-off. In contrast to a cut-off scheme, such as sanctioned in *In re Hawk Insurance Co Ltd [2001] 2 BCLC 480* and proposed in *In re British Aviation Insurance Co Ltd [2006] 1 BCLC 665* , contingent claimants will not be required to value their claims and actual claimants will not be paid in competition with values attributed to contingent claims. Accordingly, in my judgment, EL claimants with the benefit of existing judgments against T & N or final agreements with T & N are not in a different position from those who have made claims which have not yet been adjudicated or from those who could make claims but have yet to do so. The provisions which require claimants with claims as yet unestablished to follow the review procedures set out in the trust distribution procedures, in place of ordinary litigation, does not put them in a significantly different

position in the context of this scheme from claimants with the benefit of judgments or settlement agreements. Nor in the context of this scheme, which establishes a run-off, is there a significant difference between those with present claims and those who may have claims in the future. It is a core objective of the scheme to treat their claims, once made, on an equal footing.

90 None of the parties before the court on this application submitted that the differences discussed above led to the conclusion that there were separate classes.

91 Recently the administrators have included in the trust distribution procedures ("TDP") provision for regular reviews every five years of the values for the different diseases included in the TDP of the expedited review process and for the maximum values applied under the individual review process. In this way, adjustments can be made on a regular basis by reference to changes in the amounts of damages awarded by the courts. There is nothing in this aspect of the proposals which requires the creation of separate classes, and it would in any case be impossible to do so, because the date at which any individual may develop a disease is unknown.

92 There was however one issue as to classes on which there were opposing submissions. This related to the treatment of contribution claims under the TDP. Mr Chivers for Cape submitted that the contribution claimants constituted a separate class from the other EL claimants. Their claims would be subject to a "contribution claimants' formula" which was based on the relative duration and nature of exposure during different periods of employment. After applying the payment percentage, there would be a further deduction of any sums already paid out of the fund in respect of the employee whose claim gave rise to the contribution claim. It was in particular this last feature at which the main part of Mr Chivers's submissions was directed. The argument on this issue was heard before the *House of Lords gave judgment in Barker v Corus UK Ltd [2006] 2 AC 572* . In the light of the judgment in Barker's case the relevant parts of the TDP are no longer appropriate and the administrators have deleted them. Instead, in *\*1445* those cases where contribution claims are made, and it is not presently anticipated that there will be many of them, the claims will be determined by an individual review by the trustees so as to establish an appropriate apportionment factor on the facts of each case. The provision for a further deduction has also been removed.

93 While the claim of an employee is for damages and depends only on the present or future development of a disease or other personal injury, the claim of an employer is for contribution and depends on an employee who has suffered personal injury making a successful claim against the employer. Mr Chivers accepts that this contingent aspect of the employers' claims does not of itself make them a separate class. The nature of the claims against the EL insurers, both of employees and employers, is for payment in accordance with the policy terms as and when the claims are established. It makes no significant difference that the claims are for damages or for contribution or, in relation to both employees and employers, that some are actual and others are contingent. Mr Chivers also accepted that it made no difference that some creditors in a class might have other means of recovering their claims, for example a claim against another person, provided that their rights against the company or, in this case, the EL insurers were not so dissimilar as to require separate classes.

94 Mr Chivers had two grounds for his submission that there should be a separate class comprising contribution claimants. First, their claims arise only if employees, who are other members of the proposed single class, make claims against them. He submitted that where the claims of some creditors depend on action against them by other creditors, the rights of these two groups of creditors are so dissimilar as to make it impossible for them to consult together in one meeting. In effect, one group of creditors can shift the burden of loss on to another group. This is not, in my judgment, a distinction which requires the creation of separate classes. The effect of the scheme is to compromise claims against the EL insurers. All members of the proposed single class have the same claim against the EL insurers, that is, to be paid their claims for damages or contribution. Likewise all such rights are equally vulnerable to the coverage and avoidance issues taken by the EL insurers. It makes no difference to those rights whether the claims are made by employees or by other employers.

95 The second and principal submission of Mr Chivers related to the further deduction from claims of amounts, if any, already paid in respect of the underlying claim. As this feature has now been deleted, it is no longer necessary to consider it in detail. My conclusion was, for the reasons outlined below, that it did not result in the creation of a separate class of contribution claimant.

