**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) **FOR PUBLICATION** |
| | ) |
| AVANTI COMMUNICATIONS GROUP PLC,[1] | ) Case No. 18-10458 (MG) |
| | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) Chapter 15 |
| | ) |

**MEMORANDUM OPINION GRANTING RECOGNITION OF FOREIGN MAIN**
**PROCEEDING AND ENFORCEMENT OF SCHEME OF ARRANGEMENT**

*A P P E A R A N C E S:*

**MILBANK, TWEED, HADLEY AND MCCLOY LLP**
*Attorneys for Avanti Communications Group plc and the Foreign Representative Patrick Willcocks*
1 Chase Manhattan Plaza
New York, New York 10005
By:    Peter Newman, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Recognition and enforcement of schemes of arrangement sanctioned by UK courts has

become commonplace in chapter 15 cases in the United States (the "US").  Schemes of

arrangement are used to restructure balance sheets of foreign companies that often include US

dollar-denominated debt.  The debt may be issued by one company in a large corporate group,

with guarantees of the debt issued by the affiliates.  When the debt is restructured, the scheme of

arrangement often provides that the affiliate-guarantees are released, even though the affiliates are

not parties to the scheme proceeding.  Without releasing those guarantees, it would be difficult to

restructure the debt because the collective assets and earnings of the group are needed to support

the restructured debt without the risk of some creditors that hold the guarantees separately

---

[1]    Avanti Communications Group plc is the Debtor in this chapter 15 case (the "Chapter 15 Case").  The location of the Debtor's corporate headquarters and registered office is Cobham House, 20 Black Friars Lane, London, EC4V 6EB, United Kingdom ("UK").

reaching the assets of the affiliates, endangering the ability of the group to meet its restructured

debt obligations.  This is exactly the situation presented in this Chapter 15 Case of Avanti

Communications Group plc (the "Debtor," or "Avanti").

Third-party releases are often problematic in chapter 11 cases—seemingly prohibited

entirely in some Circuits but permitted under limited circumstances in other Circuits.  Courts must

confront the issue whether bankruptcy courts have the power to grant such releases, and under

what circumstances.  Circuit courts in the Fifth, Ninth, Tenth and the District of Columbia

Circuits have held that the Bankruptcy Code only permits a bankruptcy court to grant releases

against a debtor, and prohibits third-party releases absent consent.  *See, e.g.*, *Maxtile, Inc. v.

Jiming Sun (In re Maxtile, Inc.)*, 237 Fed. Appx. 274, 276 (9th Cir. 2007); *Bank of N.Y. Trust Co.

v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 251-52 (5th Cir.

2009); *Landsing Diversified Props.-II v. First Nat'l Bank and Trust Co. of Tulsa (In re W. Real

Estate Fund, Inc.)*, 922 F.2d 592, 600-02 (10th Cir. 1990) (*per curiam*); *In re AOV Indus., Inc.*,

792 F.2d 1140, 1152 (D.C. Cir. 1986).  Circuit courts in the Second, Fourth, Sixth, Seventh and

Eleventh Circuits have held that third-party releases may be given consensually and, in limited

circumstances, may be approved without consent.  *See, e.g.*, *SE Property Holdings, LLC v.

Seaside Engineering & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070,

1077-78 (11th Cir. 2015); *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347-

50 (4th Cir. 2014); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141-43 (2d Cir. 2005);

*Airadigm Commc'ns., Inc. v. FCC (In re Airadigm Commc'ns., Inc.)*, 519 F.3d 640, 655-57 (7th

Cir. 2008); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280

F.3d 648, 657-58 (6th Cir. 2002).  Issues with consent arise when less than 100% of the impaired

creditors vote to confirm the plan.  In the present case, the Scheme was overwhelmingly approved

by 98% of the only creditor class whose rights were modified by the Scheme, including the Releases of non-debtor affiliate-guarantees. This leaves open the issue whether the Court should recognize and enforce the Scheme in this case that would bind the small number of non-voting impaired creditors to the Releases.

The issues presented by third-party releases in chapter 15 cases have received a different analysis than in chapter 11 cases, focusing primarily on the foreign court's authority to grant such relief. The issue in chapter 15 cases then is whether to recognize and enforce the foreign court order based on comity. Well-settled case law in the UK expressly authorizes third-party releases in scheme proceedings, particularly the release of affiliate-guarantees. The UK Court sanctioned the Avanti Scheme, and the Court concludes that the Avanti Scheme should be recognized and enforced in the US.

Although no objections to the motions seeking to recognize and enforce the Avanti Scheme were filed in this Court—and the Court has already entered an order enforcing the Avanti Scheme—the Court believes that an explanation of the reasons for its ruling is appropriate.

This Chapter 15 Case was filed by Patrick Willcocks, the foreign representative (the "Foreign Representative") of Avanti, a limited liability company incorporated under the laws of England and Wales, in connection with a proceeding (the "UK Proceeding") commenced under Part 26 of the Companies Act 2006 (the "Companies Act") pending before the High Court of Justice of England and Wales (the "UK Court") concerning a scheme of arrangement (the "Scheme").