96 If the effect of the scheme was that other employers would always receive either nothing or a lesser percentage of their claims than employees, it would result in separate classes and meetings.

There would be a clear and significant difference of treatment between the two groups when compared with their present position as against the EL insurers. However, only in certain circumstances would the deduction have fallen to be made. If the employee's claim was paid first by the other employer, its contribution claim against the fund would not be differently treated. In a different example, if the claim was made first against the fund and the fund paid to the employee *1446 more than its apportioned share of the liability, it would on normal principles have a contribution claim against other employers. However, under the terms of the scheme and the trust deed, no contribution claims would be made by the fund. Because most of the other employers were confined to a fairly small group, this provided a counter-balancing advantage to them. The balance was not, however, level because it was likely on the whole that employees worked longer for scheme companies than for other employers. A more general benefit was that the greater the payments by the fund to employees, the lower the claims which then may be made against other employers.

97 A further factor was that the scheme did not compromise or affect claims against T & N itself. Other employers who had contribution claims which were not satisfied in whole or in part by the fund would still be able to make their claim against T & N. Depending on T & N's financial position, T & N might be able to make a payment which eliminated or reduced any difference in treatment between contribution claimants and other claimants.

98 Miss Bryant for the administrators relied on all the matters referred to above but her principal submission in favour of one class and hence one meeting was that the fundamental question facing employees and employers alike was whether the scheme represented a sensible way of dealing with their claims against the EL insurers, all of which are subject to the same risk that the EL insurers might succeed in avoiding the policies or limiting the coverage. She submitted that the admittedly different treatment of their respective claims in certain circumstances was not significant in comparison and did not involve such dissimilarity in rights as to prevent them all consulting together with a view to their common interests as creditors.

99 In my judgment, Miss Bryant was correct in her approach. She was right that the basic issue facing all claimants is whether the litigation should be compromised on the proposed terms. The comparator in the absence of the scheme is not the claimants' rights against the insurers but their disputed claims. They are not exchanging a clear right against insurers for their rights under the scheme. The prospect of different treatment in certain events should not mask that in other circumstances there would be identical treatment, that it could not be known whether such difference would arise regularly or rarely, and that there were counter-balancing benefits of some value under the scheme. I concluded that the possibility of different rights under the scheme was not such as to require a separate meeting of the contribution claimants. Their rights under the scheme, viewed as a whole, and their common interest in the litigation with the insurers enables them to be part of a single class with the employees for the purpose of considering the scheme with a view to their common interest. Submissions on the fairness of this aspect of the scheme can be made at the sanction hearing. By recording their votes, the views of contribution claimants can be assessed.

100 The changes to the proposals mean that all contribution claims will be subject to individual review so as to determine the appropriate apportionment on the facts of the case, whereas other claims will be subject to the expedited review procedure unless a claimant elects for an individual review. The lower costs of the expedited procedure is reflected in a small financial advantage in using that route, but an expedited procedure is not appropriate to the possible contribution claims, whose assessment will very *1447 much depend on their own facts. These changes have not, as I understand it, been notified to Cape. The administrators submit, and I accept, that this difference does not have a significance which would require the creation of separate classes, particularly in the light of the factors discussed in the preceding two paragraphs.

## Employers' Liability (Compulsory Insurance) Act 1969

101 The 1969 Act imposes on employers an obligation to insure against liability for personal injuries sustained by employees in the course of their employment. Section 1(1) provides:

> "Except as otherwise provided by this Act, every employer carrying on any business in Great Britain shall insure, and maintain insurance, under one or more approved policies with an authorised insurer or insurers against liability for bodily injury or disease sustained by his employees, and arising out of and in the course of their employment in

Great Britain in that business, but except in so far as regulations otherwise provide not including injury or disease suffered or contracted outside Great Britain."

Section 5 creates an offence:

"An employer who on any day is not insured in accordance with this Act when required to be so shall be guilty of an offence and shall be liable on summary conviction to a fine not exceeding £200; and where an offence under this section committed by a corporation has been committed with the consent or connivance of, or facilitated by any neglect on the part of, any director, manager, secretary or other officer of the corporation, he, as well as the corporation shall be deemed to be guilty of that offence and shall be liable to be proceeded against and punished accordingly."

The offence created by section 5 is one of strict liability. The 1969 Act does not create any civil liability for breach of statutory duty: *Richardson v Pitt- Stanley [1995] QB 123* .