The Foreign Representative filed a *Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* [ECF Doc. # 2] (the "Verified Petition" and, together with the Voluntary Chapter 15 Petition [ECF Doc. # 1], the "Petition"), seeking (i) recognition of

the UK Proceeding as a "foreign main proceeding" under chapter 15 of the Bankruptcy Code, (ii) granting relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code, (iii) recognizing, granting comity to, and giving full force and effect in the United States, to the UK Proceeding, the Scheme, the Convening Order and the Sanction Order (as defined below), and (iv) enjoining parties from taking any action inconsistent with the Scheme in the US, including giving effect to the releases set out in the Scheme (the "Releases"), including certain releases given in favor of certain of the Debtor's direct and indirect subsidiaries (the "Subsidiary Guarantors") that guaranteed the 2023 Notes (the "Guarantor Releases").

The Petition is supported by the: (i) *Declaration of Patrick Willcocks in Support of Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* (the "Willcocks Declaration," ECF Doc. # 3); and (ii) *Declaration of Nicholas Angel as English Counsel to Debtor in Support of Verified Petition for Recognition of Foreign Main Proceeding and Certain Related Relief* (ECF Doc. # 4). The Foreign Representative also filed the *Second Declaration of Patrick Willcocks in Support of the Verified Petition* (the "Second Declaration," ECF Doc. # 13), indicating that the UK Court sanctioned the Scheme on March 26, 2018. A copy of the UK Court's order sanctioning the Scheme (the "Sanction Order") was attached to the Second Declaration as Exhibit C.

The Avanti Scheme only adjusts the debt of the 2023 Noteholders (as explained below), who overwhelmingly approved the Scheme by a vote of over 98% of that class of creditors. For the reasons set forth below, the Court grants the relief sought in the Petition.

I.    **BACKGROUND**

The following facts are taken from the Petition and the Willcocks Declaration.

A.    **The Debtor**

The Debtor is a public limited company incorporated under the laws of England and Wales, with subsidiaries incorporated in England, Isle of Man, Germany, Sweden, Turkey, Cyprus, Kenya, Nigeria, Tanzania and South Africa.  The Debtor's headquarters and primary place of business is in London, England.  Avanti is a satellite operator providing fixed satellite services in Europe, the Middle East and Africa through its fleet of Ka-band satellites.  The Debtor's satellites are positioned in orbital slots that are recorded in the International Telecoms Union Master International Frequency Register.  Avanti sells satellite data communications services on a wholesale basis to a range of service providers who supply four key end markets: broadband, government, enterprise and backhaul.

Avanti's current fleet consists of two Ka-band satellites, HYLAS 1 and HYLAS 2, which have been commercially operational since April 2011 and November 2012.  A further satellite, Artemis, a multiband satellite acquired from the European Space Agency (ESA) on December 31, 2013, was successfully re-orbited in November 2017.  Avanti also has leased a steerable Ka-band beam, HYLAS 2-B, under an indefeasible right of use agreement entered into in June 2015 with another satellite operator, and also has a payload, HYLAS 3, under construction which will be deployed on the ESA's EDRS-C satellite.  HYLAS 3 is currently under construction and continues to experience delays, but is expected to launch in the first three months of 2019 (although this date is subject to further change).

Avanti's HYLAS 4 satellite, which will complete its coverage of Europe, the Middle East and Africa, has now been constructed after experiencing some delays in the factory and, in

February 2017, was successfully delivered to its launch site in Kourou, French Guyana.  HYLAS 4 is expected to launch soon, aiming to be in orbital position ready for service in July 2018 with sufficient fuel to support the satellite for up to 19 years in orbit.  HYLAS 4 is expected to generate revenue from July 2018, largely within Avanti's existing fixed cost base, and to have a strong positive effect on Avanti's business as it completes EMEA coverage and greatly increases the amount of capacity available in mature markets in Western Europe and new markets in Africa.

### B.    Capital Structure

As of December 31, 2017, Avanti's capital structure was composed of the following material financing agreements.  As of December 31, 2017, Avanti had approximately $68.0 million of cash and cash equivalents.

1.    Avanti is a borrower under a super-senior term loan facility agreement (the "Super Senior Facility Agreement"), maturing in 2020 (the "Super Senior Facility") with approximately $118 million currently outstanding.

2.    Avanti issued its 10%/15% Senior Secured Notes due 2021 (the "2021 Notes") under an Indenture, dated as of January 26, 2017 (as amended, the "2021 Indenture").  Approximately $323.3 million in aggregate principal amount of the 2021 Notes are outstanding.

3.    Avanti issued its 12%/17.5% Senior Secured Notes due 2023 (the "2023 Notes" and together with the 2021 Notes, the "Notes") under an Indenture, dated as of October 3, 2013 (as amended, the "2023 Indenture" and together with the 2021 Indenture, the "Indentures").  Approximately $557 million in aggregate principal amount of the 2023 Notes are outstanding.

4.      The Notes and the Super Senior Facility Agreement are subject to an

intercreditor agreement, dated January 26, 2017 (the "Intercreditor Agreement").