102 Two issues were raised in relation to the 1969 Act. First, would the scheme combined with the compromise of the claims of and against the EL insurers involve a contravention of the Act? Secondly, as a result of my ruling that future dependants of employees were not creditors for the purposes of section 425 of the 1985 Act, it was proposed to amend the EL policies to exclude claims under the Fatal Accidents Act 1976 by future dependants from cover under the policies but on terms that they would be entitled to claim against the trust fund as if they were EL claimants. The issue was whether this amendment to the EL policies would contravene the 1969 Act.

103 The essential features of the proposed arrangements for present purposes are as follows. The rights of the EL claimants against the EL insurers in respect of EL claims will be assigned to the trustees. EL claims mean, in short, present and future asbestos-related claims. The rights against the EL insurers are either presently vested in the EL claimants, as regards liabilities which have been incurred within the meaning of the 1930 Act, or would in the future be vested in EL claimants if T & N were in administration or liquidation when liability to them was incurred. The *1448* EL claimants will be entitled to make claims against the trust fund and will agree not to make claims against the EL insurers. The trustees and T & N will also agree not to make claims on the policies in respect of the EL claims. In addition, as I have mentioned, consideration has been given to whether the EL policies could be amended to remove cover for claims under the Fatal Accidents Act 1976 by future dependants, but on terms that they will be entitled to claim against the trust fund as if they were EL claimants.

104 As regards the first issue, there are two points to note. First, there is nothing in the 1969 Act which curtails the right of an insurer who has issued an approved policy within the meaning of the Act from avoiding the policy on grounds of non-disclosure. The Act imposes obligations on employers; it does not restrict the legal rights of insurers, although the Act is no doubt relevant to the construction of a liability policy taken out in compliance with the Act. In *Dunbar v A & B Painters Ltd [1986] 2 Lloyd's Rep 38* , the problems associated with avoidance were noted, but the right of an insurer to avoid was not doubted. Secondly, there is nothing in the 1969 Act which curtails the rights of employees to compromise claims of or against insurers where the employer's rights against insurers have been transferred to employees under the 1930 Act. There is no basis for suggesting that an individual employee could not by agreement compromise his claim against insurers and the effect of the scheme is to bind all EL claimants to a compromise of their actual or potential claims against the EL insurers to the same extent as if by individual agreement. Nor can it be the case, if the EL claimants compromise the rights transferred to them by the 1930 Act but the liability of T & N to them remains, that T & N is thereafter in breach of the 1969 Act for failure to insure or maintain insurance against that liability.

105 The second issue raises a different question. It involves not a compromise binding on EL claimants by reason of a scheme of arrangement but an amendment to the policies agreed by the employer and the insurers to exclude a certain class of potential claim. The amendment under consideration will not in substance treat the relevant potential claimants any differently from the EL claimants bound by the scheme. They will be able to claim against the fund as if they were EL claimants and their claims will be subject to review and assessment under the TDP in the same way as EL claims.

106 Submissions were made on this issue by Mr Stanley for the administrators, by Mr Field on behalf

of the employees and dependants, and by Mr Terry for RSA as one of the EL insurers. All submitted that the proposed amendment would not involve a contravention of the 1969 Act, but on a number of different grounds and there was in some respects dispute between them.

107 There were two principal and separate strands to the submissions. The first was concerned with whether the claims to be excluded were required by the 1969 Act to be covered by insurance. Section 1(1) requires employers to insure "against liability for bodily injury or disease sustained by his employees". It is common ground that this is not restricted to claims by employees. Mr Field submitted that "bodily injury or disease" did not include death, while claims under the Fatal Accidents Act 1976 are in respect *1449* of wrongful death. He drew attention to the statutory scheme for compulsory road traffic liability insurance which considerably pre-dates the 1969 Act. Now contained in the Road Traffic Act 1988, section 145(3)(a) requires that the policy must cover liability in respect of death or bodily injury. Mr Field submitted that the absence of any reference to death in section 1 of the 1969 Act was telling. In the context of a statute which makes breach of section 1 an offence of strict liability, it was appropriate to construe the section strictly and to resolve any ambiguity in the employer's favour. However, sections 145(4)(a) and 145(4A) of the Road Traffic Act 1988 suggest an assumption that liability in respect of death would be covered by employers' liability insurance under the 1969 Act and it has generally been assumed that claims under the Fatal Accidents Act 1976 are covered by the 1969 Act. As death in this context will usually, though not invariably, be preceded by bodily injury or disease, and as the 1969 Act is not confined to claims by employees, it is surprising if death is not intended to be covered. There is no apparent policy reason for not doing so and, as a matter of ordinary language, bodily injury could include death.