Under the Intercreditor Agreement, lenders to the Super Senior Facility

Agreement rank pari passu amongst themselves and above both the holders of the

2021 Notes (the "2021 Notes Creditors") and the holders of the 2023 Notes (the

"Scheme Creditors").

**C.      The Restructuring**

Due to delays associated with the manufacture, procurement and launch of two of its

satellites, Avanti experienced financial difficulties, with a materially over-leveraged capital

structure.  As a result, Avanti entered into preliminary discussions with Solus Alternative Asset

Management LP, Tennenbaum Capital Partners, LLC and Great Elm Capital Management, Inc.

(collectively, the "Ad Hoc Group," *see* Petition at 356) for a proposed comprehensive

restructuring of its indebtedness that, it hoped, would create a sustainable long-term capital

structure.  On December 13, 2017, the Debtor and certain members of the Ad Hoc Group and

other holders of the Notes (together, the "Consenting Creditors") became parties to a

restructuring agreement (the "Restructuring Agreement"), primarily agreeing to equitize the

2023 Notes and to amend the 2021 Notes.

**D.      The Scheme**

Under the terms of the Scheme, all of the Debtor's outstanding 2023 Notes will be

exchanged (the "Exchange") for 92.5% of Avanti's then enlarged issued share capital (the

"Exchange Shares").  The Exchange Shares will be allocated and issued to the Scheme Creditors

on a *pro rata* basis, based on the principal amount of 2023 Notes held by each Scheme Creditor.

The 2023 Notes debt-for-equity exchange under the Scheme will deleverage Avanti by

approximately $557 million in aggregate principal amount of the 2023 Notes and save

approximately $81 million in interest expense per year.

Under the Scheme, the Scheme Creditors will grant the Releases, including the Guarantor

Releases.  The Releases include releases of any claim or liability, whether present or future,

known or unknown, prospective or contingent, against the Debtor arising directly or indirectly

out of, from or in connection with, the 2023 Notes and the 2023 Indenture, including in respect

of any accrued but unpaid interest, other than any claim or liability arising after the

"Restructuring Effective Date" (as defined in the Scheme).  The Guarantor Releases will

preclude Scheme Creditors from seeking to recover under guarantees of the 2023 Notes provided

by each of the Debtor's subsidiaries.

Avanti previously sought to implement certain aspects of the Restructuring under the

Consent Solicitations.[2]  The Consent Solicitations sought consents from the holders of the 2021

Notes and the 2023 Notes for the following amendments:  (1) Amend the 2021 Indenture to: (a)

extend the final maturity date of the 2021 Notes from October 1, 2021 to October 1, 2022; (b)

change the interest rate payable on the 2021 Notes from 10% Cash Interest or 15% PIK interest

to 9% cash interest or 9% PIK interest for all remaining interest periods beginning October 1,

2017; (c) eliminate the Maintenance of Minimum Consolidated LTM EBITDA covenant

contained in Section 4.30 of the 2021 Indenture, which would require testing on the last day of

each fiscal quarter beginning March 31, 2018 and ending March 31, 2020; (d) permit the

issuance of up to $30 million of additional Indebtedness which will rank junior to or *pari passu*

with the 2021 Notes; (e) eliminate the Margin Increase payable on the 2021 Notes if the relevant

Minimum Consolidated LTM EBITDA threshold was not met; and (f) permit interest payments

---

[2]        Capitalized terms in this paragraph not otherwise defined shall have the meaning assigned to them in the
Consent Solicitations or other relevant noted document.

on the 2021 Notes for all remaining interest periods beginning October 1, 2017 (but excluding

the final interest payment) to be paid as PIK interest if the Debtor does not have sufficient cash

to satisfy the applicable interest coupon (collectively (a) – (f), the "2021 Notes Restructuring

Amendments"); (2) Amend the submission to jurisdiction provision of the 2023 Indenture so that

each party will submit to the exclusive jurisdiction of UK Courts (the "Jurisdiction

Amendment") until the Restructuring Agreement is either terminated or no longer in effect; and

(3) Amend and waive certain bankruptcy-related events of default within the Indentures (the

"Majority Amendments and Waiver," together with the 2021 Notes Restructuring Amendments

and the Jurisdiction Amendment, the "Consent Solicitation Amendments"), to prevent the

occurrence of an event of default under the Notes and related automatic acceleration of the Notes

from being triggered by the filing of a petition for recognition of the Scheme pursuant to chapter

15 of the Bankruptcy Code or by any other part of the Restructuring.

The required consents for each of the Consent Solicitation amendments were received by

February 7, 2018 from holders of 98.09% of the aggregate principal amount of the 2021 Notes,

and Scheme Creditors holding 87.73% of the aggregate principal amount of the 2023 Notes.  The

2021 Notes Restructuring Amendments will become effective conditional on the Restructuring

Effective Date; the other Consent Solicitation Amendments have already become effective.