108 Mr Stanley did not support Mr Field's submission but submitted that it was at least arguable that a liability to dependants under the 1976 Act was not within section 1 of the 1969 Act, unlike the deceased's claim which survives his death and can be maintained by his personal representatives by virtue of the Law Reform (Miscellaneous Provisions) Act 1934 . He pointed out that a claim under the 1976 Act is a claim to compensate the dependants, principally for their loss of the deceased's support. It is a claim for their economic loss, and not the economic loss of the deceased or his estate. Damages may also be awarded for bereavement, which, while not an economic loss, is a distinct loss suffered by the dependants. It was, therefore, arguably not a claim "for bodily injury or disease". Although liability under the 1976 Act depended on death caused by the defendant's acts or omission, damages are awarded not for the death or the personal injury which preceded it but for the distinct losses suffered by the dependants. Mr Stanley identified arguments on the language of the Act and on the policy considerations underlying it, both in support of and against this approach. In particular, as the Act is not confined to claims by employees, the most obvious class of other claimants are the dependants of deceased employees. Moreover, as Mr Field submitted, damages for economic loss are a principal head of damages recoverable by a personal injury claimant, but they are as much damages "for bodily injury" as general damages for pain, suffering and loss of amenity, and it is artificial to differentiate between claims under the 1976 Act and claims for personal injuries on the basis of the component parts of the award.

109 I am strongly inclined to the view that claims under the 1976 Act are not excluded from the scope of the 1969 Act on either of the bases suggested by Mr Field and Mr Stanley but, in light of the view which I take on the other principal submission on this issue, it is unnecessary to form a concluded view on these arguments.

110 The other principal submission was that the proposed amendment to the policies as part of, and on the terms of, an overall compromise of the EL insurers' coverage and avoidance claims did not contravene the 1969 Act. This was Mr Stanley's main submission and it was supported by *1450* Mr Terry, although their analysis of the construction of the 1969 Act to some extent differed. Mr Field submitted that this aspect of the compromise could well contravene the Act, if the Act applied to claims under the 1976 Act.

111 The apparently straightforward provisions of the 1969 Act give rise to some difficult issues of construction. This is principally because, as Mr Stanley identified, section 5 does not sit altogether easily with section 1 . They must however be construed as co-extensive, because the *Court of Appeal held in Richardson v Pitt-Stanley [1995] QB 123* that the 1969 Act operates only in the sphere of criminal law.

112 A liability insurance policy will usually relate to a fixed period, typically one year. This is recognised in section 4(2) of the 1969 Act which requires the compulsory certificate of insurance to be displayed and available for production and inspection "during the currency of the insurance and such

further period (if any) as may be provided by regulations".

113 The cover does not cease at the end of the policy period but continues in respect of the insured events which occurred during that period. Different policies may provide cover against different categories of events occurring during the policy period. Many indemnity policies provide cover against claims made during the policy period, but that was not conventionally the case with employers' liability insurance in 1969 nor does it appear to be what is contemplated by section 1(1) , although the precise requirement of the section is by no means clear. More commonly, employers' liability insurance provided cover against liability for injuries sustained during the policy period. This is in fact the nature of the cover provided by the EL policies issued by the syndicate. It is not, however, the only type of cover which might be provided. The EL policies issued by RSA or its predecessor provide cover against "bodily injury or disease caused during the period of insurance and arising out and in the cause of his employment". A disease may be "caused" long before it is "sustained".

114 The issue which arises is whether the 1969 Act is contravened if, after the expiry of the policy period, the policy is terminated or the terms of the policy are amended so that the policy no longer complies with the Act. Termination may occur as a matter of agreement. The policy might be commuted by the payment of a lump sum by the insurer or terminated with a partial return of premium. This might be agreed in relation to a policy such as that written by the syndicate on the basis of an assessment of the likelihood of claims being made in respect of injuries or diseases sustained during the policy period. More probably it would occur with a policy like RSA's, on the basis of an assessment of the likelihood of diseases developing as a result of causative events during the policy period. Alternatively, termination might involve no agreement by the employer. The insurer might exercise a right to avoid the policy for misrepresentation or non-disclosure, or the insurer might go into insolvent liquidation and the liquidator disclaims the policy.