### E.       The UK Proceeding

To effectuate the Scheme, on February 15, 2018, the Debtor applied to the UK Court for

permission to convene a meeting of its creditors for the purpose of considering and approving the

Scheme.  The UK Court considered that application at the convening hearing on February 19,

2018, and issued the Convening Order which, among other things: (i) ordered the convening of a

meeting of the Scheme Creditors (*i.e.*, holders of the 2023 Notes) (the "Scheme Meeting") on

March 20, 2018; (ii) ordered that notice of the Scheme, together with an explanatory statement and proxy forms for voting at the Scheme Meeting, be made available to the Scheme Creditors; and (iii) authorized the appointment of the Foreign Representative to act as a foreign representative in this Chapter 15 Case. *See* Willcocks Declaration ¶ 3. As only the Scheme Creditors, comprised of the holders of the 2023 Notes, are affected by the Scheme, the Scheme contains only one voting class.

The Debtor convened a meeting of the Scheme Creditors on March 20, 2018. At the Scheme Meeting, Scheme Creditors holding in aggregate $547,320,350, representing 98.3% by value of the outstanding 2023 Notes, attended the Scheme Meeting either in person or by proxy and voted in favor of the Scheme. (*See* Second Decl. ¶ 6.) No Scheme Creditors voted against the Scheme. On March 26, 2018, the Debtor asked the UK Court to sanction the Scheme. The UK Court found that all of the requirements for sanctioning the Scheme had been satisfied, including: (a) the Debtor and Scheme complied with the applicable statutory requirements; (b) the classification of Scheme Creditors fairly represented the creditors and the majority acted in a *bona fide* manner; (c) the Scheme was one that an intelligent and honest man, acting in respect of his interest as a creditor, might reasonably approve; and (d) the UK Court had jurisdiction to sanction the Scheme. Accordingly, the UK Court sanctioned the Scheme.

### F.    Connection to the United States

Though the Debtor has no place of business in the US, Avanti has two main connections with this country. First, Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), as counsel to the Foreign Representative and the Debtor, holds a $100,000 retainer in a non-interest bearing account at JPMorgan Chase in New York (the "Retainer Account"); the funds remain in the Retainer Account and are the Debtor's property. Second, the 2023 Indenture is governed by

New York law, which separately satisfies the "property in the United States" requirement for

eligibility to file a chapter 15 case under section 109(a) of the Bankruptcy Code.

## II.   LEGAL STANDARD

### A.   Requirements for Recognition of a Foreign Proceeding

Section 1517(a) of the Bankruptcy Code provides that the court shall, after notice and a

hearing, enter an order recognizing a foreign main proceeding if:

> (1) such foreign proceeding for which recognition is sought is a
> foreign main proceeding . . . within the meaning of section 1502;
> (2) the foreign representative applying for recognition is a person
> or body; and
> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).  "While not explicit in this section, the foreign proceeding and the foreign

representative must meet the definitional requirements set out in sections 101(23) and 101(24)."

8 COLLIER ON BANKRUPTCY ¶ 1517.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.

2014).  A foreign proceeding is a "collective judicial or administrative proceeding in a foreign

country, including an interim proceeding, under a law relating to insolvency or adjustment of

debt in which proceeding the assets and affairs of the debtor are subject to control or supervision

by a foreign court, for the purpose of reorganization or liquidation."  11 U.S.C. § 101(23); *see

also In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318,327 (Bankr. D. Del. 2010).  A foreign

representative is "a person or body, including a person or body appointed on an interim basis,

authorized in a foreign proceeding to administer the reorganization or the liquidation of the

debtor's assets or affairs or to act as a representative of such foreign proceeding."  11 U.S.C.

§ 101(24).

A foreign main proceeding "shall be recognized . . . if it is pending in the country where

the debtor has the center of its main interests."  *Id.* § 1517(b)(1).  The Bankruptcy Code

presumes that "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." *Id.* § 1516(c); *see also In re Bear Stearns*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007). Case law "establishes that the presumption in favor of place of registration can be rebutted by showing that the 'head office' functions were carried out in a jurisdiction other than where the registered office was located." 8 COLLIER ON BANKRUPTCY ¶ 1516.03; *see also Bear Stearns*, 374 B.R. at 130. To determine a debtor's center of main interests, courts look to a nonexclusive list of factors, including "the location of the debtor's headquarters; the location of those who actually manage the debtor . . . ; the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (quoting *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).

The Bankruptcy Code further provides that a recognition order shall be entered if the foreign representative applying for recognition is a person or body, and that the petition meets the requirements of section 1515. 11 U.S.C. § 1517(a)(2)–(3). Section 1515 requires presentation of (1) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; (2) a certificate from the foreign court affirming the existence of the proceeding and appointment of the representative; or (3) in the absence of (1) or (2), evidence which the court deems sufficient to confirm the existence of the foreign proceeding and appointment of the foreign representative. *Id.* § 1515(b). The petition must also be accompanied by a statement identifying all known foreign proceedings with respect to the

12

debtor, 11 U.S.C. § 1515(c), and if applicable, a translation of the evidentiary materials into English. *Id.* § 1515(d).

### B.    Privileges Provided By Chapter 15 of the Bankruptcy Code

Upon recognition as a foreign main proceeding, section 1520(a) of the Bankruptcy Code makes (1) sections 361 and 362 (automatic stay) applicable to property of the debtor within the jurisdiction of the US; (2) applies sections 363, 549 and 552 to any transfer of a debtor's interest in property within the US; (3) allows a foreign representative to operate a debtor's business by exercising the rights and powers of a trustee under sections 363 and 552; and (4) applies section 552 to property of the debtor within the US.  11 U.S.C. § 1520(a).