115 In these circumstances, does termination or amendment after the expiry of the policy period involve a breach of the obligation to "insure, and maintain insurance, under one or more approved policies with an authorised insurer or insurers" and, in any event, does section 1 impose a *1451 continuing obligation to replace it with insurance which complies with the 1969 Act?

116 On one construction of the Act, the requirement is restricted to having in place on each day on which an employer is carrying on business a policy covering events, whether it is injuries and diseases sustained or injuries and diseases caused, on that day. The requirement that an employer "shall insure … under one or more approved policies" refers to taking out the policy, and the requirement to "maintain insurance under one or more approved policies" refers to keeping the policy in place, for example by paying periodic premiums, during the policy period. So construed, it fits easily with section 5 which provides that an "employer who on any day is not insured in accordance with this Act when required to be so shall be guilty of an offence" and liable to a fine. If a policy is avoided or otherwise terminated during the policy period, and there is then a period during which the employer does not have the required insurance, he commits an offence on each day in that period. If the obligation were not only to have insurance in place on that day but also thereafter to maintain the cover in respect of events which occurred on that day, the employer would be committing an offence on each subsequent day unless he could purchase replacement cover. This would apply after the end of the policy period as well as during it. It could very easily prove impossible to obtain replacement insurance, particularly if the policy was terminated after the policy period. It is almost certainly impossible to obtain retrospective cover in respect of asbestos-related diseases. Section 5 is an offence of strict liability and, unless section 1 is confined as indicated above, an employer in these circumstances would either have to cease carrying on business or commit a new offence on each subsequent day for the indefinite future. It is true that this would permit employers to terminate policies voluntarily after the end of the policy period, which are needed for the continuing protection of past and present employees against past events, without committing an offence under the 1969 Act. Although this is unattractive, it would be impossible to confine the effect of section 5 on the termination of policies after the end of the policy period to such cases.

117 It was on grounds such as these that Mr Stanley submitted that the 1969 Act was not directed to the continuing force of policies after the expiry of the policy period. It was a more modest measure, introduced as a private member's Bill and designed to deter employers from carrying on business without current employers' liability insurance. The Act is capable of being easily applied and understood if the effect of the Act is confined in this way, and the creation of a strict liability offence by section 5 is in those circumstances reasonable.

118 Mr Field submitted that the obligation to maintain insurance should be read as having a greater

significance than keeping the policy in place during the policy period. He drew attention to the requirement under section 1(1) to maintain insurance against liability not only for bodily injury but also disease. While an accident and injury normally coincide, that is not the case with disease. The development of a disease will rarely coincide with the breach of duty and, as with asbestos-related diseases, may occur many years later. This was well known in 1969. The growing incidence of asbestosis had led to the Asbestos Industry Regulations 1931 (SR & O *1452* 1931/1140) and appreciation that mesothelioma could result from exposure to small quantities of asbestos dust led to the Asbestos Regulations 1969 (SI 1969/690).

119 Mr Field submitted that these considerations should inform the construction of the obligation to maintain insurance. If the obligation to maintain insurance is restricted to the policy period, it provides little or no protection to those employees who develop diseases, nor does it add to the obligation to insure. Mr Field submitted that it should be read as dealing with the mischief presented by the possibility of a consensual termination of a policy or an amendment restricting the cover provided by the policy. It should be construed as an obligation both to do all acts necessary to keep the cover in place and not to do any acts which would bring it to an end. Section 1 therefore imposes two duties. One is to be insured on each day in respect of occurrences on that day. The other is to maintain, in the sense just described, the relevant policy thereafter. Accordingly, a unilateral termination by the insurer after the policy period, for example by avoidance, would not involve or lead to a breach of obligation or an offence by the employer, whereas a consensual termination or amendment would do so. I should add that Mr Field made clear that, in his submission, the duty to maintain insurance under an approved policy after the end of the policy period presupposed an existing policy and it did not impose a duty to take out a retrospective policy.

120 How then is that approach applied to a compromise of a claim by the insurer to avoid the policy? Mr Field submitted that it depended on whether the insurer's claim was well founded. If it was, the policy was at an end by reason of the insurer's unilateral act and the compromise was a mitigation of its consequences involving no contravention of the Act. If, by contrast, the claim to avoid was not well founded, then it would be the compromise which terminated the policy and there would accordingly be a breach of the obligation to maintain insurance.