Section 1521(a) outlines the discretionary relief a court may order upon recognition.  *Id.* § 1521(a).  The discretion that is granted is "exceedingly broad," since a court may grant "any appropriate relief" that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors.  Hon. Leif M. Clark, ANCILLARY AND OTHER CROSS-BORDER INSOLVENCY CASES UNDER CHAPTER 15 OF THE BANKRUPTCY CODE, § 7[2], at 70 (2008). "Section 1521(a)(7) authorizes the court to grant to the foreign representative the sort of relief that might be available to a trustee appointed in a full bankruptcy case," including the turnover of property belonging to the debtor.  *Id.* at 73.  Section 1521(a)(7), however,  carves out avoidance powers under sections 547 and 548, which are only available to the trustee in a full case under another chapter.  8 COLLIER ON BANKRUPTCY ¶ 1521.02.

### C.    The Interplay of Section 109(a) and Chapter 15 of the Bankruptcy Code

Section 109(a) provides that "[n]otwistanding any other provision of this section, only a person that resides or has a domicile, a place of business or property in the United States, or a municipality, may be a debtor under this title."  11 U.S.C. § 109(a).  In a controversial ruling, the

Second Circuit applied the requirements of section 109(a) to eligibility to file a chapter 15 case.

*See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d

Cir. 2013).  Under section 109(a), as interpreted in *Barnet*, a foreign representative must show

that the debtor has either (i) a domicile, (ii) a place of business, or (iii) *property* in the United

States, to be eligible to file under 11 U.S.C. § 1517 (emphasis added).  *See Barnet* 737 F.2d at

247; *In re Octaviar Admin. Pty. Ltd.*, 511 B.R. 361, 369 (Bankr. S.D.N.Y. 2014).  Lower courts

in this Circuit and elsewhere have held that a professional's retainer in a U.S. bank account

satisfies the "property in the United States" requirement of section 109(a).  *See, e.g.*, *Octaviar*,

511 B.R. at 372–73 ("There is a line of authority that supports the fact that prepetition deposits

or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United

States.") (*citing In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also*

*In re Yukos Oil Co*., 321 B.R. 396, 401–03 (Bankr. S.D. Tex. 2005); *In re Global Ocean*

*Carriers Ltd*., 251 B.R. 31, 39 (Bankr. D. Del. 2000).

> **D.**     **Schemes of Arrangement Satisfy the Requirement for a Collective Judicial Proceeding in a Foreign Country Under a Law Relating to Adjustment of Debt**

A chapter 15 petition may be filed by a foreign representative "for recognition of a

foreign proceeding . . . ."  11 U.S.C. § 1515.  Section 101(23) of the Bankruptcy Code defines a

"foreign proceeding" to mean "a collective judicial or administrative proceeding in a foreign

country . . . under a law relating to insolvency or adjustment of debt in which proceeding the

assets and affairs of the debtor are subject to control or supervision by a foreign court, for the

purpose of reorganization or liquidation."  *Id*. § 101(23).  Schemes of arrangement under UK law

have routinely been recognized as foreign proceedings in chapter 15 cases.  *See, e.g.*, *In re*

*Metinvest B.V.*, No. 17-10130-LSS (Bankr. D. Del. Feb. 8, 2017); *In re DTK Finance (plc)*, No.

16-13521-shl (Bankr. S.D.N.Y. Jan. 18, 2017); *In re Metinvest B.V.*, No. 16-11424-LSS (Bankr. D. Del. Jun. 30, 2016); *In re Abengoa Concessions Investments Limited*, No. 16-12590-kjc (Bankr. D. Del. Dec. 6, 2016); *In re YH Limited*, No. 16-12262 (Bankr. S.D.N.Y. Sep. 8, 2016); *In re Metinvest B.V.*, No. 16-10105-LSS (Bankr. D. Del. Jan. 29, 2016); *In re OIC Run-Off Limited*, No. 15-13054-scc (Bankr. S.D.N.Y. Jan. 11, 2016); *In re Codere Finance (UK) Limited*, No. 15-13017-jig (Bankr. S.D.N.Y. Dec. 22, 2015); *In re Towergate Finance, plc*, Case No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015); *In re New World Resources N.V.*, Case No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014); *In re Zlomrex International Finance S.A.*, No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014); *In re Magyar Telecom B.V.*, No 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013); *In re Tokio Marine Europe Insurance Ltd.*, No. 11-13420 (MG) (Bankr. S.D.N.Y. Sept. 08, 2011); *In re Highlands Ins. Co.(U.K.)*, No. 07-13970 (MG) (Bankr. S.D.N.Y. Aug. 18, 2009); *In re Castle Holdco 4, Ltd.*, No. 09-11761 (REG) (Bankr. S.D.N.Y. May 7, 2009).

## III.   DISCUSSION

Section 1517(a) of the Bankruptcy Code provides that "an order recognizing a foreign proceeding shall be entered if . . . (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a). Each of the foregoing requirements is satisfied in this case, and, as explained below, the recognition and enforcement of the Scheme and Sanction Order furthers the goals of chapter 15.