121 If correct, this submission would prevent any compromise of a claim to avoid or restrict the coverage provided by a policy taken out in compliance with the 1969 Act. It would be impossible to know whether an offence was committed until the dispute had been finally determined, by which time it would be too late to compromise it. As Mr Stanley and Mr Terry submitted, this could be highly disadvantageous to the employees intended to be protected by the Act, and it is hard to imagine that Parliament intended to make the bona fide compromise of a bona fide dispute a criminal offence.

122 Mr Terry explained the particular concerns of the EL insurers that the scheme, and the amendments to the policies, should not involve the commission of an offence on the part of T & N or the insurers as accessories. Equally they are concerned that the validity of the compromise and the amendments to the policies should not be open to attack. Mr Terry supported the approach taken by Mr Stanley, that the absence of insurance under an approved policy on a particular day to cover events occurring on that day would involve an offence on that day, but not on subsequent days. If a policy were terminated during the policy period, the Act would require a replacement policy for the remainder of the period but if the policy is terminated for whatever reason after the policy period the Act does not *1453* require the employer to obtain replacement insurance. Otherwise it might require the employer to achieve the impossible. Alternatively, and to deal with the mischief of a voluntary commutation after the policy period, Mr Terry submitted that section 1 could be construed as prohibiting a commutation or voluntary amendment, but not as prohibiting either a unilateral avoidance or a termination or amendment as part of a genuine compromise. A compromise after the end of the policy period would neither itself involve the commission of an offence nor lead to the commission of an offence in the future as a result of the absence thereafter of the insurance required by the Act.

123 I am of the view that Mr Stanley's construction of the 1969 Act is correct. I accept, as he does, that it is surprising that an employer could with impunity allow a valid policy to be terminated after the end of the policy period, but the wording of section 5 allows little or no room for distinguishing between different causes for the absence of insurance. If section 5 is construed as applying in such a case, it will apply in the other cases in which, for whatever reason, the employer no longer has cover under an approved policy after the end of the policy period. The Act does not prohibit insurers from avoiding policies, but avoidance may deprive an employer of insurance for which no replacement is available. Parliament cannot have intended the employer to be thereafter guilty of an offence in such

circumstances, nor can it have intended to preclude bona fide compromises. Moreover, there is no material to suggest that the risk of voluntary commutations was seen as a mischief requiring legislative action.

124 It is not necessary in this case to reach a final conclusion that a voluntary commutation would not involve or cause a breach of the 1969 Act. It is enough to say that there is nothing in the Act which precludes a genuine compromise of a genuine dispute, even if that involves an amendment of the policy as proposed in this case as regards future dependants. Nor is T & N thereafter committing an offence by not having a replacement policy to provide against possible liability to future dependants. Still less can it be said that the EL insurers would be guilty of an offence as accessories by entering into a genuine compromise, having in good faith asserted a right to avoid the policies or to limit the coverage. None of this is academic so far as concerns the court's role in relation to the proposed schemes. If they involved or caused the commission of offences, I cannot envisage that the court would sanction the schemes.

## Provision for future amendment

125 The trust deed contains a provision enabling the trustee to amend any part of the TDP, except section 1 which sets out the core objective. The power may be exercised only "to take account of advances in scientific or medical knowledge or other changes in circumstances or in the law in so far as such advances or changes affect EL claims under the TDP". In an application by Cape to convene meetings to consider the scheme of arrangement which it is promoting for the purposes of dealing with asbestos liabilities, I held, after full argument, that the court has jurisdiction to sanction a scheme where either the scheme, or documents which are an integral part of the arrangement, contain provisions for amendment after the scheme has been sanctioned. Similarly, the court would in my judgment *1454 have jurisdiction to sanction the scheme to be promoted by the administrators in this case, with the trust deed containing the amendment provision.