### A.    Avanti Has Property in the United States

As a preliminary matter, a foreign representative must show that the debtor has either (i)
a domicile, (ii) a place of business, or (iii) *property* in the United States, as a condition to
eligibility under 11 U.S.C. § 1517 (emphasis added).  *See Barnet* 737 F.2d at 247; *Octaviar*, 511
B.R. at 369.  Here, the Debtor does not have a place of business or domicile in the United States,
but the Debtor's property within the territorial jurisdiction of the United States includes funds
held by Milbank as a retainer, and the 2023 Indenture governed by New York law.  Both of these
satisfy the "property in the United States" requirement for eligibility under section 109(a).  *See
In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 83-84 (Bankr. S.D.N.Y. 2015) (holding
that foreign debtor was eligible to be a debtor under section 109(a) of the Bankruptcy Code
because of (a) an interest in its US counsel's retainer account, and (b) intangible contract rights
under a New York law governed the debt indenture).

### B.    The English Proceeding is a Foreign Main Proceeding

The UK Proceeding fits the definition of a "foreign proceeding" in section 101(23) of the
Bankruptcy Code as a collective proceeding for the adjustment of debt supervised by a judicial
authority.  *See* 11 U.S.C. § 1502(3) (defining a "foreign court" as "a judicial or other authority
competent to control or supervise a foreign proceeding").  Section 1516(a) of the Bankruptcy
Code permits a court to presume that a foreign proceeding is a "foreign proceeding," if the
decision commencing the foreign proceeding so indicates.  *See* 11 U.S.C. §§ 1516(a),
1515(b)(1).  The UK Proceeding is pending in a foreign country under a law that allows
companies to effectuate binding compromises or arrangements, including the restructuring of
liabilities owed to their members or creditors (or any class of them) (*i.e.*, Part 26 of the
Companies Act) and is therefore an "adjustment of debt."  *See* Angel Declaration ¶ 10.

The UK Proceeding is a judicial proceeding—it required the Convening Order to convene the Debtor's Scheme Meeting and required the Sanction Order for the Scheme to be sanctioned, each issued by the UK Court.  *See id*. at ¶¶ 11–14.  Here, the Convening Order authorized the appointment of the Foreign Representative as "foreign representative in any proceedings under chapter 15 of the United States Bankruptcy Code . . .".  *See* Convening Order at ¶ 21. Furthermore, the Debtor is incorporated in the UK and its registered offices and headquarters are in London.  *See* Willcocks Declaration ¶ 7.  The Court may therefore presume that the UK constitutes the Debtor's "center of main interests."  11 U.S.C. § 1516(c).

Moreover, a significant proportion of the Debtor's existing assets are located in the UK. *See* Willcocks Declaration at ¶ 7.  Given the presumption of section 1516(c) of the Bankruptcy Code and the supporting factual information presented in the Petition, the UK constitutes the Debtor's "center of main interests" and the UK Proceeding constitutes a "foreign main proceeding" under the Bankruptcy Code.

### C.    The Petitioner is Qualified to be the Foreign Representative

The term "foreign representative" is defined under section 101(24) of the Bankruptcy Code as:

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

The Foreign Representative in this case is an individual who has been (1) duly appointed by the Debtor's board of directors as foreign representative of the UK Proceeding, and (2) authorized by the Convening Order to act as "foreign representative."  *See* Willcocks Declaration ¶ 3.  Accordingly, Patrick Willcocks is a "foreign representative" as defined in the Bankruptcy

Code.  *See* 11 U.S.C. § 1516(a) ("If the decision [commencing the foreign proceeding] . . . indicates . . . that the person or body is a foreign representative, the court is entitled to so presume."); *In re SphinX, Ltd.*, 351 B.R. 103, 116–17 (Bankr. S.D.N.Y. 2006), *aff'd*, *Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SphinX Ltd.)*, 371 B.R. 10 (S.D.N.Y. 2007) (holding that section 101(24) was satisfied where foreign representatives submitted a "copy of the Cayman Court's order appointing them to administer the [d]ebtors' winding up under [Cayman law] and authorizing their commencement of these chapter 15 cases . . .").

### D.    Enforcing the Scheme, Including the Releases, as Discretionary Relief Under Sections 1507 and 1521 is Proper

Upon recognition of a foreign proceeding, section 1521(a) of the Bankruptcy Code authorizes the Court to grant "any appropriate relief" to a foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors," provided that the interests of creditors and other interested entities are sufficiently protected.  11 U.S.C. §§ 1521(a), 1522(a).  Such relief may include, but is not limited to: "(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a); (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a); (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a); . . . and (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."  *Id.* § 1521(a).

In addition to section 1521's provisions regarding "any appropriate relief," section 1507(b) provides that a court "[i]n determining whether to provide additional assistance . . . shall

18

consider whether such additional assistance, consistent with the principles of comity, will

reasonably assure—

> (1) just treatment of all holders of claims against or interests in the debtor's property;
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns."