126 Consideration of all aspects of the fairness of the scheme is a matter for the hearing to sanction the scheme. It is none the less appropriate to say at this stage that the amendment provision is not such as would inevitably result in the court declining to sanction the scheme. The TDP is intended to operate over a long period, of 40 years or more. It is highly likely that there will be scientific or medical advances in that time which have a material impact on the operation of the TDP. The same is true of changes in the law, as demonstrated by the recent decisions of the Court of Appeal in Rothwell v Chemical & Insulating Co Ltd [2006] ICR 1458 and the House of Lords in Barker v Corus UK Ltd [2006] 2 AC 572 . "Other material changes" could include, for example, significant changes in projected rates of return. In order to achieve a fair distribution of the trust fund over its expected life, it is almost inevitable that some adjustments to the TDP will be required. It would be impracticable to seek to make them through further schemes of arrangement. The decision as to any changes to be made will be taken by the trustee, which is intended to be a trust company owned by the firm in which the administrators are partners. The trustee is properly regarded as independent and it will be bound by its fiduciary powers in the exercise of the power of amendment.

## Directions as to the meetings

127 I have referred to the impossibility of assembling a comprehensive and reliable database of the names and addresses of former employees of the scheme companies. The best database of retired employees and their surviving spouses is that maintained by the trustees of the T & N pension fund and notice will be sent to each person whose name and address appears in it and who is identified by the administrators as being within the class of EL claimants. It will also be sent to each other person known to the administrators as an EL claimant. Each solicitor known by the administrator to be acting for an EL claimant will be sent the notice in place of the claimant.

128 It is vitally important that all reasonable steps are taken to bring the proposed scheme and the meetings to the attention of those who will be affected by it. As the current addresses of many former employees and their dependants are unknown, the role of advertisements and similar measures is very important. The administrators intend to advertise in a wide range of newspapers, both national and local in areas where scheme companies had factories and other workplaces. There will also be advertisements in specialist legal and other publications. Although not part of the court's directions, notification will be given to trade unions, firms of solicitors who regularly act for claimants, asbestos support groups and others to whom possible claimants may turn for help or who may be able to

*Page 34*

contact possible claimants.

129 The administrators are also taking steps to ensure that the documents sent to possible claimants are as comprehensible as possible, with a question and answer document and a list of organisations which may be able to help them, as well as an explanatory statement in compliance with *\*1455 section 426* of the 1985 Act. The more complex and formal documents will be readily available to possible claimants, as well as being sent to solicitors and others, but will not be sent to EL claimants unless requested. I will direct that a copy of the scheme itself need not be included in the documents to be sent to possible claimants. This is unusual, although not unprecedented. However, I consider it appropriate in the particular circumstances of this case, having regard to the complexity of the legal arrangements and the inevitably technical character of the terms of the schemes and other documents. Their terms are fully explained in the documents which will be sent out and a copy of the scheme and other documents will be supplied on request.

130 In view of the common characteristics of the proposals for all the companies, the meetings will be preceded by a question and answer session open to the EL claimants of all companies. The individual meetings will then follow, and I will direct that it is for the chairman to decide whether, in respect of the meeting of EL claimants of each company, those attending other meetings can remain in the hall. The conduct of meetings convened pursuant to section 425 is subject to the court's direction and it is open to the court to give directions on matters which would generally be for those present at the meeting to decide. Under the general law, it is for those who are both present and entitled to be present at a meeting to decide whether persons not entitled to be present should remain, although assent will be presumed in the absence of objection: *Carruth v Imperial Chemical Industries Ltd [1937] AC 707* , 761 and 767. In the circumstances where 58 meetings are to be held, the right course in my view is to give discretion on this issue to the chairman. I shall likewise give the chairman discretion to adjourn any of the meetings if for whatever reason he considers it to be the right course.

*Order accordingly* .

## Representation

Solicitors: Denton Wilde Sapte ; DWF Solicitors ; DLA Piper Rudnick Gray Cary ; Travers Smith ; Thompsons.

*S J A*
*\*1456*

---

1. Third Parties (Rights against Insurers) Act 1930, s 1 , as amended: see post, paras 28, 29.

2. Civil Liability (Contribution) Act 1978, s 1 : see post, para 66.

3. Companies Act 1985, s 425(1) : "Where a compromise or arrangement is proposed between a company and its creditors, or any class of them, or between the company and its members, or any class of them, the court may on the application of the company or any creditor or member of it or, in the case of a company being wound up, of the liquidator, order a meeting of the creditors or class of creditors, or of the members of the company or class of members (as the case may be), to be summoned in such a manner as the court directs."

4. Employers' Liability (Compulsory Insurance) Act 1969, s 1 : see post, para 101. S 5 : see post, para 101.

(c) Incorporated Council of Law Reporting for England & Wales

© 2018 Thomson Reuters