11 U.S.C. § 1507(b) (emphasis added).  These provisions embody the protections previously

contained in section 304 of the Bankruptcy Court with one critical exception: the principle of

comity was removed as one of the factors and elevated to the introductory paragraph.  The

legislative history confirms that the principle of comity was placed in the introductory language

to section 1507 to emphasize its importance.  *See United States v. J.A. Jones Constr. Group,*

*LLC,* 333 B.R. 637, 638 (E.D.N.Y. 2005) (citing legislative history); *see also* Allan L. Gropper,

*Current Devs. in Int'l Insolvency Law: A United States Perspective,* 15 J. BANKR. L. & PRAC. 2,

Art. 3, at 3–4 (Apr. 2006) (hereinafter "Gropper") (noting that in light of the elevation of comity

to the introductory paragraph of section 1507, and the legislative history of chapter 15, courts

will likely consider precedent under section 304 in fashioning appropriate relief).

The interplay between the relief available under sections 1507 and 1521 is far from clear.

*See In re Atlas Shipping A/*S, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009).  As the court explained

in *In re Rede Energia S.A.*, 515 B.R. 69 (Bankr. S.D.N.Y. 2014):

> Section 1507(b)(1) requires that additional relief only be granted if the just treatment of creditors is ensured.  11 U.S.C. § 1507(b)(1).  The just treatment factor is generally satisfied upon a showing that the applicable law provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors.  The court in *Board of Directors of Telecom Argentina* explained that instances in

19

> which a court has held that a foreign proceeding does not satisfy this
> factor include where the proceeding fails to provide creditors access to
> information and an opportunity to be heard in a meaningful manner, which
> are [f]undamental requisites of due process, or where the proceeding
> would     not     recognize     a     creditor     as     a     claimholder.

*Id.* at 95 (internal quotation marks and citations omitted).

Cases have held that in the exercise of comity that appropriate relief under section 1521 or additional assistance under section 1507 may include recognizing and enforcing a foreign plan confirmation order.  *See In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017); *In re Rede Energia S.A.*, 515 B.R. at 89.

In deciding whether to grant appropriate relief or additional assistance under chapter 15, courts are guided by principles of comity and cooperation with foreign courts.  *See, e.g.*, *In re Atlas Shipping*, 404 B.R. at 738; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R 325, 333 (S.D.N.Y. 2008).  The Supreme Court has held that a foreign judgment should not be challenged in the US if the foreign forum provides: "[A] full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it [is] sitting . . . ."  *Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895); *see also Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy."); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 60, 66-68

(Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (concluding that comity should be accorded to foreign court orders as long as "it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated" (quoting *In re Gee*, 53 B.R. 891, 901 (Bankr. S.D.N.Y. 1985))).

The issue of granting third-party releases in chapter 11 cases is controversial. Third-party releases are permissible if creditors "consent," but what constitutes consent is the subject of conflicting decisions. For example, Judge Bernstein in *In re SunEdison, Inc.* held that a warning in a disclosure statement indicating that the failure to object is "deemed consent" to third-party releases was insufficient to turn a creditor into a consenting creditor. 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017); *see also In re Washington Mut. Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that "inaction" was not sufficient to manifest consent to support releases). Judge Bernstein's rationale was that there was no identifiable "duty to speak" on behalf of the creditors. *Id.* at 460. On that view, creditors who do not affirmatively vote to grant releases are not bound by the releases. Other cases have found consent when a disclosure statement or voting ballot warned that a failure to vote against the plan would be deemed consent to the releases. *See e.g.*, *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217-29 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 1016 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010); *aff'd in part, rev'd in part*, 627 F.3d 496 (2d. Cir. 2010); *In re Calpine Corp.*, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007). It is unnecessary for the Court to weigh-in on that issue here.

In the chapter 15 context, judges in this Court have often enforced third-party releases in foreign proceedings under section 1507 of the Bankruptcy Code. *See, e.g.*, *In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing scheme of arrangement that released affiliate guarantees); *In re Towergate Fin. plc*, Case No. 15-10509-

SMB (Bankr. S.D.N.Y. Mar. 27, 2015) [ECF Doc. # 16]; *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014) [ECF Doc. # 20]; *In re Sino-Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order containing third-party releases); *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL (Bankr. S.D.N.Y. Dec. 11, 2013) [ECF Doc. # 26]; *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (concluding that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian Orders, even if those provisions could not be entered in a plenary chapter 11 case.").

However, the Fifth Circuit in *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1042 (5th Cir. 2012), affirmed a bankruptcy court's decision in a chapter 15 case declining to grant comity and to enforce a Mexican court order approving a Mexican reorganization plan that released guarantees of US-based non-debtor affiliates of the Mexican debtor's debt. S*ee also Sino-Forest*, 501 B.R. at 665–66.  The court decided that the bankruptcy court did not abuse its discretion in refusing to enforce the order confirming the plan and releasing the guarantees.  *See Vitro*, 701 F.3d at 1060.

*Vitro* had a number of very troubling facts that the Fifth Circuit concluded supported the bankruptcy court's exercise of discretion in refusing to enforce the plan approved by the Mexican court.  Most significantly, the plan created only a single class of unsecured creditors and the necessary creditor votes to approve the plan were only achieved by counting the votes of insiders.  *Id*. at 1039.  Insider votes are not counted under the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(10) ("If a class is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, *determined without including any acceptance of the plan by*

*any insider.*") (emphasis added); *see also CIBC Bank & Trust Co. (Cayman) Ltd.*, 866 F. Supp.

1105, 1114 (S.D.N.Y. 1995) (concluding that "the Code prevents 'insiders' from voting on

whether a reorganization plan will be accepted by a class of impaired creditors").

Of the approximately 75% of principal amount of unsecured debt that voted in favor of

the plan in *Vitro*, over 50% of all voting claims were held by intercompany debt holders.  *Id*.

Similarly, under Mexican law only 50% in amount had to vote to approve the plan.  Absent the

subsidiaries' votes of intercompany debt in favor of the plan, that plan could not have been

approved.  *Id*.

The Fifth Circuit distinguished *Vitro* from other cases allowing third-party releases,

including *Metcalfe*.  Many of the same distinguishing facts are present here—the Avanti Scheme

has near unanimous support (all creditors that voted cast votes in favor of the Scheme), and that

support does not rely on votes by insiders.

As explained in the Angel Declaration, third-party non-debtor releases are common in

schemes sanctioned under UK law, particularly for releases of affiliate guarantees of the debt

that is being adjusted by the scheme.  *See In re T & N Ltd and others (No 4) [2006] EWHC 1447

(Ch)* (David Richards J.) (holding that a scheme did not necessarily prohibit the alteration of

third-party rights, in this case, creditors' rights to pursue asbestos claims against insurers); *Re

Lehman Brothers International (Europe) (In administration) (No 2) [2009] EWCA Civ 1161*

(following *T&N*, Patten LJ held (at paragraph 63) that it was "entirely logical to regard the

court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims

against the company on terms which require them to bring into account and release rights of

action against third-parties designed to recover the same loss.  The release of such third-party

claims is merely ancillary to the arrangement between the company and its own creditors."); *In*

23

*Re La Seda de Barcelona SA [2010] EWHC 1364 (Ch)* (Proudman J applied *T&N* and *Lehman*, and concluded that a third-party subsidiary guarantor could be released pursuant to a deed of release executed on behalf of scheme creditors).

Further examples of recent schemes sanctioned by UK courts that included third-party releases include: *Re Magyar Telecom BV [2013] EWHC 3800 (Ch)* (scheme company executed a deed of covenant for each note creditor whereby scheme claims (including guarantee claims of group guarantor companies) were irrevocably released); *In the Matter of New World Resources N.V [2014] EWHC 3143 (Ch)* (scheme provided for broad release of claims arising out of finance documents, among other things, against subsidiary guarantors); *Codere Finance (UK) Limited [2015] EWHC 3778 (Ch)* (scheme creditors irrevocably waived and released scheme claims (including claims against group company guarantors) and undertook to treat the scheme claims as waived and released subject to carve-outs).

The Court concludes that schemes of arrangements sanctioned under UK law that provide third-party non-debtor guarantor releases should be recognized and enforced under chapter 15 of the Bankruptcy Code. Avanti's Scheme Creditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme. *See* Angel Declaration, ¶¶ 12, 17–18. The proceedings under UK law in the UK courts afford creditors a full and fair opportunity to be heard in a manner consistent with US due process standards. *See, e.g.*, *Society of Lloyd's v. Reinhart*, 402 F.3d 982, 987–88 (10th Cir. 2005).

Under UK law, for a scheme to become legally binding on the company and all creditors in the relevant class, a majority in number representing not less than 75% in value of each class of creditors must vote in favor of the scheme. *Id* ¶ 14. Unlike chapter 11 of the Bankruptcy Code, UK law authorizing schemes of arrangement does not provide a mechanism for

"cramming down" dissenting classes of creditors. *Id.* ¶ 17.  In this case, the Scheme only adjusted the claims of a single class of creditors, namely, the holder of the 2023 Notes, and they voted overwhelmingly to approve the Scheme.  Under UK law, the entire accepting class is bound by the terms of the Scheme, including the Guarantor Releases.

The failure of a US bankruptcy court to enforce the Guarantor Releases could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization efforts and prevent the fair and efficient administration of the Restructuring.  Principles of comity permit a US bankruptcy court to recognize and enforce the Scheme.  *See In re Sino-Forest Corp.*, 501 B.R. at 665 (enforcing foreign order containing third-party releases, noting that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy"); *Metcalfe*, 421 B.R. at 700 ("Principles of comity in chapter 15 cases support enforcement of the Canadian Orders in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.")

## IV.    CONCLUSION

Recognizing the UK Proceeding (including the Scheme and Sanction Order) and enforcing the Releases of claims against the Debtor and its non-debtor subsidiaries will assist the orderly administration of the scheme of arrangement by the UK Court and help the implementation of the Scheme for the Debtor.  For the reasons explained above, the Court grants the request for recognition and enforcement of the Scheme and Sanction Order.

A separate order granting the requested relief has already been entered.

Dated:    April 9, 2018
          New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge